
Case 1:19-cv-03363-RDM    Document 20-6    Filed 01/15/21    Page 1 of 674

1-23-84
Vol. 49    No. 15
Pages 2741-2878

Monday
January 23, 1984







## Selected Subjects

**Animal Diseases**
Animal and Plant Health Inspection Service

**Aviation Safety**
Federal Aviation Administration

**Banks, Banking**
Federal Deposit Insurance Corporation
Federal Home Loan Bank Board

**Chemicals**
Environmental Protection Agency

**Commodity Exchanges**
Commodity Futures Trading Commission

**Employee Benefit Plans**
Internal Revenue Service

**Endangered and Threatened Species**
Fish and Wildlife Service

**Government Property Management**
General Services Administration

**Grant Programs—Energy**
Conservation and Renewable Energy Office

**Indians—Education**
Education Department

**Oil Imports**
Economic Regulatory Administration

**Television Broadcasting**
Federal Communications Commission

**CONTINUED INSIDE**

**DATE AND TIME:** February 13, 1984, 8:30 a.m. to 5 p.m.; and February 14, 1984, 8:30 a.m. to 12 noon.

**ADDRESS:** National Aeronautics and Space Administration, FB 10–B, February 13, Room 625–T, and February 14, Room 226–A, 600 Independence Ave. SW, Washington, D.C.

**FOR FURTHER INFORMATION CONTACT:** Henry V. Bielstein, M.D., Code EB, National Aeronautics and Space Administration, Washington, DC 20546 (202/453–1546).

**SUPPLEMENTARY INFORMATION:** The Life Sciences Advisory Committee consults with and advises the Council and NASA on the accomplishments and plans of NASA's Life Sciences Programs.

This meeting will be closed to the public from 4 p.m. to 5 p.m. on February 13 for a discussion of candidates being considered for Committee membership. During this session, the qualifications of proposed new members will be candidly discussed and appraised. Since this session will be concerned throughout with matters listed in 5 U.S.C. 552(c)(6), it has been determined that this session should be closed to the public. The remainder of the meeting will be open to the public up to the seating capacity of the room (approximately 35 persons including committee members and other participants).

**Type of Meeting**

Open—except for a closed session as noted in the agenda below.

*February 13, 1984*

8:30 a.m.—Committee Functions (Open session).

9 a.m.—SL–1 Preliminary Results (Open session).

10:30 a.m.—Review Life Sciences' Program Plan (Open session).

1 p.m.—Review of Space Station Plan (Open session).

4:00 p.m.—LSAC Membership (Closed session).

*February 14, 1984*

8:30 a.m.—Status of space Biomedical Institute (Open session).

9:30 a.m.—Advocacy Paper (Open session).

12 noon—Adjourn.

Dated: January 17, 1984.

**Richard L. Daniels,**

*Director, Management Support Office, Office of Management.*

[FR Doc. 84–1748 Filed 1–20–04; 8:45 am]

**BILLING CODE 7510–01–M**

## PACIFIC NORTHWEST ELECTRIC POWER AND CONSERVATION PLANNING COUNCIL

### Hydropower Options Task Force; Regular Meeting Notice

**AGENCY:** Hydropower Options Task Force of the Pacific Northwest Electric Power and Conservation Planning Council (Northwest Power Planning Council).

**ACTION:** Notice of meeting.

Notice of meeting to be held pursuant to the Federal Advisory Committee Act, 5 U.S.C. Appendix I, 1–4. Activities will include:

• Review of Hydropower Options Task Force Charter
• Discussion of Bonneville proposal
• Discussion of Work Schedule
• Business
• Public Comment.

**STATUS:** Open.

**SUMMARY:** The Northwest Power Planning Council hereby announces a forthcoming meeting of its Hydropower Options Task Force.

**DATE:** Tuesday, January 31, 1984. 9 a.m.

**ADDRESS:** The meeting will be held at the Council Hearing Room at 700 SW. Taylor; Suite 200, in Portland, Oregon.

**FOR FURTHER INFORMATION CONTACT:** Tom Foley, (503) 222–5161.

**Edward Sheets,**

*Executive Director.*

[FR Doc. 84–1787 Filed 1–20–84; 8:45 am]

**BILLING CODE 0000–00–M**

## DEPARTMENT OF STATE

### Office of the Secretary

[Secretarial Determination 84–3]

### Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran

In accordance with Section 6(i) of the Export Administration Act of 1979, 50 U.S.C. App. 2405(i), I hereby determine that Iran is a country which has repeatedly provided support for acts of international terrorism.

**George P. Shultz,**

*Secretary of State.*

[FR Doc. 84–1825 Filed 1–20–84; 8:45 am]

**BILLING CODE 4710–08–M**

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

### National Airspace Review; Meeting

**AGENCY:** Federal Aviation Administration, DOT.

**ACTION:** National Airspace Review Plan Revision.

**SUMMARY:** On April 22, 1982, the National Airspace Review plan was published in the **Federal Register.** The plan encompassed a review of airspace use and the procedural aspects of the air traffic control system. Subsequent revisions to the schedule of various task groups have been made. This notice advises that Task Group 2–4.4, Helicopter Operations, Approach Procedures, which was scheduled to begin February 20, 1984, has been postponed until after April 30, 1984, in order to ensure availability of pertinent flight test data results to the task group. A specific date for this task group session will be provided in a subsequent notice in conjunction with other plan revisions.

**FOR FURTHER INFORMATION CONTACT:** National Airspace Review Program Management Staff, room 1005, Federal Aviation Administration, 800 Independence Avenue. SW., Washington, D.C. 20591, 202–426–3560.

Issued in Washington, D.C., on January 11, 1984.

**Karl D. Trautmann,**

*Manager, Special Projects Staff Air Traffic Service.*

[FR Doc. 84–1750 Filed 1–20–84; 8:45 am]

**BILLING CODE 4910–13–M**

### Radio Technical Commission For Aeronautics (RTCA), Special Committee 151—Airborne Microwave Landing System Area Navigation Equipment; Meeting

Pursuant to section 10(a)(2) of the Federal Advisory Committee Act (Pub. L. 92–463; 5 U.S.C. App. I) notice is hereby given of a meeting of RTCA Special Committee 151 on Airborne Microwave Landing System (MLS) Area Navigation Equipment to be held on February 8–10, 1984, in the RTCA Conference Room, One McPherson Square, 1425 K Street NW., Suite 500, Washington, D.C. commencing at 9:30 a.m.

The Agenda for this meeting is as follows: (1) Chairman's Introductory Remarks; (2) Approval of Minutes of the

United Nations



**Security Council**

## S/2013/331*

Distr.: General
5 June 2013

Original: English

---

### Note by the President of the Security Council

In paragraph 2 of resolution 2049 (2012), the Security Council requested the Panel of Experts established pursuant to resolution 1929 (2010) to provide a final report to the Council with its findings and recommendations.

Accordingly, the President hereby circulates the report dated 3 June 2013 received from the Panel of Experts (see annex).

---

\* Reissued for technical reasons on 25 June 2013.

13-35543* (E)   260613







**Annex**

### Letter dated 3 June 2013 from the Panel of Experts established pursuant to resolution 1929 (2010) addressed to the President of the Security Council

On behalf of the Panel of Experts established pursuant to Security Council resolution 1929 (2010), I have the honour to transmit herewith, in accordance with paragraph 2 of resolution 2049 (2012), the final report on its work.

(*Signed*) Salomé **Zourabichvili**
Coordinator
Panel of Experts established pursuant to resolution 1929 (2010)

(*Signed*) Jonathan **Brewer**
Expert

(*Signed*) Kenichiro **Matsubayashi**
Expert

(*Signed*) Thomas **Mazet**
Expert

(*Signed*) Jacqueline **Shire**
Expert

(*Signed*) Elena **Vodopolova**
Expert

(*Signed*) Olasehinde Ishola **Williams**
Expert

(*Signed*) Wenlei **Xu**
Expert

## Final report of the Panel of Experts established pursuant to resolution 1929 (2010)

# Contents

|  |  | Page |
|---|---|---|
| Summary | | 5 |
| Recommendations | | 7 |
| I. | Introduction | 8 |
| | A. Methodology | 8 |
| | B. Acknowledgements | 8 |
| II. | The Panel's activities | 8 |
| | A. Consultations | 9 |
| | B. Outreach and related activities | 9 |
| | C. Assessment of implementation reports | 10 |
| | D. Reports submitted by the Panel | 10 |
| III. | Inspections of reported alleged violations | 11 |
| IV. | Analysis of compliance by the Islamic Republic of Iran with its Security Council obligations | 16 |
| | A. Nuclear programme | 16 |
| | B. Ballistic missiles | 20 |
| | C. Conventional arms and related materiel | 24 |
| | D. Procurement methods | 25 |
| | E. Prohibited activities by Iranian entities | 27 |
| V. | Analysis of implementation of sanctions by Member States | 29 |
| | A. Challenges to implementation faced by Member States | 29 |
| | B. Reporting of interdictions and incidents by Member States | 34 |
| | C. Disposal of seized items | 34 |

Annexes

| I. | Member States visited by the Panel | 35 |
|---|---|---|
| II. | Reporting by Member State by resolution | 37 |
| III. | Developments in the uranium enrichment programme of the Islamic Republic of Iran | 43 |
| IV. | Changes in name, ownership and flagging of vessels owned by the Irano Hind Shipping Company | 44 |
| V. | Movements of crude oil tankers owned by the Irano Hind Shipping Company | 45 |

S/2013/331

| | | |
|---|---|---|
| VI. | Difficulties encountered by *Amin 2* and *Tour 2* following de-flagging..................... | 46 |
| VII. | Changes in the ownership structures of vessels owned by the Islamic Republic of Iran Shipping Lines.................................................... | 49 |
| VIII. | Indicators of suspicious inquiries...................................................... | 52 |
| IX. | Incidents of non-compliance reported to the Committee since June 2012 ................. | 53 |
| X. | Panel reports to the Committee since June 2012...................................... | 54 |

13-35543

*Summary*

Concerns about the peaceful nature of the nuclear programme of the Islamic Republic of Iran remain unresolved. The international community is continuing to follow a dual-track approach to addressing the issue through both targeted Security Council sanctions and negotiations.

Negotiations between the Islamic Republic of Iran and the E3+3,* led by Catherine Ashton, High Representative of the European Union for Foreign Affairs and Security Policy, have continued. A meeting is planned between Lady Ashton and representatives of the Islamic Republic of Iran for 15 May 2013.**

The Islamic Republic of Iran has heightened concerns by announcing plans for further developments in its nuclear programme. It has begun installation of a more advanced centrifuge, the IR-2m, at the Natanz Fuel Enrichment Plant. The International Atomic Energy Agency (IAEA) reports no progress in the clarification of outstanding safeguards issues or issues relating to the possible military dimensions of the Iranian nuclear programme. At the same time, the Islamic Republic of Iran has converted a portion of its 20 per cent enriched uranium to reactor fuel. This may be, in part, an effort to allay international concerns about a growing stockpile of uranium that could be quickly converted to non-peaceful purposes but it is also a demonstration of technical progress.

The Islamic Republic of Iran has launched ballistic missiles, in violation of its Security Council obligations, however no significant technological developments have been reported. There are reports of at least two failed satellite launches over the last year.

During the Panel's current mandate, the Security Council Committee established pursuant to resolution 1737 (2006) received one report of transfers of conventional arms by the Islamic Republic of Iran. This is not an indication that such transfers are not taking place. The Panel takes note of other information from States regarding conventional arms transfers from the Islamic Republic of Iran to other countries.

The economic and currency crisis faced by the Islamic Republic of Iran is widely recognized, including by the Iranian authorities. It is difficult to distinguish the impact of United Nations targeted sanctions aimed at prohibited activities and designated individuals and entities from that of stronger and more comprehensive sanctions imposed by States on a unilateral basis.

The Islamic Republic of Iran continues to seek items for its prohibited activities from abroad using multiple and increasingly complex procurement methods, including front companies, intermediaries, false documentation and new routes. These methods require States to exercise additional vigilance and expertise in order to identify suspicious transactions.

The issue of below-control-threshold procurement poses challenges to States seeking to maintain legitimate trade with the Islamic Republic of Iran while not contributing to its prohibited activities.

S/2013/331

Iranian reliance on procurement abroad provides the international community with an opportunity to limit its ability to maintain and expand prohibited activities. Cooperation between countries and outreach from the Committee and the Panel remain high priorities in efforts to promote implementation of the resolutions and prevent circumventing of the sanctions.

_____

* The E3+3 countries include France, Germany, the United Kingdom of Great Britain and Northern Ireland, China, the Russian Federation and the United States of America.

** The present report was first submitted to the Security Council Committee on 8 May 2013.

## Recommendations

1.    The Panel recommends that the Security Council and the Committee established pursuant to resolution 1737 (2006), in accordance with existing practice, designate of the following entity, Pentane Chemistry Industries, to be in violation of paragraph 12 of resolution 1929 (2010) for the procurement of valves for use in the Arak heavy water reactor. This recommended designation is supported by documentary and factual evidence.

2.    The Panel recommends that the Committee encourage States to be alert to the attempted procurement of items for prohibited purposes, including items that fall below control thresholds, and to issues relating to end use and end users. This could take the form of an Implementation Assistance Notice.

3.    The Panel recommends that the Committee consider making available on its website an information sheet identifying the vessels currently under the control of the designated Irano Hind Shipping Company, along with their International Maritime Organization (IMO) numbers, and reminding States of the need for additional vigilance over their operations. In addition, the Panel recommends that the Committee consider issuing guidance about measures States should take regarding vessels currently owned or controlled by the Irano Hind Shipping Company when they are transferred to companies that are not affiliated with the Irano Hind Shipping Company following the company's liquidation, and request that States report any relevant developments.

4.    Noting ambiguities reported by States in the language of the resolutions concerning the phrases "entities acting on their behalf or at their direction", and "entities owned or controlled by them", the Panel recommends that the Committee consider providing guidance to States on how to implement such language.

5.    The Panel recommends that the Committee provide States with guidance, possibly in the form of an Implementation Assistance Notice, regarding the issues of timing and content of reports by States to the Committee, of inspection by the Panel and the disposal of items seized or interdicted on the basis of a suspected violation of resolution 1929 (2010) and prior resolutions.

6.    The Panel recalls its recommendation that the Committee address discrepancies between the individuals designated and those who now hold the positions identified by such designations.

## I.   Introduction

1.   The present report has been prepared in accordance with the Expert Panel's mandate as set forth in paragraph 29 of Security Council resolution 1929 (2010) and renewed by its resolution 2049 (2012) of 7 June 2012. It summarizes the Panel's work over the last year, including inspections of reported sanctions violations, consultations with Member States, outreach to States and the private sector, and discussions with outside experts. These activities are described in further detail in paragraphs 6 to 17 below.

2.   The Panel, which consists of eight members, was reappointed by the Secretary-General on 5 July 2012 (S/2012/521). The Panel's composition is as follows: Salomé Zourabichvili (France), Coordinator; Jonathan Brewer (United Kingdom of Great Britain and Northern Ireland); Kenichiro Matsubayashi (Japan); Thomas Mazet (Germany); Jacqueline Shire (United States of America); Elena Vodopolova (Russian Federation); Olasehinde Ishola Williams (Nigeria); and Wenlei Xu (China).

### A.   Methodology

3.   The Panel carries out its work on the basis of the mandate set forth in paragraph 29 of resolution 1929 (2010), mindful of the methodological standards contained in the report of the Informal Working Group of the Security Council on General Issues of Sanctions of 22 December 2006 (S/2006/997) and further described in *Best Practices and Recommendations for Improving the Effectiveness of United Nations Sanctions*. The Panel operates under the direction of the Security Council Committee established pursuant to resolution 1737 (2006).

4.   The Panel, as an independent expert body, has endeavoured to ensure that its findings are substantiated, that information contained in its reports derives from credible sources and is as verifiable as possible, and, in the case of reported violations of sanctions, includes, wherever possible, first-hand, on-site observations by the experts themselves. The Panel has also been mindful of the importance of maintaining the confidentiality of sources of information, when requested. The Panel's decisions are reached by consensus; where there are differences, the majority carries and dissenting views are reflected.

### B.   Acknowledgments

5.   The Panel wishes to acknowledge the high degree of cooperation received from many States during the course of its work. It also acknowledges valuable and proactive engagement from many private sector entities. The Panel wishes to thank and acknowledge the support it has received from the United Nations Secretariat.

## II.   The Panel's activities

6.   The Panel's activities have been carried out in conformity with its programme of work for the period from 9 June 2012 to 8 June 2013, as required by the Security Council in paragraph 2 of its resolution 2049 (2012). During its current mandate, the

Panel has held consultations with 29 Member States.[1] The Panel conducted investigations on reported alleged sanctions violations and submitted six reports to the Committee. The Panel submitted its midterm report to the Committee on 9 November 2012. At the request of the Committee, the Panel also reported a compilation of publicly available statements regarding arms transfers to Gaza.

## A.   Consultations

7.    The Panel's visits reflect the priority it gives to consultations with members of the Security Council, States involved in the diplomatic process with the Islamic Republic of Iran, bordering or regional States and relevant international organizations. The consultations also take into account Iranian interests and activities in various regions of the world.

8.    The Panel notes the heightened awareness among Member States regarding sanctions implementation, as reflected in the number of reported alleged violations. Although some States remain without sufficient capacity to fully implement United Nations sanctions, the Panel is encouraged by the high level of commitment among most of its interlocutors to the effective implementation of the sanctions contained in the relevant Security Council resolutions.

9.    The Panel has held consultations, as appropriate, with United Nations experts belonging to the Office of Disarmament Affairs, the International Atomic Energy Agency (IAEA) and experts working under the mandates contained in other Security Council resolutions.

## B.   Outreach and related activities

10.   From the beginning of its mandate, the Panel identified outreach as one of its priorities. Consistent with the Committee's direction and its encouragement of such activities, the Panel has been proactive in making contact with States and organizations in the private sector relevant to sanctions implementation, as well as individual experts and non-governmental organizations.

11.   The Panel has worked with think tanks to organize regional seminars bringing together practitioners and experts to discuss the implementation of the relevant Security Council resolutions and challenges they pose. Three such seminars have been held during the Panel's current mandate:

(a)    Buenos Aires on 19 and 20 November 2012, organized in collaboration with the International Institute for Strategic Studies (IISS), London, and the Non-Proliferation for Global Security Foundation, Buenos Aires;

(b)    Auckland, New Zealand, on 16 January 2013, organized in collaboration with IISS;

(c)    Lomé on 14 and 15 May 2013, organized by the Togolese Government and the Institute for Security Studies, Pretoria, with the support of the United Nations Regional Centre for Peace and Disarmament in Africa, Lomé.

---

[1] See annex I for the full list of countries visited by the Panel during its current and previous mandates.

12.   The Panel was also invited to participate in conferences and seminars, including the Asian Export Control Seminar in Tokyo; the Financial Action Task Force (FATF) plenary, some FATF working groups and one FATF regional body; and the Workshop on Non-Proliferation and Export Compliance in Carbon Fibre and Metal Alloy Industries, held in Dalian, China.[2]

13.   The Panel also met, held teleconferences or corresponded with experts affiliated with think tanks and universities and with representatives of many private companies (manufacturers, freight forwarders, shippers, banks and others).

## C.   Assessment of implementation reports

14.   During the reporting period only three implementation reports were received under resolution 1929 (2010), bringing the total number of such reports to 84 (see annex II). Over half of the Member States have yet to report. Of those that have reported, many provided minimal details. The Panel concluded that the reports would be more informative if Member States were to provide, on a voluntary basis, detailed information regarding the implementation of sanctions in practice.

15.   In July 2012, the Committee, with the assistance of the Panel, held the first open briefing for States Members of the United Nations, in New York. This exercise enabled Member States to hear from the Committee and the Panel, ask questions and gain a better understanding of issues related to sanctions implementation and the work of the Committee.

## D.   Reports submitted by the Panel

16.   The Panel has conducted investigations or inspections on the basis of six reports submitted by States:[3] one of the reports involved transfers of conventional arms; four were related to procurement of various items alleged to be for prohibited activities; and one concerned launches of ballistic missiles. Summaries of the Panel's inspection reports are contained in paragraphs 18 to 55 below. The Panel also reported, as requested by the Committee, a compilation of public statements regarding alleged transfers of arms to Gaza.

17.   The Panel wishes to emphasize the positive example set by those Member States which reported incidents of non-compliance. It would also like to highlight the high level of cooperation it has received from Member States and entities approached during its inspections and investigations.

---

[2] Organized by King's College, London, and the China Arms Control and Disarmament Association.

[3] Inspection teams generally consist of up to four Panel experts. The present report will refer to "the Panel" and not "members of the Panel" as all inspections and the subsequent reports engage the Panel as a whole.

## III.  Inspections of reported alleged violations[4]

### Procurement of valves (Germany)

18.   This case involves the acquisition of 1,767 valves on behalf of Modern Industries Technique Company, beginning in 2007 and continuing into 2011, for the IR-40 heavy water research reactor under construction at Arak. Out of the original total, 1,163 valves reportedly reached the company, which is designated under resolution 1929 (2010) as "responsible for design and construction of the IR-40 heavy water reactor in Arak".

19.   The Panel obtained several documents, including one from the company itself, addressed to Pentane Chemistry Industries, which contained detailed technical specifications for the valves. The order fell into three categories of valves that were initially all intended to be procured in Germany. Because of scrutiny from export control authorities and heightened vigilance over such transfers to the Islamic Republic of Iran, some of the valves were commissioned by the same Iranian agent overseeing procurement in Germany to be procured and manufactured in a third country.

20.   One group of 856 valves had a number of features consistent with use in the context of a heavy water reactor, including the material specified for valve body construction, welded, bellows sealed valves, valve stem packing material, valve actuators specified according to the Institute of Electrical and Electronic Engineers (IEEE) Standard 382 2006 for nuclear power generating stations and actuators with an Ingress Protection (IP) rating of 67.

21.   This procurement involved the use of front companies in other third countries and false end-user documentation. It also highlights the involvement of Pentane Chemistry Industries in procurement on behalf of Iranian heavy water-related activities. A previous case investigated by the Panel and reported to the Committee involving an attempted procurement of phosphor bronze wire mesh also involved this same entity.

22.   The Panel concluded that Iranian procurement of these valves is an activity prohibited under resolution 1929 (2010) and that, as such, it constituted a violation of the country's Security Council obligations.

### Interdiction of valves (Sweden)

23.   This case involves the attempted acquisition of 18 valves by the Islamic Republic of Iran using a procurement agent based in Sweden, a naturalized Swedish citizen of Iranian origin who had established a company in Sweden in order to procure items on behalf of Iranian entities. The individual had an irregular employment history and no specialized training in the engineering equipment he was seeking to procure. The company, Petroinstrument HB, initially came to the attention of Swedish authorities on the basis of suspicious transactions reports submitted by two Swedish banks in late 2010 and early 2011.

---

[4] The full text of the inspection and investigation reports submitted since June 2012 is included in a confidential annex available only to members of the Security Council.

24.   The attempted shipment involved changing the name and address on the air waybill of the consignee in a third country to one in the Islamic Republic of Iran after the details had been submitted to customs for clearance procedures.

25.   A search of the procurement agent's home following the valve seizure turned up documents from previous transactions that shed light on his activities, including several types of blank end-user certificates.

26.   None of the valves in this case are on the lists contained in IAEA document INFCIRC/254/Rev.7/Part 2.[5] The Panel determined that, based on their technical specifications, four bellows sealed valves could be used in activities prohibited under resolution 1929 (2010) and that the non-bellows sealed valves could have applications in auxiliary systems of prohibited nuclear activities.

27.   In the absence of information regarding the end user in the Islamic Republic of Iran, the Panel could not establish whether the attempted exports constitute a violation under the relevant resolutions. However, the Panel noted that in the attempted export efforts, multiple techniques were used to evade effective export controls, including obscuring the end use or end user of the valves by means of false end-user certificates and attempting the acquisition of technology that falls below established control thresholds.

## Interdictions of carbon fibre, aircraft spare parts and water measuring equipment (Bahrain)

### Carbon fibre

28.   This case involves the shipment of 28 boxes of carbon fibre from a third country to the Islamic Republic of Iran, which was interdicted in Bahrain. The consignee of the shipment was identified as Science and Technology Park in the Islamic Republic of Iran.

29.   According to Bahraini authorities, the carbon fibre met the control thresholds established by IAEA in document INFCIRC/254/Rev.7/Part 2, which would constitute a violation of relevant resolutions. High-quality carbon fibre, in particular, is widely assessed to be a target for procurement by the Islamic Republic of Iran. The Panel was unable to establish the technical specifications of the carbon fibre or to confirm information regarding its grade.

30.   The Panel's investigation identified a link between the stated consignee and an entity in the Islamic Republic of Iran associated by two States with procurement for the country's prohibited nuclear activities. The Panel has no further information regarding the alleged end user's relationship to activities prohibited under relevant resolutions.

### Aircraft spare parts

31.   In November 2010, a shipment of aircraft spare parts was shipped by air from one country to Bahrain through a third country. The seized consignment consisted of

---

[5]  On 4 March 2013, the Committee updated the list of items referred to in para. 13 as follows: the lists of items in INFCIRC/254/Rev.9/Part 1 and INFCIRC/254/Rev.7/Part 2 were superseded by the lists of items in INFCIRC/254/Rev.11/Part 1 and INFCIRC/254/Rev.8/Part 2.

some 40 items, including seals, valves and related parts for Fokker 27 small passenger planes. According to the consignor, the shipment as a whole was of use only in Fokker 27 aircraft.

32.   According to the invoice provided by the Bahraini authorities, the consignee was identified as a Bahraini trading company for transit to ANA Trading in the Islamic Republic of Iran, which the Panel associated with procurement on behalf of the Iranian military. However, the invoice provided to the Panel by the consignor in a third country made no reference to the Islamic Republic of Iran as the ultimate destination.

33.   The Panel concluded that it required additional information regarding the end use and/or end user of the spare parts in order for it to establish a violation of United Nations sanctions.

**Water measuring equipment**

34.   According to information provided by Bahraini authorities, the seized consignment, described as "pumps" and "water measuring equipment", originated with a firm in a third country and was imported by a Bahraini trading company. The consignment was to be re-exported to an Iranian firm identified by Bahraini authorities as Behbood Farayand Control Co. The Panel has not identified any links between the Iranian firm and proliferation-sensitive activities.

35.   The Panel concluded it would require additional information regarding the items in question and their end use or end user in order to determine whether this transfer constitutes a violation by the Islamic Republic of Iran of relevant resolutions.

## Interdictions of process control equipment, bellows, cables and batteries (State X)

**Process control equipment**

36.   Components of a programmable logic controller and related process control equipment and software were confiscated while in transit to the Islamic Republic of Iran. They were reportedly for use in the Iranian nuclear programme and for re-shipment to Kalaye Electric, a designated entity. They were sent by express parcel service from a company abroad to an individual in Tehran.

37.   The Panel's investigations demonstrated that the items could be used in Iranian prohibited nuclear activities, although they also have other industrial applications. The items are not controlled by lists in relevant resolutions. The Panel established that the individual is a manager or director of the Iranian Simatec Development Company. Several States linked Iranian Simatec Development with procurement on behalf of the Kalaye Electric Company.

38.   Based on information available to the Panel, it was not possible to conclude whether this attempted procurement was a violation of the relevant resolutions.

**Bellows**

39.   Two hundred stainless steel bellows in transit to the Islamic Republic of Iran were confiscated. They were reportedly for use in the Iranian nuclear programme

and for re-shipment to the Kalaye Electric Company. They were sent by express parcel service from a company abroad to an individual in Tehran. The bellows were of single-ply construction with dimensions suitable for use in bellows sealed valves or as pipework connections (they were not suitable for use in centrifuge rotors).

40. The Panel's investigations indicated that the bellows had many industrial applications and could be used in Iranian prohibited nuclear activities. They are not controlled by lists in relevant resolutions. The individual's address as shown on the shipping documentation was found to be identical to that of the Eyvaz Technic Company. Several Member States associated that company with proliferation-sensitive activities in connection with uranium enrichment sites at Natanz and Qom/Fordow.

41. Based on information available to the Panel at the time, it was not possible to conclude whether this attempted procurement was a violation of the relevant resolutions.

**High-quality cables**

42. Fourteen rolls of cables in transit to the Islamic Republic of Iran were confiscated. They were reportedly for re-shipment to the Shahid Hemmat Group, a designated entity. Shipping documentation listed both the consignor and consignee (Daryabar, Tehran) as freight forwarders.

43. The Panel's investigations indicated that the cables appeared to be industrial standard cables used to perform transfer of signal data. On the basis of available evidence, the Panel was not in a position to establish whether this attempted procurement was a violation of relevant Security Council resolutions.

**Lead acid batteries**

44. A shipment of lead acid batteries was confiscated. The batteries were reportedly to be reshipped to the Iranian Setnic Company, which supplies batteries to Iranian uranium enrichment installations. The batteries were suitable for ensuring uninterrupted supply in the event of power failure.

45. On the basis of the available evidence, the Panel was not in a position to establish whether this attempted procurement was a violation of relevant Security Council resolutions.

## The *Jihan* (Yemen)

46. Yemeni authorities interdicted the vessel *Jihan* with a shipment of arms suspected of coming from the Islamic Republic of Iran. The Panel conducted a physical examination of the seized items and the vessel, interviewed the detained crew and analysed waypoint data retrieved from Global Positioning System (GPS) devices.

47. According to the crew members, all Yemenis, they sailed from Yemen to Chabahar in the Islamic Republic of Iran and were transferred via Bandar Abbas to Bandar Lengeh. They were then taken on a small boat towards the *Jihan*, which was floating off the coast, and subsequently started a voyage towards Yemen. At no time were immigration or emigration procedures carried out in the Islamic Republic of Iran.

48.   The journey by boat from the shore to the *Jihan* was estimated by four crew members to be between 15 and 30 minutes. One of the crew members said that the small boat spent half an hour looking for the *Jihan*, which was 1 to 2 km from the shore when they found it. Another crew member estimated between 40 to 45 minutes for the journey, and one said that it took one hour. The speed of the small boat is not known but the Captain stated that the *Jihan* was located approximately two miles off the coast when the crew got on board the vessel.

49.   En route to Yemen, the *Jihan* underwent two inspections by the Coast Guard of a third country, and the ship was eventually interdicted in Yemeni territorial water by a joint team of the Yemeni Coast Guard and the United States Navy.

50.   The Panel has no information regarding the location at which the *Jihan* was loaded with arms, nor by whom.

51.   The seized items consisted of ammunition, weapons and other military and non-military items and materials, including man-portable air defence systems, 122 mm rockets, rocket-propelled grenade launchers, C-4 plastic explosive blocks and electrical equipment that can be used to manufacture improvised explosive devices. A comparison of ammunition and weapons with those observed during previous inspections of seized arms and related materiel by the Panel identified several visual similarities, in particular among the labels stuck on ammunition boxes reading "Ministry of Sepah".

52.   The Panel's investigation also identified several methods of concealment involved in the shipment, including falsified ship registration and relevant certificates for the *Jihan*. The seized items were concealed in four compartments hidden by diesel fuel tanks, which could not be accessed from the deck. These hidden compartments could be accessed only after the diesel fuel tanks were emptied.

53.   Five members of the Panel found that all available information placed the Islamic Republic of Iran at the centre of the *Jihan* operation: the crew bypassed routine immigration and airport security procedures while in the country; and the voyage originated in Iranian territorial waters when the crew boarded the vessel at a point approximately two miles off the coast of Bandar Lengeh. The Panel identified similarities among some of the arms, as well as their packaging, with previously reported cases of arms shipments inspected by the Panel and found to have originated in the Islamic Republic of Iran.

54.   Three members of the Panel noted that: no information was found about the time and location that the arms and other items were loaded on the *Jihan*; the statements of the crew on the boarding point were inconsistent; and one of the two key individuals arranging the shipment was a Yemeni businessman and the other's nationality was unknown. Some of the arms and other items had visual similarities with items the Panel previously inspected and several concealment methods were involved.

55.   Based on the above findings, the Panel reached two sets of conclusions: five members concluded that the shipment is a violation of paragraph 5 of resolution 1747 (2007); and three members concluded that it is a probable violation of paragraph 5 of resolution 1747 (2007).

### Ongoing investigations

56.   The Panel has a number of ongoing investigations of reported cases, described below. In addition, the Panel is aware of a number of other cases that are expected to be reported to the Committee.

57.   On 23 January 2013, Spain reported a violation concerning an export of machine tools. At the time the incident was reported, Spanish authorities noted that details of the operation could not be shared with the Committee because the matter was still part of a legal process. The Panel is awaiting additional information before commencing its investigation.

58.   On 4 February 2013, Germany reported a violation concerning the export of technical equipment for use in satellite technology.

59.   On 15 February 2013 and 4 March 2013, State X reported the confiscation of a variety of goods and materials suspected to be of use in prohibited programmes.

60.   On 29 April 2013, the United States reported a violation involving the transfer and attempted transfer of items to Iran related to its prohibited nuclear activities. The items included vacuum equipment for test stands, pressure transducers and vacuum pumps, as well as materials for the fabrication of centrifuge machine components, including magnetic tape, maraging steel and aluminium alloys.

61.   On 29 April 2013, the United States reported a violation involving the transfer of specialized metals to several entities in the Islamic Republic of Iran associated with the ballistic missile programme, including entities designated under resolution 1929 (2010) and previous resolutions.

62.   On 11 April 2013, France reported that it received an export licence request for a fibre-optic gyroscope for a third country declared as the end user. The authorities of that third country interdicted the shipment once it became clear that an intermediary intended to re-export the goods to the Islamic Republic of Iran. The goods were then returned to France.

## IV.   Analysis of compliance by the Islamic Republic of Iran with its Security Council obligations

63.   This section details the Panel's assessment of the implementation by the Islamic Republic of Iran of its obligations under resolution 1929 (2010) and previous resolutions. It addresses developments in the areas of nuclear and ballistic missile activities, conventional arms transfers and activities involving designated individuals and entities.

### A.   Nuclear programme

#### Recent developments

64.   Below the Panel highlights recent developments in the Iranian nuclear programme and provides analysis of nuclear-related procurement priorities.

65.   IAEA has reported extensively on the status of Iranian compliance with both its obligations under the Agency's safeguards and under Security Council resolutions.[6] In brief, IAEA has found that the Islamic Republic of Iran: continues to expand its uranium enrichment activities in violation of those obligations; is continuing construction of a heavy water research reactor; is continuing, contrary to its Safeguards Agreement, not to implement modified code 3.1; is not implementing its Additional Protocol; and has made no progress in resolving outstanding questions related to the possible military dimensions of its nuclear programme. Annex III contains a table illustrating developments in Iranian enrichment activity over the past year.

### Advanced centrifuges

66.   Among significant recent developments, the Panel notes the decision by the Islamic Republic of Iran to install advanced centrifuges with increased enrichment capacity. In February 2013, IAEA reported that the country was planning to install IR-2m centrifuges, which have a carbon fibre rotor, in a unit of Production Hall A.[7] Production Hall A consists of eight units of 18 cascades each. A single unit of 18 cascades would consist therefore of approximately 3,000 centrifuges (assuming cascades of up to 174 centrifuges). As of February 2013, these centrifuges were in the process of being installed.

67.   It will take time to establish how well the IR-2m centrifuge is performing (its potential enrichment capacity is assessed by experts to be approximately four to five times greater than the IR-1 centrifuge). It should be noted that although the Islamic Republic of Iran has been testing IR-2 generation centrifuges at the Natanz Pilot Fuel Enrichment Plant since early 2008, it has operated only a single cascade of the IR-2m centrifuges since August 2011. Little is known about the manufacturing and engineering of the IR-2m by the Islamic Republic of Iran or how many it ultimately plans to install. The country is also testing other advanced centrifuges.

### Uranium mining activity

68.   Since the Panel's last report, the Islamic Republic of Iran has announced the opening of its second declared uranium mine, at Saghand, as well as the Shahid Rezayeenejad yellowcake processing facility. On 9 April 2013, President Ahmadinejad formally inaugurated the two facilities.[8] The Saghand mine is believed to have a capacity to process 50 tons of uranium annually. The Panel has noted previously that the combined annual output of the two declared uranium mines is inadequate to fuel a single 1000 MW reactor.

---

[6] "Implementation of the NPT Safeguards Agreement and relevant provisions of Security Council resolutions in the Islamic Republic of Iran", IAEA report of 21 February 2013 (GOV/2013/6) and previous reports.

[7] GOV/2013/6, paras. 11-13.

[8] Fars News Agency, "Iran Inaugurates Two More Uranium Facilities on Nuclear Technology Day", 9 April 2013.

## Procurement priorities

69.   There is little publicly available information regarding current Iranian indigenous production capabilities, stocks of components and raw materials related to the country's prohibited nuclear activities. The Panel has received some information from States regarding specific targets for procurement by the Islamic Republic of Iran and has investigated a number of reported incidents providing some insight into procurement priorities.[9] The following provides an overview of the specific items investigated by the Panel, and their potential or established role in prohibited activities.

### Valves

70.   The Iranian demand for high-quality valves was demonstrated by two cases investigated by the Panel. In one, the Panel was able to show through documentary and other evidence that the valves were intended for use in the IR-40 Arak heavy water research reactor. In the other case, it could not be established that the valves were intended for use in nuclear-related activities. However, the methods used, including false shipping documents, raised doubts about the nature of the procurement. In both cases the valves fell below established control thresholds.

### Process control equipment

71.   Process control equipment, including pressure transducers, electro-pneumatic positioners, a programmable logic controller and related equipment and software were intercepted en route to the Islamic Republic of Iran. The technical specifications of the items seen by the Panel placed them below the established control thresholds. The Panel determined that all have applications in a number of industrial settings, including the operation of a nuclear reactor or centrifuge cascade. Several States informed the Panel that these items are procurement priorities for the Islamic Republic of Iran. Information available did not allow the Panel to establish whether the attempted procurement was a violation of the country's obligations under resolution 1929 (2010).

### Bellows

72.   The Panel investigated a shipment of 200 stainless steel bellows, which it concluded were most consistent in size and shape for use in bellows sealed valves, or for use as a fitting or connector. The Panel noted that such bellows have a wide range of industrial uses, but could also be used in valves with prohibited applications. These bellows also fell outside of the control lists referenced in paragraph 13 of resolution 1929 (2010). Information available to the Panel was insufficient to establish whether the procurement was a violation of Iranian obligations under resolution 1929 (2010).

---

[9] The United Kingdom continues its practice, as noted in the Panel's final report of 4 June 2012 (S/2012/395), of sharing information regarding denials of export licenses in the context of its membership of the Nuclear Suppliers Group.

**Carbon fibre**

73.   One interdicted shipment of carbon fibre dating from 2010 was investigated by the Panel during this mandate.[10] The Panel was not able to establish the quality of the carbon fibre or whether it would be usable in prohibited nuclear activities (such as the construction of centrifuge rotors). There was circumstantial evidence to suggest that the carbon fibre may have been counterfeit. This carbon fibre was packaged in materials bearing the label of a well-known carbon fibre manufacturer. The attempted procurement suggests that the Islamic Republic of Iran was intending to acquire carbon fibre that can be used for prohibited nuclear activities. The Panel notes that carbon fibre has widespread industrial applications.

74.   The Panel is aware of other carbon fibre procurement attempts highlighted by States during consultations. In one case, a subsidiary of a leading producer of carbon fibre reported receiving several suspicious inquiries in 2012 for several tons of high grade carbon fibre, suitable for use in gas centrifuges. One State expressed concern about the development of a secondary carbon fibre resale market dealing in surplus stocks of soon-to-expire carbon fibre at below market prices. A different State reported that investigations showed that Iranian procurers are likely to use Internet trading sites to make contact with intermediaries in order to procure carbon fibre.

75.   Two other States have informed the Panel of recent carbon fibre interdictions that are yet to be reported to the Committee. These States also noted significant exports of carbon fibre both to the Islamic Republic of Iran and to other countries in its region. In other cases shared with the Panel, the declared end user raised suspicions.[11]

**Other items**

76.   In addition to the items noted above, States have informed the Panel that over the last six months, the Islamic Republic of Iran is known to have sought the following items with relevance to its prohibited nuclear activities:

    (a)   **Ring magnets**: ring magnets are used in the top bearing and suspension assembly of the gas centrifuge. Each gas centrifuge requires two ring magnets: one fitted to the top end cap of the high-speed rotor assembly and one fitted to a stationary mount;

    (b)   **Stainless steel tubes**: stainless steel tubing/piping can be used to connect gas centrifuges together to form cascades of gas centrifuges. Very small diameter stainless steel tubing is used to connect each gas centrifuge to a larger diameter cascade "header" pipework. A gas centrifuge plant, which consists of many cascade units and thousands of gas centrifuges, thus requires large quantities of stainless steel tubing/piping;

---

[10] The issue of carbon fibre was addressed in detail in the Panel's 2012 final report (S/2012/395).

[11] One example was a construction company in the Islamic Republic of Iran seeking a large quantity of carbon fibre; another involved an Iranian trading company that was known primarily for household consumer products and had no known reason for seeking high grades of carbon fibre.

(c)   **Aluminium**: high strength aluminium alloys (such as the 7000-series) are used for the manufacture of centrifuge rotor tubes, baffles and end caps; medium strength alloys (6000-series alloys) can be used for centrifuge vacuum casings;

(d)   **Inverters**: inverters or frequency changers are used to supply the high frequency electrical power required for the drive motor of the gas centrifuge. Depending on the design approach, one small inverter can be used for each gas centrifuge, or a larger inverter can be used to supply multiple gas centrifuges;

(e)   **Semi-hard magnetic alloy**: semi-hard magnetic alloy, such as the cobalt-iron-vanadium magnetic alloy (for example, Vicalloy), in thin-strip or tape form is used for hysteresis type motors, including those used in some gas centrifuge models.

**Procurement of below-threshold items**

77.   The Panel continues to be told by many States that the Islamic Republic of Iran is seeking items that fall below established control thresholds but could be used for prohibited activities. All of the nuclear-related cases investigated by the Panel during its current mandate involve items that are not found among the lists contained in paragraph 13 of resolution 1929 (2010). The issue of below-threshold procurement poses unique challenges to States seeking to maintain legitimate trade with the Islamic Republic of Iran while not contributing to prohibited activities. One State emphasized that "critical dual-use items are more at the centre of procurement than listed goods".

**High-quality items**

78.   The cases investigated by the Panel demonstrate that the Islamic Republic of Iran prefers to procure high-quality items from well-known suppliers. This is illustrated by the acquisition of valves for the Arak heavy water reactor, where German-made valves were preferred, although the country was ultimately forced to accept the manufacture of some valves made in another country.

**Continuing reliance on procurement abroad**

79.   Although Iranian nuclear fuel cycle capabilities are well established in many areas, its reliance on procurement abroad continues to provide the international community with opportunities to limit its ability to maintain and expand certain activities.

**Procurement by the Islamic Republic of Iran of below threshold items**

80.   The issue of identifying items that are not included on the control lists poses challenges to States seeking to maintain legitimate trade with the Islamic Republic of Iran while not contributing to prohibited nuclear activities.

## B.   Ballistic missiles

81.   This section provides a brief summary of recent developments related to Iranian ballistic missile activities and an analysis of those activities. These are based on information from States, non-governmental experts and media sources, in particular statements by senior Iranian officials.

## Recent developments

### Missile launches

82.   Unlike the Iranian nuclear programme, much of which is under IAEA safeguards, the country's ballistic missile activities remain non-transparent to the international community, with the exception of periodic launches or tests, and statements, some of which may be exaggerated, by senior Iranian officials.

83.   The Islamic Republic of Iran has a large, diverse arsenal of ballistic missiles, including both liquid and solid fuelled missiles of varying ranges.[12] The Panel notes that while the country engages in periodic exercises or test launches of its missiles, its longest range solid fuelled ballistic missile, the Sejil (Ashura), has not been seen publicly over the last year or involved in any launches of which the Panel is aware.

84.   The most recent confirmed Shahab launches took place in July 2012, when the Islamic Republic of Iran staged the "Great Prophet 7" military exercises, conducted by the Aerospace Force of the Islamic Revolutionary Guard Corps. These included launches of the Shahab 1 and 3, Zelzal, Fateh-110 and Tondar missiles, as well as an anti-ship ballistic missile, the Khalij Fars. In January 2013, the Panel submitted a report to the Committee with its assessment of the launches, which concluded that "the Iranian launches of the Shahab 1 and 3 missiles during the Great Prophet 7 exercises held from 2 to 4 July 2012 constituted a violation by the Islamic Republic of Iran of paragraph 9 of resolution 1929 (2010)".

85.   The Panel's analysis of the exercises, supported by independent satellite imagery, showed that a majority of the launched missiles hit their targets. "Nearly all the missiles fell within 2 km of the centre of the 6 $km^2$ air base".[13] This result was presented by the Islamic Republic of Iran as confirmation of the increased accuracy of its missiles. No new modifications or types of missiles were tested during these exercises. The Shahab 3 missiles launched were characterized by one Member State as a "classic" Shahab 3 missile, with a range of approximately 1,000 km.[14]

86.   On 4 August 2012 the Islamic Republic of Iran test-fired what was described by Iranian officials as a new variant of the Fateh-110 short-range ballistic missile with an upgraded guidance system. Defence Minister Ahmed Vahidi was quoted saying that "the fourth generation of high-precision Fateh-110 missiles with a range of over 300 km was test-fired by the defence ministry's aerospace industries organization".[15] On 27 April, Defence Minister Vahidi announced that new cruise and ballistic missiles would be unveiled within six months.[16]

---

[12] The Panel's 2012 final report (S/2012/395) provides details about the Iranian missile arsenal.

[13] "Satellite Imagery Shows Accuracy of Iran's Ballistic Missiles", *Jane's Defence Weekly*, 31 October 2012.

[14] "Iran's Nuclear and Missile Potential: A Joint Threat Assessment by U.S. and Russian Technical Experts", East West Institute, May 2009, and "Iran's Ballistic Missile Capabilities: A Net Assessment", International Institute for Strategic Studies, 2010.

[15] Fars News Agency, 4 August 2012. See also *Jane's Intelligence Weekly*, "Iran test-fires upgraded Fateh-110 missile", 6 August 2012.

[16] Mehr News Agency, "Minister Says Iran to Unveil New Ballistic Missile", 27 April 2013.

**Space launch activities**

87.   There are conflicting reports regarding Iranian space launch activities. In February, Ahmad Fazeli, the head of the Iranian Space Agency, announced that several new satellites, made primarily by Iranian university students, would be sent into orbit over the next year, starting with a communications satellite.[17] The Panel notes that there have been no announced successful launches of satellites. There are reports of two failed launches in the mandate period, one on 22 September 2012 and one on 17 or 18 January 2013.[18]

88.   In January 2013, Iranian State television broadcast images of a Pishgam rocket taking off carrying a primate and Government officials announced the successful launch and landing of a bio-capsule containing a primate.[19] The Defence Ministry's Aerospace Industries Organization said that "the capsule was sent to an orbit beyond 120 km in altitude and carried out telemetry of the environmental data records". Iranian officials later denied allegations of differences in photos of the primate before and after the launch, insisting that the bio-capsule returned to earth safely.[20]

89.   Until now, all satellites (the Omid, Rasad-1, and Navid)[21] have been launched using variants of a two-stage liquid-fuelled Safir space launch vehicle. The Simorgh, a two-stage liquid-propellant space launch vehicle, with a potential capacity to launch heavier objects into higher altitudes, was unveiled on 3 February 2010, but it is not yet in operational use. No new space launch vehicles were tested or launched during the reporting period.

**Launch facilities**

90.   According to statements by Defence Minister Vahidi, as of June 2012, approximately 80 per cent of the construction of the Khomeini Space Centre near Semnan in the northern part of the Islamic Republic of Iran was completed. Commercial satellite imagery confirmed that the country is expanding its rocket launch capabilities at the Semnan Space Centre to accommodate larger missiles and space launch vehicles, likely to include the Simorgh 3 space launch vehicle.[22] Some experts suggest that the country will be able to launch the new Simorgh space launch vehicle by mid-2013.

**Cooperation between the Democratic People's Republic of Korea and the Islamic Republic of Iran**

91.   Assessments of cooperation between the Democratic People's Republic of Korea and the Islamic Republic of Iran are contradictory. Some experts continue to believe that the Democratic People's Republic of Korea provides scientific and material support to the Islamic Republic of Iran. Others have concluded that cooperation between the two States is limited to expertise. The Panel has sought information from States and the Democratic People's Republic of Korea Panel

---

[17] Fars News Agency, "Iran to Send Six New Home-Made Satellites into Orbit Next Year", 19 February 2013.

[18] "For Third Time in Two Years, Iran Fails to Launch Satellite", Times of Israel, 27 February 2013. "Iran suspected of suffering launch failure in February", Spaceflight101, 20 March 2013.

[19] Fars News Agency, "Iran Takes First Step to Send Man to Space", 28 January 2013.

[20] Mehr News Agency, "Iran's Space Monkey Mission was not Fake, Pictures Reveal", 3 February 2013.

[21] Launches took place on February 2009, 16 June 2011 and 3 February 2012, respectively.

[22] "Iran's rocket programme", *Jane's Intelligence Review*, vol. 24, Issue 10 (1 October 2012).

regarding such cooperation. Although there are reports of Iranian officials present at launches of missiles by the Democratic People's Republic of Korea, the Panel has seen no evidence of specific technical cooperation.

**Nuclear warhead development**

92.   Since November 2011, there has been no additional information reported by IAEA regarding alleged Iranian activities to integrate a nuclear payload onto a ballistic missile.[23]

## Procurement priorities

93.   The Panel has received little information regarding Iranian procurement efforts explicitly for ballistic missile-related items. The Panel investigated the seizure of high-quality cables, which were suspected to have been procured on behalf of the Shahid Hemmat Industrial Group, an entity designated under resolution 1737 (2006). The cables involved were designed for data transmission. In this case, the Panel was not able to establish a link to illicit procurement on behalf of Iranian prohibited missile activities or that this attempted procurement was a violation of the relevant resolutions.

94.   The Panel is currently investigating additional reported seizures that allegedly implicate the Islamic Republic of Iran in procurement on behalf of its ballistic missile programme, including aluminium rods, steel bars, vibration measuring devices, a fibre-optic gyrocompass and specialized metals.

95.   The Panel continues to receive information from Member States regarding Iranian attempts to procure high grade carbon fibre on behalf of the nuclear programme. The Panel notes that carbon fibre is also used in ballistic missile programmes.

96.   The relative lack of success achieved with space launches by the Islamic Republic of Iran over the mandate period, and the absence of tests of Sejil variants, could reflect procurement difficulties. If true, this would indicate that States are exercising heightened vigilance over sensitive ballistic missile-related items. Nonetheless, Iranian officials continue to announce, at regular intervals, advancements or innovations in activities involving ballistic missile technology.

## Findings

97.   No significant, new missile capabilities were demonstrated by the Islamic Republic of Iran during the mandate period. The country has continued to violate its obligations under the relevant Security Council resolutions with launches of ballistic missiles.

98.   Despite at least partial success in making its ballistic missile programme indigenous, the Islamic Republic of Iran remains reliant on foreign suppliers for technology, some components and raw materials. Preventing supply of these items is critical for international efforts to slow prohibited Iranian ballistic missiles activities.

---

[23]  See GOV/2011/65.

## C. Conventional arms and related materiel

99.   This section describes transfers of arms and related materiel by the Islamic Republic of Iran during the reporting period. It reflects, primarily, the Panel's analysis of the incidents on which it has submitted reports to the Committee based on findings from inspections and information provided to it during consultations and obtained from open sources.

### Recent developments

100.  During the reporting period only one incident of non-compliance was reported to the Committee concerning conventional arms transfers by the Islamic Republic of Iran. On 14 February 2013 Yemen reported a transfer of conventional arms and related materiel involving the Islamic Republic of Iran. In addition, at the direction by the Committee, the Panel reported a compilation of public statements made by senior Iranian and local officials regarding Iranian arms transfers to Gaza.

101.  Some States, other Security Council expert groups and reports available in the public domain suggest continuing arms transfers by the Islamic Republic of Iran within the region and to African States such as Côte d'Ivoire, Kenya and Somalia. The Panel was also informed that the country continues to seek ways and means to transfer arms to groups in the region, despite the limitations imposed by the sanctions measures under the relevant Security Council resolutions.

### Analysis

102.  The *Jihan* **(Yemen) case**: the *Jihan* (Yemen) is described in paragraphs 46 to 55 above.

103.  **Transfer of explosives to Kenya**: two Iranians have been convicted for importing explosives from the Islamic Republic of Iran in connection with planning terrorism-related activities in Kenya.[24] Information obtained from one State suggests that the Quds Force of the Islamic Revolutionary Guard Corps. was involved in this matter. The Panel has been in contact with Kenyan authorities and will continue to investigate, as appropriate.

104.  **Alleged arms transfers to Gaza**: the Panel reported to the Committee a compilation of public statements on arms transfers to Gaza. The Panel noted that senior Iranian officials, including the Commander-in-Chief of the Islamic Revolutionary Guard Corps.[25] have publicly stated that they provided military and financial assistance to non-State actors in Gaza. The recipients acknowledged receiving weapons and rockets from the Islamic Republic of Iran in November 2012. The Panel was requested to continue monitoring this issue.

105.  During its visit to Israel, the Panel examined the remnants of several types of rockets that had recently landed in Israeli territory. The physical markings of the remnants appeared similar to those of the 107 mm rockets observed by the Panel

---

[24] BBC, "Iranians jailed for life in Kenya over terror charges", 6 May 2013.
[25] The predecessor, Major General Yahya Rahim Safavi, is on the Consolidated List of Individuals and Entities under reference number I.37.E.1.

during an inspection of a previous violation by the Islamic Republic of Iran. The Panel notes that further technical analysis is necessary to confirm these similarities and the origin. The Panel has been informed by one State that reduction of media reports of arms transfers to Gaza is the result of disabling and closing tunnels.

106. **Alleged arms transfers to the Syrian Arab Republic via Iraqi airspace**: States have reported that the Islamic Republic of Iran is continuing to send arms and related materiel to the Syrian Arab Republic via Iraqi airspace. In particular, two States reported that in 2012 the Islamic Republic of Iran used Iran Air and Mahan Air to transport arms from Teheran to Damascus.[26] The Committee has not received reports of such transfers. Iraqi authorities informed the Panel that their inspection of two aircraft on their way from the Islamic Republic of Iran did not confirm such transfers. Media have reported a third inspection but also without any arms being found.[27]

107. States also reported to the Panel attempts by the Islamic Republic of Iran to transfer raw material, spare parts and technology in order for the recipient countries to later assemble and produce armaments.

108. **Arms and related materiel in African States**: the Panel has been following the issue of Iranian arms and ammunition found in African States, in particular in:

(a) **Sudan**: information from two States indicates that alleged Iranian arms transfers to the Sudan were ongoing in the last few years. These transfers were said to be part of a memorandum of understanding on military cooperation concluded in 2007 between the two States. An air raid in January 2012 destroyed a factory in southern Khartoum that was allegedly engaged in manufacture or assembly of weapons under the same memorandum of understanding;

(b) **Somalia**: Iranian arms transfers to Al-Shabab in Somalia have also been widely reported;[28]

(c) **Côte d'Ivoire**: the Group of Experts on Côte d'Ivoire, in its 2013 final report, described ammunition found that was "similar to Iranian production".[29] The Group could not determine when the ammunition was transferred to Côte d'Ivoire or by whom. The report includes photographs of ammunition and packaging, in particular green plastic bags, some of which appear visually similar to those seen by the Panel during its previous inspections.

109. The Panel continues to seek additional information and evidence to confirm these allegations independently.

## D.   Procurement methods

110. The following provides the Panel's assessment of the methods and strategies used by the Islamic Republic of Iran for the procurement of items that can be used

---

[26] One of these States reported that from October 2011 to October 2012 the frequency of such flights diminished but at the same time flights between these airports and Baghdad Al Muthanna Airport increased.

[27] "Iraq inspects Iranian Cargo Plane Bound for Syria", Agence France-Presse, 15 April 2013.

[28] "Iran denies shipping arms to Islamist militants in Somalia", Reuters, 14 February 2013.

[29] S/2013/228, para. 49.

for prohibited programmes. Much of this assessment is based on the Panel's investigations of cases reported to the Committee during the mandate period.

**Use of front companies**

111. In several cases investigated by the Panel, front companies were established with the aim of overseeing procurement and shipments to the Islamic Republic of Iran, or providing a false address for the delivery of items. One case investigated by the Panel involved the shipment of items to a front company in a third country, established to be the consignee. Another case, which could not be linked conclusively to procurement on behalf of prohibited nuclear activities, involved a dual-national who was reportedly approached by Iranians to establish a trading company in a European country solely for the purpose of procuring items to be shipped to the Islamic Republic of Iran.

112. Other types of front companies that might be used for prohibited procurement could be so-called "shell" companies, often set up in jurisdictions which offer quick and inexpensive registration procedures and which may hide legal ownership of an entity. Such companies may be used by individuals or companies to conduct all sorts of business transactions, including financial transactions.[30] They typically have limited liability and no significant assets or employment, and no physical presence other than a mailing address.

113. Offshore centres may host thousands of registered businesses or financial institutions and, with limited regulatory resources, may rely on corporate service providers, which themselves may operate through "introducers", to carry out due diligence. Such centres could be vulnerable to exploitation by the Islamic Republic of Iran for the purpose of circumventing sanctions.

114. Front companies could also be short-term businesses set up for the purposes of carrying out a single procurement operation before being closed down.

**Intermediaries in the procurement chain**

115. Some cases of procurement investigated by the Panel involved multiple intermediaries or trading agents (including brokers, shippers and freight forwarders), which served to obscure the identity of the ultimate end users thus adding to the difficulty of detecting procurement of prohibited items. In one case intermediaries in third countries were used to provide false end-user certificates or to take receipt of items before transferring them to the Islamic Republic of Iran.

**Involvement of freight forwarders**

116. The Panel has previously highlighted the practice of altering shipping documentation at the last minute in order to conceal the Islamic Republic of Iran as the ultimate destination of shipments. In one case investigated by the Panel, a procurement agent arranged with a freight forwarder for air waybills to be altered in more than two dozen cases, following the initiation of the customs clearance process and shortly prior to shipment. Detecting last-minute changes to shipping documentation remains a challenge for customs authorities.

---

[30] The compliance officer of one international bank stated that in his experience financing-related front companies usually conducted their business in jurisdictions separate from the physical location of the company whose transactions they handle.

**Use of false end-user certificates**

117. The Panel has seen several examples of false end-user certificates presented to authorities or companies in attempted transfers. In one case, the end-user certificate was a crude attempt to appear legitimate, using language found on the Internet, which was determined by authorities to have come from a Government website. A private sector firm that received the certificate quickly identified it as suspect and reported it to authorities. In another case the Panel found an end-user certificate for a third country, from which the items concerned would be reshipped to the Islamic Republic of Iran.

**Favourable terms of trade**

118. In several cases investigated by the Panel, Iranian procurers or their agents purchased items on an "ex-works" basis. This is attractive for sellers because the purchaser has responsibility for obtaining any necessary export licence for insurance coverage and freight forwarding arrangements. One State said that it regarded trade on an "ex-works" basis to be a "red-flag" that would trigger additional scrutiny.

**Use of European Union internal market**

119. In its 2012 final report, the Panel highlighted examples of attempts by the Islamic Republic of Iran to take advantage of the European Union (EU) internal market to shift goods from one member State of the Union to another before export, in an effort to disguise the ultimate end user abroad. The Panel was informed of an example in which a freight forwarder shipped prohibited items within the EU and arranged for documentation to be altered before the items were exported outside the EU.

**Use of the Iranian diaspora**

120. In two cases investigated by the Panel, and in a third case reported to the Committee as prosecuted under national jurisdiction, the Islamic Republic of Iran turned to expatriates or dual nationals living abroad to establish companies for the purpose of procurement and to approach suppliers. The Panel has heard of other such examples in the course of consultations with States.

121. The Panel notes that the variety and complexity of procurement methods employed by Iran gives rise to the possibility that legitimate businesses can be unwittingly drawn into procurement for prohibited activities.

## E.   Prohibited activities by Iranian entities

122. This section describes the activities of the designated Irano Hind Shipping Company and entities involved in prohibited activities by the Islamic Republic of Iran.

## Irano Hind Shipping Company

123. Developments within the Irano Hind Shipping Company following its designation under resolution 1929 (2010) were discussed in the Panel's 2012 final

report.[31] Evidence collected by the Panel during its current mandate suggests that measures implemented by States against the company are negatively affecting its operations.

124.  In July 2012, shareholders of the company publicly confirmed their decision to dissolve it. While the process towards dissolution and liquidation appears to be ongoing, operations of its vessels are continuing. Several changes in registration and ownership took place in the company fleet during the reporting period, including de-flagging. These changes are illustrated in annex IV.

125.  Two crude oil tankers, the *Amin 2* and *Tour 2*, remain under the beneficial ownership of a company affiliated with the Irano Hind Shipping Company, although they were transferred to a different registered owner that ceased to exist soon after. The *Amin 2* and *Tour 2* repeatedly sailed between the Islamic Republic of Iran and the Syrian Arab Republic during the reporting period (see annex V). According to one State, following de-flagging they began having difficulties passing through the Suez Canal (see annex VI). It appears that the de-flagging effectively hindered the operations of vessels controlled by the Irano Hind Shipping Company.

126.  A third oil tanker, the *Volga*, was transferred to a different owner who does not appear to be affiliated with the Irano Hind Shipping Company. After the change of ownership, it began sailing the same shipping routes connecting the Islamic Republic of Iran and the Syrian Arab Republic as the *Amin 2* and *Tour 2* but without the difficulties encountered by those two tankers (see annex V).

127.  The *Amin 2* has now been left with no option other than to fly the flag of the Islamic Republic of Iran. The same situation also appears to apply to other vessels related to the Islamic Republic of Iran Shipping Lines, which is not a designated entity as a whole (see annex VII).

## Findings

128.  States face serious challenges in establishing ownership or monitoring changes of ownership of vessels belonging to the Irano Hind Shipping Company. Where jurisdictions provide off-shore facilities to establish shell companies quickly and inexpensively, vigilance or other measures by States on the basis of owner companies alone may be insufficient.

129.  The case of the designated Irano Hind Shipping Company, as described above, offers a lesson: the activities of designated shipping companies can be hindered more effectively if sanctions include specific measures directly targeting vessels owned or controlled by the companies. This can be achieved by listing their vessels with unchangeable IMO numbers and applying other measures such as the prevention of registration of these vessels.

---

[31] The assessment in this section, including the annexes, is based on information from States and the Panel's research, including from Lloyd's List Intelligence tool, Seasearcher (last accessed on 28 April 2013). For the sake of simplicity, the current (as of 28 April 2013) name of the vessels is used.

### Entity involved in sanctions violations

**Pentane Chemistry Industry**

130.  Pentane Chemistry Industry was engaged as a procurement front in a violation case (see paras. 18-22 above). In that case, it was commissioned by a designated Iranian entity, Modern Industries Technique Company, to procure valves usable for heavy water-related activities. Modern Industries Technique Company is designated as being responsible for the design and construction of the IR-40 heavy water reactor in Arak. Pentane Chemistry Industry was also specified by one State as being a recipient, in the Islamic Republic of Iran, of phosphor bronze wire mesh, which is also usable for heavy water-related activities.

## Entities "owned or controlled by"

131.  On the basis of their connections with prohibited activities by the Islamic Republic of Iran, 78 entities have been designated by the Security Council or Committee and their assets have been frozen. In addition, the resolutions require the freezing of assets belonging to entities "acting on behalf of, or at the direction of" or "owned or controlled by" designated entities. The Panel notes that ambiguity as to the meaning of these terms allows the Islamic Republic of Iran to shift procurement activities to non-designated entities, thus minimizing disturbance to its procurement networks.

132.  During the course of the mandate, several States brought the names of entities that were assessed by them to be involved in prohibited activities but which are not designated under the resolutions to the attention of the Panel. The Panel's research shows that some of those entities are subsidiaries of, or partners with, designated entities. For example, several States highlighted the importance of the Iran Centrifuge Technology Company, also known as TESA, which reportedly operates an IR-1 centrifuge assembly facility at Natanz, to the national gas centrifuge programme. The company took over the activities of Farayand Technique, which is designated under resolution 1737 (2007). The company is also a subsidiary of the Atomic Energy Organization of Iran.

## V.   Analysis of implementation of sanctions by Member States

133.  Below the Panel provides its assessment of the challenges confronting States in their implementation of sanctions and their responses.

## A.   Challenges to implementation faced by Member States

134.  Since its establishment by resolution 1929 (2010), the Panel has visited almost a third of the States Members of the United Nations for consultations. These consultations have demonstrated a high level of awareness of States about the requirements of Security Council resolutions on the Islamic Republic of Iran. The great majority of States have incorporated appropriate controls into domestic legislation, and most have established intragovernmental coordination mechanisms to promote and monitor implementation of the requirements by relevant

S/2013/331

Government departments and the private sector. In addition, customs procedures and export controls have been appropriately modified, controls have been incorporated into the financial sector, and programmes of outreach to the private sector have been established by most States, which have also put measures into place to address the need for vigilance.

135. The Panel notes that many States promote the establishment of internal compliance programmes, while some make it a requirement for obtaining export licences for sensitive goods. Some States offer simplified export procedures for trusted companies.

**Capacity**

136. Some States lack sufficient resources and trained and experienced officials to give proper priority to the effective implementation of sanctions. Such States would benefit from support, including training and the development of technical expertise.

**Complexity of procurement methods**

137. States are confronted with a wide range of methods and techniques used by the Islamic Republic of Iran to procure goods and materials for its prohibited activities. These are described in section IV above.

**Indirect trade**

138. Many States told the Panel that they believe circumventions of sanctions have little chance of taking place because all trade with the Islamic Republic of Iran, including legitimate trade, had significantly declined (or in many cases had virtually ceased). Such assumptions could be erroneous because prohibited procurement can take place through third countries. A simple reduction in trade with the Islamic Republic of Iran may not indicate that prohibited procurement is not taking place.

**Business facilitation**

139. Many States have introduced regulatory regimes and policies designed to facilitate business and generate economic growth. Such measures can include streamlined processes for establishing and registering trading companies or shell companies, as noted in paragraph 112 above (the latter particularly in some island jurisdictions). There is a need for careful balance between facilitation of economic activity and appropriate controls in order to minimize possible dangers of exploitation of the economic infrastructure by the Islamic Republic of Iran. It is important that company registration details be publicly available in sufficient detail to facilitate identification by potential business partners (full addresses, phone numbers, names of Board Members, etc.).

**Visa-free regimes**

140. The Panel notes that some States have visa-free regimes with the Islamic Republic of Iran. One State that recently introduced a visa-free regime as a means of promoting trade and economic cooperation reported several attempts to use its territory to trans-ship potentially controlled equipment to the Islamic Republic of Iran. One State's long-standing visa-free regime has been identified by several States as one of the reasons why it is a hub for procurement activity. Visa-free

regimes could also be used to sustain *hawala* (transfer)-type practices, although the Panel has not seen specific examples of this practice.

**Customs**

141. The Panel notes that customs and border authorities in several States have introduced strict risk management systems and specific procedures in connection with direct trade with the Islamic Republic of Iran. The practical impact of this can be that flows of both legitimate and potentially illicit trade increase significantly through third countries. This can raise challenges for both the originating country and intermediary countries, which may need to implement additional measures to identify the illicit items amidst increased trade volume.

**Financial sector**

142. The identification of financial transactions underpinning prohibited procurements by the Islamic Republic of Iran represents a serious challenge. The Panel has investigated one reported case that came to the attention of authorities as a consequence of suspicious transactions reports from financial institutions.

143. None of the investigations and inspections carried out by the Panel have provided evidence of the connections between channels used by the entities within the Islamic Republic of Iran responsible for financing procurement with the corresponding payments to suppliers overseas. Part of the problem is that the volumes of goods and materials associated with illicit procurement are small in comparison with legitimate commerce, and the size of the financial transactions does not stand out. In several cases shipping documents record no or low value, which may reduce the likelihood of the shipment coming to attention.

144. Most States have regulatory mechanisms in place to monitor attempts by the Islamic Republic of Iran to initiate financial links covered by paragraphs 23 and 24 of resolution 1929 (2010); several States reported continuing interest from Iranian financial institutions in establishing such links:

    (a)   One State rejected two applications to open banks because of lack of supporting information;

    (b)   One neighbouring State said that two new Iranian banks (Parsian and Karafarin) had opened as new branches of Bank Melli.

145. In the context of exercising vigilance over the activities of Bank Saderat and Bank Melli, one State reported that a Director of a branch of Bank Saderat in a third country was also a Director of a bank suspected of involvement in Iranian proliferation financing networks, which was located in an offshore financial centre.[32]

---

[32] Separately, the compliance officer of a bank noted that, although in 2010 the website of the bank in the offshore centre contained the names of Iranians on the Board, this information had subsequently been removed, but could still be accessed from archive sites.

S/2013/331

146. A number of States have shared information regarding how procurement may be financed. Such methods include cash smuggling,[33] working with banks that do not implement unilateral financial sanctions, *hawala* (particularly in neighbouring countries), increased use of money exchange businesses (especially in known transit hubs in the region), the use of Iranian banks not subject to the SWIFT embargo, the use of gold and new payment methods.[34] One State reported that it was investigating a substantial sum transferred apparently illicitly from an Iranian-owned local account to banks in third countries.

147. The Panel notes media reports asserting that two private sector firms have acknowledged trading commodities, in particular aluminium oxide (also known as alumina), with the Islamic Republic of Iran. Some of the aluminium oxide is alleged to have been supplied to an entity in the country, the Iranian Aluminium Company (Iralco), which is associated with procurement for the Iranian nuclear programme.[35] The aluminium oxide was swapped with the firms for processed aluminium from the Islamic Republic of Iran, which was reportedly able to retain any surpluses from the exchange. If confirmed, such transactions may reflect an avenue for procurement of a raw material in a manner that circumvents sanctions. The companies involved have stated that they have halted the transactions.

148. In exercising vigilance over transactions related to the Islamic Republic of Iran, banks are increasingly seeking additional documentation to establish the legitimacy of the transfers. Use of forged documents has been cited repeatedly by States as a way of circumventing banking system controls, which undermines due diligence.

149. The complexities of rigorous implementation of United Nations financial sanctions on Iran have been addressed by FATF. FATF has introduced standards on financing of proliferation in connection with Security Council resolutions (fourth round of FATF recommendations, February 2012). FATF is also preparing guidance on implementation of activity-based financial sanctions and vigilance provisions of Security Council resolutions.

## Safety implications of concealment practices

150. As recorded in the Panel's previous reports, the Islamic Republic of Iran continues to transport concealed and undocumented shipments of arms and related materiel by sea. This is a dangerous practice which puts ports and sea lanes at risk. Several States have alleged the use by the Islamic Republic of Iran of civil aircraft for arms transport.

---

[33] In addition to cash smuggling, two States also said that the Islamic Republic of Iran transferred cash into their jurisdictions by requiring Iranian tourists to bring their full personal allowance with them. Iranian officials were observed collecting these funds from individual tourists and then using exchange bureaux to buy dollars or euros, which they then transferred out of the country.

[34] For example, prepaid cards, mobile telephone transactions and Internet banking, as discussed at the meeting of the Association of Certified Anti-Money Laundering Specialists in Dubai on 20 and 21 January 2013.

[35] Rupert Neate, "Glencore traded with Iranian supplier to nuclear programme", *The Guardian*, 21 April 2013; and Reuters, "Trafigura says supplied Iranian firm linked by European Union to atomic work", 4 March 2013.

13-35543

## Challenges linked to European Union legislation

151. Two specific challenges have arisen with respect to implementation of United Nations sanctions by the European Union. Security Council resolutions on the Islamic Republic of Iran are incorporated into European Union sanctions regulations and become binding domestic legislation for the member States of the Union:

    (a)   National implementing authorities (such as customs, police and other bodies), even if aware that a given infringement involved Security Council sanctions, might not appreciate that it should be reported through the relevant authority to the Security Council Committee;

    (b)   The Court of Justice of the European Union annulled the Union's asset freeze measures against Bank Mellat on 29 January 2013[36] and against Bank Saderat on 5 February 2013.[37] The Court's decisions are under appeal, but the possibility arises that, if successful, these attempts could lead to other challenges to the Union's sanctions. Several States indicated that this could bring European Union sanctions implementation into conflict with United Nations sanctions implementation.

## Private sector in sanctions implementation

152. Internal compliance programmes help entities more easily identify suspicious enquiries and more effectively strengthen export controls.[38] A challenge for the private sector is to ensure that company compliance procedures implemented at headquarters are satisfactorily translated to subsidiaries in different jurisdictions, and even more so in the case of overseas brokers or distributors.

153. Some States encourage reporting of suspicious enquiries by the private sector.[38] In one of the cases investigated by the Panel, a company notified the authorities of a suspicious procurement attempt detected by its internal compliance department on the basis of irregularities in the end-user documentation. Examples of suspicious indicators are contained in annex VIII.

154. Authorities face a particular challenge in the fast-growing trade through Internet platforms. The role of such platforms in carbon fibre surplus procurement has been highlighted by several States.

155. Many resources and databases that are accessible through the Internet offer simple and quick checks of telephone numbers and addresses of entities that may be suspected of being front companies. As the Panel has found during its own investigations, such checks can sometimes reveal connections to designated individuals or entities.

---

[36] Judgment of the General Court of 29 January 2013, *Bank Mellat v. Council* (Case T-496/10) (*Official Journal of the European Union*, C79/12).

[37] Judgment of the General Court of 5 February 2013, *Bank Saderat Iran v. Council* (Case T-494/10) (*Official Journal of the European Union*, C71/16).

[38] A case study is described by Daniel Salisbury and David Lowrie in "Targeted: A case study in Iranian illicit missile procurement", *Bulletin of the Atomic Scientists*, vol. 69, issue 3, pp. 23-30, May/June 2013.

**Intangible transfer challenges in education**

156. Several States commented on the difficulties of monitoring Iranians seeking access to advanced academic or technical training in sensitive areas. In some States, educational institutions may be reluctant to compromise their academic independence by cooperating with authorities in monitoring the activities of students or researchers or participants at seminars or conferences. States have taken a range of approaches to address this challenge. One State prevents any access to courses in sciences or engineering. Another has promoted internal compliance programmes for universities and research centres to avoid technology transfer.

## B.  Reporting of interdictions and incidents by Member States

157. The Committee received 11 reports of interdictions and incidents, covering a significantly higher number of cases than those received during the Panel's previous mandate. This reflects increased awareness of reporting responsibilities among States, and could also result from enhanced implementation.

158. Several States told the Panel that they had not reported interdictions or other incidents because of confidentiality requirements of domestic legal proceedings or legislation, although some of the information may be in the public domain. Some States have managed to accommodate such restrictions by providing a partial report to the Committee while legal proceedings were still under way, and have even invited the Panel for inspection. Another State has adopted legislation that explicitly authorizes relevant information, even if confidential, to be passed on to the United Nations.

159. The Panel considers that it is important for States to understand that reporting does not indicate weaknesses in its control measures, or of ineffectiveness in implementation of sanctions. In fact, reporting would indicate the reverse.

## C.  Disposal of seized items

160. A challenge for Member States is that the resolutions are ambiguous with regard to the requirements for the disposal of seized items. Limited guidance is provided in the relevant resolutions.

161. In some cases, shipments had been returned by the State before reporting to the Committee, thus making it impossible for the Panel to carry out a physical examination and making it difficult for it to reach a conclusion.

## Annex I

### Member States visited by the Panel*

| | | | |
|---|---|---|---|
| 1. | Armenia | 31. | **Namibia** |
| 2. | **Australia** | 32. | **Netherlands** |
| 3. | **Austria** | 33. | **New Zealand** |
| 4. | Azerbaijan | 34. | Nigeria |
| 5. | **Bahrain** | 35. | Norway |
| 6. | Belarus | 36. | Oman |
| 7. | Belgium | 37. | **Panama** |
| 8. | Brazil | 38. | Qatar |
| 9. | Bulgaria | 39. | Republic of Korea |
| 10. | Canada | 40. | Romania |
| 11. | China | 41. | Russian Federation |
| 12. | **Djibouti** | 42. | **Saudi Arabia** |
| 13. | **Egypt** | 43. | Singapore |
| 14. | **Ethiopia** | 44. | Spain |
| 15. | **France** | 45. | **Sweden** |
| 16. | **Georgia** | 46. | Switzerland |
| 17. | **Germany** | 47. | **Togo** |
| 18. | **Guatemala** | 48. | Turkey |
| 19. | **Hungary** | 49. | **Turkmenistan** |
| 20. | India | 50. | Ukraine |
| 21. | **Iraq** | 51. | **United Arab Emirates** |
| 22. | **Israel** | 52. | **United Kingdom of Great Britain and Northern Ireland** |
| 23. | Italy | | |
| 24. | **Japan** | 53. | **United States of America** |
| 25. | **Jordan** | | |
| 26. | **Kazakhstan** | 54. | Viet Nam |
| 27. | **Luxembourg** | 55. | **Yemen** |
| 28. | Malaysia | | |
| 29. | Malta | | |
| 30. | Morocco | | |

_____

\* Names of States visited by the Panel during the current mandate are in bold.

**Seaports**: Rotterdam (Netherlands), Quetzal (Guatemala), Djibouti (Djibouti), Aden (Yemen), Turkmen-bashi (Turkmenistan).

**Airports**: Luxemburg (Luxemburg), The Hague (Netherlands), Guatemala City (Guatemala), Budapest (Hungary).

**Border crossings**: Georgia [with Armenia], Turkmenistan [with the Islamic Republic of Iran].

## Annex II

## Reporting by Member State by resolution*

| Member State | All | Resolution | | | | None |
|---|---|---|---|---|---|---|
| | | 1737 (2006) | 1747 (2007) | 1803 (2008) | 1929 (2010) | |
| Afghanistan | | | | | | |
| Albania | | | | | | |
| Algeria | | | | | | |
| Andorra | | | | | | |
| Angola | | | | | | |
| Antigua and Barbuda | | | | | | |
| Argentina | | | | | | |
| Armenia | | | | | | |
| Australia | | | | | | |
| Austria | | | | | | |
| Azerbaijan | | | | | | |
| Bahamas | | | | | | |
| Bahrain | | | | | | |
| Bangladesh | | | | | | |
| Barbados | | | | | | |
| Belarus | | | | | | |
| Belgium | | | | | | |
| Belize | | | | | | |
| Benin | | | | | | |
| Bhutan | | | | | | |
| Bolivia (Plurinational State of) | | | | | | |
| Bosnia and Herzegovina | | | | | | |
| Botswana | | | | | | |
| Brazil | | | | | | |
| Brunei Darussalam | | | | | | |
| Bulgaria | | | | | | |
| Burkina Faso | | | | | | |
| Burundi | | | | | | |
| Cambodia | | | | | | |
| Cameroon | | | | | | |
| Canada | | | | | | |
| Cape Verde | | | | | | |

_____

* Shading indicates reports submitted.

| Member State | All | \u200b | | Resolution | | | None |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | 1737 (2006) | 1747 (2007) | 1803 (2008) | 1929 (2010) | | |
| Central African Republic | | | | | | | ■ |
| Chad | | | | | | | ■ |
| Chile | | | | | | | ■ |
| China | ■ | ■ | ■ | ■ | ■ | | |
| Colombia | ■ | ■ | ■ | ■ | ■ | | |
| Comoros | | | | | | | ■ |
| Congo | | | | | | | ■ |
| Costa Rica | | ■ | ■ | | | | |
| Côte d'Ivoire | | | | | | | ■ |
| Croatia | ■ | ■ | ■ | ■ | ■ | | |
| Cuba | ■ | ■ | ■ | ■ | ■ | | |
| Cyprus | ■ | ■ | ■ | ■ | ■ | | |
| Czech Republic | | ■ | | ■ | ■ | | |
| Democratic People's Republic of Korea | | | | | | | ■ |
| Democratic Republic of the Congo | | | | | | | ■ |
| Denmark | | ■ | ■ | ■ | ■ | | |
| Djibouti | ■ | ■ | ■ | ■ | ■ | | |
| Dominica | | | | | | | ■ |
| Dominican Republic | | | | | | | ■ |
| Ecuador | | ■ | ■ | | | | |
| Egypt | ■ | ■ | ■ | ■ | ■ | | |
| El Salvador | | | | | | | ■ |
| Equatorial Guinea | | | | | | | ■ |
| Eritrea | | | | | | | |
| Estonia | | ■ | ■ | | ■ | | |
| Ethiopia | | | | | | | ■ |
| Fiji | | | | | | | ■ |
| Finland | ■ | ■ | ■ | ■ | ■ | | |
| France | ■ | ■ | ■ | ■ | ■ | | |
| Gabon | | | | | | | ■ |
| Gambia | | | | | | | |
| Georgia | | ■ | ■ | ■ | ■ | | |
| Germany | ■ | ■ | ■ | ■ | ■ | | |
| Ghana | | ■ | | | | | |
| Greece | | ■ | ■ | | ■ | | |
| Grenada | | ■ | | | | | |
| Guatemala | ■ | ■ | ■ | ■ | ■ | | |

| Member State | All | 1737 (2006) | 1747 (2007) | 1803 (2008) | 1929 (2010) | None |
|---|---|---|---|---|---|---|
| | | | *Resolution* | | | |
| Guinea | | | | | | ■ |
| Guinea Bissau | | | | | | ■ |
| Guyana | | | | | | ■ |
| Haiti | | | | | | ■ |
| Honduras | | | | | | ■ |
| Hungary | ■ | ■ | ■ | ■ | ■ | |
| Iceland | | | | | | ■ |
| India | ■ | ■ | ■ | ■ | ■ | |
| Indonesia | | ■ | | ■ | | |
| Iran (Islamic Republic of) | | | | | | ■ |
| Iraq | ■ | ■ | ■ | ■ | ■ | |
| Ireland | ■ | ■ | ■ | ■ | ■ | |
| Israel | ■ | ■ | ■ | ■ | ■ | |
| Italy | ■ | ■ | ■ | ■ | ■ | |
| Jamaica | ■ | ■ | | ■ | | |
| Japan | ■ | ■ | ■ | ■ | ■ | |
| Jordan | ■ | ■ | ■ | ■ | ■ | |
| Kazakhstan | ■ | ■ | ■ | ■ | ■ | |
| Kenya | | | | | | ■ |
| Kiribati | | | | | | |
| Kuwait | | ■ | ■ | ■ | | |
| Kyrgyzstan | | ■ | ■ | ■ | | |
| Lao People's Democratic Republic | | | | | | ■ |
| Latvia | ■ | ■ | ■ | ■ | ■ | |
| Lebanon | | | | | | ■ |
| Lesotho | | | | | | ■ |
| Liberia | | | | | | ■ |
| Libya | | ■ | ■ | ■ | | |
| Liechtenstein | | ■ | | ■ | | |
| Lithuania | ■ | ■ | ■ | ■ | ■ | |
| Luxembourg | ■ | ■ | ■ | ■ | ■ | |
| Madagascar | | | | | | ■ |
| Malawi | | | | | | ■ |
| Malaysia | | | | | | ■ |
| Maldives | | | | | | ■ |
| Mali | | | | | | ■ |
| Malta | ■ | ■ | ■ | ■ | ■ | |

S/2013/331

| Member State | All | Resolution | | | | None |
|---|---|---|---|---|---|---|
| | | 1737 (2006) | 1747 (2007) | 1803 (2008) | 1929 (2010) | |
| Marshall Islands | | | | | | X |
| Mauritania | | | | | | |
| Mauritius | | X | X | X | | |
| Mexico | X | X | X | X | X | |
| Micronesia (Federated States of) | | | | | | X |
| Monaco | | X | X | | | |
| Mongolia | | | | | | X |
| Montenegro | X | X | X | X | X | |
| Morocco | X | X | X | X | X | |
| Mozambique | | | | | | X |
| Myanmar | | | | | | |
| Namibia | | | | | X | |
| Nauru | | | | | | X |
| Nepal | | | | | | |
| Netherlands | X | X | X | X | X | |
| New Zealand | X | X | X | X | X | |
| Nicaragua | | | | | | X |
| Niger | | X | X | | | |
| Nigeria | X | X | X | X | X | |
| Norway | | X | X | X | X | |
| Oman | | X | X | X | X | |
| Pakistan | X | X | X | X | X | |
| Palau | | | | | | X |
| Panama | X | X | X | X | X | |
| Papua New Guinea | | | | | | X |
| Paraguay | | | | | | |
| Peru | X | X | X | X | X | |
| Philippines | X | X | X | X | X | |
| Poland | X | X | X | X | X | |
| Portugal | X | X | X | X | X | |
| Qatar | X | X | X | X | X | |
| Republic of Korea | X | X | X | X | X | |
| Republic of Moldova | | X | X | | X | |
| Romania | X | X | X | X | X | |
| Russian Federation | X | X | X | X | X | |
| Rwanda | | | | | | X |
| Saint Kitts and Nevis | | | | | | X |
| Saint Lucia | | | | | | X |

S/2013/331

| Member State | All | Resolution | | | | None |
| --- | --- | --- | --- | --- | --- | --- |
| | | 1737 (2006) | 1747 (2007) | 1803 (2008) | 1929 (2010) | |
| Saint Vincent and the Grenadines | | | | | | ■ |
| Samoa | | | | | | ■ |
| San Marino | | | | | ■ | |
| Sao Tome and Principe | | | | | | ■ |
| Saudi Arabia | | ■ | | ■ | ■ | |
| Senegal | | | | | | ■ |
| Serbia | | ■ | ■ | | ■ | |
| Seychelles | | | | | | ■ |
| Sierra Leone | | | | | | ■ |
| Singapore | ■ | ■ | ■ | ■ | ■ | |
| Slovakia | ■ | ■ | | | | |
| Slovenia | | ■ | ■ | | | |
| Solomon Islands | | | | | | ■ |
| Somalia | | | | | | ■ |
| South Africa | | ■ | | ■ | ■ | |
| South Sudan | | | | | | ■ |
| Spain | ■ | ■ | | | | |
| Sri Lanka | | | ■ | ■ | | |
| Sudan | | | | | | ■ |
| Suriname | | ■ | ■ | | | |
| Swaziland | | | | | | ■ |
| Sweden | ■ | ■ | ■ | | ■ | |
| Switzerland | ■ | ■ | ■ | | | |
| Syrian Arab Republic | | | | | | ■ |
| Tajikistan | | | | | | ■ |
| Thailand | ■ | ■ | ■ | ■ | ■ | |
| The former Yugoslav Republic of Macedonia | ■ | ■ | ■ | ■ | ■ | |
| Timor-Leste | | | | | | ■ |
| Togo | | | | | | ■ |
| Tonga | | | | | | ■ |
| Trinidad and Tobago | | | | | | ■ |
| Tunisia | | | | | | ■ |
| Turkey | | ■ | | | ■ | |
| Turkmenistan | ■ | ■ | ■ | ■ | ■ | |
| Tuvalu | | | | | | ■ |
| Uganda | | | | | | ■ |



| Member State | All | Resolution | | | | None |
| --- | --- | --- | --- | --- | --- | --- |
| | | *1737 (2006)* | *1747 (2007)* | *1803 (2008)* | *1929 (2010)* | |
| Ukraine | | | | | | |
| United Arab Emirates | | | | | | |
| United Kingdom of Great Britain and Northern Ireland | | | | | | |
| United Republic of Tanzania | | | | | | |
| United States of America | | | | | | |
| Uruguay | | | | | | |
| Uzbekistan | | | | | | |
| Vanuatu | | | | | | |
| Venezuela (Bolivarian Republic of) | | | | | | |
| Viet Nam | | | | | | |
| Yemen | | | | | | |
| Zambia | | | | | | |
| Zimbabwe | | | | | | |
| **Total** | 64 | 99 | 86 | 80 | 84 | 91 |

## Annex III

## Developments in the uranium enrichment programme of the Islamic Republic of Iran

|  | *International Atomic Energy Agency Board report (24 Feb. 2012) (GOV/2012/9)* | *International Atomic Energy Agency Board report (21 Feb. 2012) (GOV/2013/6)* | *Increase over the year* |
|---|---|---|---|
| IR-1 centrifuges at the Natanz Fuel Enrichment Plant | 9,156 centrifuges installed | 12,669 centrifuges installed | 3,513 centrifuges installed |
| IR-2m centrifuges at Natanz Fuel Enrichment Plant | N/A | 180 centrifuges and casings | 180 centrifuges and casings |
| Quantity of 5 per cent UF6 at Natanz Fuel Enrichment Plant | 5,451 kg UF6 | 8,271 kg UF6 | 2,820 kg UF6 |
| Quantity of 20 per cent UF6 at Pilot Fuel Enrichment Plant | 95.4 kg UF6 | 149.9 kg UF6 | 54.5 kg UF6 |
| IR-1 centrifuges at Fordow Fuel Enrichment Plant | 696 centrifuges installed | 2,710 centrifuges installed | 2,014 centrifuges installed |
| Quantity of 20 per cent UF6 at Fordow Fuel Enrichment Plant | 13.8 kg UF6 | 129.9 kg UF6 | 116.1 kg UF6 |

A comparison of data contained in the International Atomic Energy Agency (IAEA) Board reports dated 24 February 2012 and 21 February 2013 illustrate developments in the Iranian uranium enrichment programme over a period approximately concurrent with the Panel's mandate.

44      **Annex IV**

## Changes in name, ownership and flagging of vessels owned by the Irano Hind Shipping Company

**(1 April 2012-28 April 2013)**

The table below details the changes in name, ownership and flagging between 1 April 2012 and 28 April 2013 among vessels beneficially owned by Irano Hind Shipping Company as of 1 April 2012. Changes in names, flags and registered owners are ongoing.

The changes demonstrate the following:

Two crude oil tankers, the *Volga* and *Desh Shobha*, were transferred to other beneficial owners.

Flag changes show some patterns, as colour-coding in the table shows, among both bulk carriers and crude oil tankers. One tanker has subsequently been flagged in the Islamic Republic of Iran.

Among the six vessels, all the bulk carriers are registered with a single company and all the tankers with another company.

| Name | | Flag* | | | | | Registered Owner | | |
|---|---|---|---|---|---|---|---|---|---|
| Current name | Previous name | Current flag | Previous flags | | | | Current registered owner | Previous registered owners | |
| **Bulk Carrier** | | | | | | | | | |
| *Attar* (**IMO 9074092**) | | TZA | MLT | | | | **Alicia Marine Co. Ltd (BLZ)** | ISIM ATR Ltd (MLT) | |
| *Sattar* (**IMO 9040479**) | | Unknown | TZA | | | | **Alicia Marine Co. Ltd (BLZ)** | ISIM Sat Ltd (MLT) | |
| *Sinin* (**IMO 9274941**) | | Unknown | TZA | MLT | | | **Alicia Marine Co. Ltd (BLZ)** | Isim Sinin Ltd (MLT) | |
| *Teen* (**IMO 9101649**) | | Unknown | TZA | MLT | | | **Alicia Marine Co. Ltd (BLZ)** | Biis Maritime Ltd (MLT) | |
| **Crude oil tankers** | | | | | | | | | |
| *Amin 2* (**IMO 9422366**) | *Amin* | IRN | TGO | SLE | BOL | MLT | **Auris Marine Co. Ltd (MHL)** | Isim Amin ltd (MLT) | |
| *Tour 2* (**IMO 9364112**) | *Tour* | Unknown | TGO | SLE | BOL | MLT | **Auris Marine Co. Ltd (MHL)** | Isim Tour Ltd (MLT) | |
| *Volga* (**IMO 9003237**) | *ISI Olive* | TGO | SLE | BOL | MLT | | Tabuk Maritime Inc (PAN) | Auris Marine Co. Ltd (MHL) | ISIM Olive Ltd (MLT) |
| *Desh Shobha* (**IMO 9459046**) | *Taj Mahal* | IND | MLT | | | | Shipping Corp. of India Ltd (IND) | Irano Hind Shipping Co. (IRN) | |

* Name of flag States is indicated in ISO three-digit country codes: BLZ: Belize, BOL: Bolivia (Plurinational State of), IND: India, IRN: Iran (Islamic Republic of), MHL: Marshall Islands, MLT: Malta, PAN: Panama, SLE: Sierra Leone, TZA: United Republic of Tanzania.

**Annex V**

## Movements of crude oil tankers owned by the Irano Hind Shipping Company

**(March 2012-April 2013)**



## Annex VI

### Difficulties encountered by *Amin 2* and *Tour 2* following de-flagging

1.  **Amin 2 (June to October 2012)**

    The flag State took action to revoke the registration of the *Amin 2* during or after its passage through the Suez Canal towards Syrian ports. The *Amin 2* remained at Banias port in the Syrian Arab Republic for approximately one month. It then departed from Banias port in the direction of the Suez Canal but had to return to Tartous port, Syrian Arab Republic, as indicated in figure I. After staying at Tartous port for approximately one month, it departed for the Islamic Republic of Iran, taking an unusually lengthy route around the entire African continent, which took more than one month (see figure II).

    Figure I



Figure II



**2.** ***Tour 2* (December 2012 to March 2013)**

    A separate flag State also took action to revoke this vessel's registration while the *Tour 2* was berthed at Tartous port. *Tour 2* departed Tartous port in mid-January 2013 and sailed the eastern Mediterranean until it passed through the Suez Canal on about 15 March 2013 (see figure III below).

Figure III



## Annex VII

# Changes in the ownership structures of vessels owned by the Islamic Republic of Iran Shipping Lines

**(1 April 2012-28 April 2013)**

Figure I below illustrates a comparison of the fleet owned by the Islamic Republic of Iran Shipping Lines as a whole between 1 April 2012 and 28 April 2013. It shows that vessels under beneficial ownership of the company and its related companies, Sapid Shipping Company and Hafiz Darya Shipping Line, continuously changed names, flags and registered owners during this period.*

Figure I also shows a significant increase in the number of Iranian-flagged vessels, shown in red (from 42 out of 124 vessels to 106 out of 117 vessels).

---

  * *Acronyms/abbreviations*: IRISL: Islamic Republic of Iran Shipping Lines; Sapid: Sapid Shipping Company; HDSL: Hafiz Darya Shipping Line; Kish Roaring: Kish Roaring Ocean Shipping Company; Oghyanous: Oghyanous Khoroshan Kish Shipping Company; Mosakhar: Mosakhar Darya Shipping Company.

Figure I
**Ownership structure (as of 1 April 2012)**



**Ownership structure (as of 28 April 2013)**



Figure II below illustrates the complexity of changes in beneficial ownership structure of the fleet owned by the Islamic Republic of Iran Shipping Lines. It shows that approximately 20 vessels have been transferred to three Iranian shipping companies: Mosakhar Darya Shipping Company, Kish Roaring Ocean Shipping Company and Oghyanous Khoroshan Kish Shipping Company.

Figure II



## Annex VIII

### Indicators of suspicious enquiries

Several companies highlighted the following as indicators of possibly suspicious enquiries:

• Reluctance by the customer to share information on end use and end user;

• Inconsistency between enquiries and the customer's business activities;

• Inconsistency between the technical properties of the items of interest and the technical capability of their country of destination;

• Potential purchasers with little or no relevant business background;

• Offers of abnormally favourable terms of payment;

• Purchasers' eagerness to acquire products despite unfamiliarity with the products' properties;

• Purchasers' refusal to accept standard post-sales services, such as installation, maintenance or training;

• Enquiries which lack specific dates by when delivery is necessary;

• Trading or transportation companies named as consignees;

• Unusual transportation routes for export, or unusually remote destination;

• Use of postal address by purchaser.

## Annex IX

### Incidents of non-compliance reported to the Committee since June 2012

**Valves (Germany)**: COMM.61 (23 Aug. 2012)

**Great Prophet Exercise (United States of America, United Kingdom of Great Britain and Northern Ireland, France and Germany)**: COMM.73 (9 Oct. 2012)

**Machine tools (Spain)**: COMM.8 (23 Jan. 2013)

**Satellite technology (Germany)**: COMM.13 (4 Feb. 2013)

**Jihan vessel (Yemen)**: COMM.15 (7 Feb. 2013)

**Report on the shipments confiscated during the second quarter of 2012 (State X)**: COMM.19 (15 Feb. 2013)

**Report on the shipments confiscated during the third and fourth quarters of 2012 (State X)**: COMM.27 (5 March 2013)

**Valves (Sweden)**: COMM.30 (8 March 2013)

**Milad Jafari case (United States)**: COMM.41 (29 April 2013)

**Parviz Khaki case (United States)**: COMM.42 (29 April 2013)

**Fibre-optic gyroscope (France)**: COMM.44 (1 May 2013)

**Annex X**

## Panel reports to the Committee since June 2012

1. Compilation of public statements of transfers of arms to Gaza by the Islamic Republic of Iran (1737 Committee request): COMM.93 (14 Dec. 2012)

2. Great Prophet Exercise (United States of America, United Kingdom of Great Britain and Northern Ireland, France and Germany): Note.6 (11 Jan. 2013)

3. Bahraini interdictions (Bahrain): Note.45 (21 March 2013)

4. *Jihan* (Yemen): Note.55 (22 Apr 2013)

5. Valves (Germany): Note.64 (1 May 2013)

6. Valves (Sweden): Note.63 (1 May 2013)

7. Interdictions of process control equipment, bellows, cables and batteries (State X): Note.65 (3 May 2013)

———————

United Nations

S/2015/401*



# Security Council

Distr.: General
2 June 2015

Original: English

---

## Note by the President of the Security Council

In paragraph 2 of resolution 2159 (2014), the Security Council requested the Panel of Experts established pursuant to resolution 1929 (2010) to provide a final report to the Council with its findings and recommendations.

Accordingly, the President hereby circulates the report dated 1 June 2015 received from the Panel of Experts (see annex).

---

\* Reissued for technical reasons on 4 June 2015.

15-06375* (E)    040615



Please recycle 

**Annex**

### Letter dated 1 June 2015 from the Panel of Experts established pursuant to Security Council resolution 1929 (2010) addressed to the President of the Security Council

The Panel of Experts established pursuant to resolution 1929 (2010) has the honour to transmit herewith, in accordance with paragraph 2 of resolution 2159 (2014), the final report on its work.

The report was provided to the Security Council Committee established pursuant to resolution 1737 (2006) on 24 April 2015 and was considered by the Committee on 1 June 2015.

The Panel would appreciate it if the present letter and its annex were brought to the attention of the members of the Security Council and issued as a document of the Council.

(*Signed*) Salomé **Zourabichvili**
Coordinator
Panel of Experts established pursuant to
Security Council resolution 1929 (2010)

(*Signed*) Mowaffaq **al-Refai**
Expert

(*Signed*) Jonathan **Brewer**
Expert

(*Signed*) J. Christian **Kessler**
Expert

(*Signed*) Chunjie **Li**
Expert

(*Signed*) Thomas **Mazet**
Expert

(*Signed*) Kazuto **Suzuki**
Expert

(*Signed*) Elena **Vodopolova**
Expert

# Final report of the Panel of Experts established pursuant to resolution 1929 (2010)

## Summary

The current mandate of the Panel is concurrent with the continuing implementation and extension of the previously agreed Joint Plan of Action, which will end on 30 June 2015, a few days before the end of the Panel's mandate on 9 July 2015.

The present report is being delivered shortly after the Islamic Republic of Iran and the E3+3 countries,[a] on 2 April 2015, "reached solutions on key parameters of a Joint Comprehensive Plan of Action" and while negotiations are continuing towards final agreement.

The Security Council, in a new resolution, will endorse a final agreement and will have to address existing Security Council sanctions which have been at the centre of recent negotiations. To date, all Security Council sanctions have remained fully in effect. It has been, inter alia, the task of the Panel to remind Member States of the continuing application of Security Council sanctions and their obligations under the resolutions. It is to be noted that, despite the ongoing negotiations and high expectations of a final agreement to be reached, the mandate period has not been marked by a relaxing of United Nations sanctions implementation, nor a wavering of political will by the Member States to act in accordance with Security Council obligations. Such commitment by Member States has exerted a definite influence in reaching the negotiated result.

The Islamic Republic of Iran has complied with its safeguards obligations, implemented its commitments under the Joint Plan of Action, and worked with the International Atomic Energy Agency (IAEA) on Framework for Cooperation matters.

As part of the Joint Plan of Action, concomitant with IAEA confirmation that the Islamic Republic of Iran was fulfilling the "voluntary measures" agreed in this format, some unilateral sanctions have been suspended, providing limited relief to the Islamic Republic of Iran's economy.

The Panel has not identified cases of procurement for activities prohibited under Security Council resolutions that occurred during the current mandate, nor have any such cases being reported by Member States.

However, the following developments have been noted in other areas covered by the Security Council resolutions, and not addressed in the Joint Plan of Action:

During the current mandate, the Islamic Republic of Iran has not launched or unveiled any new types of medium-range ballistic missiles. However, the Fajr satellite was launched by a Safir space launch vehicle and the Islamic Republic of Iran's annual Great Prophet military exercise reportedly involved the Fateh 110 ballistic missile.

The Islamic Republic of Iran's arms transfers have actively continued, as reflected in numerous media reports, raising concerns among some Member States. The Panel notes that no State has formally reported an actual case of non-compliance although one State has informed the Panel of an offer by the Islamic Republic of Iran.

Travels to neighbouring countries of a prominent designated Iranian individual, amply covered by the media, have been duly noted by the Panel. Nevertheless, no violation of the travel ban as such has been formally reported to the Committee.

The Panel has observed that the private sector remains in compliance. Although many companies, in the expectation of increased commercial opportunities in the near future, are exploring possibilities, companies have limited themselves to preliminary understandings. This indicates that the private sector remains risk adverse, mindful of obligations and of reputation.

The overall lack of reporting is a distinctive feature of this mandate period. It might be linked, inter alia, to a decrease in the Islamic Republic of Iran's prohibited activities and restraint on the part of Member States so as not to affect the negotiations process.

Given the ongoing negotiations, the Panel refrains from additional recommendations to those already proposed in the Panel's previous final reports.[b]

---

[a] The E3+3 countries include France, Germany, the United Kingdom of Great Britain and Northern Ireland, China, the Russian Federation and the United States of America.
[b] These are to be found in the 2011 final report, in S/2012/395, in S/2013/331 and in S/2014/394.

## Introduction

1.    The present report has been prepared in accordance with the Panel's mandate as set forth in paragraph 29 of resolution 1929 (2010), and renewed by resolution 2159 (2014). It summarizes the Panel's work since 9 June 2014.

### Methodology

2.    The Panel conducted its work on the basis of its mandate, under the direction of the Security Council Committee established pursuant to resolution 1737 (2006). The Panel is mindful of the Fact Sheet of the Committee,[1] the methodological standards contained in the report of the Informal Working Group of the Security Council on General Issues of Sanctions of 22 December 2006 (S/2006/997) and further described in *Best Practices and Recommendations for Improving the Effectiveness of United Nations Sanctions*. The Panel is aware of potential sensitivities in connection with information received from Member States or the private sector and is mindful of preserving confidentiality of all sources of information.

### Activities of the Panel

3.    The Panel's work includes consultations with Member States, inspections of reported incidents and investigations of possible cases of non-compliance, and also outreach to raise awareness about United Nations sanctions implementation, possible circumvention and the need for vigilance. The Panel regularly consults experts in governments, academia, non-governmental organizations, the private sector, United Nations bodies and, as appropriate, other United Nations panels of experts. During the present mandate, the Panel held consultations with 11 Member States, participated in 12 seminars and conferences and co-organized an outreach seminar in Jordan.

## I.   Recent developments

## A.   International and internal context

### Joint Plan of Action and negotiations

4.    The current mandate of the Panel has coincided with the continuing implementation and extension of the Joint Plan of Action,[2] and with the Islamic Republic of Iran and the E3+3 reaching "solutions on key parameters of a Joint Comprehensive Plan of Action" (hereafter "agreement of 2 April"). The Joint Plan of Action will end on 30 June 2015, a few days before the end of the Panel's mandate on 9 July 2015.

---

[1] "Fact sheet: the 1737 Committee and its Panel of Experts", approved by the Committee on 19 April 2013. Fact sheet posted on the Committee's web page: www.un.org/sc/committees/1737/pdf/Fact_Sheet_en.pdf.

[2] The Joint Plan of Action entered into force on 20 January 2014 and was extended on 24 November 2014 until the end of June 2015 with an intermediate date for the conclusion of a political agreement by 31 March 2015. The "parameters for the Joint Comprehensive Plan of Action" were adopted on 2 April and, as decided by the E3+3, details have to be worked out by 30 June 2015.

5.    To date, the Islamic Republic of Iran has implemented the requirements of the Joint Plan of Action. This has generated positive expectations in the international community. However, the Islamic Republic of Iran has continued to deny the legitimacy of provisions of Security Council resolutions not addressed in the Joint Plan of Action:[3] arms transfer activities by the Islamic Republic of Iran appear to have actively continued, raising concerns in particular in the region; some cases of non-compliance with the travel ban have also been observed.

6.    During the negotiations, Security Council sanctions have remained fully in effect. It has been, inter alia, the task of the Panel to remind Member States of the continuing application of sanctions and obligations under the existing resolutions.

**Economy of the Islamic Republic of Iran**

7.    Since the first phase of the Joint Plan of Action, certain unilateral sanctions have been suspended, others partially lifted (regarding the Islamic Republic of Iran's purchases and sale of gold and metal, exports of petrochemical products, and its automotive industry and spare parts). Some assets, frozen under unilateral sanctions, have been released to the Islamic Republic of Iran. As at mid-April 2015, and since the adoption of the Joint Plan of Action, the Islamic Republic of Iran has received US$ 10.43 billion in 21 instalments.[4] This has released some pressure on the Islamic Republic of Iran's economy although it has continued to suffer from its inability to access hard currencies, while it has been authorized by the Joint Plan of Action to restart its oil exporting activities.

8.    The Islamic Republic of Iran's economy moved out of recession in December 2014.[5] In his speech of 11 February 2015, marking the thirty-sixth anniversary of the Revolution, the President of the Islamic Republic of Iran, Hassan Rouhani, said the economy had grown at an annual rate of 4 per cent, pulling it out of two years of recession.[6] Inflation, once around 40 per cent, is now below 17 per cent. But, while oil still represents 42 per cent of state revenues, the fall in oil prices is endangering the recovery and could tilt the country again towards recession.[7]

9.    Meanwhile, numerous foreign companies, taking advantage of the improved diplomatic atmosphere, are attempting to position themselves for an eventual relaxation of sanctions to gain market share. Economic delegations have visited Tehran and preliminary deals have been discussed. The Panel has no indication that this activity has led to non-compliance with the Security Council resolutions.

**Political situation**

10.    It is difficult to evaluate the internal political balance of forces between the pro-Rouhani elements and the conservative ones rallying around the leaders of the Islamic Revolutionary Guard Corps (IRGC) and conservative forces in Parliament.

---

[3] International Atomic Energy Agency (IAEA), Communication dated 11 March 2015 received from the Permanent Mission of the Islamic Republic of Iran to the Agency regarding the report of the Director General on the implementation of safeguards in Iran (INFCIRC/873, 17 March 2015).

[4] Information received from one Member State.

[5] "Rouhani says recession over in Iran", *Mehr news*, 24 December 2014.

[6] Ladane Nasseri, "Iran exits recession with 4% growth in six months, Rouhani says", *Bloomberg*, 24 December 2014.

[7] "Iran's economy: fading hope", *The Economist*, 7 March 2015.

The declarations of the Supreme Leader, Ayatollah Ali Khamenei, seem to have given President Rouhani room for manoeuvre and a measure of support in his attempt to finalize negotiations. Despite the President's public criticism of IRGC for accumulating power and engaging in corruption,[8] the Corps supported the agreement of 2 April.[9] The President has still to convince these conservative elements that the outcome will be acceptable in terms of the Islamic Republic of Iran's prestige and future capacity to protect and pursue its peaceful nuclear programme. At this stage, he seems to retain a rather significant popular support from a population tired of sanctions and eager to see the partial lifting of sanctions be transformed into a long-lasting agreement carrying economic benefits.

11.   While the Panel is aware of the gist of the negotiations that led to the agreement of 2 April, it is not in a position to speculate or to draw on the parameters, given the discrepancies in the comments made by the parties. Given the requested date of submission of the present report (21 April 2015), no analysis of what might be the elements of a final agreement will be found herein.

## B.   Nuclear

12.   While the Islamic Republic of Iran has fulfilled its requirements under the Joint Plan of Action and, except for two measures, under the Framework for Cooperation, as agreed with the International Atomic Energy Agency (IAEA), it has continued certain nuclear activities, including uranium enrichment and some work at Arak. The Islamic Republic of Iran also took actions implementing its Safeguards Agreement under the Treaty on the Non-Proliferation of Nuclear Weapons.[10] IAEA continued its verification responsibilities and reported to its Board of Governors and to the Security Council.

### Joint Plan of Action

13.   As provided for in the Joint Plan of Action agreed between the Islamic Republic of Iran and the E3+3, and reported by IAEA,[11] the Islamic Republic of Iran has ceased enriching uranium above 5 per cent U-235, is no longer operating cascades in an interconnected configuration, and has down-blended 20 per cent enriched UF6 to 5 per cent enrichment or converted it to uranium oxide. The Islamic Republic of Iran has no known capability to convert that material back into UF6. An amount of 2,720 kg of 5 per cent UF6 was also converted to uranium oxide. IAEA continued daily access to the Natanz and Fordow enrichment facilities, and regular managed access to centrifuge production and storage activities. Enrichment research and development activities have been conducted under safeguards and without accumulating enriched uranium.

---

[8] Arash Karami, "Rouhani criticizes consolidation of power in government", *Al-Monitor*, 9 December 2014.
[9] "IRGC supports nuclear framework deal", *Al-Monitor*, 7 April 2015.
[10] IAEA, "Text of the Agreement between Iran and the Agency for the application of safeguards in connection with the Treaty on the Non-Proliferation of Nuclear Weapons" (INFCIRC/214, 13 December 1974).
[11] IAEA, "Status of Iran's nuclear programme in relation to the Joint Plan of Action" (GOV/INF/2015/8, 20 April 2015).

S/2015/401

14.   During the reporting period, the Islamic Republic of Iran provided an updated design information questionnaire for the Arak reactor and agreed to a "safeguards approach" for the reactor. No "further advances" have been undertaken at Natanz, the Fordow fuel enrichment plant or the Arak reactor, including no manufacture and testing of fuel for the Arak reactor. Information and managed access have been provided for the declared uranium mining and milling activities.

15.   The Islamic Republic of Iran provided, in relation to enhanced monitoring, plans for nuclear facilities and a description of each building at each nuclear site; descriptions of the scale of operations being conducted for each location engaged in specified nuclear activities; and information on uranium mines and mills and on source material.[12]

### Framework for Cooperation and possible military dimensions

16.   Among the measures agreed between the Islamic Republic of Iran and IAEA, all but two appear to have been completed. Those two "practical measures" concern "possible military dimensions" of past activities. The first relates to allegations of large-scale high explosives experimentation at Parchin. The second relates to studies, reported in scientific publications, regarding neutron transport and associated modelling and calculations and their alleged application to compressed materials. Continuing discussions between IAEA and the Islamic Republic of Iran have yet to resolve either issue.

### Safeguards

17.   With respect to implementation of safeguards under the Non-Proliferation Treaty in the Islamic Republic of Iran, IAEA reported in February that it "continues to verify the non-diversion of declared nuclear material at the nuclear facilities and locations outside facilities[13] declared by Iran under its safeguards agreement".[14] More specifically, with respect to each declared uranium enrichment facility, the Agency concludes that the facility "has operated as declared by Iran in the relevant design information questionnaire".[15] However, the Agency continues to state that it cannot at this time confirm completeness.[16]

## C.   Ballistic missiles

### Ballistic missile programme

18.   During the current mandate, the Islamic Republic of Iran did not report the unveiling or testing of new types of ballistic missiles, nor were tests of known medium-range ballistic missiles identified by the Panel. Iranian officials and media, while usually keen to publicize their achievements in that field, have not been reporting any new ballistic missile developments.

---

[12] Ibid.

[13] A technical term. Locations outside facilities are sites that do not meet the IAEA definition of a nuclear facility but possess nuclear material.

[14] IAEA, "Implementation of the NPT Safeguards Agreement and relevant provisions of Security Council resolutions in the Islamic Republic of Iran" (GOV/2105/15, 19 February 2015, para. 71).

[15] Ibid, para. 38.

[16] Ibid, para. 71.

19.     The Islamic Republic of Iran possesses two variants of ballistic missile that, according to experts, are believed to be potentially capable of delivery of nuclear weapons. One, the Ghadr missile, is a variant of liquid-fuel Shahab-3, with a range of approximately 1,600 km. The other is the solid-fuel Sejil missile, with a range of about 2,000 km. Both types were last launched in 2011.[17]

20.     The Panel took note of the Great Prophet 9 exercise held from 25 to 27 February 2015 in the Strait of Hormuz. According to media reports, "a number of the IRGC cruise and two ballistic missiles were fired", in particular, "a mobile naval target was destroyed by Fateh-110 and Zelzal missiles on a deserted island 270 km away from the war games zone".[18] The Fateh-110 is a solid-fuel short-range ballistic missile with a range of around 200 km.[19] It is possible that one of the objectives of the exercise was to continue improvement of the accuracy of existing missiles.[20] Medium-range ballistic missiles, such as Shahab-3 modifications, traditionally part of these exercises, were not reported to be involved this time.

21.     The Panel also notes recent published photographs[21] of the construction site at the Shahrud launch site discussed in its last final report.[22] On the basis of the photographs, the Panel notes that no significant progress appears to have been made in the ongoing construction at the site (see figure I).

---

[17]  See the Panel's final report of 2011 (paras. 108, 109, 111 and 113).

[18]  "Iran's IRGC wraps up first day of major maneuvers in Persian Gulf", *Press-TV*, 25 February 2015; see also "IRGC missiles destroy mock aircraft carrier in Persian Gulf", *Fars News Agency*, 25 February 2015; "Iran to test-fire 20 new missiles in Persian Gulf", *Press-TV*, 25 February 2015; Arask Karami, "IRGC: naval exercise also 'media-psychological' operation", *Al-Monitor*, 2 March 2015; and Franz-Stefan Gady, "In A2/AD showcase, Iranian Navy sinks *Nimitz* carrier mock-up", *The Diplomat*, 28 February 2015.

[19]  Panel's final report of 2011 (para. 110).

[20]  During the past few years, the Islamic Republic of Iran has stated that it was working on raising Fateh-110 missiles' high-precision/accuracy. The Islamic Republic claims that some Fateh-110 modifications already have a range of over 300 km and can accurately hit the targets. See also "Iran test-fires upgraded Fateh-110 missiles", *Jane's Intelligence Weekly*, 6 August 2012.

[21]  The site, though announced by the Islamic Republic of Iran and designed for launches of space launch vehicles, does not yet have the storage facility for liquid-fuel missiles that allows analysts to suggest that it could be constructed for launches of solid-fuel missiles. See Norbert Brügge's blog for recent pictures, "Satellite images from Iran's missile launch complex near Shahrud", 13 April 2015, available from http://www.b14643.de/Spacerockets_1/Diverse/ Shahrud_Missile-Range/; and, for comparison, see J. S. Bermudez and J. Binnie, "Second Iranian space-launch center revealed", *IHS Jane's Defense Weekly*, 7 August 2013.

[22]  S/2014/394, para. 52.

Figure 1
**Aerial images of the Shahrud launch site**



*Source*: Digital Globe.

## Space programme

22.   On 9 January 2015, President Rouhani announced that all Iranian space activities were moved from the Office of the Presidency to the Ministry of Communications and Information Technology.[23] This move appears to be aimed at restructuring the space programme with more practical and realistic objectives, in particular regarding satellite launches.[24]

## Satellite launch

23.   On 2 February 2015, the Islamic Republic of Iran reportedly launched into Earth orbit an experimental satellite Fajr. Its prototype, together with three other satellites, was unveiled on 7 February 2011.[25] This was the first announced successful launch since 2012 (four satellites were launched in 2009, 2011 and 2012,[26] and another two satellite launch attempts in 2012 reportedly failed,[27] followed by several announcements of launches). The satellite was launched from a military base in northern Semnan province seemingly by a two-staged Safir-1B space launch vehicle based on the Shahab-3 ballistic missile (see figure II).[28]

---

[23] Arash Karami, "Rouhani moves space program back to ministry", *Al-Monitor*, 5 February 2015.

[24] The Iranian Minister of Communications and Information Technology, Mahmoud Vaezi, announced "the country's plans to widen its home-grown space program to make more applied and national uses of the technology". He announced the end of the first 10-year development plan which "mostly focused on testing" and the beginning of the new second 10-year plan which "will make more tangible uses of the space technology". See "Science Minister: Iran's aerospace industry readying for long jump", *Fars News Agency*, 10 March 2015.

[25] "Safir Data Sheet", *Space Launch Report*. Last updated on 6 February 2015. Available from www.spacelaunchreport.com/safir.html.

[26] See the Panel's final reports of 2012 (S/2012/395, para. 84) and 2013 (S/2013/331, para. 89).

[27] See S/2013/331, para. 87. See also "For third time in two years Iran fails to launch satellite", *Times of Israel*, 27 April 2013; and "Iran suspected of launch failure in February'', *Spaceflight101*, 20 March 2013.

[28] Stephen Clarck, "Iranian satellite successfully placed in orbit", *Spaceflight now*, 2 February 2015. See also the description of Fajr on *Spaceflight101*, last updated in February 2015, available from www.spaceflight101.com/re-entry-february-2015.html.

Figure II
**Launch of a Fajr satellite on a Safir-1B space launch vehicle; video captured on
2 February 2015**



*Source*: Arms control; www.armscontrol.org/blog/ArmsControlNow/2015-01-26/Irans-
   Overdue-ICBM.

24.    The Fajr satellite weighs about 50 kg and was designed for collecting imagery.
Although it initially entered orbit,[29] doubts about its success were confirmed by the
fact that, despite a planned 18 months in orbit, the satellite re-entered Earth
atmosphere after 23 days.[30]

25.    The details of the flight of the space launch vehicle and technical
specifications of the satellite suggest that the launch of the Safir was not, in this
case, aimed at, but could contribute to, the development of a ballistic missile
capable of delivering nuclear weapons. In this regard, the Panel notes that the
details of this case present similarities with the launch of another satellite by a Safir
space launch vehicle in 2011, which was reported by Member States, analysed by
the Panel and described in its 2012 final report.[31]

---

[29] The "tracking data from US Air Force Space Surveillance Network indicated an object
   associated with the launch in an orbit with a perigee of about 139 miles and an apogee of about
   450 km (285 miles). Satellite is flying in an orbit tilted at 55.5 degrees to the equator"; quoted
   from "Iranian satellite successfully placed in orbit", *Spaceflight now*, 2 February 2015.
[30] North American Aerospace Defense Command registration number 40387. See Online satellite
   and flare tracking (Satflare) at www.n2yo.com/satellite/?s=40387.
[31] S/2012/395, paras. 35-36.

26.   The Islamic Republic of Iran announced its plans to launch three other satellites during the period from March 2015 to March 2016 named Zafar, Tolou and Pars "from more powerful launchers and on the back of bigger carriers".[32]

27.   The Joint Plan of Action makes no reference to the Islamic Republic of Iran's ballistic missile activities.

## D.   Transfers of conventional arms and related materiel

28.   Unlike every previous mandate, during the current mandate no transfers of conventional arms and related materiel by the Islamic Republic of Iran were reported to the Committee. The Panel however notes media reports pointing to continuing military support and alleged arms transfers to the Syrian Arab Republic,[33] Lebanon,[34] Iraq,[35] and Yemen,[36] and to Hizbullah and Hamas.[37] The Panel further notes that Iranian officials, although not denying military support, do not mention transfers of arms.

29.   The discrepancy between media reports of alleged arms transfers and the lack of reporting to the Committee could have a number of explanations, among those some that were observed by the Panel in the past (the Islamic Republic of Iran's use of air, land or sea shipment routes in a way that avoids interdictions by Member States) or reluctance to report on the part of Member States.

**Arms transfers to Iraq**

30.   Shipment of arms was confirmed by the President of the Kurdistan Regional Government, Massoud Barzani, during a joint press conference with the Islamic Republic of Iran's Foreign Minister, Mohammad Javad Zarif, on 26 August 2014. President Barzani said: "We asked for weapons and the Islamic Republic of Iran was the first country to provide us with weapons and ammunition."[38] Mr. Zarif, in a public talk at the New York-based Council of Foreign Relations, said: "We don't have boots on the ground in Iraq. We have advisers in Iraq. We send equipment to Iraq."[39] The Islamic Republic of Iran is reported to continue to supply weapons in support of the Kurdistan Regional Government against the Islamic State in Iraq and the Levant (ISIL).[40]

31.   According to a recent media report quoting a United States official, the Islamic Republic of Iran deployed to Iraq weapons "similar to Fajr-5 rockets and Fateh-110

---

[32] "Science Minister: Iran's aerospace industry readying for long jump", *Fars News Agency*, 10 March 2015.

[33] "Iran boosts military support in Syria to bolster Assad", *Reuters*, 21 February 2014.

[34] "Iran ready to send Lebanon arms to battle terrorists", *The Daily Star*, 21 October 2014.

[35] Michael R. Gordon and Eric Schmitt, "Iran sends 3 attack planes to Iraqi Government", *New York Times*, 8 July 2014.

[36] "Iranian ship unloads 185 tons of weapons for Houthis at Saleef port", *Al Arabiya News*, 20 March 2015.

[37] "IRGC Commander: Syria, Iraq, Palestine, Hezbollah aided by Iran's missile technology", *Fars News Agency*, 2 February 2015.

[38] "Iran boosts military support in Syria to bolster Assad", *Reuters*, 21 February 2014.

[39] "A conversation with Mohammad Javad Zarif", Council on Foreign Relations, 17 September 2014.

[40] "Iran arms exports to Iraq tolerated in fight against Isis says report", *The Guardian*, 17 February 2015.

missiles" but "slightly different and had different names."[41] This information, if confirmed, would indicate that the Islamic Republic of Iran, in order to help in the fight against ISIL, is now moving advanced weaponry to the region (see figure III).

Figure III
**Kurdish fighters fire a M40-type 106-mm recoilless gun from an Iranian Safir jeep near Tuz Khurmatu in Iraq on 31 August 2014**



*Source*: Press Association.

**Alleged arms transfers to the Syrian Arab Republic**

32.    The Panel has in previous reports investigated the issue of arms transfers by air from Tehran to Damascus.[42] The Panel found in 2012 that Yas Air was in violation of paragraph 5 of resolution 1747 (2007) "for transporting prohibited arms and related materiel from the Islamic Republic of Iran to the Syrian Arab Republic".[43] As a consequence Yas Air was designated by the Committee.[44] Media reports indicate that the Islamic Republic of Iran continues to transfer arms and related materiel to the Syrian Government.[45] Given the deteriorating security situation in the Syria Arab Republic, there is no possibility of gathering evidence that would confirm or deny these allegations.

---

[41] Eric Schmitt, "Iran sent arms to Iraq to fight ISIS, U.S. says", *New York Times*, 16 March 2015.
[42] See S/2013/331, para. 106: "… two States reported that in 2012 the Islamic Republic of Iran used Iran Air and Mahan Air to transport arms from Tehran to Damascus"; and S/2014/394, para. 43: "Several States and some local authorities in Iraq indicated to the Panel that a likely supply route of arms from the Islamic Republic of Iran to the Syrian Arab Republic involves the use of Iraqi territory, primarily by air, but also by land".
[43] See S/2012/395, para. 229.
[44] Listed on 18 April 2012 by a decision of the Committee (IRe.077).
[45] Khaled Atallah, "Israeli strikes on Syria hit Iranian weapons destined for Hezbollah", *Al-Monitor*, 9 December 2014; "Fighting ISIL is a smokescreen for US against Syria, Iran", *Global Research*, 26 September 2014.

**Arms offered by the Islamic Republic of Iran to Lebanon**

33.    According to media reports, in October 2014 the Islamic Republic of Iran offered to send arms and related materiel to the Lebanese army in support of the fight against terrorism.[46]

34.    Lebanese authorities, when contacted by the Panel, confirmed the offer.[47] They indicated that the Islamic Republic of Iran was awaiting the consent of the Government of Lebanon, which sought the view of the Panel. The Panel informed the Lebanese authorities that in its opinion any such transfer would be prohibited under paragraph 5 of resolution 1747 (2007) and suggested that this matter be brought to the attention of the Committee.

35.    The Panel assesses this "attempt"[48] as a case of non-compliance by the Islamic Republic of Iran as stated in paragraph 3 of the Fact Sheet of the Committee.[49] At the time of writing, the Panel has no information as to an actual delivery taking place. At this stage, the Panel notes that Lebanon followed best practices in seeking an informal view as to whether the proposed Iranian donation would be prohibited under Security Council resolutions.

**Arms shipments to Yemen**[50]

36.    The Panel, in its final report of 2013,[51] described an investigation into arms found on board the vessel *Jihan* by Yemeni and United States authorities on 23 January 2013 that was reported separately to the Committee. The Panel has continued analysis of information received in connection with that case. This suggests that the *Jihan* case follows a pattern of arms shipments to Yemen by sea which can be traced back to at least 2009. The analysis further suggests that the Islamic Republic of Iran was the origin of these shipments, and that the intended recipients were the Houthis in Yemen or possibly in some cases further recipients in neighbouring countries. It also shows that current Iranian military support to Houthis in Yemen is consistent with patterns of arms transfers going back more than five years.[52] Details of cases are contained in annex I.

---

[46] "Iran vows to help Lebanon in war on terrorism", *Fars News Agency*, 1 October 2014; "Daily lists details of Iran's arms aid to Lebanon", *Fars News Agency*, 11 October 2014; and "Iran reiterates full support for Lebanon in fight against terrorism", *Fars News Agency*, 5 January 2015.

[47] Letter from the Permanent Mission of Lebanon to the United Nations dated 23 October 2014 addressed to the Panel of Experts and containing the list of arms.

[48] *One expert notes that insufficient information on the terms of the "offer" does not, in that expert's opinion, allow one to confirm that the reported event constitutes an "attempt" of arms transfer.*

[49] "Sanctions violations may occur when activities or transactions proscribed by the resolutions are undertaken or attempts are made to engage in proscribed transactions or activities, whether or not the transaction or activity has been completed."

[50] The Panel notes that the Security Council imposed an arms embargo on Houthis in Yemen in resolution 2216 (2015) adopted on 14 April 2015.

[51] S/2013/331.

[52] Yara Bayoumy and Mohamed Ghobari, "Iranian support seen crucial for Yemen's Houthis", *Reuters*, 15 December 2014; and "Yemen crisis: Kerry warns Iran over Houthi rebel support", *BBC News*, 9 April 2015.

S/2015/401

# II.   Analysis of the activities of the Islamic Republic of Iran

## A.   Procurement

### 1.   Recent trends

37.   During the current mandate, the Committee and the Panel have not received any new reports of incidents of non-compliance from Member States. The Panel has not been made aware of any procurement cases relating to the current mandate period. A decrease in official reporting and information-sharing on potential incidents of non-compliance was already identified by the Panel in its final report of 2014.

38.   The Panel cannot with confidence identify the reasons for the observed drastic reduction in reporting and information-sharing. The current situation with reporting could reflect a general reduction of procurement activities by the Iranian side or a political decision by some Member States to refrain from reporting to avoid any possible negative impact on ongoing negotiations between the Islamic Republic of Iran and E3+3.

39.   However, some Member States informed the Panel that, according to their assessment, the Islamic Republic of Iran's procurement trends and circumvention technique remain basically unchanged and that the Islamic Republic of Iran was continuing to procure below control threshold items. No information was shared with the Panel to substantiate such assessments. The situation could be explained in part by the latency of the Islamic Republic of Iran's procurement networks.

40.   In this regard, a Member State informed the Panel that:

"An Iranian procurer approached a company in January 2015 to supply Howden CKD compressors. The stated end user was suspected to be a false end user for the goods, which were in fact to be exported to Iran. The procurer and transport company involved in the deal had provided false documentation in order to hide the origins, movement and destination of the consignment with the intention of bypassing export controls and sanctions, specifically United Nations Security Council resolution 1737 (2006) paragraph 4.c."[53]

41.   The Government of the United Kingdom of Great Britain and Northern Ireland informed the Panel on 20 April 2015 that it "is aware of an active Iranian nuclear procurement network which has been associated with Iran's Centrifuge Technology Company (TESA) and Kalay Electric Company (KEC)." The Panel notes that KEC is designated under Security Council resolution 1737 (2006).[54]

---

[53] Following a media report ("Exclusive: Czechs stopped potential nuclear tech purchase by Iran: sources", *Reuters*, 13 May 2015), the Panel was made aware by the United Nations Secretariat of a letter sent by Colfax Corporation to the Secretariat stating that "neither Howden CKD nor any of its agents have been able to find any record of a request or associated response to a request to supply the referenced compressors. The company has strict sanctions procedures in place that would have been triggered if a request to provide such products to Iran had been received." The Panel is continuing its investigation.

[54] Listed on 23 December 2006 in section A of the annex to resolution 1737 (2006) (IRe.032) under the name "Kala-Electric", a.k.a. "Kalaye Electric". "Kalay Electric Company (KEC)", as referred in the United Kingdom letter is identical to "Kala-Electric or Kalaye Electric".

42.   Given the late communications, the Panel could not independently investigate the information referred to in paragraphs 40 and 41.

## 2.   Cases of procurement

### Frequency converter

43.   According to information received by the Panel, a Finnish manufacturer agreed in 2011 to sell a frequency converter to an engineering company in Pakistan, for which no export licence was required under Finnish law. The Pakistani freight forwarder handling the shipment subsequently requested that the consignee on the airway bill be changed to Farayand Pas Company in Tehran. The Finnish freight forwarder did so, making sure that the manufacturer was not alerted, but the air carrier refused to handle it on the basis that the harmonized standard code flagged the United Nations list of prohibited items.

44.   The freight forwarders then decided to ship the consignment to a trading company in Dubai, United Arab Emirates. Dubai customs authorities impounded the shipment because of inconsistent documentation. Then the Pakistani engineering company asked for a new commercial invoice naming the Dubai trading company as the buyer, but the Finnish manufacturer refused.[55]

### Procurement for Shahid Bagheri Industrial Group

45.   According to information provided by German authorities, in 2012 and 2013 several attempts were made by a German citizen with an Iranian background (Dr. B) to procure items for Shahid Bagheri Industrial Group (SBIG), a Security Council-designated entity[56] responsible for the Islamic Republic of Iran's solid-fuel missiles. The items were non-listed and dual-use, and included polystyrene, vacuum pumps, butterfly valves, pressure reducers, flame detectors and magnetic valves.

46.   The items were procured in Germany or in third countries through Dr. B's company and exported to a second company he owned in the United Arab Emirates. From there, the items were re-exported to a SBIG front company in the Islamic Republic of Iran which used successive different names (Pooya Commercial & Engineering Co., Tehran, Kimia Trading Co. Tehran). German authorities also identified six additional front companies. "All of the named front companies acted exclusively on behalf of SBIG. There was no other business segment. Delivering items to SBIG is prohibited since the end of 2006. As a result, all procurement activities of SBIG by using front companies were illicit."[57] (See annex II.)

47.   German officials confirmed to the Panel that they had acted in conformity with paragraph 13 of resolution 1929 (2010) determining that the procured dual-use items "could contribute to enrichment-related, reprocessing or heavy water-related activities or to the development of nuclear weapons delivery systems" because their end user was a designated entity. The case is awaiting the results of an appeal by the defendant, and has yet to be reported to the Committee.

---

[55] None of the parties involved was convicted.

[56] Listed on 23 December 2006 in section B of the annex to resolution 1737 (2006) (IRe.066).

[57] Information provided by German authorities.

**Carbon fibre and a carbon fibre winding machine**

48.   Information was provided by one Member State during the current mandate on two shipments of Nuclear Suppliers Group-controlled carbon fibre (see figure IV) to the Islamic Republic of Iran and an attempted procurement of a carbon fibre winding machine, another item listed by Security Council resolutions relating to the Islamic Republic of Iran.

49.   According to the indictment,[58] Hamid Reza Hashemi, an American national who operated a company in Tehran, illegally shipped listed high-grade carbon fibre to the Islamic Republic of Iran (see the technical analysis of the carbon fibre in annex III). In 2008, under the false end use of compressed natural gas tank production, Hashemi arranged for a supplier to export a shipment of carbon fibre, valued at $28,170, from the United States to the Islamic Republic of Iran via Luxembourg and Dubai. The arrival of the shipment in the Islamic Republic of Iran was confirmed by one of Hashemi's intermediaries based in Turkey.

50.   In June 2008, another shipment of 3,095 kg of the same carbon fibre was arranged by Hashemi to be transported from the United States to the Islamic Republic of Iran via the United Kingdom and Dubai. United States authorities stated in court that British authorities intercepted the shipment in 2009.[59] At no point had the supplier, Hashemi, or anyone else involved, obtained an authorization from relevant governments.[60]

Figure IV
**HexTow® IM7-12K carbon fibre**



*Source*: Hexcel Corp. website, www.hexcel.com/Products/CF_ContFibers.

51.   In June 2011, Hashemi sought to purchase from one supplier in the United States a carbon fibre winding machine, a dual-use item that, depending on its specification, could be controlled. The Panel possesses no information on the

---

[58] United States District Court for the Southern District of New York, *The United States of America vs. Hamid Reza Hashemi and Murat Taskiran*. Case Number 7:12-cr-00804. Filed on 5 December 2012.

[59] Ibid.

[60] *Summary of Major U.S. Export Enforcement, Economic Espionage, Trade Secret And Embargo-Related Criminal Cases (January 2008 to the present)*, United States Department of Justice, 23 January 2015, page 21. Another case study on gyroscopes can be found in annex IV.

specifications of this winding machine. In December 2012, Hashemi travelled to the United States where he was arrested and, in November 2013, convicted.

**Aluminium tubes sent to the Islamic Republic of Iran**

52.   The Panel received copies of shipping documentation from a Member State relating to two shipments of aluminium sent to the Islamic Republic of Iran on 3 and 23 July 2012 by a consignor (NBH Industries SDN BHD, Level 20 Menara Standard Chartered Bank, Kuala Lumpur) to an Iranian consignee (Automotive Industries Gohar Yaghot Neshan, of Khoramabad, Islamic Republic of Iran[61]). Pending additional information on those shipments and their interdictions, the Panel's investigation continues.

53.   The Panel's analysis revealed that the same consignor, at the same address, was identified as a front company in court documents supporting an indictment issued by United States authorities[62] in connection with an attempt in 2011 to export aluminium alloy 7075 tubing[63] to Malaysia. This type of aluminium is of potential use in the Islamic Republic of Iran's centrifuge programme.[64] The shipping documents received by the Panel indicate that the consignor was active in 2012, procuring aluminium for the Islamic Republic of Iran.

**Constant speed drive and pressure sensor**

54.   According to a United States Department of Justice press release dated 15 May 2014,[65] two spare parts for fighter aircraft were intended to be shipped to the Islamic Republic of Iran, via Greece, between December 2012 and March 2013. The items involved were "spare parts for combat aircraft", which are covered by paragraph 8 of Security Council resolution 1929 (2010).

55.   During the Panel's consultations with Greece in March 2014, officials from enforcement agencies confirmed that the items arrived from Israel. Inspection by Greek Air Force technical experts identified them as a constant speed drive[66]

---

[61] The information regarding the consignee contained in the shipping documentation was inconsistent with that available in the public domain.

[62] United States Attorney's Office, Northern District of Illinois, "Belgian man charged with attempting to illegally export aluminium tubes to Malaysian front for individual in Iran", press release, 30 October 2013; United States District Court Northern District of Illinois, Eastern Division, *United States of America v. Nicholas Kaiga*, Case No. 13 CR.531, 26 June 2013.

[63] A controlled item under Security Council resolutions relating to the Islamic Republic of Iran, on the basis of the diameter of the tubes and their composition.

[64] Daniel Salisbury and Ian J. Stewart, "Nicholas Kaiga's efforts to supply aluminium tubes to Iran", *Project Alpha*, King's College London, 17 July 2014; see also David Albright and Andrea Stricker, "US busts Iranian smuggling scheme involving a nuclear-related good", *ISIS Report*, 31 January 2014.

[65] "Citizen of Israel charged with violating U.S. arms export laws", United States Department of Justice, 15 May 2014.

[66] Product number 695145G.

S/2015/401

specially designed for the F-4C Phantom fighter jet and a sensor outline, absolute pressure,[67] for the F-14 Tomcat fighter jet.[68]

56.   Following investigations, Greek authorities decided that the case should be dealt with by the judiciary. A local court ordered the spare parts to be confiscated and returned to the State of origin.

## B.   Financing procurement

57.   The Panel has received no report regarding violations of Security Council financial sanctions. However, the Panel continued to receive information from Member States and the private sector about methods used by the Islamic Republic of Iran to carry out financial transactions. Some of these methods were used in a way that concealed the connection to the Islamic Republic of Iran. Some were described previously[69] and additional mechanisms are described in annex V. They could be used for legitimate trade, the financing of which has become even more difficult, as well as for illicit procurement. The Panel has received no evidence of specific cases in which any of these mechanisms were used to finance the procurement of items prohibited under Security Council resolutions.

**Transfers through companies outside the Islamic Republic of Iran**

58.   The Panel previously described mechanisms which might be used for financing both legitimate trade and illicit procurement involving a triangular arrangement of companies inside and outside the Islamic Republic of Iran.[70] They are illustrated in general terms in figure V. A variant of this mechanism was described by one Member State: A local company needed to pay for services provided by an Iranian entity, but was unable to do so because the entity was designated under national legislation. Instead, the local company made offset payments to domestic manufacturers for spare parts they had previously supplied to the Iranian entity (see figure VI).

---

[67] Product number 949470-6-1.

[68] The Islamic Republic of Iran Air Force owns up to nineteen F-14s in service, which it imported approximately in 1976. The Panel notes that, as of 2012, the F-14 Tomcat fighter aircraft was only in service with the Islamic Republic of Iran Air Force. See paragraph 10 of the superseding indictment, which is available from www.iranwatch.org/sites/default/files/us-doj-cohen-superseding-indictment-050813.pdf.

[69] See S/2014/394, para. 71.

[70] Media reports describe general trading companies set up for this purpose. See for example Benoit Faucon, Jay Solomon and Farnaz Fassihi, "As sanctions bite, Iranians invest big in Georgia", *Wall Street Journal*, 20 June 2013; and Emanuele Ottolenghi, "How Iran is skirting sanctions in the southern Caucasus", *The National Interest*, 15 December 2014.

S/2015/401

Figure V
**Illustration of possible methods used by Iranian entities to finance procurement**\*



\* These methods could be used for both legitimate procurement and for procurement prohibited under Security Council resolutions relating to the Islamic Republic of Iran.

Figure VI
**Illustration of a variant of figure VI**\*



\* In exchange for services received from an Iranian entity, a company abroad makes payments to a manufacturer for goods it supplied to that Iranian entity.

**Transfers through banks and financial institutions outside the Islamic Republic of Iran**

59.   One Member State reported that the Islamic Republic of Iran was carrying out financial transactions connected with procurement through non-sanctioned banks and that some related financial transactions, formerly carried out through banks in the United Arab Emirates, were also being conducted through banks in the South Caucasus, Central Asia and South-East Asia. According to another Member State,[71] Iranian businessmen acquired majority shares in one of those banks in 2011, which

---

[71] "Treasury targets networks linked to Iran", United States Department of the Treasury, press release, 6 February 2014.

was then used to facilitate transactions through several Iranian banks including Bank Melli and Bank Saderat.[72] Media reports also describe companies set up abroad by Iranian businessmen to offer financial services, such as pre-paid cards,[73] the role of which in money-laundering has been underlined by the Financial Action Task Force.

**Overseas accounts of the Central Bank of the Islamic Republic of Iran**

60.    Some States that import oil or other energy products from the Islamic Republic of Iran authorized banks in their jurisdictions to receive payments into accounts belonging to the Central Bank of the Islamic Republic of Iran. These accounts, in local currencies, are intended for use in transacting legitimate business within the State concerned.

61.    The Panel previously highlighted a case of misappropriation of such funds. Recent media reports suggest another possible misuse of such funds held by another Member State. Several Iranians holding student visas set up eight separate shell companies in the State concerned in 2013 and 2014 in order to access at least $150 million of oil export revenues in accounts held by the Central Bank of the Islamic Republic of Iran at a State-owned bank.[74] The funds were reportedly paid out against invoices for exports of goods to the Islamic Republic of Iran, although the goods were never exported. The central bank of the State concerned subsequently issued a notice advising banks that, when they provide advances to companies for exports, they check that the exports actually take place.[75]

## C.   Designated entities/individuals

### Updating positions or functions of designated individuals

62.    The Panel continued to study the activities of designated individuals. Many of them have changed their positions or functions referred to in the relevant resolutions. The Panel's final report of 2014 provided new information regarding designated entities and individuals. The information was reflected in the updated 1737 (2006) sanctions list published by the Committee. Since then, the Panel continued to research and acquired additional information which contributed to the Consolidated Security Council Sanctions List.

63.    The following table, based on open-source information, provides updates on known positions of designated individuals and their activities. The changes of positions described in previous final reports (S/2014/394, S/2013/331 and S/2012/395) are not shown in this table.

---

[72]  See paragraph 10 of resolution 1803 (2008), in which States are called upon to exercise vigilance over the activities of financial institutions in their territories with all banks domiciled in the Islamic Republic of Iran, in particular with Bank Melli and Bank Saderat.

[73]  Emanuele Ottolenghi, "Prepaid cards may be Iran's latest sanctions busting tactic", *Forbes*, 3 June 2014.

[74]  Nidhi Verma and Devidutta Tripathy, "RBI tightens compliance after suspected Iran export scam", *Reuters*, 10 February 2015.

[75]  "Delay in utilization of advance received for exports", *RBI Notice 74*, 9 February 2015.

S/2015/401

| Identifier number | Designated individual | Position described in the list | Most recent known position |
|---|---|---|---|
| IRi.001 | Fereidoun Abbasi-Davani | Senior Ministry of Defence and Armed Forces Logistics Scientist | Head of the Atomic Energy Organisation of Iran from 2011 to 2013[a] |
| IRi.004 | Ali Akbar Ahmadian | Chief of IRGC Joint Staff | Head of the IRGC Strategic Studies Centre in September 2007[b] |
| IRi.009 | Bahmanyar Morteza Bahmanyar | Head of Finance and Budget Department, Aerospace Industries Organization | Chief financial officer of IRGC Cooperative Foundation[c] |
| IRi.011 | Morteza Behzad | Involved in making centrifuge components | Managing Director and Deputy Chairman of the Board of Directors of the Iran Enrichment Company[d] |
| IRi.012 | Ahmad Vahid Dastjerdi | Head of the Aerospace Industries Organization | Chairman of the Presiding Board of the Oil Pension Funds[e] |
| IRi.027 | Mohammad Mehdi Nejad Nouri | Rector of Malek Ashtar University of Defence Technology | Deputy Minister of Science, Research and Technology[f] |
| IRi.033 | Morteza Rezaie | Deputy Commander of IRGC | Chairman of IRGC Cooperative Foundation[d] |
| IRi.035 | Morteza Safari | Commander of IRGC Navy | President/Chancellor of Imam Hossein University[g] |
| IRi.037 | Seyed Jaber Safdari | Manager of the Natanz enrichment facilities | Head of the Department of Advanced Technologies and Deputy for Advanced Technologies at Novin Energy Company[d] |
| IRi.043 | Mohammad Baqer Zolqadr | IRGC officer, Deputy Interior Minister for Security Affairs | Deputy Judiciary Chief for Strategic Affairs and Director of the intelligence centre of the Judiciary[h] |

[a] Steven Ditto, "Iranian suspicions about the IAEA", *Policywatch* 2227, Washington Institute, 21 March 2014.

[b] Muhammad Sahimi, "The IRGC strategic brain trust, Part 2: Ahmadian, Hejazi, and Jafari", *Frontline*, Public Broadcasting Service, 11 August 2012.

[c] Emanuele Ottolenghi and Saeed Ghasseminejad, "If the US wants a nuclear deal, it needs to fully enforce its sanctions against Iran's Revolutionary Guards", *Business Insider*, 19 September 2014.

[d] "Increasing sanctions against Iranian nuclear proliferation networks joint Treasury and State Department actions target Iran's nuclear enrichment and proliferation program", United States Department of State, press statement, 13 December 2012.

[e] "Head of Iran's Oil Pension Fund Investment Co. appointed", *Business & Economy Digest*, 11 March 2012.

[f] "Iran's interest on aircraft technology cooperation", Indonesian science and technology portal (State Ministry of Research and Technology), 8 August 2013. Available from http://international.ristek.go.id/news/detail/view/133-iran---s-interest-on-aircraft-technology-cooperation.

[g] Iran Briefing, 23 January 2012. See also "Iran manufactures first home-made VTOL drone", *Fars News Agency*, 3 March 2015. Imam Hossein University is funded and operated by IRGC (see "Imam Hussein University of the Revolutionary Guards", *Iran Watch*, last updated on 1 April 2013).

[h] "Judiciary Chief makes new appointments: Deputy for Strategic Affairs and Director of the Intelligence Center of the Judiciary", *Iran Daily Brief*, 18 May 2012.

**Travel ban**

64.   The Panel observed, during the current mandate, several examples of effective implementation of the travel ban. One Member State applied to the Committee for exemption from the application of the travel ban, and another Member State informed the Panel about the denial of entry of a designated individual. However, there are a number of media reports on the movement of a designated individual in the Middle East region.

65.   A Member State informed the Committee that Hamid-Reza Mohajerani, designated under resolution 1803 (2008)[76] for the involvement in production management at the uranium conversion facility at Esfahan, requested a visa to attend a conference organized by an international organization in its territory. A request for exemption was submitted to the Committee and consequently his travel was permitted.

66.   Another State informed the Panel that Yahya Rahim Safavi, senior military aide to the Supreme Leader and former Commander of IRGC, designated under resolution 1737 (2006),[77] sought entry for educational purposes. This was denied by the State on the basis of paragraph 10 of resolution 1929 (2010).

67.   Although no Member State reported a travel ban violation, a number of media reports with photographs and videos indicated that Qasem Soleimani, Commander of the Quds force and designated under resolution 1747 (2007),

---

[76] isted on 3 March 2008 in annex I to resolution 1803 (2008) (IRi.023).
[77] isted on 23 December 2006 in section E of the annex to resolution 1737 (2006) (IRi.036).

[78] has travelled to many countries of the region, notably Iraq,[79] the Syrian Arab Republic and Lebanon (see figure VII).[80] He was reportedly organizing and training militia and regular forces in those countries. He was reported to visit Lebanon for a meeting with the Secretary General of Hizbullah, Seyyed Hassan Nasrallah (see figure VIII).[81] He was also shown on the front page of Newsweek as a commander fighting against ISIL in Iraq.[82]

---

[78] Listed on 24 March 2007 in annex I to resolution 1747 (2007) (IRi.039).

[79] "Iran general in Iraq 'whenever we need': militia chief", *The Daily Star*, 22 March 2015.

[80] Amir Ali Hajizadeh, Commander of the IRGC Aerospace Force, confirmed the role of General Soleimani in the Kurdish region in Iraq. See "Iranian commander confirms Quds Force chief was in Iraq: TV", *Reuters*, 24 September 2014. It has been said that he led the combat to retake Iraqi cities occupied by ISIL such as Karbala, Jurf al-Sakhar, Amerli, Jalula, Saadia and Tikrit.

[81] "Iran's General Soleimani met with Nasrallah after Quneitra attack: report", *Tasnim News Agency*, 30 January 2015.

[82] Janine Di Giovanni, "Nemesis: the shadowy Iranian training Shia militias in Iraq", *Newsweek*, 27 November 2014.

Figure VII

**Soleimani reported at the front line of the operation to retake Tal Ksaiba, near Tikrit in Iraq**



*Source*: *Reuters*.

Figure VIII

**Soleimani reportedly visiting in Lebanon the tomb of Hezbollah Commander, Jihad Mughniyah, who was killed on the Golan Heights**



*Source*: Jean Aziz, "What was behind Qasem Soleimani's visit to Lebanon?", *Al-Monitor*, 3 February 2015.

### Designated entities

68.   Khatam al-Anbiya Construction Headquarters (KAA), wholly owned by IRGC and designated under Security Council resolution 1929 (2010)[83] for involvement in large-scale civil and military construction projects and other engineering activities, including the construction of the uranium enrichment site at Qom/Fordow by its subsidiaries, has expanded its activities during this mandate period.[84] The Majlis (Parliament) approved the Rouhani government budget request to allocate to KAA a budget of $3.7 billion for Persian Year 1394 (21 March 2015 to 19 March 2016). This amount is twice as much as the previous year's,[85] exceeds the budget for IRGC ($2.7 billion), and almost equals the budget for the Ministry of Defence and regular forces.[86]

### Irano Hind Shipping Company

69.   The Irano Hind Shipping Company (IHSC), designated under Security Council resolution 1929 (2010)[87] as an entity owned, controlled or acting on behalf of the Islamic Republic of Iran Shipping Lines (IRISL), has remained active since the designation without its assets apparently being frozen. As seen in annex VI, two oil tankers, the *Amin 2* and the *Tour 2*, are actively transporting crude oil to the Syrian Arab Republic, particularly after September 2014. Other vessels owned by IHSC, *Sattar*, *Attar* and *Teen*, were inactive during the mandate period.

70.   The financial situation of IHSC has deteriorated. A bank, which provided loans to IHSC prior to its designation, and has been the nominal owner of several IHSC vessels, including the bulk carrier vessel *Sinin*, since 2006, demanded that IHSC repay its loan. The *Sinin* was auctioned off in October 2014 by Chinese authorities.[88] The *Sinin* is now called the *Miami Pride*. Its current registered owner is Matrix Treasure International Limited, registered in the British Virgin Islands, and the beneficial owner is unknown. The Panel notes that such renaming and re-registering of the vessel *Sinin* would qualify for reporting under paragraph 20 of Security Council resolution 1929 (2010).

### Economic activities involving designated individuals

71.   It is well-known that IRGC is a complex amalgam of military, political and economic forces and has large financial resources that influence the Islamic Republic of Iran's economy. Financial wings of IRGC, IRGC Cooperative Foundation (Bonyad-e Taavon-e Sepah) and the Mostazafan Foundation (Bonyad-e Mostazafan), are actively pursuing investments in a variety of sectors. The Mostazafan Foundation invests in diverse businesses from agriculture to service sector. Together with the Mostazafan Foundation, IRGC financial wings control 43 companies through public

---

[83]  Listed on 9 June 2010 in annex II to resolution 1929 (2010) (IRe.036).
[84]  "IRGC construction projects continue while private sector lags", *Al-Monitor*, 30 October 2014.
[85]  Kambiz Foroohar, "Rouhani to raise Iran's Revolutionary Guards budget by 50%", *Bloomberg*, 8 December 2014.
[86]  "The Joint Chiefs of Staff, the Army's current budget was reduced by 36%", *Tasnim News Agency*, 8 December 2014 (17 Azar 1393; original in Farsi), translated in "Defense expenditures in Iran's 1394 budget", *The Arkenstone*, 8 December 2014.
[87]  Listed on 9 June 2010 in annex III to resolution 1929 (2010) (IRe.028).
[88]  "Weekly market report", *WeberSeas* (Hellas) S.A., 17 October 2014.

trading on the Tehran Stock Exchange, and 218 small and medium-sized companies with 1,073 managers with IRGC affiliation.[89]

72.   The IRGC Cooperative Foundation is led by Morteza Rezaie, former Deputy Commander of IRGC and designated under Security Council resolution 1747 (2007),[90] as Chairman. This fact indicates that the Foundation is controlled by the above designated individual. Morteza Bahmanyar, designated under Security Council resolution 1737 (2006)[91] for his former position in the Aerospace Industries Organization, is now the Foundation's chief financial officer.[92] This could mean that this individual may participate in the control of the Foundation.[93] The Panel notes that it has no information to confirm that these two foundations have a role in procurement activities prohibited by relevant Security Council resolutions.

# III.   Implementation by Member States

### Control lists

73.   The Panel notes that since the Committee updated the control lists as identified in paragraph 13 of resolution 1929 (2010) in March 2013, the lists have been further modified by relevant multilateral export control regimes.[94]

### Customs

74.   The Panel notes increasing cooperation between different authorities involved in export control not only at the national but also the international level, making use of such forums as the World Customs Organization (WCO), the World Trade Organization (WTO), multilateral export control regimes, INTERPOL etc.

75.   States continue to internationally standardize and harmonize existing procedures for customs clearance and control and further improve them. In this regard, the Panel notes that the WCO has further improved the Framework of Standards to Secure and Facilitate Global Trade (SAFE Framework). Almost all States visited by the Panel for consultations had introduced the SAFE-recommended risk management and pre-arrival systems that would allow easier identification of potential illegitimate transfer of goods.

---

[89] "Increasing sanctions against Iranian nuclear proliferation networks joint Treasury and State Department actions target Iran's nuclear enrichment and proliferation program", United States Department of State, press statement, 13 December 2012.

[90] Listed on 24 March 2007 in annex I to resolution 1747 (2007) (IRi.033).

[91] Listed on 23 December 2006 in section D of the annex to resolution 1737 (2006) (IRi.009).

[92] It is noted that it is not unusual for IRGC high-ranking officials to move from a position in its military wing to IRGC civilian structures and vice versa.

[93] The term "controlled by … designated individuals or entities" in paragraph 11 of resolution 1929 (2010) is not clearly defined. In this regard, the Panel refrains from making affirmative judgement on whether Morteza Bahmanyar is in control of the Foundation.

[94] See INFCIRC/254/Rev.11/Part 1, INFCIRC/254/Rev.8/Part 2 and S/2012/947.

S/2015/401

76.    In October 2014, WCO issued the Strategic Trade Control Enforcement guide on identification of sensitive/strategic goods.[95] In order to facilitate implementation of the guidelines, WCO is assisting Member States in capacity-building related to enforcement of strategic trade controls, in particular technical identification of dual-use items.

77.    In addition, States further strengthen the control of trafficking of critical strategic goods by international joint customs operations. To that end, common risk assessment parameters are being developed and information-sharing through the WCO customs enforcement network is being enhanced.

78.    The existing dichotomy of two major tasks (facilitation of trade and control of trade) faced by licensing authorities and customs has increased. Initiatives such as that of WTO on 27 November 2014 amending the Trade Facilitation Agreement require speeding-up of all customs clearance procedures. This adds to existing pressure on enforcement agencies when implementing export control, in particular sanctions.

79.    Another practical challenge derives from the fact that the items on control lists do not easily correspond to customs tariff categories. National customs are based on the international harmonized system; many individual codes include both controlled and uncontrolled items. These codes may be used in risk assessment as risk indicators and can lead to false alarms. WCO decided to enlarge the code to provide more detailed subcategories of items; the risks identification processes will become more targeted and less time-consuming.

**Delivery term ex works**

80.    Ex works (EXW)[96] is one of the 11 delivery terms defined in the International Commercial Terms[97] published by the International Chamber of Commerce. Under EXW, it is the buyer located in a foreign country, rather than the seller in the exporting country, who is responsible for clearing the goods through export control procedures.[98]

81.    The challenge presented to export control by the EXW clause is that it transmits the responsibility to clear export control from the seller to the buyer, thus

---

[95] The Strategic Trade Control Enforcement guide is aimed at securing and facilitating trade control enforcement consistent with the principles of the SAFE Framework of Standards; it assists in particular in identifying potential high-risk consignments and guides with a twofold approach both senior management level and operational officers. The guide assists Member States to meet their obligations under the international legal framework and regimes, under embargoes and sanctions (explicitly referring to sanctions against the Islamic Republic of Iran), and Security Council resolution 1540 (2004).

[96] See S/2013/331, para. 118.

[97] The International Commercial Terms are a series of pre-defined commercial terms published by the International Chamber of Commerce with a periodical review. Its latest version, Incoterms 2010, was published on 27 September 2010 and entered into force on 1 January 2011 (see the 11 terms in annex VII).

[98] Under the delivery term EXW (name place), the seller makes the goods available at the named place, usually the seller's premises; the buyer arranges the pickup of the freight from the named place, owns the in-transit freight, and is responsible for clearing the goods through export control procedures where such clearance is applicable, and other necessary export formalities. EXW is, among the 11 international commercial terms, the only term under which the buyer takes the responsibility to clear the export control procedures if such clearance is applicable.

creating an opportunity for the buyer to circumvent export control mechanisms. As illustrated in paragraphs 43 and 44 of this report, the buyer's freight forwarder can alter the true destination of the procured items on the airway bill without any obligation to notify the seller. Items can be shipped out of the exporting country in violation of controls.

82.　In order to prevent circumvention, Member States could consider alerting their customs authorities to exercise additional vigilance in case of export transactions following use of the EXW clause. The Panel notes that the proliferation risk could be substantially increased when the manufacturers/sellers of sensitive items enter into international sales contracts with an EXW clause, if compared with other terms defined by the International Chamber of Commerce.

**Maritime transportation compliance**

83.　Key elements of an effective compliance programme for entities working in the maritime transportation sector have been published as a Security Council document.[99]

**Post-shipment control**

84.　The Panel notes that the Islamic Republic of Iran continues to demonstrate special interest in high-grade machine tools which could contribute to nuclear and missile activities as well as wider industrial applications. Member States continue to strengthen post-shipment control. During the consultation with Japan, the Panel was informed of the Relocation Machine Security system, which uses sensors to detect relocation of machine tools from the certified end-use location. In case of relocation, the Relocation Machine Security system requires a one-time password for restarting operation.[100]

**Challenges when implementing financial provisions**

85.　During the current mandate, the Panel continued to analyse the implementation by Member States of financial provisions of Security Council sanctions relating to the Islamic Republic of Iran. These provisions continue to be among the most challenging for Member States to implement. Nevertheless, the Panel notes that the fourth round of evaluations by the Financial Action Task Force incorporates Recommendation No. 7 on financing of proliferation,[101] relating to Security Council targeted financial sanctions. This process enhances the Panel's

---

[99] See S/2015/28.

[100] The system was introduced by one Japanese company in 2006, at its own initiative. In October 2010, the Japanese Ministry of Economy, Trade and Industry issued a regulation that recommends all Japanese manufacturers of machine tools to equip themselves with the Relocation Machine Security system.

[101] Recommendation No. 7 of the current Recommendations of the Financial Action Task Force, published in February 2012, states that countries should implement targeted financial sanctions to comply with Security Council resolutions relating to the prevention, suppression and disruption of the proliferation of weapons of mass destruction and its financing. Those resolutions require countries to freeze without delay the funds or other assets of, and to ensure that no funds and other assets are made available, directly or indirectly, to or for the benefit of, any person or entity designated by, or under the authority of, the Security Council under Chapter VII of the Charter of the United Nations. Fourth-round evaluations have been carried out to date of Spain, Norway, Belgium and Australia.

S/2015/401

understanding of how Member States implement Security Council financial sanctions and the challenges they face.

**Intangible technology transfer**

86.   The Committee considered several requests from Member States and multilateral organizations for guidance regarding provision to the Islamic Republic of Iran of technical assistance or training. The Panel, in its consultation with Member States, has observed the growing awareness of the issues relating to transfer of intangible technology, including the issuance of new guidelines. [102]

# IV.   Activities of the Panel

## A.   Inspections

87.   During the current mandate, which coincides with the Joint Plan of Action, and in the absence of any new official report on current incidents of non-compliance, the Panel did not carry out any inspections. It has nonetheless continued its activity of investigating, gathering information and analysing circumvention patterns. In this activity it has received support from Member States that have provided additional information.

## B.   Consultations

88.   The Panel's activities have been carried out in conformity with its programme of work for the period from 10 July 2014 to 9 July 2015, as required by paragraph 3 of Security Council resolution 2159 (2014). During its current mandate, the Panel has held consultations with 11 Member States. The Panel submitted to the Committee its midterm report on 24 October 2014.

89.   Under the current mandate, at the invitation of the country concerned, the Panel of Experts conducted visits to Bahrain, Latvia, Denmark, Mongolia, Monaco, Poland, Estonia, Finland, the Lao People's Democratic Republic, Japan and Jordan to discuss measures taken to implement Security Council resolutions 1737 (2006), 1747 (2007), 1803 (2008) and 1929 (2010). The Panel has also held consultations, as appropriate, with the Office of Disarmament Affairs of the Secretariat, the United Nations Statistics Division, IAEA and other United Nations panels of experts.

## C.   Outreach and related activities

90.   The Panel participated in conferences and seminars: the Financial Action Task Force plenaries and working group meetings; the European Union Non-Proliferation and Disarmament Conference; the 45th plenary meeting of the Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing

---

[102] For example, *The Higher Education Guide and Toolkit on Export Controls and the ATAS Student Vetting Scheme*, prepared by the Department for Business Innovation and Skills and the Foreign and Commonwealth Office, United Kingdom (in partnership with the Association of University Legal Practitioners and Project Alpha of King's College London), 2 April 2015. Available from www.acsss.info/business/guidance-for-academia.

of Terrorism; the Ninth Annual Conference of the WCO Partnerships in Customs Academic Research and Development; a symposium organized by Australia and Singapore on "Managing Sanctions Risk in the Maritime Transportation Sector"; the Fall 2014 session of the Security and Strategic Trade Management Academy at the Center for International Trade and Security at the University of Georgia; a Governance and Compliance Management Conference hosted by the Government of Germany; a seminar hosted by the Belfer Center for Science and International Affairs at the John F. Kennedy School of Government of Harvard University; conferences organized by the Centre for Science and Security Studies at King's College London; a workshop on non-proliferation and export compliance organized by the China Arms Control and Disarmament Association, in cooperation with King's College; the 22nd Asian Export Control Seminar hosted by the Center for Information on Security Trade Control; the seminar on the Islamic Republic of Iran organized by the Japan Institute of International Affairs; and the 2015 Carnegie International Nuclear Policy Conference, sponsored by the Carnegie Endowment for International Peace. The Panel also held teleconferences or corresponded with academics and experts affiliated with think tanks, as well as representatives of many private companies.

91.   The Panel also co-organized with the International Institute for Strategic Studies a two-day seminar held in Amman on 11 and 12 February 2015. Hosted by the Government of Jordan, the seminar brought together practitioners and experts of the region to discuss the implementation of the relevant Security Council resolutions and challenges they pose.

### D.   Composition

92.   The Panel's composition at the time of the submission of the report is as follows: Salomé Zourabichvili (France), Coordinator; Mowaffaq Al-Refai (Jordan); Jonathan Brewer (United Kingdom of Great Britain and Northern Ireland); J. Christian Kessler (United States of America); Chunjie Li (China); Thomas Mazet (Germany); Kazuto Suzuki (Japan); and Elena Vodopolova (Russian Federation).

## Annex I

### Patterns of arms shipments from the Islamic Republic of Iran to Yemen

1.    The Panel has continued to study and analyse information received in 2013 during the investigation into the *Jihan* arms shipment.[a]

2.    Previous cases, none of which was reported by Yemen to the Committee but on which Yemeni authorities later provided information (see map), are described below in their chronological order:

- **Unnamed vessel (April 2009)**. According to information received by the Panel from Yemeni authorities, members of an Iranian "spy ring" arrested on 14 July 2009 said during the investigation conducted by Yemeni authorities that, in April 2009, an Iranian vessel unloaded crates of weapons on to Yemeni boats in international waters. They were then delivered in batches to Midi district. One of the batches was taken by car to a farm in Mukhazin district in the Yemeni governorate of Sa'dah, the main Houthi centre.

- **The vessel *Mahan 1* (October 2009)**. According to information received from Yemeni authorities and court documents, on 25 October 2009 the Yemeni Navy seized in Yemeni territorial waters an Iranian vessel named *Mahan 1*. According to Yemeni authorities, among the crew were five Iranians.[b] Yemeni prosecutors issued a writ confiscating the ship and weapons found on board. The First Instance Court of Sana'a convicted the crew of the *Mahan 1* of smuggling arms from the Islamic Republic of Iran to Yemen. An appeal by the Iranian Embassy in Yemen was rejected by the Specialized Appeals Court in December 2012.[c]

- **Unnamed vessel (February 2011)**. According to information received from Yemeni authorities, on 21 February 2011, an Iranian fishing vessel was seized by Yemeni authorities seven kilometres from the coast of Hadramawt governorate, after it pursued Yemeni fishermen in Yemeni territorial waters. Investigation by Yemeni authorities showed that the vessel carried a shipment of weapons comprising 900 Iranian-made anti-tank and anti-helicopter rockets intended for Houthi rebels.

- **The vessel *Nafis 1* (July 2011)**. According to information from Yemeni authorities and the statements of two crew members of *Jihan*, the *Nafis 1* sailed on 20 July 2011 from the Iranian military port of Chabahar bound for the Yemeni port of Nishtun.

  It was seized on 14 August 2011 by authorities of one Member State and detained for seven months.

  The Panel received conflicting information from the two crew members of the *Jihan* as to whether arms were on board. The Member State concerned made no report which suggested that the vessel carried arms.

---

[a] See the Panel's final report of 2014 (S/2014/394).
[b] The Specialized Appeals Court, Sana'a District, decision dated 23 December 2012.
[c] Ibid.

- **Nafis 1** (IMO 8609753) is an Iranian vessel owned by the Iranian company Molaei M. Analysis by the Panel of commercial ship tracking data shows that from the end of May 2011 until March 2012 the vessel's Automatic Identification System was switched off and it could not be tracked by standard commercial satellites. The Panel has no further information about the cargo and the reason for its detention and continues its investigation.

- **The vessel *Imdad 1* (March 2012)**. According to testimony provided by the crew of the *Jihan 1* to Yemeni authorities, the *Imdad 1* sailed from the Khawr Dabwah district of Mahrah governorate of Yemen in March 2012 to Bandar Abbas in the Islamic Republic of Iran. While in a military port in Bander Abbas, the *Imdad 1* was repaired, equipped and loaded with weapons. Only two members of the crew were present during the loading of these weapons.

  The *Imdad 1* then returned to Qusay'ir, governorate of Hadramawt, Yemen, in late May/early June 2012. The cargo was unloaded into small boats that had been rented from local fishermen at a point between Qusay'ir and Ra's Ba Ghashwah, governorate of Hadramawt. The cargo was taken to Shihr, stored and then taken to Sa'dah in four journeys by the same truck.

- **Unnamed vessel (March 2015)**. According to a media report dated 20 March 2015, an Iranian vessel carrying weapons arrived at As Salif port, Yemen, which was at the time in Houthi hands. The report alleged that according to its sources the vessel was carrying more than 180 tons of weapons and military equipment.[d]

---

[d] "Iranian arms-laden vessel arrives at As Salif Port in Al Hudaydah", *Al-Sharq al-Awsat*, 20 March 2015 (in Arabic).

S/2015/401

**Map of landing points**



*Source*: Panel of Experts.

## Annex II

**List of front companies identified by German authorities as acting on behalf of Shahid Bagheri Industrial Group in chronological order as they were identified**

1. Aban Commercial & Industrial Group, Tehran

2. Mehr Engineering and Industrial Group, Tehran

3. Saba Machinery Suppl(y)ing Co., Tehran

4. Selm Commercial Co., Tehran

5. Tabesh Engineering & Trading Cooperation, Tehran

6. Alae Industrial Co., Tehran

7. Pooya Commercial & Engineering Co., Tehran

8. Kimia Trading Co., Tehran

**Annex III**

## Technical analysis of HexTow® IM7 12K carbon fibre

- According to its product data, the carbon fibre involved in the case possesses a tensile strength of 5,655 MPa, a tensile modulus of 276GPa and a density, 1.78 g/cm$^3$.[a]

- Such specifications are equivalent to 15.81*10$^6$ m in "Specific Modulus" and 32.39*10$^4$ m in "Specific Tensile Strength", as defined in section 2.C.7 of INFCIRC/254/Rev.7/Part 2.

- Section 2.C.7. of INFCIRC/254/Rev.7/Part 2 reads:

  *"Fibrous or filamentary materials", and prepregs, as follows:*

  *a.    Carbon or aramid "fibrous or filamentary materials" having either of the following characteristics:*

  *1.    A 'specific modulus' of 12.7 x 10$^6$ m or greater; or*

  *2.    A 'specific tensile strength' of 23.5 x 10$^4$ m or greater;*

  *Note: Item 2.C.7.a. does not control aramid "fibrous or filamentary materials" having 0.25% or more by weight of an ester based fibre surface modifier.*

- The specifications of the carbon fibre in question indicate that the item falls above the control thresholds established in lists cited in resolution 1929 (2010).

---

[a] HexTow IM7 carbon fibre product data, official website of Hexcel Corporation. Available from www.hexcel.com/resources/datasheets/carbon-fiber-data-sheets/im7.pdf.

**Annex IV**

### The Islamic Republic of Iran's procurement of miniature vertical gyroscopes

- According to information in the public domain, the Islamic Republic of Iran tried to procure vertical gyroscopes from June 2007 to September 2008.

- During the procurement of the vertical gyroscopes, at least five parties were involved: the Iranian purchaser; a front company in South-East Asia, Iranian-controlled; an intermediary based in South Caucasus; a trader in a South Pacific country; and a broker in North America. It appears that the funding followed the same pattern with successive intermediaries, except the one in South Caucasus.

- The gyroscopes in question, VG34 series miniature vertical gyroscopes (quantity 32, value €239,550), have a wide range of applications, including inertial navigation system such as in missiles, and stabilization of flying vehicles such as military aircraft.

- The gyroscope, the smallest produced by its manufacturer, has a ±90˚ sensitivity on the roll axis and ±60˚ sensitivity on the pitch axis. Furthermore, the gyroscope is sampled with 16-bit resolution and has an accuracy of within 0.25˚ of true vertical because of its specific self-erection system.[a]

- According to section 9.A.1 of document S/2006/815 as referred to in paragraph 3 (c) of resolution 1737 (2006), the specifications of the vertical gyroscopes indicate that they fall above the control threshold referred to in the resolution.

---

[a] Matthew Rhudy, Yu Gu, Jason Gross and Marcello R. Napolitano, "Evaluation of Matrix Square Root Operations for UKF within a UAV GPS/INS Sensor Fusion Application", *International Journal of Navigation and Observation*, Vol. 2011, Article ID 416828, 11 pages, 2011. doi:10.1155/2011/416828.

**Annex V**

## Examples of financial transactions illustrating the need for vigilance[a]

1.    One Member State described an example of a transaction involving intermediaries in multiple countries. The methods of concealment of the involvement of designated entities are to be noted: A purchase order was placed by a designated entity, Atomic Energy Organisation of Iran[b] (see diagram). The purchase order was forwarded through a front company. Payment was initiated by a second front company in the Islamic Republic of Iran through another designated entity, Bank Sepah[c] which transferred funds through an Iranian company in the food business to a non-United Nations sanctioned Iranian bank. From there, the transfer was made via a bank in country A[d] to a bank in country B.

---

[a] See paragraph 22 of resolution 1929 (2010), under which States shall require companies incorporated in their territory or subject to their jurisdiction to exercise vigilance when doing business with Iranian entities.

[b] Listed on 23 December 2006 in section A of the annex to resolution 1737 (2006) (IRe.006).

[c] Listed on 24 March 2007 in annex I to resolution 1747 (2007) (IRe.007).

[d] The website of this bank (as accessed through the Wayback Machine on 11 March 2015) records that the Chief Executive Officer in 2010 previously served with Saderat Bank Iran.

**Diagram illustrating mechanisms of procurement and financing involving multiple intermediaries and multiple countries**



2.    Several international financial institutions detected financial transactions structured so as to hide the involvement of an Iranian entity:

- A payment for freight charges which named two logistic companies but which made no reference to the Islamic Republic of Iran: at the request of the financial institution, an invoice was provided. This was found to contain a bill of lading reference number. Upon tracking this bill of lading, the final destination of the shipment was found to be the Islamic Republic of Iran;

- A payment to a company in a State neighbouring the Islamic Republic of Iran: the policy of the financial institution was to conduct enhanced due diligence where companies in this particular State were concerned and, as a result, this company (the beneficiary of the payment) was found to be located in the Islamic Republic of Iran. The address in the neighbouring State was a fake;

- An import Letter of Credit (LC) covering a shipment of goods: the goods originated in State A in South Asia, ostensibly to be shipped from State B neighbouring the Islamic Republic of Iran to State C in North Africa. The financial institution investigated the LC which showed that the shipment was conducted by a third party company, which was Iranian. The beneficiary of the LC in the neighbouring State B was acting as front company to the Iranian one, which was the actual beneficial owner from the LC;

- Payment covering goods shipped from a State A in North Africa to a State B neighbouring the Islamic Republic of Iran: a review by the international financial institution of related shipping documents revealed that the goods were in fact in transit to Iran;

- A company A in the Islamic Republic of Iran entered into an agreement with a company B located in a State in the Middle East under which company B agreed to accept or process payments on behalf of company A. Company B had a bank account at a non-Iranian financial institution. Company A informed its customers to direct their payments to company B and informed beneficiaries to expect payments from company B's bank. It is not known how the financial transaction between company B and company A in the Islamic Republic of Iran was conducted;

- An Iranian with an established business in the Islamic Republic of Iran, selling goods domestically and abroad, moved out of the Islamic Republic of Iran and continued to own and receive income from his business in the Islamic Republic of Iran. The income was received in the form of wire transactions from small financial institutions located in neighbouring countries. The accounts in the financial institutions from which the wires originated were affiliated with companies located outside the Islamic Republic of Iran (hawala methods may have been used to transfer value between the business in the Islamic Republic of Iran and these companies);

- A non-Iranian company A located outside the Islamic Republic of Iran attempted to send a payment to a company B inside the Islamic Republic of Iran: company A sent the payment to a specific account purportedly belonging to company B at a bank inside the Islamic Republic of Iran. The payment was rejected by an international financial institution and a report filed with the authorities. Company A then arranged a second payment for a similar amount, to a beneficiary company C located outside the Islamic Republic of Iran. The

beneficiary account number was the same account number as the original company B. It is not known if/how this second attempted payment would have reached company B and no connection between the Iranian company B and the beneficiary company C located outside the Islamic Republic of Iran was revealed by open source searches.

3.    One Member State was aware of a number of Iranian residents who, periodically in 2014, withdrew cash in local currency to the value of US$ 85,000 and then flew to the United Arab Emirates, carrying the cash smuggled inside suitcases. The State was not aware of the final destination of the cash.

**Annex VI**

## Movements of Irano Hind Shipping Company ships

Two crude oil tankers, *Amin 2* and *Tour 2*, increased frequency of visits to the Syrian military port of Banias during the current mandate.





**Annex VII**

## International commercial terms as defined in Incoterms 2010

Among the 11 terms, EXW is the only one under which the buyer takes the responsibility to clear the export control procedures, where such clearance is applicable.

| Group | Abbreviations | Full terms | Transportation and freight | Customs declaration and export control clearance |
|---|---|---|---|---|
| E | EXW | Ex works | Buyer | Buyer |
| F | FCA | Free carrier | Buyer | Seller |
|  | FOB | Free on board | Buyer | Seller |
|  | FAS | Free alongside ship | Buyer | Seller |
| C | CFR/CNF | Cost and freight | Seller | Seller |
|  | CIF | Cost insurance and freight | Seller | Seller |
|  | CPT | Carriage paid to | Seller | Seller |
|  | CIP | Carriage and insurance paid to | Seller | Seller |
| D | DAP | Delivered at place | Seller | Seller |
|  | DAT | Delivered at terminal | Seller | Seller |
|  | DDP | Delivered duty paid | Seller | Seller |

———————————

United Nations

$S$/2018/68

 **Security Council**

Distr.: General
26 January 2018

Original: English

---

### Letter dated 26 January 2018 from the Panel of Experts on Yemen mandated by Security Council resolution 2342 (2017) addressed to the President of the Security Council

The members of the Panel of Experts on Yemen have the honour to transmit herewith the final report of the Panel, prepared in accordance with paragraph 6 of resolution 2342 (2017).

The report was provided to the Security Council Committee established pursuant to resolution 2140 (2014) on 9 January 2018 and considered by the Committee on 23 January 2018.

We would appreciate it if the present letter and the report were brought to the attention of the members of the Security Council and issued as a document of the Council.

(*Signed*) Ahmed **Himmiche**
Coordinator
Panel of Experts on Yemen
mandated by Security Council resolution 2342 (2017)

(*Signed*) Fernando Rosenfeld **Carvajal**
Expert

(*Signed*) Dakshinie Ruwanthika **Gunaratne**
Expert

(*Signed*) Gregory **Johnsen**
Expert

(*Signed*) Adrian **Wilkinson**
Expert

Please recycle 

S/2018/68

# Final report of the Panel of Experts on Yemen

*Summary*

After nearly three years of conflict, Yemen, as a State, has all but ceased to exist. Instead of a single State there are warring statelets, and no one side has either the political support or the military strength to reunite the country or to achieve victory on the battlefield.

In the north, the Houthis are working to consolidate their hold on Sana'a and much of the highlands after a five-day street battle in the city that ended with the execution of their one-time ally, former President Ali Abdullah Saleh (YEi.003), on 4 December 2017. In the days and weeks that followed, the Houthis crushed or co-opted much of what remained of the former President's network in Yemen.

In the south, the Government of President Abd Rabbuh Mansur Hadi was weakened by the defection of several governors to the newly formed Southern Transition Council, which advocates for an independent south Yemen. Another challenge for the Government is the existence of proxy forces, armed and funded by member States of the Saudi Arabia-led coalition, who pursue their own objectives on the ground. The battlefield dynamics are further complicated by the terrorist groups Al-Qaida in the Arabian Peninsula (AQAP) and Islamic State in Iraq and the Levant (ISIL) (Da'esh), both of which routinely carry out strikes against the Houthis, the Government and Saudi Arabia-led coalition targets.

The end of the Houthi-Saleh alliance opened a window of opportunity for the Saudi Arabia-led coalition and forces loyal to the Government of Yemen to regain territory. This window is unlikely to last for long, however, or to be sufficient in and of itself to end the war.

The launch of short-range ballistic missiles, first by forces of the Houthi-Saleh alliance and subsequently, following the end of the alliance, by Houthi forces against Saudi Arabia, changed the tenor of the conflict and has the potential to turn a local conflict into a broader regional one.

The Panel has identified missile remnants, related military equipment and military unmanned aerial vehicles that are of Iranian origin and were brought into Yemen after the imposition of the targeted arms embargo. As a result, the Panel finds that the Islamic Republic of Iran is in non-compliance with paragraph 14 of resolution 2216 (2015) in that it failed to take the necessary measures to prevent the direct or indirect supply, sale or transfer of Borkan-2H short-range ballistic missiles, field storage tanks for liquid bipropellant oxidizer for missiles and Ababil-T (Qasef-1) unmanned aerial vehicles to the then Houthi-Saleh alliance.

The Houthis have also deployed improvised sea mines in the Red Sea, which represent a hazard for commercial shipping and sea lines of communication that could remain for as long as 6 to 10 years, threatening imports to Yemen and access for humanitarian assistance through the Red Sea ports.

Yemen's financial system is broken. There are competing central banks, one in the north under the control of the Houthis, and one in the south under the control of the Government. Neither is operating at full capacity. The Government is unable to effectively collect revenue, while the Houthis collect taxes, extort businesses and seize assets in the name of the war effort.

18-00267

Yemen has a liquidity problem. Salaries throughout the country often go unpaid, meaning that medicine, fuel and food, when available, are often prohibitively expensive. New profiteers are emerging as a result of the war and the black market now threatens to eclipse formal transactions.

Although Ali Abdullah Saleh is now deceased, it is likely that Khaled Ali Abdullah Saleh, acting on behalf of Ahmed Ali Abdullah Saleh (YEi.005), will continue to control the wealth of the Saleh family. There is no indication, as yet, as to whether he will use this wealth to support acts that threaten the peace, security or stability of Yemen.

Throughout 2017, there have been widespread violations of international humanitarian law and international human rights law by all parties to the conflict. The air strikes carried out by the Saudi Arabia-led coalition and the indiscriminate use of explosive ordnance by Houthi-Saleh forces throughout much of 2017 continued to affect civilians and the civilian infrastructure disproportionally. The Panel has seen no evidence to suggest that appropriate measures were taken by any side to mitigate the devastating impact of these attacks on the civilian population.

The rule of law is deteriorating rapidly across Yemen, regardless of who controls a particular territory. The Government of Yemen, the United Arab Emirates and Houthi-Saleh forces have all engaged in arbitrary arrests and detentions, carried out enforced disappearances and committed torture. The Houthis have summarily executed individuals, detained individuals solely for political or economic reasons and systematically destroyed the homes of their perceived enemies. The Houthis also routinely obstruct humanitarian access and the distribution of aid.

Following the missile attack on Riyadh on 4 November 2017, the Saudi Arabia-led coalition ordered the closure of all land crossings into, and all seaports and airports in Yemen. Entry points under the control of the Government of Yemen were quickly re-opened, while those under the control of the Houthis, such as Hudaydah, remained closed for weeks. This had the effect of using the threat of starvation as an instrument of war.

Delays and unpredictability resulting from the current inspection regime for the Red Sea ports have created additional barriers and business risks for shippers and importers supplying Yemen. The confidence of the Saudi Arabia-led coalition in the United Nations inspection process must be improved to ensure an increased flow of essential supplies and humanitarian aid through the Red Sea ports.

S/2018/68

# Contents

|  |  |  | Page |
|---|---|---|---|
| I. | Introduction | | 6 |
| | A. | Mandate and introduction | 6 |
| | B. | Methodology | 7 |
| | C. | Programme of work | 7 |
| | D. | Cooperation with stakeholders and organizations | 8 |
| II. | Threats to the peace, security or stability of Yemen | | 9 |
| | A. | Challenges to the authority of the legitimate Government of Yemen | 9 |
| | B. | Impediments to the cessation of hostilities and to the resumption of the political process | 10 |
| | C. | Security and regional dynamics | 13 |
| | D. | The "Southern question" | 14 |
| | E. | Contested areas and potential fragmentation | 15 |
| | F. | Maritime security | 16 |
| III. | Armed groups and military units | | 17 |
| | A. | Yemeni Government and Saudi Arabia-led coalition regular forces | 17 |
| | B. | Saudi Arabia-led coalition proxy forces | 18 |
| | C. | Houthi forces | 19 |
| | D. | The network of Ali Abdullah Saleh | 20 |
| | E. | Al-Qaida in the Arabian Peninsula | 21 |
| | F. | Islamic State in Iraq and the Levant | 23 |
| IV. | Arms and implementation of the targeted arms embargo | | 24 |
| | A. | Houthi-Saleh "land missile campaign" | 25 |
| | B. | Extended-range short-range ballistic missiles | 27 |
| | C. | Houthi use of unmanned aerial vehicles | 32 |
| | D. | Waterborne improvised explosive devices | 33 |
| | E. | Sea mines | 34 |
| | F. | Anti-tank guided missiles | 35 |
| | G. | Black market | 35 |
| | H. | Increasing the effectiveness of the targeted arms embargo | 36 |
| V. | Economic context and overview of finance | | 37 |
| | A. | Control of State economic resources by the Houthis and their affiliates | 37 |
| | B. | Money supply problems | 40 |
| | C. | Financial consequences of the conflict on the import of food | 41 |
| VI. | Assets freeze | | 43 |
| | | Khaled Ali Abdullah Saleh | 45 |

VII.     Travel ban . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     45

VIII.    Acts that violate international humanitarian law and human rights law . . . . . . . . . . . . . . . . . .     45

         A.     Incidents attributed to the Saudi Arabia-led coalition . . . . . . . . . . . . . . . . . . . . . . . . .     46

         B.     Houthi and Saleh forces: violations associated with the deprivation of liberty . . . . . . . . .     49

         C.     Indiscriminate use of explosive ordnance against civilian populated areas . . . . . . . . . . . .     50

         D.     Violations by the Government of Yemen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     51

         E.     Attacks inside hospitals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     52

         F.     Recruitment and use of children in armed conflict . . . . . . . . . . . . . . . . . . . . . . . . . . . .     52

IX.      Obstruction of humanitarian assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     53

         A.     Obstruction of deliveries of humanitarian assistance . . . . . . . . . . . . . . . . . . . . . . . . . . .     53

         B.     Obstruction to the distribution of humanitarian assistance . . . . . . . . . . . . . . . . . . . . . . .     54

X.       Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     54

         Annexes* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     56

---

 *  The annexes are being circulated in the language of submission only and without formal editing.

S/2018/68

# Final report of the Panel of Experts on Yemen

# I. Introduction

## A. Mandate and introduction

1.    By its resolution 2342 (2017), the Security Council renewed the sanctions measures in relation to Yemen and further extended the mandate of the Panel of Experts on Yemen until 28 March 2018. The Panel is mandated to:

    (a)    Assist the Security Council Committee established pursuant to resolution 2140 (2014) in carrying out its mandate as specified both in resolutions 2140 (2014) and 2216 (2015), including by providing the Committee at any time with information relevant to the potential designation at a later stage of individuals and entities who may be engaging in acts that threaten the peace, security or stability of Yemen, as defined in paragraph 18 of resolution 2140 (2014) and paragraph 19 of resolution 2216 (2015);

    (b)    Gather, examine and analyse information from States, relevant United Nations bodies, regional organizations and other interested parties regarding the implementation of the sanctions measures and targeted arms embargo, in particular incidents undermining the political transition;

    (c)    Provide a midterm update to the Committee no later than 28 July 2017, and a final report to the Security Council no later than 28 January 2018, after discussion with the Committee;

    (d)    Assist the Committee in refining and updating information on the list of individuals subject to sanctions measures, including through the provision of identifying information and additional information for the publicly available narrative summary of reasons for listing;

    (e)    Cooperate with other relevant expert groups established by the Security Council, in particular the Analytical Support and Sanctions Monitoring Team established by Council resolution 1526 (2004).[1]

2.    On 1 August 2017, the Panel presented a midterm update to the Committee,[2] in accordance with paragraph 6 of resolution 2342 (2017). An additional update containing information on the obstruction of commercial shipping through Red Sea ports in Yemen controlled by the Houthi-Saleh forces[3] was submitted to the Committee on 31 March 2017, and two updates on an escalation in relation to a missile attack against Riyadh on 4 November 2017 were submitted to the Committee on 10 and 24 November 2017.

3.    The present report covers the period from 1 January 2017 to 31 December 2017. The Panel has also continued to investigate outstanding issues covered in its previous report, dated 31 January 2017 (S/2017/81).

---

[1] The Monitoring Team established by resolution 1526 (2004) and extended by resolution 2253 (2015).

[2] The midterm update and the additional updates provided to the Committee and to the members of the Security Council are confidential (archived in the files of the Secretariat).

[3] Houthi-Saleh forces refers to the armed units of the alliance up until its collapse on 1 December 2017.

18-00267

## B.   Methodology

4.    In its investigations, the Panel complied with paragraph 11 of resolution 2342 (2017), which pertains to the best practices and methods recommended in the report of the Informal Working Group of the Security Council on General Issues of Sanctions (S/2006/997). The Panel placed emphasis on adherence to standards regarding transparency and sources, documentary evidence, corroboration of independent verifiable sources and providing the opportunity to reply.[4] The Panel has maintained transparency, objectivity, impartiality and independence in its investigations and has based its findings on a balance of verifiable evidence.

5.    The Panel used satellite imagery of locations in Yemen procured by the United Nations from private providers to support investigations. It also used information from commercial databases that record maritime and aviation data and mobile phone records. Public statements by officials through official media channels were accepted as factual, unless contrary facts were established. While the Panel has been as transparent as possible, in situations in which identifying sources would expose them or others to unacceptable safety risks, the Panel decided not to include identifying information in the report and assigned the relevant evidence for safekeeping in United Nations archives.

6.    The Panel reviewed social media, but no information gathered was used as evidence unless it could be corroborated using multiple independent or technical sources, including eyewitnesses, in order to meet the highest achievable standard of proof.

7.    The spelling of place names within Yemen is often dependent on the ethnicity of the source or quality of translation. The Panel has adopted a consistent approach in the report, with personal names and major place names spelled out as in previous United Nations documents and in accordance with the standard spelling found in the United Nations Terminology Reference System (UNTERM). Dates in documents provided by Member States given according to the Islamic calendar have been converted to the corresponding dates according to the Gregorian calendar.

## C.   Programme of work

8.    In the course of its investigations Panel members have travelled to Belgium, Djibouti, Egypt, Ethiopia, France, the Islamic Republic of Iran, Israel, Italy, Jordan, the Netherlands, Oman, Qatar, Saudi Arabia, Spain, Sweden, Turkey, the United Arab Emirates, the United Kingdom of Great Britain and Northern Ireland, the United States of America and Yemen. The Panel twice requested official visits to areas of Yemen (Ma'rib and Mukalla) under the control of the legitimate Government: on both occasions the response from the legitimate Government and Saudi Arabia was too late to allow for the United Nations travel approval and security processes to be completed.

9.    The Panel requested visits to territory controlled by the Houthi-Saleh alliance (Sana'a and Ta'izz) on three separate occasions. The Sana'a-based authorities initially approved the first visit, but withdrew that approval 24 hours later. They did not respond the subsequent two requests after informing the Panel that they did not wish to cooperate with it.[5]

10.   Oman initially agreed to a visit to the Mazyunah border crossing point with Yemen but cancelled the visit immediately prior to the Panel's departure for Oman.

---

[4] Information on methodology and opportunity to reply is contained in annex 1.
[5] Letter to the Panel dated 23 March 2017.

## D.   Cooperation with stakeholders and organizations

### 1.   United Nations system

11.   The Panel wishes to highlight the excellent level of cooperation with the Office of the Special Envoy of the Secretary-General for Yemen and the United Nations resident coordinators in the neighbouring States visited by the Panel. The United Nations country team and United Nations agencies with a regional mandate remain supportive of the Panel's work. The Panel has consistently had direct access to country team officials in Sana'a and the wider region to exchange information and expertise.

12.   In conformity with paragraph 7 of resolution 2342 (2017), the Panel has maintained close cooperation with the Analytical Support and Sanctions Monitoring Team concerning Islamic State in Iraq and the Levant (ISIL) (Da'esh), Al-Qaida and the Taliban and associated individuals and entities, [6] the Somalia and Eritrea Monitoring Group, [7] and the Secretariat staff working on the implementation of resolution 2231 (2015).

### 2.   Communications with Member States

13.   The Panel has sent 192 letters to Member States and entities requesting information on specific issues relevant to its mandate. The Panel wishes to affirm that such requests for information do not necessarily imply that those Governments, or individuals or entities in those States, have been violating the sanctions regime. The Panel notes, however, that 25 per cent of requests to Member States for information are still awaiting a response. At the time of submission of the present report, replies are awaited from: Australia, France, the Islamic Republic of Iran, Marshall Islands, Oman, the Russian Federation, Saudi Arabia, Serbia, Togo, the United Arab Emirates, the United Kingdom and Yemen. Furthermore, the ministry of foreign affairs, based in Sana'a, and several other entities have not yet replied. A summary of the Panel's correspondence during the reporting period is contained in annex 3 to the present report.

### 3.   Government of Yemen

14.   The Panel met the Prime Minister of Yemen, Ahmed Bin Dagher, and other officials of the legitimate Government of Yemen in Aden in March 2017. [8] Although they expressed full support to the Panel, they provided information of insufficient evidential quality.

### 4.   Houthi-Saleh alliance

15.   The Panel maintained phone contact with representatives of the Houthi Ansarallah movement and the leaders of the General People's Congress. The Panel also met with some of their representatives during visits to countries in the region.

---

[6] Established by resolution 1526 (2004) and extended by resolution 2253 (2015).

[7] Established by resolutions 751 (1992) and 1907 (2009), and recently extended by resolution 2317 (2016).

[8] In order to avoid confusion between the Government of Yemen and Houthi-Saleh alliance authorities and appointments, and to easily distinguish between the two in the present report, for Government of Yemen ministries and Government officials the Panel will use capitalization: for example, "Minister of Defence" and "Ministry of Defence". The Houthi duplicate administration would then be referred to as, the "Sana'a based minister of defence" and the "Sana'a based ministry of defence". Similarly, military ranks and appointments will follow the same format, for example, "General" and "general", "35th Armoured Brigade" and "62nd mechanized brigade" and so forth.

## II.   Threats to the peace, security or stability of Yemen

16.   In paragraph 18 of resolution 2140 (2014), the Security Council determined that obstructing or undermining the successful completion of the political transition, as outlined in the Gulf Cooperation Council initiative and the implementation mechanism agreement, poses a threat to the peace, security or stability of Yemen and can be used as designation criterion.

## A.   Challenges to the authority of the legitimate Government of Yemen

17.   The authority of the legitimate Government of Yemen has now eroded to the point that it is doubtful whether it will ever be able to reunite Yemen as a single country. The Panel bases this assessment on the following four factors: (a) President Hadi's inability to govern from abroad; (b) the formation of a "Southern Transitional Council", with the stated goal of creating an independent south Yemen; (c) the continued presence of the Houthis in Sana'a and much of the north; and (d) the proliferation and independent operations of proxy military forces funded and armed by members of the Saudi Arabia-led coalition.

18.   President Hadi remained outside Yemen for much of 2017.[9] Several Governors either resigned or were removed[10] from their posts by President Hadi, including Nayif Salim Saleh al-Qaysi (QDi.402),[11] the then Governor of Bayda', who was sanctioned by the United Nations on 22 February 2017 for providing support to an Al-Qaida branch in Yemen.[12] The legitimate Government's inability to pay salaries to civil servants, soldiers and other Government employees has also undermined its authority and diminished popular support.

### 1.   Southern Transitional Council

19.   On 11 May 2017, the former Governor of Aden, Major General Aydrus al-Zubaydi, announced the formation of the Southern Transitional Council[13] with the stated goal of creating an independent south Yemen.[14] On 30 November 2017 the Council announced the names of the 303 members of a "National Assembly".[15]

20.   Throughout 2017, support for the Southern Transitional Council and its goal of an independent south Yemen has grown among the population as well as within the Yemeni Armed Forces and proxy forces. Uniformed members of the Security Belt Forces are frequently photographed at Council rallies carrying flags of the former People's Democratic Republic of Yemen. The Panel has also identified elements of the Hadrami Elite Forces posting Council logos and the flag of the former southern State at their checkpoints.

---

[9] Hadi's last publicly reported visit to Yemen was in February 2017.
[10] For a list of current Governors loyal to the legitimate Government see annex 4.
[11] See annex 5 for the network of Nayef al-Qaysi.
[12] Al-Qaysi was removed from his post as Governor on 23 July 2017.
[13] Information provided in the Panels' 2017 confidential midterm update report (paras. 9 and 10). For the leadership of the Southern Transitional Council see annex 7.
[14] South Yemen was an independent State from 1967 until unification in 1990.
[15] The first meeting was held in Aden on 23 December 2017. Ahmed bin Breik was elected president and Anis Youssef Ali Luqman as vice-president. The distribution of seats is: Hadramawt, 100 seats; Aden, 62 seats; Shabwah, 37 seats; Lahij, 36 seats; Abyan, 31 seats; Mahrah, 24 seats; Dali', 10 seats; and Socotra, 3 seats. Websites of the Southern Transitional Council can be viewed in Arabic (http://www.southerntransitionalcouncil.net/) and English (http://en.southerntransitionalcouncil.net/) (all hyperlinks, unless otherwise indicated, accessed on 29 December 2017). The Council has opened local or branch offices in all eight governorates. For a list of names see annex 7.

S/2018/68

### 2. Houthi-Saleh alliance

21.    Until its collapse in early December 2017 the Houthi-Saleh alliance, through its joint supreme political council, continued to undertake roles and responsibilities exclusively within the authority of the legitimate Government.[16] The Houthis have now taken unilateral control of all State institutions within their territory. The longer they remain in control, the more entrenched they will become.[17]

## B.  Impediments to the cessation of hostilities and to the resumption of the political process

22.    No real progress towards a peaceful settlement was made during 2017. The political process has stalled as all parties to the conflict continue to believe that they can achieve a military victory that would negate the necessity for political compromise.

23.    Since the attack on the convoy of the Special Envoy of the Secretary-General for Yemen, Ismail Ould Cheikh Ahmed, in Sana'a on 25 May 2017,[18] he has been prevented from visiting Sana'a.[19] The Houthis have effectively banned the Special Envoy by refusing to accept any subsequent proposals from him.

24.    The Houthis believe that they only have to survive and outlast the Saudi Arabia-led coalition in order to "win" the war, which limits their willingness to negotiate. The Saudi Arabia-led coalition, on the other hand, is faced with four broad choices: (a) unilaterally cease hostilities and leave the Houthis in control; (b) mount a massive ground invasion with no guarantee of success and certain casualties; (c) continue to carry out airstrikes and hope for different results, although after 33 months of air strikes the number of credible targets remaining is considered to be very low; or (d) attempt to resurrect Saleh's network as part of an anti-Houthi coalition. Although the battle lines may shift slightly in the coming months, as a result of the collapse of the Houthi-Saleh alliance, the Panel does not believe that any side is in a position to secure an outright military victory.

25.    Another complicating factor is that the political decision makers on all sides are not bearing the brunt of the war, the Yemeni civilians are. The Houthi leadership is largely insulated from attacks, and from the shortages of food, fuel, medicine and water. The Saudi Arabia-led coalition relies on relatively low-risk airstrikes and a limited number of ground troops, which reduces the domestic political fallout.

---

[16]  See S/2017/81, para. 20.

[17]  Houthis control Amran, Dhamar, Hajjah, Ibb, Mahwit, Raymah, Sa'dah and Sana'a. Contested governorates are Bayda', Hudaydah, Jawf, Ma'rib and Ta'izz. The list of governors can be found in annex 8.

[18]  See https://www.reuters.com/article/us-yemen-security-un/u-n-wants-investigation-into-attack-on-yemen-envoys-convoy-idUSKBN18L18I.

[19]  See https://www.reuters.com/article/us-yemen-security-un/houthis-ban-u-n-special-envoy-from-yemen-for-alleged-bias-idUSKBN18W2D0.

**Collapse of the Houthi-Saleh alliance and death of Saleh**

26.    Tensions between the Houthis and Ali Abdullah Saleh (YEi.003) spiked in August 2017,[20] and again on 29 November 2017 when armed Houthi supporters clashed with Saleh supporters in and around the al-Saleh mosque in Sana'a. The latter incident sparked a five-day street war that led to the collapse of the Houthi-Saleh alliance and the death of Ali Abdullah Saleh.

27.    Although Ali Abdullah Saleh initially appeared to have the upper hand in Sana'a, the Houthis quickly retook several military installations and sent reinforcements into the city, while isolating Saleh from military and tribal allies. Abdullah Yahya al-Hakim (YEi.002) and Mohammed Ali al-Houthi, the head of the Houthi's revolutionary committee, were instrumental in reaching out to tribes around Sana'a and convincing them not to support Ali Abdullah Saleh. The Panel believes that Mohammed Ali al-Houthi meets the designation criteria owing to his involvement in leading these events, which constitute a threat to the peace and security of Yemen.

28.    On 2 December 2017 Ali Abdullah Saleh reached out to the Saudi Arabia-led coalition, promising a "new page" in relations and calling on his supporters to take up arms and fight.[21] But without the help of tribal sheikhs and key generals, who were either unwilling or unable to help, Saleh[22] and his soldiers in Sana'a were overrun and killed early on the morning of 4 December 2017.

---

[20]  In August 2017, Abdulmalik al-Houthi and Ali Abdullah Saleh criticized one another in competing speeches ahead of the public celebration of the thirty-fifth anniversary of the General People's Congress. On 26 August 2017, a prominent Saleh supporter, Khaled Ahmed Zayd al-Radhi, the head of foreign relations for the General People's Congress and head of the Vulcan Group, was killed in a clash with the Houthis in Sana'a. On 12 September 2017 Abdulmalik al-Houthi and Ali Abdullah Saleh spoke directly in an attempt to ease the tensions. For an account of events escalating tensions within the alliance see annex 9.

[21]  The Panel notes that during this time the Saudi Arabia-led coalition deployed air strikes against exclusively Houthi targets close to Saleh's armed supporters. Should this have been an attempt to protect Ali Abdullah Saleh then it would be a non-compliance with para. 14 of resolution 2216 (2015) as it would equate to military support to a listed individual. The Panel continues to investigate this matter.

[22]  Based on the imagery of Saleh's body, the Panel believes he was executed at close range with a bullet to the left side of the back of the head. The Houthis transported Saleh's body in an SUV outside of Sana'a, where they staged a mock ambush to make it appear as though he was killed while fleeing for his life. The Panel believes this is one of the many moves that the Houthis took in December 2017 as part of a strategy to discredit Ali Abdullah Saleh.

Figure I
**Mohammed Ali al-Houthi and Abdullah Yahya Al Hakim in Sana'a (December 2017)**[a]



> [a] Video from confidential sources: Mohammed Ali al-Houthi (left) and Abdullah Yahya
> Al Hakim (right).

29.    There were also widespread reports that Ali Abdullah Saleh's nephew and senior military commander Tariq Muhammad Abdullah Saleh[23] was killed in the fighting. The Panel is working to independently confirm this. The Panel has confirmed that Arif al-Zuka, the Secretary-General of the General People's Congress and the top political aide of Ali Abdullah Saleh, was also killed. The Houthis also managed to capture several of Ali Abdullah Saleh's relatives.[24] The Panel believes that some of those individuals were wounded in the fighting, and that the Houthis are holding them as leverage in the event that either Ahmed Ali Abdullah Saleh (YEi.005) or Khaled Ali Abdullah Saleh attempt to resurrect the Saleh network.

30.    Over the course of the next several days, the Houthis attempted to crush or co-opt the remnants of Saleh's network while simultaneously consolidating their own rule over Sana'a and much of northern Yemen. They executed key military commanders, who were part of Saleh's Sanhan tribe;[25] arrested prominent members

---

[23] Tareq Saleh was the commander of Saleh's Special Guards and de facto head of the Republican Guard.

[24] The Panel has determined that that two of Saleh's six sons, Salah and Midyan, were captured along with Saleh's nephew, Muhammad Muhammad Abdullah Saleh, a key military figure and General Supervisor of the Vulcan Group (see http://www.vulcanyemen.com/owners.htm). The Panel also believes that the Houthis captured Tariq Saleh's eldest son, Afash, and Yahya Muhammad Abdullah Saleh's eldest son, Kenan. Lists of Saleh's sons and nephews are contained in confidential annexes 10 and 11. For the names of Saleh's daughters and sons-in-law, see confidential annex 12.

[25] On 5 December 2017 the Houthis executed major generals Mahdi Maqawlah, Abdullah al-Dhabaan (commander, 35th armoured brigade and former axis commander in Ta'izz) and Murad al-Awbali (commander 62nd mechanized brigade).

of the General People's Congress, [26] and intimidated others; [27] forcibly dispersed protests; [28] kidnapped the children of prominent families tied to Saleh; [29] destroyed the homes of Saleh supporters; and instigated a media blackout by blocking social media sites and much of the Internet. The Houthis also announced that they were changing the name of the al-Saleh mosque, and claimed that they found large quantities of gold, silver and cash in Saleh's house, which they were depositing in the Central Bank. [30] The Panel anticipates more crackdowns as the Houthis attempt to solidify their grip on power.

## C. Security and regional dynamics

### 1. Regional dynamics

31.   Qatar was expelled from the Saudi Arabia-led coalition on 5 June 2017, and the withdrawal of its forces began on 7 June 2017. This has had little impact from a military perspective. However, tensions between Qatar and members of the Saudi Arabia-led coalition have spilled over into Yemen, as coalition members and their proxies have targeted the al-Islah party, which they see as an ally of Qatar.[31]

### 2. Areas under the control of forces allied to the legitimate Government of Yemen

32.   Although the armed forces of the legitimate Government remain present throughout the eight southern provinces, (Abyan, Aden, Dali', Hadramawt, Lahij, Mahrah, Shabwah and Socotra), a number of other actors such as Al-Qaida in the Arabian Peninsula (AQAP), ISIL, tribal opponents, the recently formed Southern Transitional Council and proxy forces of the Saudi Arabia-led coalition challenge the Government's ability to govern and impose its authority. Armed forces loyal to President Hadi are also operating in Ta'izz and Ma'rib.

33.   Forces of the United Arab Emirates in southern Yemen view the Security Belt Forces (for the leadership and structure of the Security Belt Forces, see annex 6) as key pillars of their security strategy for Yemen. This approach continues to marginalize Government institutions such as the National Security Bureau and the Political Security Organization, further undermining and reducing the legitimate Government's intelligence and security capabilities.

---

[26] List of members of the General People's Congress detained by the Houthis is contained in annex 13.

[27] In the aftermath of Saleh's death, the Houthi television channel, al-Masirah, broadcast footage of a meeting of the General People's Congress in Amran, at which individuals pledged their allegiance to the state and distanced themselves from Ali Abdullah Saleh. The Panel believes that this is the Houthi way of illustrating they will only go after Saleh's supporters, not the General People's Congress as a whole (http://www.almasirah.net/gallery/preview.php?file_id= 10509#.WihdwAa5gRg.twitter).

[28] On 6 December 2017 the Houthis fired shots to disperse a protest by women demanding that the Houthis surrender the body of Ali Abdullah Saleh for burial.

[29] Armed men affiliated with the Houthis entered the house of Ruqayah al-Hijjri, the sister of one of Saleh's wives (see confidential annex 14), and seized at least one of her children (http://www.almasdaronline.com/article/95978).

[30] The Houthi imagery used to support this claim are stock images that originate outside Yemen (see http://www.saba.ye/ar/news481198.htm).

[31] On 11 October 2017, security forces in Aden, acting on the orders of Shallal Ali Shaye, the Head of Security, stormed an al-Islah party building, arresting 10 individuals (see https://www.reuters.com/ article/us-yemen-security/yemen-islamist-party-members-arrested-ratcheting-up-tensions-idUSKBN1CG1J1).

### 3. Involvement of the Saudi Arabia-led coalition forces

34. Saudi Arabia-led coalition forces continue to provide financial, political, military and logistic support to the Yemeni Armed Forces and a number of proxy armed groups. The main battlefronts for the forces of Saudi Arabia are Ma'rib and Midi, while those of the United Arab Emirates operate largely in Aden, Abyan, Hadramawt, Lahij, Mahrah, Mukha and Shabwah.

35. On 7 December 2017, southern resistance forces, with support from the Saudi Arabia-led coalition under Brigadier General Abdul Salam al-Shehi, took control of the Abu Musa al-Ashar camp outside Khawkhah and continued to push northward towards Hudaydah city.[32] As part of this security operation, southern elements under the command of Haitham Qassem Taher launched a military offensive in the Hudaydah governorate, meeting minimal resistance from Houthi elements north of Mukha city on the coast of the Red Sea.

36. The United Arab Emirates continues to expand its support to proxy forces in the south, primarily the Security Belt Forces in Abyan, Aden and Lahij, and to the Hadrami and Shabwani Elite Forces (see paras. 55 to 58 below). The United Arab Emirates maintains military training facilities in Shamussah and Rayyan near Mukalla, where a number of foreign military advisers and trainers are based in support of the Elite Forces.[33]

## D. The "Southern question"

37. The Panel assesses that, given the length of the war, lack of military progress and the divisions that have emerged, secession into a separate south Yemen is now a real possibility. Furthermore, the ability of the legitimate Government to administer and govern the eight governorates it claims to control has been significantly eroded during 2017. The situation in Aden and Mahrah provide solid examples of the background to this risk.

### 1. Aden

38. Security within the governorate has deteriorated significantly over the course of 2017. ISIL has carried out several large-scale suicide attacks and has claimed responsibility for a number of assassinations (see para. 74 below). There have also been several politically motivated assassinations that have not been claimed by either AQAP or ISIL. For example, on 18 October 2017, Fahd al-Yunisi, the imam of the Sahaba mosque in Aden, was assassinated by an, as yet, unidentified gunman.[34]

39. The legitimate Government has also repeatedly failed to pay the salaries of Government workers and appears incapable of providing basic services to the city, including adequate electricity. On 16 November 2017, Abd al-Aziz al-Muflahi, the Governor of Aden, submitted his resignation, citing the Government's inability to pay salaries.[35] The Panel has seen billboards throughout Aden and other cities in the south of the country demonizing Prime Minister bin Daghir and the legitimate Government for their inability to provide for Yemenis.[36] There appear to be no efforts by local authorities to counter this campaign against the Government.

---

[32] See http://adengad.net/news/291513/.

[33] Evidence from Panel visits to Yemen and interviews with confidential sources.

[34] See http://adengad.net/news/283179/. The Panel has identified other, politically motivated, assassinations claimed by neither AQAP or ISIL in Yemen.

[35] Appointed in April 2017, after President Hadi removed Aydarus al-Zubaydi; Al-Muflahi had also clashed with Prime Minister bin Daghir, claiming that the latter often acted as the Governor.

[36] See https://twitter.com/goldensla/status/926022844307378178.

S/2018/68

2. **Mahrah**

40.    There are growing tensions in the eastern governorate of Mahrah over the deployment of new military forces into the region to combat smuggling.[37] On 15 November 2017, Brigadier General Abdullah Mansour Ali and the 123rd Infantry Brigade replaced the 137th Mechanized Brigade in Mahrah. Nearly two weeks later, on 27 November 2017, President Hadi appointed Rajih Said Bakrit as the new Governor of Mahrah, replacing Mohammed Abdullah Kudah.[38] The former Governor remains in Mahrah, protected by armed elements of his tribe and other officials with shared interests.[39] His tribe, the Al Kudah, controls access to coastal territory east of Ghaydah port, in Jarub and Zaghar, towards the border with Oman.

## E.   Contested areas and potential fragmentation

41.    The events in Bayda' and Ta'izz also provide further indication of the very real risks of the fragmentation of Yemen.

1. **Bayda'**

42.    Located at the crossroads of the former north-south border, Bayda' occupies a highly valuable and strategic location. Of particular importance is the area of Bayhan, in northern Bayda', which is a primary smuggling route into Sana'a from the south, with links to Ma'rib and the Arabian Sea coast. The Houthi presence is centred on the city of Rada', while AQAP appears to be active near Dhahab and the surrounding areas in Suma and south throughout Zahir. ISIL operates from a small enclave within Qayfah, while resistance elements supported by the Saudi Arabia-led coalition are confined to the lower southwest in Humaiqan, Bayda' city and near Mukayras (see map in annex 17).[40]

2. **Ta'izz**

43.    As described in paragraphs 28 to 33 of the Panel's confidential midterm update report, the city of Ta'izz remains a flashpoint in the conflict and a humanitarian disaster. Ta'izz has been the focus of the most sustained fighting over the past year. Houthi forces continue to besiege the city. Tension between local resistance elements, Salafi militias and Yemeni Army Forces spiked in October 2017, following the decision by the United States, Saudi Arabia and the Gulf Cooperation Council to sanction Abu al-Abbas,[41] a key Salafi leader. Like the Houthis in Sana'a, Abu al-Abbas continues to hold territory inside the city and exercises rights and responsibilities exclusive to the legitimate Government.[42] Prior to 25 October 2017, Abu al-Abbas had received significant support from the United Arab Emirates. The Panel is investigating whether this support continues.

---

[37] Attempts to create a Mahrahi Elite Force, similar to the Hadramawt and Shabwah Elite Forces, appear to have been tabled for the moment.

[38] See http://adengad.net/news/289730/: Kudah was named a Minister of State and a member of President Hadi's Council of Ministers.

[39] Principal Mahrah Governorate officials are listed in annex 15. Known AQAP affiliates operating in the governorate are listed in annex 16.

[40] These resistance elements are associated with the former Governor of Bayda', Nayif al-Qaysi (QDi.402), and Abd al-Wahhab al-Humayqani (see annexes 5 and 18).

[41] Abu al-Abbas was sanctioned by the United States and by the Saudi Arabia-led coalition on 25 October 2017. Known associates are listed in annex 19.

[42] Prior to being sanctioned, Vice-President Ali Muhsin al-Ahmar had attempted to incorporate Abu al-Abbas and his militia into the Yemeni Armed Forces. That attempt failed.

44.   The various Salafi militias[43] that have emerged from the nearly three years of war are not only competing, and at times clashing, with Government forces, but also with each other. This competition has only increased in the wake of the sanctions against Abu al-Abbas. The militias view Ta'izz as a zero-sum game and a weakened Abu al-Abbas has meant that several smaller militias are fighting for more territory. In Ta'izz, the more urban territory a group holds, the more outside support they attract.

45.   Sanctions on Abu al-Abbas may also have prompted Houthi-Saleh forces to step up their attacks on resistance forces inside the city of Ta'izz and in the surrounding areas. A number of airstrikes by the Saudi Arabia-led coalition on Ta'izz, believed to have been targeting Houthi-Saleh forces, have resulted in civilian casualties. One airstrike hit elements from the 22nd Armoured Brigade, loyal to President Hadi, in the al-Aroos area of Saber mountain.[44] Such incidents have disrupted relations between local forces and allies of the Saudi Arabia-led coalition, giving Houthi-Saleh forces the opportunity to mobilize their forces and exploit the situation to gain new ground along various fronts in Ta'izz.

46.   Both AQAP and ISIL remain active in Ta'izz, although both groups have experienced defections and fragmentation (see para. 66 below).

## F.   Maritime security

47.   During 2017 there was an increase in the number and type of maritime security incidents affecting the safety and security of the strategic sea lines of communication and approaches to the Red Sea ports. This jeopardizes the delivery of humanitarian assistance to Yemen by sea, in violation of paragraph 19 of resolution 2216 (2015). Figure II illustrates the number and the distribution of maritime security incidents within the region during 2017, including:

(a)   Attacks using missiles or explosives against Saudi Arabia-led coalition naval vessels and the Red Sea ports, including the emergence of new threats from: (i) remote controlled skiffs containing explosives (water-borne improvised explosive devices); and (ii) the use of a land-based anti-tank guided missiles;

(b)   An attempted attack against the Marshall Islands-flagged tanker MV *Muskie* very similar in modus operandi to that against the Spanish-flagged MV *Galicia Spirit*;[45]

(c)   An armed helicopter attack on 16 March 2017 by an as yet unidentified perpetrator against a civilian vessel containing migrants that resulted in at least 42 fatalities;

(d)   The use of naval and improvised sea mines (see paras. 110–114 below).

---

[43] Other militias in Ta'izz, include: the al-Sa'lik Brigade and those under the control of Hashem al-Sanani, Saud Mayub, Hareth al-Izzy and Abu Saduq.

[44] See http://www.middleeasteye.net/news/saudi-forces-accused-deliberately-targeting-allies-yemens-Ta'izz-179331116.

[45] MV *Galicia Spirit* attack reported in S/2017/81, paras. 37 and 38 and annex 14. MV *Muskie* attack reported in the Panels' 2017 confidential midterm update.

Figure II
**Maritime security incidents: 2017**



48.   While the tactics contained in the industry publication *Best Management Practices for Protection against Somalia Based Piracy* (BMP 4)[46] will protect vessels, to some degree, against attempted boarding by small groups of armed militants or pirates, they will not provide protection against attacks involving waterborne improvised explosive devices, anti-ship missiles,[47] land based anti-tank guided missiles or sea mines.

# III.   Armed groups and military units

49.   Pursuant to paragraph 17 of resolution 2140 (2014), and as reiterated by the Security Council in its resolutions 2216 (2015), 2266 (2016) and 2342 (2017), the Panel continues to investigate individuals and entities associated with armed groups who may be engaging in or providing support for acts that threaten the peace, security or stability of Yemen.

## A.   Yemeni Government and Saudi Arabia-led coalition regular forces

50.   Troops under the ostensible control of President Hadi routinely display the flag of an independent south Yemen. At times, they have referred to the former Governor of Aden and current Head of the Southern Transitional Council, Aydarus al-Zubaydi,

---

[46]   See www.mschoa.org/docs/public-documents/bmp4-low-res_sept_5_2011.pdf?sfvrsn=0.
Although addressing Somalia-based piracy, the practices also apply to transit in the Red Sea, and to protection against Yemeni-based pirates. The title is a legacy from the initial publication *Best Management Practices for Protection against Somalia Based Piracy* (BMP 1).

[47]   See S/2017/81, paras. 35 and 36, and annex 13.

as their "president".[48] It is the assessment of the Panel that President Hadi no longer has effective command and control over the military and security forces operating on behalf of the legitimate Government of Yemen.[49] One way President Hadi has attempted to arrest the erosion of his power is through the deployment of new military units, particularly the Ta'izz-based 5th Presidential Protection Brigade, which is reminiscent of the Republican Guard Brigades that former President Ali Abdullah Saleh used to safeguard his rule.[50]

51.    Regular military units, such as the 103rd Infantry Brigade in Abyan,[51] which are wholly or mostly dependent on the legitimate Yemeni Government for salaries and equipment, are underequipped, often paid late or paid only in part. The problem, for this particular Brigade, is further compounded by the fact that their camp in Abyan is on the frontlines and a frequent target of AQAP attacks.[52] In September, frustrated soldiers of the 103rd Infantry Brigade blocked a major road in Abyan to protest the fact that they had received only a partial salary.

52.    The situation is slightly different in Ma'rib, where Vice-President Ali Muhsin al-Ahmar[53] has spent significant periods of time visiting the battlefronts in Sirwah and Nihm. The troops in that area are better paid and better equipped, which is a direct result of Vice President al-Ahmar's support and patronage.

53.    The most effective Yemeni security units, however, are the proxy forces formed and supported by member States of the Saudi-Arabia led coalition, which, in turn, act as proxies for those member States in Yemen.

## B.   Saudi Arabia-led coalition proxy forces

54.    The Panel believes that proxy forces funded and armed by member States of the Saudi Arabia-led coalition present a threat to the peace, security or stability of Yemen. Unless they are brought back under direct Yemeni command and control, with all salaries and equipment distributed through Yemeni Government channels, these forces will do more to further the fracturing of Yemen than they will to hold the State together.

### 1.   Security Belt Forces

55.    The Security Belt Forces, which were formed in March 2016,[54] technically fall under the Ministry of the Interior. However, in practice, they are trained, supplied and paid for by the United Arab Emirates and operate outside the Yemeni military

---

[48] On 25 October 2017, the official twitter account of the Hadrami Elite Forces referred to Aydarus al-Zubaydi as *al-rais*, or "president." (see https://twitter.com/NokhbaHadramout/status/923209607174152192).

[49] For a list of Yemen's military districts and their commanders, see annex 20.

[50] Formed on 17 November 2017. Commanded by Brigadier General Adnan Ruzaiq, a Salafi fighter from the Al Qamush tribe in Shabwah, who arrived in Ta'izz in 2015 with 160 fighters. Ruzaiq has previously come into conflict with Security Belt Forces, who attacked his house in Aden in January 2017, in what is another example of the fragmentation of the armed forces of the legitimate Government. For a list of Presidential Protection Brigades see annex 21.

[51] The Brigade was moved from its base in Aden to Abyan in late July 2017.

[52] On 8 August 2017, an AQAP suicide bomber, Arif Adil Hassan Habib, attacked their camp, killing 12 soldiers and wounding 28.

[53] Ali Muhsin al-Ahmar, a relative of former president Ali Abdullah Saleh, who broke with him in 2011, is one of the most powerful military commanders in recent Yemeni history, and still has a strong network of support within Yemen's military.

[54] As early as September 2015 then Governor of Aden, Nayif Bakri, was talking about forces of Saudi Arabia and the United Arab Emirates forming a "security belt" in the south (see https://sputniknews.com/middleeast/201509051026642155/).

command-and-control structure. Initially numbering around 10,000 soldiers, the Security Belt Forces have grown to more than 15,000 troops and are active in the governorates of Aden, Abyan and Lahij.[55]

56.    At times, Security Belt Forces have clashed with Yemeni military units loyal to President Hadi,[56] and have also been implicated in a number of violations of international humanitarian law and international human rights law (see para. 166 below).[57] Security Belt Forces have also been among the most active in combatting AQAP and ISIL in Yemen, particularly since August 2017 (see para. 38 above).

### 2.    "Elite Forces"

57.    In early 2016, the United Arab Emirates formed and funded the Hadrami Elite Forces ahead of a planned assault on Mukalla.[58] Like the Security Belt Forces, the Hadrami Elite Forces are better paid than their regular Yemeni army counterparts and operate outside the Yemeni military command-and-control structure.

58.    In late 2016, the United Arab Emirates also formed and funded the Shabwani Elite Forces, using the same model. Like the Hadrami Elite Forces, the Shabwani units are made up of local fighters who operate outside the Yemeni military command-and-control structure.[59] The Panel estimates the Shabwani Elite Forces currently number between 3,000 to 4,000 fighters.[60] Although these forces have been active in the fight against AQAP and ISIL in Yemen, the Panel finds them to be proxy forces that are undermining the authority of the legitimate Government of Yemen.

## C.   Houthi forces

59.    Militarily, the Houthis are a tribal-based militia[61] grafted on to, and allied with, a professionally trained military from elements of the former Yemeni Armed Forces.[62] When the Houthis took control of Sana'a in late 2014 they needed the political and military experience provided by the network of Ali Abdullah Saleh (see paras. 43–45 below). By late 2017 this had ceased to be the case. Over the past year, the Houthis have gradually eased out Saleh loyalists from key positions and replaced them with their own supporters. This process culminated in a five-day street war in Sana'a in late November and early December 2017 that ended with the death of Ali Abdullah Saleh (see para. 29 above).

---

[55] For an overview of the command structure see annex 6.
[56] The Panel has identified several clashes between the two sides, for example on 16 September 2017, Hadi's Presidential Protection Force refused to hand over a military checkpoint at Arish on the Aden-Abyan road to the United Arab Emirates-backed security forces (see https://www.reuters.com/article/us-yemen-security-clash/gunfight-erupts-in-southern-yemen-one-civilian-killed-witnesses-idUSKCN1BR0M4).
[57] Elements affiliated with Security Belt Forces have also been implicated in a number of extrajudicial detentions of civilians in Aden (see annex 22).
[58] The initial impetus for the creation of the Hadrami Elite Forces was to create a local face for the efforts to retake the city of Mukalla from AQAP in April 2016 (see S/2017/81, para. 51).
[59] The Panel has identified clashes in October 2017 between the Shabwani Elite Forces and the 23rd Mechanized Brigade, loyal to Vice-President Ali Muhsin al-Ahmar.
[60] The Shabwani Elite Forces command structure is set out in annex 23.
[61] Key security and military figures for the Houthis are listed in annex 24. Key Houthi political figures are listed in annex 25.
[62] The Houthi militia has been fighting for much of the past 13 years, first in a series of six successive wars against then President Saleh's Government from 2004 to 2010, and since March 2015 against the Saudi Arabian-led coalition. After the Houthis took control of Sana'a in early 2015, Yemen's military fragmented, with several key officers joining the Houthis, others remaining loyal to former President Saleh and others siding with President Hadi.

60.    Although there will likely be defections from soldiers still loyal to Ali Abdullah Saleh's network, the Panel does not believe these defections will take place in significant enough numbers, or be carried out in an organized enough fashion, to threaten the Houthis' hold on Sana'a and much of the north, at least in the near term. In the immediate aftermath of the death of Ali Abdullah Saleh the Houthis moved quickly to crush or co-opt what remained of his network, while consolidating their rule through a series of brutal crackdowns, arrests and executions (see para. 29 above).

61.    On 4 November 2017, the Houthis launched a short-range ballistic missile attack on Riyadh (see para. 82 below). Saudi Arabia responded two days later by, among other things, issuing a "wanted" list of 40 Houthis, with significant rewards for information leading to their capture or death.[63]

62.    With the collapse of the Houthi-Saleh alliance the Houthis may look for international partners to offset the loss of domestic allies. Indeed, the Panel considers that further "internationalization" of the war is likely. The more isolated the Houthis become, the more they will look to make common cause with countries seeking to combat the member States of the Saudi Arabia-led coalition. The Panel is aware of media reports that the Islamic Republic of Iran has provided "advisers" to the Houthis and it is investigating this matter.[64]

63.    Although the Houthis continue to recruit new fighters, including children (see paras. 185 and 186 below), the movement is at heart a family organization.[65] This means that the most trusted commanders are those related to the leader, Abdulmalik al-Houthi (YEi.004).[66] This explains why, in April 2017, when it looked as though the Saudi Arabian-led coalition was planning an offensive against Hudaydah, the Houthis named Yusif Ahsan Isma'il al-Madani[67] as the commander of the 5th military district in Hudaydah.[68] The Houthis made a similar move later in 2017, transferring Abd al-Khaliq al-Houthi (YEi.001) from the Midi front to the Nihm front near Sana'a, to better protect the capital.

## D.    The network of Ali Abdullah Saleh

64.    The Panel does not believe that Ahmed Ali Abdullah Saleh, Khaled Ali Abdullah Saleh, or any other single individual is capable of reconstituting Ali Abdullah Saleh's network. Soldiers from the republican guards and special guards are now faced with a choice of either allying themselves with the legitimate Government forces and the Saudi Arabia-led coalition, whom they have been fighting for most of the past three years, or joining the Houthis, who executed Ali Abdullah Saleh and senior military

---

[63] The Government of the former president Ali Abdullah Saleh issued a similar list of 55 "wanted" Houthis in 2009. The list issued by Saudi Arabia is in annex 26.

[64] In a response to a letter from the Panel dated 28 November 2017, the Islamic Republic of Iran replied, on 6 December 2017, that "Iran has no military presence in Yemen, but has a diplomatic representation in Sana'a, providing 'advisory assistance' to support efforts at finding a political solution to the current crisis".

[65] The first leader was Husayn Badr al-Din al-Houthi. When he was killed in 2004, the leadership transferred to his father, Badr al-Din al-Houthi, and then to his half-brother and the current leader, Abdulmalik al-Houthi. The Houthi family tree is provided in annex 27.

[66] This is also true at the political level, for example, Saleh al-Samad, head of the supreme political council, is close to Abdulmalik al-Houthi, and studied under both Husayn Badr al-Din al-Huthi and his father, Badr al-Din al-Houthi.

[67] Al-Madani is related to the Houthi family by marriage. He was one of Husayn Badr al-Din al-Houthi's most trusted commanders in the initial Houthi war of 2004 and later married one of Husayn's daughters.

[68] A list of Houthi military district commanders is provided in annex 28.

commanders in December 2017. Any attempt at full-scale resistance to the Houthis is complicated by the fashion in which small groupings of republican guard soldiers have been distributed to various battlefronts. This distribution of forces meant that Saleh was unable to count on large numbers of loyal soldiers at short notice when he needed them on 3 December 2017.

65.   Given the extrajudicial executions and mass detentions carried out by the Houthis after the death of Ali Abdullah Saleh (see para. 29 above) it is likely that there will be a cycle of revenge killings, which may last for years. For example, in 2004, Saleh's soldiers killed Husayn Badr al-Din al-Houthi, the first leader of the Houthi movement. Thirteen years later, when Houthi forces killed Ali Abdullah Saleh, their fighters claimed that this avenged Husayn's death.[69] In a televised appearance after Saleh's death, Abdulmalik al-Houthi was wearing Husayn's dagger, a clear sign that he considered his brother's death avenged. Saleh's family and supporters will likely attempt to seek their own revenge against the Houthis. The key difference, however, is that Husayn Badr al-Din al-Houthi led a movement, while Ali Abdullah Saleh headed a network.

## E.   Al-Qaida in the Arabian Peninsula

66.   Throughout 2017 AQAP averaged slightly more than one attack every two days.[70] These attacks fell into five broad categories: (a) suicide attacks;[71] (b) mortar attacks; (c) assassinations;[72] (d) improvised explosive device attacks; and (e) small-scale assaults. The attacks have taken place mostly in the following three governorates: Bayda', Abyan, and Hadramawt.[73]

67.   AQAP is fighting a multi-front war in Yemen against three enemies: (a) the Houthis; (b) the United States and the West; and (c) the Government of Yemen and Saudi Arabian-led coalition forces,[74] with the ultimate goal of acquiring and governing territory.[75] Internationally, the group continues to have two goals:

---

[69]  These chants can be heard on the video of Houthi fighters placing Saleh's body in the back of a pick-up truck.

[70]  There have been more than 200 attacks claimed during 2017 by AQAP. This is roughly similar to the number of attacks claimed by AQAP in 2016.

[71]  A list of suicide (person-borne improvised explosive device/suicide vehicle improvised suicide device) attacks by AQAP is provided in annex 29.

[72]  The majority of assassination attempts by AQAP used improvised explosive devices. The Panel differentiates between general improvised explosive device attacks and assassinations; for example, on 3 October 2017 AQAP placed an improvised explosive device under the vehicle of Arif Said Abdullah al-Muhammadi, a criminal investigator, in Mukalla. Al-Muhammadi survived the attack.

[73]  There has also been AQAP activity and attacks in Shabwah, Ma'rib, Lahij and Aden, but the vast majority of attacks have taken place in the three governorates listed. More than half of all attacks claimed by AQAP in 2017 took place in Bayda'.

[74]  The clearest articulation of this approach came in March 2017, during an interview with the AQAP leader Qasim al-Rimi (QDi.282), which was released on 29 April 2017 (see https://azelin.files.wordpress.com/2017/05/al-qacc84_idah-in-the-arabian-peninsula-22interview-with-qacc84sim-al-raymicc8422-en.pdf).

[75]  AQAP has held and governed territory in Yemen, from 2011 to 2012 and again in 2015 and 2016; both times it alienated the local population and chose to withdraw instead of remaining behind to fight.

launching attacks against Western targets from its base in Yemen; and inspiring or inciting individuals living in the West to carry out terrorist attacks.[76]

68.   Although the Panel assesses that AQAP is still quite capable of launching and inspiring attacks against international targets,[77] it also believes that AQAP is currently more vulnerable than it has been in years. The Panel bases its assessment on the following four factors: (a) a dramatic increase in air and drone strikes by the United States; (b) a sustained ground campaign by Yemeni and international forces; (c) the arrests of several mid and low-level AQAP figures; and (d) internal dissension among members of the organization.[78]

69.   In 2017, the United States increased the number of air and drone strikes in Yemen, which rose from 30 in 2016 to well over 120 in 2017.[79] The United States has also declared three governorates in Yemen to be "areas of active hostilities", a designation which authorizes target approval to be taken at a lower level.[80]

70.   In August 2017, Yemeni troops backed by the United Arab Emirates, with advisers provided by the United Arab Emirates and the United States, launched a ground offensive against AQAP targets in Shabwah, Hadramawt and parts of Abyan.[81] This offensive expanded and continued through late 2017, resulting in the death or capture of several low and mid-level AQAP members.[82] Despite this, the core leadership of AQAP in Yemen remains intact.[83]

71.   On 17 August 2017, AQAP released a statement warning the tribes of Abyan not to join the forces of the United Arab Emirates and its proxies, such as the Security Belt Forces. Five days later, on 22 August 2017, it released a similar statement in Shabwah,[84] again warning local tribes against joining the Shabwani Elite Forces. Both of these statements illustrate exactly how vulnerable AQAP is to tribal politics. AQAP recruits within the tribes, but more importantly it relies on tribal non-aggression to

---

[76] On 7 May 2017, al-Rimi released a video message, entitled "A Lone Mujahid or an Army by Itself", encouraging individuals in the west to carry out attacks (see http://jihadology.net/2017/05 /07/new-video-message-from-al-qaidah-in-the-arabian-peninsulas-shaykh-qasim-al-raymi-an-inspire-address-1-a-lone-mujahid-or-an-army-by-itself/). On 13 August 2017, AQAP released issue No.17 of its English-language magazine *Inspire*, with the title "Train Derail Operations;" the first issue of the magazine since November 2016.

[77] The Panel continues to investigate how AQAP is using the money it acquired when it had control of Mukalla in 2015 and early 2016.

[78] The Panel considers that many of these actions, particularly air and drone strikes, can have a detrimental impact in the long term, essentially killing one terrorist today but creating two more tomorrow, particularly if civilians are killed as collateral damage.

[79] The United States carried out "multiple ground operations and more than 120 strikes" in 2017, primarily against AQAP (see http://www.centcom.mil/MEDIA/PRESS-RELEASES/Press-Release-View/Article/1401383/update-on-recent-counterterrorism-strikes-in-yemen/).

[80] See https://www.nytimes.com/2017/03/12/us/politics/trump-loosen-counterterrorism-rules.html. Within "areas of active hostilities" United States forces are granted latitude to conduct strikes without explicit approval from the White House, which may explain, at least in part, the increase in the number of strikes.

[81] On 29 January 2017, the United States carried out a raid on a suspected AQAP target in Bayda', which resulted in the death of one American soldier. A second American soldier, Staff Sergeant Emil Rivera-Lopez, was killed in a helicopter crash "off the coast of Yemen" on 25 August 2017. The United States denied that Rivera-Lopez, who was part of a special operations support unit, was on a combat mission (see http://www.centcom.mil/MEDIA/PRESS-RELEASES/Press-Release-View/Article/1298631/dod-declares-dustwun-soldier-deceased/).

[82] The majority of those captured or killed have been mid and low-level AQAP figures, for example, on 31 October 2017, Security Belt Forces in Abyan made a surprise raid on an AQAP camp, capturing several individuals, including Muhammad al-'Awadh, a former bodyguard to Osama bin Laden (see http://www.almasdaronline.com/article/95157).

[83] A list of AQAP figures of interest to the Panel is provided in annex 30.

[84] A description of the AQAP relationship with the tribes in Yemen is contained in annex 31.

survive. If the tribes of Yemen were to turn against AQAP, the organization would not survive.

72.    On 17 September 2017, AQAP released the eighth in a series of films, this one entitled "Repulsing the Aggression", which, for the first time, talked more about the role of the United Arab Emirates in Yemen than it did about the Houthis.[85] This media focus mirrored what AQAP was doing on the battlefield. Throughout the first half of 2017 more than two-thirds of AQAP attacks were directed against Houthi targets. Since August that trend has been reversed and AQAP now targets United Arab Emirates-backed troops more than it does the Houthis. More international pressure on AQAP came on 25 October 2017 when the newly formed Terrorist Financing Targeting Center[86] announced that it was sanctioning 11 Yemenis and two Yemeni organizations for ties to AQAP and ISIS.[87]

73.    Partly as a result of this increased pressure and partly due to fighting on so many fronts at once, AQAP has also struggled to maintain a sense of organizational unity across the country. In a sign of internal fissures within the organization, AQAP released a statement in October 2017 saying that the Shariah court in Ta'izz was no longer operating under its instructions. Additionally, many of the group's media releases in recent months have focused on surviving in times of "adversity" and amidst "setbacks." However, AQAP's branch in Yemen has endured setbacks before, most notably in 2004 and 2005 when the group was virtually eradicated. It has managed to resurrect itself since that time. The Panel assesses that the longer the current conflict lasts in Yemen, the more recruits AQAP will attract.

## F.   Islamic State in Iraq and the Levant

74.    Although much smaller than AQAP, the ISIL affiliate in Yemen is still capable of carrying out coordinated large-scale attacks.[88] Much like AQAP, ISIL is mostly active in Yemen's southern and central governorates, particularly Bayda', Abyan and Aden.[89] Indeed, some areas of Bayda', where AQAP was active in 2016 and early 2017, are now active battle fronts for ISIL, which has led some to believe that the two organizations are working together. The Panel has seen no evidence to suggest that the two groups are either working together or coordinating attacks. Instead, the evidence suggests that, at most, there is a tacit non-aggression pact between AQAP

---

[85]  See http://jihadology.net/2017/09/17/new-video-message-from-al-qaidah-in-the-arabian-peninsula-repulsion-of-aggression-8/.

[86]  The Terrorist Financing Targeting Centre was established in May 2017 during a visit by the President of the United States, Donald Trump, to Saudi Arabia. The United States and Saudi Arabia are co-chairs, and the other member countries are: Bahrain, Kuwait, Oman, Qatar and the United Arab Emirates (see https://www.treasury.gov/press-center/press-releases/Pages/sm0092.aspx).

[87]  The names of AQAP-affiliated individuals sanctioned by the member countries of the Terrorist Financing Targeting Centre are listed at: https://www.treasury.gov/press-center/press-releases/Pages/sm0187.aspx. Among the individuals sanctioned were the former Governor of Bayda', Nayif al-Qaysi (QDi.402), who was replaced on 23 July 2017. Also sanctioned was Abu al-Abbas, a Salafi leader in Ta'izz, who has previously received funding and support from the United Arab Emirates (see para. 45 above).

[88]  On 5 November 2017, ISIL attacked a Criminal Investigation Department building in Aden: a suicide bomber rammed his vehicle into the gates, and along with three more individuals in suicide vests, rushed into the building. ISIL later claimed that the attack killed 69 individuals, and it identified its four fighters as coming from the governorates of Hadramawt, Ibb, Ta'izz and Shabwah.

[89]  In general, ISIL has carried out three types of attacks in Yemen: suicide attacks, close quarter assassinations and mortar attacks.

and ISIL based on their common enemies. the Houthis,[90] and the security forces tied to the legitimate Government and the Saudi Arabia-led coalition.

75.    On 16 October 2017, the United States carried out its first direct strikes on ISIL in Yemen, hitting two camps in Bayda'.[91] Less than two weeks later, on 25 October, the United States, Saudi Arabia and the other countries partners in the Terrorist Financing Targeting Center sanctioned five individuals for their ties to ISIL in Yemen.[92] Since its initial strikes in mid-October 2017, the United States has carried out several more air and drone strikes against ISIL, all of which, to date, have taken place in Bayda'.[93]

76.    In addition to the increased pressure from the air, ISIL has also suffered from the collapse of the group's so-called caliphate in Iraq and the Syrian Arab Republic. The Panel has yet to see any evidence of an influx of ISIL fighters into Yemen. Instead the opposite appears to be happening: low-level ISIL fighters appear to be defecting to AQAP.[94] The Panel continues to investigate whether this is related to a lack of outside funding coming into Yemen or to other factors.

## IV.    Arms and implementation of the targeted arms embargo

77.    Pursuant to paragraphs 14 to 17 of resolution 2216 (2015), the Panel continues to focus on a range of monitoring and investigative activities in order to identify if there have been any violations of the targeted arms embargo involving the direct or indirect supply, sale or transfer to, or for the benefit of individuals and entities listed by the Committee and the Security Council.

78.    There have been no changes to the options for supply chains for the delivery of weapons and ammunition to the individuals and entities listed by the Committee and the Security Council and those acting on their behalf or at their direction reported by the Panel on 31 January 2017.[95] There has been no reported maritime seizures of weapons and ammunition during 2017, and only very limited seizures of arms-related material have been identified on the main land supply route from the east of Yemen.[96]

79.    The Panel has now identified strong indicators of the supply of arms-related material manufactured in, or emanating from, the Islamic Republic of Iran subsequent to the establishment of the targeted arms embargo on 14 April 2015, particularly in the area of short-range ballistic missile technology (see paras. 86 to 96 below) and unmanned aerial vehicles (paras. 98 to 105 below).

---

[90]  Like AQAP, ISIL has a hierarchy of enemies with the Shia Houthis at the top. In August 2017, the group released photographs of a Houthi commander it had crucified, identified as Abu Murtada al-Muhatawari.

[91]  See http://www.centcom.mil/MEDIA/PRESS-RELEASES/Press-Release-View/Article/1344652 /us-forces-conduct-strike-against-isis-training-camps-in-yemen/. The two camps were named for deceased ISIL leaders: Abu Bilal al-Harbi and Abu Muhammad al-Adnani. One week prior to the United States strikes, on 9 October 2015, ISIL had released training photographs from those camps.

[92]  See https://www.treasury.gov/press-center/press-releases/Pages/sm0187.aspx. A list of ISIL figures of interest to the Panel is provided in annex 32.

[93]  For example, the United States carried out three successive drone strikes on 10, 11, and 12 November 2017 in Bayda', which killed five individuals.

[94]  However, the United States estimates that ISIL in Yemen has "doubled in size over the past year" (see http://www.centcom.mil/MEDIA/PRESS-RELEASES/Press-Release-View/Article/1401383 /update-on-recent-counterterrorism-strikes-in-yemen/).

[95]  See S/2017/81, para. 60 and table 1.

[96]  See annex 33.

## A.   Houthi-Saleh "land missile campaign"

### 1.   Overview

80.   The strategic "land missile campaign" of the Houthi-Saleh alliance against Saudi Arabia continued during 2017, although at a reduced level of intensity (64 per cent of the level in 2016). The Houthi-Saleh alliance continues to demonstrate a mobile short-range ballistic missile or free flight rocket[97] capability to strike at Saudi Arabia. This has a strategic impact by: (a) demonstrating a defensive weakness on the part of Saudi Arabia to this threat, and compelling it to deploy disproportionately costly counter-measures to protect itself from such attacks; (b) demonstrating the vulnerability of the Saudi Arabian civilian population to such attacks; (c) countering inaccurate Saudi Arabia-led coalition claims to have destroyed the missile stockpiles in 2015, thus undermining the credibility of their wider media operations; and (d) demonstrating that the Houthi-Saleh alliance is capable of directly threatening Saudi Arabia. A summary of reported and confirmed launches of short-range ballistic missiles and free flight rockets is contained in annex 34 to the present report. Figure III illustrates launches of short-range ballistic missiles only.

Figure III
**Launches of short-range ballistic missiles: 2015–2017**



Map No. 4581 UNITED NATIONS November 2017. Geospatial Information Section, Department of Field Support. Data and location source: Panel of Experts for Yemen, United Nations Security Council Sanctions Committee

---

[97] The free flight rockets are the improvised S-75 Dvina surface-to-air missile, referred to by the Houthis as Qaher-1 missiles (see S/2017/81, para. 81 and annex 42).

81.   The tactical military impact of short-range ballistic missiles is limited due to their small numbers, inherent inaccuracy and relatively small high explosive warhead size (less than 600 kg to 950 kg).

## 2.   Increased regional tensions

82.   At approximately 20.07 hours (local time) on 4 November 2017 remnants of a short-range ballistic missile landed within the perimeter of King Khaled International Airport in Riyadh.[98] This particular attack[99] by the Houthi-Saleh alliance resulted in an immediate escalation of regional tensions, with an announcement by the Saudi Arabia-led coalition of the temporary closure of all ground, sea and air routes into Yemen as of 6 November 2017.

83.   The Panel travelled to Riyadh from 17 to 21 November 2017 to inspect the remnants of the short-range ballistic missile attacks launched against Saudi Arabia by Houthi-Saleh forces on 19 May, 22 July, 26 July and 4 November 2017. The Panel also visited Saudi Arabia from 24 to 26 December 2017 to inspect remnants of a further short-range ballistic missile attack on Riyadh on 19 December 2017. The findings and conclusions of the Panel are set out below (see paras. 88–92).

## 3.   Short-range ballistic missile capability of the Houthi-Saleh forces

84.   It is certain that the pre-conflict Yemeni Missile Defense Command possessed at least 18 SS-1 Scud-B missiles in 2004, and had also procured 90 Hwasong-6 (Scud-C type) missiles during the first decade of the 2000s.[100] During hostilities in early 2015, the 5th and 6th missile brigades aligned themselves with the Houthi-Saleh forces.

85.   The initial Saudi Arabia-led coalition air strikes failed to completely destroy the supply of short-range ballistic missiles. The first confirmed[101] Scud-C type[102] short-range ballistic missile launch against Saudi Arabia took place on 29 June 2015, with the last probable Scud-C type attack being on 26 July 2017.[103] The Qaher-1 free flight rocket attacks covered in the report of the Panel dated 31 January 2017[104] continued in 2017 until the last confirmed firing on 27 March 2017.[105]

---

[98]   It was initially reported that this short-range ballistic missile was interdicted in flight by a MIM-104 Patriot surface-to-air missile before reaching its intended target. From the physical evidence inspected, the Panel can only comment that the rocket motor assembly may have been intercepted. The propellant tank, which is designed to separate, had no traces of fragmentation from an interceptor missile warhead. There was also a crater at the point of impact (King Khalid International Airport).

[99]   There were two previous short-range ballistic missile attacks against the Riyadh area on 5 February 2017 (Muzahimiyah) and 19 May 2017 (Riyadh governorate).

[100]   Including: (a) Jane's Defence Equipment and Technology Intelligence databases; and (b) a report of the United States Congressional Research Services (see http://www.dtic.mil/cgi-bin /GetTRDoc?AD=ADA521480). Twelve Scud-type missiles were discovered in transit to Yemen on 10 December 2002, but after an initial detention the vessel was allowed to proceed to Yemen to make the delivery as there was no legal reason to seize them at that time.

[101]   Letter to the Panel dated 4 October 2017 from Saudi Arabia.

[102]   Either Scud-B upgraded to Scud-C level, or a Hwasong-6 supplied by the Democratic People's Republic of North Korea.

[103]   Confirmed by the Panel from imagery of the warhead, which was a cluster munition type fitted to Scud-C type short-range ballistic missile.

[104]   See S/2017/81, paras. 81–84 and annex 42.

[105]   There have been two unconfirmed reports of missiles been fired on 7 and 27 August 2017, which could have been Qaher-1 type missiles.

## B.   Extended-range short-range ballistic missiles

### 1.   Background

86.   In the reporting period, there have been four confirmed attacks by short-range ballistic missiles with an extended range substantially beyond that normally expected of the missiles known to be in the inventory of the Houthi-Saleh alliance. The launch of the first missile was on 19 May 2017 (see table 1).[106]

Table 1
**Confirmed launches of extended-range short-range ballistic missiles by the Houthi-Saleh alliance in 2017**[a]

| Date | Event | Range (km) | Remarks |
|------|-------|-----------|---------|
| 19 May | Impacts in Riyadh province | 965 | First confirmed launch |
| 22 July | Impacts on Yanbu', west of Medina | 900+ | Approximately 2 months since previous launch |
| 4 Nov. | Missile launched towards Riyadh | 1,043[b] | Approximately 3 months since launch of previous missile |
| 19 Dec. | Missile launched towards Riyadh | 915 | Release of a video of the launch by the Houthi on 19 December 2017[c] |
| | | | Probably intercepted in flight |

[a] *Source*: letter from member State of 4 October 2017 (first two launches).
[b] Since it is possible that the missile flew further than 1,000 km, it could more accurately be referred to as a medium-range ballistic missile. As the range overlap is so small, the Panel will continue to refer to it as a short-range ballistic missile as it is derived from that class of missiles. The range is based on the target event report from the Patriot system. The data obtained through the Shared Early Warning Systems places the estimated launch point one degree of longitude further north, which would mean a range of 937 km.
[c] See https://mobile.almasdarnews.com/article/video-footage-houthis-long-range-missile-launch-saudi-arabia/.

87.   A Houthi military spokesperson, major general Sharaf Luqman, admitted for the first time on 30 March 2017 that missiles damaged by the air strikes were being repaired and modified by Yemeni specialists.[107] The Panel has also not discounted the idea that foreign missile specialists may be providing technical advice in Yemen,[108] or that Houthi-Saleh missile specialists may have visited a third country for training. The Houthi forces almost certainly do not have the design or engineering capability to manufacture a new type of short-range ballistic missile.

### 2.   Technical analysis and finding

88.   The Panel initially examined the options available to extend the range of the Scud-C type short-range ballistic missile known to be in the Houthi-Saleh inventory, and concluded that sufficient weight savings could not be made to such missiles, nor could the power output be upgraded sufficiently to account for an extension of range from a known maximum of 600 km to over 1,000 km.

---

[106] There were also unconfirmed media reports of a short-range ballistic missile landing in Riyadh province on 5 February 2017. If confirmed, this would be the first identified launch of an extended-range short-range ballistic missile from Yemen.
[107] sputniknews.com/middleeast/201703301052137016-yeminis-repair-soviet-missiles/.
[108] https://english.alarabiya.net/en/features/2018/01/01/Who-are-the-Iranian-Revolutionary-Guard-officers-leading-Houthis-in-Yemen-.html.

89.    Launches of short-range ballistic missiles beyond the range of 670 km were observed in 2016, which indicates that a weight-saving programme to the Scud-C types almost certainly took place in 2016 (see annex 35), achieving a limited range extension of approximately 11.75 per cent for that type of missile. Evidence of this includes the use of composite material compressed air bottles of a United States design instead of the standard steel air bottles.[109] The Houthi refer to this missile as the Borkan-2.

90.    After inspecting the remains of the "22 July" and "4 November" extended range short-range ballistic missile in Riyadh the Panel now finds that:

(a)    Many of the internal design features,[110] external characteristics[111] and dimensions of the remnants of the missile inspected by the Panel are consistent with those of the Iranian designed and manufactured Qiam-1 missile. This means that they were almost certainly produced by the same manufacturer. Figure IV shows the position of the main components inspected by the Panel in relation to a Qiam 1. Figure V is an illustration of the Scud-C type missile, while figure VI is an illustration, for comparison, of the extended-range short-range ballistic missile inspected by the Panel;

Figure IV
**Major components and their relative position compared to a Qiam-1 short-range ballistic missile**[a]



Partial fuel tank and tail unit — Yanbu, Saudi Arabia (22 July 2017)

Oxidizer tank and rocket motor — Riyadh (4 Nov. 2017)

Qiam-1

[a]   Image of the extended-range-short-range ballistic missile taken by the Panel in Riyadh on 19 and 20 November 2017 (Qiam-1 image from http://3.bp.blogspot.com/-qsK7VV6oZfc/Tq1ET0NyVdI/AAAAAAAAADo/NGlhWpeJTsw/s1600/Qiam-1.jpg).

---

[109]  The company could not trace these components owing to the large production volumes of such bottles.

[110]  For example, the reversal of the positions of the fuel and oxidizer tanks in the missile body. This configuration is only seen, within the known short-range ballistic missile systems, on the obsolete Scud-A and the Iranian Qiam-1 missiles. Other design features of the extended-range short-range ballistic missile include: (a) composite compressed air bottles; and (b) an upgraded guidance system.

[111]  For example: (a) the use of a mainly aluminium airframe; and (b) the lack of fins at the rear of the missile. Scud-C variants have fins, the Iranian Qiam-1 does not.

Figure V
**Illustrative main section layout of Scud-C missile**[a]



> [a] Panel diagram (not to scale). Valves are shown larger proportionally than on real missile to assist in identification (see annex 36, appendix C, figure C.36.1).

Figure VI
**Illustrative main section layout of an extended-range short-range ballistic missile**[a]



> [a] See annex 36, appendix C, figure C.36.2.

   (b)   A standard Qiam-1 missile has an operational range of 750 to 800 km, as compared to the over 1,000km range of the missile examined by the Panel. The Panel finds it is not a Qiam-1 short-range ballistic missile, but a derived lighter version, designed specifically by the manufacturers of the Qiam-1 to extend the range to over 1,000 km by reducing weight;[112]

   (c)   Variations in build quality and welding standards identified by the Panel mean that the technology was almost certainly transferred in modular system form,[113] requiring the missile engineers of the Houthi-Saleh alliance to assemble and functionality test the missiles prior to operational deployment;

   (d)   Three jet vane housings from the remnants of the 4 November 2017 missile had markings (see figure VII) very similar in design to the company logo of Shahid

---

[112] The Iranian designed and manufactured Shabab-3 missile has a range of 1,300 km, so this missile was almost certainly not designed to fill in a "range gap" in the Iranian ballistic missile suite.

[113] The modular system consists of: (a) warhead; (b) guidance unit; (c) fuel tank; (d) oxidizer tank; and (e) rear section (rocket motor, actuators and pumps).

S/2018/68

Bagheri Industries,[114] based in the Islamic Republic of Iran (see figure VIII). A tracing request has been sent to the authorities in the Islamic Republic of Iran;[115]

Figure VII
**Enhanced image of Shahid Bagheri Industries logo on a jet vane housing**[a]



[a] Image taken by the Panel.

Figure VIII
**Shahid Bagheri Industries logo on a trade stand**[a]



[a] *Source*: http://www.sns.co.ir/?p=327.

(e)   The Houthi-Saleh alliance has obtained access to "extended-range" missile technology more advanced than the Scud-C and Hwasong-6 short-range ballistic missiles that the alliance was known to possess in January 2015. They refer to this missile as the Borkan-2H, and this is the name attributed to the missile by the Panel;

(f)   It is highly probable that the route used to supply the Borkan-2H components was the main land supply route into Houthi-Saleh-held territory following a ship-to-shore transfer to the ports in the area of Nishtun and Ghaydah in Mahrah governorate.[116] Although concealment in cargo of vessels offloading in the Red Sea ports is unlikely, it cannot be excluded as an option;

(g)   The use of the Borkan-2H against civilian targets in Saudi Arabia is a violation of international humanitarian law (see para. 179 below and annex 64);

(h)   As of yet, the Panel has no evidence as to the identity of the supplier, or any intermediary third party;[117]

(i)   As the Islamic Republic of Iran has not provided any information to the Panel of any change of custody of the components for the building of extended-range short-range ballistic missiles, the country is in non-compliance with paragraph 14 of resolution 2216 (2015) in that it failed to take the necessary measures to prevent the

---

[114] Also possibly known as Shahid Bakeri Industries. This organization is a subsidiary of the Iranian Aerospace Industries Organization.
[115] Request sent in Panel letters dated 9 and 12 December 2017.
[116] The Panel notes the redeployment of the 123rd Infantry Brigade to Ghaydah and the appointment of a new Governor of Mahrah, Rajih Said Bakarit, on 27 November 2017, as part of the strategy to improve security along this main supply route.
[117] The Panel sent tracing requests to the Member State of the manufacturer on 26 November, 11 December and 14 December 2017.

direct or indirect supply, sale or transfer of such technology to the Houthi-Saleh forces, an entity acting at the direction of listed individuals.[118]

91.   The Panel's observations and full technical analysis to support the above findings are presented in annex 36.

### 3.   Related case: liquid propellant oxidizer field storage tanks for short-range ballistic missiles

92.   In January 2017, a consignment of industrial process equipment was seized by a member State of the Saudi Arabia-led coalition near Ma'rib, along the main supply route from the Mahrah governorate. Two hazardous chemical storage tanks, which were also seized in the shipment, are almost identical in design, configuration and size to the oxidizer storage field tanks used for the Scud-type missile or other short-range ballistic missile systems (see figures IX and X for comparison).

Figure IX
**Oxidizer field storage tanks seized near Ma'rib[a]**

Figure X
**Scud oxidizer field storage tank[a]**





[a] *Source*: confidential.

[a] Stored at Gharyan Air Defence base, Libya (2017).
Confidential source.

93.   Although most of the other equipment seized is also standard for the chemical or food processing industries, some items show artisanal crafting such as unusual welding connectors (pipelines and flanges) and other improvised engineering features. This proves adaptation for a purpose other than initially designed for. The Panel finds that the equipment has military utility for the reprocessing of inhibited red fuming nitric acid, the oxidizer for the liquid bipropellant used in short-range ballistic missiles.

94.   Tracing requests by the Panel have identified that: (a) two components were manufactured in the Islamic Republic of Iran; (b) three components were supplied to the Islamic Republic of Iran from foreign manufacturers, one of which was paid for through a European bank account and had Farsi labelling added to it.[119]

95.   The Panel as of yet has no evidence as to the identity of the supplier, or any intermediary third party.[120]

---

[118] The Panel wrote to the Islamic Republic of Iran on 15 December 2017, informing the authorities of this finding and again requested any information the Government may have as to any change in custody of these components. The Panel then visited the Islamic Republic of Iran from 15 to 17 January 2018 for further discussions. For the Islamic Republic of Iran's response to the Panel's findings, see annex 36, appendix E.

[119] See full analysis in annex 36, appendix A.

[120] The Panel sent tracing requests to the Member State involved on 11 December 2017.

96.   Since it has not provided any information to the Panel of any change of custody of the liquid bipropellant storage tanks or accounted for the presence of Iranian manufactured components, the Islamic Republic of Iran is in non-compliance with paragraph 14 of resolution 2216 (2015) in that it failed to take the necessary measures to prevent the direct or indirect supply, sale or transfer of military equipment related to extended-range short-range ballistic missiles to the Houthi-Saleh forces, an entity acting at the direction of listed individuals.[121]

## C.   Houthi use of unmanned aerial vehicles

97.   During 2017 the forces of the Houthi-Saleh alliance continued to make limited use of small and medium-sized unmanned aerial vehicles for intelligence, surveillance, target acquisition and reconnaissance,[122] and in the case of the medium-sized unmanned aerial device, explosive attacks.[123] The small unmanned aerial vehicles are all based on commercially available systems, such as the X-8 Skywalker, which have a military utility for surveillance and target planning.

### 1.   Qasef-1 unmanned aerial vehicles

98.   On 27 November 2016, a Dubai registered truck (Dubai/13933) was intercepted at the al-Milh checkpoint near Ma'rib and was found to contain components for at least six complete Qasef-1 unmanned aerial vehicles and components for up to another 24.[124] Components were also recovered by forces of the United Arab Emirates from crashed unmanned aerial vehicles in Ma'rib (19 September 2016)[125] and Aden airport (16 November 2016).[126]

99.   The Panel finds that the medium-sized Qasef-1 unmanned aerial vehicle is virtually identical in design, dimensions and capability to that of the Ababil-T,[127] manufactured by the Iran Aircraft Manufacturing Industries.[128] The analysis of the Qasef-1 UAV is provided in annex 38.

100.  The Panel has identified that at least two components of the system were supplied to the Islamic Republic of Iran after the implementation of the targeted arms embargo on 14 April 2015. The route for the funding of one of the components used a third party broker, and an intermediary account in a third country. This is indicative of a deliberate attempt to disguise the final destination of the components.

101.  The Panel finds that, based on: (a) the design of the unmanned aerial vehicles; and (b) the tracing of component parts, the material necessary to assemble the Qasef-1 unmanned aerial vehicles, emanated from the Islamic Republic of Iran.

---

[121] See footnote 118 above.
[122] Initially reported in the Panels' 2017 confidential mid-term update.
[123] See annex 37 for summary of explosive attacks on forces of the United Arab Emirates.
[124] Information contained in a letter from a Member State: information includes Qasef-1 serial Nos. 22-122-33, 22-122-34, 22-122-38, 22-1721-39, 22-1721-X, 22,1721-0 and 22-1722-9.
[125] Letter from Member State, including Qasef-1 serial No. 22-1728.
[126] Qasef-1 serial No. 22-122-39.
[127] Janes' database (see www.janes.his.com).
[128] Iran Aircraft Manufacturing Industries is a subsidiary of the Iran Aircraft Industries Organization, owned by the Government of the Islamic Republic of Iran, and is part of the Defence Industries Organization conglomerate.

### 2.  The "Rased" unmanned aerial vehicles

102.  The unmanned aerial vehicles referred to as the "Rased" (surveyor) by the Houthi-Saleh alliance is almost certainly the Skywalker X-8 unmanned aerial vehicle (see annex 39).

### 3.  Embargo violations

103.  The Panel considers that the supply of unmanned aerial vehicles specifically designed for military intelligence, surveillance, target acquisition and reconnaissance or attack operations to entities acting on behalf of individuals or entities designated by the Security Council falls within the scope of "military equipment" under paragraph 14 of resolution 2216 (2015).

104.  As the Islamic Republic of Iran has not provided any information to the Panel of any change of custody of the Qasef-1 or the components,[129] the Islamic Republic of Iran is in non-compliance with paragraph 14 of resolution 2216 (2015) in that it failed to take the necessary measures to prevent the direct or indirect supply, sale or transfer of military related equipment to the Houthi-Saleh forces, an entity acting at the direction of listed individuals.

105.  The Panel considers that since commercially available unmanned aerial vehicles can have significant military utility for surveillance and target reconnaissance, or can be easily modified to operate as attack drones, they should also fall within the scope of "military equipment" under paragraph 14 of resolution 2216 (2015) when used for military purposes.

## D.  Waterborne improvised explosive devices

106.  The Houthi have successfully deployed waterborne improvised explosive devices on at least two occasions: (a) an attack against a Royal Saudi Arabian Navy frigate; and (b) in the port of Mukha. The Panel notes that the United Arab Emirates have released information on a seizure of this type of explosive device to the United States and a commercial armament investigative company.

107.  Although the Panel has seen imagery and third-party analysis of waterborne improvised explosive devices, it does not include any analysis or findings in the present report as the information it has seen does not meet the criteria of transparency and verification contained in paragraphs 21 and 22 of the best practices and methods recommended in the report of the Informal Working Group of the Security Council on General Issues of Sanctions (S/2006/997).

108.  The Panel finds that the United Arab Emirates is in non-compliance with paragraph 8 of Security Council resolution 2342 (2017), in that it did not provide unhindered access to documents and sites, in order for the Panel of Experts to execute its mandate. The Panel further finds that it is also in non-compliance with paragraph 17 of Council resolution 2216 (2015), in that it did not promptly supply an initial written report on the seizure to the Committee, nor a subsequent written report within 30 days of the seizure.

109.  The Panel cannot therefore independently confirm that the technology was transferred to Yemen after the implementation of the targeted arms embargo on 14 April 2015 (see resolution 2216 (2015), para. 14), and continues to investigate.

---

[129] Panel letter to Islamic Republic of Iran dated 19 December 2017.

### E.  Sea mines

110.  The Panel has identified further use of sea mines during 2017. The chronology of incidents is contained in annex 40 to the present report.

#### 1.  Iranian manufactured "bottom" sea mines

111.  The United Arab Emirates reported the discovery of at least three sea mines in the port of Mukha to the Panel.[130] The recovered sea mines (see figure XI) are consistent in shape and size to the Iranian manufactured "bottom" sea mine (see figure XII), which was first identified at an Iranian arms fair in October 2015.

Figure XI                                                Figure XII
**Sea mine recovered from Mukha (2017)**                  **Sea mine at Iranian Arms fair (2015)**




112.  The Panel has written to Iran requesting clarification as to the nomenclature and export status of the type of sea mine shown in figure XII but has yet to receive a response.

#### 2.  Use of improvised sea mines by the Houthi-Saleh alliance

113.  The Panel has investigated the confirmed use of improvised sea mines[131] by the Houthi-Saleh alliance.[132] One mine was recovered from Midi on 23 March 2017 (see figure XIII) and two of a similar but not identical design from Thwaq Island[133] (see figure XIV) on, or around, 27 May 2017. The recovery from Thwaq Island, which is uninhabited, is evidence that these types of mines have been deployed in the Red Sea by the Houthi. Since approximately 12 improvised mines were seen in a shore storage area in Houthi-controlled territory in November 2016[134] it is highly likely that more than the three recovered improvised mines were deployed, and thus a threat to the sea lines of communication in the Red Sea now exists. The length of the threat posed by such mines is dictated by the battery life of their power source, which is dependent on the type of AA battery used, however, it could be between 6 to 10 years.

---

[130] Initially reported in para.61 of the 2017 confidential midterm update.
[131] Reported in a letter to Committee dated 13 September 2017.
[132] Initially reported in paras. 63 and 64 of the 2017 confidential midterm update.
[133] Coordinates 16° 18' 42.61" N, 42° 41' 10.77" E.
[134] Confidential source.

Figure XIII
**Improvised sea mine recovered near Midi (23 March 2017)[a]**



Figure XIV
**Improvised sea mines recovered from area of Thwaq Island (May 2017)[a]**



[a] See www.youtube.com/watch?v=6H04M4Vpif8&feature=youtu.be.

[a] Imagery from a Member State and confirmed by the Panel.

The Panel would not normally use uncorroborated single source social media, but as the imagery shows a design virtually identical to that described by a confidential eyewitness the Panel has included it.

114. Although designed to be used as moored contact mines, the design is flawed and these mine types will not always moor as designed, or may break free of their mooring. The recovered mines from Thwaq Island are evidence that some of these mines have already become drifting sea mines. A detailed technical and threat analysis is provided in annex 41.

## F.  Anti-tank guided missiles

115. In its report dated 31 January 2017,[135] the Panel reported on the seizure and operational use of anti-tank guided missiles with characteristics very similar to that of the Iranian manufactured Dehleyvah. The lack of open source information at the time prevented the Panel from confirming them as Dehleyvah missiles.

116. The Panel has now compared the markings and design features of the 9M133 Kornet and Iranian Dehleyvah missiles seized by the French naval vessel *La Provence* on 20 March 2016.[136] The findings, provided in annex 42 to the report, will act as a definitive source[137] for future investigations and identification.

## G.  Black market

### 1.  Small arms ammunition

117. The Panel has continued to monitor the price of small arms ammunition on the black market. Although prices have now started to rise (by 20 per cent during 2017), as shown in annex 43, the cost of (for example) one type of 7.62 mm x 39 mm round in Aden is now still significantly less ($0.94) than it was prior to the conflict ($1.60). This gives a strong indication that small arms ammunition is still readily available to all parties in Yemen, and that no external resupply is needed as yet.

---

[135] S/2017/81, paras. 76 and 77 and annex 37.
[136] See S/2017/924, annex 7.2.
[137] See also https://www.ihs.com/products/janes-weapons-ammunition.html.

### 2. Suspicious end user certificates

118. The Panel has obtained[138] a copy of a number of end-user certificates issued by the Houthi-Saleh administration that are designed to support the procurement of weapons and ammunition from Bulgaria, China, the Philippines, the Islamic Republic of Iran, Serbia and the Slovak Republic by the then Houthi-Saleh administration (see annex 44). The Panel has contacted these Member States; Bulgaria, China, the Philippines and the Slovak Republic have all confirmed that these end-user certificates have not been presented for any arms purchases from them.

119. The company authorized to broker the above potential arms trades, Al Fosal Trading (also known as Fusal), is listed as being managed by Adeeb Fares Mohamed Mana'a, the son of designated individual, and known arms trafficker, Fares Mohammed Hassan Mana'a (SOi.008).[139] Fares Mana'a is currently a Sana'a based minister of state.[140]

120. The date of the documentation, 6 July 2015, is three months after the Houthi-Saleh alliance took control of Sana'a. By that time, as reported by the Panel is its report dated 31 January 2017,[141] the Houthi-Saleh alliance had taken control of potentially up to 68 per cent of the national arms stockpile. It is thus unlikely that they would have needed at that point to be exploring means of procuring the small arms, light weapons and ammunition listed in these end-user certificates. It is more likely that Fares Mohammed Hassan Mana'a seized an opportunity to use his contacts in the then new Houthi-Saleh administration to obtain appropriate documentation that could be used to support arms procurement for his regional arms business.

121. As previously reported by the Panel,[142] both Fares Mana'a and Adeeb Mana'a were involved in a separate illicit regional arms transfer during the period from 2013 to 2015. The involvement of Fares Mohammed Hassan Mana'a as part of the brokering company, and his known relationship with the Houthis, means that any future potential regional transfer using these end-user certificates would still be to the financial benefit of listed individuals, and thus a violation of paragraph 14 of resolution 2216 (2015).

## H. Increasing the effectiveness of the targeted arms embargo

122. The deployment of advanced extended-range short-range ballistic missiles technology by the Houthi-Saleh forces demonstrates a vulnerability in the current inspection and enforcement measures to well-planned shipments of non-explosive arms and arms-related material.[143] Only the Government of Yemen and the Saudi Arabia-led coalition are in a position to improve interdiction measures to cover the land route from Mahrah.

123. The Panel has examined options for enhancing inspection rates for the United Nations Verification and Inspection Mechanism for Yemen (UNVIM) system so as to improve the confidence of the Saudi Arabia-led coalition in the process. A permanent UNVIM presence at Hudaydah port, would: (a) serve to increase the confidence of the Saudi Arabia-led coalition that illicit shipments through that port would be made more

---

[138] Confidential source.

[139] Listed under authority of paragraph 8 to resolution 1844 (2008) on 12 April 2010 by the Security Council Committee pursuant to resolutions 751 (1992) and 1907 (2009) concerning Somalia and Eritrea.

[140] Appointed on 28 November 2016.

[141] See S/2017/81, para. 78 and annex 39.

[142] Ibid., para. 80 and annex 41.

[143] As noted in the Panel's confidential medium-term update, the seizure of components for military unmanned aerial vehicles from the Houthi-Saleh forces by the Saudi Arabia-led coalition forces in Ma'rib in 2016 is another indicator of this vulnerability.

difficult; (b) act as a deterrent to any illicit shipments that may be taking place. The deployment of a naval or fleet support vessel anchored at the entrance of Hudaydah port under the auspices of the United Nations would negate the known problems of a permanent shore-based presence. Such a vessel would have the necessary surveillance and weapons systems for self-protection, with the ability to take UNVIM inspectors ashore, when necessary. When ashore, armed naval ratings or marines from the host vessel could provide close protection, with port security being contracted to private security companies approved by the Houthi administration under a memorandum of understanding. This would significantly reduce the personal risk to UNVIM inspectors and negate the logistic and security requirements needed for a permanent shore presence, while ensuring a neutral inspection and monitoring presence during commercial vessel discharges. The vessel could also serve as a base for capacity- building training of a neutral Yemeni coast guard, which would combine elements from both parties.

## V.   Economic context and overview of finance

124.  In accordance with its mandate, the Panel has investigated the economic context in which individuals designated pursuant to resolutions 2140 (2014) and 2216 (2015) and their networks have continued to operate in violation of sanctions measures. In particular, the Panel has examined the flow of money, the transfer of wealth and the establishment of new shell companies to finance operations that threaten the peace, security or stability of Yemen.

125.  The Panel finds that during 2017 the legitimate Government, local authorities, the Houthi-Saleh alliance and other militia forces all continued to collect "State" revenues in their respective areas with only a limited return by way of the provision public services. Their actions have eroded the foundations of the formal economy and created a liquidity problem, increasing the likelihood of a collapse of the Yemeni banking and financial system. Conditions now exist that are conducive to money laundering, an additional impediment to a peaceful political transition and recovery. The continuing conflict has enabled new profiteers of war to emerge from Yemen, who are gradually replacing the traditional business communities based in Sana'a and Ta'izz. This will certainly create new challenges and additional spoilers.

## A.   Control of State economic resources by the Houthis and their affiliates

### 1.   Revenue collected by the Houthis from State assets

126.  The Houthis continue to directly control most of the national economy in their areas through ministers and managers loyal to them, or through deputies and revolutionary committees who act as supervisors within their organizations.

127.  The Panel has analysed non-tax revenues from the latest available State budget (2011) in order to evaluate what could potentially be available for Houthi exploitation. This equates to approximately 2,818 billion rials ($11.3 billion),[144] of which a minimum of 407 billion rials ($1.62 billion) might be under their control (see annex 45).

---

[144] The official exchange rate is fixed by the Central Bank of Yemen at $1 to 250 Yemeni rials in Sana'a and at a floating rate of about $1 to 370 rials (since 15 August 2017); the market rate on that date. The rate has increased continuously since then, reaching 400 rials per dollar by 31 December 2017. The Panel, in analysing the Sana'a-based economy, has used the official rate of 250 rials to the dollar or the market rate of 370 rials to the dollar (figures rounded to nearest $100,000).

128. Telecommunications companies are the main source of revenue for the Houthis in Sana'a.[145] On 21 August 2017, the Sana'a based minister of telecommunications, Julaidan Mahmood Julaidan,[146] an affiliate of the General People's Congress, informed a media conference that mobile telecommunications companies have transferred 98 billion rials ($264.8 million) during the 20 months since he took over the ministry on 1 December 2016.[147] This amount, which is not denied by the Houthis, represents an equivalent of $159 million per annum.

129. Tobacco sales account for the second main source of revenue available to the Houthis. For example, Kamaran Industry and Investment declared that its 2015 tax and customs duties bill was 23.9 billion rials ($64.7 million).[148] The Panel estimates an equivalent amount from the other two producers.[149]

130. In order to increase custom revenues the Houthis started to collect additional customs duties on commodities imported through the areas under the control of the legitimate Government (see annex 46).

131. On 28 May 2016, Yahya Mohamed Abdullah al-Osta was appointed by Mohamed Ali al-Houthi as the acting head of the Sana'a-based Yemen customs authority.[150] Since then he has overseen the implementation of illegal mechanisms for the collection of customs duties for the benefit of entities and individuals acting on behalf and under the control of Abdulmalik al-Houthi.

132. On 4 April 2017, the Sana'a based ministry of finance established new permanent customs posts at the Amran and Dhamar checkpoints,[151] designed to exploit the additional road traffic as a result of the decrease of traffic through the Hudaydah port route.

### 2. Black market fuel

133. The Panel finds that the distribution of fuel and oil products remains one of the main sources of revenue for the Houthis. The monopoly on the import and distribution of oil products by the Yemen Petroleum Company was terminated by the Houthis on 28 June 2015.[152] They orchestrated a private bidding competition for the distribution, which now allows them to control the sector, mainly through the use of black market distributors under their control.

134. Data available to the Panel between May 2016 and July 2017, when the official exchange rate was at 250 rials to $1, indicates that Houthi revenue from the black-

---

[145] Four telecommunications companies are operating in Yemen: (a) mobile (State owned); (b) Y Telecom (under State control); (c) Sabafon, associated with Hamed Al Ahmar; and (d) MTN, known to be associated with Shaher Abdulhaq, although the Panel has learned that he probably transferred his shares to MTN South Africa in exchange for shares in that company.

[146] Reported as executed by the Houthis after 4 December 2017.

[147] General People's Congress-affiliated television, Al-Yemen Alyoum, 21 August 2017 (see https://www.youtube.com/watch?v=RlsXBlGWvhk).

[148] See http://www.kamaran.com/english/research_and_development.php.

[149] Three companies associated with brands such as Pall Mall and Rothmans control the sale of tobacco in Yemen. One being the Kamaran United Industries Company of the HSA Group. The State collects 90 per cent of the sales price for each pack sold, in addition to 18 rials for various other fees.

[150] Mohamed Abdullah al-Osta was a mid-level staff member working as a legal adviser within the ministry of finance.

[151] Decision 138 of 2017 (see http://customs.gov.ye/news_show_ar.php?id=132).

[152] Fuel distribution in Yemen has always included revenue gained from smuggling across the region. Fuel in Yemen was not taxed, but subsidized, the arbitrage thus making it profitable for smuggling across the Horn of Africa. The Houthis took Sana'a using the pretext of the removal of fuel subsidies by the Government under the former Prime Minister Mohammed Basindawa. Currently there are no taxes or subsidies on fuel imports.

market sale of oil products delivered at the Red Sea ports of Hudaydah and Ra's Isa[153] could be as high as 318 billion rials ($1.27 billion)[154] (see annex 47).[155]

135. The Panel noted that to date 61 companies have applied for entry clearance through UNVIM[156] for 234 tankers, of which 173 have been allowed to deliver fuel.[157] The list of consignees is provided in confidential annex 48. The Panel noted that only 11 companies have continued to import fuel during 2016 and 2017 while 12 companies appear to have ceased importing to Yemen after 1 March 2017 and 11 new companies have emerged since that date. This is indicative of a Houthi strategy to take control of oil imports. Further evidence includes:

(a)   Only the Alhutheily Group, with a previous track record in the oil industry, has continued to operate at the same level, (see consignee line 22 in figure XV: details are given in annex 48, appendix 2);[158]

(b)   The Falak Shipping Company, used by the Tawfiq Mathar brothers, which used to import fuel to Yemen for the Yemen Petroleum Company during the Saleh era, has ceased to operate through the Yemeni Red Sea ports;

(c)   All current active oil importers are Houthi affiliated.

Figure XV
**Change of fuel consignees during 2016 and 2017**



136. The Panel continues to monitor the situation in order to assess if the space lost by pre-Houthi era businessmen is a consequence of the conflict, or part of a strategy to replace them with what Yemenis are calling "Generation 2017" businessmen, (in reference to Houthi business associates in Yemen). The Panel is investigating the change of beneficial ownership of the Vulcan Group, the most important supplier for the Yemeni Ministry of Defence during the Saleh era.[159]

---

[153] Closed since June 2017.
[154] Central Bank of Yemen rate of $1 = 250 rials.
[155] Data collected from: (a) UNVIM records of fuel delivered since May 2016; (b) market prices in Yemen for fuel delivery, transport and storage; and (c) other fees corroborated with traders and sources inside Yemen.
[156] See https://www.vimye.org/docs/GoY Announcement of UNVIM Launch.pdf.
[157] The amount delivered equals 2,358,953 tons of fuel products, as at 30 November 2017.
[158] ATICO Trading and Company, registered in Yemen, is a traditional operator in the oil industry (see http://www.alhutheily.com/index.php/contact).
[159] See http://vulcanyemen.com/. The Panel has evidence indicating the owner's (Khalid Ahmed Alradi) involvement of previous contracts. The Houthis killed him on 26 August 2017 for being a Saleh supporter.

3. **Risk of the looting and trafficking of antiquities and cultural objects**

137. The Panel has investigated the risks of smuggling of antiquities and cultural objects from conflict areas in Yemen for sale abroad (see annex 49).

138. A case of artefacts seized in Switzerland between 2009 and 2010 arriving from Qatar and the United Arab Emirates, although still under a judicial process,[160] could assist the Panel in identifying smuggling methods and networks. Although the artefacts left Yemen before the imposition of sanctions, the Panel is investigating this case as the objects in question were illegally exported, in violation of the Yemen Law of Antiquities N21/1994,[161] during the Saleh regime and may lead to the identification of more of the Saleh family assets. The market value of the artefacts is estimated at more than $1.5 million.

139. As there is no official record of Yemeni cultural heritage, the interdiction of antiquities exported and sold for profit abroad is very difficult to ascertain. The Panel has seen images posted on the official media sites of parties in Lahij, Sana'a and Ta'izz showing precious artefacts abandoned without any protection mechanism. Recently, al Masirah television, showed images of the house of Tawfiq Saleh Abdulla Saleh, the former chairman of Kamaran.[162]

## B. Money supply problems

### 1. Liquidity in Yemen and the Central Bank of Yemen

140. In Houthi-controlled territory, a central bank structure with private banks and finance institutions continues to operate.[163]

141. In 2017 the legitimate Government managed to print 600 billion rials ($1.6 billion).[164] The printing was aimed at: (a) securing a reserve to restart the payment of salaries; (b) improving the circulation of cash in all of Yemen as the M1[165] money supply is now depleted; and (c) to replace damaged banknotes. None of these objectives have yet been achieved.[166]

142. The Houthis tried to solve the liquidity problem using several approaches, which have all failed so far, including:

(a) The corrupt use of a food voucher system by an individual reported to be "Abu Nabil al-Qaramani", who operates with Houthi permission for their financial benefit (see annex 52);

(b) An attempt to use 5,000 rial promissory notes printed outside Yemen was foiled by a seizure in the Government controlled area of Jawf, on 25 May 2017, of a

---

[160] See http://ge.ch/justice/vestiges-archeologiques-le-ministere-public-confisque-des-objets-provenant-de-palmyre-en-syrie-du-ye.

[161] Amended by Law 8/1997 of 17 February 1997.

[162] See http://www.yafa-news.net/archives/263955 and http://almasirah.net/gallery/preview.php?file_id=10481#.Wiifxroebms.whatsapp (at minute 15.36).

[163] All of the 18 banks licensed to operate in Yemen have their main office in Sana'a, apart from the National Bank of Yemen, known as Al Ahli Bank, which has its main office in Aden (see annex 50).

[164] Printing by the Russian GOZNAK Joint Stock Company (see http://goznak.ru/en/).

[165] M1 is a metric that measures the most liquid components of the money supply. It includes cash and assets that can quickly be converted to currency.

[166] The M0 (or M-zero) money supply in Yemen is estimated to be 1,129.5 billion rials according to a 2014 report issued by the Central Bank of Yemen. This could represent 50 per cent of the M1 money supply according to a Bank official (information provided to the Panel meeting in Riyadh, June 2017). Banknotes older than six years are likely to be torn and invalidated for transactions. Data on the annual printing of banknotes is provided in annex 51.

truck carrying 35 billion rials ($140 million) worth of such notes. This denomination has not been used so far for transactions (see annex 53).

143.  The Panel submitted a 5,000 Yemeni rial note for forensic analysis in order to identify the parties behind the counterfeit as well as external entities and individuals supporting them.

144.  The Panel noted that on 20 November 2017, the Office of Foreign Assets Control of the United States Department of the Treasury designated an Iranian network and *ForEnt Technik GmbH*,[167] an Iranian-owned, Frankfurt-based company, for their involvement in the printing of the above-mentioned counterfeit Yemeni bank notes.[168] The Panel continues to investigate this matter.

### 2.  Cross-border trafficking of money and gold

145.  The Panel has investigated three cases of trafficking of finance assets for the benefit of the Houthi-Saleh alliance acting on behalf of listed individuals (see table 2).

Table 2
**Financial seizures in Mahrah: 2017**
(Value given in millions of United States dollars)

| Date | Location | Route | Smugglers | Item seized | Value |
|------|----------|-------|-----------|-------------|-------|
| 9 May | Shehen, Mahrah | Yemen to the United Arab Emirates | Yemeni | Banknotes<br>7 gold bars | 3.42 |
| 17 July | Shehen, Mahrah | Yemen to the United Arab Emirates | United Arab Emirates-based Yemenis | 7,174,700 Saudi riyals | 1.91 |
| 27 July | Shehen, Mahrah | Yemen to the United Arab Emirates | Citizens of the United Arab Emirates | 700,000 Saudi riyals<br>42 gold bars | 0.19 |

146.  These cases illustrate the level of smuggling activity in Mahrah governorate (see annex 54).

## C.  Financial consequences of the conflict on the import of food

147.  Restrictions imposed by the parties to the conflict on imports has resulted in significant additional financial costs to importers. Many suppliers and freighters are no longer willing to take the risk of entering into transactions with Yemeni importers.

### 1.  Hard currency exchange problems

148.  The main challenge is that hard currency is now mainly exchanged through the underground economy, with all the associated risks linked to corruption and money laundering. Currency transfers from Yemeni workers and the diaspora abroad has mainly been in Saudi riyals. Prior to the current conflict, any excess of Saudi riyals accumulated by Yemeni banks and money exchanges used to be transferred by air to Bahrain, where it was exchanged for United States dollars and converted into letters of credit.

---

[167] See http://forent-tech.com/index.html.
[168] See https://www.treasury.gov/press-center/press-releases/Pages/sm0219.aspx.

### 2.   Challenges facing the import of goods

149.  The situation in Yemen would have been far worse were it not for the fact that the outlook for the international trade in food products has been favourable to importers. The current cost of food commodities and shipping from suppliers remains low compared to the pre-conflict period (see example in table 3), although some additional shipping costs are incurred for the final leg of the journey into Yemeni ports due to delays at sea and demurrage at the ports.[169]

Table 3
**Cost of wheat (No.1 Hard Red Winter): 2012–2017**[a]

(In United States dollars per ton)



  [a] *Source*: United States Department of Agriculture, Market News (see http://www.indexmundi.com/commodities/?commodity=wheat&months=60).

150.  Delays, diversions and seizures of cargo of commercial vessels by the Saudi Arabia-led coalition during inspections have contributed to significant financial losses for ship owners and traders. The cost of these delays to owners and shippers, which can reach $30,000 per day, have gradually eroded their credibility with their international trading partners (suppliers, insurers and freighters). Details of the case study on the confiscation of the Liberia-flagged tanker, MV *Androussa*, on 4 April 2017, while it was proceeding to Ra's Isa, are given in confidential annex 55. The Panel visited the tanker in Yanbu, on 25 December 2017, with Saudi Arabian officials. The Panel and the officials of Saudi Arabia were shown some steel pipes next to a workshop that the officials considered to be suspicious, but which the Panel estimated were most probably for the vessel's maintenance. Saudi Arabia has not yet submitted an inspection report, which is required within 30 days under paragraph 17 of resolution 2216 (2015).[170] The case illustrates the loss for traders and shipping companies operating in Yemen.[171] One trader has seen three planned cargo deliveries for the remainder of 2017 cancelled owing to the risk posed by the conflict (figure XVI).

---

  [169] Houthi ministry of transport and trade (see http://www.moit.gov.ye/moit/sites/default/files/%20% D8%A7%D9%84%D8%AB%D8%A7%D9%84%D8%AB%D9%85%D9%86%D8%A3%D9%83 %D8%AA%D9%88%D8%A8%D8%B1.pdf).

  [170] UNVIM submitted an interim Member State monitoring report on 12 May 2017, covering the inspection in Jeddah, between 8 and 16 April 2017, as well as subsequent inspections in Yanbu port between 17 April and 11 May 2017. The report concluded that no prohibited items were found on board the vessel, but that the inspection team had discovered a series of inconsistencies, irregularities and misdeclarations as well as traces of high explosives in ballast tanks 3, 4 and 6.

  [171] The tanker, and its cargo of 41,500 tons of gas oil worth more than $23 million, was subsequently formally confiscated on 14 September 2017 (see https://www.uqn.gov.sa/articles/ 1507838892820964500/).

Figure XVI
**Extract from a cancellation letter received by an importer**[a]



[a] *Confidential source*: Importer.

# VI. Assets freeze

151.  Pursuant to paragraphs 11 and 21 (b) of resolution 2140 (2014), as extended by paragraph 5 of resolution 2342 (2017), the Panel has continued to gather, examine and analyse information regarding the implementation by Member States of assets freeze measures. The Panel has continued to focus on the five listed individuals and on identifying and investigating other individuals and entities that may be acting on their behalf or at their direction and entities owned or controlled by them.

152.  Since the death of Ali Abdullah Saleh, the resultant inherited wealth will no longer be within the scope of the Panel's mandate unless: (a) those funds are made available to Ahmed Ali Abdullah Saleh or any other individual acting on the latter's behalf, including Khaled Ali Abdullah Saleh; or (b) Houthi fighters, acting on behalf of the three Houthi listed individuals, seize Saleh assets. The Panel has sent letters to the Government of Yemen and Ahmed Ali Abdullah Saleh requesting official documentation that certifies the death of Ali Abdullah Saleh in order to allow the Committee to update the list. The Panel met with Ahmed Ali Abdullah Saleh in Abu Dhabi on 27 December 2017. He indicated that he had not yet received confirmed information as to where his father was buried, that members of his family are still being held by the Houthis in Yemen and that members of his family have been dispossessed by the Houthis. He complained that his listing was unjust as he has never been and is not involved in any act that threatens the peace, security or stability of Yemen.

153.  The status of the estimated assets owned by listed individuals of the Saleh family and individual entities acting on their behalf traced by the Panel are shown in table 4 below.

S/2018/68

Table 4

**Estimated assets owned by the Saleh family that meet the assets freeze criteria[a]**

(Estimated in United States dollars)

| Country | Identified | Frozen | Status | Remarks |
|---|---|---|---|---|
| France | 11 350 000 | | To be confirmed | 2 apartments owned by Ahmed Ali Abdullah Saleh |
| Malaysia | | 780 000 | Frozen | Owned by Ahmed Ali Abdullah Saleh (balance in 2016) |
| Netherlands | | To be confirmed | Frozen | Acting on behalf of Ahmed Ali Abdullah Saleh (asset is in France) |
| Oman | | 25 818 000 | Frozen | Transferred by Ahmed Ali Abdullah Saleh from an account in Yemen in 2012 |
| Singapore | | 460 000 | | Securities owned by Ahmed Ali Abdullah Saleh |
| Switzerland | | 4 431 000 | Frozen | Owned by Ali Abdullah Saleh |
| United Arab Emirates | | 166 000 | Frozen | Owned by Ahmed Ali Abdullah Saleh |
| United Arab Emirates | 55 000 000 | | To be confirmed | Owned by Ali Abdullah Saleh, and transferred in June 2011 |
| United Arab Emirates | 51 720 000 | | To be confirmed | Transferred by Trice Bloom Ltd. and Towkay Ltd. from Bank of New York Mellon Corporation in 2014 from an initial inward transfer of 71 493 448 |
| United Arab Emirates | 33 472 000 | | | Transferred by PACT Trust, Ali Abdullah Saleh, (October 2014) |
| United Arab Emirates | 58 140 000 | | | Transferred by Wildhorse Investments, Ali Abdullah Saleh (October 2014) |
| United Arab Emirates | 3 024 000 | | | Transferred by Ansan Wikfs Investments Limited, a company owned by Shaher Abdulhak **Total in the United Arab Emirates: 198 332 000** |
| United Kingdom | | 3 700 000 | Frozen | Owned by Ahmed Ali Abdullah Saleh; Panel notified by United Kingdom authorities to the Civil Forum for Asset Recovery in 2017.[a] This asset is in a United Kingdom-registered bank, but in an account in another European country |
| United States of America | 90 000 000[b] | To be determined | | Transferred from or through banks in the United States to banks in the United Arab Emirates for the benefit of Khaled Ali Abdullah Saleh between August 2013 and December 2014 |
| **Subtotals** | **191 036 000** | **35 355 000** | | |
| **Grand total** | **226 391 000** | | | |

[a] Managed by Khaled Ali Abdullah Saleh.

[b] Part of this amount is included in funds traced in the United Arab Emirates. Once details are confirmed, reconciliation of funds can take place between United States and United Arab Emirates data.

154. The Panel is investigating assets seizures by the Houthis for their benefit. An order was issued on 23 December 2017 to the Sana'a based Central Bank of Yemen by "the committee for identification and seizure of assets owned by traitors" to seize all bank accounts owned by 1,223 individuals (see annex 56).

155. The Panel shared information on bank accounts and account transfers in relation to listed individuals with five Member States and awaits their replies. This lack of information on already frozen assets constrains the Panel from tracing further financial assets. In 2017, no information on the freezing of assets was submitted to

the Committee or Panel, while one notification of an intent to unfreeze was submitted to the Committee.

### Khaled Ali Abdullah Saleh

156.  In its report dated 31 January 2017[172] the Panel identified Khaled Ali Abdullah Saleh[173] as a financier acting on behalf and/or at the direction of his father, Ali Abdullah Saleh, and his brother, Ahmed Ali Abdullah Saleh. The Panel is investigating potential funds that could be made available by Khaled Ali Abdullah Saleh for the benefit of listed individuals from transfers and investments equalling $20.9 million made by Raydan Investments Limited in the United Arab Emirates (see annex 57).

157.  The Panel has received a bank statement related to a credit card (4XXXXXXXXXXX3455) owned by Khaled Ali Abdullah Saleh, who has used two passports from a Member State. The bank statement confirms that he travelled during late 2016 and early 2017 to Munich, Germany, Budapest, Prague, Vienna and Zurich, Switzerland. The Panel noted that he sought the services of Keyana Management Consulting in Munich.[174] The card was also used to support personal PayPal purchases of potential weapons and specialized equipment prohibited by the targeted arms embargo on Yemen on 26 December 2016 (http://www.nashq.com/) and 18 January 2017 (https://www.dmhq-shop.de/). He continues to manage the Saleh family assets in such a way so as to circumvent the asset freeze and targeted arms embargo sanctions measures.

## VII.   Travel ban

158.  Pursuant to paragraph 15 of resolution 2140 (2014), the Panel continues to focus on a range of monitoring and investigative activities in order to identify whether the individuals designated by the Committee and Security Council have violated the travel ban. No violations have been identified.

## VIII.   Acts that violate international humanitarian law and human rights law

159.  In paragraph 9 of resolution 2140 (2014), the Security Council called upon all parties to comply with their obligations under international law, including applicable international humanitarian law and human rights law. In paragraphs 17, 18 and 21 of that resolution and in paragraph 19 of resolution 2216 (2015), the Council further clarified the Panel's responsibilities with regard to investigations of violations of international humanitarian law and international human rights law and human rights abuses, including investigation into obstructions to the delivery of humanitarian assistance.

---

[172] S/2017/81, sect. VI, paras. 42–44.
[173] Born 2 August 1987.
[174] See http://www.keyana-consulting.com/: the company, based in Munich, offers financial investment services.

## A.   Incidents attributed to the Saudi Arabia-led coalition

### 1.   Air strikes

160.  During the reporting period, the Panel investigated 10 air strikes[175] that led to at least 157 fatalities and 135 injuries, including at least 85 children. The strikes also destroyed five residential buildings, two civilian vessels, a market, a motel and a Government of Yemen forces location (see table 5). Detailed case studies of the first four incidents, which include assessments of compliance with international humanitarian law, are contained in annex 58.

Table 5
**Air strikes: 2017**

| Appendix in annex 58 | Date | Location | Incident and target | Type of ordnance | Civilian casualties |
|---|---|---|---|---|---|
| A | 16 March | Red Sea | Migrant boat | Small arms ammunition | 42 dead 34 injured |
| B | 25 Aug. | Sana'a | Residential building | High explosive aircraft bomb | 16 dead 17 injured |
| C | 2 Sept. | Hajjah | Residential building | High explosive aircraft bomb | 3 dead 13 injured |
| D | 1 Nov. | Sa'dah | Night market | High explosive aircraft bomb fitted with "Paveway" guidance unit | 31 dead 26 injured |
| E | 9 June | Sana'a | Residential building | Mark 82 or 84 high explosive aircraft bomb with "Paveway" guidance unit | 4 dead 8 injured |
| F | 4 Aug. | Sa'dah | Residential building | Mark 84 high explosive aircraft bomb | 9 dead 3 injured |
| G | 23 Aug. | Arhab | Motel | Mark 82 or 84 high explosive aircraft bomb with "Paveway" guidance unit | 33 dead 25 injured |
| H | 16 Sept. | Ma'rib | Vehicle | High explosive aircraft bomb or air-to-ground missile | 12 dead |
| I | 10 Nov. | Sa'dah | Residential building | Mark 82 or 84 high explosive aircraft bomb with "Paveway" guidance unit | 4 dead 4 injured |
| J | 14 Nov. | Ta'izz | Government forces | Mark 82 or 84 high explosive aircraft bomb with "Paveway" guidance unit | 3 dead 5 injured |

161.  In the 10 incidents investigated the Panel finds that:

(a)    The use of precision-guided weapons is a strong indicator that the intended targets were those affected by the air strikes;

(b)    In all cases investigated, there was no evidence that the civilians in, or near this infrastructure, who are prima facie immune from attack, had lost their civilian protection;

(c)    Even if in some of the cases listed in table 5, the Saudi Arabia-led coalition had targeted legitimate military objectives, the Panel finds that it is highly unlikely

---

[175] These and other incidents referred to in this section were selected because the available evidence met the standards set out in annex 1, appendix B.

that the principles of international humanitarian law of proportionality and precautions in attack were respected;

(d)   The cumulative effect on civilians and the civilian infrastructure demonstrates that even if precautionary measures were taken, they were largely inadequate and ineffective.

162.  On the individual case studies, the Panel finds that:

(a)   Except for incident A, the only military entity capable of carrying out these airstrikes was the Saudi Arabia-led coalition. In incident A, it is highly unlikely that an entity other than a member State in the Saudi Arabia-led coalition could have carried out the attack;

(b)   Except for incidents B and D, the Saudi Arabia-led coalition has not acknowledged its involvement in any of the attacks, nor clarified, in the public domain, the military objective it sought to achieve. In incidents B and D, the Panel is unable to concur with the justifications provided by the Saudi Arabia-led coalition (see annex 58);[176]

(c)   Measures taken by the Saudi Arabia-led coalition in its targeting process to minimize child casualties, if any, remain largely ineffective,[177] especially when it continues to target residential buildings.

163.  The Panel requested information throughout 2017 from the Saudi Arabia-led coalition in reference to the rationale that the coalition had applied in order to justify the collateral damage to civilians and civilian infrastructure identified by the Panel. The response received contained no verifiable information. In the case of the air strikes listed in table 5, the Panel's independent investigations could not find any evidence of the presence of high value targets that would justify the collateral damage at these target sites. In another incident, in which the Saudi Arabia-led coalition admitted to killing a high value target in a strike on an alleged training camp, which then turned out to be a school, the Joint Incident Assessment Team later denied that a strike by the Saudi Arabia-led coalition had taken place (see annex 59).

164.  The Panel also identified two cases (see table 6) where the Joint Incident Assessment Team found that the Saudi Arabia-led coalition did not conduct strikes, but the Panel's independent investigations found clear evidence of air strikes. The Panel thus concluded that the only entity capable of carrying out these two attacks was the Saudi Arabia-led coalition (details are provided in annex 60).

Table 6
**Findings of the Joint Incident Assessment Team and conclusions of the Panel**

| Date | Incident | Joint Incident Assessment Team | Panel conclusions |
| --- | --- | --- | --- |
| 9 Aug. 2016 | Sana'a food factory | Saudi Arabia-led coalition did not carry out an air strike on the location | High explosive aircraft bomb used Saudi Arabia-led coalition is responsible |
| 24 Sept. 2016 | Ibb residential complex | Saudi Arabia-led coalition did not carry out an air strike on the location | Mark 82 high explosive aircraft bomb with "Paveway" guidance unit used Saudi Arabia-led coalition is responsible |

---

[176]  Statement of the official spokesman of the official Saudi Arabia-led coalition.
[177]  See S/2017/821, para. 200, for information on measures reportedly taken by the Saudi Arabia-led coalition to reduce child casualties.

165. Those individuals responsible for planning, authorizing and/or executing air strikes that disproportionately affect civilians and civilian infrastructure are likely to fall under the designation criteria contained in paragraphs 17 and 18 of resolution 2140 (2014). The Panel continues to investigate this issue.

## 2.   Ground operations: detentions by the United Arab Emirates

166. In 2017, the Panel investigated 12 instances of individuals deprived of their liberty being held in detention facilities at the United Arab Emirates base in Burayqah, at Al Rayyan airport and in the port of Balhaf (see confidential annex 61 and annex 62). The Panel finds that:

(a)   The forces of the United Arab Emirates in Yemen detained individuals in least three places of detention in Yemen, which were administered and supervised exclusively by the United Arab Emirates;

(b)   The Government of Yemen had no authority over individuals detained in the bases administered by the United Arab Emirates;

(c)   The forces of the United Arab Emirates engaged in, or supervised, joint arrest operations with the Hadrami and Shabwani Elite Forces;

(d)   The forces of the United Arab Emirates have engaged with Yemeni security forces in regular detainee transfers;

(e)   The forces of the United Arab Emirates were responsible for: (i) torture (including beatings, electrocution, constrained suspension and imprisonment in a metal cell ('the cage') in the sun); (ii) ill treatment; (iii) denial of timely medical treatment; (iv) denial of due process rights; and (v) enforced disappearance of detainees, in violation of international humanitarian law and international human rights law.[178]

167. The Panel estimates that the total number of detainees[179] in the custody of the forces of the United Arab Emirates in Yemen, as at 1 November 2017, was over 200.

168. The Panel requested, but did not receive, either from the United Arab Emirates or Yemen, the relevant legal authority under which the United Arab Emirates, as a foreign force, was authorized to engage in the arrest and the deprivation of liberty of individuals in Yemen. Instead, the representatives of the United Arab Emirates denied that the country supervises or administers detention facilities in Yemen.[180]

169. The widespread and systematic nature of the arbitrary arrest, deprivation of liberty and enforced disappearance of individuals by the United Arab Emirates in Yemen demonstrates a pattern of behaviour that is clearly inconsistent with the country's obligations under international humanitarian law and international human rights law. At the same time, the continued denial of the role of the United Arab Emirates in arbitrary arrests and detentions contributes to violations occurring with impunity by both United Arab Emirates forces and its Yemeni proxies. This denial offers them protection and the ability to operate without any foreseeable consequences.

170. For the United Arab Emirates, working with Government of Yemen security forces provides plausible deniability for violations,[181] while also providing a veneer

---

[178] A legal assessment of the situation is given in annex 62. Information provided by detainees was verified through medical reports, testimonies of other detainees and their families and/or satellite imagery, in accordance with Panel methodology.

[179] The term detainees in this report refers to individuals deprived of their liberty, including internees.

[180] Letter from the United Arab Emirates to the Panel dated 8 November 2017.

[181] Ibid.

of legitimacy and authority for the arbitrary arrests and consequent detentions undertaken on their behalf.

171.  Both Governments refuse to conduct credible investigations into such abuses or to act against the perpetrators. The United Arab Emirates is in Yemen with the consent of the legitimate Government, which has full authority to revoke, limit or to clarify the boundaries of its consent, in order to further the compliance of the forces of the United Arab Emirates with international humanitarian and international human rights law. The Government of Yemen has also failed to assert effective command and control over its own forces in this regard (see para. 54 above).

172.  The Panel finds that those responsible for detention-related abuses in Yemen fall within the designation criteria under paragraph 17 and/or paragraph 18 of resolution 2140 (2014).

## B. Houthi and Saleh forces: violations associated with the deprivation of liberty

173.  The Panel investigated 16 cases of arbitrary arrest and the deprivation of liberty and other violations of international humanitarian law and human rights norms committed by Houthi-Saleh forces. Eleven individuals were identified who either committed or held command responsibility for the violations.[182] These violations were committed by officials of the Sana'a-based political security organization (3), the Sana'a-based national security bureau (3) and other Houthi authorities (10). In the national security bureau, Motlaq Amer al-Marrani (also known as Abu Emad), deputy head of the national security bureau, was involved in all violations investigated by the Panel.

174.  These violations by the members of the Sana'a-based political security organization and the Sana'a-based national security bureau and by other Houthi authorities involved: arbitrary arrest and deprivation of liberty; torture, (including of a child); denial of timely medical assistance; prolonged enforced disappearances; lack of due process; and three deaths in custody.

175.  During the course of the past year, the Panel has observed that some individuals within the detaining authorities are now profiting from detentions. The Panel identified the release of one detainee after his family paid 1,000,000 rials ($4,000) to officials of the Sana'a-based political security organization.

176.  The Panel investigated the detention of individuals in the Dhammar Community College, an informal place of detention.[183] One of the major reasons for the continued detention of individuals in this prison is the inability of the leaders of the Houthi-Saleh forces and the leaders of the "resistance" forces to agree on a local prisoner exchange. Some detainees were informed that they would be released either: (a) upon payment of a ransom; or (b) during an exchange. Any detention of civilians, solely as leverage for future prisoner exchanges, is hostage taking, which is prohibited under international humanitarian law.[184]

### Violations by Houthi authorities after 1 December 2017

177.  The Panel initiated investigations into the arbitrary arrest, deprivation of liberty and extrajudicial execution of affiliates of the General People's Congress, including

---

[182] A legal assessment is provided in confidential annex 63.

[183] The total number of detainees in the facility vary from 25 to 100.

[184] Customary international humanitarian law rule 96 on hostage-taking (see https://ihl-databases.icrc.org/customary-ihl/eng/docs/v2_rul_rule96). Under the terms of international humanitarian law, civilians are to be detained only if they pose an imminent security threat and then, only for as long as that threat is existent.

incitement of violence against them. A significant deprivation of liberty took place on 2 December 2017 when 41 local journalists were arbitrarily detained.[185]

## C. Indiscriminate use of explosive ordnance against civilian populated areas

178. The Panel investigated 10 incidents of the indiscriminate use of explosive ordnance in densely populated areas such as Ta'izz, which, together, resulted in 23 civilian deaths (see table 7). The Panel finds that in these cases, there was almost certainly an indiscriminate use of explosive ordnance. Detailed case studies of three of the incidents, which include assessments of compliance with international humanitarian law, are provided in annex 64. The responsibility for all case studies, except for case study C in table 7, is attributed to the Houthi-Saleh forces.[186]

Table 7
**Summary of the indiscriminate use of explosive ordnance in civilian populated areas: 2017**

| Date | Location | Incident and target | Type of explosive ordnance | Civilian casualties | Appendix to annex 64 |
|------|----------|--------------------|-----------------------------|---------------------|----------------------|
| 18 Jan. | Nur, Ta'izz | Residential area | 120 mm high explosive mortar bomb | 9 dead 8 injured | E |
| 21 May | Jahmila, Ta'izz | Residential area | High explosive ordnance (to be confirmed) | 2 dead | F |
| 21 May | Thabat, Ta'izz | Residential area | High explosive ordnance (to be confirmed) | 3 dead 3 injured | G |
| 21 May | Humayrah, Ta'izz | Commercial area | High explosive ordnance (to be confirmed) | 2 dead 5 injured | H |
| 29 May | Nur, Ta'izz | Residential area | 120mm high explosive mortar bomb | 1 dead 7 injured | A |
| 30 June | Jumhuri, Ta'izz | Residential area | 106 mm recoilless rifle | 1 dead 9 injured | I |
| 6 Sept. | Rawdah, Ma'rib | Residential area | 120mm high explosive mortar bomb | 3 injured | B |
| 21 Sept. | Sinah, Tai'zz | Residential area | Rocket-propelled grenade-7 variant | 0 | J |
| 2 Nov. | Onsowa, Ta'izz | Residential area | 120mm high explosive mortar bomb | 5 dead | D |
| 11 Nov. | Riyadh | Civilian airport | Short-range ballistic missile | 0 | C |

---

[185] See https://rsf.org/en/news/houthis-holding-41-journalists-hostage-inside-yemeni-tv-station.
[186] In the 2 November 2017 mortar attack, technical analysis demonstrates that the mortar base plate was in an area under the control of Abu al-Abbas.

179. The indiscriminate use of explosive ordnance against civilian locations in Yemen and Saudi Arabia committed by the Houthi-Saleh forces falls within paragraph 17 and/or paragraph 18 of resolution 2140 (2014). The Panel finds that the continued use of such weapons could not happen unless sanctioned as a policy by the high-level Houthi leadership, including Abdulmalik al-Houthi personally.

## D. Violations by the Government of Yemen

180. The Panel investigated violations of international humanitarian law and international human rights law relating to arbitrary arrest and detention, enforced disappearance, torture, ill-treatment and denial of timely medical assistance for 21 individuals. These individuals were in the custody of or in locations controlled by the Security Belt Forces in Aden and Lahij; the Special Forces in Ma'rib; the Hadrami and Shabwani Elite Forces; Major General Shallal Ali Shaye;[187] Brigadier General Ali Abdullah Taher;[188] Ghassan al-Aqrabi;[189] Colonel Abu Mohammad Abdul Ghani Shaalan;[190] and Imam al-Nubi.[191] Further information on such violations is provided in annex 65 and confidential annex 66. Nine deaths also occurred in custody, including that of three children.

181. Some officials maintained extrajudicial detention sites. In Aden, this included a house under the control of Major General Shallal Ali Shaye in At-Tawahi, formerly the Waddah nightclub. Bir Ahmed I was an extrajudicial detention site administered by Ghassan al Aqrabi, who is affiliated with the Security Belt Forces and United Arab Emirates forces. On 12 November 2017, the United Arab Emirates moved detainees to Bir Ahmed II. On 13 November 2017, the Attorney General of Yemen received the case files of the detainees. In early December 2017, following his intervention, some detainees had family visits in Bir Ahmed II and some were released.

182. Also in November 2017, 133 detainees were reportedly transferred from Al Rayyan airport to Mukalla Central Prison,[192] although there is inadequate information to conclude that all detainees who were in Al Rayyan were transferred, as some families still have not been able to gain access to their relatives who were detained in Al Rayyan.

---

[187] Director of General Security, Aden. The detention-related abuses investigated occurred at a house in At-Tawahi under his control.
[188] Former Security Director, Ma'rib (see https://yemensaeed.net/news.php?id=61163).
[189] Supervisor of Bir Ahmed I and II.
[190] Special Forces Commander, Ma'rib. Colonel Shallan was present and in control of his troops when a child was killed.
[191] Former Commander of Camp 20, Aden.
[192] See http://www.chicagotribune.com/sns-bc-ml--yemen-prisoners-20171113-story.html.

Figure XVII
**Bir Ahmed I and Bir Ahmed II**



## E.   Attacks inside hospitals

183.  The Panel investigated two incidents, in which two seriously ill patients were assassinated inside the Revolution Hospital on 24 March 2017 and 13 December 2017 (see confidential annex 67).

184.  In Sana'a, following the death of Ali Abdullah Saleh, the Panel is investigating incidents in which injured persons were killed inside hospitals. Wounded, sick and out of action personnel are protected under international humanitarian law. [193]

## F.   Recruitment and use of children in armed conflict

185.  The Panel investigated individuals and networks operating in Yemen that engage in child recruitment. The Panel has identified two individuals who recruited a total of five children on behalf of Houthi forces (see annex 68 and confidential annex 69). The Panel finds, based on their analysis over the past year, that these cases are representative of a much larger problem.

---

[193] See common article 3 to the Geneva Conventions of 1949 and article 7(1) of the Protocol Additional to the Geneva Conventions relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II).

186. The Panel finds that the following also contributes to the increase in the recruitment of children:

(a)   The non-payment of salaries results in children being compelled to search for economic alternatives on behalf of their families: Houthi-Saleh forces paid newly recruited children approximately 15,000 to 20,000 rials per month ($60 to $80);

(b)   The disruption to education means that children often have little to do, thus making them vulnerable to street level recruitment;

(c)   As families continue to live in areas controlled by the Houthi-Saleh forces, they are afraid to speak out against such recruitment, thus allowing it to continue unchallenged;

(d)   For parents with financial means, the airport closure and visa restrictions mean that they cannot send or take their children out of the country for their own protection.

## IX.   Obstruction of humanitarian assistance

187. Pursuant to paragraph 19 of resolution 2216 (2015), the Panel continues to investigate the obstruction of the delivery of humanitarian assistance to Yemen or access to, or distribution of, humanitarian assistance in Yemen.

### A.   Obstruction of deliveries of humanitarian assistance

188. The Saudi Arabia-led coalition continued to obstruct the entry of humanitarian and commercial goods to Yemen by: (a) continuing the blockade on the Sana'a airport to commercial flights (see annex 70); (b) imposing gradual restrictions on civilian items entering Yemen through the Red Sea ports (see confidential annex 71) and (c) through severe restrictions on the imports of commercial and humanitarian goods from 6 to 23 November 2017. During the latter period, over 750,600 tons of commercial and humanitarian goods were diverted from Yemen or their entry to the country delayed.[194]

189. The imposition of more access restrictions on 6 November 2017 was another attempt by the Saudi Arabia-led coalition to use paragraph 14 of resolution 2216 (2015) as justification for obstructing entry of commodities into Yemen that are essentially civilian in nature Obstructing the entry into Yemen of many of the commodities listed in confidential annex 71 is contrary to the spirit of resolution 2216 (2015).

190. The blockade is essentially using the threat of starvation as a bargaining tool and an instrument of war. The Houthi forces are also using the population as a pawn when they escalate their strikes against Saudi Arabia, knowing full well the brunt of reprisals will be felt by the civilian population. The Houthis are relying on public condemnation of Saudi Arabia's reprisals to offset any liability on their part for those actions.

191. The continued non-reporting in 2017 by Member States of inspections undertaken in their territory means that they are in non-compliance with paragraph 17 of resolution 2216 (2015). This undermines the monitoring responsibilities of the Committee as envisaged in paragraph 17 of resolution 2216 (2015) and undermines

---

[194] Information from UNVIM and LogCluster data.

the safeguards placed to ensure that the sanctions regime is not misused to achieve unilateral objectives.

## B.   Obstruction to the distribution of humanitarian assistance

192.   In 2017, Houthi-Saleh forces continued to obstruct the distribution of humanitarian assistance and prevented humanitarian access.[195] The Panel investigated obstructions, which included: (a) aid diversion; (b) delays or refusals that affect timely distribution; (c) arrests, detentions, intimidation and torture of humanitarian staff and confiscation of equipment; (d) interference in the selection of beneficiaries, areas of operation and implementing partners; (e) declaration of areas as military zones, making them inaccessible to humanitarians; (f) extortion and demands for payment under threats of violence; (g) obstruction of the delivery of cholera response material; (h) issues relating to customs clearance; and (i) delays in clearing the importation of medicine from Sana'a International Airport. These obstacles are compounded by the non-payment of public sector salaries and visa restrictions for humanitarian workers.

193.   The Panel also investigated obstructions to humanitarian access by the executive unit (in Ta'izz, Hajjah and Hudaydah), the Sana'a-based ministries of education and health, and the Sana'a-based national security bureau. Some of these actors are militarizing the distribution of aid. The Panel finds that Motlaq Amer al-Marrani (also known as Abu Emad), the deputy head of the Sana'a-based national security bureau was also responsible for the arbitrary arrest, detention and ill treatment of humanitarian workers and other authorities working on humanitarian assistance. He has also unduly used his authority and influence over humanitarian access as a leverage to generate profit.

194.   At the request of humanitarian stakeholders, the confidential information and analysis relating to this section is provided in confidential annex 72.

## X.   Recommendations

195.   The Panel recommends that the Security Council:

(a)   Consider including in its resolution or presidential statement a call on the member States of the Saudi Arabia-led coalition not to misuse resolution 2216 (2015) as a justification to obstruct the delivery of essential goods and humanitarian aid by air or sea;

(b)   As a confidence-building measure, consider authorizing the deployment of a neutral naval vessel to the sea approaches and entrance of Hudaydah port, under the auspices of UNVIM, thus increasing discharge rates and ensuring a neutral inspection and monitoring presence during commercial vessel discharges in Houthi-controlled territory;

(c)   Consider including in its resolution language specifying that the components used for the manufacture of military equipment may fall within the scope of the targeted arms embargo;

(d)   Consider commissioning an ad hoc report from the Committee, with assistance from its Panel of Experts, and working with other relevant United Nations bodies, including the Office for Disarmament Affairs, and in consultation with international and regional organizations and entities, to examine the use and impact

---

[195]   United Nations, international and national non-governmental organization sources.

of commercially available unmanned aerial vehicles in conflict zones for military purposes, and to make recommendations on appropriate counter-measures to their transfer and use.

196. The Panel recommends that the Committee:

(a)   Consider engaging with the International Maritime Organization (IMO), [196] with a view to recommending that it liaise with the industry shipping group responsible for the publication *Best Management Practices for Protection against Somalia Based Piracy* (BMP4) to ensure that the protection measures set out in the publication are still appropriate for addressing the new threats that have emerged in the Red Sea area;

(b)   Consider engaging with the Combined Maritime Forces to encourage them to cooperate with the Panel in accordance with paragraph 10 of resolution 2117 (2013) and paragraph 8 of resolution 2342 (2017), and to respond to Panel's requests for information;

(c)   Consider reminding Member Sates of their obligation under paragraph 11 of resolution 2140 (2014) to freeze without delay all funds, other financial assets and economic resources on their territories that are owned or controlled, directly or indirectly, by individuals or entities acting on behalf or at their direction of listed individuals, or by entities owned or controlled by them, in particular the United Arab Emirates with regard to Khaled Ali Abdullah Saleh and the assets he manages that are identified herein and in the report of the Committee dated 31 January 2017 (S/2017/81);

(d)   Consider engaging with the United Nations Educational, Scientific and Cultural Organization, encouraging it to issue a communiqué informing international auctioneers and museums that the export and sale of Yemeni artefacts is illegal and that measures should be taken to ensure that funding raised from transactions relating to Yemen's cultural heritage will not be used to finance armed groups;

(e)   Consider encouraging the Government of Yemen to establish mechanisms with international financial institutions and the Saudi Arabia-led coalition to allow those Yemeni banks with effective anti-money-laundering measures to transfer hard currency outside of Yemen in order to raise the letters of credits necessary to support imports;

(f)   Consider engaging with the Office of the Secretary-General to examine the development and institution, within UNVIM, of a complaints mechanism for shippers and freight forwarders, to be made available through the UNVIM website.

---

[196] See http://www.imo.org.

## Annex 1:      Methodology

1.      The Panel used satellite imagery of areas of Yemen procured by the United Nations from private providers to support its investigations. It also used commercial databases recording maritime and aviation data and mobile phone records. Public statements by officials through their official media channels were accepted as factual unless contrary facts were established. While the Panel strived to be as transparent as possible, in situations in which identifying sources would have exposed them or others to unacceptable personal security risks, the Panel decided not to include identifying information in the present report and instead placed the relevant evidence in United Nations archives.

2.      The Panel reviewed social media, but no information gathered was used as evidence unless it could be corroborated using multiple independent or technical sources, including eyewitnesses, to appropriately meet the highest achievable standard of proof.

3.      The spelling of toponyms within Yemen often depends on the ethnicity of the source or the quality of transliteration. The Panel has adopted a consistent approach in the present report.

4.      The Panel has placed importance on the rule of consensus among the Panel members and agreed that, if differences and/or reservations arise during the development of the report, it would only adopt the text, conclusions and recommendations by a majority of four out of the five members. In the event of a recommendation for designation of an individual or a group, such recommendation would be done on the basis of unanimity.

5.      The Panel has offered the opportunity to reply to Member States, entities and individuals involved in the majority of incidents that are covered in this report. Their response has been taken into consideration in the Panel's findings. The methodology for this is provided in appendix A.

**Appendix A to Annex 1: 'The opportunity to reply' methodology used by the Panel**

1.     Although sanctions are meant to be preventative not punitive, it should be recognized that the mere naming of an individual or entity1 in a Panel's report, could have adverse effects on the individual. As such, where possible, individuals concerned should be provided with an opportunity to provide their account of events and to provide concrete and specific information/material in support of their narrative. Through this interaction, the individual is given the opportunity to demonstrate that their alleged conduct does not fall within the relevant listing criteria. This is called the 'opportunity to reply'.

2.     The Panel's methodology on the opportunity to reply is as follows:

(a)     Providing an individual with an 'opportunity to reply' should be the norm;

(b)     The Panel may decide not to offer an opportunity of reply if there is credible evidence that it would unduly prejudice its investigations, including if it would:

(i)     Result in the individual moving assets if they get warning of a possible recommendation for designation;

(ii)     Restrict further access of the Panel to vital sources;

(iii)     Endanger Panel sources or Panel members;

(iv)     Adversely and gravely impact humanitarian access for humanitarian actors in the field; or

(v)     For any other reason that can be clearly demonstrated as reasonable and justifiable in the prevailing circumstances.

3.     If the circumstances set forth in 2 (b) do not apply, then the Panel should be able to provide an individual an opportunity to reply.

4.     The individual should be able to communicate directly with the Panel to convey their personal determination as to the level and nature of their interaction with the Panel.

5.     Interactions between the Panel and the individual should be direct, unless in exceptional circumstances.

6.     In no circumstances can third parties, without the knowledge of the individual, determine for the individual its level of interaction with the Panel.

7.     The individual, on the other hand, in making their determination of the level and nature of interaction with the Panel, may consult third parties or allow third parties (for example, legal representative or his government) to communicate on his/her behalf on subsequent interactions with the Panel.

---

1 Hereinafter just the term individual will be used to reflect both.

**Appendix B to Annex 1: Violations relating to IHL, IHRL, and acts that constitute human rights abuses investigative methodology**

1.      The Panel adopted the following stringent methodology to ensure that its investigations met the highest possible evidentiary standards, despite it being prevented from visiting places in Yemen other than Aden. In doing so it has paid particular attention to the "Informal Working Group on General Issues of Sanctions Reports", S/2006/997, on best practices and methods, including paragraphs 21, 22 and 23, as requested by paragraph 11 of resolution 2342 (2017).

2.      The Panel's methodology in relation to its investigations concerning IHL, IHRL and human rights abuses is set out as below:

(a)      All Panel investigations are initiated based on verifiable information being made available to the Panel, either directly from sources or from media reports.

(b)      In carrying out its investigations on the use of explosive ordnance, the Panel relies on at least three or more of the following sources of information:

(i)      At least two eye-witnesses or victims;

(ii)      At least one individual or organization (either local or international) that has also independently investigated the incident;

(iii)      If there are casualties associated with the incident, and if the casualties are less than ten in number, the Panel obtains copies of death certificates and medical certificates. In incidents relating to mass casualties, the Panel relies on published information from the United Nations and other organizations;

(iv)      Technical evidence, which includes imagery of explosive events such as the impact damage, blast effects, and recovered fragmentation. In all cases, the Panel collects imagery from at least two different and unrelated sources. In the rare cases where the Panel has had to rely on open source imagery, the Panel verifies that imagery by referring it to eyewitnesses or by checking for pixilation distortion;

a.      In relation to air strikes, the Panel often identifies the responsible party through crater analysis or by the identification of components from imagery of fragmentation; and

b.      The Panel also analyses imagery of the ground splatter pattern at the point of impact from mortar, artillery, or free flight rocket fire to identify the direction from which the incoming ordnance originated. This is one indicator to assist in the identification of the perpetrator for ground fire when combined with other source information.

(v)      The utilisation of open source or purchased satellite imagery wherever possible, to identify the exact location of an incident, and to support analysis of the type and extent of destruction. Such imagery may also assist in the confirmation of timelines of the incident;

(vi)      Access to investigation reports and other documentation of local and international organizations that have independently investigated the incident;

(vii)      Other documentation that supports the narrative of sources, for example, factory manuals that may prove that the said factory is technically incapable of producing weapons of the type it is alleged to have produced;

(viii)      In rare instances where the Panel has doubt as to the veracity of available facts from other sources, local sources are relied on to collect specific and verifiable information from the ground. (For example, if the Panel wished to confirm the presence of an armed group in a particular area);

(ix)      Statements issued by or on behalf of a party to the conflict responsible for the incident; and/or

(x)      Open source information to identify other collaborative or contradictory information regarding the Panel's findings.

(c)      In carrying out its investigations on deprivation of liberty and associated violations the Panel relies on the following sources of information:

(i)      The victims, where they are able and willing to speak to the Panel, and where medical and security conditions are conducive to such an interview;

(ii)      The relatives of victims and others who had access to the victims while in custody. This is particularly relevant in instances where the victim dies in custody;

(iii)      Interviews with at least one individual or organization (either local or international) that has also independently investigated the incident;

(iv)      Medical documentation and, where applicable, death certificates;

(v)      Documentation issued by prison authorities;

(vi)      Interviews with medical personnel who treated the victim, wherever possible;

(vii)      Investigation and other documentation from local and international organizations that have independently investigated the incident. The Panel may also seek access to court documents if the detainee is on trial or other documentation that proves or disproves the narrative of the victim;

(viii)      Where relevant, the Panel uses local sources to collect specific and verifiable information from the ground, for example, medical certificates;

(ix)      Statements issued by the party to the conflict responsible for the incident; and/or

(xx)      Open source information to identify other collaborative or contradictory information regarding the Panel's findings.

(d)      In carrying out its investigations on other violations, including forced displacement and threats against medical workers, the Panel relies on information that includes:

(i)      Interviews with victims, eyewitnesses, and direct reports where they are able and willing to speak to the Panel, and where conditions are conducive to such an interview;

(ii)      Interviews with at least one individual or organization (either local or international) that has also independently investigated the incident;

(iii)      Documentation relevant to verify information obtained;

(iv)      Statements issued by the party to the conflict responsible for the incident; and/or

(v)      Open source information to identify other collaborative or contradictory information regarding the Panel's findings.

(e)      The standard of proof is met when the Panel has reasonable grounds to believe that the incidents had occurred as described and, based on multiple corroboratory sources, that the responsibility for the incident lies with the identified perpetrator. The standard of proof is "beyond a reasonable doubt".

(f)      Upon completion of its investigation, wherever possible, the Panel provides those responsible with an opportunity to respond to the Panel's findings in so far as it relates to the attribution of responsibility. This is undertaken in accordance with the Panel's standard methodology on the opportunity to reply. Generally, the Panel would provide detailed information in any opportunity to respond, including geo-locations. However, detailed information on incidents are not provided when there is a credible threat that it would threaten Panel sources, for example, in violations related to deprivation of liberty, violations associated with ground strikes on a civilian home, or in violations associated with children.

(g)      If a party does not provide the Panel with the information requested, the Panel will consider whether this is of sufficient gravity to be considered as non-compliance with paragraph 8 of resolution 2342 (2017), and thus consideration for reporting to the Committee.

3.      The Panel will not include information in its reports that may identify or endanger its sources. Where it is necessary to bring such information to the attention of the Council or the Committee, the Panel may include more source information in confidential annexes.

4.      The Panel will not divulge any information that may lead to the identification of victims, witnesses, and other particularly vulnerable Panel sources, except: 1) with the specific permission of the sources; and 2) where the Panel is, based on its own assessment, certain that these individuals would not suffer any danger as a result. The Panel stands ready to provide the Council or the Committee, on request, with any additional imagery and documentation to supports the Panel's findings beyond that included in its report. Appropriate precautions will be taken though to protect the anonymity of its sources.

**Annex 2:      UN Geographic Information Systems (GIS) map (place name identification)**

Figure 2.1
**UN GIS place names Yemen**



## Annex 3: Summary of Panel correspondence (2017)

Table 3.1
**Correspondence with Member States [1]**

| Member State | Number of letters sent by the Panel | Number of unanswered letters by Member State | Remarks |
|---|---|---|---|
| Australia | 3 | 3 | |
| Bulgaria | 1 | | |
| Canada | 1 | | |
| China | 7 | | |
| Djibouti | 2 | | |
| Egypt | 2 | | |
| Finland | 1 | | |
| France | 4 | 4 | |
| Germany | 3 | | |
| India | 3 | | |
| Islamic Republic of Iran | 9 | 5 | |
| Italy | 4 | | |
| Japan | 1 | | |
| Marshall Islands | 1 | 1 | |
| Netherlands | 1 | | |
| Oman | 5 | 1 | |
| Philippines | 1 | | |
| Republic of Korea | 2 | | |
| Russian Federation | 5 | 3 | |
| Kingdom of Saudi Arabia | 30 | 7 | |
| Serbia | 2 | 2 | |
| Singapore | 3 | | |
| Slovakia | 1 | | |
| Sweden | 1 | | |
| Switzerland | 9 | | |
| Togo | 1 | | |
| Turkey | 2 | | |
| Ukraine | 2 | | |
| United Arab Emirates | 22 | 4 | |
| United Kingdom of Great Britain and Northern Ireland | 4 | 2 | |
| United States of America | 10 | | |
| Yemen | 26 | 11 | . |
| **Total** | **169** | **43** | 25% unanswered |

[1] This includes letters received by the Panel in Arabic on 2 January 2018, which had been outstanding for some months. This has not allowed the Panel time to fully analyze and verify all the information provided; hence some of it has not been included in the annexes to this report. The information will be used in ongoing investigations and reported on accordingly at the appropriate time.

Table 3.2
**Correspondence with Sana'a based authorities**

| Entity | Number of letters sent by the Panel | Number of unanswered letters by entity | Remarks |
|---|---|---|---|
| Sana'a based ministry of foreign affairs | 3 | 2 | |
| **Total** | **3** | **2** | |

Table 3.3
**Correspondence with offices**

| Office | Number of letters sent by the Panel | Number of unanswered letters by entity | Remarks |
|---|---|---|---|
| Taipei Economic and Cultural Office in New York | 3 | | |
| **Total** | **3** | **0** | |

Table 3.4
**Correspondence with international and regional organizations**

| Organization | Number of letters sent by the Panel | Number of unanswered letters by entity | Remarks |
|---|---|---|---|
| Combined Maritime Force | 6 | 6 | |
| IFC (World Bank Group) | 1 | | |
| **Total** | **7** | **6** | |

Table 3.5
**Correspondence with commercial companies**

| Company | Number of letters sent by the Panel | Number of unanswered letters by entity | Remarks |
|---|---|---|---|
| Aerovironment (USA) | 1 | 1 | Holding email only |
| Daewoo (Republic of Korea) | 1 | 1 | |
| Dileton Maritime (Greece) | 1 | | |
| Garmin (USA) | 2 | 1 | |
| MSA Incorporated (USA) | 1 | | |
| PayPal (USA) | 1 | 1 | |
| Phillips (Netherlands) | 1 | 1 | |
| Prime Tanker Management (Greece) | 1 | | |
| Winterbotham (Bahamas) | 1 | 1 | |
| **Total** | **10** | **6** | |

Table 3.6
**Correspondence with Individuals**

| Individual | Number of letters sent by the Panel | Number of unanswered letters by entity | Remarks |
|---|---|---|---|
| Ahmed Ali Abdullah Saleh (Yei.005) | 1 | | |
| **Total** | **1** | | |

S/2018/68

## Annex 4:      Governors loyal to the legitimate Government

Table 4.1
**Governors loyal to the legitimate Government**

| Ser | Name | Governorate / municipality | Remarks / Appointed |
|---|---|---|---|
| 1 | *(Abd al-Aziz al-Maflakhi,[1] resigned 16 November 2017)* | Aden | Resigned November 2017 |
| 2 | Major General Abu Bakr Hussayn Salem | Abyan | Previous Axis Commander in Abyan<br>Resigned 22 |
| 3 | Major General Abd al-Ghani Hafed'llah Jamil | Amanat Al Asimah | Minister of State |
| 4 | Abd al-Rahman Khazm al-Sa'wr | Amran | July 2017 |
| 5 | Saleh Ahmed Ali al-Rasas<br>*(Replaced Nayef Salih Salem al-Qaysi (QDi.402) on 23 July 2017)* | Bayda' | |
| 6 | Major General Ali Muqbil Saleh[2]<br>*(Replaced Dr Fadhi al-Ja'di)* | Dali' | 24 December 2017 |
| 7 | Major General Ali al-Qawsi | Dhamar | |
| 8 | Brigadier General Faraj Salami al-Bahasani | Hadramawt | Commander, 2nd Military District. June 2017 |
| 9 | Major General Abd al-Karim al-Sanini | Hajjah | |
| 10 | Dr. al-Hasan Ali Taher | Hudaydah | |
| 11 | Major General Abd al-Wahab al-Wai'li | Ibb | |
| 12 | Amin al-'Akimi | Jawf | |
| 13 | Brigadier General Ahmed Abdullah al-Turky[3]<br>*(Replaced Dr Naser al-Khubaji)* | Lahij | 24 December 2017 |
| 14 | Rajah Said Ba'Krait<br>*(Replaced Mohammed Abdallah Kudah)* | Mahrah | 28 November 2017 |
| 15 | Salah Sami'ah | Mahwit | |
| 16 | Major General Sultan Ali Mabkhout al-Aradha | Ma'rib | |
| 17 | Mohammed al-Hawri | Raymah | |
| 18 | Hadi Tarshan Abdullah Tarshan | Sa'dah | |

---

[1] President Hadi issued a statement refusing to accept his resignation. Governor Maflakhi remains outside Yemen. See http://www.worldbulletin.net/headlines/196024/yemeni-president-rejects-aden-governors-resignation.
[2] Major General Saleh also remains commander of the 33rd Armored Brigade in Dali'.
[3] Brigadier General Ahmed Abdullah al-Turky also remains commander of the 17th Infantry Brigade.

**S/2018/68**

| Ser | Name | Governorate / municipality | Remarks / Appointed |
|---|---|---|---|
| 19 | Major General Abd al-Qawi Ahmed 'Ubad al-Sharif | Sana'a | |
| 20 | Ali Bin Rashid al-Harthi | Shabwah | June 2017 |
| 21 | Ahmed Abdullah Ali al-Soqotri | Socotra | June 2017 |
| 22 | Ameen Ahmed Mahmoud *(Replaces Ali al-Mamari)*[4] | Ta'izz | 24 December 2017 |

---

[4] Resigned in late September 2017 over unpaid salaries in his governorate, he rescinded his resignation, and remained in office until replaced. http://en.nthnews.net/2017/09/28/taiz-governor-appointed-by-hadi-announced-his-resignation-because-of-disagreement-over-salaries/.

18-00267

## Annex 5: Network of Nayef Salih Salem al-Qaysi[1]

Table 5.1
**Network of Nayef Salih Salem al-Qaysi**[2]

| Ser | Name | Position | Location |
|-----|------|----------|----------|
| 1 | Abdo Rabbo al-Qaysi | Office manager | Aden |
| 2 | Ahmed Saleh al-Aysi | | |
| 3 | Jalal Muqatah | | Aden |
| 4 | Mohammed Saleh al-Ghunaimy | Local resistance leader | Diy Na'am Front |
| 5 | Mohammed Abd al-Qawi Musa al-Homaiqani | Ta'izz front liaison | |

[1] https://www.treasury.gov/press-center/press-releases/Pages/jl0462.aspx.
[2] https://www.treasury.gov/press-center/press-releases/Pages/jl0462.aspx.

## Annex 6: Leadership and structure of provincial security and Security Belt forces[1]

Table 6.1
**Leadership and structure of provincial security and Security Belt forces**

| Serial | Name | Position | Location | Remarks |
|---|---|---|---|---|
| 1 | Colonel Khader al-Nub[2] | Director of General Security | Abyan | |
| 2 | Colonel Abd al-Latif al-Sayed[3] | Commander Security Belt Forces | Abyan | |
| 3 | Lieutenant Colonel Mohammed al-Oban | Deputy Commander Security Belt Forces | Abyan | |
| 5 | Major General Shallal Ali Shaye | Director of General Security | Aden | |
| 6 | Brigadier General Wadha Omar Abdulaziz[4] | Commander Security Belt and 3rd Support Brigade | Aden | |
| 7 | Brigadier General Munir Mahmoud Ahmed al-Mashali[5] | Commander 1st Support Brigade[6] Emergency Forces | Abyan/Aden | |
| 8 | Colonel Nabil al-Mashwashi | Commander 2nd Support Brigade | Aden | |
| 9 | Colonel Hader al-Shukhaty | Commander 4th Support Brigade | Lahij | |
| 10 | Colonel Mukhtar al-Nubi | Commander 5th Support Brigade | Radfan/Lahij | |

---

[1] Note. Directors of General Security fall under the umbrella of the Ministry of Interior. Security Belt Forces are now organized under each General Security Directorate, as per confidential security officials.

[2] Appointed 14 November 2017, replacing Brigadier General Abdullah al-Fadhli.

[3] Former head of Abyan popular Committees In south Yemen, a militia leader is president's top ally. The Daily Mail, 24 March 2015. http://www.dailymail.co.uk/wires/ap/article-3009836/In-south-Yemen-militia-leader-presidents-ally.html.

[4] Replaced Nasser al-Shukhaty.

[5] Also known as Abu al-Yamama al-Yafa'i.

[6] Security Belt Forces component since 17 February 2017.

## Annex 7: Southern Transitional Council (STC) local office directors[1]

Table 7.1
**Southern Transitional Council local office directors**

| Ser | Name | Position | Office Location |
|-----|------|----------|-----------------|
| 1 | Aydarous Muhammed Saleh Haqis | Head of Office | Abyan |
| 2 | Dr. Abd al-Nasser Ahmed Ali al-Waly | Head of Office | Aden |
| 3 | Abdullah Mahdi Saeed Ahmed | Head of Office | Dali' |
| 4 | Nassib bin Ahmed bin Nassib al-'Omry | Head of Office | Hadramawt |
| 5 | Faysal Ahmed Hamash Saleh | Head of Office | Lahij |
| 6 | Salem Ali Saeed al-Qamiry | Head of Office | Mahrah |
| 7 | Ali Muhsin Rawis al-Suleimany | Head of Office | Shabwah |
| 8 | Nazim Mubarak Ali bin Qablan | Head of Office | Soqotra |

---

[1] The names were announced on 30 November 2017, see http://adengad.net/news/290304/.

## Annex 8: Houthi Governors

Table 8.1
**Houthi appointed governors**[1]

| Ser | Name | Governorate / municipality | Remarks |
|---|---|---|---|
| 1 | | Aden | |
| 2 | | Abyan | |
| 3 | | Amanat Al Asimah | |
| 4 | Faysal Ja'man | Amran | |
| 5 | | Bayda' | |
| 6 | | Dali' | |
| 7 | Fadhil al-Sharqi | Dhamar | |
| 8 | | Hadramawt | |
| 9 | Nayef Abu Kharfashah | Hajjah | |
| 10 | Abd al-Khaliq Badr al-Din al-Houthi | Hudaydah | |
| 11 | Abd al-Wahid Saleh | Ibb | |
| 12 | Sam al-Malahi | Jawf | |
| 13 | | Lahij | |
| 14 | | Mahrah | |
| 15 | | Mahwit | |
| 16 | | Ma'rib | |
| 17 | Murad al-Sharef | Raymah | |
| 18 | | Sa'dah | |
| 19 | Ahmed Qatinah | Sana'a | |
| 20 | | Shabwah | |
| 21 | | Socotra | |
| 22 | Mansour al-Lakoumi | Ta'izz | |

---

[1] The table includes all governorates of Aden to illustrate those to which the Houthis' have appointed governors.

## Annex 9:        The killing of Khaled Ahmed al-Radhi

## I.        Introduction

1.        The Panel is investigating whether the killing of Khalid Ahmed al-Radhi by the Houthis, on 26 August 2017[1] was a targeted killing, part of a larger strategy or as a consequence of confusion. Khaled Ahmed al-Radhi served as a deputy of the GPC foreign policy committee, was a Colonel in the Armed Forces and the owner of Vulcan Group, the most important supplier of material for the Yemeni Ministry of Defence during Ali Abdullah Saleh (YEi.003)'s presidency.[2]

2.        Khaled al-Radhi's family extends from tribal elements in Amran, namely the Al Kharef tribe of the Hashid Confederation, which was led by Bayt al-Ahmar until 2014 when Houthis took over Amran governorate.[3] His family, of Zaydi background, included various pro-Houthi members as well as officials within the GPC and pro-Saleh armed forces. His cousin, Ambassador Abdullah Ali al-Radhi, a former Yemeni envoy to Tehran[4] and London[5] during Ali Abdullah Saleh (YEi.003)'s presidency, is well known for his links to the regime in Tehran. The family's status survived the six wars between Ali Abdullah Saleh (YEi.003)'s's regime and Houthis,[6] and the 2011 uprising.

## II.        Tensions within the Houthi-Saleh alliance

3.        As result of distrust, miscalculation and obstructed lines of communication between former president Ali Abdullah Saleh (YEi.003) and the Houthi leadership, pre-existing tensions within the alliance of necessity deepened in 2017. A speech by Abdulmalik al-Houthi (YEi.004) on 19 August 2017[7] brought to light the level of looming tension. Abdulmalik al-Houthi (YEi.004) referred to rising threats by a 'Fifth Column', used by his supporters to accuse GPC elements protesting unpaid salaries. The speech served to pave the ground for much graver accusations of treason against Ali Abdullah Saleh (YEi.003) and his party.[8]

4.        Ali Abdullah Saleh (YEi.003) responded on 20 August[9] 2017 with a speech of his own, setting the stage for the rally in Sana'a on 24 August 2017 to commemorate the 35th anniversary of the establishment of the GPC.[10] By this time the Houthis had begun to mobilise militia elements around the capital limits,[11] calling the deployment a security operation, which was not meant to intimidate the GPC. By Saturday 26 August 2016, the Houthis had established a number of checkpoints around Sana'a, some coincidently, very near residential sites of Ali Abdullah Saleh (YEi.003)'s family and party members.

## III.        The killing of Khaled Ahmed al-Radhi

5.        Check points not only emerged in order to constrain the movement of Ali Abdullah Saleh (YEi.003) and his loyalists, but as was the case on Saturday 26 August 2017, they aimed to instigate confrontations. Such was the case when Salah Ali Abdullah Saleh and his armed escort were stopped at a check point in the Hadda District, leading to an altercation and clashes when Salah refused to exit his

---

[1] https://www.thenational.ae/world/mena/pro-saleh-colonel-killed-in-fighting-with-houthi-allies-in-sanaa-1.623118.
[2] http://vulcanyemen.com/. The Panel has evidence indicating his involvement in previous contracts.
[3] Houthi militia took control of Shaykh Abdullah bin Hussein al-Ahmar's (d. Dec. 2007) complex in al-Khamr, Amran and demolished all residential quarters on 2 February 2014. See https://yemen-press.com/news26876.html.
[4]https://worldpeace365.wordpress.com/2017/11/08/iran-in-yemen-tehrans-shadow-looms-large-but-footprint-is-small/; https://wikileaks.org/plusd/cables/09SANAA149_a.html ;https://wikileaks.org/plusd/cables/09SANAA1662_a.html .
[5] https://www.reuters.com/article/us-yemen-saleh/yemens-saleh-stable-recovering-ambassador-idUSTRE75A1HH20110611.
[6] https://www.rand.org/content/dam/rand/pubs/monographs/2010/RAND_MG962.pdf.
[7] http://www.aljadeedpress.net/archives/24938.

[8] https://www.thenational.ae/world/houthi-rebels-may-soon-oust-saleh-yemen-vice-president-says-1.628087.
[9] https://www.youtube.com/watch?v=QZHPiVj3ts4andfeature=youtu.be.

[10] http://www.aljazeera.com/news/2017/08/yemen-saleh-stages-mass-rally-houthi-rift-170824183626444.html.
[11] https://www.youtube.com/watch?v=SArtbJ_AuA0andfeature=youtu.be.

vehicle, and his armed escorts scuffled with Houthi elements. Khaled Ahmed al-Radhi responded by deploying armed tribal elements, in attempts to de-escalate the confrontation and mediate Salah's right of way. The Houthis shot Al-Radhi dead upon exiting his own vehicle.

6.      The immediate response to al-Radhi's killing was the suggestion it was a targeted assassination, as one shot to the head was identified as cause of death, with a second would in the torso area.  Houthi gunmen were identified as the culprits, and a sniper shot to the head was confirmed to the Panel.

7.      A targeted assassination was generally quickly dismissed as Houthi elements would require an order for such a thing. Furthermore, SRC president Mohammed Ali al-Houthi and SPC president Saleh al-Samad visited al-Radhi's family home on 29 August 2017 to clear all doubt. There are no confirmed reports on the traditional tribal customs arranged to repair relations between the family and Houthis. The Panel maintains the killing of Khaled al-Radhi was an accidental consequence of confusion at a time of heightened tensions.

S/2018/68

**CONFIDENTIAL ANNEX NOT FOR PUBLIC DISSEMINATION**

**Annex 10:      Ali Abdullah Saleh (YEi.003) sons**

S/2018/68

**CONFIDENTIAL ANNEX NOT FOR PUBLIC DISSEMINATION**

**Annex 11:**     **Ali Abdullah Saleh (YEi.003) nephews**

S/2018/68

**CONFIDENTIAL ANNEX NOT FOR PUBLIC DISSEMINATION**

**Annex 12:      Ali Abdullah Saleh (YEi.003) daughters**

## Annex 13:   GPC members killed or detained by the Houthi (December 2017)

Table 13.1
**Officials of the General People's Congress (GPC) Party[1]**

| Ser | Name | Title | Status |
|---|---|---|---|
| **1** | **Ali Abdullah Saleh (YEi.003)** | **President, GPC** | **Deceased (4 December 2017)** |
| 2 | Sadeq Amin Abu Ras | Vice President, GPC | |
| **3** | **Aref Awadh al-Zuqa** | **Secretary General** | **Deceased** |
| 4 | Yasser Ahmed al-Awadhi | Assistant Secretary General, Regulatory Affairs | In Sana'a |
| 5 | Dr. Abu Bakr al-Qirbi | Assistant Secretary General, Cultural and Information Affairs | Outside Yemen |
| 6 | Fayqa al-Saeed | Assistant Secretary General, Civil Society Organizations | In Sana'a |
| 7 | Yahya al-Ra'i | Assistant Secretary General/ Speaker of Parliament | In Sana'a |

---

[1] The Panel has been unable to confirm if Sana'a based GPC members are under detention.

**CONFIDENTIAL ANNEX NOT FOR PUBLIC DISSEMINATION**

**Annex 14:      Ali Abdullah Saleh (YEi.003) wives**

S/2018/68

## Annex 15:    Mahrah Governorate Officials

Table 15.1
**Mahrah Governorate Officials**

|   | Name | Position | Location of Origin | Remarks |
|---|------|----------|--------------------|---------|
| 1 | Rajah Saeed Ba'Krait[1] | Governor | Hawf | |
| 2 | Salim Mohammed al-Aboodi | Assistant Governor | | |
| 3 | Ahmed "Qahtan" Muhawi al-Mujibi | Chief of Security | | |
| 4 | Mughareb bin Burqtaimi | Nishtun Port Director | Kudah | Serves as tribal affairs advisor |
| 5 | Ali Salem al-Kharizy | Assistant Governor for Desert Region | Miz'yunah | |
| 6 | Abdullah Issa bin Afrar | Sultan | | STC member |

---

[1] Was appointed on 18 November 2017 by President Hadi, replacing Mohammed Abdullah Kudah.

18-00267

**Annex 16:     AQAP affiliates in Mahrah - 2017**

Table 16.1
**AQAP affiliates in Mahrah - 2017**

| Ser | Name | Title | Location of Origin | Remarks |
|-----|------|-------|--------------------|---------|
| 1 | Mohammed Salem Bir al-Sa'b | AQAP affiliate | Bayt Sumud tribe | |
| 2 | Abu Bakr Mohammed al-Jaylani | AQAP affiliate | Hawf | |
| 3 | Rashid Ali al-Sulimy | AQAP affiliate | Hawf | |
| 4 | Hisham al-Hamad | AQAP affiliate | Hawf | |
| 5 | Aydha bin Dhuwama | AQAP affiliate | Subaiha | |
| 6 | Mohammed Arman | AQAP affiliate | Bayt Sumud Tribe /Herma region | |
| 7 | Khudress Arman | AQAP affiliate | Bayt Sumud Tribe /Herma region | Brother to Mohammed Arman |

S/2018/68

## Annex 17:     Conflict Map of Bayda'[1]



Map No. 4582 UNITED NATIONS December 2017
Data and location source: Panel of Experts for Yemen, United Nations Security Council Sanctions Committee

Department of Field Support
Geospatial Information Section (formerly Cartographic Section)

---

[1] Developed by the Panel.

18-00267

**Annex 18:     Network of Abd al-Wahhab al-Humayqani**

Table 18.1
**Network of Abd al-Wahhab al-Humayqani**

| Ser | Name | Position | Location of Origin | Remarks |
|-----|------|----------|--------------------|---------|
| 1 | Abdo Rabbo Hussein al-Wuhayshi | Senior aide to Abd al-Wahhab al-Homaiqani | Bayt Sumud tribe | |
| 2 | Ali Mohammed Taher al-Homaiqani | Bayda' Resistance | Hawf | |
| 3 | Mohammed Ali Mohammed Taher al-Homaiqani | Financial Officer | Hawf | |
| 4 | Hisham al-Hamad | | Hawf | |
| 5 | Hussein Ali Mohammed Taher al-Homaiqani | | Subaiha | |
| 6 | Suleiman Mohammed Abd al-Rahman al-Homaiqani | | Bayt Sumud tribe / Herma region | |
| 7 | Abd al-Rahman Abdullah Mohammed al-Homaiqani | | Bayt Sumud Tribe / Herma region | Brother to Mohammed Arman |

## Annex 19:     Associates of Abu al-Abbas

Table 19.1
**AQAP associates of Abu al-Abbas**

| Ser | Name | Position | Location | Remarks |
|-----|------|----------|----------|---------|
| 1 | Ali al-Hassan | Salik brigade | Saber mountain | Related to Abd al-Malik al-Hudaby (also AQAP) |
| 2 | Majid Mahyub (a.k.a Majid Aby Ayhum) | Salik brigade | Saber mountain | Lieutenant to Abu al-Abbas |
| 3 | Azzam al-Farhan | Jund al-Khalifa brigade | | Lieutenant to Abu al-Abbas (ISIS associated)[1] |

Table 19.2
**Subordinates of Abu al-Abbas**

| Ser | Name | Position | Location | Remarks |
|-----|------|----------|----------|---------|
| 1 | Ammar al-Jendaby (a.k.a Umar al-Jandabi) | Deputy | Houd al-Sharaf and al-Shaab school | |
| 2 | Adnan Rozaiq al-Qamishy | Hassan brigade | al-Saeed library | Also a Damaj student |
| 3 | Maran Ghalib | Commander | Musy Gate | |
| 4 | Nathan Kuwati | | | Nephew of Maran Galib (serial 3). |

Table 19.3
**Political and civilian associates of Abu al-Abbas**

| Ser | Name | Position | Location | Remarks |
|-----|------|----------|----------|---------|
| 1 | Abdu Hamoud al-Sagheer | Teacher | | Allied to al-Islah through Sheikh Hamoud Saeed Makhalfi (Islah) |
| 2 | Harith Lutf al-Aizy | Prison escapee / ex judge in AQAP courts | Suq al-Samil, Houd al Sharaf area | |

---

[1] Formerly worked under Abu Malik al-Musabi, who was killed in action in the Tha'bat area in June 2016.

S/2018/68

**Annex 20:      Yemeni Government Military Districts and Commanders**

Table 20.1
**Yemeni Government Military Districts and Commanders**

| Military District | Area | Name |
|---|---|---|
| 1 | Sayyun | Major General Saleh Muhammad Tamis[1] |
| 2 | Mukalla | Major General Faraj Salamin al-Bahasani[2] |
| 3 | Ma'rib | Major General Ahmed Hasan Jibran[3] |
| 4 | Aden | Major General Fadhl Hasan |
| 5 | Hudaydah | Major General Amr Sajaf[4] |
| 6 | Amran / Sa'dah | Major General Amin al-Wa'ili[5] |
| 7 | Dhamar / Sana'a | Major General Nasser al-Dhaybani[6] |

---

[1] On 20 June 2017, Tamis was lightly wounded while attempting to mediate a tribal dispute in Hadramawt.
[2] On 29 June 2017, President Hadi named al-Bahasani Governor of Hadramawt to replace Ahmed bin Brik, who was fired for joining the STC.
[3] Appointed on 21 January 2017.
[4] Appointed on 23 February 2017. Sudanese troops are active in district 5 under the command of Brigadier General Hafiz Taj Maki.
[5] When Major General al-Wa'ili is out of the district, the acting commander is Major General Mansur bin Thawabah.
[6] Appointed 22 August 2017.

## Annex 21:     Presidential Protection Brigade Commanders

Table 21.1
**Presidential Protection Brigade Commanders**

| Ser | Name | Brigade | Rank |
|-----|------|---------|------|
| 1 | Sind al-Rahwah | 1st | Brigadier General |
| 2 | Abd al-Raqib Dabwan | 2nd | Brigadier General |
| 3 | Ibrahim Haydan al-Sayari | 3rd | Brigadier General |
| 4 | Mahran al-Qubati | 4th | Brigadier General[1] |
| 5 | Adnan al-Rozaiq | 5th | Brigadier General[2] |

---

[1] Brigadier General Mihran bin Muhammad bin Sayyid al-Qubati was born in 1983 in the Khor Maksar district of Aden. He is also known by the *kunya* Abu Jaf'ar and is loyal to President Hadi
[2] Brigade formed by presidential decree on 17 November 2017.

## Annex 22:    Camp 20 case study

## I.    Introduction

1.      Camp 20[1] was named after the police uprising of 20 June 1967 (Black Tuesday) against British authorities.[2] It was established under the former People Democratic Republic of Yemen (PDRY). The camp was maintained under the Central Security Forces since unification until July 2015.

2.      The Panel continues to investigate a number of arbitrary detentions by Government security forces and armed groups operating throughout the liberated governorates of Yemen. A number of incidents in Aden this year led to investigations of Camp 20 in the Crater District of Aden governorate.[3] Ordered closed on 28 October 2017 by President Abdo Rabbo Mansour Hadi,[4] Camp 20 was under the command of Imam Ahmed Muhammed Abdu al-Salwy,[5] who resigned on 31 October 2017.

3.      The case of Amjad Mohammed Abd al-Rahman, assassinated on 14 May 2017, is at the centre of the investigation. His assassination and detention related abuses remain unsolved and without proper judicial investigation by local authorities.

## II.    Background

4.      Imam Ahmed Muhammed Abdu al-Salwy, a.k.a Imam al-Nubi, is originally from the Crater district of Aden governorate. He is regarded as a local preacher and youth leader within the al-Islah Party.[6] It is reported that Imam al-Nubi joined the al-Islah party in 2007, leading a group of party loyalists in 2011 when conflict erupted between Southern Secessionists (Hirak) and al-Islah during the youth uprising against Ali Abdullah Saleh (YEi.003).

5.      Al-Nubi later led a group of armed elements against Houthi-Saleh forces in Tawilah neighbourhood of Crater district from March to July 2015. Al-Nubi is said to have taken control of Camp 20 in August following the liberation of Aden from Houthi-Saleh forces.

6.      Imam al-Nubi's ascent through the ranks of the Southern Resistance, and his integration into the Security Belt Forces, was facilitated by the position held by his half-brother Mukhtar al-Nubi.[7] Mukhtar was appointed commander of the 5th Support Brigade[8] on 23 November 2016 after leading Security Belt Forces in the Radfan district of Lahj governorate.[9] Mukhtar is a well-respected leader within Hirak. Reports indicate that Imam al-Nubi was instrumental in arming Mukhtar and his forces in 2015 from his arsenal in Crater.

---

[1] Today across from Aban Mosque in Crater, Aden.
[2] https://www.nam.ac.uk/explore/aden-emergency-1963-67; and
http://hansard.millbanksystems.com/lords/1967/jun/21/south-arabia-mutiny-by-federal-forces.
[3] Camp 20 fell under the Ministry of Interior, previously occupied by Central Security Forces until liberation of Aden in July 2015.
[4] http://www.aden-tm.net/NDetails.aspx?contid=35227.
[5] Imam al-Nubi did not hold any military rank, as Camp 20 remained under the Ministry of Interior until ordered closed by president Hadi. He was regarded as a 'civilian leader' of the camp. Although Imam al-Nubi dressed in military uniform, no insignias or ranks were ever displayed; http://adengd.net/news/285234/. Imam is his given name, not his title.
[6] al-Tajammu al-Yamani lil-Islah (Yemeni Congregation for Reform).
[7] a.k.a. Mukhtar Ahmed Abdu al-Nubi; Mukhtar Ali al-Nubi; Mukhtar Ali Muthni Saleh al-Nubi; and Mukhtar Ahmed Abdu al-Nubi.
[8] http://almandeb.news/?p=74113.
[9] http://adengd.net/news/212587/.

S/2018/68

## III.   Amjad's case[10]

7.      Elements belonging to the forces in Camp 20 have been accused of engaging in a harassment campaign against those political activists and individuals perceived as supporting 'secularist agendas' in Aden. [11] Among those targeted was Amjad Mohammed Abd al-Rahman.[12]

8.      Amjad was a fourth-year student at Aden university, in his early 20s, and has being engaged in political activism since 2011. In February 2015, he co-founded the al-Nadi al-Nasiyya Cultural Organization with a group of like-minded youths. His activism focused on promoting political ideas that conflicted with those of local religious leaders. On 24 January 2017, he published a post on his Facebook page discussing sermons from the al-Hamad mosque in Crater District. That same day he was forcefully removed from near his home by armed men and detained in Camp 20. He was released 24 hours later, deprived of sleep and telling his family he had been tortured.

9.      Amjad told the story of his detention in a dark room inside the Camp 20 facilities. Amjad indicated he was repeatedly questioned about his views on God, upsetting his interrogators by answering 'I am my own god', meaning he was self-taught and not a student of any particular religious shaykh. Interrogators are believed to have misinterpreted this and used it as evidence of him being an atheist.

10.      At 11:45 hours on 14 May 2017 Amjad was assassinated at the Café Max (an internet shop) on Kuwait Street in Shaykh Othman district. One masked man shot Amjad four times in the face. Witnesses were unable to provide sufficient information about the shooter. The media attributed responsibility to elements from Camp 20.[13]

11.      Individuals familiar with Amjad's case point to threats received via WhatsApp text messages from one 'Khaled Sa'yl' and others from inside Yemen and outside, and public warnings via media outlets against his activism.

## IV.   Other incidents

12.      As a result of the allegations against Amjad, such as him being atheist, his family was unable to hold his funeral services in the area of Crater.[14] He had to be buried in al-Shab district instead. A number of close acquaintances were also harassed by elements from Camp 20 immediately following his death.

13.      Among those also harassed by elements from Camp 20 were journalists Hani al-Junaid, Hussam Radman of Dubai TV, Majid al-Shuabi of Abu Dhabi TV, Ismail Salim of Shaqdafah TV (detained/tortured) and Khaled Senami.[15]

## V.   Remaining concerns

14.      Although Camp 20 has been ordered closed by President Hadi,[16] and Imam al-Nubi has resigned from his command, it is unclear as where he and his troops have been reassigned. The Panel continues to monitor individuals who exerted influence over Imam al-Nubi and his troops from outside the Camp and government institutions.

---

[10] Information provided with informed consent from the family.

[11] https://english.alarabiya.net/en/features/2017/04/04/Yemeni-student-in-Aden-gets-detained-tortured-with-electric-wires.html. The Panel has verified another case where elements associated with Camp 20 were reportedly behind another case of arbitrary arrest and detention because of the detainee being an atheist. In this case, harassments and death threats resulted in the individual having to flee Aden.

[12] https://womenpress.org/en/womenpress-news/journalists-released-after-being-tortured-and-charged-with-atheism-in-aden.html.

[13] https://www.hunaaden.com/news39780.html.

[14] https://www.middleeastmonitor.com/20170722-yemens-al-hirak-movement/.

[15] https://twitter.com/demolinari/status/917971227825844224.

[16] https://presidenthadi-gov-ye.info/archives/سقيم-ةيروم-ةلجم-جوي-ريهيم-.نمأ-ندع-فقوبأ/.

**Annex 23:      Shabwani Elite Forces command structure**

Table 23.1
**Shabwani Elite Forces command structure**

| Ser | Name | Unit | Rank |
|-----|------|------|------|
| 1 | Muhammad al-Buhar al-Qumayshi | Shabwani Elite Forces | Lieutenant Colonel |
| 2 | Mahdi Mohammed Barahma | Shabwah Rapid Intervention Forces | Major |
| 3 | Muhammed Saleh Farah al-Kirby | Harad Base (Shabwah) | General |
| 4 | Muhammed Saleh al-Qakhly al-Nasy | Training Facilities (Shabwah) | Colonel |

## Annex 24:     Key Houthi military and security figures

Figure 24.1
**Prominent Houthi military commanders**

| Ser | Name | Role | Rank/Remarks |
|-----|------|------|--------------|
| 1 | Muhammad Abd al-Karim al-Ghamari | head of general staff | major general |
| 2 | Ali Hamud al-Mushki | deputy head general staff | major general |
| 3 | Muhammad Fadhl | head of the navy and coastal defence | major general |
| 4 | Abdullah Yahya al-Hakim | head of intelligence | major general (YEi.002) known as Abu Ali al-Hakim[1] |
| 5 | Muhammad Nasser al-Ata'fi | minister of defence | major general |
| 6 | Ali al-Kuhlani | head of military logistics and support | major general |
| 7 | Husayn al-Ruhani | head of special operations | major general |
| 8 | Muhammad al-Miqdad | head of military operations | major general |
| 9 | Ibrahim al-Shami | head of the air force | major general |

---

[1] Abdullah Yahya al-Hakim was previously the military commander of district 4 for the Houthis. He was appointed to his new position on 20 August 2017.

18-00267

S/2018/68

**Annex 25:     Key Houthi political figures**

Table 25.1
**Key Houthi political figures**

| Serial | Name | Title | Organization | Remarks |
|---|---|---|---|---|
| 1 | Mohammed Ali al-Houthi | president | supreme revolutionary committee | Military wing |
| 2 | Abdullah Yahya 'Abu Ali' al-Hakim (YEi.002) | chief of military intelligence / commander of republican guard (Dec 2017) | ministry of defence | Military wing |
| 3 | Mutlaq 'Abu Emad' Amer al-Marani | deputy director | national security bureau ('NSB') | Military wing |
| 4 | Abdul Karim al-Houthi | chairman | executive committee | Affiliated with Military wing |
| 5 | 'Mohammed' Abd al-Salam Salah Filaitah | spokesman | politburo | Affiliated with Military wing |
| 6 | Saleh al-Samad | president | supreme political council | Political wing |
| 7 | Mahdi al-Mashat | chief of staff | sayyid abdulmalik badr al-din al-houthi | Political wing |
| 8 | Ali al-Emad | chairman | revolutionary monitoring committee/ politburo | Political wing |
| 9 | Hamza al-Houthi | | foreign affairs committee | Political wing |
| 10 | Hussein al-'Izzi | | foreign affairs committee | Political wing |

S/2018/68

## Annex 26:      Saudi Arabia published Houthi "Most Wanted" list[1]

Figure 26.1
**Houthi "Most Wanted" list**

| Ser | Name | Reward (US$) | Remarks |
|---|---|---|---|
| 1 | Abdul Malik al-Houthi | 30,000,000 | (YEi.004) |
| 2 | Saleh Ali al-Samad | 20,000,000 | president, supreme political council |
| 3 | Muhammad Ali al-Houthi | 20,000,000 | head of revolutionary committee |
| 4 | Zakariya Yahya al-Shami | 20,000,000 | |
| 5 | Abdullah Yahya al-Hakim | 20,000,000 | (YEi.002) |
| 6 | Abd al-Khaliq al-Houthi | 20,000,000 | |
| 7 | Muhammad Nasser al-Ata'fi | 20,000,000 | minister of defence |
| 8 | Yusif al-Madani | 20,000,000 | head of 5th military district |
| 9 | Abd al-Qadir al-Shami | 20,000,000 | |
| 10 | Abd al-Rabb Jarfan | 20,000,000 | |
| 11 | Yahya Muhammad al-Shami | 20,000,000 | |
| 12 | Abd al-Karim Amir al-Din al-Houthi | 15,000,000 | |
| 13 | Yahya Badr al-Din al-Houthi | 10,000,000 | |
| 14 | Hassan Muhammad Zayd | 10,000,000 | |
| 15 | Safr Maghdi al-Sufi | 10,000,000 | |
| 16 | Muhammad Abd al-Karim al-Ghamari | 10,000,000 | |
| 17 | Abd al-Raziq al-Marwani | 10,000,000 | |
| 18 | Amar Ali al-Marani | 10,000,000 | |
| 19 | Ibrahim Ali al-Shami | 10,000,000 | |
| 20 | Fadhl Muhammad al-Matla | 10,000,000 | |
| 21 | Muhsin Saleh al-Hamzi | 10,000,000 | |
| 22 | Ahmed Saleh Hindi Daghsan | 10,000,000 | |
| 23 | Yusif al-Fiyshi | 10,000,000 | |
| 24 | Husayn Hamud al-Azzi | 5,000,000 | |
| 25 | Ahmed Muhammad Yahya Hamid | 5,000,000 | |
| 26 | Talal Abd al-Karim Aqlan | 5,000,000 | |
| 27 | Abdullah Muhammad Hajir | 5,000,000 | |
| 28 | Fares Mana'a | 5,000,000 | |
| 29 | Ahmed Abdullah Aqubat | 5,000,000 | |
| 30 | Abd al-Latif Hamud al-Mahdi | 5,000,000 | head of 4th military district |
| 31 | Abd al-Hakim Hashim al-Khaywani | 5,000,000 | |

---

[1] This list was released by the Saudi Arabian government on 6 November 2017.

18-00267

| Ser | Name | Reward (US$) | Remarks |
|---|---|---|---|
| 32 | Abd al-Hafiz al-Saqqaf | 5,000,000 | |
| 33 | Mubarak Mishn al-Zayadi | | head of 3rd military district; member of SPC |
| 34 | Ali Sa'id al-Razimi | 5,000,000 | |
| 35 | Saleh al-Sha'ir | 5,000,000 | |
| 36 | Ali Hamud al-Mushki | 5,000,000 | deputy head general staff |
| 37 | Muhammad Sharaf al-Din | 5,000,000 | |
| 38 | Dhayf Allah Qasim al-Shami | 5,000,000 | |
| 39 | Abu Ali al-Kuhlani | 5,000,000 | |
| 40 | Ali Nasser Qirshah | 5,000,000 | |

S/2018/68

## Annex 27:    Houthi family tree

Table 27.1
**Houthi family tree**

1.    The Houthi family tree shows the sons of Badr al-Din Amir al-Din Husayn al-Houthi (1922 – 2010), the father of Abdulmalik al-Houthi (YEi.004).

| Ser | Wife | Name | Remarks |
|---|---|---|---|
|  | Wife 1 |  | From Khawlan bin Amr |
| 1 |  | Husayn Badr al-Din al-Houthi[1] | (Deceased) (1960 – 2004) Initial Houthi Movement Leader |
| 2 |  | Yahya Badr al-Din al-Houthi | Current minister of education in '28 November government' |
| 3 |  | Ahmed Badr al-Din al-Houthi |  |
| 4 |  | Abd al-Qadir Badr al-Din al-Houthi |  |
|  | Wife 2 |  |  |
| 5 |  | Muhammad Badr al-Din al-Houthi |  |
| 6 |  | Hamid Badr al-Din al-Houthi |  |
|  | Wife 3 |  |  |
| 7 |  | Ibrahim Badr al-Din al-Houthi |  |
| 8 |  | Amir al-Din Badr al-Din al-Houthi |  |
|  | Wife 4 |  | A Sayyid woman from the Sittin family |
| 9 |  | Abdulmalik Badr al-Din al-Houthi | (YEi.004) |
| 10 |  | Abd al-Khaliq Badr al-Din al-Houthi | (YEi.001) |
| 11 |  | Najm al-Din Badr al-Din al-Houthi |  |
| 12 |  | Abd al-Salam Badr al-Din al-Houthi |  |
| 13 |  | Ali Badr al-Din al-Houthi |  |

---

[1] Husayn Badr al-Din al-Houthi married one of his daughters to a top lieutenant, Yusif al-Madani, who continues to remain a key Houthi military commander to this day.

S/2018/68

## Annex 28:     Houthi military districts and commanders

Table 28.1
**Houthi military districts and commanders**

| military district | Location | Name | Remarks |
|---|---|---|---|
| 1 | Sayyun | No known Houthi commander | |
| 2 | Mukalla | No known Houthi commander | |
| 3 | Ma'rib | Mubarak Salih al-Mishin | |
| 4 | Aden | Abd al-Latif Hamud Mahdi | Appointed 25 April 2017 |
| 5 | Hudaydah | Yusif al-Madani[1] | Married to daughter of Husayn Badr al-Din al-Houthi |
| 6 | Amran / Sa'dah | Muhammad Yahya al-Hawari[2] | |
| 7 | Dhamar / Sana'a | Hamid al-Kharashi | |

---

[1] Al-Madani is a trusted member of the Houthis, who was named Houthi commander of the 5th military district when a Saudi Arabia-led coalition attack on the port city of Hudaydah looked imminent.
[2] The Panel is now able to confirm that reports that major general Muhammad al-Hawari was killed in the Saudi Arabia-led coalition strike on the Community Hall in Sana'a on 8 October 2016 were incorrect.

**Annex 29:   Summary of reported PBIED and SVIED attacks (2017)**

Table 29.1
**Summary of reported PBIED and SVIED attacks (2017)**

| Ser | Date | Location | Device Type | Target | Civilian Fatalities[1] | Military Fatalities | Civilians Injured | Military Injured | Claimed by | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 7 Jan 2017 | Al-Wadea, Abyan | PBIED | Military checkpoint, | | 6 | | 20 | No claim | |
| 2 | 11 Jan 2017 | Loder, Abyan | PBIED | | | 1 | | 5 | AQAP | |
| 3 | 15 Feb. 2017 | Bayda | SVIED | | 3 | | 3 | | AQAP | |
| 4 | 24 Feb 2017 | Zinjibar | SVIED | Military Camp | | 8 | | 11 | AQAP | |
| 5 | 29 Mar 2017 | Al-Houta, Lahj | SVIED | | | 6 | | | AQAP | |
| 6 | 9 Apr 2017 | Aden | PBIED | CP | | | | | | Failed attack |
| 7 | 7 Jun 2017 | Zanjibar | SVIED | Governor | | 2 | | | AQAP | |
| 8 | 12 Jun 2017 | Da'wan | SVIED | | | 2 | | | AQAP | |
| 9 | 8 Aug 2017 | Lodor | SVIED | 103 Brigade | | 3 | | 6 | AQAP | Arif Abd al-Hassan Habib |
| 10 | 23 Oct 2017 | Abyan | SVIED | CP | | 4 | | 10 | AQAP | |
| 11 | 29 Oct 2017 | Al Mahfad, Abyan | SVIED / PBIED | | | 3 | | | AQAP | |
| 12 | 5 Nov 17 | Khormaksar, Aden | SVIED | | | 18 | | | ISIL | SVIED and 4 x PBIED |
| 13 | 14 Nov 17 | Shiekh Othman, Aden | SVIED | Security Belt Operations Centre | | 6 | | | ISIL | Abu Haga al-Adani |

---
[1] Excluding the 'suicide' bomber. Named in Remarks column where published.

Figure 29.1
**Summary of SVIED attacks (Quarterly 2016 – 2017)**



Figure 29.2
**Summary of PBIED attacks (Quarterly 2016 – 2017)**



## Annex 30:     AQAP linked persons of interest to the Panel[1]

Figure 30.1
**Prominent AQAP figures**

| Ser | Name | Role | Remarks |
|---|---|---|---|
| 1 | Qasim Yahya al-Raymi | Leader | (QDi.282) Yemeni |
| 2 | Ibrahim Asiri | Chief bomb maker | Saudi |
| 3 | Said Attif al-Awlaqi | Head of AQAP (Shabwah[2]) | Yemeni |
| 4 | Muntasir Badi | Financier in Abyan | |
| 5 | Khaled Umar Batarfi | Battle commander | Yemeni |
| 6 | Khalid al-Daba | AQAP leader in Lahij | May be under arrest[3] |
| 7 | Muhammad Abdullah Husayn Daramah | Judge on Shariah Council | |
| 8 | Muhammad Abd al-Karim al-Ghazali | Financial Head | Yemeni |
| 9 | Abu Yusif al-Lahji | Head of AQAP (Lahij) | Yemeni |
| 10 | Khamis Arfaj al-Marwani | Head of AQAP (Jawf) | Yemeni |
| 11 | Salim al-Najdi | Media figure | Saudi |
| 12 | Ibrahim al-Quso | Propagandist | Former Guantanamo detainee / Sudanese |
| 13 | Wa'il Sayf (Abu Salim al-Adani) | Head of AQAP (Aden) | Yemeni |
| 14 | Muhammad Umar | Military Commander Jawf | Yemeni |
| 15 | Nayif al-Qaysi[4] | Financier | (QDi.402) Yemeni |
| 16 | Adil Abdu al-Dhuhbani[5] | Militia Leader Ta'izz | Yemeni, (a.k.a  Abu al-Abbas) |
| 17 | Sayf Abd al-Rabb al-Hayashi[6] | Weapons/Dealer Financier | Yemeni |
| 18 | Bilal Ali Muhammad al-Wafi[7] | Commander in Ta'izz | Yemeni |
| 19 | Ghalib al-Zaidi[8] | AQAP leader in Ma'rib | (QDi.401) Yemeni |

[1] This table has been compiled from a variety of sources, including confidential sources, interviews with individuals inside and outside of Yemen, open sources, news reports and AQAP documents.
[2] On 20 June 2017 a US strike killed Abu Khattab al-Awlaqi, the deputy head of AQAP in Shabwah.
[3] The Panel has received a report, which it has been unable to verify, that security forces loyal to President Hadi may have arrested Khalid al-Daba.
[4] Nayif al-Qaysi is the former Governor of Bayda' for the legitimate Government. He was sanctioned by the UN ISIL (Da'esh) and Al-Qaida Sanctions Committee on 22 February 2017. He was removed from his post as Governor on 23 July 2017. He was sanctioned by the Terrorist Financing Target Center (TFCT) and its member States on 25 October 2017.
[5] Adil Abdu al-Dhuhbani, better known as Abu al-Abbas, is the most powerful militia leader in Ta'izz (see 2017 Panel Mid-term Update, paras. 28 – 33). He has received significant support in the past from the UAE. He was sanctioned by the TFCT on 25 October 2017.
[6] Sayf al-Hayashi was sanctioned by the TFTC on 25 October 2017.
[7] Bilal al-Wafi was sanctioned by the TFTC on 25 October 2017.
[8] On 22 February 2017 the ISIL (Da'esh) and Al-Qaida Sanctions Committee listed al-Zaidi (QDi.401).

## Annex 31:     AQAP and the tribes (and the 23 May 2017 US raid)

### I.      Introduction

1.       This section includes a case study of the al-'Idhal clan of the Murad tribe and the 23 May 2017 US raid.

2.       Tribes in Yemen are not monolithic entities[1] that either decide to join or provide refuge to AQAP as a group.[2] Instead what tends to happen is that individual members of a particular tribe join AQAP and then welcome outside fighters into their village, effectively providing AQAP with an umbrella of tribal protection.

3.       Such tribesmen have dual identities. They are AQAP members to al-Qaida, and tribesmen to their tribes. This means that while they are sometimes targeted and killed as AQAP members, they are often avenged as tribesmen.

4.       This issue of dual identities is also at the centre of the US raid on a cluster of homes belonging to the al-'Idhal clan of the Murad tribe[3] in Ma'rib on 23 May 2017.[4] The US carried out the raid on a target it had identified as AQAP, which was then defended on the ground as an attack on the tribe.

### II.     Background

5.       In late April or early May 2017, approximately three weeks prior to the raid, one member of the clan, Muhammad Said al-'Idhal, an AQAP member, was killed in a US armed unmanned aerial vehicle (AUAV) strike.[5] Following his death, at least seven men from outside the clan moved in to his house.[6] It was this very house that the United States then subsequently targeted on 23 May 2017.

### III.    The Raid

6.       The night raid began at approximately 02:00 hours on 23 May 2017, with approximately 50 troops from the US Navy SEAL[7] special forces descending on the village.[8] Almost immediately the raiding party came under attack by the al-'Idhal clan tribesmen, who seeing their village was under attack could not have been aware that only one particular house was being targeted.

7.       Five tribesmen were killed, ranging in age from 15 – 80, and another five were wounded.[9] Both AQAP

---

[1] Many, although certainly not all, tribes in Yemen belong to two main tribal confederations, Hashid and Bakil. Each tribal confederation is led by a *shaykh ma-shaykh* (sheikh of sheikhs). The Hashid tribe is smaller than the Bakil tribe but, at least until recently, acted as a more cohesive whole. Neither tribal confederation, however, speaks with one voice on any given issue. Indeed, it is more helpful to think of each tribal confederation as an alliance of member states, each pursuing their own self-interests.

[2] In fact, the tribes of Yemen and AQAP are closer to natural enemies than they are to allies, as both groups seek to control and administer territory.

[3] The Murad tribe has roughly 60,000 members.

[4] This is the second US military raid against AQAP that the Panel has documented in 2017. The first, on 29 January 2017, included the use of UAE forces.

[5] The US acknowledged a drone strike in Ma'rib on 18 April 2017. http://www.centcom.mil/MEDIA/NEWS-ARTICLES/News-Article-View/Article/1162256/pentagon-spokesman-updates-iraq-syria-yemen-operations/. Another drone strike in Ma'rib was reported on 29 April 2017, which killed an individual named Muhammad al-'Idhal. http://www.almasdaronline.com/article/90812.   The Panel has not been able to independently verify if this individual was Muhammad Said al-'Idhal.

[6] These appear to be the seven men the US targeted and killed during the raid as AQAP members. Confidential local source.

[7] Sea, Air and Land.

[8] Confidential local source, and http://www.centcom.mil/MEDIA/PRESS-RELEASES/Press-Release-View/Article/1190002/us-forces-conduct-counter-terrorism-raid/.

[9] The names of the dead are: Nasser Ali Mahdi al-'Idhal, Saleh Lutfaf al-'Idhal, Yasser Lutfaf al-'Idhal, Abdullah Said al-'Idhal, and Abd al-Qadir Saleh al-'Idhal.

and local Yemenis highlighted this fact in subsequent statements and accounts of the raid.[10] The US troops also killed the seven individuals that they had targeted, who were staying in the house of the late Muhammad Said al-'Idhal.[11]

8.      The US has not released the names of those seven individuals, and neither local Yemeni reporting nor the AQAP statement acknowledged their deaths.[12] AQAP members who survived the raid prevented villagers from entering Muhammad Said al-'Idhal's house after the raid, and over the next few days the seven bodies were removed from the village for burial in an unknown location.[13]

## IV.    The aftermath

9.      The raid on the AQAP house in an al-'Idhal clan village illustrates the complexities of fighting AQAP in the midst of the broader conflict in Yemen. Although the US achieved its target, by killing seven AQAP members, it also killed five tribesmen who were acting in self-defence. They were defending their village not to protect AQAP but rather because of the perception that their village was under attack by, to them, unknown armed men. Such actions can have unintended consequences. On one hand, armed UAV strikes and armed raids such as the one on 23 May 2017 can induce some clans and tribes to deny aid to AQAP. On the other hand, the death of tribesmen can act as a force-multiplier for AQAP, leading to more men joining AQAP in order to avenge their fallen relatives.[14]

10.     AQAP is aware that it needs the tribes to operate in Yemen. If the tribes in Yemen were to turn against AQAP en masse, the terrorist organization would have no freedom to manouvere, no recruits and no future. AQAP is aware of this and has therefore developed a two-track approach to the tribes. Firstly, AQAP propaganda frequently stresses its desire for positive relations with various tribes; overtures that most tribes ignore.[15] Secondly, it is actively working to recruit young tribesmen,[16] not simply because it wants more fighters, but because these particular tribal fighters represent the entry into tribal society that AQAP so desires.

11.     It is not the tribes of Yemen that are a problem when it comes to the war against AQAP. Indeed, the tribes' could be a powerful ally against AQAP, providing some governance and structure in areas where AQAP would otherwise have a free hand. Instead, it is young, not quite fully integrated tribesmen who represent the greatest challenge. They are able to use their two identities as tribesmen and AQAP members to blur the lines and provide AQAP with protection and foothold they need to grow and thrive in Yemen.

12.     The Panel believes that the dynamics outlined in this annex represent a threat to the peace, security, and stability of Yemen.

---

[10] See AQAP's statement of 26 May 2017. https://azelin.files.wordpress.com/2017/05/al-qacc84_idah-in-the-arabian-peninsula-22about-the-american-landing-upon-the-murace84d-tribe22.pdf. For Yemeni reporting see, for example: http://www.almasdaronline.com/article/91432.

[11] http://www.centcom.mil/MEDIA/PRESS-RELEASES/Press-Release-View/Article/1190002/us-forces-conduct-counter-terrorism-raid/.

[12] Similarly, the United States statement failed to acknowledge the five tribesmen killed in the raid.

[13] Confidential local source.

[14] The Panel has information suggesting that both trends are taking place within the al-'Idhal clan.

[15] For most tribes AQAP is a minor nuisance not a major concern.

[16] Part of this recruiting process involves the payment of monthly salaries, which the Panel continues to investigate. Older tribesmen typically have little interest in joining AQAP as they are often more established men with families and positions of influence in the tribes and see AQAP as a threat.

**Annex 32:     ISIL affiliated persons of interest to the Panel[1]**

Figure 32.1
**Prominent ISIL figures**

| Ser | Name | Role | Remarks |
|-----|------|------|---------|
| 1 | Abu Sulayman al-Adani[2] | Head of ISIL-Yemen | Yemeni |
| 2 | Nasir al-Ghaydani (Abu Bilal al-Harbi) | An ISIL leader | Deceased[3] |
| 3 | Khaled Abdullah al-Marfadi | Military commander | Yemeni[4] |
| 4 | Khaled Umar al-Marfadi | Financial official | Yemeni[5] |
| 5 | (Abu Abd al-Rahman al-Muhajir)[6] | Shariah official | |
| 6 | (Abu Saleh)[7] | Military commander | |
| 7 | Radwan Muhammad al-Qanan[8] | ISIL leader in Aden | Yemeni |
| 8 | Muhammad Said Umar Bawazir | An ISIL leader | |
| 9 | Nashwan al-Wali al-Yafa'i[9] | Financier | Yemeni |
| 10 | Khalid Sa'id Ghabish al-Ubaydi[10] | ISIL leader in Hadramawt | Yemeni |

---

[1] This table has been compiled from a variety of sources, including confidential sources, interviews with individuals inside and outside of Yemen, open sources, and news reports.

[2] Abu Sulayman al-Adani was named by Terrorist Financing Target Center (TFCT) and its member states as the head of ISIL-Yemen and was sanctioned on 25 October 2017. See: https://www.treasury.gov/press-center/press-releases/Pages/sm0187.aspx.

[3] The Panel can confirm that Abu Bilal al-Harbi has been killed. Following his death, ISIL in Yemen named a training camp in al-Baydha after him.

[4] al-Marfadi is from Yafa'a. He was sanctioned by the TFCT on 25 October 2017.

[5] Also from Yafa'a.

[6] al-Muhajir reportedly also uses the *kunya*: Abu Muhammad-al-Kanani.

[7] Abu Saleh reportedly also uses the *kunya*: Abu Husayn.

[8] Radwan Qanan was sanctioned by the TFCT on 25 October 2017.

[9] Nashwan al-Yafa'i was sanctioned by the TFCT on 25 October 2017.

[10] Khalid al-Ubaydi was sanctioned by the TFCT on 25 October 2017.

S/2018/68

## Annex 33:   Arms supply routes to Houthi territory in Yemen

Table 33.1
**Summary of arms supply routes to Houthi territory in Yemen**

| Ser | Transport mode | Destination / Route | Status for arms supply | Remarks |
|---|---|---|---|---|
| 1 | Air | Airports in Houthi controlled territory | **Closed** | ▪ Saudi Arabia-led coalition has air superiority. Air routes under constant airborne surveillance. |
| 2 | Air | Air delivery to improvised air strips or by air drops | **Highly unlikely** | ▪ Saudi Arabia-led coalition has air superiority. Air routes under constant airborne surveillance. |
| 3 | Sea Vessels > 300t[1] | Red Sea ports (e.g. Hudaydah) | **Unlikely** | ▪ All vessels require UNVIM clearance and are subject to random or planned inspection or interdiction by Saudi Arabia-led coalition naval forces. <br> ▪ No seizures on this route since March 2017. <br> ▪ Possible for non-explosive weapons in component form concealed in cargo, but land routes are a better option, as interdiction risks are lower. |
| 4 | Sea Vessels < 300t | Red Sea ports or across beaches | **Unlikely** | ▪ Small vessels risk interdiction by Saudi Arabia-led coalition or Combined Maritime Forces (CMF)[2] naval forces. <br> ▪ No seizures on this route since March 2017. |
| 5 | Sea | Gulf of Aden ports or across beaches (west of Qishn) | **Effectively closed** | ▪ Ports in territory under control of legitimate government of Yemen. <br> ▪ Vessels risk interdiction by Saudi Arabia-led coalition or CMF naval forces. <br> ▪ Subsequent interdiction risk on land route. <br> ▪ Evidence of vessels smuggling arms from Yemen to Somalia across beaches.[3] |

---

[1] Regulation V/19 of SOLAS (International Convention for the Safety of Life at Sea, 1974) requires that automatic identification systems (AIS) be fitted and used on vessels of above 300 gross tonnes. The AIS may be switched off to hide a vessel's position if engaged in nefarious activity, but the vessel will still be visible to naval radar.  Lack of an AIS signal would raise the immediate suspicions of Saudi Arabia-led coalition or CMF naval vessels.
[2] https://combinedmaritimeforces.com.
[3] Paras. 103 - 110 to S/2017/925.

18-00267

S/2018/68

| Ser | Transport mode | Destination / Route | Status for arms supply | Remarks |
|---|---|---|---|---|
| 6 | Sea | Arabian Sea ports or across beaches (east of Qishn) | **Possible** | ▪ Ports in territory (e.g. Ghaydah) not under effective control of legitimate government of Yemen.<br>▪ Vessels risk interdiction by Saudi Arabia-led coalition, CMF or Omani naval forces.<br>▪ Subsequent interdiction risks on land route.<br>▪ Interdiction risk at border control posts (BCP) if landed in Oman. |
| 7 | Land | From Oman | **Possible** | ▪ Initial interdiction dependent on effectiveness of control checks at busy BCP.<br>▪ Interdiction risks increase with proximity to Houthi controlled territory as checkpoints increase with proximity.<br>▪ Not suitable for larger calibre weapons, such as artillery, as concealment in vehicles difficult. |
| 8 | Land | Southern main supply route (MSR) from Al Ghaydah | **Open** | ▪ Interdiction risks increase with proximity to Houthi controlled territory as checkpoints increase with proximity.<br>▪ Not suitable for larger calibre weapons, such as artillery, as concealment in vehicles difficult. |
| 9 | Land | Northern MSR via Thamud | **Open** | ▪ Interdiction risks increase with proximity to Houthi controlled territory as checkpoints increase with proximity.<br>▪ Not suitable for larger calibre weapons, such as artillery, as concealment in vehicles difficult. |
| 10 | Land | From Saudi Arabia | **Closed** | ▪ Border is well patrolled. |

## Annex 34:     Summary of Houthi-Saleh SRBM and FFR attacks against Saudi Arabia

1.      Tables 34.1 to 34.4 contain summaries of Houthi-Saleh forces short-range ballistic missile (SRBM) or free flight rocket FFR attacks against Saudi Arabia during the conflict.  The data was supplied by Saudi Arabia, and then compared against the media and Houthi-Saleh reported attacks in paragraphs 81 to 85 and annex 42 of S/2017/81 and the consolidated tables below developed by the Panel.

2.      Table 34.1 contains a summary of the total number of reported or confirmed launches.

Table 34.1
**Summary of confirmed or reported Houthi-Saleh SRBM and FFR attacks against Saudi Arabia (2015 - 2017)**

| Year | SCUD B /C or Hwasong-5/6 | | Borkan -2 (SCUD ER)[1] or Borkan-2H | | Qaher-1 (S-75) | | Zelzal-2/3 | | OTR-21 Tocka | | Not Known | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | L[2] | Intercepted[3] | L | Intercepted | L | Intercepted | L | Intercepted | L | Intercepted | L | Intercepted | L | Intercepted |
| 2015 | 3 | 1 (33%) | | | 18 | 9 (50%) | | | | | 2 | 1 (50%) | 23 | 11 (48%) |
| 2016[4] | 6 | 1 (17%) | 2 | 2 (100%) | 24 | 12 (50%) | 2 | 1 (50%) | 2 | 2 (100%) | 11 | 3 (27%) | 47 | 21 (45%) |
| 2017 | | | 9 | 4 (43%) | 4 | 4 (100%) | | | | | 19 | 14 (78%) | 33 | 23 (73%) |
| Totals | 9 | 2 (22%) | 11 | 6 (58%) | 46 | 25 | 2 | 1 (50%) | 2 | 2 (100%) | 32 | 18 (58%) | 112 | 55 (49%) |

---

[1] These are probably SCUD-B or Hwasong-5 or 6 SRBM modified for extended range by the Houthi-Saleh alliance.
[2] L = Launched.
[3] Reported or confirmed as being intercepted and destroyed in flight by anti-missile systems. Probably PAC-3 Patriot.
[4] Note corrected figures from annex 42 of S/2017/81.

3.    Table 34.2 contains a summary of missile and FFR launches that have been confirmed to the Panel by the Government of Saud Arabia.

Table 34.2
**Summary of Saudi Arabian government confirmed Houthi-Saleh SRBM and FFR attacks against Saudi Arabia (2015 - 2017)**

| Year | SCUD B /C or Hwasong-5/6 | | Borkan - 2(SCUD ER)[5] or Borkan-2H | | Qaher-1 (S-75) | | Zelzal-2/3 | | OTR-21 Tocka | | Not Known | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | L[6] | Intercepted[7] | L | Intercepted | L | Intercepted | L | Intercepted | L | Intercepted | L | Intercepted | L | Intercepted |
| 2015 | 2 | 1 (50%) | | | 7 | 5 (71%) | | | | | 2 | 1 (50%) | 11 | 7 (64%) |
| 2016 | 1 | 1 (100%) | 2 | 2 (100%) | 15 | 10 (67%) | | | | | 5 | 2 (40%) | 23 | 15 (65%) |
| 2017 | | | 7 | 3 (33%) | 4 | 4 (100%) | | | | | 15 | 12 (80%) | 25 | 18 (72%) |
| Totals | 3 | 2 (67%) | 9 | 5 (58%) | 26 | 19 (73%) | | | | | 22 | 15 (68%) | 60 | 41 (70%) |

---

[5] These are probably SCUD-B or Hwasong-5 or 6 SRBM modified for extended range by the Houthi-Saleh alliance.
[6] L = Launched.
[7] Intercepted and destroyed in flight by anti-missile systems. Probably PAC-3 Patriot.

18-00267

S/2018/68

4.      Table 34.3 contains a summary of launches reported in open source media, but not confirmed by the Government of Saudi Arabia.

Table 34.3
**Summary of other media reported Houthi-Saleh SRBM and FFR attacks against Saudi Arabia (2015 - 2017)**

| Year | SCUD B /C or Hwasong-5/6 | | Borkan-2(SCUD ER)[8] or Borkan-2H | | Qaher-1 (S-75) | | Zelzal-2/3 | | OTR-21 Tocka | | Not Known | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | L[9] | Intercepted[10] | L | Intercepted | L | Intercepted | L | Intercepted | L | Intercepted | L | Intercepted | L | Intercepted |
| 2015 | 1 | 0 (0%) | | | 11 | 4 (36%) | | | | | | | 12 | 4 (33%) |
| 2016 | 5 | 0 (0%) | | | 9 | 2 (22%) | 2 | 1 (50%) | 2 | 2 (100%) | 6 | 1 (17%) | 24 | 6 (25%) |
| 2017 | | | 2 | 1 (50%) | | | | | | | 4 | 3 (75%) | 6 | 4 (60%) |
| Totals | 6 | 0 (0%) | 2 | 1 (50%) | 20 | 6 (30%) | 2 | 1 (50%) | 2 | 2 (100%) | 10 | 4 (40%) | 42 | 14 (33%) |

---

[8] These are probably SCUD-B or Hwasong-5 or 6 SRBM modified for extended range by the Houthi-Saleh alliance.
[9] L = Launched.
[10] Intercepted and destroyed in flight by anti-missile systems. Probably PAC-3 Patriot.

18-00267

5.       Table 34.4 contains more details of SRBM missile and FFR attacks that have been confirmed by the government of Saudi Arabia (shown as a numerical serial),[11] and those reported in the media or claimed by the Houthi-Saleh alliance (shown as an alphabetical serial).

Table 34.4
**Details of confirmed and reported Houthi missile and FFR attacks against Saudi Arabia (June 2015 – 18 December 2017)**

| Serial | | | | Coordinates ( º ' " ) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| KSA Confirmed[12] | Reported | Date | Likely missile type | Launch point | Patriot interception | Impact point | Probable target | Distance (km) | Location / Remarks |
| 1 | | 6 Jun 2015 | | 16 35 36N 43 43 06E | N 18 08 03 E 42 25 51 | | Khamis Mushayt | 219 | |
| 2 | A | 29 Jun 2015 | SCUD | 16 32 50N 44 07 39E | | 19 11 15N 45 01 15E | Sulayvil base | 308 | |
| 3 | B | 26 Aug 2015 | Qaher-1 | 15 18 05N 44 12 54E | 16 51 23N 42 41 22E | | Jizan | 238 | Jazan |
| 4 | C | 15 Oct 2015 | SCUD | 15 18 49N 44 12 52E | | 18 56 48N 42 41 58E | Khamis Mushayt | 435 | |
| | D | 4 Dec 2015 | Qaher-1 | | | 16 53 59N 44 35 01E | Jazan airport | | Coordinates are centre of target and not impact point. |
| | E | 9 Dec 2015 | Qaher-1 | | | 16 53 57N 44 33 26E | Jazan | | Coordinates are centre of target and not impact point. |
| | F | 9 Dec 2015 | Qaher-1 | | | 16 53 57N 44 33 26E | Jazan | | Coordinates are centre of target and not impact point. |
| 99 | G | 13 Dec 2015 | Qaher-1 | 16 25 40N 44 08 08E | | 18 18 17N 42 43 54E | Khamis Mushayt | | |
| 5 | | 14 Dec 2015 | | Unidentified | | 18 27 32N 42 41 58E | Khamis Mushayt | | |
| | H | 18 Dec 2015 | Qaher-1 | | | 17 33 19N 44 14 33E | Najran | | Impacted east of town |
| | I | 19 Dec 2o15 | Qaher-1 | | | 17 33 19N 44 14 33E | Najran | | Impacted near museum |
| | J | 19 Dec 2015 | Qaher-1 | 15 23 41N 44 10 10E | | 16 30 41N 42 58 24E | Al-Wahal BCP | | Coordinates are centre of target and not impact point. |

---

[11] In either table 42.2 of S/2017/81 or letter to the Panel dated 4 October 2017.
[12] The coordinates provided by the Saudi Arabian authorities are predominantly based on those from the Shared Early Warning System (SEWS) data.

| Serial KSA Confirmed[12] | Reported | Date | Likely missile type | Coordinates ( ° ' " ) | | | Probable target | Distance (km) | Location / Remarks |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Launch point | Patriot interception | Impact point | | | |
| | K | 20 Dec 2015 | Qaher-1 | | | 18 18 19N 42 44 43E | Khamis Mushayt airport | | Coordinates are centre of target and not impact point. |
| 6 | L | 21 Dec 2015 | Qaher-1 | 15 23 41N 44 10 10E | 16 43 53N 42 44 22E | | Jazan | 213 | |
| 7 | M | 21 Dec 2015 | Qaher-1 | 15 24 48N 44 13 05E | 16 52 08N 42 41 01E | | Jazan airport | 230 | |
| 99 | N | 23 Dec 2015 | Qaher-1 | 16 26 05N 443 03 55E | 18 18 19N 42 43 43E | | Jazan Aramco | ? | |
| 8 | | 25 Dec 2015 | Qaher-1 | 16 26 05N 44 03 55E | | 18 30 49N 42 49 31E | Jazan | 266 | Landed north of Khamis Mushayt town |
| O | O | 26 Dec 2015 | Qaher-1 | 15 15 48N 44 14 05E | Reported destroyed in flight | | Najran | | |
| 9 | P | 27 Dec 2015 | SCUD | 15 54 20N 43 59 51E | 17 54 38N 44 10 14E | | Najran | 226 | Najran |
| | Q | 27 Dec 2015 | Qaher-1 | | | 16 53 47N 44 33 26E | Jazan | | Coordinates are centre of target and not impact point. |
| | R | 28 Dec 2015 | Qaher-1 | | Reported destroyed in flight | | Najran | | |
| | S | 30 Dec 2015 | Qaher-1 | | Reported destroyed in flight | | | | |
| 10 | T | 31 Dec 2015 | Qaher-1 | N 15 19 42 E 44 04 33 | N 17 00 06 E 43 02 06 | | | 217 | Jazan |
| 11 | U | 1 Jan 2016 | Qaher-1 | 16 41 43N 43 51 51E | | 17 59 39N 42 49 26E | Khamis Mushayt | 182 | |
| 12 | | 7 Jan 2016 | Qaher-1 | 15 00 08N 44 13 35E | 16 50 16N 42 38 47E | | Jazan | 265 | |
| 13 | | 28 Jan 2016 | Qaher-1 | 14 59 08N 44 20 23E | | 17 34 51N 44 43 39E | Khamis Mushayt | 292 | Disappeared from radar screen |
| | V | 8 Feb 2016 | Qaher-1 | | | 18 18 19N 42 44 43E | Khamis Mushayt airport | | Coordinates are centre of target and not impact point. |

18-00267

S/2018/68

| Serial KSA Confirmed[12] | Reported | Date | Likely missile type | Coordinates ( ° ' " ) | | | Probable target | Distance (km) | Location / Remarks |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Launch point | Patriot interception | Impact point | | | |
| 14 | W | 8 Feb 2016 | Qaher-1 | 16 25 39N 44 08 34E | 18 00 43N 42 52 06E | | Abha | 222 | |
| 15 | X | 9 Feb 2016 | Qaher-1 | 15 20 50N 44 02 33E | 16 59 28N 42 29 06E | | Jazan | 248 | |
| 16 | | 11 Feb 2016 | Qaher-1 | 15 22 55N 44 09 29E | | 17 02 45N 42 27 15E | Jazan | 269 | Exploded in the air |
| 17 | Y | 13 Feb 2016 | Qaher-1 | 16 24 23N 44 04 51E | 18 05 56N 42 45 56E | | Abha | 234 | |
| 18 | Z | 9 May 2016 | | 16 23 52N 44 05 01E | 18 16 48N 42 55 50E | | Khamis Mushayt | 252 | |
| 19 | AA | 9 May 2016 | | 16 40 05N 43 50 53E | | 18 20 43N 42 22 57E | Najran | 243 | Disappeared from radar screen |
| | AB | 13 May 2016 | Qaher-1 | | | 16 53 47N 44 33 26E | Jazan | | Coordinates are centre of target and not impact point. |
| | AC | 20 May 2016 | Qaher-1 | | | 16 53 47N 44 33 26E | Jazan | | Coordinates are centre of target and not impact point. |
| 20 | AD | 30 May 2016 | Qaher-1 | 15 29 57N 44 05 27E | 17 00 53N 44 22 11E | | Najran | 171 | |
| | AE | 6 Jun 2016 | SCUD | | Reported destroyed in flight | | King Khalid airbase | | |
| 21 | AF | 4 Jul 2016 | Qaher-1 | 16 43 42N 43 50 27E | 18 17 22N 42 39 55 | | Abha | 214 | |
| 22 | AG | 23 Jul 2016 | Qaher-1 | Unidentified | 17 34 34N 44 09 03E | | Najran | | |
| 23 | | 27 Jul 2016 | Qaher-1 | 16 37 41N 43 50 44E | | 17 56 47N 43 15 23E | Khamis Mushayt | 159 | |
| 24 | AH | 10 Aug 2016 | Qaher-1 | 16 49 17N 43 48 21E | 17 44 43N 43 02 57 | | Khamis Mushayt | 135 | |
| 25 | AI | 10 Aug 2016 | Qaher-1 | 16 46 44N 42 48 23E | 17 39 06N 43 07 24 | | Abha | 103 | |
| 26 | | 12 Aug 2016 | Qaher-1 | 15 52 24N 43 05 57E | | Unidentified | Jazan | | |

| KSA Confirmed[12] | Reported | Date | Likely missile type | Coordinates ( ° ‘ “ ) Launch point | Coordinates ( ° ‘ “ ) Patriot interception | Impact point | Probable target | Distance (km) | Location / Remarks |
|---|---|---|---|---|---|---|---|---|---|
| 27 | | 13 Aug 2016 | Qaher-1 | 16 44 54N 43 46 29E | 18 18 04N 42 40 48 | | Abha | 208 | |
| | AJ | 16 Aug 2016 | Qaher-1 | | | 18 20 43N 42 22 57E | Najran | | Seven reported civilian fatalities |
| | AK | 19 Aug 2016 | Qaher-1 | | Reported destroyed in flight | | Khamis Mushayt | | |
| 28 | | 25 Aug 2016 | | 15 16 29N 44 03 45E | 16 40 03N 42 45 50E | | Jazan | 208 | |
| | AL | 26 Aug 2016 | SCUD | | | 16 52 55N 42 33 44E | Jizan Hamiyej Power Station | | Coordinates are centre of target and not impact point. |
| 29 | | 30 Aug 2016 | | 15 55 09N 43 11 19E | | 18 16 37N 42 19 20E | Landed in Aqabat al-Sima' (Abha) | 278 | |
| | AM | 31 Aug 2016 | Zelzal-3 | | | 18 20 43N 42 22 57E | Najran | | Coordinates are centre of target and not impact point. |
| | AN | 2 Sep 2016 | SCUD | | | 21 28 58N 40 32 39E | King Fahid airbase | | Coordinates are centre of target and not impact point. |
| | AO | 10 Sep 2016 | SCUD | | | | Asir province | | |
| | AP | 10 Sep 2016 | SCUD | | | 17 39 46N 42 03 44E | Al Shqaigh water plant | | |
| 30 | | 11 Sep 2016 | | 15 56 01N 43 58 06E | | 16 48 34N 43 05 46E | Jazan | 135 | |
| 31 | AQ | 12 Sep 2016 | SCUD | 16 49 03N 43 43 56E | 17 57 13N 43 00 18E | | Khamis Mushayt | 148 | |
| | AR | 4 Oct 2016 | Zelzal-3 | | | | Al Montazah | | |
| | AS | 8 Oct 2016 | Qaher-1 | | | 18 18 17N 42 43 54E | Khamis Mushayt | | Coordinates are centre of target and not impact point. |
| 99 | AT | 9 Oct 2016 | | 16 44 33N 43 49 10E | 21 28 36N 40 27 18E | | Ta'if | 634 | |
| | AU | 20 Oct 2016 | | | | 16 53 47N 44 33 26E | Jazan | | Coordinates are centre of target and not impact point. |
| | AV | 20 Oct 2016 | | | | 18 20 43N 42 22 57E | Najran | | Coordinates are centre of target and not impact point. |

18-00267

| Serial | | | | Coordinates ( ° ' " ) | | | | | |
| KSA Confirmed[12] | Reported | Date | Likely missile type | Launch point | Patriot interception | Impact point | Probable target | Distance (km) | Location / Remarks |
|---|---|---|---|---|---|---|---|---|---|
| 99 | AW | 27 Oct 2016 | | 17 03 14N 43 23 33E | | 22 02 50N 39 52 14E | Khulays governorate, Ta'if | 667 | |
| | AX | 1 Nov 2016 | | | | 16 53 47N 44 33 26E | Jazan | | Coordinates are centre of target and not impact point. |
| | AY | 1 Nov 2016 | | | | 18 20 43N 42 22 57E | Najran | | Coordinates are centre of target and not impact point. |
| | AZ | 1 Nov 2016 | | | | | Asir province | | |
| | BA | 15 Nov 2016 | OTK-21 Tochka | | Reported destroyed in flight | | Najran | | |
| | BB | 15 Nov 2016 | OTK-21 Tochka | | Reported destroyed in flight | | Najran | | 2nd FFR reported |
| | BC | 26 Nov 2016 | | | Reported destroyed in flight | | Khamis Mushayt | | |
| | BD | 27 Jan 2017 | | | Reported destroyed in flight | | Najran | | |
| | BE | 30 Jan 2017 | | | | 13 56 41N 42 45 36E | Zuqar Island | | |
| 99 | | 5 Feb 2017 | ER | 17 07 09N 43 33 39E | | 24 20 32N 46 19 04E | Muzahimiyah | 852 | |
| 32 | | 14 Feb 2017 | | 16 35 35N 43 53 45E | 18 10 55N 42 39 09E | | Khamis Mushayt | 221 | |
| 33 | | 18 Feb 2017 | | 16 46 28N 43 48 48E | | 17 38 50N 42 08 20E | Abha | 201 | |
| 34 | | 16 Mar 2017 | | 14 52 29N 42 58 29E | 16 37 11N 42 36 45E | | Ta'if | 198 | |
| 35 | | 19 Mar 2017 | | 15 32 43N 44 10 17E | 16 52 17N 43 02 28E | | Jazan | 191 | |
| 36 | | 27 Mar 2017 | | 16 37 50N 43 52 20E | 17 57 09N 43 26 43E | | Khamis | 154 | |

| Serial | | | | Coordinates ( $^0$ $'$ $''$ ) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| KSA Confirmed[12] | Reported | Date | Likely missile type | Launch point | Patriot interception | Impact point | Probable target | Distance (km) | Location / Remarks |
| 37 | | 27 Mar 2017 | | 16 37 50N 43 52 20E | 18 18 33N 43 30 28E | | Najran | 191 | |
| 38 | | 27 Mar 2017 | | 16 38 14N 43 51 25E | 18 08 00N 42 54 00E | | Najran | 166 | |
| 39 | | 19 May 2017 | | 16 37 14N 43 51 28E | 17 59 52N 43 19 28E | | Najran | 163 | |
| 40 | | 4 Feb 2017 | | 17 03 47N 43 36 29E | 22 12 57N 45 37 55E | | Khamis Mushayt | | |
| 41 | | 14 Feb 2017 | | 16 35 35N 43 53 45E | 18 10 55N 42 39 09E | | Khamis Mushayt | 221 | |
| 42 | | 18 Feb 2017 | | 16 46 28N 43 48 48E | | 17 38 50N 42 08 20E | Shuqayq | 203 | |
| 43 | | 16 Mar 2017 | | 14 52 29N 42 58 29E | 16 37 11N 42 36 45E | | Jazan | 198 | |
| 44 | | 19 Mar 2017 | | 15 32 43N 44 10 17E | 16 51 17N 43 02 28E | | Jazan | 189 | |
| | BF | 20 Mar 2017 | | | Reported destroyed in flight | | Najran | | |
| 45 | BG | 27 Mar 2017 | Qaher-1 | 16 37 50N 43 52 20E | 17 57 09N 43 26 43E | | Khamis Mushayt | 157 | |
| 46 | BH | 27 Mar 2017 | Qaher-1 | 16 37 50N 43 52 20E | 18 18 33N 43 30 28E | | Khamis Mushayt | 191 | |
| 47 | BI | 27 Mar 2017 | Qaher-1 | 16 38 14N 43 51 25E | 18 08 00N 42 54 00E | | Abha | 195 | |
| 48 | BJ | 27 Mar 2017 | Qaher-1 | 16 37 14N 43 51 28E | 17 59 52N 43 19 28E | | Khamis | 163 | |
| 49 | | 19 May 2017 | SCUD | 17 03 47N 43 36 29E | 22 12 57N 45 37 55E | | Najran | | |
| 50 | BK | 19 May 2017 | ER | 17 07 10N 43 36 57E | | 24 03 54N 46 24 28E | Riyadh governorate | 825 | |
| 51 | BL | 22 Jul 2017 | Borkan-2H | 17 04 04N 43 51 08E | | 23 58 55N 38 14 26E | Yanbu' | 965 | |

18-00267

| Serial | | | | Coordinates ( $^0$ ' " ) | | | | | |
|--------|--|--|--|--|--|--|--|--|--|
| KSA Confirmed[12] | Reported | Date | Likely missile type | Launch point | Patriot interception | Impact point | Probable target | Distance (km) | Location / Remarks |
| 52 | BM | 26 Jul 2017 | SCUD-C type | 16 23 36N 44 05 03E | 21 23 46N 40 34 10E | | Ta'if | 668 | Warhead is cluster munition type from a SCUD-C type. |
| 53 | | 7 Aug 2017 | | 18 04 46N 45 00 02E | | 16 32 03N 42 48 33E | Jazan | 289 | |
| 54 | | 27 Aug 2017 | | 18 04 46N 43 03 26E | 18 13 80N 42 31 26E | | | 58 | |
| | BN | 27 Oct 2017 | | | | 22 12 57N 45 37 55E | Najran | | |
| 99 | BO | 4 Nov 2017 | Borkan-2H | 15 57 09N 43 48 13E | Reported destroyed in flight | 24 56 27N 46 43 29E | Riyadh, King Khaled airbase | 820+ | |
| | BP | 30 Nov 2017 | | | Reported destroyed in flight | | Khamis Mushayt | | |
| 100 | BQ | 19 Dec 2017 | Borkan-2H | | | | Riyadh | 1,000+ | |

## Annex 35:   SCUD-C type modification programme

## I.   Background

1.     The first time an SRBM was launched with an extended range (ER-SRBM) beyond that normally expected of the known missiles in the Houthi-Saleh inventory was on 9 October 2016. Since then there has been four confirmed launches of SRBM with a range slightly in excess of the known maximum range of 550km to 600km for this SRBM type (see table 35.1).

Table 35.1
**Confirmed Houthi-Saleh SCUD-C launches (>600km)**

| Ser | Date | Target | Range (km) | Remarks |
|-----|------|--------|-----------|---------|
| 1 | 9 Oct 2016 | Ta'if | 634 | ▪ Reported as intercepted by Patriot MIM-104 system. |
| 2 | 27 Oct 2016 | Ta'if | 667 | ▪ |
| 3 | 19 May 2017 | Najran | 611 | ▪ Reported as intercepted by Patriot MIM-104 system. |
| 4 | 26 Jul 2017 | Ta'if | 668 | ▪ Warhead is a cluster munition type from SCUD-C type (see paragraph 6) |

2.     The Panel finds that it is almost certain that these particular missiles were not the ER-SRBM (at annex 36), but rather as a result of minor modifications being made to the SCUD-C type SRBM known to be in the possession of the Houthi-Saleh alliance prior to January 2015. It is possible that this is the missile the Houthis refer to as the Borkan-2 (see figure 35.1).

Figure 35.1
**Houthi media image of Borkan-2**



## II.    Technical options to extend range

3.    The Panel assesses that the only realistic technical options to extend the range[1] of the SCUD-C type SRBM, are limited to:

(a)    Reducing the explosive weight within the warhead to virtually nil;

(b)    Reducing component weight;

(c)    Increasing the liquid bi-propellant capacity of an SRBM by adding additional fuel and oxidizer tanks; or

(d)    Increasing the liquid bi-propellant capacity of an SRBM by adding larger fuel and oxidizer tanks in place of the current tanks.

### A.    Reduction of warhead weight

4.    The removal of the high explosive warhead would save, dependent on the SRBM type, approximately 600kg in weight. A significant proportion of the weight of the missile consists of the liquid bi-propellant (65%) and warhead (10% - 15%). The majority of the propellant expended launching the SRBM along the first phase of its trajectory in order to gain height above ground and counter the force of gravity; hence the missile is continually losing weight as the propellant burns. Therefore, in theory, a noticeable range increase could be achieved by the removal of the warhead weight, as this would be less weight that is needed to be lifted against the force of gravity.  Even without a warhead, the damage caused entirely by the kinetic energy of the missile body impacting the ground would be localized, but significant.

5.    As one of the aims of the Houthi-Saleh missile campaign is strategic propaganda, then the loss of any warhead damage is insignificant to them. Appendix 1 shows the weight of propellant and warheads for each of the SRBM in the possession of Houthi-Saleh forces at the outbreak of the conflict. This data supports the finding that extended range for these particular SRBM types may be being gained by removing the explosive from the warheads SCUD-C type missiles in their arsenal.[2]

6. Evidence of a programme to lighten the load of these SRBM in order to extend range is the use of a carrier warhead for sub-munitions, as identified by the Panel from the remnants of the launch against Ta'if on 26 July 2017 (figure 35.2).

---

[1] Due to the differential in altitude above sea level (ASL) a missile fired from the higher altitude of Yemen (approx. 2,250m ASL) against Riyadh (610m ASL) there would be a very limited range extension of only 1.4km.
[2] The removal of the warhead would alter the centre of gravity of the missile. Computational fluid dynamics (CFD) modeling may be required to confirm how much ballistic stability would be retained in flight, and what extended range could be expected.

Figure 35.2
**SCUD C type sub munition warhead (Ta'if, 26 July 2017)[3]**



## 2.      Reducing component weight

7.      A reduction in the weight of components would result in an incremental, but small, increase in the theoretical maximum range of the missile system. This was certainly done in the case of the SRBM fired against Ta'if on 22 July 2017. Among the remnants of this SRBM the Panel identified that the compressed air bottles used to pressurise the fuel system were made of a composite material, rather than the steel of the standard SCUD-C type system (figures 35.3 and 35.4). The compressed air bottles used were modern and manufactured by a United States company, Mine Safety Appliances Incorporated,[4] or one of their subsidiaries.  The response from the manufacturer to a Panel tracing request for this component[5] included a comment that the component was mass-produced and no serial numbers were allocated.

Figure 35.3
**MSA composite compressed air bottles**



Figure 35.4
**MSA composite compressed air bottles**



---

[3] All imagery taken by Panel unless otherwise indicated. This image was from a confidential source.
[4] http://us.msasafety.com/Supplied-Air-Respirators-%28SCBA%29/SCBA-Parts-%26-Accessories/Air-Cylinders/p/000010000800002001.
[5] Panel letter dated 20 November 2017.

18-00267

3.      **Increasing liquid propellant capacity (additional fuel and oxidiser tanks)**

8.      A small increase in the liquid bi-propellant capacity of an SRBM could be achieved by adding additional small fuel and oxidizer tanks in any free space within the missile body. Such free space is very limited though, and the installation of the necessary piping and valves to integrate with the designed fuel flow system would require a significant degree of engineering expertise to achieve in practice. The Panel has seen no evidence of this approach being taken.

4.      **Increasing liquid propellant capacity (larger fuel and oxidiser tanks)**

9.      A larger increase in the liquid bi-propellant capacity of an SRBM would be achieved by adding larger fuel and oxidizer tanks, in place of the current tanks.  This would require a significant degree of engineering expertise to achieve as it would require cutting the missile in half to add the extended range tanks and additional pipe lengths and valves. It is part of the route taken by the Democratic People's Republic of North Korea (DPRK) in the development of the Hwasong-7 and Hwasong-9 extended range SCUD variants.[6] Outside the DPRK only Syria has been reported to own such a system. The Panel finds that the Houthi has not taken this approach, as the dimensions of the liquid propellant tank remnant inspected from the Ta'if SRBM fall within those of the normal SCUD-C type SRBM.

## III.    IHL non-compliance

10.     The Panel finds that in their use of SRBM, Houthi-Saleh forces failed to take account of the inherently indiscriminate nature of the weapon in that:

(a)      Since the blast and fragmentation danger areas are primarily based on the size and design of the explosive warhead, this missile's likely impact on civilians was foreseeable, especially when directed at civilian populated areas; and

(c)      As such weapons have a known Circular Error Probability (CEP)[7] of up to 1,000m, they should not be used against targets within 1,000m of the civilian population.

## IV.    Panel findings

11.     The Panel finds that:

(a)      The SRBM used for the attack against Ta'if, Saudi Arabia on 26 July 2017 was highly probably a SCUD-C / Hwasong-6 type SRBM with minor modifications to save weight, thus slightly increasing range;

(b)      Based on the ranges achieved, it is highly likely that the other attacks listed in table 35.1 were also locally modified SCUD-C / Hwasong-6 type SRBM and not the ER-SRBM covered at annex 36;

(c)      It is possible that the Houthi-Saleh missile engineers of the 5th and 6th missile brigade would have the technical capacity to make such minor modifications with little, or no, external assistance;

(d)      It is almost certain that the minor modifications made to the SCUD-C / Hwasong-6 type SRBM would not result in the necessary increase in range to target the Riyadh area.

---

[6] https://missilethreat.csis.org/missile/scud-er/.

[7] The CEP is a measure of a weapon system's precision. It is defined as the radius of a circle, centered on the mean, whose boundary is expected to include the landing points of 50% of the missiles fired.

S/2018/68

**Appendix A to Annex 35: Analysis of Houthi-Saleh SRBM weights versus extended range**

Table A.35.1
**Weight of liquid bi-propellant and explosive warheads in Houthi-Saleh SRBM**

| Item | Nomenclature | SCUD-B Tonnes | SCUD-B Litres | SCUD-C Tonnes | SCUD-C Litres | Hwasong-5 Tonnes | Hwasong-5 Litres | Hwasong-6 Tonnes | Hwasong-6 Litres |
|------|--------------|-------|--------|-------|--------|-------|--------|--------|--------|
| Fuel | Kerosene (TM-185)[8] | 1.31 | 1,617 | 1.81 | 2,235 | 1.31 | 1,617 | 1.81 | 2,235 |
| Oxidiser | IRFNA[9] (AK-271) | 2.45 | 1,815 | 2.53 | 1,874 | 2.45 | 1,815 | 2.53 | 1,874 |
| Total | Bi-Propellant | 3.76 | 3,432 | 4.34 | 4,109 | 3.76 | 3,432 | 4.34 | 4,109 |
| Warhead | | 0.99 | | 0.60 | | 0.99 | | 0.77 | |
| Launch Weight[10] | | 5.90 | | 6.40 | | 5.90 | | 6.57 (est) | |
| % Weight Saving | | 16.7% | | **9.4%** | | 16.7% | | **11.7%** | |
| Design Range (km) | | 300 | | **600** | | 350 | | **600** | |

---

[8] JET A-1 could be used as a substitute. It is the standard aviation fuel for turbo engines and available in Yemen.
[9] Inhibited Red Fuming Nitric Acid.
[10] This is the weight of the bi-propellant, warhead and the missile components (e.g. rocket motor, guidance unit, missile body).

18-00267

## Annex 36:   Extended Range (ER) Short Range Ballistic Missile (Borkan-2H)

## I.   Introduction

1.     The Panel travelled to Riyadh, Saudi Arabia from 17 to 21 November 2017 to inspect debris recovered from short-range ballistic missiles (SRBM) attacks launched against Saudi Arabia by Houthi-Saleh forces on 19 May, 22 July, 26 July and 4 November 2017. The Saudi Arabian authorities recovered all components unless otherwise indicated. The Panel also visited Saudi Arabia from 24 – 26 December 2017 to inspect remnants of a further SRBM attack on Riyadh on 19 December 2017.

2.     The Panel visited two Saudi Arabian military bases where the authorities had gathered remnants from four SRBM attacks against Saudi Arabia. The Panel also visited four impact points from the 4 November 2017 attack, where other remnants of the SRBM were identified. These being inside Riyadh city and King Khaled International Airport (KKIA) (see figures 36.1 and 36.2).

Figure 36.1
**Impact points of final ER-SRBM track (4 November 2017)[1]**



_____

[1] All imagery taken by Panel unless otherwise indicated.

S/2018/68

Figure 36.2
**Remnants identified along final ER-SRBM track (4 November 2017)[2]**



## II.    Initial observations

3.      The launch and impact points are at table 36.1. The Panel made the following initial general observations on the condition of the SRBM remnants (table 36.2):

Table 36.1
**Launch and impact points**

| Attack date | Target | Launch point | Impact point | Remarks |
|---|---|---|---|---|
| 19 May 2017 | Southern Riyadh Province | 17⁰03'47"N, 43⁰26'29"E | 24⁰03'54"N, 46⁰24'28"E | |
| 22 Jul 2017 | Yanbu | 17⁰04'04"N, 43⁰51'08"E | 23⁰49'29"N, 38⁰23'47"E | |
| 26 Jul 2017 | Taif | 16⁰23'36"N, 44⁰05'03"E | 21⁰23'46"N, 40⁰34'10"E | |

---

[2] Images taken by Saudi Arabia security agencies immediately after attack.

18-00267

| Attack date | Target | Launch point | Impact point | Remarks |
|---|---|---|---|---|
| 4 Nov 2017 | Riyadh | 15°57'59"N, 43°48'13"E | 24°56'27"N, 46°43'29"E | Impact point of warhead. Launch point based on Patriot data. |
| 19 Dec 2017 | Riyadh | 16°39'51"N, 43°52'13"E | 24°35'43"N, 46°38'17"E[3] | After intercept. Two impact points for Patriot intercept missile debris were identified. No ER-SRBM debris has yet been identified. |

Table 36.2
**General observations on all missile remnants inspected in Saudi Arabia by the Panel**

| Attack date | Target | Approximate range (km) | Location of remnants inspected | General observations on SRBM remnants |
|---|---|---|---|---|
| 19 May 2017 | Southern Riyadh Province | 838 | Military base, 100km from Riyadh | Partial inspection due to time constraints and inaccessibility of components. No conclusions made. |
| 22 Jul 2017 | Yanbu | 942 | Military base, Riyadh | Rear section, comprising elements of rocket motor, recovered from immersion in water by the Saudi authorities. Partial inspection only possible. |
| 26 Jul 2017 | Taif | 668 | Military base, 100km from Riyadh | Several components, including only remnant of warhead and guidance section recovered by the Saudi authorities. Subsequent Panel analysis identified this was not an ER-SRBM (see annex 35). |
| 4 Nov 2017 | Riyadh | 1,043 | Military base, Riyadh | The most complete SRBM with extensive and well-preserved remnants. Full inspection by Panel. |
| 19 Dec 2017 | Riyadh | 965 | Riyadh area | No ER-SRBM debris yet identified. |

# III.    Analysis of SRBM tracks

## A.    4 November 2017 ER-SRBM against Riyadh

4.      The Saudi Arabian authorities provided the Panel with the coordinates of the ER-SRBM flight path based on data from the target event report from the Patriot anti-missile system.[4] The Panel confirmed the track of the ER-SRBM (figure 36.3) through extrapolation of the identified four points of debris impact. The track was assessed as being 017° and which bisects the Saudi Arabian provided launch coordinates, which are for the settlement of al-Mayqa' in Amran governorate of Yemen.  Based on the high intensity presence of Saudi Arabian armed forces along that track inside Saudi Arabian held territory within Yemen, the Panel finds it almost certain that the ER-SRBM for the 4 November 2017 attack could not have been covertly launched from a closer range within Saudi Arabian territory.

---

[3] Other impact point at 24°33'45"N, 46°38'13"E.
[4] The Shared Early Warning Systems (SEWS) data estimates a launch point one degree of longitude further North, which would mean a range of 937km.

Figure 36.3
**Estimated ER-SRBM track from launch to impact**



**B.      Reported tracks for all ER-SRBM launches**

6.      The Panel was unable to independently verify the tracks of the other four ER-SRBM provided by the Saudi Arabian authorities. The Saudi Arabian authorities have reported them as being as shown in figure 36.5.

Figure 36.5
**Reported tracks of other SRBM[5]**



## IV.   Technical analysis of remnants

7.      Table 36.3 summarises the technical observations of the Panel for the 4 November 2017 Riyadh ER-SRBM. This analysis will be further refined should any response to tracing requests be received. Supporting imagery and further explanation is at appendix A. Table 36.4 summarises the technical observations of the Panel for the 22 July 2017 Yanbu ER-SRBM. Confirmatory imagery from the 22 July Yanbu ER-SRBM is at appendix B.

---

[5] The Panel found that the 26 July 2017 was not an ER-SRBM, but a slightly modified SCUD-C/Hwasong-6. See details at annex 35.

S/2018/68

Table 36.3
**Technical observations for the 4 November 2017 ER-SRBM**

| Serial | Functional area | Component | General observations on ER-SRBM remnants |
|---|---|---|---|
| 1 | Warhead | Warhead Cone | ▪ Fragments of the warhead were recovered, but neither the shape nor design could be determined from them.<br>▪ The explosive weight of the warhead could not be determined from the fragmentation, and it is possible a reduced weight warhead was used as a weight saving measure to extend range. |
| 2 | Guidance Unit | Electronics | ▪ One component had 2009 stamped on it, which is probably the year of manufacture of that component.<br>▪ The guidance unit is of a different, and more modern, design to that of the SCUD-C and Hwasong-6. |
| 3 | Missile Main Assembly (MMA) | Exterior skin | ▪ The exterior skin of the oxidiser tanks is made of 5000 series of between 1.8mm to 2.1mm thickness aluminium alloy, rather than steel, which is used on the SCUD C, Hwasong-6 and Qiam-1 missiles.<br>▪ The welding of the MMA exterior skin was typical of that to be expected in a manufacturing plant.<br>▪ The welding used to join the oxidiser and fuel sections together and to the guidance and tail units was of a low quality and was not applied by the original manufacturer. It was artisanal welding.<br>▪ The exterior skin had been over painted blue, with Borkan 2-H (in Arabic) added in white.  The quality of the over paint did not match the quality of the original manufacturers paint, which could be observed on parts of the missile body.<br>▪ The over paint of the artisanal welds used to join the main components showed brush strokes, as opposed to the general original body paint that had been sprayed on. |
| 4 | Missile Main Assembly (MMA) | Liquid propellant tanks | ▪ The fuel tank is to the rear of the oxidiser tank, whereas in the SCUD and Hwasong-6 series of SRBM it is situated forward of the oxidiser tank.<br>▪ The oxidiser tank had internal aluminium alloy reinforcing ribs added to increase structural rigidity.<br>▪ The oxidizer tank was split in two internally to allow for the redistribution of oxidizer in flight to maintain a suitable centre of gravity, and hence ballistic stability.<br>▪ 6 valves were identified on the oxidiser tank sections. (*On the Yanbu 22 July 2017 SRBM three valves were identified on the fuel tank section*).[6] A SCUD-C type missile only has 4 x Valves (1 x FFV, 1 x FDV, 1 x OFV and 1 x ODV). See appendix 3. |
| 5 | Tail unit | Rocket Motor | ▪ The rocket motor is typical in design of that to be found on the SCUD and Hwasong-6 series of SRBM. Further analysis is needed to identify if any modifications have been made to improve performance of the rocket motor. |

---

[6] The Panel's initial analysis is that for the complete missile system these may be 3 x Combined Drain and Fuel Filling Valves (DFFV), 3 x Vent Valves, 2 x Pressure Relief Valves (PRV) and 1 x Valve (purpose unknown). Panel investigations continue to determine the exact purpose of each valve.

18-00267

| Serial | Functional area | Component | General observations on ER-SRBM remnants |
|--------|-----------------|-----------|------------------------------------------|
| 6 | Tail unit | Jet vane housing internal control vanes | ▪ Three jet vane housings had a logo cast in the metal. The logo reported[7] to be that of Shahid Bakeri Industries, Iran. A tracing request has been sent to the Islamic Republic of Iran. |
| 7 | Tail unit | Compressed air bottles | ▪ The compressed air bottles recovered were made of carbon fibre and not the steel bottles expected from a SCUD C. The Panel assesses this was a design change to save weight.[8] |
| 8 | Tail unit | Stabiliser fins | ▪ According to the Saudi authorities no stabiliser fins were recovered during their search. The Qiam-1 guidance system negates the need for stabiliser fins, which is also a weight saving measure. |

Table 36.4
**Technical observations for the 22 July 2017 ER-SRBM**

| Serial | Functional area | Component | General observations on ER-SRBM remnants |
|--------|-----------------|-----------|------------------------------------------|
| 1 | Missile Main Assembly (MMA) | Fuel tank | ▪ A pipe from the fuelling valve of the fuel tank is in place to allow for fuelling in the horizontal position only. This has tactical advantages, allowing the missile to be fuelled in buildings or caves before being erected into its vertical launch position.<br>▪ It would also have a secondary function as an anti-static measure during fuelling operations.<br>▪ The welding of the MMA exterior skin was typical of that to be expected in a manufacturing plant.<br>▪ The welding used to join the fuel tank to the tail section was of a low quality and was almost certainly not applied by the original manufacturer. It was artisanal welding.<br>▪ The exterior skin of the fuel tanks is made of 5000 series of between 1.8mm to 2.1mm thickness aluminium alloy, rather than steel, which is used on the SCUD C, Hwasong-6 and Qiam-1 missiles. |
| 2 | Tail unit | Rocket Motor | ▪ The rocket motor is typical in design of that to be found on the SCUD and Hwasong-6 series of SRBM. Further analysis is needed to identify if any modifications have been made to improve performance of the rocket motor. |
| 3 | Tail unit | Compressed air bottles | ▪ The compressed air bottles recovered were made of carbon fibre and not the steel bottles expected from a SCUD C. The Panel assesses this was a design change to save weight. |
| 4 | Tail Unit | Wind-bolts[9] | ▪ The Wind-bolt housing identified had metal covering the location where the fin would normally be located. There was no evidence of a fin ever having been removed. |

---

[7] The logo is very similar to that on trade stand at http://www.sns.co.ir/?p=327. The Iranian response to a tracing request stated that this was not the Sahid Bagheri Industrial Group (SBIG) as initially thought by the Panel. A second tracing request relating to Shahid Bagheri (Bakeri) Industries has been sent and a response is awaited.

[8] The composite bottles identified on the Ta'if SRBM (26 July 2017) were mass-produced by a US manufacturer. A tracing request was responded to by the US manufacturer who stated that the bottles were mass produced and that serial numbers were not allocated to each bottle produced.

[9] Four wind-bolts are used to secure the base of the missile to the launch platform to keep the missile secure during elevation and prior to firing. It is highly probable that these are explosively cut during the missile firing sequence

| Serial | Functional area | Component | General observations on ER-SRBM remnants |
|---|---|---|---|
| 10 | Tail unit | Stabiliser fins | ▪ No stabiliser fins were recovered. The Qiam-1 guidance system negates the need for stabiliser fins, which is also a weight saving measure. |

8.      There are significant design differences to this SRBM compared to the SCUD-C / Hwasong-6 series of SRBM known to be in Houthi-Saleh possession since the imposition of the targeted arms embargo on 14 April 2015.  The technical differences of this SRBM are of such significance, and would require complex ballistic modelling, extensive test and evaluation, that they highly unlikely to be the result of upgrades to the SCUD-C / Hwasong-6 series. The use of an aluminium alloy body, lack of fins and use of lighter components, such as the carbon fibre air bottles, all indicate design changes specifically made to save weight.  The reversal of the positioning of the fuel and oxidizer tanks in the main missile assembly is most likely related to ensuring the centre of gravity is in a position to ensure stable flight. Table 36.5 summarises the design features and characteristics of the SCUD-C / Hwasong-6 versus Qiam-1 versus the Borkan-2H. These are illustrated at figure 36.6.

Table 36.5
**Design feature comparison**

| Serial | Functional area | Design Feature | SCUD C | Hwasong-6 | Qiam-1 | Borkan-2H |
|---|---|---|---|---|---|---|
| 1 | Warhead | Triconic warhead shape | X[10] | ✓ | ✓ | ✓ |
| 2 | Guidance Unit | Advanced guidance system | X | X | ✓ | ✓ |
| 3A | Missile Main Assembly (MMA) | Steel airframe | ✓ | ✓ | ✓ | X |
| 3B | Missile Main Assembly (MMA) | Aluminium alloy airframe | X | X | X | ✓ |
| 3C | Missile Main Assembly (MMA) | Oxidiser tank (Front) | X | X | ✓ | ✓ |
| 3D | Missile Main Assembly (MMA) | Fuel tank (Rear) | X | X | ✓ | ✓ |
| 3E | Missile Main Assembly (MMA) | Horizontal fuelling capability pipe | X | X | ✓ | ✓ |
| 3F | Missile Main Assembly (MMA) | Internal reinforcing aluminium alloy ribs | X | X | Not known | ✓ |
| 3G | Missile Main Assembly (MMA) | Factory quality welding all over | ✓ | ✓ | ✓ | X |
| 3H | Missile Main Assembly (MMA) | Artisan welding | X | X | X | ✓ |
| 3I | Missile Main Assembly (MMA) | 4 x liquid bi-propellant Filling/Draining Valves | ✓ | ✓ | X | X |
| 3J | Missile Main Assembly (MMA) | 9 x liquid bi-propellant Filling/Draining Valves, Pressure Relief valves (PRV) and other valves TBC.[11] | X | X | ✓ | ✓ |

immediately prior to launch.
[10] X = Not Present.
[11] See appendix 3 for comparison of valve layouts on missiles.

| Serial | Functional area | Design Feature | SCUD C | Hwasong-6 | Qiam-1 | Borkan-2H |
|--------|-----------------|----------------|--------|-----------|--------|-----------|
| 4A | Tail unit | Rocket Motor | ✓ | ✓ | ✓ | ✓ |
| 4B | Tail unit | Actuator for internal graphite control vanes | ✓ | ✓ | ✓ | ✓ |
| 4C | Tail unit | Composite compressed air bottles | X | X | Not known | ✓ |
| 4D | Tail unit | Wind-bolt housings covered | X | X | ✓ | ✓ |
| 4E | Tail unit | Stabiliser fins | ✓ | ✓ | X | X |

Figure 36.6
**Major components and their relative position compared to a Qiam-1 SRBM[12]**



Partial Fuel Tank and Tail Unit – Yanbu (22 Jul 17)

Oxidiser Tank and Rocket Motor Riyadh (4 Nov 17)

Qiam-1

9.      Based on the components seen by the Panel and the design of the ER-SRBM, the Panel finds that SCUD C / Hwasong-6 missiles are not being modified into the Borkan-2H.  The Panel does not discount the option that some components from these missile types are being used in the Borkan-2H though.

## V.   Estimation of warhead size

10.     The crater size at KKIA (figure 36.7) for the 4 November 2017 Borkan-2H attack was estimated by photogrammetry as being 3.18m in diameter and 0.67m in depth.  Explosive engineering software[13] predicts that an explosive mass of 45kg (TNT equivalent) (+/- 20%) would be required for the formation of a crater of these dimensions. Open source information states that the warhead size for the Qiam-1 is 750kg, so a reduction in warhead size has very probably been made as a further weight saving measure to increase range.

---

[12] Qiam-1 missile image from  http://3.bp.blogspot.com/-qsK7VV6oZfc/Tq1ET0NyVdI/AAAAAAAAADo/NGlhWpeJTsw/s1600/Qiam-1.jpg.
[13] Explosive Engineers Toolbox. OnePoint4 Limited.

S/2018/68

Figure 36.7
**4 November 2017 crater at KKIA**



## VI.   Source of the Borkan-2H

10.      The Panel considers that it is unlikely that the Government of Yemen obtained any new extended range (ER) SRBM during the final years of Ali Abdullah Saleh's (YEi.003) presidency, which ended on 25 February 2012. His relationship with Iran was such that Iranian military support in terms of advanced ER-SRBM technology, particularly of a missile that had only just entered Iranian operational service during 2010, would almost certainly not be forthcoming. There is also no evidence of the supply of any advanced ER-SRBM technology to Yemen between the assumption of the Presidency by Abdrabbuh Mansur Hadi and 20 January 2015 when the Houthis took control.

11.      During 20 January to 26 March 2015 there would have been a short window of opportunity to ship complete ER-SRBM to the Houthi-Saleh forces prior to the commencement of the Saudi Arabia-led coalition air campaign.  This is also assessed as unlikely as: 1) the first launch of an ER-SRBM was not until either 9 October 2016, when a missile flew 634km,[14] or 5 February 2017 when an ER-SRBM impacted on Muzahimiyah (a flight of 852km); and 2) there would be no need to weld the missile sections together with artisanal welding. Furthermore, had the Houthi-Saleh forces access to ER-SRBM technology when the Saudi Arabia-led coalition air campaign started on 26 March 2015, then it is highly likely they would have used them in retaliatory attacks at that time. If this narrow window of opportunity was exploited then it is more likely that the Borkan-2H would have been shipped as complete missiles, negating the requirement to assemble them in Yemen in less than ideal conditions. The Panel thus considers that the component sections for these ER-SRBM were almost certainly shipped to Yemen in violation of the

---

[14] This was the first reported impact of a SRBM beyond the maximum range of 600km for the SCUD-C or Hwasong-6.

18-00267

targeted arms embargo of 14 April 2015. The Panel does not yet have prima facie evidence as to the identity of the supplier.

12.     The Panel still considers it unlikely that complete ER-SRBM have been smuggled into Yemen post the implementation of the targeted arms embargo on 14 April 2015. Their size, being 12m x 1m when packed in a wooden crate, would have made them vulnerable to interdiction by Saudi Arabia–led coalition ground and naval forces. Whereas, if smuggled in main section form, [15] the largest section would be approximately 4m x 1m when packed in a wooden crate, which is a much more manageable and concealable size. The missile is not modular by design but the main sections could be shipped after manufacture by the factory for later assembly. The Houthi-Saleh missile engineers then assemble them into complete missiles and functionality test the systems to ensure reliability on launch. Evidence for this option includes the difference in weld quality between the main components themselves (factory quality) and the joints between the main components (poor quality), and the poor over paint quality in places.  The missile when assembled is then referred to as the Borkan-2H by the Houthi-Saleh alliance. The Panel has not yet seen any evidence of external missile specialists working in Yemen in support of the Houthi-Saleh engineers.

13.     The Panel thus finds that the Borkan-2H is not a missile type known to have been in the possession of the Yemeni Armed Forces prior to 2015. The design features (at table 36.5 above), technical characteristics and dimensions are consistent with those reported for the Iranian designed Qiam-1 missile (illustrated at figure X.6). Notwithstanding this, a major design difference between the Qiam-1 and the Borkan-2H is that the Qiam-1 is constructed of steel, compared to the aluminium alloy of the Borkan-2H. The Panel therefore finds that the Borkan-2H is an advanced derivative of the Iranian Qiam-1 specially designed with weight saving measures by the designers of the Qiam-1 to achieve the range of 1000+km. A standard Qiam-1 has a declared operational range of 750km.

14.     Further evidence of Iranian manufacture of the Borkan-2H components is provided by two components inspected by the Panel:

(a)     Three jet vane housings for the internal graphite control surface vanes are marked with a logo similar to that of Shahid Bagheri Industries. [16] This organization a subsidiary of the Iranian Aerospace Industries Organization (IAIO) (figures 36.8 to 36.10). The Panel has sent a tracing request to the Islamic Republic of Iran and is waiting for a response; and

(b)     A printed circuit board (PCB) in a relay box marked SHIG 6081. The Panel believes SHIG is the abbreviation for the Shahid Hemat Industrial Group.  It is a subsidiary of the Iranian Aerospace Industries Organization. The Panel has sent a tracing request to the Islamic Republic of Iran and is waiting for a response.

---

[15] Those sections being a warhead, a guidance unit, a fuel tank, an oxidiser tank and a tail unit.

[16] Also known as the Shahid Bagheri Industrial Group (SBIG) and Shahid Bakeri Industries.

S/2018/68

Figure 36.8
**Jet vane housing with Shahid Bakeri Industries logo markings**

Figure 36.9
**Shahid Bagheri Industries trade stand with logo[17]**





Figure 36.10
**Jet vane housing with Shahid Bagheri Industries logo markings**



## VII.    Likely trafficking routes

15.      The Panel thus considers there are now only likely to be three trafficking routes that explain the availability of this advanced ER-SRBM technology used in the Borkan-2H SRBM:

(a)      Along the land route from the Omani border, or Ghaydah and Nishtun in Mahrah governorate after ship to shore transhipment to small dhows. A route that has already seen limited seizures of anti-tank guided weapons and also of liquid bi-propellant oxidiser field storage tanks (see appendix D). The Panel considers this route as the most likely option;

---

[17] Source: http://www.sns.co.ir/?p=327.

S/2018/68

(b)    Through a Red Sea port in shipping containers, via a third country port and not on a vessel direct from the supplier, or as loose crates using false bills of lading, referring to, for example, agricultural machinery. This option carries a high risk of interdiction as all containers are now cross-loaded at either Jeddah or King Abdullah Port and are subjected to inspection by the Saudi Arabian authorities.[18] Prior to January 2017 Djibouti and Salalah, Oman were used as transhipment ports for containers, and only 25% were subjected to more detailed inspection.[19] It is possible shipments of ER-SBRM main sections were successfully shipped using this route prior to its closure. The Djibouti to Hudaydah container route is now effectively closed as subsequent delays to shipping due to frequent Saudi Arabia-led coalition re-inspections in the Coalition Holding Area (CHA) resulted in a significant increase in shipping costs;[20] or unlikely;

(c)    Through a Red Sea port concealed within a bulk cargo carrier or even a fuel tanker. This route carries a high risk of detection by a Saudi Arabia-led coalition inspection in the CHA. In addition it would require that the illicit cargo be loaded onto a vessel with no recent calls at Iranian ports, or with Iranian connections, as such vessels are subjected to additional clearance research by UNVIM and the Saudi Arabia-led coalition naval vessels in the Coalition Holding Area (CHA).

16.    The use of small fishing dhows being used across Red Sea beaches is not considered a very likely option due to the heavy naval presence of the Saudi Arabia-led coalition and Combined Maritime Forces (CMF) in the Red Sea and Gulf of Aden.  No illicit arms shipments to Yemen have been detected on this route since 20 March 2016, and those detected have been assessed as being destined for Somalia.[21]

17.    The detection of missile component shipments presents major challenges;

(a)    The metal and carbon fibre composition of the components means that arms and explosive search (AES) dogs would not indicate that the component containers, likely wooden crates, were suspicious. Other than the warhead, which could be sent unfilled, there are no explosive or gun oil scents for the dogs to detect; and

(b)    The x-ray profile of the ER-SRBM main sections may not be recognizable to all x-ray operators, although the warhead should raise suspicions. For example, the fuel and oxidizer tanks would appear similar to other commercial storage tanks.

## VII.    IHL aspects

20.    In respect of the missiles fired at Saudi Arabia, the Panel cannot conclude that Abdulmalik al-Houthi (YEi.004) consented to each individual missile strike against Saudi Arabia. However, the Panel finds without a reasonable doubt that it is the policy adopted by the Houthi leadership that allows for the continued use of these missiles against Saudi Arabia. Given the foreseeable political and military repercussions, it is unlikely that the missile launched on 4 November 2017 at King Khalid International Airport, could have taken place without the knowledge and prior consent of Abdulmalik al-Houthi (YEi.004). The Panel has concluded that this missile strike violated IHL, in that it targeted a civilian airport, and constitutes a threat to peace, security and stability of Yemen. (See more detailed IHL analysis at annex 64).

---

[18] Source: UNVIM.

[19] Ibid.

[20] Pacific International Lines (PIL) were the only major shipper using this route and other shippers prefer now using Jeddah to avoid delays at sea.

[21] 2017 Panel 2017 Midterm Update and SEMG S/2017/924 (paras. 115 - 118).

**Appendix A to Annex 36: Imagery supporting technical analysis for 4 November Riyadh Borkan-2H**

Table A.36.1
**Imagery design characteristics of SCUD-C/Hwasong-6 SRBM versus Borkan-2H SRBM[22]**

| Serial[23] | Component | Remarks | Image |
|---|---|---|---|
| 1 | Warhead | Fragmentation recovered suggests warhead detonation may have occurred. |  |
| 2 | Advanced guidance system | Mounting plate for inertial navigation system (INS). Not seen on SCUD-C. Arrows used to identify the direction of component mounting. |  |
| 2 | Advanced guidance system | Relay unit (may be common to SCUD-C) |  |

---

[22] The Panel has a comprehensive set of imagery of the remnants of three of the four SRBM strikes covered in this annex.  Only those that illustrate a design feature difference between the SCUD-C / Hwasong-6 and the Borkan-2H have been included.

[23] Cross references to serial number in table 36.3.

| Serial[23] | Component | Remarks | Image |
|---|---|---|---|
| 2 | Advanced guidance system | Relay unit (Panel removed cover) |  |
| 2 | Advanced guidance system | Relay unit. Contains printed circuit board (PCB) marked SHIG 6081. The Panel believes SHIG is the abbreviation for the Shahid Hemat Industrial Group.  It is a subsidiary of the Iranian Aerospace Industries Organization. |  |
| 2 | Advanced guidance system | Three-point mounting plate for inertial measurement unit (IMU). |  |
| 2 | Advanced guidance system | Reverse of three-point mounting plate for IMU. Similar in design to that of a IMU used on larger Iranian rockets. |  |

**S/2018/68**

| Serial[23] | Component | Remarks | Image |
|---|---|---|---|
| 2 | Advanced guidance system | Open source[24] image of IMU mounting plate used on larger Iranian rockets.<br><br>Shows very similar mounting plate design. |  |
| 3B | Aluminium alloy airframe | 1.8mm |  |
| 3C | Oxidiser tanks forward | Oxidiser tank.<br>Tanks join just to right of the "H". |  |
| 3C | Oxidiser tank forward | Oxidiser Vent Valve |  |

---

[24] Supplied by confidential source.

| Serial[23] | Component | Remarks | Image |
|---|---|---|---|
| 3D | Horizontal filling capability pipe | |  |
| 3E | Internal reinforcing aluminium alloy ribs | |  |
| 3F | Factory quality welding | Factory weld on left and artisanal weld on right. |  |
| 3G | Artisan welding | Artisanal welding used to join main sections of missile together. |  |

**S/2018/68**

| Serial[23] | Component | Remarks | Image |
|---|---|---|---|
| 3H | Artisan welding | Note factory quality weld at right angles to artisanal weld. |  |
| 4A | Rocket Motor | Further analysis required to identify any differences from SCUD-C rocket motor. |  |
| 4B | Jet vane housing for internal graphite control vanes | Metallurgical examination of the graphite may provide more evidence of manufacturer. Three were recovered. |  |

18-00267

| Serial[23] | Component | Remarks | Image |
|---|---|---|---|
| 4C | Composite compressed air bottles | Identical in size, material and shape to the ones recovered from the 26 July 2017 Yanbu Borkan-2H.[25] |  |
| 4D | Stabiliser fins | No remnants identified. | |

---

[25] Similar composite air bottles were recovered from the SRBM remnants of the 26 July 2017 Ta'if attack, from which the manufacturer was identified. The response from the manufacturer to a Panel tracing request for this component included a comment that the component was mass-produced and no serial numbers were allocated.

S/2018/68

**Appendix B to Annex 36: Imagery supporting technical analysis from 22 July 2017 Yanbu Borkan-2H**

Table B.36.1
**Imagery design characteristics of SCUD-C/Hwasong-6 SRBM versus Borkan-2H SRBM[26]**

| Serial[27] | Component | Remarks | Image |
|---|---|---|---|
| 3B | Aluminium alloy airframe | 1.8mm |  |
| 3D | Fuel tank to rear | Fuel Valve. Note use of yellow paint, a common identifier for fuel ports. |  |
| 3E | Horizontal filling capability pipe | |  |

---

[26] The Panel has a comprehensive set of imagery of the remnants of the three of the four SRBM strikes covered in this annex. Only those that illustrate a design feature difference between the SCUD-C / Hwasong-6 and the Borkan-2H have been included.

[27] Cross references to serial number in table 36.4.

18-00267

| Serial[27] | Component | Remarks | Image |
|---|---|---|---|
| 3F | Internal reinforcing aluminium alloy ribs | |  |
| 3F | Artisan welding | Artisanal welding used to join main sections of missile together. Rust was evident on the artisanal welding on remnants of the Yanbu SRBM that was recovered from water by the Saudi authorities, whilst the factory welds on the same remnant were rust free. |  |
| 4A | Rocket Motor | Remnants of propellant supply piping visible. |  |
| 4B | Composite compressed air bottles | Damaged but recognisable as composite air bottles. |  |

**Appendix C to Annex 36: Comparison of layout of filling, drainage and pressure valves for SCUD-C type SRBM and the Borkan-2H**

1.    The schematic at figure C.36.1 of the SCUD-C type SRBM design is based on a wide range of both open and confidential sources.

Figure C.36.1
**Schematic of SCUD-C type SRBM design[28]**



Table C.36.1
**Layout of filling, drainage and pressure valves for SCUD-C type[29]**

| Valve Number | Component | Remarks |
|---|---|---|
| 1 | Fuel Filling Valve (FFV) | Position is at forward end of fuel tank, meaning the SRBM can only be fuelled efficiently to maximum capacity when in the vertical launch position. |
| 2 | Fuel Drainage Valve (FDV) | |
| 3 | Oxidiser Filling Valve (OFV) | |
| 4 | Oxidiser Drainage Valve (ODV) | |

2.    The Panel has compiled the illustration at figure C.36.2 from their examination of the remnants of both the 22 July 2017 Yanbu ER-SRBM and the 4 November 2017 Riyadh ER-SRBM. The triconic warhead is for illustrative purposes only, as the shape could not be defined from recovered fragments. It is included as all open source imagery shows the Qiam-1 with a triconic warhead.

---

[28] Panel diagram. Not to scale. Valves are shown larger proportionally than on real missile to assist in identification.
[29] The section is still under Panel analysis.

18-00267

Figure C.36.2
**Schematic of Borkan-2H ER-SRBM design**[30]



Table C.36.2
**Layout of filling, drainage and pressure valves for Borkan-2H ER-SRBM design**[31]

| Valve Number | Component | Marking on missile[32] | Image |
|---|---|---|---|
| 1 | Oxidiser Valve (Probable Filling and Drainage) (4 November 2017 ER-SRBM) | | |
| 2 | Oxidiser Filling and Drainage Valve (4 November 2017 ER-SRBM) | FILLING DRAIN-O | |
| 3 | Oxidiser Valve (Probable Pressure Relief Valve) (4 November 2017 ER-SRBM) | | |
| 4 | Oxidiser Filling and Drainage Valve (4 November 2017 ER-SRBM) | FILLING DRAIN-O | |

---

[30] Panel diagram. Not to scale. Valves are shown larger proportionally than on real missile to assist in identification.
[31] The section is still under Panel analysis.
[32] All the markings were in English.

**S/2018/68**

| Valve Number | Component | Marking on missile[32] | Image |
|---|---|---|---|
| 5 | Oxidiser Valve (Probable Pressure Relief Valve) (4 November 2017 ER-SRBM) | VENT-O |  |
| 6 | Oxidiser related Valve (4 November 2017 ER-SRBM) | | |
| 7 | TBC | |  |
| 8 | Fuel Vent Valve (22 July 2017 ER-SRBM) | VENT-F |  |
| 9 | Fuel Filling and Drainage Valve (22 July 2017 ER-SRBM) | FILLING DRAIN-F |  |

**Appendix D to Annex 36: Suspect process equipment for liquid bi-propellant oxidizer**

1.      A consignment of components was captured by UAE forces operating near Mar'ib in Yemen during January 2017. Imagery was made available by the UAE for Panel analysis.

2.      The consignment contained individual items of process equipment, such as pumps, tanks, drums and vessels, some of which appear to be of specific design for particular purposes:

      (a)      A stainless-steel vessel housing with two mixing impellers (figures C.36.1 and C.36.2);

      (b)      A large mixing or transfer vessel (figures C.36.3 and C.36.4);

      (c)      A horizontal vessel with a dished (and hinged) end-piece that is rated for elevated temperatures and pressures, which appears to be fitted with particular level instrumentation, and has a pressure relief valve (figures C.36.5, C.36.6 and C.36.7);

      (d)      A heating vessel (figure C.36.8); and

      (e)      Two vessels (figures C.36.9 and C.36.10), which are virtually identical in design, configuration and size to the liquid bi-propellant oxidiser storage tanks known to be used for the SCUD missile system (figures C.36.11 and C.36.12 for comparison).

3.      The consignment also contained the conventional electrical equipment such as switchgear, control panels, electrical cabinets, drives and motors, cabling and instrumentation necessary to provide the power and control systems. There is some labelling in Farsi, suggesting Iranian origin.

4.      Although most of the equipment can be considered standard for the chemical, food or similar industries, some items show artisanal crafting such as unusual welding connectors (pipelines and flanges) and other improvised engineering features. This confirms adaptation for a purpose other than initially designed for.

Figure D.36.1
**Mixing impellers[33]**

Figure D.36.2
**Mixing impellers**




---

[33] Imagery courtesy of a Member State and confidential sources.

Figure D.36.3
**Storage or transfer vessel**



Figure D.36.4
**Storage or transfer vessel**



Figure D.36.5
**Pressure vessel**



Figure D.36.6
**Pressure vessel**



Figure D.36.7
**Pressure vessel**



Figure D.36.8
**Heating vessel**



18-00267

S/2018/68

Figure D.36.9
**Field storage tanks for liquid bi-propellant oxidiser**

Figure D.36.10
**Field storage tanks for liquid bi-propellant oxidiser**






Figure D.36.11
**Liquid bi-propellant oxidiser field storage tank[34]**

Figure D.36.12
**Liquid bi-propellant oxidiser field storage tank[35]**





---

[34] Stored at Gharyan Air Defence base, Libya (2017). Confidential source.
[35] http://www.gulflink.osd.mil/envs/scud_irfna.htm.

Table D.36.1
**Origin and destination of mixing unit components**

| Serial | Component | Serial / Lot number OR Markings | Manufacturer | | Supplied to | | |
|---|---|---|---|---|---|---|---|
| | | | Company | Country / entity | Date | Company | Country / entity |
| 1 | Component TGC-63X 150-S | RKV0604001 | Ningbo Sono Manufacturing Company (STNC) | China | | Not supplied directly to Yemen | |
| 2 | Model YS90S@ Light Duty Multi-Stage Pump | S/N 14040993 | Tianjin Electromotor Company (Steam)[1] | China | | Company merged and not manufacturing | |
| 3 | Compact NSX 100B Surge Protective Device | 15/14 GNVAK | Schneider Electric Industries SAS[2] | France | | | |
| 4 | M3KP 224 SMb 4 Motor | S/N E856237200 ABB Oy Motors[3] | Probably counterfeit | | | | |
| 5 | Hydraulic Pump | VDE05Z0 | Hanning Electro-Werke GmbH[4] | Germany | | Not traced | |
| 6 | PM80 Pump | V-109 | Pentax Industries SPA[5] | Italy | 2013 | Inconclusive | |
| 7 | 120000UF 15V Capacitor | 5796393 | Phillips NV[6] | Netherlands | | | |
| 8 | PU 12x8 Pneumatic Hose | W3B4L097 | Jisehan Hosetech, Tanhay Corporation[7] | Republic of Korea | Feb 2015 | Noavar Hava Limited[8] | Iran |

---

[1] http://www.steampumps.com.
[2] http://www.schnieder-electric.com.
[3] http://www.abb.com. The company has informed the Panel that the recovered motor was a fake.
[4] http://www.hanning-hew.de.

[5] http://www.pentax-pumps.it.
[6] http://www.phillips.com.
[7] http://www.tanhay.com.
[8] http://noavarhava.com/.

18-00267

| Serial | Component | Serial / Lot number OR Markings | Manufacturer | | Supplied to | | |
|--------|-----------|--------------------------------|-----------|----------------|------|---------|-----------------|
| | | | Company | Country / entity | Date | Company | Country / entity |
| 9 | Transformer | JS90565-1 | Alfa Technic Limited | Iran | | | |
| 10 | Moulded Case Circuit Breaker | | Pars Fanal[9] | Iran | | Alfa Technic Limited | Iran |
| 11 | ECT 8472 Industrial Pressure Transmitter | 513487-046 | Trafag AG | Member State | Aug 2014 | Noran Sanat Daryaye Chalous Company[10] | Iran |
| 12 | Solenoid Valves Models 4V21008 and 4V110-15 | | AirTac International Group[11] | Entity | | | |
| 13 | Hydraulic Unit | 0729212 | Hid-Tek Limited[12] | Turkey | May 2015 | Araz Fakhr Azar Limited Company[13] | Iran |
| 14 | L404F 'Pressuretrol' Controller | 97-3667D L404F 1102 3 | Honeywell Incorporated[14] | USA | | | |
| 15 | KBR-14 Pressure Gauges | 15 Apr 22 15 Apr 23 DN25PN16 | KBR Incorporated[15] | USA | | | |
| 16 | Series 150SJ Low Water Cut-Off/Pump Generator | 160J | ITT McDonnell and Miller[16] | USA | | | |

[9] www.parsfanal.com.
[10] 257 South Lalehazar Street, 11447, Tehran, Iran.
[11] http://en2.airtac.com/us.aspx?c_kind=6andc_kind2=141.
[12] http://www.hid-tek.com.tr.
[13] http://www.arazfakhrazar.com.
[14] http://www.honeywell.com.
[15] http://www.kbr.com.
[16] www.xylem.com. ITT is a subsidiary company.

S/2018/68

S/2018/68

Figure D.36.13
**Supply chain diagram**



18-00267

6.      The following images are of equipment and components for the tracing requests listed in table C.36.1 above.

Figure D.36.14
**Component TGC-63X 150-S**



Figure D.36.15
**Model YS90S@ Light Duty Multi-Stage Pump**



Figure D.36.16
**Compact NSX 100B Surge Protective Device**



Figure D.36.17
**M3KP 224 SMb 4 Motor**



Figure D.36.18
**Hydraulic Pump**



Figure D.36.19
**120000UF 15V Capacitor**



Figure D.36.20
**PU 12x8 Pneumatic Hose**
(Traced: KR > IR)



Figure D.36.21
**Transformer**
(Traced: Manufactured in IR)



Figure D.36.22
**Moulded Case Circuit Breaker**
(Traced: Manufactured in IR)



Figure D.36.23
**ECT 8472 Industrial Pressure Transmitter**
(Traced: Member State > IR)



Figure D.36.24
**Solenoid Valves Models 4V210-08 / 4V110-15**
(Partial Traced: > IR)



Figure D.36.25
**Hydraulic Unit**
(Traced: TR > IR)



Figure D.36.26
**'Pressuretrol' Controller**



Figure D.36.27
**KBR-14 Pressure Gauges**



Figure D.36.28
**Series 150SJ Low Water Cut-Off/Pump Generator**



S/2018/68

**Appendix E to Annex 36: Response of Islamic Republic of Iran**

 Permanent Mission of the Islamic Republic of Iran to the United Nations

622 Third Ave New York, NY 10017   www.Iran-UN.org   Tel:+1(212)687-2020   Fax:+1(212)867-7086   E-mail:PR-Iran@un.int

In the name of God, the most Compassionate, the most Merciful

No. 100379                                                22 January 2018

Excellency,

Upon instruction from my Government, and with regard to the final report of Panel of Experts on Yemen established pursuant to Security Council Resolution 2140 (2014), requested under paragraph 6 of the UN Security Council Resolution 2342 (2017), I have honor to bring the following points to the attention of the members of the Committee:

1- The Islamic Republic of Iran reiterates its principled position on the necessity of an early, all-inclusive Yemeni led peaceful settlement to put an end to the Yemen crisis. In this regard, we re-emphasize the need for the immediate and unconditional cessation of the military aggression conducted by the Saudi-led Coalition, the elimination of the air, sea and land blockade on Yemen and the unimpeded urgent humanitarian aid and medical assistance to the Yemeni people.

2- My Government also re-emphasizes the imperative of according priority to addressing the threat posed by growing terrorism and violent extremism, including the presence of al-Qaida in the Arabian Peninsula (AQAP) and future potential growth of the Islamic State in Iraq and Levant (ISIL, also known as Da'esh) affiliates in Yemen which continues to constitute a threat to international peace and security.

3- The Saudi Arabian regime, misusing certain provisions of UN Security Council Resolution 2216 (2015), continues its relentless aggression in Yemen that has devastated the lives of millions of people while, at the same time, aims to distract the attention of the international community through libeling baseless allegations against other UN Member States.

4- Despite the fact that the UNSC Resolution 2216 (2015) is not a balanced document and fails to acknowledge the realities in Yemen, the Islamic Republic of Iran has undertaken to implement its provisions and to continue its compliance. In this regard, certain directives have been issued to the relative authorities, including those responsible for trade control.

5- In accordance with its longstanding position, my Government has actively engaged in cooperation with different international mechanisms, including the UN Secretary General Special Envoy for Yemen, the UN Office for the Coordination of Humanitarian Affairs, and the Panel of Experts established pursuant to resolution 2140 (2014). In this regard, despite our reservations and critical points

S/2018/68

 **Permanent Mission of the Islamic Republic of Iran to the United Nations**

622 Third Ave New York, NY 10017  Tel:+1(212)687-2020  Fax:+1(212)867-7086  E-mail:PR-Iran@un.int

about some of the Panel's assessments in its report, the Panel was received in Tehran on 15-16 January 2018, During which different aspects of the Yemen crisis as well as the main findings and assessments contained in the Panel's report were discussed in meetings with relevant Iranian authorities.

6- Unfortunately, the report contains accusations against my Government based on fabricated evidence provided by Saudi Arabia. Seemingly, the initial assessment of the Panel is based on such evidence.

7- The Panel, based on fabricated evidence provided by the Saudi Arabia and citing some non-exclusive apparent features belong to 2 of 82 missiles, allegedly launched from Yemeni territories targeting the Saudi Arabia, has tried to link these two missiles and Iran's Qiam-1 short range ballistic missile. In this regard, almost all other references to the non-apparent characteristics of the Qiam-1, including those related to the effective range, warhead weight, internal design features, internal fueling system, navigation system and etc., are erroneous. Meanwhile, the Panel has failed to provide its reliable sources of these speculations. It is worthy to note that evidence projected by the violations of international law have no probative value. All other claims, including similarities between logos found on components and trademark belongs to certain military industries in Iran, are inaccurate and flawed.

8- In each and every claim, including the alleged transfer of missile components to Yemen, in addition to "technical matching of components", substantiated information regarding "the exact time of transfer" and "the available routes" must be clearly furnished. In this context, the assessments by the Panel lack logical merit. Due to the imposed all-round blockade and given the sensitivity, heavyweight and large size of the parts (including the launcher, oxidizer's tank and, etc.), technical difficulty of re-aligning and coaxializing disassembled parts, there are serious uncertainties about the possibility of external origins for the missiles as well as the related component and feasibility to supply with unconventional routes.

9- Based on open source information, prior to the onset of hostilities and adoption of UN Security Council Resolution 2216 (2015), the Yemeni Government had considerable potentials in the field of ballistic missiles and notable stockpiles of SRBMs including SCUD B, C, Hwasong 5, 6, Borkan-1, Ghaher-1, and etc. that could have been utilized by its local expertise as the technical bases for further upgrades.

10- There are also conflicts and contradictions between statements and positions provided by the Saudi Arabian authorities and those put out by the Panel with regard to strike or interception of missiles. The qualities of the retrieved missile

 **Permanent Mission of the Islamic Republic of Iran to the United Nations**

622 Third Ave New York, NY 10017   www.Iran-UN.org   Tel:+1(212)687-2020   Fax:+1(212)867-7086   E-mail:PR-Iran@un.int

components contradict the assertion about intercepting the missile by defense systems which is an issue that should be clarified.

11- There is serious doubt regarding the authenticity and credibility of the Panel's assessment. In general, the Panel has failed to fully comply with the relevant fact-finding requirements. It is a well-established rule of international law that such a claim against a sovereign State requires a degree of certainty that the Panel failed to reach. Particularly, the Panel's report even fails to comply with the Methodological Standards elaborated in different phrases in the Annex of UNSC document S/2006/997, inter alia, paragraph 21, 22, 23, 25, 27, and 28. The Islamic Republic of Iran firmly believes that, in this case, the Panel should have considered the admissibility of the evidence from State that is party to the conflict as a preliminary step. Moreover, the reliability and probative values of the evidence are questionable on many reasonable grounds, including those enumerated above. The liberal approach taken by the Panel vis-à-vis the allegations would encourage more fabrications of allegation for political purposes. Accordingly, not only did the Panel not help restoring peace and security in the region, but would also hurdle the possibility of any political solution in the future.

12- The Islamic Republic of Iran categorically rejects those baseless allegations contained in the Panel's report and reiterates that it has no policy to transfer to or manufacture arms in Yemen. It is incumbent upon the Panel to revise and correct its assessments on the implementation of Arms Embargo imposed by UN Security Council Resolution 2216 (2015).

I should appreciate if you would have this letter included as an Annex to the Final Report of the Panel of Expert pursuant to the Security Council Resolution 2140 (2014).

Eshagh Âl-Habib
Ambassador
Charge d'Affaires, a.i.

Ahmed Himmiche
Coordinator
Panel of Experts on Yemen
Security Council resolution 2342 (2017)
to the United Nations, New York

18-00267

## Annex 37:   Reported UAV attacks on UAE forces in Yemen (2016 - 2017)

1.      The UAE have reported eleven attacks against their ground forces by attack UAVs and one crashed UAV (table 37.1) to the Panel.[1]

Table 37.1
**UAV attacks against UAE ground forces**

| Serial | Date | Time (GMT) | Location | Remarks |
|--------|------|------------|----------|---------|
| 1 | 19 Sep 2016 | | Sharurah, Ma'rib | Crashed UAV (Serial Number: 22-17-28) (See annex 38) |
| 2 | 1 Dec 2016 | 17:17 | Ma'rib | |
| 3 | 1 Dec 2106 | 17:50 | Ma'rib | |
| 4 | 1 Dec 2016 | 18:20 | Ma'rib | |
| 5 | 3 Dec 2016 | 09:46 | Ma'rib | |
| 6 | 13 Dec 2016 | 19:20 | Ma'rib | |
| 7 | 13 Dec 2016 | 20:00 | Ma'rib | |
| 8 | 2 Jan 2017 | 17:17 | Al Mandab | |
| 9 | 7 Jan 2017 | 18:20 | Al Mandab | |
| 10 | 8 Jan 2017 | 23:15 | Al Mandab | |
| 11 | 9 Jan 2017 | 00:50 | Ma'rib | |
| 12 | 17 Jan 2017 | 20:20 | Al Mandab | |

2.      On 19 September 2016 a Qasef-1 UAV, launched from Sana'a airport area, crashed in the Sharurah Area near Ma'rib governorate.  The UAV had travelled for approximately 100km at an average flight speed of 150kph for 40 minutes (figure 37.1).

Figure 37.1
**UAV Track (19 September 2016)[2]**



_____

[1] Letter to Panel on 26 January 2017 from Permanent Mission.
[2] Panel diagram based on a Member State's information.

S/2018/68

## Annex 38:  Houthi-Saleh 'Qasef-1' unmanned aerial vehicles (UAV)

### A.    Seizures

1.      On 27 November 2016, a Dubai registered truck (Dubai/13933) was intercepted at the Almeel checkpoint near Ma'rib and was found to contain components for at least six complete Qasef-1 UAV and some components for up to another 24 UAV.[1] Components were also recovered by UAE forces from crashed UAV in Ma'rib (19 September 2016)[2] and Aden Airport (16 November 2016).[3]

2.      The medium sized Qasef-1 (Striker-1) UAV (figures 38.1 and 38.2) is virtually identical in design and capability to that of the Ababil-T[4] UAV (figures 38.3 and 38.4) manufactured by the Iran Aircraft Manufacturing Industries (HESA).[5] The Ababil-T is a short to medium range attack UAV with the capability of delivering a 30 to 45kg warhead up to 150km.

Figure 38.1
**Houthi image of UAV Qasef 1 (Striker 1)[6]**



Figure 38.2
**Crashed UAV Qasef 1[7]**



Figure 38.3
**Iranian Ababil-T UAV[8]**



Figure 38.4
**Iranian Ababil-T UAV[9]**



### B.    Design and manufacture standards

5.      The design and manufacture standards for the Qasef-1 UAV are not of a high quality.  Table 38.1 summarises some of these issues.

---

[1] Letter from Member State. Including Qasef-1 Serial Numbers 22-122-33, 22-122-34, 22-122-38, 22-1721-39, 22-1721-?, 22,1721-0 and 22-1722-9.

[2] Letter from Member State. Qasef-1 Serial Numbers 22-1728.

[3] Qasef-1 Serial Numbers 22-122-39.

[4] Source. Identified from Janes' www.janes.his.com database.

[5] HESA is a subsidiary of the government owned Iran Aircraft Industries Organization (AIO), located in Isfahan, Iran. AIO is itself part of the Defence Industries Organization (DIO) conglomerate.

[6] Sources. 1)  https://mobile.almasdarnews.com/article/photos-hourhis-reveal-new-types-surveillance-attack-drones; and 2) https://www.youtube.com/watch?feature=youtu.beandv=YfsV6C4W8b4andapp=desktop (at 29 – 41 seconds).

[7] Source. Conflict Armament Research.  Other information also derived from, or cross checked with, Conflict Armament Research, *Iranian Technology Transfers to Iran,* March 2017. http://www.conflictarm.com/download-file/?report_id=2465andfile_id=246.

[8] Image courtesy of Janes' www.janes.his.com database.

[9] Ibid.

18-00267

Table 38.1
**Qasef-1 UAV design issues**

| Serial | Component / Issue | Comment | Operational limitation |
|---|---|---|---|
| 1 | Li-Ion Battery | Only one battery is fitted to the UAV.  It powers the servos for the ailerons and the GPS. | There is no built-in redundancy, so a battery failure will lead to immediate flight termination. |
| 2 | DC Output Converter | This is fitted to step down the voltage from 11.1V for the aileron servos to 3V for the GPS. | |
| 3 | Circuit Boards | Silicone has been used as a form of crude insulation. | This may melt at high operating temperatures leading to electrical failures. |
| 4 | Circuit Boards | Metal bolts have been used to secure the circuit boards to the UAV. | These may cause short circuits and electrical failures. |
| 5 | Li-Ion Battery (2,680mAh) | Wrapped in red tape. | There is no rationale for this, other than possibly to try and disguise manufacturer and hence source. |
| 6 | GPS | GPS is the sole means of inputting target data. | Once the UAV reaches the target the GPS will switch off the power and the UAV will "glide" to the target.  Target accuracy can thus only be within +/- 25m, dependent on the cruising altitude set by the operator. It is not a precision weapon. |

## C.    Tracing and sources

6.      The Panel initiated tracing requests for those components that had markings in order to identify the manufacturer and supply chain for the Qasef-1 UAV (see summary and diagram at appendix A).

7.      One component, the Titanium Gear Servo HS-7955TC, was traced from the manufacturer to Tehran Hobby[10] in Iran. The payment was made by Succor Trading through Emirates Islamic Bank (account number: 370XXXXXX6102). The component was supplied to Tehran Hobby limited in mid-2015, subsequent to the implementation of the targeted arms embargo on 14 April 2015.

8.      One component, the DC Output Converter, was traced from the manufacturer to Arman Optimized Systems[11] in Iran. Initially Arman Optimized Systems paid for the components from an Iranian Bank and

---

[10] Tehran Hobby, Eastern Suite, 1st Floor, No.1 Espinas Building, Mirzababaei Blvd, Pounak Square, Tehran, Iran.  http://tehranhobby.com/.
[11] Arman Optimized Systems, 5th Floor, 111 Ebne Yamin Street, North Sohrevardi Avenue, Tehran, Iran. +98 21 8850 1327. Source: Confidential.

components were delivered directly, but commencing in August 2015 the company requested delivery to a logistics company[12] in Hong Kong and payment was made from a Hong Kong bank.[13]

9.      The Panel has also identified that in 2012 another component type, the L78 Voltage regulator, was supplied by the manufacturer to one of three other companies in China. The subsequent movement of this component could not be traced.

10.     A Model V-10 Gyroscope is identical in design to one recovered from an Iranian manufactured Ababil-3 UAV in Iraq. The serial number of one of the Qasef-1 V-10 gyroscopes is a 4-digit serial number (S/N 2218) and only 83 serial numbers different from the Ababil-3 UAV (S/N 2301) recovered in Iran. These both very possibly being from the same source.[14]

## D.     Panel findings

11.     The components necessary to assemble Ababil-T UAV have been supplied to the Houthi-Saleh alliance. Although Houthi-aligned media announced that the Sana'a-based ministry of defence manufactured the UAV, in reality they are assembled from components supplied by an outside source and shipped into Yemen.

12.     The Panel finds that, based on: 1) the design, dimensions and characteristics of the UAV; and 2) the identification and tracing of component parts, the material necessary to assemble the Qasef-1 UAVs, emanated from Iran. The assembled UAV are then virtually identical to the ABABIL-T manufactured by the Iran Aircraft Manufacturing Industries (HESA).[15] The Panel finds that the Ababil-T UAV has been designed and produced specifically for the military purposes of remote explosive attack or ISTAR.

13.     The Panel finds that as the Islamic Republic of Iran has not provided any information to the Panel of any change of custody of the Qasef-1 or the components, the Islamic Republic of Iran is in non-compliance with paragraph 14 of resolution 2216 (2015) in that it failed to take the necessary measures to prevent the direct or indirect supply, sale or transfer of military related equipment to the Houthi-Saleh forces, an entity acting at the direction of listed individuals.

---

[12] Part supplied via Turn Key International Logistics Company Limited, Flat D. G/F Roxy Industrial Centre, 41 – 49 Kwai Cheong Road, Hong Kong, China. +852 9219 8927 / +852 6382 1975. Source: Confidential.

[13] Industrial and Commercial Bank of China (Asia) Limited, Hong Kong, China. (SWIFT: UBHKHKHH). Account Number: 86XXXXXX4237. Account Name: Ginseng Global Company Limited.

[14] Iranian Technology Transfers to Yemen, Conflict Armament Research Limited, London, March 2017.

[15] HESA is a subsidiary of the government owned Iran Aircraft Industries Organization (AIO), located in Isfahan, Iran. AIO is itself part of the Defence Industries Organization (DIO) conglomerate.

**Appendix A to Annex 38: QASEF-1 component tracing**

Table A.38.1
**Origin and destination of UAV components**

| Ser | Component | Serial / Lot number | Image reference[16] | Manufacturer | | Supplied to | | |
| | | | | Company | Country / entity | Date | Company | Country / entity |
|---|---|---|---|---|---|---|---|---|
| 1 | Sail Propeller Y-A 22x18 | | IMG_2997 | Sail Aviation Propeller[17] | China | | No response to tracing request | |
| 2 | Titanium Gear Servo HS-7955TC | | IMG_2998 | Hitec[18] | Republic of Korea | Mid 2015 | Tehran Hobby Limited[19] | Iran |
| 3 | DC Output Converter MIW 3021 | | IMG_3029 | Minmax | Entity | Post Aug 2015 | Arman Optimised Systems[20] | Iran |
| 4 | NAVIOR Satellite Compass NAVIS NC144_02 | 58013428 | IMG_3028 | NAVIS Ukraine[21] | Ukraine | *2009* | *Anshuai Electronics[22]* | *India* |
| 5 | Voltage Regulator | L78 | P2020160 | ST Microelectronics | Member State | 2002 | WT Microelectronics,[23] Willas-Array Electronics,[24] or Selcom Electronics[25] | Hong Kong, China Hong Kong, China |
| 6 | DLE-111 Petrol Engine | | IMG_2995 | Mile Hao Xing Technology Company[26] | China | | *Company claims a counterfeit* | |
| 7 | Full Duplex Multi-Frequency Data Link | FKAR-D94-1018 | IMG_3009 | Not identified | | | | |
| 8 | Li-Ion Battery | 2212230 | IMG_3006 | Not identified | | | | |
| 9 | Vertical Gyroscopes V10 | 1233, 1768, 2076, 2099, 2109, 2216 and 2218 | IMG_3047 | Not identified | | | *S/N 2301 seen on an Iranian Ababil-3 recovered in Iraq* | |

[16] Sources: Conflict Armament Research and Confidential Sources.  Images at appendix 2.

[17] Sail Aviation Propeller, Audio Supplies Company Limited, Kaiyuan City, Liaoning Province, China. Email: mailto:2284001479@qq.com.

[18] HITEC RCD Korea, Ochang, Cheongwon-gun, Chungcheongbuk-do, Republic of Korea. http://www.hitecrcd.co.kr/new/.  Possibly manufactured in China though by Hitec-Multiplex China Incorporated, 3F of Hong Li Building 1, 24W Jinfeng Road, Jindig Industrial Park, Tanglia, Zhuhai, China. http://www.hitecrcd-china.com.

[19] Tehran Hobby, Eastern Suite, 1st Floor, No.1 Espinas Building, Mirzababaei Blvd, Pounak Square, Tehran, Iran.  http://tehranhobby.com/.

[20] Arman Optimized Systems, 5th Floor, 111 Ebne Yamin Street, North Sohrevardi Avenue, Tehran, Iran. +98 21 8850 1327.  Part supplied via Turn Key International Logistics Company Limited, Flat D. G/F Roxy Industrial Centre, 41 – 49 Kwai Cheong Road, Hong Kong, China. +852 9219 8927.

[21] NAVIS Ukraine LLC, Smela Street, Mazur 14, Cherkasy Region, Ukraine 20704. http://www.navis-ukraine.com.ua.

[22] Anshuai Electronics, Plot 21, Venkateshwara Colony, Ecil Post, Hydrabad – 500062, Andhra Pradesh, India. Although NAVIS state they supplied to Anshuai, this company states they did not receive that particular serial number. Panel investigations continue.

[23] WT Microelectronics Limited, Lot 3719, H DD 104, Hong Kong, China. http://www.wtmec.com/WT/?lang=en.

[24] Willis-Array Electronics, 24/F, Wyler Centre, Phase 2, 200 Tai Lin Pai Road, Kwai Chung, New Territories, Hong Kong, China. http://www.willas-array.com/index.php?lang=en.

[25] Selcom Group S.p.A.,Via A. Grandi, 5 , 40013 Castel Maggiore (BO), Italy. Manufactured by Selcom Electronics Limited, A7/A24 Workshop, No 5399, Waiqingsong Road, Waiqingsong H, Shanghai, 201707, China. http://www.selcomgroup.com/contacts/.

[26] Mile Hao Xiang Technology Co. Ltd, located in the Chinese Yunnan Honghe Hani Autonomous Prefecture of Maitreya. (http://www.dlengine.com).

Figure A.38.1
**Supply chain diagram**



**Appendix B to Annex 38: QASEF-1 component imagery**[27]

Figure B.38.1
**IMG-2997: Sail Propeller**



Figure B.38.2
**IMG-2998: Titanium Gear Servo HS-7955TC**



Figure B.38.3
**IMG-3029: DC Output Converter MIW 3021**



Figure B.38.4
**IMG-3028 NAVIOR Satellite Compass NAVIS NC144_02**



Figure B.38.5
**P2020160: L78 Voltage Regulator**



Figure B.38.6
**IMG-2995: DLE-111 Petrol Engine**



---

[27] Imagery from Conflict Armament Research.

S/2018/68

Figure B.38.7
**IMG-3009: Full Duplex Multi-Frequency
Data Link**



Figure B.38.8
**IMG-3006: Li-Ion Battery**



Figure B.38.9
**IMG-3047: Vertical Gyroscope V10**



Figure B.38.10
**IMG-3053: Li-Ion Battery Unknown Make**



18-00267

## Annex 39: Houthi-Saleh 'Rased' unmanned aerial vehicles (UAV)

### A.    Seizures

1.    The Saudi Arabia-led coalition has seized a number of crashed or downed 'Rased' UAV in 2017; 1) Nihm (25 March 2017); 2) Sana'a (20 September 2017); and Kirsh, Lahij (20 September 2017) (see figures 39.1 to 39.3).[1]

Figure 39.1
**Downed 'Rased' UAV**
**Nihm (25 March 2017)**



Figure 39.2
**Downed 'Rased' UAV**
**Sana'a (20 September 2017)**



Figure 39.3
**Downed 'Rased' UAV**
**Kirsch, Lahij (20 September 2017)**



### B.    Design

2.    The Panel is almost certain that the 'Rased" UAV is actually the commercially available Skywalker-8 manufactured by Skywalker Technology Limited of China (www.skywalker-model.com). The common design and characteristics between the two UAV are shown at figures 39.4 and 39.5.

---

[1] Twitter: @JoshuaKoontz_1.

S/2018/68

Figure 39.4
**'Rased' v Skywalker-8 type indicators 1**





**Type Indicators 1**

1. Winglet shape and size.
2. Tail profile.
3. Nose profile.
4. Wing area and shape.

X-8 Skywalker Imagery from www.img.banggood.com.

18-00267

Figure 39.5
**'Rased' v Skywalker-8 type indicators 2**



**Type Indicators 2**

1. Aileron position and size.
2. Access panel.



X-8 Skywalker Imagery from www.img.banggood.com.

3.      Dimensional analysis by photogrammetry provides a further indicator that the two UAV are the same. Photogrammetry was used to estimate the dimensions of an X-8 Skywalker to compare it to the declared Houthi dimensions (figure 39.6).  The Houthi declared dimensions of a wingspan of 2.2m and a length of 1.0m.  Photogrammetry derived dimensions of an X-8 Skywalker produce a wing span tip to tip of 2.24m and a length from nose tip to rear of wing tip of 1.1m.  When allowing for error due to parallax these are virtually identical to the Houthi declared data.

Figure 39.6
**'Rased' versus Skywalker-8 type dimensional analysis by photogrammetry**

| KNOWN OBJECT PHOTOGRAMMETRY | | Image | 20150711101811-3964.jpg |
|---|---|---|---|

| Known Dimensions | mm | On Screen | Scale |
|---|---|---|---|
| X-8 Wing Span (Foil) | 2122 | 270 | 0.1272 |

| Estimated Dimensions | mm | On Screen | Scale |
|---|---|---|---|
| Wing Span (Tips) | **2240** | 285 | 0.1272 |
| | | | |

| KNOWN OBJECT PHOTOGRAMMETRY | | Image | 20150711101844-9760.jpeg |
|---|---|---|---|

| Known Dimensions | mm | On Screen | Scale |
|---|---|---|---|
| Main Body Length | 790 | 80 | 0.1013 |

| Estimated Dimensions | mm | On Screen | Scale |
|---|---|---|---|
| Length (Nose to Tail) | **1086** | 110 | 0.1013 |
| | | | |

## C.    Supply options

4.    The X-8 Skywalker is widely available commercially (see table 39.1). The Panel has also identified that the X-8 Skywalker is unique in its design, and that no other comparable UAV is available in commercial markets.

Table 39.1
**Commercial availability of Skywalker X-8**

| Ser | Company | Country | Remarks |
|---|---|---|---|
| 1 | Airelectronics[2] | Spain | |
| 2 | Aerosystems West[3] | USA | |
| 3 | Banggood[4] | China (Hong Kong) | Shipped from Hong Kong, China |
| 4 | DH Gate.com[5] | Global | Shipped direct from China |
| 5 | E-Bay[6] | UK | Shipped direct from Hong Kong, China |
| 6 | Flitetest.com[7] | USA | Reviewed by USA consumer |

---

[2] http://www.airelectronics.es/products/solutions/x8/.
[3] https://www.aerosystemswest.com/product-page/skywalker-x8-flying-wing.
[4] https://www.banggood.com/es/Skywalker-X8-X-8-Black-White-FPV-Flying-Wing-2122mm-EPO-RC-Airplane-KIT-p-1104501.html?utm_source=googleandutm_medium=cpc_odsandutm_content=anaandutm_campaign=es-Splan-ds-feed-planeandgclid=EAIaIQobChMI9LH7hPvW1gIV7rvtCh3wtAiYEAAYASAAEgLVpvD_BwE.
[5] https://www.dhgate.com/uk/skywalker-x8-uk.html.
[6] http://www.ebay.co.uk/itm/SkyWalker-2120mm-X8-RC-Plane-White-KIT-No-Electronics-/171816307772.
[7] https://www.flitetest.com/articles/skywalker-x-8.

| Ser | Company | Country | Remarks |
|-----|---------|---------|---------|
| 7 | FPVModel.com[8] | China | Shipped direct from China. |
| 8 | Porcupine RC[9] | USA | Shipped direct from Hong Kong, China |
| 9 | UAV Systems International[10] | USA | Sold as part of a full UAV surveillance system in USA |
| 10 | UuuStore.com[11] | China | Shipped direct from China. |

---

[8] https://www.fpvmodel.com/skywalker-white-x8-airplane-fpv-flying-wing_g27.html.
[9] http://www.porcupinerc.com/SkyWalker-2120mm-X8-FPV-RC-Plane-KIT-Black-No-Electronics_p_534.html.
[10] http://www.uavsystemsinternational.com/product/x8-long-range-surveillance-drone/.
[11] http://www.uuustore.com/skywalker-x8-epo-white-uav-flying-wing-2120mm-big-fpv-necessary-airplane-p-1830.html.

**Annex 40:     Chronology of reported sea mine incidents in Red Sea (2017)**

Table 40.1
**Summary of sea mines warnings, seizures or deployments (2017 to date)**

| Ser | Date | Mine Type | Incident type | Location near | Geo-location | Remarks |
|---|---|---|---|---|---|---|
| 1 | Nov 2016 | Improvised | Find | Hudaydah | | Reported to Panel by a confidential source. |
| 2 | 4 Feb 2017 | Not Known | Threat | Mukha | | US MARAD[1] warns of sea mines near entrance to Mukha harbour.[2] |
| 3 | 7 Mar 2017 | Improvised | Explosion | Hudaydah | $13^0 16.64$'N , $43^0 10.96$'E | Mine strike against A54 Qatari launch. |
| 4 | 7 Mar 2017 | Not Known | Explosion | Mukha | $13^0 13.00$'N , $43^0 13.50$'E | Mine strike against the Yemen Coastguard vessel, YN Safwan al-Ozavbi.[3] |
| 5 | 23 Mar 2017 | Improvised | Find, Rendered Safe | Midi | $16^0 15.00$'N , $42^0 48.00$'E | Recovered off beach. |
| 6 | 25 Mar 2017 | Improvised | Detonated during Render Safe Procedure (RSP) | Hudaydah | $16^0 20.48$'N , $42^0 45.01$'E | Mine detonated when attempt made by private maritime security team to detach electrical conductor to isolate the detonator. |
| 7 | 25 Mar 2017 | Improvised | Find, Rendered Safe | Mukha | $13^0 20.00$'N , $43^0 14.00$'E | |
| 8 | 15 Apr 2017 | Improvised x 4 | Find, Rendered Safe | | $16^0 20.38$'N , $42^0 45.39$'E | One detonated during tow to disposal site. |
| 9 | 15 Apr 2017 | Improvised | Find, Rendered Safe | | $16^0 20.43$'N , $42^0 44.35$'E | Detonated during tow to disposal site. |
| 10 | 24 Apr 2017 | Improvised | Detonated during Render Safe Procedure (RSP) | | | Location not provided. |

[1] Maritime Administration (United States Department of Transport).
[2] https://www.marad.dot.gov/msci/alert/2017/22863/.
[3] Also reported by MARAD. https://www.marad.dot.gov/msci/alert/2017/23275/.

18-00267

| Ser | Date | Mine Type | Incident type | Location near | Geo-location | Remarks |
|-----|------|-----------|---------------|---------------|--------------|---------|
| 11 | 30 Apr 2017 | Improvised | Detonated during Render Safe Procedure (RSP) | | $16^0$19.82'N , $42^0$45.90'E | |
| 12 | 1 May 2017 | Not Known | Explosion | Hudaydah | $16^0$15.00'N , $42^0$48.00'E | Reported to have being detonated by local fishermen. |
| 13 | 27 May 2017 | Improvised x 2 | Find, Rendered Safe | Thwaq Island[4] | $16^0$18.37'N , $42^0$45.94'E | Reported to Committee by Saudi Arabia on 30 September 2017. |
| 14 | 5 Jun 2017 | Improvised | Find, Rendered Safe | | $13^0$19.26'N , $43^0$10.09'E | |
| 15 | 5 Jun 2017 | Improvised | Find, Rendered Safe | | $13^0$19.35'N , $43^0$10.07'E | |
| 16 | 6 Jun 2017 | Improvised | Find, Rendered Safe by demolition | | $13^0$19.17'N , $43^0$09.87'E | |
| 17 | 6 Jun 2017 | Improvised | Find, Rendered Safe | | $13^0$18.56'N , $40^0$39.93'E | |
| 18 | 6 Jun 2017 | Improvised | Find, Rendered Safe | | $13^0$18.39'N , $43^0$09.21'E | |
| 19 | 7 Jun 2017 | Improvised | Find, Rendered Safe by demolition | | $13^0$19.43'N , $43^0$09.78'E | |
| 20 | 7 Jun 2017 | Improvised | Find, Rendered Safe | | $13^0$19.90'N , $43^0$09.80'E | |
| 21 | 7 Jun 2017 | Improvised | Find, Rendered Safe | | $13^0$19.54'N , $43^0$09.63'E | |
| 22 | 7 Jun 2017 | Improvised x 2 | Find, Rendered Safe | | $16^0$20.44'N , $42^0$44.75'E | |

---

[4] 16°18'42.61"N, 42°41'10.77"E.

S/2018/68

| Ser | Date | Mine Type | Incident type | Location near | Geo-location | Remarks |
|-----|------|-----------|---------------|---------------|--------------|---------|
| 23 | 8 Jun 2017 | Improvised | Find, Rendered Safe by demolition | | 13$^0$18.62'N , 43$^0$09.47'E | |
| 24 | 8 Jun 2017 | Improvised | Find, Rendered Safe by demolition | | 13$^0$18.21'N , 43$^0$09.35'E | |
| 25 | 8 Jun 2017 | Improvised | Find, Rendered Safe by demolition | | 13$^0$19.08'N , 43$^0$09.80'E | |
| 26 | 8 Jun 2017 | Improvised | Find, Rendered Safe | | 13$^0$19.55'N , 43$^0$09.63'E | |
| 27 | 8 Jun 2017 | Improvised | Find, Rendered Safe | | 13$^0$19.50'N , 43$^0$09.73'E | |
| 28 | 10 Jul 2017 | 1 x Improvised | Find | Midi | 16$^0$15.00'N , 42$^0$47.00'E | Reported to be recovered South-West of Port and rendered safe by Yemeni military. |
| 29 | 14 Sep 2017 | Improvised | Find | Ghurab Island | | Unconfirmed media reports. |
| 30 | 20 Sep 2017 | Improvised | Find, Rendered Safe | | 16$^0$16.56'N , 42$^0$45.36'E | |
| 31 | 25 Sep 2017 | Improvised | Detonated during Render Safe Procedure (RSP) | | 16$^0$16.56'N , 42$^0$45.52'E | |
| 32 | 25 Sep 2017 | Improvised | Detonated during Render Safe Procedure (RSP) | | 16$^0$16.05'N , 42$^0$45.45'E | |
| 33 | 25 Sep 2017 | Improvised | Find, Rendered Safe | | 16$^0$17.01'N , 42$^0$43.97'E | Detonated during tow to disposal site. |

## Annex 41:   Analysis of improvised sea mines

### A.   Threat

1.      Sea mines are low cost, easy to deploy, tactically very effective, difficult to detect and thus are a potent threat to both naval and commercial vessels. Relatively small quantities present a threat out of proportion to their numbers. The now confirmed possession, and probable use in the Red Sea area of sea mines by Houthi-Saleh forces adds another dimension to the maritime security environment. The deployment of these improvised sea mines now threatens the delivery of humanitarian assistance should they drift into the vital sea lines of communication (SLOC) or the approaches to the Red Sea ports. There is also the possibility of a merchant vessel being struck by a sea mine due to the volume of traffic and relatively constrained area of the Red Sea. The spatial density (mines/nm$^2$) of these sea mines will be a major contributory factor as to whether a vessel is hit. The last time when sea mines were sown in the Red Sea was 1984 resulting in 19 vessels being struck over a period of months. Only a single mine was detected, disarmed and recovered.[1]

2.      The direction of drift of any sea mines within the Red Sea is seasonally dependent. From May to November 2017 the mines will have drifted down the Red Sea until they join the predominantly Southern summer current and reach the Strait of Bab al-Mandab, or drift ashore back on the Yemeni coast or coastal islands (as indicated by the recovery from Thwaq Island). It is possible that they will then drift through the Strait of Bab al-Mandab into the Eastern Indian Ocean.

3.      In November 2017 the currents changed direction. Any remaining improvised sea mines will continue to drift down the coast with the Eastern Boundary Current until they reach Mukha and the Strait of Bab al-Mandab, where they will be drawn into the predominantly Northern winter current, reverse direction and drift up the central channel of the Red Sea near or in the major shipping lanes towards the Suez Canal area (figure 41.1).

Figure 41.1
**Seasonal sea mine drift in Red Sea**[2]




### B.   Technical analysis

4.      The recovered improvised sea mines are similar in design and concept to mid-20th century sea mines. They are locally manufactured and contain approximately 21 kg of high explosive.  Table 41.1 contains data on the mine design and dimensions.

---

[1] www.washingtonpost.com/archive/politics/1984/09/18/british-moving-possible-mine-from-red-sea/a5f41b34-8f7b-4fa3-990e-dc1dee3648c6/?utm_term=.9a199f7b0232 and www.csmonitor.com/1984/0808/080817.html.
[2] Information on seasonal currents from http://www.hisutton.com/Houthi_mines_in_Red_Sea.html.

S/2018/68

Table 41.1
**Design and dimensions of Houthi-Saleh improvised sea mines**

| Ser | Area | Data | Remarks |
|---|---|---|---|
| 1 | Dimensions | 0.72m (L) x 0.397m (D) | |
| 2 | Initiation system (switch) | 4 x Contact Horns | |
| 3 | Initiator | Commercial electric detonator | |
| 4 | Booster explosive charge | RDX (0.7kg) | Probably harvested military explosive from abandoned explosive ordnance (AXO) |
| 5 | Main explosive charge | Ammonium Nitrate / Aluminium (20.3kg) | Improvised Ammonal Velocity of Detonation = 4,000m/s+ |
| 6 | Power Source | 16 x AA Batteries | |
| 7 | Container type | Ferrous cylinder | |

5.      The "Thwaq" mines were reported as being of sound construction, with a degree of standardization between the mines, which includes quick connecters to the wiring harness. The mines are assessed as being watertight, meaning that it should not be expected that they would leak and subsequently sink.

6.      There are a number of features of the "Midi" mine that challenge its design integrity.  These are discussed in table 41.2, which refers to figure 41.2.

7.      <span style="color:red">WARNING</span>.  At least 4 of the 25 improvised mines (16%) encountered by the Saudi Arabia-led coalition to date have initiated during the render safe procedure, or when being towed to a safe disposal site.

Figure 41.2
**The "Midi" improvised sea mine[3]**

 

---

[3] Widely reported in media. e.g. Covert Shores, 25 March 2017.

18-00267

Table 41.2
**Design and dimensions of Houthi-Saleh improvised sea mines**

| Red Circle | Generic | Analysis | Remarks |
|---|---|---|---|
| 1 | Horns | No rust on horns so probably plastic | Presence of AA batteries means not chemical as there is no requirement for an electrolyte to charge a battery. |
| 2 | Mooring wire | Based on the cable diameter and rim size, the cable is no more than 30m. | |
| 3 | Cradle | Assuming the steel is one inch angle iron means that could be too small to overcome the buoyancy of the mine on its own and would require a sinker attached to it. | No sinkers identified. |
| | | From known mine dimensions the cradle is assessed as being approximately 0.45m (L) x 0.4m (W).  From density calculations it is estimated that the mass of the cradle plus 30m of mooring wire is approximately 26kg. | |
| 4 | Mooring wire | Approximately 30m of possible 10mm steel cable. | |
| 5 | Dissolving Arming Disc | | There is no mine release mechanism on the cradle, which would be required if the mine were to be armed hydrostatically. |
| 6 | Unknown vessel | | |
| 7 | Container | Based on the dimensions of the "Thwaq" mine, the container is 0.72m long by 0.397m diameter.  Assuming 10mm thickness steel, the approximate container weight is 87kg. | |

7.      There are slight design differences between the "Midi" mine and the "Thwaq" mines, namely the positioning of the Dissolving Arming Disc, which is central on the "Midi" mine and offset on the "Thwaq" mine.

8.      The buoyancy of an object can be calculated by comparing the Buoyancy Force (Newtons (N)) against the Gravity Force (N).

Buoyancy Force = Volume ($m^3$) x Density of Water ($kg/m^3$) x Force of Gravity (g) ($m/s^2$)

Gravity Force = Mass (kg) x g ($m/s^2$)

9.      If the buoyancy force is greater than the gravity force then the improvised mine will float. In this case the steel thickness of the improvised mine body will be the determining factor as to whether the improvised mines float or sink.  For these improvised sea mines if the steel is thicker than 7mm the improvised mines will sink.

## Annex 42:    Technical analysis of ATGW 9M133 'Kornet' versus 'Dehleyvah'

1.    Tables 42.1 and 42.2 show the location of the markings and other "identifiers".   Supporting imagery is at figures 42.1 to 42.4.

Table 42.1
**Identifiers for ATGM type (9M133 'Kornet' v 'Dehleyvah')**

| Serial | Identifier or markings | 9M133 'Kornet' | 'Dehleyvah' | Remarks |
|--------|------------------------|----------------|-------------|---------|
| 1 | End Cap Chamfer | Minimal | Pronounced | |
| 2 | Tube Code | Yes | None | K (K) = Warhead Type<br>H (N) = Warhead Code |
| 3 | Warhead Filling and Date | Yes | None | |
| 4 | Load Condition | Yes | None | OK CHAP means Fuzed |
| 5 | Missile Type Code | Numerical only | Numerical and text | M (M) = Missile Code |
| 6 | Lot / Batch Number | 02 - 08 | LOT: 07<br>DATE: 2015 | |
| 7 | ATGM Serial Number | Numerical only | S/N: then Numerical | |
| 8 | Temperature Limitations | None | -20$^0$C to +50$^0$C | |
| 9 | Body Colour | Sandy Green | Olive Green | |
| 10 | Tube Material | Wrapped GRP | Extruded | |
| 11 | Font for Markings | Stencil type | Block type | |

Table 42.2
**Identifiers for ATGM type (9M133-1 'Kornet' (Export Version) v 'Dehleyvah')**

| Serial | Identifier or markings | 9M133 'Kornet' | 'Dehleyvah' | Remarks |
|--------|------------------------|----------------|-------------|---------|
| 1 | End Cap Chamfer | Minimal | Pronounced | |
| 2 | Tube Code | Yes | None | K (K) = Warhead Type<br>H (N) = Warhead Code |
| 3 | Load Condition | Yes | None | FULLY LOADED means Fuzed |
| 4 | Missile Type Code | Numerical only | Numerical and text | M (M) = Missile Code |
| 5 | Lot / Batch Number | 02 - 08 | LOT: 07<br>DATE: 2015 | |
| 6 | ATGM Serial Number | Numerical only | S/N: then Numerical | |
| 7 | Temperature Limitations | None | -20$^0$C to +50$^0$C | |
| 8 | Body Colour | Sand | Olive Green | |
| 9 | Tube Material | Wrapped GRP | Extruded | |
| 10 | Font for Markings | Stencil type | Block type | |

18-00267

Figure 42.1
**9M133 'Kornet' ATGM[1]**



Figure 42.2
**9M133 'Kornet' ATGM (Export Version)[2]**



Figure 42.3
**'Dehleyvah' ATGM[3]**



Figure 42.3
**'Dehleyvah' ATGM markings[4]**



---

[1] Panel image.
[2] Ibid.
[3] Confidential source.
[4] Ibid.

## Annex 43:    Summary of black market small arms ammunition prices[1]

Figure 43.1
**Graph of Black Market prices (Yemen) (2015 – 2017)**



Figure 43.2
**Graph of Black Market prices (Aden) (2015 - 2017)**



---

[1] Data sourced from a UN agency in Yemen.

18-00267

Figure 43.3
**Graph of Black Market prices (Abyan) (2016 - 2017)**



Figure 43.4
**Graph of Black Market prices (Other) (2016 - 2017)**



S/2018/68

## Annex 44:    End User Certificates

Figure 44.1
**EUC related letter from Houthi-Saleh administration**



18-00267

S/2018/68

*UN official translation from Arabic* [1]

Republic of Yemen
Ministry of Defence
Procurement Office

No. ...

Date: 1 July 2015

Major General Husayn Najiy Khayran
Acting Minister of Defence
    On the instructions of the acting Minister of Defence and Chief of the General Staff, Major General Husayn Najiy Khayran, [handwritten addition, illegible] between the Ministry of Defence, represented by the Procurement Office, being the first party, and the Fusul corporation, represented by its director, Mr. Adib Fares Mohammed, being the second party, for the importation of the arms and ammunition mentioned in the end user certificate that was drafted on the instructions of the acting Minister of Defence.

    Accordingly, the second party undertakes to deliver in instalments the above-mentioned in the period between July 2015 and the end of 2016.

    The value was calculated on the basis of each invoice individually and guarantees were offered by Mr. Fares Mana'a and Mr. Rashid Fares.

Mr. Fares Mohammed Mana'a

Second party

(*Signed*) Mr. Adib Mohammed Fares

First party

[stamped] (*Signed*) Colonel Muhammad Muhammad al-Saqqaf

Director, Procurement Office

---

[1] 1702089E dated 13 February 2017.

Figure 4.2
**EUC to support possible attempt to procure arms from Bulgaria**



Figure 44.3
**EUC to support possible attempt to procure arms from China, Iran, Serbia and Slovak Republic**



Figure 44.4
**Second EUC to support possible attempt to procure arms from Iran**



End User Certificate No.(D.M/KH/ /2015)

To whom it may concern:
We the ministry of Defense of the Republic of Yemen hereby officially confirm that following goods:

| No. | Item | Qty |
|-----|------|-----|
| 1 | AKSU-74U rifle cal. 5.45x39mm (short assault rifle) | 10.000 |
| 2 | AKSU-74U rifle cal. 7.62x39mm | 10.000 |
| 3 | AKSU-47 assault rifle cal. 7.62x39mm | 150.000 |
| 4 | Ammunition cal. 5.45x39mm | 10.000.000 |
| 5 | Ammunition cal. 7.62x39mm | 100.000.000 |
| 6 | Machine gun cal. 7.62x54mm | 2.500 |
| 7 | Sniper rifle cal. 7.62x54mm | 1.500 |
| 8 | Ammunition cal. 7.62x54mm | 20.000.000 |
| 9 | Machine gun G3 cal. 7.62x51mm | 20.000 |
| 10 | Ammunition cal. 7.62x51mm | 10.000.000 |
| 11 | Pistol Tokarev TT cal. 7.62x25mm | 60.000 |
| 12 | Ammunition cal. 7.62x25mm | 15.000.000 |
| 13 | Pistol Makarov cal. 9x18mm | 20.000 |
| 14 | Ammunition cal. 9x18mm | 10.000.000 |
| 15 | Pistol cal. 6.35mm | 20.000 |
| 16 | Ammunition cal. 6.35mm | 5.000.000 |
| 17 | Pistol cal. 7.65mm (32 auto) | 20.000 |
| 18 | Ammunition 7.65mm (32 auto) | 5.000.000 |
| 19 | Pistol cal. 9mm | 20.000 |
| 20 | Ammunition cal. 9x19mm | 10.000.000 |
| 21 | Pistol cal. 22LR | 20.000 |
| 22 | Ammunition cal. 22LR | 30.000.000 |
| 23 | MP5 machine gun cal. 9x19mm | 5.000 |
| 24 | Rifle M16 cal. 5.56mm | 10.000 |
| 25 | Ammunition cal. 5.56mm | 10.000.000 |

Will be imported for Ministry of Defense of the Republic of Yemen from the Republic of Iran purchased by "DEFENSE INDUSTRIES ORGANIZATION IRAN".
The above mentioned equipment will exclusively be used by Yemeni Army and will not be re-exported to any other third party.
The Ministry of Defense hereby confirms the importation of these goods will be ensured by AL-FOSOL TRADING headed by Mr. Adeeb F. Mohamed.
Delivery : in serveral shipments during the years 2015-2016.
This certificate is valid till the 31 December 2016.///

With best regards,,,

Brig. /
Mohammed Mohammed AL-Sakkaf
Director of Procurement Department

Figure 44.5
**EUC to support possible attempt to procure arms from the Philippines**



Figure 44.6
**Second EUC to support possible attempt to procure arms from Serbia**



End User Certificate No.(D.M/KH/ /2015)

To whom it may concern:

We the ministry of Defense of the Republic of Yemen hereby officially confirm that following goods:

| No. | Item | Qty |
|---|---|---|
| 1 | AK-47 rifle cal. 7.62x39mm | 50.000 |
| 2 | Ammunition cal. 7.62x39mm | 50.000.000 |
| 3 | AKSU-74U 5.45x39mm (short assault rifle) | 10.000 |
| 4 | Ammunition 5.45x39mm | 5.000.000 |
| 5 | AKSU-74U cal. 7.62x39mm | 20.000 |
| 6 | Hunting rifle cal. 22LR | 30.000 |
| 7 | Ammunition rifle cal. 22LR | 50.000.000 |
| 8 | Sniper rifle cal. 7.62x54mm | 2.000 |
| 9 | Machine gun cal. 7.62x54mm | 1.000 |
| 10 | Ammunition cal. 7.62x54mm | 10.000.000 |
| 11 | Sniper rifle cal. 7.62x51mm | 3.000 |
| 12 | Ammunition cal. 7.62x51mm | 5.000.000 |
| 13 | Sniper rifle cal. 7.92mm | 5.000 |
| 14 | Ammunition cal. 7.92mm | 10.000.000 |
| 15 | Tokarev TT cal. 7.62x25mm | 40.000 |
| 16 | Ammunition cal. 7.62x25mm | 15.000.000 |
| 17 | Makarov cal. 9x18mm | 20.000 |
| 18 | Ammunition cal. 9x18mm | 10.000.000 |
| 19 | Ammunition cal. 6.35mm | 7.000.000 |
| 20 | Pistol cal. 7.65mm (32 auto) | 5.000.000 |
| 21 | Ammunition cal. 9x19mm | 5.000.000 |
| 22 | Ammunition cal. 38 special | 5.000.000 |
| 23 | Pistol cal. 7.65mm and pistol cal. 6.35mm | 25.000 |

Will be imported for Ministry of Defense of the Republic of Yemen from the Serbia Republic purchased by "ZASTAVA ORUJE AD KOSOVSKA 4".

The above mentioned equipment will exclusively be used by Yemeni Army and will not be re-exported to any other third party.

The Ministry of Defense hereby confirms the importation of these goods will be ensured by AL-FOSOL TRADING headed by Mr. Adeeb F. Mohamed.

Delivery : in serveral shipments during the years 2015-2016.

This certificate is valid till the 31 December 2016.///

With best regards,,,

Brig. /
Mohammed Mohammed AL-Sakkaf
Director of Procurement Department

Figure 44.7
**Second, third and fourth EUC to support possible attempt to procure arms from the Slovak Republic**



S/2018/68

وزارة الدفاع
دائرة المشتريات

الرقم :
التاريخ :

D.M/KH/10/2015
Date: 30/6/2015

## End User Certificate No.(D.M/KH/10/2015)

*To whom it may concern:*
We the ministry of Defense of the Republic of Yemen hereby officially
confirm that following goods:

| No. | Item | Qty |
|---|---|---|
| | | 200.000 |
| 1 | AK-47 rifle cal. 7.62x39mm | 100.000.000 |
| 2 | Ammunition cal. 7.62x39mm | 5.000 |
| 3 | Sniper rifle cal. 7.62x54mm | 2.500 |
| 4 | PKS cal. 7.62x54mm | 15.000.000 |
| 5 | Ammunition cal. 7.62x54mm | 20.000 |
| 6 | AKSU-74U cal. 7.62x39mm | 10.000 |
| 7 | AKSU-74U cal. 5.45x39mm (short assault rifle) | 5.000.000 |
| 8 | Ammunition 5.45x39mm | 30.000 |
| 9 | Hunting rifle cal. 22LR | 50.000.000 |
| 10 | Ammunition rifle cal. 22LR | 20.000 |
| 11 | Pistol cal. 22LR | 50.000 |
| 12 | Tokarev TT cal. 7.62x25mm | 5.000.000 |
| 13 | Ammunition cal. 7.62x25mm | 15.000 |
| 14 | Makarov 9x18mm | 5.000.000 |
| 15 | Ammunition cal. 9x18mm | 30.000 |
| 16 | Pistol cal. 6.35mm | 7.000.000 |
| 17 | Ammunition cal. 6.35mm | 20.000 |
| 18 | Pistol cal. 7.65mm (32 auto) | 5.000.000 |
| 19 | Ammunition 7.65mm (32 auto) | 15.000 |
| 20 | Pistol cal. 9mm | 5.000.000 |
| 21 | Ammunition cal. 9x19mm | 5.000.000 |
| 22 | Ammunition cal. 38 special | 10.000 |
| 23 | Machine gun  M16 cal. 5.56mm | 10.000.000 |
| 24 | Ammunition M16 cal. 5.56mm | |

Will be imported for Ministry of Defense of the Republic of Yemen from the Slovak
Republic purchased by "VERSOR. S.R.O KARADZHICHOVA STEET 8, SLOVAKIA".
The above mentioned equipment will exclusively be used by Yemeni Army and
will not be re-exported to any other third party.
The Ministry of Defense hereby confirms the importation of these goods will be
ensured by AL-FOSOL TRADING headed by Mr. Adeeb F. Mohamed.
Delivery : in several shipments during the years 2015-2016.///
This certificate is valid till the 31 December 2016.///
With best regards,,,

Brig. /
Mohammed Mohammed AL-Sakkaf
Director of Procurement Department

18-00267

S/2018/68



End User Certificate No.(D.M/KH/14/2015)

*To whom it may concern:*

We the ministry of Defense of the Republic of Yemen hereby officially confirm that following goods:

| No. | Item | Qty |
|---|---|---|
| 1 | AKSU-74U cal. 5.45mm (short assault rifle) | 20.000 |
| 2 | AKSU-74U cal. 7.62x39mm | 20.000 |
| 3 | AKSU assault rifle cal. 7.62x39mm | 20.000 |
| 4 | Ammunition 5.45x39mm | 10.000.000 |
| 5 | Ammunition 7.62x39mm | 20.000.000 |
| 6 | Ammunition 9x18mm | 20.000.000 |
| 7 | Ammunition 6.35mm | 20.000.000 |
| 8 | Pistol caliber 9x18mm | 20.000 |
| 9 | Pistol caliber 6.35mm | 20.000 |

Will be imported for Ministry of Defense of the Republic of Yemen from the Slovak Republic.

The above mentioned equipment will exclusively be used by Yemeni Army and will not be re-exported to any other third party.

The Ministry of Defense hereby confirms the importation of these goods will be ensured by AL-TAWAFOQ AL-ARABY headed by Mr. Khalid Abdullah.

Delivery : in several shipments during the years 2015-2016.

This certificate is valid till the 31 December 2016.///

With best regards,,,

Brig. /

*Mohammed Mohammed AL-Sakkaf*

*Director of Procurement Department*

18-00267

185/329

## Annex 45:    Estimated revenue available to groups based on 2011 CBY budget

Table 45.1
**2011 Budget estimated revenues (YER Million)**

| Budget item | Designation | Central authorities | Local authorities | Current control |
|---|---|---|---|---|
| 1 | Tax | 363,837 | 16,929 | |
| 1.1 | Zakat | | 11,588 | Houthi |
| 1.1.1.1 | Zakat agriculture | | 397 | Houthi |
| 1.1.1.2 | Zakat qat | | 837 | Houthi |
| 1.1.1.3 | Zakat vegetables | | 234 | Houthi |
| 1.1.1.4 | Zakat animals | | 33 | Houthi |
| 1.1.1.5 | Zakat public companies | | 2,137 | Houthi |
| 1.1.1.6 | Zakat private companies | | 4,883 | Houthi |
| 1.1.1.7 | Zakat individuals | | 1,404 | Houthi |
| 1.1.1.8 | Zakat fitra[1] | | 1,053 | Houthi |
| 1.1.1.9 | Other zakat | | 605 | Houthi |
| 1.2 | Tax on revenues | 170,067 | 1,653 | |
| 1.2.1.1 | Tax state salaries | *73,996* | | Houthi |
| 1.2.1.2 | Tax salaries joint companies | *17,175* | | Houthi |
| 1.2.1.3 | Tax salaries private companies | *19,148* | | Houthi |
| 1.2.1.4 | Liberal professions | | 462 | Houthi |
| 1.2.1.5 | Estate rent tax | | 1,190 | Houthi |
| 1.2.1.6 | Estate sale tax | *1,797* | | Houthi |
| 1.2.2. | Corporate income tax | *56,797* | | Houthi |
| 1.2.3.1 | Tax penalties | *1,146* | | Houthi |
| 1.5 | Commodities and services | 137,403 | | |
| 1.5.1.1 | Fuel | *22,215* | | Houthi |
| 1.5.1.3 | Cigarettes | *31,999* | | Houthi |
| 1.5.1.4 | Qat | | 2,321 | Houthi |
| 1.5.1.5 | Others | *12,462* | | Houthi |
| 1.5.1.11 | Tax construction products | *46,389* | | Both |
| 1.5.1.12 | Other commodities | *52,674* | | |
| 1.5.1.13 | Services and cell phones | *11,376* | | Houthi |
| 1.5.1.16 | Other services | *56,318* | | |
| 1.5.4.14 | Tax telecommunications | *2,899* | | Houthi |
| 1.6.1. | Customs | 52,979 | | |
| 1.6.1.1 | Vehicles | *6,124* | | Import, reduced[2] |
| 1.6.1.2 | Electric equipment | *1,725* | | Import, reduced |

---

[1] Zakat given by all Muslims after the completion of the fasting month of Ramadan

[2] The term reduced means that the revenue available now is reduced from that available in 2011 due to the conflict.

| Budget item | Designation | Central authorities | Local authorities | Current control |
|---|---|---|---|---|
| 1.6.1.3 | Medical | 2,657 | | Houthi |
| 1.6.1.7 | Customs others | 42,470 | | |
| 2 | Foreign Assistance | 36,278 | | Government |
| 2.1.x.x | Foreign government donors | 17,823 | | |
| 2.2.x.x | International organizations donors | 18,455 | | |
| 3 | Revenues Public Ownership | 1,318,793 | | Houthi |
| 3.1.2.2 | Industrial revenues | 1,754 | | Severely reduced |
| 3.1.2.3 | Telecom revenues | 14,945 | | Houthi |
| 3.1.2.5 | Financial revenues | 17,203 | | Severely reduced |
| 3.1.2.6 | Public extractive revenues | 11,076 | | Government, reduced |
| 3.1.4.1 | Oil exports | 728,287 | | Government, reduced |
| 3.1.4.2 | Oil internal consumption | 393,051 | | Government, reduced |
| 3.1.4.3 | Natural gas exports | 38,474 | | Government, reduced |
| 3.1.4.4 | Natural gas internal consumption | 26,195 | | Government, reduced |
| 3.1.4.7 | Licences mineral exploitation | 20,743 | | Government, reduced |
| 3.1.4.8 | Tax oil companies | 2,993 | | Government, reduced |
| 3.1.4.14 | Others | 22,526 | | |
| 3.2.1.3 | Fisheries revenues | 456 | | Government, reduced |
| 3.2.1.4 | Vehicle registration | 165 | | Houthi, reduced |
| 3.2.1.5 | Book sales revenues | 31 | | Houthi |
| 3.2.2.3 | Registrar revenues | 197 | | Houthi |
| 3.2.2.6 | Legal registrations | 26 | | Houthi, reduced |
| 3.2.2.11 | Passports | | 516 | Houthis reduced |
| 3.2.2.14 | Consular | 2,273 | | Government |
| 3.2.2.15 | Identification cards | | 279 | Houthi, reduced |
| 3.2.2.16 | Birth registration | | 7 | Houthi |
| 3.2.2.17 | Drivers licence | | 127 | Houthi reduced |
| 3.2.2.18 | Well digging licence | | 9 | Houthi, reduced |
| 3.2.2.19 | Market place | | 30 | Houthi, reduced |
| 3.2.2.20 | Central butcheries | | 12 | Houthi, reduced |
| 3.2.3 | Non-market institutions | 6,125 | | |
| 3.2.3.3 | Printed forms | 2,675 | | |
| 3.2.3.6 | Universities | 72 | | Houthi, reduced |
| 3.2.3.23 | Others | 3,370 | | |
| 3.3 | Penalties | 541 | | Houthi, reduced |
| 3.5.1 | Others | 30,071 | | |
| 3.5.1.1 | Funds | 7,473 | | |
| 3.5.1.3 | Waste | 254 | | |

S/2018/68

| Budget item | Designation | Central authorities | Local authorities | Current control |
|---|---|---|---|---|
| 3.5.1.4 | Remaining non-executed budget | *17,218* | | |
| 3.5.1.5 | Others | *7,114* | | |
| 5.4.2.1 | Long term securities | 14,980 | | |
| | **Totals** | **2,818,623** | **978** | |

Table 45.2
**Main budget items likely available to the Houthis (YER Millions)**

| Budget item | Designation | Central authorities | Local authorities | Under Houthi control |
|---|---|---|---|---|
| 1 | Tax | 363,837 | 16,929 | Yes |
| 2 | Foreign Assistance | 0 | | No |
| 3 | Revenues Public Ownership | 43,649 | 980 | Small portion |
| | **Totals** | **407,486** | **17,909** | |

18-00267

**Annex 46:   Customs extortion of traders**

1.     The Panel gathered evidence indicating that Yahya Mohamed Abdullah al-Osta, the acting head of the Sana'a based Yemen customs authority ('YCA'), appointed by Mohamed Ali Al Houthi on 28 May 2016[1], played a major role in establishing mechanisms with the aim of applying additional customs taxes outside the legal framework. This facilitated the extortion of traders.

2.     As the mechanisms did not have any legal basis, al-Osta coerced selected members of the chamber of commerce in Sana'a to sign an agreement allowing inspection and fees associated with them.

3.     In early 2017 random customs checks were instigated in the Sana'a area, which targeted traders not affiliated with the Houthis for false customs declaration at the ports. Extortion and customs clearance delays led to discontent within the Sana'a based chamber of commerce, with traders vehemently complaining about the new procedures after the shooting of a trader at a customs check point on 1 March 2017.[2] On 3 March and 8 April 2017, the 'YCA" agreed to conduct checks outside the port, although the agreement was coerced and not legal. It was denounced and cancelled publicly by the same chamber on 13 August 2017.

4.     Since then Yahya Mohamed Abdullah al-Osta has overseen the implementation of illegal mechanisms for the collection of customs duties for the benefit of Houthi armed groups acting on behalf and under the control of Abdulmalik al-Houthi (YEi 004).

5.     On 4 April 2017, the Sana'a based ministry of finance established new permanent customs posts at the Amran and Dhamar checkpoints,[3] designed to exploit the additional taxes as a result of the decrease of traffic from Hudaydah port.

---

[1] Mohamed Abdullah al-Osta was a mid-level staff member working as a legal advisor within the ministry of finance.
[2] Chamber of Commerce meeting on 1 March 2017, confirmed to the Panel by members of the chamber, https://www.youtube.com/watch?v=LhlFKR7R3Tk, authenticity confirmed to the Panel by members of the chamber.
[3] Decision 138 of 2017, see http://customs.gov.ye/news_show_ar.php?id=132.

S/2018/68

**Appendix A to Annex 46: Coercion of the chamber of commerce and industry (meeting on 4 March 2017)**



18-00267

S/2018/68



REPUBLIC OF YEMEN
MINISTRY OF FINANCE
YEMEN CUSTOMS

يسرى عليها المعاينة بمطابقتها بالعينة مع البيان الجمركي

٥. أي واردات لا تحمل بيانات جمركية تعامل وفقا لأحكام التهريب وبموجب قانون الجمارك .

٦. الإلتزام بقرارات رئيس الوزراء لعام ٢٠١٦م المتعلقة بمكافحة التهريب .

وفقا لذلك تم الإتفاق بين كل من الغرفة التجارية بأمانة العاصمة والغرفة التجارية بمحافظة صنعاء من جهة ومصلحة الجمارك من جهة أخرى وعلى الجمارك إبلاغ الأمن المركزي والمفتش العام بوزارة الداخلية بضرورة منع الملاحقات في الشوارع وسط العاصمة .

٧. بالنسبة للواردات من منفذي الوديعة والشحن يتم تقديم أقرار من التاجر باي فارق بالبضاعة وبساعد في جزء من الغرامة في حالة عدم وجود اي فارق بعد ذلك .

وعلى الجميع أتباع أساليب حضارية في التوعية والتواصل المستمر والتعاون عملا بمبدأ الشراكة القائمة بين الجمارك والقطاع التجاري .

وأقفل المحضر في تمام الساعة العاشرة والنصف صباحاً من نفس اليوم السبت الموافق ٢٠١٧/٣/٤م وتم التوقيع بين الطرفين في جو من الود والإخاء .

والله الموفق ،،،

مقرر الإجتماع
فيصل عبدالعزيز العوامي

| ممثلي مصلحة الجمارك | | | ممثلي الغرفة التجارية | | |
|---|---|---|---|---|---|
| التوقيع | الصفة | الأسم | التوقيع | الصفة | الأسم |
| | الوكيل المساعد للشئون الفنية | يحيى شرف الكبسي | | عضو مجلس إدارة الغرفة بأمانة العاصمة | محمد محمد شارب |
| | الوكيل المساعد لشئون الضابطة | مجاهد اللطيف | | مستشار الغرفة التجارية بالأمانة | محمد عبدالله الآنسي |
| | مستشار المصلحة | عبدالله المهدي | | | |
| | مدير عام الضابطة | نور الدين البوح | | | |
| | مدير عام جمارك وكالة صنعاء | علي حسين حميد | | | |
| | مدير عام الرقابة | محمد حسين العابد | | | |
| | مسئول غرفة العمليات | هشام راجح | | | |

بعتمد

نائب رئيس الغرفة التجارية الصناعية
بأمانة العاصمة
أ/ محمد محمد صلاح

رئيس الغرفة التجارية الصناعية
بمحافظة صنعاء
أ/ حسين محمد السواري

القائم بأعمال رئيس مصلحة الجمارك
وكيل المصلحة
أ/ يحيى محمد الأستى

Email: info@Customs.gov.ye
Tel : 967- 1 -500522
Fax: 967- 1 -260381
Yemen -a'Sana

www.customs.gov.ye

2

S/2018/68

*UN official translation from Arabic*

Date:    9 April 2017

**Minutes of the meeting on joint coordination between the customs authority and the chambers of commerce and industry of the capital governorate and Sana'a governorate**

At 0900 hours on the morning of Saturday, 4 March 2017, a joint meeting was held between the leadership of the customs authority and the leaderships of the chambers of commerce and industry of the capital governorate and Sana'a governorate. The subject was joint coordination between, on the one hand, the customs authority, represented by Yahya Muhammad al-Osta, Chargé d'affaires a.i. and deputy chief of the customs authority, and, on the other hand, the chamber of commerce and industry of the capital governorate, represented by Muhammad Muhammad Salah, deputy head of the chamber of commerce and industry of that governorate, and the chamber of commerce and industry of Sana'a governorate, represented by Husayn Muhammad al-Suwari, Head of the Chamber.

The meeting was attended by the following:

**The chamber of commerce**

Muhammad Sharib        –            member of the board of directors of the chamber

Muhammad al-Insi       –            counsel to the chamber of commerce

**The customs authority**

Yahya Sharaf al-Kibsi            –            assistant deputy for technical affairs

Mujahid al-Tahif               –            assistant deputy for control affairs

Abdullah al-Mahdi       -            counsel to the authority

Nur al-Din al-Badah      -            director-general of control, Sana'a

Ali Husayn Hamid        -            director-general of customs inspection

Muhammad Husayn al-Abid-            assistant director-general of inspection

Hisham Rajih-            operations room official

[*Handwritten*:]   Authentic copy, Director of the Office of the Deputy (*Illegible signature*)]

**After discussing various issues, the attendees agreed on the following:**

1.        Goods coming from Hudaydah and Salif would not be granted entry.

2.        For incoming goods exempted under the existing Arab agreement and the Yemeni-Saudi agreement, the merchant shall provide a customs declaration and pay any discrepancy based on a calculation of 48 per cent. Customs will conduct a spot check of 20 per cent of any shipment to determine if they are subject to financial payment. If any are found to be in violation, the inspection will be widened.

3.        Goods coming from Aden will be subject to a 10 to 20 per cent check, and will be subject to inspection if violations are found. If no violations are found, they will be released immediately without any payment other than 20,000 in additional charges.

4.        Goods not of Arab origin meeting existing specifications include the following:

| Olives – soap | Cooking oils | Metal and wood |
| Canned goods - sweets | Frozen chicken | Non-Arab cement |

Energy drinks – raw materials for manufacturing, etc.

Such goods will be subject to checks to make sure they match the customs declaration precisely.

5.     Any imports not accompanied by a customs declaration will be treated under provisions for smuggling and the Customs Act.

6.     The Prime Minister's 2016 decision on combating smuggling will be complied with.

In accordance with the preceding, an agreement was reached between, on the one hand, the chamber of commerce of the capital governorate and the chamber of commerce of Sanaʾa governorate, and, on the other hand, the customs authority. The customs authority committed to informing central security and the Inspector-General of the Ministry of the Interior of the need to prohibit raids in the streets inside the capital.

7.     For imports at the Wadiʿah and Shahn crossing points, the merchant will submit a declaration of any discrepancy in the goods. He will be assisted in paying part of the fine, provided no additional discrepancy is found.

All parties committed to keep each other informed and to engage in cordial communication and cooperation under the principle of partnership between Customs and the private sector.

The meeting ended at 1030 hours on that day, Saturday 4 March 2017. The two sides signed in a spirit of friendship and brotherhood.

May God grant success.

(*Signed*) Faysal Abdulaziz **al-Awwami**

S/2018/68

**Appendix B to Annex 46: Coercion of the chamber of commerce and industry (meeting 8 April 2017)**



18-00267

S/2018/68

*UN official translation from Arabic*

**Minutes of the coordination meeting between the customs authority and the chamber of commerce**

The chamber of commerce and industry at the capital governorate Sana'a met with the customs authority on Saturday, 8 April 2017. The previous minutes were reviewed and adopted. At the same time, various outstanding matters were discussed and those present agreed on the following:

1.      With regard to the fee in cases where the importer or merchant has submitted an accurate declaration of the quantity and prevailing price, the authority agrees to wave the fee where the declaration is prior to the opening of the means of transport.

2.      There would be ongoing coordination between the chamber and the authority on any emerging issues of concern to both parties.

3.      Media escalation would cease, and both parties would take responsibility in that regard.

4.      Procedures would be facilitated for any merchant or importer in compliance who cooperated with the Authority within the law.

5.      All present declared that the customs supervision currently being inaugurated in the governorates was as needed in accordance with article 67 of the customs act (No. 14 of 1990, as amended).

**Appendix C to Annex 46: Letter of 13 August 2017 from the chambers of commerce and industry to the customs authority cancelling the agreement of 4 March 2017**



S/2018/68



**Republic of Yemen**

Chamber of Commerce & Industry

Capital Secretariat

No.
Date:

كما أن مصلحة الجمارك تصر على توريد الرسوم الجمركية (نقداً)، وهذا الإجراء كارثة كبيرة على القطاع الخاص، بسبب أزمة السيولة التي تواجهها بلادنا حالياً وامتناع البنك المركزي عن تزويد البنوك التجارية بالعملة الوطنية، ناهيكم عن المخاطر الكبيرة لنقل السيولة من مكان لآخر في مثل هذه الأوضاع.

ولا ننسى الغرامات الباهظة التي يتحامل بها موظفو الجمارك والتعسف في تأخير الإجراءات وغيرها من المضايقات والتعسفات التي يعاني منها القطاع الخاص كل يوم، حتى باتت الإجراءات الجمركية في المناطق الشمالية هاجساً يُنقل كاهل جميع التجار بلا استثناء.

وبدلاً من أن تكون الاتفاقية الموقعة بين القطاع الخاص ممثلاً بالغرفة التجارية بأمانة العاصمة صنعاء ومصلحة الجمارك وسيلة لتخفيف الحمل على التجار إذا بمصلحة الجمارك تسيء استعمال تلك الاتفاقية وتشرعن لإجراءاتها وابتزازها للقطاع الخاص أكثر من ذي قبل، وما يجده التجار من عنت وضرر من مصلحة الجمارك تضاعف أكثر بعد تلك الاتفاقية.

## لـــذلـــك:

فإن الغرفة التجارية الصناعية بأمانة العاصمة صنعاء وبناء على الكم الكبير من الشكاوى المقدمة من جميع شرائح ومكونات القطاع الخاص والتي تطالب بإلغاء هذه الاتفاقات التي تضر الاقتصاد الوطني بشكل كلي ، ونشعركم رسمياً بإلغاء الاتفاقية الموقعة بين المصلحة والغرفة حتى إشعار آخر.

والله الموفق ،،،

محمد محمد صلاح

نائب رئيس الغرفة

صورة مع التحية إلى:
- فخامة الأخ/ رئيس المجلس السياسي   حفظه الله .
- معالي الأخ/ رئيس مجلس النواب.
- دولة الأخ/ رئيس مجلس الوزراء.
- معالي الأخ / وزير المالية.

Sana'a - Al-Zubairi St. P.O.Box: 195

S/2018/68

*UN official translation from Arabic*

Date:   12 August 2017

**Subject: Official notice of cancellation of recent agreements between the chamber of commerce and the customs authority**

The chamber of commerce and industry of the capital governorate presents its compliments and wishes you continued progress in your work.

I write in reference to the above subject and agreements that we signed with the customs authority on 3, 4 and 20 April 2017. Even though some of their provisions were prejudicial to the private sector, the chamber was trying to prevent any sources of friction in relations between the private sector and the customs authority, and we signed those unfair agreements with the customs authority in the hope of normalizing relations between the Authority and the private sector. Those relations had deteriorated considerably owing to abusive treatment of the private sector by the customs administration and officials, the introduction of mechanisms and decisions contrary to the customs act and other relevant legal provisions, the creation of customs departments in Dhamar, Amran, and so on. We had hoped for the restoration of all the official customs procedures and documentation used in customs departments at land and sea border points in the Republic of Yemen.

Unfortunately, the customs authority has continued to persist daily in impeding commercial activity and inventing new procedures that strangle Yemeni merchants, in every sense of the word.

The customs authority imposes unjustified duties on goods coming from Aden. It subjects them to additional inspections, checks, duties and fees even when those goods have valid customs declarations. Goods coming from the ports of Hudaydah and Salif are also subject to delays, theft and fees, as are goods coming from Wadiʻah, Mukalla and Shahn. There have been numerous complaints coming from all over of the commercial and private sectors. Merchants, importers, owners, investors and businessmen are all complaining about arbitrary customs practices and procedures, and are demanding the cancellation of these unfair agreements.

The Customs Authority is also insisting on the payment of customs duties in cash. That is a disaster for the private sector, given the liquidity crisis currently faced by our country and the refusal by the Central Bank to supply commercial banks with national currency, not mention the increased risk of liquid assets being diverted from one location to another under such conditions.

That is not even to mention the exorbitant fees being charged by customs officials and the arbitrary delays, procedures and other inconveniences suffered by the private sector every day. In the northern regions, customs procedures remain a burden on the shoulders of all merchants without exception.

The agreement signed between the private sector – represented by the chamber of commerce and industry in the capital governorate Sanaʼa – and the customs authority was supposed to lighten the burden on merchants. Instead, the customs authority is abusing that agreement, misapplying its procedures, and fleecing the private sector more than ever before. Merchants have found that the hardship and damage inflicted on them by the customs authority has only been compounded by the agreement.

Therefore, given the enormous volume of complaints submitted by all parts of the private sector demanding the cancellation of these agreements, and the damage these agreements are doing to the overall national economy, the chamber of commerce and industry at the capital governorate Sanaʼa hereby notifies you officially of the cancellation of the agreements signed between the authority and the chamber until further notice.

(*Signed*) Muhammad Muhammad **Salah**

Deputy Head of the Chamber

## Annex 47:    Houthi revenue from black market sales of oil products

Table 47.1
**Estimates of oil distribution and sale costs[1]**

| Item | YER (Market[2] Rate) | YER (CBY[3] Rate) | US$[4] | Remarks |
|---|---|---|---|---|
| 1. Total cost with delivery in Sana'a (Diesel per L) | 184 | | | |
| 2. Total cost with delivery in Sana'a (Petrol per L) | 196 | | | |
| *a. Delivery cost to Red Sea ports (diesel/L)* | *135* | *93* | *0.37* | *US$446/Ton (1,200L)* |
| *b. Delivery cost to Red Sea ports (petrol/L)* | *140* | *96* | *0.38* | *US$520/Ton (1,350L)* |
| *c. Transport cost to Sana'a* | *6* | *5* | *0.02* | *Private transport* |
| *d. YPC Fees/(Diesel per L)* | *43* | *29.5 / 34.2* | *0.12 / 0.14* | *Collected by Houthis* |
| *e. YPC Fees/(Petrol per L)* | *50* | *29.5 / 34.2* | *0.12 / 0.14* | *Collected by Houthis* |
| *3. Official sale price (Sana'a)* | *215* | *147* | *0.59* | |
| 3a. Black Market price (Sana'a) (Diesel per L) | 240[5] | 164 / 171 | 0.66 / 0.68 | Houthi affiliate |
| 3b. Black Market price (Sana'a) (Petrol per L) | 250[6] | 164 / 171 | 0.66 / 0.68 | Houthi affiliate |
| 4. Houthi Margin/L (Sales) (Diesel/Petrol) | 56 / 54 | | | On Sales |
| 5. Total Houthi Margin/L (Diesel/Petrol) | 99 / 104 | | | Including YPC fee |

---

[1] Confidential sources in the oil and gas industry in Yemen.
[2] At unofficial exchange rate of USD$ 1 = YER 365.
[3] CBY rate is YER 250 to US$1.00.
[4] At CBY rate.
[5] Current price per liter for diesel and petrol. The price reached YER 280 throughout 2016 and early 2017. See statement of the acting chief of customs http://customs.gov.ye/news_show_ar.php?id=130.
[6] Ibid.

S/2018/68

Table 47.2
**Estimates of potential oil revenue for the Houthis (5 May 2016 – 30 July 2017)[7].**

| Item | Delivered (MT) | Delivered (L) | Houthi margins | |
| --- | --- | --- | --- | --- |
| | | | YER (Market)[8] | US$ (CBY Rate)[9] |
| Total fuel deliveries to Red Sea ports (MT) | 2,031,609 | | | |
| Total if all Petrol (L) | | 2,742,672,150 | 318,462,300,000 | 1,273,849,200 |
| Total if all Diesel (L) | | 2,437,930,800 | 269,468,100,000 | 1,077,872,400 |

---

[7] The Panel could not estimate the costs after July 2017 as: 1) exchange rate stopped to be fixed to YER 250 for 1 USD$; and 2) cost of fuel increased continuously since July and reached 25% in December 2017 compared to July 2017. http://www.bunkerindex.com/prices/bixfree_1709.php?priceindex_id=4.
[8] At unofficial exchange rate of USD$ 1 = YER 365. The fuel is sold on the black market so this rate applies.
[9] Official exchange rate used in this case as that is the value the Houthis would acquire if exchanged on international market.

18-00267

CONFIDENTIAL ANNEX NOT FOR PUBLIC DISSEMINATION

**Annex 48:     List of consignees for fuel import in Red Sea ports**

S/2018/68

Table X.2

**Number of tankers for consignees for fuel import in Red Sea ports before and after 1 March 2017**

| Ser | Consignees | Number of tankers before | Number of tankers after |
|---|---|---|---|
| 1 | Abha Global Trading | 2 | |
| 2 | Aggreko Yemen for Agricultural Products | 2 | |
| 3 | az-Zahraa Establishment for Trading and Agencies | 2 | |
| 4 | Bin Dowal for Iron Steel Co. Mukalla, Yemen | 2 | |
| 5 | Dynasty Trading Yemen | 2 | |
| 6 | Mok Corporation for Trading and Oil Services | 2 | |
| 7 | Oil Premier Oil Services and Trading | 2 | |
| 8 | Matrixoil Import, Yemen | 3 | |
| 9 | Middle East Shipping | 3 | |
| 10 | Ahmed Mohammed Saleh Albaidhani for Trading | 4 | |
| 11 | Nama'a Power Oil Services and Importing | 4 | |
| 12 | Elaf for Import Oil Derivatives | 5 | |
| 13 | Albarakah Republic Trading Company | 1 | 1 |
| 14 | Golden Oil FZC, Sharjah, UAE | 1 | 1 |
| 15 | Yemen Company for Industrial  Investment | 1 | 2 |
| 16 | Balad al Khairat for Import Petroleum | 1 | 7 |
| 17 | Yemen Petroleum Company | 3 | 1 |
| 18 | Deema Yemen for Trading and Agencies | 3 | 9 |
| 19 | Climax for Import | 4 | 2 |
| 20 | Sam Oil Company for Trade and Oil Services | 7 | 20 |
| 21 | Tamco Petroleum | 7 | 14 |
| 22 | Atico Trading and Industry | 10 | 11 |
| 23 | Yahya Oseily Export Company Limited | 11 | 17 |
| 24 | Begad International for Import | 13 | |
| 25 | al Attas for Trade and Marketing | | 4 |
| 26 | al Hutheily General Trading | | 3 |
| 27 | Alchemist Energy Trading DMCC | | 3 |
| 28 | al Emteaz International for Importing | | 3 |
| 29 | Falcon Shipping and Marine Services | | 3 |
| 30 | Waqood for Investment | | 3 |
| 31 | al Zahra Trading and Agencies Establishment | | 2 |
| 32 | Hamady for Trade and Cold Store | | 2 |
| 33 | MOPC for Oil and Gas Services | | 2 |
| 34 | Vamoil International | | 2 |

18-00267

## Annex 49:    Risks of looting and trafficking of antiquities and cultural objects

Figure 49.1
**Example of artefacts seized in Geneva**








S/2018/68

Figure 49.2
**Artefacts observed in Lahij[1]**







---

[1] Sources: Yafa News, August 2017, http://www.yafa-news.net/archives/263955. Interview with the director of archaeology at al-Dad district, Lahij (November 2017).

Figure 49.3
**Artefacts observed in in Tebbat Tawfiq Saleh Sourg of Sana'a[2]**





[2] http://almasirah.net/gallery/preview.php?file_id=10481#.Wiifxroebms.whatsapp.

Figure 49.4
**Artefacts observed in Ta'izz under the control of resistance forces (Museum al-Ardi in Ta'izz)**





A resistance fighter inspects the damage to the Ta'izz National Museum, Yemen.
Photo: AHMAD AL-BASHA/AFP/Getty Images.[3]

---

[3] https://news.artnet.com/art-world/taiz-national-museum-destroyed-419792.

18-00267

## Annex 50:    Banks and finance institutions in Yemen

Table 50.1
**Yemeni banks and financial institutions**

| Ser | Bank | Capital YER Billion | Branch(s) | Government stake % | Other stake % | Founded | Remarks |
|-----|------|---------------------|-----------|---------------------|----------------|---------|---------|
| 1 | Central Bank of Yemen (CBY) | 6.0 | 21 | 100 | | 1971 | |
| 2 | Yemen Bank for Reconstruction and Development | 15.0 | 44 | 51 | P[1]49 | 1962 | Shareholder in Kamaran (KIIC) |
| 3 | National Bank of Yemen | 10.0 | 27 | 100 | | 1969 | Known as Al Ahli Bank, owned by the Government, the only bank with head office in Aden |
| 4 | Arab Bank | 6.0 | 9 | | F100% | 1972 | |
| 5 | United Bank Limited | 6.0 | 3 | | F100% | 1972 | |
| 6 | Housing Bank | 0.2 | 1 | 97% | P3% | 1977 | |
| 7 | International Bank of Yemen | 15.0 | 23 | | P85%, F15% | 1979 | Associated with Shahir Abdulhaq Bishr |
| 8 | Yemen Kuwait Bank for Trade and Investment | 6.0 | 12 | | P100% | 1979 | Associated with Alsonidar family |
| 9 | Cooperative and Agricultural Credit Bank | 14.9 | 51 | 100 | | 1982 | Owns branches in Djibouti and in Bosaso, Puntland, Somalia |
| 10 | Al-Rafidayn Bank | 6.5 | 1 | | F100% | 1982 | |
| 11 | Yemen Commercial Bank | 7.9 | 14 | 10 | P90% | 1993 | Associated with al-Rowayshan family |
| 12 | Islamic Bank of Yemen for Finance and Investment | 4.4 | 6 | 4.5 | P73.5%, F22% | 1995 | Associated with Al-Aswadi family |
| 13 | Tadhamon International Islamic Bank | 20.0 | 21 | | P96.7%, F3.3% | 1996 | Associated with Hayel Saeed family |

[1] P = Private Investor stake and F = Foreign Investor state.

| Ser | Bank | Capital YER Billion | Branch(s) | Government stake % | Other stake % | Founded | Remarks |
|---|---|---|---|---|---|---|---|
| 14 | Saba Islamic Bank | 16.0 | 16 | | P85%, F15% | 1997 | Associated with Al Ahmar family and Dubai Islamic Bank |
| 15 | Yemen Gulf Bank | 1.3 | 2 | 1% | P77%, F22% | 2001 | |
| 16 | Shamil Bank of Yemen and Bahrain | 6.0 | 9 | | P57%, F43% | 2002 | |
| 17 | Qatar National Bank (QNB) | 6.0 | 1 | | F100% | 2007 | |
| 18 | Al-Amal Microfinance Bank | 3.8 | 18 | 45% | P20%, F35% | 2008 | |
| 19 | Al-Kuraimi Islamic Microfinance Bank | 10.0 | 23 | | P100% | 2010 | Associated with the Al-Kuraimi family |

Table 50.1
**Money exchangers operating in Yemen**

| Ser | Name | Arabic Name | Used by traders | Presence in Sana'a | Presence in Ta'izz |
|---|---|---|---|---|---|
| 1 | Abd al-Aawi al-Amri Exchange | عبدالقوي لعامري للصرفة | | | Yes |
| 2 | Abdellah Meftah Exchange | عبدالله مفتاح للصرفة | | Yes | |
| 3 | Abdullah Al Amri Exchange | عبد الله لعامري للصرفة | Yes | | |
| 4 | Abu Adel Exchange | بو عادل للصرفة | | Yes | |
| 5 | Abu Hisham Exchange | بو هشام للصرفة | | Yes | |
| 6 | Abu Meftah Exchange | بو مفتاح للصرفة | Yes | | |
| 7 | Abu Murad Exchange | بو مراد للصرفة | | Yes | |
| 8 | Abu Taha Athur Exchange | بو طه لثور للصرفة | | Yes | |
| 9 | Ahmed al Amri Exchange | احمد لعامري للصرفة | | Yes | Yes |
| 10 | Ahmed Al Amri Exchange | أحمد لعامري للصرفة | Yes | | |
| 11 | Al Akwa'a Exchange | ا كوع للصرفة | Yes | | |
| 12 | Al Arabiya Exchange | لعربية للصرفة | | Yes | |
| 13 | Al Atiri Exchange | لعطيري للصرفة | | Yes | |
| 14 | Al Aydarus Exchange | لعيدروس للصرفة | Yes | Yes | |
| 15 | Al Azzi Exchange | لعزي للصرفة | | | Yes |
| 16 | Al Baidani Exchange | لبيضني للصرفة | Yes | | |
| 17 | Al Barq Exchange | لبرق للصرفة | Yes | Yes | |
| 18 | Al Busairi Exchange | لبسيري للصرفة | Yes | | |
| 19 | Al Faqih Exchange | لفقيه للصرفة | | | Yes |
| 20 | Al Gharassi Exchange | لغراسي للصرفة | | Yes | |
| 21 | Al Hajri Exchange | لحجري للصرفة | Yes | Yes | |
| 22 | Al Hatha'a Exchange | لحظاء للصرفة | | Yes | |
| 23 | Al Hattar Exchange | لهتار للصرفة | | Yes | |
| 24 | Al Hazmi Exchange | لحزمي للصرفة | Yes | | |
| 25 | Al Jazeera Exchange | لجزيرة اخوان | Yes | Yes | Yes |
| 26 | Al Kabus Exchange | لقبوس للصرفة | | Yes | |

| Ser | Name | Arabic Name | Used by traders | Presence in Sana'a | Presence in Ta'izz |
|-----|------|-------------|-----------------|--------------------|--------------------|
| 27 | Al Khaleej Exchange | الخليج للصرافة | | Yes | |
| 28 | Al Khulaidi Exchange | الخليدي للصرافة | | | Yes |
| 29 | Al Mahraqi Exchange | المحرقي للصرافة | Yes | | |
| 30 | Al Majrabi Exchange | المجربي للصرافة | Yes | | |
| 31 | Al Marah Exchange | المرح للصرافة | | Yes | |
| 32 | Al Marry Exchange | المري للصرافة | Yes | | |
| 33 | Al Mesbahi Exchange | المصباحي للصرافة | | Yes | |
| 34 | Al Mihdar Exchange | المحضار للصرافة | Yes | | |
| 35 | Al Muhajeer Exchange | المهاجر للصرافة | Yes | | |
| 36 | Al Muttahida Exchange | المتحدة للصرافة | Yes | | |
| 37 | Al Omgui Exchange | العقي للصرافة | Yes | | |
| 38 | Al Qasmi Exchange | القسمي للصرافة | | Yes | |
| 39 | Al Qutaibi Exchange | القطيبي للصرافة | Yes | | |
| 40 | Al Yabani Exchange | اليباني للصرافة | Yes | | |
| 41 | Al Yemeni Exchange | اليمني للصرافة | Yes | | |
| 42 | Alamari Exchange | مؤسسة العمري للصرافة | | Yes | |
| 43 | Amran Exchange | عمران للصرافة | Yes | | |
| 44 | Annajm Exchange | النجم للصرافة | Yes | | |
| 45 | Annasser Exchange | الناصر للصرافة | Yes | | Yes |
| 46 | Annuman Exchange | النعمان للصرافة | Yes | Yes | |
| 47 | Ashahdi Exchange | الشاحدي للصرافة | Yes | | |
| 48 | Assaeed Exchange | السعيد للصرافة | Yes | | |
| 49 | Assaifi Exchange | الصيفي للصرافة | Yes | | |
| 50 | Assuraimi Exchange | الصريمي للصرافة | Yes | | |
| 51 | Athur Exchange | الثور للصرافة | Yes | | |
| 52 | Attadamun Exchange | التضامن للصرافة | Yes | | |
| 53 | Azzubairi Exchange | الزبيري للصرافة | Yes | | |
| 54 | Ba Wazeer Exchange | باوزير للصرافة | Yes | | |

18-00267

| Ser | Name | Arabic Name | Used by traders | Presence in Sana'a | Presence in Ta'izz |
|---|---|---|---|---|---|
| 55 | Bakhash Exchange | بخاش للصرافة | Yes | | |
| 56 | Behyan Exchange | بويان للصرافة | Yes | | |
| 57 | Ben Amer Exchange | بن عامر للصرافة | Yes | | |
| 58 | Dahhan Exchange | دحان فتاح للصرافة | | Yes | |
| 59 | Exchange | لحظاء للصرافة | Yes | | |
| 60 | Hamood Ahmed Yuseef Exchange | حمود احمدي وسف للصرافة | | | Yes |
| 61 | Heza'a Meftah Exchange | هزاع فتاح للصرافة | | Yes | |
| 62 | Mahfuth al-M'abari Exchange | محفوظ لمهري للصرافة | | | Yes |
| 63 | Masood Exchange | مسعود للصرافة | Yes | | |
| 64 | Mathna Exchange | مثنى للصرافة | Yes | | |
| 65 | Muhamed Abdulmalik Athur Exchange | محمد عبدلملك اثور للصرافة | | Yes | |
| 66 | Muhsein Shrhan Exchange | محبن شرحان للصرافة | | Yes | |
| 67 | Munawar Lotf Exchange | منور لطف للصرافة | | | Yes |
| 68 | Naguib Radif Exchange | نجيب رضيف للصرافة | | | Yes |
| 69 | Nahshal Exchange | نهشل للصرافة | Yes | | |
| 70 | Sabra Exchange | صبرة للصرافة | Yes | Yes | |
| 71 | Saleh Al Arwi Exchange | صلح لعروي للصرافة | | Yes | |
| 72 | Shar'ab Arruna Ben Lotf Exchange | شرعب لرون فبن لطف للصرافة | | | Yes |
| 73 | Suwaid and Sons Exchange | سويد واو د للصرافة | | Yes | |
| 74 | Suwaid Exchange | سويد للصرافة | Yes | | |

## Annex 51:   Money supply M0[1] of YER (1999 to present)

Table 51.1
**Value (YER Million) by banknote denomination**

| Year | | | | | | | | | | | |
|------|---|---|---|---|---|---|---|---|---|---|---|

| Year | *Value (YER Million) for each banknote denomination* | | | | | | | | | | |
|------|---|---|---|---|---|---|---|---|---|---|---|
| *Year* | *1* | *5* | *10* | *20* | *50* | *100* | *200* | *250* | *500* | *1000* | *Coins* |
| 1999 | 123 | 247 | 649 | 1,556 | 12,842 | 48,589 | 40,819 | | 30,469 | 33,770 | 19 |
| 2000 | 123 | 289 | 679 | 1,156 | 11,492 | 50,540 | 43,235 | | 31,439.0 | 62,469.0 | 19 |
| 2001 | 123 | 327 | 807 | 1,083 | 9,840 | 49,760 | 42,287 | | 39,113 | 72,236.8 | 19 |
| 2002 | 122 | 376 | 829 | 1,047 | 9,155 | 53,354 | 40,919 | | 58,802 | 79,151 | 19 |
| 2003 | 124 | 390 | 920 | 994 | 9,727 | 53,271 | 41,618 | | 75,255 | 91,954 | 19 |
| 2004 | 124 | 425 | 1,081 | 902 | 10,134 | 49,159 | 39,990 | | 87,782 | 113,181 | 19 |
| 2005 | 127 | 457 | 1,165 | 908 | 6,404 | 31,083 | 36,793 | | 100,209 | 160,359 | 19 |
| 2006 | 127 | 474 | 1,250 | 965 | 4,570 | 21,591 | 32,897 | | 102,518 | 254,934 | 19 |
| 2007 | 127 | 483 | 1,315 | 1,089 | 4,184 | 17,939 | 27,205 | | 111,758 | 279,873 | 19 |
| 2008 | 128 | 532 | 1,399 | 1,227 | 4,289 | 15,415 | 21,961 | | 129,336 | 316,196 | 19 |
| 2009 | 128 | 551 | 1,461 | 1,325 | 4,528 | 14,810 | 10,087 | 10,563 | 158,597 | 349,650 | 19 |
| 2010 | 128 | 557 | 1,536 | 1,417 | 4,085 | 13,079 | 5,125 | 16,650 | 141,553 | 387,249 | 19 |
| 2011 | 128 | 559 | 1,613 | 1,502 | 3,357 | 12,208 | 3,967 | 19,787 | 151,882 | 605,263 | 19 |
| 2012 | 128 | 584 | 1,845 | 1,775 | 2,892 | 14,556 | 3,124 | 11,235 | 109,260 | 687,378 | 19 |
| 2013 | 128 | 614 | 1,934 | 2,110 | 2,755 | 15,056 | 2,724 | 9,000 | 79,022 | 708,532 | 19 |
| 2014 | 129 | 675 | 1,936 | 2,412 | 2,409 | 14,373 | 2,397 | 10,833 | 73,578 | 746,123 | 19 |
| 2017 | | | | | | | | | 600,000 | 400,000 | |

---

[1] M0 is a measure of the money supply, which combines any liquid or cash assets held within a central bank and the amount of physical currency circulating in the economy.

## Annex 52:      Vouchers issued by Abu Nabil Al Qaramani

1.      Voucher card indicating that an employee with a salary YER 410,000 was to receive vouchers worth YER 200,000 and YER 60,000 to be used respectively in Dhamran market and Ashariga market

Figure 52.1
**Al Qaramani voucher ID card to be used with voucher[1]**



2.      Allocation of YER 5,000 and YER 10,000 vouchers to one administrative service

Figure 52.2
**Al Qaramani vouchers (YER 20,000 and YER 30,000)**





---

[1] Source: Employee with identity masked.

## Annex 53:   Money laundering of new (counterfeit) YER 5,000 promissory notes[1]

Figure 53.1
**Seized counterfeit YER 5,000 denomination promissory notes and blanks passport**



Figure 53.2
**Packaged counterfeit YER 5,000 denomination promissory notes**



---

[1] Images from confidential source and Jawf press.

18-00267

Figures 53.3 and 54.4
**Subsequent seizure en-route in Houthi controlled areas**





**53.3: Seizure by Houthis in Ibb**

**53.4 Seizure by legitimate Government in Ma'rib**

Figure 53.5
**Detailed image of counterfeit YER 5,000 denomination promissory note received by the Panel used in forensic analysis**



Figure 53.6
**Detailed image of counterfeit YER 5,000 promissory note received by the Panel used in forensic analysis**



## I.    Technical analysis

1.      There is a noticeable absence of a watermark, a security thread in the substrate or security features which are present in a majority of banknotes produced on paper substrate, including 500 YER and 1,000 YER notes.

2.      There is a noticeable absence of intaglio print, a printing technique typically utilised on banknotes and passports.

3.      The front of the note is protected by: 1) yellow green fluorescent ink (it contains fluorescent substance in addition to visible colour pigments - Arabic script in yellow green); and 2) the fluorescent overprint (image which is invisible under white light and it fluoresces under UV light – wavy decorative and textual elements in Latin script in yellow green).

4.      The serial number is printed ink-jet by propelling small droplets of liquid ink directly onto the substrate, a technique that is not usually utilised on banknotes.

5.      Poor adhesion of the stripe onto the substrate, with some fragments of the holographic stripe missing. These defects suggest that the applied holographic foil choice is inadequate and is likely that the foil would not withstand well a typical banknote lifecycle / circulation.

6.      The colour shifting security feature depicting four eight-pointed stars is printed utilising colour shifting ink that is not widely available and only from a limited number of suppliers.

7.      Semantic difference with notes issued by the CBY found in the second line of text on the front of notes, just under the line: Central Bank of Yemen. On the YER 1,000 note the text reads: Issued by virtue of the Central Bank of Yemen Law, while on the YER 5,000 note the text reads: Cheque issued by the Central Bank of Yemen.

8.      The words in the sequence Five Hundreds Riyals ( ريال_ة،مئ،سمخ in Arabic) under the numeric 500 are separated by one spaces in the YER 500 note while the words in the sequence Five Thousand Riyals ( ريال ف ١ سمخ in Arabic are (are stuck together, to appear as FiveThousandRiyals. The spaces which are seen in

Yemeni and most Arabic notes with varying width are not seen in notes with Arabic characters such as from Jordan, Iran and KSA.

9.      The serial number on genuine YER 500 and YER 1,000 notes is a seven digit number, while on the counterfeit YER 5,000 note it is an eight digit number.

10.     The banknote serial number on the YER 1,000 note appears in two positions, in a vertical and a horizontal direction, whilst the serial number on the YER 5,000 note appears twice, only in a horizontal direction.

11.     The lack of intaglio printing, watermark and / or a security thread due to budgetary constraints are usually those of lower denominations and extremely rarely of higher denomination

12.     The poor fit could be caused by the utilisation of inadequate printing equipment, poor process control or both - suggesting that the questioned note was not printed by a company ordinarily involved in banknote manufacturing.

13.     Simulation of a security print feature is usually expected to be seen on counterfeit notes.

14.     The manufacturer of the questionable YER 5,000 note appears to have access to equipment and materials that are available to a commercial printing company.

15.     The ability to source and successfully utilise colour shifting and fluorescent inks is an indication that the manufacturer of the 5000 YER note is a security printing company generally specialised in printing of cheques, tax stamps or other security documents such as gift vouchers.

Figure 53.7

**Semantic comparison between 5 000 YER note (middle) with 500 YER (top) and 1000 YER bottom**



## II.    Conclusions

16.    Following a thorough comparative evaluation, and due to a number of observed deficiencies, most notably the absence of: 1) intaglio printing; 2) letterpress numbering; 3) watermark; and 4) a security thread, the note does not meet the standards of a contemporary, counterfeit-resilient banknote.

17.    The see-through feature on the note exhibits poor registration between front and reverse of the note, where blue and green segments of the numerals should be joined to give perfect or near-perfect fit between print on the front and reverse. This fault might appear only on a small number of banknotes. If the fault appears on a large number of banknotes it would indicate that the printer is not able to control the process well. One of the most unexpected characteristics of the questioned banknote is not the absence of a split duct printing, but its simulation, which only gives the appearance of the smooth merging of inks into each other.  One other plausible explanation would be that the feature was deliberately sacrificed in order to ensure more economical use of a substrate.

S/2018/68

**Annex 54:   Cases of seizure of the non-authorized export of banknotes and gold bars through Shehen, Mahrah**

## I.   Banknotes and gold bars seized in Shehen, Mahrah on 9 May 2017

1.      The Panel is investigating a potential case of trafficking of finance assets potentially for the benefit of listed individuals following the seizure on 9 May 2017 at the Shehen border crossing point (BCP) with Oman. A pickup truck was inspected by Yemeni local authorities and found to contain the equivalent of US$ 3.42 Million in mixed foreign currency and gold.[1] The customs service proceeded the same day with the arrest of the two individuals, seizure of the vehicle, the deposit of the shipment at the CBY branch and the submission of the case to the prosecutor.

2.      On 15 May 2017, the prosecutor, Naji Said Mohamed Kadah, ordered the customs to release the two individuals and the vehicle, and to handover the shipment to a third person presented as the owner. As the Head of Customs refused, the Governor himself ordered him to comply informing him that he was in contact with President Hadi on the subject. The Panel has not received any confirmation as to the current custody of the shipment. The individuals involved are:

  (a)      Mohamed Mohamed Saleh al-Addah from Shabwah, arrested at the BCP as the custodian of the shipment;

  (b)      Saleh Saed Ahmed Judhaib from Ma'rib, arrested at the BCP; and

  (c)      Saleh Yahya Mohamed Abdullah al-Haddad, owner of the Yahya Mohamed al-Haddad company for trade and entrepreneurships, presented documentation claiming that he was the owner of the shipment.

3.      This case is an illustration of the smuggling activity in Mahrah as well as the involvement of local authorities in the trafficking.

Figure 54.1
**Cash and gold bars seized at Shehen BCP, Mahrah on 9 May 2017**[2]




---

[1] GBP 5,425, AED 150,000, SAR 8,726,106, QAR 107,429, US$ 178,850 and 19.04 kg of gold ("at US$39 per gram").
[2] Source: https://www.al-omana.com/news56507.html, 9 May 2017. Corroborated by local customs and judiciary authorities.

Figure 54.2
**Customs receipt for GBP 5,425 cash seized at Shehen BCP, Mahrah on 9 May 2017**



Figure X54.3
**Customs receipt for AED 150,000 cash seized at Shehen BCP, Mahrah on 9 May 2017**



Figure 54.4
**Customs receipt for SAR 8,726,106 cash seized at Shehen BCP, Mahrah on 9 May 2017**



Figure 54.5
**Customs receipt for QAR 107,429 cash seized at Shehen BCP, Mahrah on 9 May 2017**



Figure 54.6
**Customs receipt for 7 x 19.04kg gold bars seized at Shehen BCP, Mahrah on 9 May 2017**



Figure 54.7
**Declaration for funds deposited in Dubai**



NOTE: Declaration that the funds were handed over to Mohamed Mohamed Saleh al-Addah for deposit at the Al Bader Exchange in Dubai,

Figure 54.8
**Yahya Mohamed al-Haddad Institute for Trade and Enterprise registration documents (4 September 2013)**



NOTE: Registration document for "Yahya Mohamed al-Haddad Institute for Trade and Enterprises" under the name of Yahya Mohamed Abdullah al-Haddad on 4 September 2013.

18-00267

Figure 54.9
**Identity document of Saleh Saed Ahmed Judhaib**



Figure 54.10
**Identity document of Mohamed Mohamed Saleh al-Addah**



Figure 54.11
**Vehicle licence plate of truck seized at Shehen BCP, Mahrah on 8 May 17**



## B.   Banknotes and gold bars seized at Shehen BCP, Mahrah on 17 July 2017

1.     The Panel is investigating two additional potential cases of trafficking of finance assets potentially for the benefit of listed individuals:

    (a)     Seizure on 17 July 2017 at Shehen BCP of 7,174,700 Saudi Riyal (SAR); and

    (b)     Seizure on 27 July 2017at Shehen BCP of 300,000 SAR and 42 gold bars.

2.     On 9 May 2017 at the Shehen BCP with Oman, a pickup truck was inspected by Yemeni local authorities and found to contain the equivalent of US$ 3.42 Million in mixed foreign currency and gold.[3] The customs service proceeded the same day with the arrest of the two individuals, seizure of the vehicle, the deposit of the shipment at the CBY branch and the submission of the case to the prosecutor.

3.     The Panel has shared the information with the Government of Yemen and is still awaiting a reply to its information requests.

---

[3] GBP 5,425, AED 150,000, SAR 8,726,106, QAR 107,429, US$ 178,850 and 19.04 kg of gold ("at US$39 per gram").

Figure 54.12
**Customs form XX 378 on the seizure on 17 July 2017 at Shehen BCP of SAR 7,174,700**



Figure 54.13
**Customs form XX 379 on seizure on 27 July 2017 at Shehen BCP of SAR 300,000 and 42 gold bars**



**S/2018/68**

<p style="color:red;text-align:center">**CONFIDENTIAL ANNEX NOT FOR PUBLIC DISSEMINATION**</p>

**Annex 55:    Confiscation of MV Androussa (IMO 9101182)**

## Annex 56: Houthis order to seizure assets owned by their opponents

Figure X56.1
**Order to the Sana'a based CBY by "the committee for the identification and the confiscation of assets owned by traitors" to freeze assets of 1223 individuals**[1]



[1] The order was posted in several media. The Panel confirmed its authenticity with confidential financial sources in Sana'a. The Panel is analyzing the list comprising the 1,223 names.

S/2018/68

*Panel's unofficial translation from Arabic*

Republic of Yemen
supreme political council                                    23/12/2017
committee for identification and seizure of assets owned by traitors

to the governor of the central bank

Based on the order of the special criminal prosecutor number 4376 dated 17 November 2017 which mandated us to take measures for the provisional seizure of assets owned by traitors whose names are in the attached list comprising of 1,223 names starting by Ebtehaj Abdullah al-Kamel and ending by Yussef Hussein Mahdi.

In this regard and in order to implement the special criminal prosecutor's order, we trust you could issue a circular to all banks for the provisional seizure of all bank accounts owned by traitors whose assets are seized and whose names are in the attached list

signed
**major general Abdelhakim Hashem al Khewani**
**deputy minister of interior**
**head of the committee for identification and seizure of assets owned by traitors**


END OF TRANSLATION

18-00267

## Annex 57: Saleh financial network

Table 57.1
**List of individuals and entities of Saleh financial network**

| Ser | Identity | Type |
|-----|----------|------|
| 1 | **Ali Abdulah Saleh (Yei.003)** **(Deceased on 4 November 2017)** | Person |
| 2 | Ahmed Ali Abdullah Saleh (Yei.005) (a.k.a Ahmed Al-Ahmar Ali Abdullah) | Person |
| 3 | Khaled Ali Abdullah Saleh (a.k.a. Khaled Al-Ahmar Ali Abdullah) | Person |
| 21 | Towkay Limited British Virgin Islands | Company |
| 22 | Trice Bloom Limited, British Virgin Islands | Company |
| 23 | Precision Diamond Limited, British Virgin Islands | Company |
| 24 | Unmatchable Limited, British Virgin Islands | Company |
| 25 | Albula Limited, Turks and Caicos Islands | Company |
| 26 | Foxford Management Limited, Bahamas | Company |
| 27 | Weisen Limited, British Virgin Islands | Company |
| 28 | M-S Ansan Wikfs Hadramawt Limited, Cayman Islands | Company |
| 29 | SCI 59 Rue Galilee, France | Company |
| 31 | M-S ANSAN Wikfs Limited, Cayman Islands | Company |
| 32 | Ansan Wikfs Darfur (for Gold), Cayman Islands | Company |
| 35 | Afhamka B.V. Netherlands | Company |
| 36 | Wild Horse Investment Inc, Bahamas | Company |
| 37 | Raydan Investments LLC, UAE | Company |
| 38 | Tilsit Real Estate BV, Netherlands | Company |
| 41 | The Pact Trust | Company |
| 43 | 59 Rue Galilee, Paris 75008, France | Address |

S/2018/68

Table 57.2
**Raydan Investment Holdings Limited transfers in UAE**[1]

| Date | AED | US$ | Investment / Transfer in UAE |
|---|---|---|---|
| Jan to Apr 2014 | 5,173,301 | *1,407,865* | Ecostar International Holdings Limited |
| Feb to Apr 2014 | 25,560,000 | *6,955,910* | Al Ramz Securities LLC bank account number AEXXXXXXXXXXX58492164, National Bank |
| 9 Jun 2014 | *44,085,680* | 12,000,000 | Staroil Operating Company bank account number AEXXXXXXXXXXX89601, Abu Dhabi Islamic Bank |
| 25 Jun 2014 | 963,685 | *262,300* | Select Global Development LLC account number AEXXXXXXXXXXX09693, Mashreq Bank |
| 23 Mar 2015 | 1,237,789 | *336,906* | EMAAR Properties PJSC Opera Grand account number AEXXXXXXXXXXXX54615, Commercial Bank of Dubai |
| 22 Apr 2015 | 103,385 | *28,140* | Eversheds LLP bank account number AEXXXXXXXXXXX39001, HSBC Bank Middle East for oil concession payment |
| **Totals** | **77,123,860** | **20,891,121** | |

---

[1] The currency of transfer is in normal bold text.  All exchange rates from www.xe.com on 3 July 2017. US$ 1 = AED 3.67.

18-00267

Figure 57.1
**Saleh financial network**



  
S/2018/68

## Annex 58:    Case studies of air strikes in Yemen (2017)

1.      The Panel initiated investigations on ten air strikes against civilian targets in Yemen during 2017. Full case studies for four of these air strikes are included as shown in table 58.1.[1]

2.      The Panel arrived at its findings and conclusions based on its own investigations and information available in the public domain. If the Saudi Arabia-led coalition can provide verifiable information on the military objectives sought to be achieved that may counter the Panel's conclusions and findings, the Panel stands ready to review them.

3.      Saudi Arabia, on behalf of the Saudi Arabia led-coalition has refused to engage with the Panel, stating that "the coalition's activities" fall outside the mandate of the Panel of Experts.[2] The Panel reaffirms that violations of IHL, including those that are committed by the Saudi Arabia-led coalition, as a party to the conflict in Yemen, fall within the Panel's mandate and that those individuals responsible for planning, deciding on and/or executing air strikes[3] that disproportionately affect civilians and civilian infrastructure may fall under the designation criteria contained in paragraphs 17 and 18 of resolution 2140 (2014). The Saudi Arabia-led coalition, as the military entity carrying out these air strikes, can also fall within paragraphs 17 and 18 of resolution 2216 (2015) (see paragraph 8).

Table 58.1
**Full case studies of air strikes against civilian targets**

| Date | Location | Incident and target | Type of ordnance | Civilian casualties | Case study in Appx |
|------|----------|---------------------|------------------|---------------------|--------------------|
| 16 Mar 2017 | Red Sea | Maritime helicopter attack against Somali migrant boat. | Small arms ammunition | 42 dead 34 injured | A |
| 25 Aug 2017 | Sana'a | Air delivered ordnance against a civilian residence | High explosive (HE) aircraft (a/c) bomb | 16 dead 17 injured | B |
| 2 Sep 2017 | Hajjah | Air delivered ordnance against a civilian residence | HE a/c bomb | 3 dead 13 injured | C |
| 1 Nov 2017 | Sa'dah | Air delivered ordnance against a night market | HE a/c bomb fitted with Paveway guidance unit. | 31 dead 26 injured | D |

4.      In the ten incidents investigated the Panel finds that:

(a)      The use of precision-guided weapons[4] is a strong indicator that the intended targets were either the objects or the individuals affected by the air strikes;

---

[1] The Panel selects its cases accordance with its IHL methodology in Annex 1, primarily based on the availability of requisite high standard of evidence.

[2] Letter from the Kingdom of Saudi Arabia dated 10 October 2017.

[3] Regarding those executing attacks, it is possible that the pilot of the aircraft may fire his or her weapons in reliance of the accuracy of the information that may have been previously provided to him or her. In these cases, the Panel finds that it is those commanders who plan and decide upon the air strikes, who have at their disposal the relevant information from a variety of sources, who have the responsibility to ensure compliance with international humanitarian law. See also William Boothby and Michael N. Schmitt, *The Law of Targeting* (Oxford University Press, 2012).

[4] Precision-guided weapons systems have low percentage failure rates.

(b)     In all cases investigated, there was no demonstrable evidence that the civilians in, or near these objects, who are *prima facie* immune from attack, had lost their civilian protection;

(c)     Even if in some of the below mentioned cases, the Saudi Arabia-led coalition had targeted legitimate military objectives, the Panel finds, based on its investigations, that it is highly unlikely that the IHL principles of proportionality and precautions in attack were respected in these incidents;

(d)     The cumulative effect on civilians and the civilian objects demonstrates that even if precautionary measures were taken, they were largely inadequate and ineffective; and

(e)     In respect of the individual case studies, the Panel finds that:

(i)     Except for case study 1, the only military entity capable of carrying out these airstrikes is the Saudi Arabia-led coalition. In case study 1, it is highly unlikely that an entity other than the Saudi Arabia-led coalition could have carried out the attack;

(ii)     Except for cases 2 and 4, the Saudi Arabia-led coalition has not acknowledged its involvement in any of the attacks, nor clarified, in the public domain, the military objective sought to be achieved. In cases 2 and 4, the Panel is unable to concur with the justifications provided by the Saudi Arabia-led coalition.

(iii)     In case study 4, an attack on a night market, even if there was a Houthi gathering as claimed by the Saudi Arabia-led coalition, evidence strongly demonstrates that the Saudi Arabia-led coalition did not meet IHL requirements of proportionality and precautions in attack. This also applies to case summary 7;

(iv)     Except for case summary 10, where Saudi Arabia-led coalition targeted the 22nd Armoured Brigade of the legitimate Government, there is no demonstrable evidence that all those affected were deprived of the protection afforded to civilians; and

(v)     In the cases where air strikes targeted residential buildings, over half of those affected were children. The Panel finds that measures taken in the Saudi Arabia-led coalition in its targeting process to minimize child casualties, if any, remain largely ineffective.[5]

5.     In the absence of any verifiable information from the Saudi Arabia-led coalition, the Panel concludes that the evidence strongly demonstrates that these air strikes violated the IHL obligations of individual member States of the Saudi Arabia-led coalition. All States whose forces engage in, or otherwise participate in military operations on behalf of the coalition are responsible for "all acts committed by persons forming part of its armed forces".[6] These States "may not evade their obligations by placing their contingents at the disposal of an ad hoc coalition".[7] All Saudi Arabia-led coalition member States and their allies[8] also have an obligation to take appropriate measures to ensure respect for IHL by the Saudi Arabia-

---

[5] For measures reportedly taken by the Saudi Arabia-led coalition to reduce child casualties, see paragraph 200 of the Secretary General's Report on Children in Armed Conflict, S/2017/821, 24 August 2017. The report notes that "the United Nations was informed of measures taken by the Saudi Arabia-led coalition in 2016 to reduce the impact of conflict on children, including through their rules of engagement and the establishment of a joint incident assessment team mandated to review all incidents involving civilian casualties and identify corrective action". Yet, of the 43 incidents examined by the Joint Incident Assessment Team (JIAT), made available to the Panel, in only two incidents did it find that the Saudi Arabia-led coalition violated IHL. The Panel also notes that there is no transparency in the implementation of the recommendations of the JIAT by the Saudi Arabia-led coalition.

[6] See updated commentary to common article 1 of the Geneva Conventions of 12 August 1949. See also article 3 of The Hague Convention respecting the Laws and Customs of War on Land of 1907.

[7] See updated commentary to common article 1 of the Geneva Conventions.

[8] Based on the updated commentary to common article 1, "allies" may include those States that engage in "financing, equipping, arming or training" of the coalition armed forces for their engagement in Yemen and/or those States that plan, carry out and debrief operations jointly with the coalition. For the specific States that are involved, see para. 30.

led coalition.[9] This obligation is especially incumbent upon the Government of Yemen, upon whose request and with whose consent the air strikes are being conducted (see S/2015/217). The Panel stands ready to provide the Committee with further information if requested, but in the interest of brevity, provides only summaries of the cases in table 58.2 below.

Table 58.2
**Other air strikes against civilian targets**

| Appx to Annex 58 | Date | Location | Incident and target | Type of ordnance | Civilian casualties |
|---|---|---|---|---|---|
| D | 9 Jun 2017 | Sana'a | Air delivered EO against residential building | Mk 82 or 84 HE bomb / Paveway | 4 dead 8 wounded |
| E | 4 Aug 2017 | Sa'dah | Air delivered EO against a civilian residence | Mk 84 2000lb aircraft bomb | 9 dead 3 injured |
| F | 23 Aug 2017 | Arhab | Air delivered EO against hotel | Mk 82 or 84 HE bomb / Paveway | 33 dead 25 injured[10] |
| G | 16 Sep 2017 | Ma'rib | Air delivered EO against civilian vehicle | HE a/c bomb or air to ground missile (AGM) | 12 dead |
| H | 10 Nov 2017 | Sa'dah | Air delivered EO against residential building | Mk 82 or 84 HE bomb / Paveway | 4 dead 4 injured |
| I | 14 Nov 2017 | Ta'izz | Air delivered ordnance against legitimate Government of Yemen forces on Saber mountain | Mk 82 or 84 HE bomb / Paveway | 3 dead 5 injured |

6.      The Panel also takes note of the JIAT findings that differ from Panel findings in 2016, on the case study summaries contained in serials 5, 7, 8, and 9 of S/2017/81. The Panel, after evaluating the information provided by the JIAT in the public domain, attaches the full case studies of those incidents in annex 60. The Panel, in contrast to the JIAT findings, confirms that: 1) the Saudi Arabia-led coalition was responsible for those air strikes; and 2) in the absence of any credible evidence to the contrary including the military objectives, which can only be provided by the Saudi Arabia-led coalition, evidence still strongly demonstrates that the Saudi Arabia-led coalition violated IHL in those incidents.

7.      IHL requires military commanders and those responsible for planning, authorizing and executing decisions regarding attacks to take all feasible precautions to avoid, and in any event to minimize, incidental loss of civilian life, injury to civilians and damage to civilian objects. Air strikes that disproportionately affect civilians and civilian infrastructure are veritable threats to the peace, security and stability of Yemen.

---

[9] This obligation to respect and ensure respect under common article 1 of the Geneva Conventions of 12 August 1949 is not limited to those coalition States that actively participated in this air strike as stated in the updated commentary. "The duty to ensure respect … is particularly strong in the case of a partner in a joint operation, even more so as this case is closely related to the negative duty neither to encourage nor to aid or assist in violations of the Conventions. The fact, for example, that a High Contracting Party participates in the financing, equipping, arming or training of the armed forces of a Party to a conflict, or even plans, carries out and debriefs operations jointly with such forces, places it in a unique position to influence the behaviour of those forces, and thus to ensure respect for the Conventions".

[10] UN figures. See "Press briefing note on Yemen, Cambodia and Guatemala". Media and witnesses reported that 60 people died, and 13 were injured. In accordance with Panel methodology in annex 2, the Panel relies on UN data when the casualty figure is above ten. The Panel has requested, and is awaiting, an update on the figures from the UN OHCHR.

**Appendix A to Annex 58:  Maritime attack against Somali migrant boat, Hudaydah on 16 March 2017**[11]

**I.    Introduction**

1.    This case study aims at identifying acts considered by the Panel as potential violations of IHL. This annex includes the Panel's findings on the incident relating to an attack on a boat carrying civilian migrants that occurred on 16 March 2017, within 60 nautical miles (nm) off the Yemeni Red Sea coast.[12]

2.    This incident took place in a maritime area where there has been a recent escalation of hostilities. All the available evidence points to the incident being directly linked to the Yemen conflict. Given that no Member State or organization has so far accepted responsibility for the incident, the Panel is currently discounting the possibility that the incident was a result of a legitimate law enforcement operation permitted under Article 73 of the United Nations Convention on the Law of the Sea, unless further evidence to the contrary is found.

**II.    Background**[13]

3.    On the night of 16 March 2017,[14] a small vessel carrying approximately 146 passengers[15] was attacked in the Red Sea off the coast of Yemen. There were at least 42 fatalities, which included 11 Somali women,[16] and 34 Somalis, including eight children, were injured.[17]  The vessel, which contained predominantly Somali nationals, was sailing away from Yemen when the incident occurred.[18] Sources state that some of the migrants had left al-Kharaz camp in Ras al-Ara in Lahij Governorate in Yemen and that the boat was destined for Sudan.[19] Survivors state that late in the night of 16 March 2017, a large vessel approached the boat and ordered the boat to stop. When the boat proceeded without stopping, rockets were fired that did not impact on the boat. The helicopter, highly likely to have come from the large vessel, fired on the boat for five minutes and then circled the boat and fired again from another direction resulting in the damage and injuries documented in this case study.[20] The helicopter then left, as did the vessel. After 30 minutes[21] the boat proceeded to shore, without encountering further resistance or any assistance.

---

[11] This case study was included in the mid-term update submitted to the Committee on 28 July 2017. An updated version is included here.

[12] Some accounts state that the vessel was between 30 - 55 nm off the coast of Yemen when the incident occurred. As far as the Panel is aware, there were no distress call made to the shore and there is no open source record of the geo-location of the incident. The Government of Yemen claims a territorial sea out to 12 nm from their coast, a contiguous zone of 24 nm and an exclusive economic zone out to 200nm. This is in accordance with the United Nations Convention on the Law of the Sea (UNCLOS) www.un.org/depts/los/convention_agreements/texts/unclos/unclos_e.pdf, which Yemen ratified on 21 July 1997 and acceded to the subsequent Agreement that amended the original convention on 13 October 2014.

[13] For media coverage on the issue, see http://ca.reuters.com/article/topNews/idCAKBN16O0UI-OCATP, http://www.euronews.com/2017/03/17/dozens-of-somali-refugees-killed-in-airstrike-off-yemen, https://ethiocritical.com/2017/06/06/saudi-chopper-massacre-analysis-of-the-deaths-of-42-somali-refugees-at-sea-and-why-justice-is-beyond-them/amp/. For the Government of Somalia's initial response, see http://www.independent.co.uk/news/world/middle-east/saudi-arabia-led-coalition-blamed-somalia-deadly-attack-boat-refugees-fleeing-yemen-a7637456.html.

[14] Some witnesses stated that the attack occurred after around 21.00 hours.

[15] This included four Yemenis.

[16] In Yemen, women are not considered likely to engage in hostilities. Under IHL, women, like children are afforded special protection.

[17] OHCHR. See also http://www.unhcr.org/news/press/2017/3/58cc01754/news-comment-unhcrs-spokesperson-william-spindler-attack-refugee-boat-yemen.html. UNHCR reports that at least 42 were killed in the incident, www.unhcr.org/news/press/2017/3/58cfe9824/unhcr-condemns-refugee-deaths-yemen-calls-inquiry.html.

[18] Source: UN.

[19] UN. Some sources stated that the boat stopped at many unspecified locations along the path to pick up migrants who joined the journey.

[20] Testimony from Panel sources, testimonies shared by two organizations, interviews with UN agencies, and international organizations, Somali diaspora, information/ reports provided by four international organizations, and open source documentation. There were no reports of the shots being fired from the vessel.

[21] Sources informed the Panel that those alive hid themselves beneath the bodies of the dead and remained motionless for approximately 30 minutes to avoid further attack.

S/2018/68

4.    The Panel has not obtained any evidence that demonstrates the presence of any fighters, weapons or military equipment in the vessel that would have made the vessel a legitimate military target, nor had any party to the conflict alleged the boat to be a military target (see paragraph 20). The Panel's request to visit the site to interview survivors and inspect the boat was denied by the Houthi-Saleh alliance.[22]

Figure A.58.1
**Migrant boat in port after attack (17 March 2017)[23]**



## III.    Technical analysis[24]

### A.    Wound ballistics and calibre

5.    The Panel analysed imagery from a range of sources that was taken on 17 and 22 March 2017. From the immediate post-incident imagery of 17 March 2017, which included human remains still on the vessel, wounds were identified that had all the characteristics of the penetrating and perforated trauma[25] typical of that caused by the impact of a high velocity small arms round. It is almost certain[26] that the wounds had been caused by small arms fire from a weapon of a calibre of no more than 7.62mm.

### B.    Location of firing point

6.    The circumstances surrounding the incident mean that only the perpetrator themselves can confirm the exact geo-coordinates the weapon was fired from.  All forensic evidence from the firing point would remain on the firing platform or be lost to the sea. Notwithstanding this, examination of physical forensic evidence on the small vessel itself provides indicators as to the direction and altitude of the firing point.

7.    Examination of the imagery taken on 22 March 2017 and obtained by the Panel identified a bullet strike from a small calibre high velocity round of between 5.56mm to 7.62mm in one of the blue barrels on the deck of the vessel (figures A.58.2 to A.58.5). The bullet has perforated the top of the barrel and the kinetic energy of impact has caused plastic deformation to the barrel material in the area immediately surrounding the bullet strike. Figure 1.X.5 shows the damage to the hull of the vessel caused by a bullet perforating the hull from the inside to outside. Larger calibre bullets (12.7mm and above), or cannon rounds (20mm and above) would have caused substantially more damage than that shown in the imagery.

---

[22] Letter to Panel dated 23 March 2017.

[23] Photos contained in this case study were obtained from three confidential sources who collected the imagery independently of each other and these photos were verified against multiple different open source imagery.

[24] The Panel has consulted with an independent ballistic forensic scientist Mr. Philip Boyce BSc, MSc, who agrees with the technical analysis of the Panel.

[25] Penetrating trauma occurs when the bullet remains within the human body. Perforating trauma occurs when the bullet passes through the human body. In the case of perforating trauma from a high velocity projectile the exit will typically be larger than the entry wound.

Figure A.58.2
**Bullet strike on blue barrel**[27]



Figure A.58.3
**Bullet strike on blue barrel**



Figure A.58.4
**Bullet strike on blue barrel**



Figure A.58.5
**Bullet strike on hull**[28]



8.      Closer examination of figures A.58.3 to A.58.5 also clearly shows a directional impact strike indicating that the round was fired from a direction forward of the vessel.  This direction correlates with the training given to armed forces that are taught that the ideal firing position from a moving platform to a moving target is generally with the target moving directly towards you.  This reduces the need for lateral deflection[29] when aiming, and also makes best use of the 'beaten zone' of a machine gun as it means the target is moving into the impact zone and not out of it.

9.      The beaten zone of a machine gun is the elliptical pattern formed by the rounds striking the ground or the target. The size and shape of this beaten zone changes when the range to the target changes or when the machine gun is fired from differing altitudes. On uniformly sloping or level terrain, the beaten zone is long and narrow. As the altitude of the machine gun increases, its attitude to the target changes and the relative beaten zone becomes

---

[27] Image source: Confidential.
[28] Source: https://www.youtube.com/watch?v=-Dl4SnO59D8.
[29] Deflection is a technique used for effectively firing a projectile at a moving target, which is also known as "leading the target". It means shooting ahead of a moving target so that the target and projectile will collide.

shorter and slightly wider.  Figures A.58.6 to A.58.8 illustrate how the beaten zone of a machine gun will change dependent on its platform.  In this case: 1) normal land; 2) the deck of a ship; and 3) from an aerial platform such as a helicopter.

Figure A.58.6
**Beaten Zone (MG on Ground)**

Figure A.58.7
**Beaten Zone (MG on Deck of Ship)**

Figure A.58.8
**Beaten Zone (MG on Helicopter)**



10.     The Panel finds it highly unlikely that a surface attack from another small vessel took place as: 1) the gunshot damage on the blue barrel (figures A.58.3 and A.58.4) was not from low angle trajectory high velocity fire; and 2) the humans on the vessel would have shielded the blue barrel from low angle trajectory high velocity fire.

Figure A.59.9
**Bullet trajectory analysis (side view)**



Figure A.58.10
**Bullet trajectory analysis (plan view)**



11.     The Panel finds it unlikely that a surface attack from a weapon mounted on a naval vessel was the cause of the attack based on the analysis of the attack angle estimated in paragraph 8 above, but cannot discount the possibility of a naval vessel being present in the local area. Table A.58.1 shows the distances at which various vessel types would have to have been located for rounds from a weapon on their deck to hit the migrant boat based on the attack angle established in figure A.58.9.

Table A.58.1
**Bullet trajectory analysis**

| Ser | Vessel type | Height (m) | Trajectory angle | | Range (m) | Trajectory angle | | Range (m) |
|---|---|---|---|---|---|---|---|---|
| | | | Degrees | TAN | | Degrees | TAN | |
| 1 | Corvette (Deck) | 4.2 | 15 | 0.268 | 15.7 | 20 | 0.36 | 11.5 |
| 2 | Corvette (Bridge roof) | 13.1 | 15 | 0.268 | 48.9 | 20 | 0.36 | 36.0 |
| 3 | Frigate (Deck) | 9.4 | 15 | 0.268 | 35.1 | 20 | 0.36 | 25.8 |
| 4 | Frigate (Bridge roof) | 16.3 | 15 | 0.268 | 60.8 | 20 | 0.36 | 44.8 |
| 5 | Destroyer (Deck) | 6.8 | 15 | 0.268 | 25.4 | 20 | 0.36 | 18.7 |
| 6 | Destroyer (Bridge roof) | 14.9 | 15 | 0.268 | 55.6 | 20 | 0.36 | 40.9 |
| 7 | Aircraft Carrier (Flight deck) | 16.5 | 15 | 0.268 | 16.5 | 20 | 0.36 | 45.3 |
| 8 | Aircraft Carrier (Bridge) | 31.7 | 15 | 0.268 | 31.7 | 20 | 0.36 | 87.1 |
| 9 | VLCC[30] (Deck) | 17.1 | 15 | 0.268 | 17.1 | 20 | 0.36 | 47.0 |
| 10 | VLCC (Bridge wing) | 46.4 | 15 | 0.268 | 46.4 | 20 | 0.36 | 127.7 |

12.     This analysis clearly shows that any attack from another vessel would have to have been so close that the passengers could hardly fail to notice it was firing at them.

13.     Similarly, the analysis also clearly shows that the shots could not have been fired from the land because the boat would have to have been so close to land (island or coast) that the passengers could not fail to notice their proximity to the land.  In this case it is probable that they would have grounded the boat before being shot at based on the firing angle analysis, unless fired at from tall cliffs.

14.     The distance/height parameters do allow for an AK47 attack from within the boat, but the Panel has found no evidence of this possibility to date.

---

[30] Very Large Crude Carrier.

15.      The Panel thus concludes that the attack was from an aerial platform based on the trajectory of the bullet strike as shown in figures A.58.9 and A.58.10 and the analysis of attack angles in table A.58.1.

## C.    Weapon type

16.      The Panel has discounted the impact of an explosive weapon (including rockets) on the vessel, as there is no indication in any of the imagery of any explosive effects such as fragmentation, deformation or metal shear, on materials.[31] Similarly there is no photographic evidence of traumatic amputation on the casualties, which would be expected if it were an explosive attack.

17.      The calibre of the bullet (5.56mm to 7.62mm)  indicates that only the following generic weapon types could have been used for this attack: 1) assault rifle; 2) light machine gun; 3) medium machine gun; or 4) minigun.[32] There have been media reports[33] that an AH64 Apache attack helicopter[34] was used for the attack. However the Panel has discounted the Apache as an attack platform as that particular helicopter only carries: 1) 30mm M230 Chain Gun;[35] 2) 70mm Hydra,[36] CRV 7[37] or APKWS[38] air to ground rockets; 3) AIM-92 Stinger;[39] and/or 4) Hellfire[40] anti-tank guided missiles as its weapon systems. It does not mount weapons of 5.56mm to 7.62mm calibre. [41]

18.      It is unlikely that an assault rifle (5.56mm or 7.62mm) was the weapon system used, as the inherent instability of the aerial platform would make accuracy difficult.  Light machine guns are rarely pintle mounted[42] on airframes, thus the Panel finds it most likely that either a pintle mounted[43] medium machine gun or minigun was the weapon system used.  These are commonly mounted on virtually all naval helicopters, and examples of pintle mounts are shown in figures A.58.11 and A.58.12.

---

[31] It is possible that if rockets were used, as reported by an eyewitness, they missed the target and impacted in the sea. The Panel considers this unlikely due to the size of the vessel and the accuracy of close range rocket systems.

[32] The M134D 7.62mm Minigun manufactured by www.dillonaero.com.  This system is in service with Saudi-Arabia-led coalition members; 1) Saudi Arabia and 2) Yemen.  The system is also in service with the following members of the Combined Maritime Force; 1) Australia; 2) Canada; 3) Iraq; 4) Italy; 5) Jordan; 6) Republic of Korea; 7) Malaysia; 8) Norway; 9) Pakistan; 10) The Philippines; 12) Spain; 13) Thailand; 14) Turkey; 15) United Kingdom; and 16) United States.

[33] For example: 1) www.theguardian.com/world/2017/mar/17/somali-refugees-killed-helicopter-attack-off-yemen-coast; 2) http://www.independent.co.uk/news/world/middle-east/yemen-refugees-killed-helicopter-attack-on-ship-somali-injured-government-houthi-rebel-unhcr-women-a7634751.html; and 3) www.middleeasteye.net/news/dozens-somali-refugees-killed-yemen-helicopter-attacks-boat-1163813622.

[34] www.boeing.com/defense/ah-64-apache/.

[35] www.orbitalatk.com/defense-systems/armament-systems/automatic-cannons-chain-guns/docs/109493_10 M230LF Chain Gun.pdf.

[36] Air Intercept Missile. www.gd-ots.com/armament_systems/rw_hydra.html.

[37] Canadian Rocket Vehicle. www.magellan.aero/product/rockets/.

[38] Advanced Precision Kill Weapon System. www.baesystems.com/en-us/product/apkws-laser-guided-rocket.

[39] www.raytheon.com/capabilities/products/stinger/.

[40] www.lockheedmartin.com/content/dam/lockheed/data/mfc/pc/longbow-fcr-and-longbow-hellfire-missile/mfc-longbow-fcr-pc.pdf.

[41] 1) Major General Ahmed al-Asiri, during a visit to London on 30 March 2017, distanced Saudi Arabia as a potential perpetrator by claiming that Saudi helicopters "did not hold the ammunition found at the site". www.theguardian.com/world/2017/mar/31/saudi-arabia-yemen-military-campaign-general-ahmed-aisir-clashes-with-critics. 2) This statement was in relation to the initial reports that an AH64 Apache was the attack platform. At no point did Major General Ahmed al-Asiri specifically deny that the attack platform belonged to another member State of the Saudi Arabia-led coalition. Source: Attendee at the press conference.

[42] A pintle mount is a fixed mount that allows the gun to be freely traversed and/or elevated while keeping the gun in one fixed position.

[43] There are also Moveable Weapons Mounts (MWMS) that clamp to the doorframe of a helicopter.

Figure A.58.11
**Example of a pintle mount (minigun)[44]**



Figure A.58.12
**Example of a pintle mount (7.62mm MMG)[45]**



19.　　Based on the analysis above the Panel concludes that the damage caused in this attack was highly likely a result of rounds fired from a medium machine gun or minigun of 7.62mm calibre mounted on a helicopter. It is likely that this was a naval helicopter operating off a warship as: 1) the potential position of the targeted vessel in the Red Sea at the time of the attack means that it is highly unlikely that land based assets were used; and 2) there were reports of sightings of a large vessel in the immediate area at the time of the attack (see paragraph 3). The only party directly engaged in the conflict in Yemen that has this capability is the Saudi Arabia-led coalition, although many of the warships operating in the Red Sea as part of the Combined Maritime Forces (CMF), or independently, would also have armed naval air assets.

## IV.　　Analysis of violations of international humanitarian law[46]

### A.　　Violation of principle of distinction

20.　　IHL requires that a party carrying out an attack distinguish between civilians and fighters, and civilian objects and military objectives.[47] Parties are prohibited from directing attacks against civilians.[48] None of the parties to the conflict have advanced any claims that the vessel or its occupants had become legitimate military targets. The UAE state media has quoted an UAE official as saying that the UAE recognized the civilian nature of this boat prior to the incident.[49]

22.　　At the time of the incident, the vessel was carrying over 140 individuals, including women and children, and some of whom the UNHCR had classified as refugees.[50] The Panel has found no evidence as of yet to demonstrate that these individuals, or the vessel, had lost its immunity from direct attack at the time of the incident. Yet, the fact that the gunfire was repeatedly and directly aimed at the vessel and its passengers, demonstrate that this vessel and its occupants were indeed the direct target of the attack.

---

[44] wwwi.ytimg.com/vi/HWjQnxlvwa0/maxresdefault.jpg.  Included for illustrative purposes only.

[45] Credit. Taken by Technical Sergeant Dennis J. Henry Jr, USAF. © USAF. Released to public domain for fair use as ID 121129-F-PM120-898. Included for illustrative purposes only.

[46] Yemen and all members of the Saudi Arabia-led coalition who have contributed air assets to military operations in Yemen are parties to the Geneva Conventions of 1949, the Protocol Additional to the Geneva Conventions of 12 August 1949 and relating to the Protection of Victims of International Armed Conflicts (Additional Protocol I), and Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of Non-International Armed Conflicts (Additional Protocol II) of 8 June 1977. Customary IHL is binding on all parties to the conflict in Yemen. See www.icrc.org for the ratification status of treaties by parties to the conflict.

[47] Common Article 3 (CA3) to the Geneva Conventions of 1949 (GC 1949), Article 13 to the Additional Protocol II (AP II) and ICRC Customary IHL Rules 1 – 10.

[48] CA3 to GC 49, Article 13 to the AP II and ICRC Customary IHL Rules 1 and 7.

[49] www.wam.ae/en/details/1395302603973.

[50] www.unhcr.org/news/press/2017/3/58cfe9824/unhcr-condemns-refugee-deaths-yemen-calls-inquiry.html.

23.     Thus, given that: 1) there is no demonstrable evidence that the vessel or the occupants had lost their civilian protection; and 2) the attack was clearly directed against the vessel and the occupants, there are very strong indications that the party that carried out the attack violated the IHL principles relating to distinction.

## B.     Violation of principles relation to precautions and proportionality

24.     IHL requires that military commanders and those responsible for planning and executing decisions regarding attacks take all feasible precautions to avoid, and in any event to minimize, incidental loss of civilian life, injury to civilians and damage to civilian objects.[51] IHL also imposes an obligation on parties to the conflict to cancel or suspend an attack if it becomes clear that its attack is likely to cause excessive civilian damage.[52]

26.     It is not clear if and what effective advance precautionary measures were taken to minimize civilian casualties or damage to civilian objects. It is highly likely that the vessel requested the boat to stop, and when it failed to do so, fired rockets in its direction. It is not clear if these rockets were fired as warning shots, or were intended to destroy the boat. However, evidence collected thus far demonstrates that the gunfire was directed deliberately at the occupants of the boat as demonstrated in the deaths of nearly one third of the vessel's passengers, and serious injuries to others.

27.     The Panel has found readily available public information that demonstrates that the area around the Yemeni 'Red Sea' ports are regular migration routes for many migrants and refugees in the region. For example, 967 migrants from Ethiopia and Somalia arrived at the Red Sea coast in January 2017 and 1,135 in February 2017 by similar boats.[53] It is reasonable to presume that the parties engaged in the conflict in Yemen were aware of these migratory patterns and should have, thus, taken extra precautions to ensure that harm to these individuals was minimized.

28.     Additionally, the fact that the vessel was headed away from Yemen, and was full of passengers, also significantly lessens the likelihood that the vessel was carrying weapons or fighters towards Yemen. Even if it was suspected that this specific vessel, or vessels of this size or nature, had previously engaged in arms smuggling into Yemen, the attack on the vessel, at the time and in circumstances where the boat was filled with passengers, including women and children, was extremely unlikely to be proportionate response. The Panel also highlights that even if the vessel were engaged in human smuggling at the time of the incident, [54] this would not absolve the parties involved in the conflict from their IHL obligations.

29.     The Panel takes full cognizance of the recent maritime security incidents experienced by Saudi Arabia-led coalition and United States' naval vessels in the Strait of Bab al Mandab and Red Sea. Yet, this would not exempt any party to the conflict in Yemen, from their obligations under IHL to ensure that a target is a legitimate military objective prior to attack.

## C.     Violations of obligations relating to those wounded at sea

30.     IHL requires that "whenever circumstances permit, and particularly after an engagement, each party to the conflict must, without delay, take all possible measures to search for, collect and evacuate the wounded, sick and shipwrecked without adverse distinction".[55] It also requires that those wounded at sea must receive medical care "to the fullest extent practicable" and "with the least possible delay".[56]

31.     While there is some evidence to suggest that the party conducting the attack, desisted from further attacks, after the civilian nature of the vessel became evident,[57] there is no demonstrable evidence to suggest that they took

---

[51] Rules 15 and 18 of the ICRC Customary Study.
[52] Rule 19 of ICRC Customary Study.
[53] Report of the Danish Refugee Council, www.reliefweb.int/sites/reliefweb.int/files/resources/RMMS Mixed Migration Monthly Summary February 2017.pdf.
[54] The Panel understands that at least one crew-member was arrested for human smuggling following the incident.
[55] Emphasis added. ICRC Customary Law Study, Rule 109. See also CA3 to the Geneva Conventions and Article 8 of AP II.
[56] ICRC Customary Law Study, Rule 110. See also CA 3 to the Geneva Conventions and Articles 7 - 8 of AP II.
[57] Some reports from eyewitnesses indicate that the firing stopped after they shone the lights of the vessel on themselves to show that they were civilians.

S/2018/68

any measures to assist the dead or wounded. There were no distress calls made on behalf of the vessel, nor was there any attempt to rescue the wounded. According to witnesses, it took the targeted vessel at least another six hours to reach a safe port with the wounded after the incident.

32.      The Panel notes a report published in the UAE state news agency.[58]  The statement is attributed to a UAE official who stated that the UAE "*clearly recognized the non-military nature of the boat which was carrying a large number of civilians… in the light of this information, the UAE Armed Forces adhered to the strict engagement rules preventing them from targeting any non-military targets*". This statement, if accurate, indicates that the UAE had naval assets with a surveillance capability in the area and thus either visual or radar visibility of the vessel around the time of, or prior to, the incident. It is therefore, highly unlikely, that UAE naval assets in the vicinity remained unaware of the incident.[59] It is thus possible that they would have been in a position to assist the wounded and even more likely that they could have evidence as to the perpetrators of the incident. The Panel has engaged with the UAE to obtain further information surrounding the event, including if any attempts were made to rescue those wounded at sea, but has not received a response.

## V.      Obligation to investigate the incident

33.      UAE state media has reported that the UAE has launched an investigation into this incident. The article stated, "investigations indicate the possibility that the boat was targeted by the Houthi rebel forces operating in the region".[60] The Panel does not discount the possibility of another vessel being involved in the incident, but given the technical and forensic evidence documenting the almost certain involvement of air assets in this incident, it is highly unlikely the Houthi-Saleh forces were responsible for this incident. This is because 1) Houthi-Saleh forces do not have the technical capacity to launch small arms attacks from the air, 2) there is no evidence, thus far, of external parties with such air assets, using those air assets in support of the Houthi-Saleh alliance; and 3) the only forces with such a capability are those opposing the Houthi-Saleh forces.

34.      Given the allegations that the incident may amount to a war crime,[61] parties have an obligation under international humanitarian law to investigate.[62] This obligation is particularly incumbent upon the Government of Yemen. Saudi Arabia,[63] the UAE,[64] and the United States[65] have all independently denied their involvement in the incident. The Panel notes that other Member States also have the right to vest universal jurisdiction in their national courts over alleged war crimes.[66] There are no requirements that the identity of the offender be known to initiate an investigation, only that there is reliable and credible information that a violation may have happened.[67]

## VI.     Attribution of responsibility

35.      The Panel finds that the perpetrators could have only come from Member States that have the capability to operate armed helicopters in the area, highly probably from naval assets. The Panel does not consider it a coincidence that three vessels were reportedly attacked on 16 and 17 March 2017 off the coast of Hudaydah, all allegedly being subject to helicopter gunfire or attacks from a naval vessel. A fourth boat also disappeared on 16 March 2017, with debris found subsequently and all ten on board were missing (see table 1.X.2).

---

[58] http://wam.ae/en/details/1395302603973, http://gulfnews.com/news/uae/government/uae-denies-targeting-boat-carrying-somali-refugees-1.1997104, http://www.emiratesnews247.com/uae-not-target-somali-refugee-boat-off-coast-yemen/. This is the only statement from the UAE on the incident. The Panel is not aware if the UAE government has refuted this statement.

[59] The Panel notes recent media statements that the UAE is leading the operations on behalf of the Saudi Arabia-led coalition in and around Hudaydah port. http://english.alarabiya.net/en/News/gulf/2017/03/27/White-House-considering-potential-attack-to-liberate-al-Hudaydah-port.html.

[60] www.wam.ae/en/details/1395302603973.

[61] www.hrw.org/news/2017/03/26/yemen-attack-refugee-boat-likely-war-crime.

[62] See in particular, Article 158 of the ICRC Customary IHL Study.

[63] http://uk.reuters.com/article/uk-yemen-security-refugees-idUKKBN17112I?il=0.

[64] www.wam.ae/en/details/1395302603973.

[65] http://uk.reuters.com/article/uk-yemen-security-refugees-idUKKBN17112I?il=0.

[66] ICRC Customary IHL Rule 157.

[67] Schmitt, M. "Investigating Violations of International Law in Armed Conflict", p.39 Volume 2 Harvard National Security Journal 2011.

36.     The Panel finds it is extremely unlikely that an unidentified naval vessel and a military aircraft could enter the Bab al-Mandab strait without triggering the radar systems of the naval entities that conduct surveillance of the strait. It is also extremely unlikely that such a military vessel and helicopter would be able to launch an assault without triggering the same radar systems. The Member States that have these capabilities in the area include those belonging to the Saudi Arabia led-coalition and the Combined Maritime Forces (CMF).

37.     The Panel regrets that the UAE, the Saudi Arabia-led coalition, and the CMF have not cooperated with the Panel and responded to Panel requests for information. It also regrets that the Houthi-Saleh alliance, which has attributed responsibility for this attack to the Saudi Arabia-led coalition, denied the Panel access to Hudaydah to investigate this incident.[68]

## E.     Similar attacks

38.     The Panel notes that this incident was only one of several incidents reported in that period that occurred off the coast of Hudaydah. Five of these incidents were recorded by the UN and Mwatana Organization. The following incidents in table A.58.2 are presented for information purposes only, as the Panel did not independently verify the same:

Table A.58.2
**Incidents of fishing vessels (FV) being attacked**

| Ser | Date | Coastal Location | Alleged Incident | Comments |
|-----|------|-----------------|-----------------|----------|
| 1 | 3 Feb 2017 | Island off the coast of Hudaydah | A helicopter fired on the tents and boats of fishermen gathered on the Island. | Killed six and injuring seven individuals. |
| 2 | 15 Mar 2017 | Al-Durayhimi. (15 miles off Turfah Island) | A helicopter seen taking off from a warship, shot at the occupants of the FV without warning. | Killed two and injured five individuals. The injured remained afloat on the fishing boat at sea until late afternoon on 16 March 2017 when volunteers pulled them to a fishing port in Hudaydah. No notice was issued by any party prohibiting access to this fishing area. |
| 3 | 15 Mar 2017 | Al-Durayhimi. (15 miles off Turfah Island) | A FV was struck by a warship missile almost immediately after the above attack. | Killed five and injured three individuals. The occupants witnessed the previous boat (serial 2) being shot by a helicopter. The survivors stated that there were no indications that they had entered a restricted zone. |

---

[68] Letter dated 23 March 2017.

S/2018/68

| Ser | Date | Coastal Location | Alleged Incident | Comments |
|---|---|---|---|---|
| 4 | 16 Mar 2017 | North of Hudaydah | Ten fishermen were reported as missing. | Parts of the boat were found burned 20 miles away from Al Teir Mount, west to the Eritrean waters. |
| 5 | 5 Apr 2017 | Off the coast of Hudaydah | Fishing boat was shot by helicopter gunfire. | Four killed. |

## VII.  Humanitarian considerations

39.     Immediately after the incident, most survivors were accommodated by the local authorities in the Hudaydah prison because, it was said that there was no other facility in Hudaydah where they could be accommodated.  While the authorities confirmed to the UN that the survivors were not in detention in the true sense of the word, the survivors were not allowed to leave the prison.  In May 2017, the authorities transferred the survivors from the Hudaydah Central Prison to the Immigration, Passports and Naturalization Authority detention center in Sana'a. As at November 2017, some of those affected in this incident returned to Somalia, while some others sought refugee status in Aden.

**Appendix B to Annex 58: Air strike on civilian residential area in Faj Attan, Sana'a (25 August 2017)**

**1.    Background**

1.  At approximately 02:00 hours on 25 August 2017, explosive ordnance dropped from a military aircraft detonated on several residential buildings in Faj Attan in Sana'a.[69] The explosions killed 16 individuals, including seven children and injured 17 other individuals, which included eight children.[70] The Saudi Arabia-led coalition claimed that the strike was a result of a "technical mistake". This was the third time that explosive ordnance has been delivered to this area, the delivery of which is attributed to the Saudi Arabia-led coalition, and that affected some of the same buildings.[71]

**II.    Technical Analysis**

2.  Post blast analysis of the image at figure B.58.1 to B.58.4 shows damage that is typically characteristic of the detonation of a significant quantity of high explosive, and is fully consistent with the blast damage resulting from air strikes using high explosive aircraft bombs.

Figure B.58.1
**Post-blast damage[72]**



Figure B.58.2
**Post-blast damage**



---

[69] Approximate location: 15⁰19'18.04"N, 44⁰10'42.4"E.

[70] Information provided by sources on the ground and verified through media reports. See "Yemen: Hiding Behind Coalition's Unlawful Attacks" https://www.hrw.org/news/2017/09/08/yemen-hiding-behind-coalitions-unlawful-attacks. In one incident, eight members of the same family died with the only survivor being a 6-year-old child. One of the residential buildings destroyed had no occupants, as they had left following a previous air strike on that building (see paragraph 2). The other building had four families, some of whom were displaced persons from Ta'izz.

[71] These strikes on 28 January 2016 and 20 April 2015 in Faj Attan documented by (S/2016/73), p 153 (recorded 25 deaths and 400 injuries in April 2015), and Human Rights Watch Report, "Yemen: War Crimes Not Addressed" recorded six deaths in January 2016.

[72] Photos contained in this case study were obtained from two confidential sources in the area.

Figure B.58.3
**Post-blast damage**



Figure B.58.4
**Post-blast damage**



## III.    Response of the Saudi Arabia-led coalition

3.       Following the incident, the Saudi Arabia-led coalition spokesperson stated that a "*technical mistake*" had resulted in the incident, without providing further substantive or convincing details. He added that *"… all procedures (related to operational planning and implementation) were correct… there was no direct targeting of the alleged house"*.[73] The target point (TP) was an alleged Houthi-Saleh Command, Control and Communication (C3) centre at Faj Attan, Sana'a.[74] Media released imagery,[75] attributed to the Saudi Arabia-led coalition, provided further details on the TP (figure B.58.5). Panel imagery is at figure B.58.6 to B.58.9.

Figure B.58.5
**Imagery attributed to the Saudi Arabia-led coalition[76]**



The inset shows the legitimate target — a Houthi military site. The small box shows the site that was struck as a result of a technical error.

---

[73] http://www.arabnews.com/node/1151086/middle-east.
[74] Around the vicinity of 15⁰19'20.50"N, 44⁰10'53.08"E.
[75] http://www.arabnews.com/node/1151086/middle-east, https://uk.reuters.com/article/uk-yemen-security-strike/saudi-led-force-admits-strike-in-yemens-capital-hit-civilians-idUKKCN1B60L8. The Panel requested the Saudi Arabia-led coalition to confirm the authenticity of the image on September 2017; the Saudi Arabia-led coalition declined to respond. Letter from the Kingdom of Saudi Arabia dated 10 October 2017.
[76] http://www.arabnews.com/node/1151086/middle-east.

Figure B.58.6
**Imagery on 18 August 2017**[77]



Figure B.58.7
**Imagery on 27 August 2017**[78]



---

[77] Satellite imagery obtained by Panel.
[78] Ibid.

Figure B.58.8 and B.58.9
**Enhanced imagery of the TP before and after the strike**[79]



## IV.   Analysis of violations of international humanitarian law (IHL)

4.       In the absence of a response from the Saudi Arabia-led coalition, the Panel analyzed the applicable law in relation to this incident based on facts gathered through its own independent investigations. [80]

5.       The Panel finds that in respect of the stated "technical mistake",

(a)       While it is possible for precision guided munitions to malfunction resulting in a target error, the Saudi Arabia-led coalition has refused to provide sufficient technical detail to enable such a judgement to be independently reached, reiterating that "*Coalition forces are committed to implementing…international humanitarian law*" and that "*the coalition's activities fall outside the scope of that (Panel of Expert's) mandate*".[81]

(b)       The Panel finds that by refusing to respond the Saudi Arabia-led coalition is effectively denying the opportunity for an independent confirmation of the Saudi Arabia-led coalition's position that a "technical malfunction" resulted in the deaths of 17 civilians. An independent assessment is particularly relevant considering that the TP in satellite imagery demonstrates a broken-down wall, which remained undisturbed post-strike.

6.       In the media, the Saudi Arabia-led coalition spokesperson, Colonel Turki al-Maliki, defended the strike as having "*a legitimate military target*", which he said was a Houthi command and control centre (C3). Satellite imagery shows a "damaged man-made wall type structure with debris" at the TP[82] (see figures B.58.6 - B.58.9).

7.       The Panel continues to welcome any information from the Saudi Arabia-led coalition that can be used to independently verify that the TP was a C3 centre and further detailed information on the nature of the technical mistake that resulted in the civilian deaths and damage to civilian infrastructure.

---

[79] Source: Ibid. At the TP the presence of a damaged man-made wall type structure with debris is observed. The visual changes as seen before and after the air strikes for the TP is mainly due to satellite camera view angle difference when the images were taken, which can be observed from the different appearance of the high-rise building in the images.  There are no major changes observed for the TP from the two images.
[80] This included photos and videos obtained from three sources, multiple open source imagery, statements of five sources, which included eyewitnesses; satellite imagery, and other documentation including death certificates.
[81] Letter to Panel dated 10 October 2017.
[82] UN.

S/2018/68

**Appendix C to Annex 58: Air strike on residential buildings (al-Maqadhi house) in Farah Village, Washa, Hajjah (2 September 2017)**

### I.      Background

1.       At approximately 13:30 hours on 2 September 2017, two items of explosive ordnance dropped from a military aircraft detonated within three minutes of each other.   The EO hit several residential buildings of the al-Maqadhi tribe[83] in Washa, Hijjah Governorate.[84] The first explosion affected residential buildings, but did not cause any casualties. The second explosion killed two women and one child and injured 13 others, which included one woman and ten young children. Witnesses informed the Panel that the reason that 14 of the 16 affected were women and children was because after the first strike, the men and the older children managed to flee to safety. The second strike did not leave enough time for the women and the young children to escape. The casualties were also high because 2 September 2017 was the second day of Eid - the annual day of gathering for the al- Maqadhi tribe for celebrations and resolution of tribal conflicts.

Figure C.58.1
**Remote location of the al-Maqadhi houses[85]**



_____

[83] The residents in this complex belong to the Al Maqhdi tribe. They are led by Sheif Mohamah Yahyah Maqhdi and Sheik Ali Yahyah Maqhdi. They are said to be aligned to the legitimate Government.
[84] At approximately 16⁰19'39.7"N, 43⁰25'10.1"E.
[85] Google Earth Pro imagery of 29 January 2017.

18-00267

## II.    Technical analysis of physical evidence

2.    The imagery at figure C.58.2 to C.58.5 shows damage that is highly indicative of the detonation of precision-guided aircraft bombs on structures.

Figure C.58.2[86]
**Paveway tail fin**



Figure C.58.3
**Crater al-Maqadhi houses (first strike)**



Figure C.58.4
**Damage to al-Maqadhi houses (second strike)**



Figure C.58.5
**Damage to al-Maqadhi houses**



3.    The Panel finds that:

(a)    Technical analysis of imagery (figure C.58.2) of the fragment recovered from the explosion indicates that one explosive device was fitted with a Paveway guidance unit for a high explosive (HE) aircraft bomb.  The fragment is the remnants of the rear fin from a Paveway guidance unit;

(b)    Photogrammetry of the imagery at figure C.58.3 estimates that the crater diameter was 3.4 m in sandy soil, and thus from crater analysis the explosive mass is estimated to be in the region of 940kg (TNT equivalent). This equates to the explosive content of a Mark 84 2000lb aircraft bomb;

(c)    The only military entity operating the type of aircraft in the area that has the capability to aerially deliver such precision-guided munitions is the Saudi Arabia-led coalition; and

---

[86] All images in this annex were obtained from residents in the complex or human rights investigators who visited in the aftermath.

(d)     The Panel is concerned that the damage to the top of the building shown in figure C.58.4 may be an entry points (hole) initially caused by the kinetic energy from a third unexploded aircraft bombs. These bombs have hardened weapons grade steel cases, which would have easily penetrated the thin-skinned roofs before it should have detonated on the floor of the building. The lack of damage the rest of the building is an indicator that there may be an unexploded bomb (UXO) under the floor of that building. The Saudi Arabia-led coalition has been asked if they would respond on humanitarian grounds to confirm, or otherwise, whether a third aircraft bomb was used in this strike.

## IV.     Response of the Saudi Arabia-led coalition

4.     The Saudi Arabia-led coalition was provided the opportunity to respond, but chose not to citing that "the coalition's activities" fall outside the mandate of the Panel of Experts.[87]

## V.     Analysis of violations of international humanitarian law (IHL)

5.     In the absence of a response from the Saudi Arabia-led coalition, the Panel analysed the applicable law in relation to this incident based on facts obtained during its own independent investigations.[88]  The Panel finds that:

(a)     Based on the use of precision-guided weapons, the remote location of the target site, and the repeated strikes, the al-Maqadhi residential complex was almost certainly the intended target of the two air strikes;

(b)     The Panel found no explanation in the public domain as to why this residential area, which is *prima facie* a civilian object immune from direct attack, was considered by the Saudi Arabia-led coalition to be a legitimate military objective;

(c)     The Panel also found no demonstrable evidence that the occupants of the house, who as civilians were prima facie immune from attack, had lost their civilian protection;

(d)     While the Panel is not convinced that the Saudi Arabia-led coalition directed its air strike against a legitimate military target,[89] even if it had, the Panel finds that there are serious concerns whether it respected IHL principles of proportionality and precautions in attack given that 14 of the 16 affected were women and children. Any proportionality assessment should have taken into consideration that given the celebrations of the day there was a high likelihood that civilians, including women and children would be in the complex; and

(e)     The cumulative effect on civilians and the civilian object also demonstrates that if precautionary measures were taken, they were largely inadequate and ineffective. If precautionary measures were not taken, it is incumbent on the Saudi Arabia-led coalition to demonstrate why in those circumstances, such precautionary measures were not feasible.[90]

---

[87] Letter to Panel dated 10 October 2017.

[88] This included photographs obtained from two sources, statements of four sources, and an investigation report issued by the National Commission of Inquiry of Yemen (document with Panel).

[89] See Article 13 (1) and (2) of Protocol II Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of Non-International Armed Conflicts (AP II) and Article 13 (3) on the loss of protection. See also CIHLR 1, 5 and 6. Prosecutor v Dario Kordic and Mario Cerkez (2005), para. 54.

[90] For example, if the target were some of the male occupants or guests, it is possible that they could have been targeted outside this highly residential area.

**Appendix D to Annex 58:  Air Strike on a night market, Sa'dah (1 November 2017)**

## I.    Background to Events

1.      At approximately 02:00 hours on 1 November 2017, explosive ordnance dropped from a military aircraft detonated in or close to a hotel in the busy night market in Saher district of Sa'dah governorate.[91] The explosion resulted in 31 deaths and 26 injured in Sahar district, Sa'dah governorate, and of these at least eight were children.[92]

2.      The Saudi Arabia-led coalition admitted striking the market and stated that "*the target was the gathering point for some armed Houthi militants*".[93]

3.      One witness informed the Panel, that while there is was a regular presence of two vehicles belonging to Houthi fighters, approximately 1,000m from the market, all sources confirmed that the market was civilian in nature, composing of hotels, restaurants, and coffee shops. The hotel that was affected by the airstrike was identified as an overnight lodging used by Qat farmers and their families who regularly visited the market.

## II.    Technical Analysis

4.      The imagery at figure D.58.1 to D.58.2 shows damage that is highly indicative of the detonation of precision-guided aircraft bombs.

Figure D.58.1
**Post strike damage in outer night market area[94]**



Figure D.58.2
**Post strike damage in outer night market area[95]**



---

[91] United Nations, See https://reliefweb.int/report/yemen/statement-humanitarian-coordinator-yemen-jamie-mcgoldrick-continued-violence-affecting.

[92] A local hospital informed the Panel that it received 29 dead and 26 injured: 2 children were recorded as having died, and six others were injured. Three bodies were burnt beyond recognition.

[93] The Saudi Arabia-led coalition says that the strike hit a legitimate target in Yemen, see https://www.reuters.com/article/us-saudi-yemen/saudi-led-coalition-says-strike-hit-a-legitimate-target-in-yemen-idUSKBN1D40OE. Initial statement on the incident: "Coalition to Restore Legitimate Government of Yemen: We closely follow up media outlets' allegations on targeting market in Sa'dah" http://www.spa.gov.sa/viewfullstory.php?lang=enandnewsid=1683445.

[94] Confidential source.

[95] Confidential source.

Figure D.58.3
**EO impact crater**[96]



3.      The Panel finds from photogrammetry of the imagery at figure D.58.3 that the crater diameter was approximately 3.6 m in sandy soil, and thus from crater analysis the explosive mass is estimated to be in the region of 940kg (TNT equivalent). This equates to the explosive content of a Mark 84 2,000lb aircraft bomb.

4.      The only military entity operating the type of aircraft in the area that has the capability to aerially deliver such precision-guided munitions is the Saudi Arabia-led coalition.

## III.   Response of the Saudi Arabia-led coalition

5.      The Saudi-led coalition accepted responsibility for this airstrike, but justified it as a "gathering point" for Houthi fighters (see paragraph 2 above).

## IV.   Analysis of violations of international humanitarian law (IHL)

6.      In the absence of a timely response from the Saudi Arabia-led coalition to the Panel, the Panel analyzed the applicable law in relation to this incident based on facts obtained during its own independent investigations. [97]

7.      It is possible that some individual fighters may have been present amongst civilians, as Houthi fighters frequent the market to buy Qat and other commodities. However, there was no information on the public domain or from witnesses that supported a finding that the market was a "gathering point" for Houthi fighters at the time of the air strike, but a gathering point for civilians.

8.      Even if the Saudi Arabia-led coalition targeted Houthi fighters, the Panel is not convinced that the Saudi Arabia-led coalition respected relevant principles of IHL, including those relating to proportionality,[98] for the following reasons:

     (a)     There is no evidence to support a finding that:

          (i)     There were Houthi-Saleh fighters in the market; and

---

[96] Credit: Naif Rahma, Reuters.

[97] This included photographs obtained from two sources, interviews with three sources, and a report issued by a local hospital. Open source images were verified by witnesses. Information from the UN.

[98] Under IHL "launching an attack which may be expected to cause incidental loss of civilian life, injury to civilians, damage to civilian objects, or a combination thereof, *which would be excessive in relation to the concrete and direct military advantage anticipated*, is prohibited". (Emphasis added). See CIHLR 14.

(ii)     Those fighters were of sufficient military value to justify collateral damage to the civilians and civilian objects and consequently, the Saudi Arabia-led coalition met its obligations relating to proportionality.

(b)     The Saudi Arabia-led coalition did not provide the Panel with information that demonstrated that a significant number of those who died or injured were Houthi fighters or that the effects on civilians and civilian objects were not excessive in relation to the concrete and direct military advantage anticipated.

(c)     This likelihood of excessive harm to civilians and civilian objects could have reasonably been anticipated in the circumstances because:

(i)     The market place was a civilian object *prima facie* immune from attack;

(ii)     It was also a civilian gathering point;

(iii)     The market was functional on the night of the air strike; and

(iv)     The timing of the attack would be such as to cause a disproportionately high number of civilian causalities given that it was a night market.

9.     IHL requires military commanders and those responsible for planning and executing decisions regarding attacks to take all feasible precautions to avoid, and in any event to minimize, incidental loss of civilian life, injury to civilians and damage to civilian objects. The fact that the Saudi Arabia-led coalition knew that this was a market place and thus a civilian location where there would ordinarily be a congregation of civilians, meant that they should have been particularly vigilant when undertaking a proportionality assessment and making use of all feasible precautionary measures to minimize the incidental loss of civilian life and damage to civilian property.[99] It is reasonable to expect that the Saudi Arabia-led coalition should have taken into account these factors given that the fact that information that the target location was a civilian night market was readily available.[100]

10.     The Panel remains concerned that the Saudi Arabia-led coalition continues to justify air strikes in civilian gathering areas by referring to it as "Houthi gatherings", without providing any further information that may assist an independent verification if the relevant IHL principles were met (see also S/2017/81 for Khamees Mustaba market).

---

[99] See commentary to CIHLR 14, and the United States Department of Defense Law of War Manual (2015), p.1033, which requires combatants to assess in good faith the information that is available to them, when conducting attacks.
[100] See CIHLR 14.

## Annex 59:    Joint Incident Assessment Team findings and recommendations

1.     The establishment of JIAT is a positive step given that it is possibly the only entity outside the Joint Force Command that has access to sensitive information on military operations. Yet, the Panel finds that there is a lack of transparency in the implementation of JIAT recommendations, which may undermine JIAT's credibility.

2.     The JIAT found that of the 43 air strikes that were attributed to the Saudi Arabia-led coalition[1]:

    (a)     11 air strikes did not take place against the identified targets;

    (b)     In 30 incidents, the Saudi Arabia-led coalition did not violate IHL; and

    (d)     In two incidents, the Saudi Arabia-led coalition violated IHL.

3.     The Panel has, based on public information and its investigations, observed that there needs to be a further examination of some of these cases to eliminate any doubts relating to violations of IHL by the Saudi Arabia-led coalition. In this context, the Panel highlights the different findings of the Panel and JIAT and the contradictions between statements of the Saudi Arabia-led coalition and the JIAT on the Saudi Arabia-led coalition's responsibility and rationale for some air strikes.

Table X.1
**JIAT and Panel findings on the same investigations**

| Date | Location | JIAT findings[2] | Panel findings |
|---|---|---|---|
| 15 Mar 2016 | Khamis Market, Hijjah | Intelligence indicated a large gathering of Houthi recruits near the market. Market has no activity except on Thursday. Strike was on Tuesday. The gathering was 34 km from the Saudi border. | This Panel concluded in S/2016/81 that the market was active on that date and while it was possible that some fighters (10) were present, it was unconvinced that IHL on proportionality and precautionary measures were respected. |
| 9 Aug 2016 | Al Aqil Food factory, Sana'a. | The factory was not targeted on 9 August 2016. The closest target point was 7 km from the factory | The Panel concluded in S/2016/81 that an HE bomb delivered from air caused the damage. It concluded that the only known entity capable of carrying out the air strike was the Saudi Arabia-led coalition. |
| 15 Aug 2016 | Abs Hospital, Hajjah | Pilot followed a vehicle, which had left a site of an air strike and struck it next to a building that does not bear any marks that would indicate before the strike that it is a hospital. The vehicle was a legitimate military target. | The Panel concluded in S/2016/81 that there were 43 causalities, while JIAT concluded 20. The Panel concluded that the vehicle was a civilian vehicle carrying a wounded civilian, MSF shared hospital coordinates and coalition was aware of the hospital's location and that it violated IHL. |
| 13 and 22 Sep 2016 | Alsonidar Complex | Between 4 – 23 September 2016, six ballistic missiles were launched towards Saudi Arabia from northern Sana'a. Three trucks and an armed military vehicle entered factory complex. Targeted complex because of continued use of the complex "in supporting the war effort". | The coalition spokesperson stated that the complex "is now becoming a military manufacturing unit specialized in producing pipes Houthis use to assemble local-made missiles… "[3] The Panel reviewed evidence but could not find evidence to support the conclusions of JIAT. |

---

[1] The press released related to the 43 air strikes were provided by JIAT to the Panel.
[2] JIAT findings are summarized in this annex. Full press releases have been shared by JIAT with the Panel for 41 of the 43 cases.
[3] http://www.reuters.com/article/us-yemen-security-idUSKCN11J27V.

| Date | Location | JIAT findings[2] | Panel findings |
|---|---|---|---|
| 24 Sep 2016 | Ibb residential house | The actual target, a military HQ, was 1070 meters from the residential complex. The coalition did not strike the residential complex. | The Panel concluded in S/2016/81 that the factory complex was targeted using a precision-guided HE aircraft bomb and only party to the conflict with the known capability to deliver precision guided HE aircraft bombs is the Saudi Arabia-led coalition. |
| 8 Oct 2016 | Funeral Hall, Sana'a | The Air Operations Centre in Yemen did not operate in accordance with Coalition command and control regulations, nor rules of engagement and procedures. The coalition aircraft wrongly targeted the location, resulting in civilian deaths and injuries. | The Panel found in S/2016/81 that the Saudi Arabia-led coalition violated several principles of IHL, including those protecting hors de combat, in this double tap attack. The Panel has requested, but not received, information on the measures taken to implement JIAT's recommendations. |

Table X.2
**JIAT and Saudi Arabia-led coalition's findings on the same incidents**

| Date | Location | JIAT findings | Coalition statements in the immediate aftermath of the incident |
|---|---|---|---|
| 30 Aug 2015 | Al-Sham Water Factory | The Saudi Arabia-led coalition executed a (close air support mission), on an anti-air artillery (AAA), stationed in proximity to the factory. Due to weather effect and clouds over the target, the bomb deflected from its path and hit warehouse of the factory, destroying it and resulting in some deaths and injuries. | On 30 August 2015, the "Coalition spokesman Brigadier General Ahmed Asseri denied the strike had hit a civilian target, saying it was a location used by the Houthis to make IEDs and to train African migrants whom they had forced to take up arms."[4] |
| 6 Oct 2015 | Wedding, Dhammar | There were no air operations on the said date, but on 7 October 2015, the Saudi Arabia-led coalition targeted a group of armed vehicles in the same area. | On 08 Oct 2015, the Saudi Arabia-led coalition stated that it did not conduct any air strikes in Dammar.[5] |
| 26 Oct 2015 | Haydan Hospital, Sa'dah | The building was a medical facility used as a military shelter. MSF should have been informed of the withdrawal of protection. | The coalition denied hitting the hospital.[6] |
| 2 Dec 2015 | Mobile Clinic, Ta'izz | High value military target close to clinic. The clinic should have been removed "so as not to be expose it to any incidental effects." | MSF informed Saudi Arabia of the location. One hour before the strike, Saudi Arabia stated, "be sure that we will not approach those locations and your team has to stay there for the time being".[7] |

---

[4] https://www.reuters.com/article/us-yemen-security/saudi-led-coalition-air-strike-kills-36-yemeni-civilians-residents-idUSKCN0QZ09P20150830.

[5] "Death toll from air strike on Yemen wedding party rises above 130: medics" at https://www.reuters.com/article/us-yemen-security/death-toll-from-air-strike-on-yemen-wedding-party-rises-above-130-medics-idUSKCN0RT0XT20150929, and http://www.aljazeera.com/news/2015/10/deadly-air-strike-reported-yemen-wedding-party-151008073704528.html.
http://www.gulf-times.com/story/457994/Air-strike-kills-13-at-Yemen-wedding-coalition-den.

[6] "Yemeni MSF hospital bombed, Saudi-led coalition denies responsibility" at http://www.reuters.com/article/us-yemen-security/yemeni-msf-hospital-bombed-saudi-led-coalition-denies-responsibility-idUSKCN0SL0VK20151027.

[7] MSF, "MSF incident report: airstrike on the Ta'izz health clinic, Houban District, Taiz City, Yemen, 2 December 2015" at https://reliefweb.int/sites/reliefweb.int/files/resources/Yemen_Taiz_investigation_summary_final.pdf.

| Date | Location | JIAT findings | Coalition statements in the immediate aftermath of the incident |
|------|----------|---------------|------------------------------------------------------------------|
| 13 Aug 2016 | Al Fadhil school, Sa'dah | The school was not targeted. The closest targets that day were "warehouses and weapons' storage" located 10 km from the school. | On 14 August 2016, the Saudi Arabia-led coalition spokesman stated that the strikes hit a Houthi training camp, killing militia fighters, including the leader Yehya Munassar Abu Rabua; *"The site that was bombed ... is a major training camp for militia ... Why would children be at a training camp?", "When jets target training camps, they cannot distinguish between ages" and that Yemen's government had confirmed to the coalition that "there is no school in this area".*[8] UNICEF confirmed that 7 children were killed and 21 injured, who were studying at the school during the strike.[9] The other recorded strike that day was a house of a head of a school. |

---

[8] "Saudi-led coalition strikes militant training camp in Yemen" https://www.saudiembassy.net/press-release/saudi-led-coalition-strikes-militant-training-camp-yemen, "At least 10 children have been killed in an airstrike on school in Yemen" at http://www.thejournal.ie/yemen-airstrike-children-killed-2927896-Aug2016/, "Coalition says strike hit militant training camp in Yemen" http://gulfnews.com/news/gulf/yemen/coalition-says-strike-hit-militant-training-camp-in-yemen-1.1878902, "Saudi-led coalition strikes militant training camp in Yemen" https://www.saudiembassy.net/press-release/saudi-led-coalition-strikes-militant-training-camp-yemen.
[9] "UNICEF Statement on the killings of children in Sa'dah, Northern Yemen" at https://www.unicef.org/media/media_92095.html.

## Annex 60:   Case studies of airstrikes documented by the Panel in 2016 and the JIAT findings

1.      The Panel takes note of the Joint Incident Assessment Team (JIAT) findings that differ from Panel findings in 2016 on the case study summaries contained in serials 5, 7, 8, and 9 of S/2017/81. The Panel, after evaluating the information placed by the JIAT in the public domain, attaches the full case studies of those incidents in the following appendices to enable an independent assessment of the IHL violations attributed to the Saudi Arabia-led coalition. The case studies were not included in S/2017/81 to maintain brevity of that report. After careful consideration of the findings of JIAT, the Panel continues to find that:

(a)      The Saudi Arabia-led coalition was responsible for the following air strikes; and

(b)      The evidence strongly demonstrates that the Saudi Arabia-led coalition violated IHL.

Table 60.1
**Air strikes affecting civilians and civilian infrastructure documented in 2016**

| Appx | Date | Location | Type of EO | Civilian fatalities | Civilian injured | Effect on civilian objects |
|---|---|---|---|---|---|---|
| A | 9 Aug 2016 | Nahda, Sana'a | High Explosive (HE) aircraft bomb | 10 | 13 | Snack factory destroyed. |
| B | 13 Sep 2016 | Ban al-Hareth, Sana'a | Mk 82 HE bomb / Paveway IV | 0 | 0 | Alsonidar factory complex severely damaged. |
| C | 22 Sep 2016 | Ban al-Hareth, Sana'a | GBU-24 / Paveway IV | 0 | 0 | Alsonidar factory complex severely damaged. |
| D | 24 Sep 2016 | Mafraq Jiblah, Ibb | Mk 82 HE bomb / Paveway | 9 | 7 | Civilian house destroyed. |

2.      The Panel will also provide in brief its findings in two further investigations in 2016 that were also not enclosed in full in S/2017/81 to enable full disclosure of the Panel's findings and to assist further independent investigations into these incidents.

Table 60.2
**Air strikes affecting civilians and civilian infrastructure documented in 2016**

| Appx | Date | Location | Type of EO | Civilian fatalities | Civilian injured | Effect on civilian objects |
|---|---|---|---|---|---|---|
| E | 25 Mar 2016 | T'baisha, Ta'izz | Not confirmed | 10 | 0 | Civilian house destroyed. |
| F | 25 May 2016 | Mahala, Lahj | Mk 82 HE bomb / Paveway | 0 | 2 | Water bottling factory destroyed. |

**Appendix A to Annex 60: Al Aqil Factories, Nahda District, Sana'a (Food Snack Factories) (9 August 2016)**

1.      The JIAT concluded that the Saudi Arabia-led coalition did not target the Al Aqil factory complex.[1]

2.      The Panel finds that a technical analysis of evidence demonstrates beyond a reasonable doubt that the factory complex was targeted using a precision-guided high explosive (HE) aircraft bomb. The only party to the conflict with the known capability to deliver such precision guided HE aircraft bombs is the Saudi Arabia-led coalition. This case study contains the Panel's findings of 2016.

## I.      Background

3.      On 9 August 2016, at approximately 10:00 hours, explosive ordnance dropped from a military aircraft detonated on a factory complex that produces food snacks in Nahda District, Sana'a.[2] The explosion and the resultant fire killed ten civilians and injured 13, and destroyed the factory and the production equipment.[3] There was a military maintenance centre adjacent to the factory (figure A.60.1), yet it was not affected by air strikes that day.[4]

4.      On 19 January 2016, another factory in the same complex was damaged by an air strike (see image A.60.3).[5]

Figure A.60.1
**Locations of the military maintenance camp (red outline) and the factory complex (green outline)**

Figure A.60.2
**Pre-air strike factory complex (10 January 2016)**





[1] Press release with Panel.
[2] Around 15°23'42.0"N, 44°11'41.9"E.
[3] For example, see video at "Saudi-Led Coalition Resumes Bombing of Yemeni Capital After Talks Collapse" at http://www.nytimes.com/2016/08/10/world/middleeast/yemen-sana-airstrikes.html?_r=0.
[4] Google Earth.
[5] Owner stated that a subsidiary branch of the factory in Damrah was also hit by air strikes on 25 January 2016.

18-00267

Figure A.60.3
**First strike damage (29 February 2016)**

Figure A.60.4
**Second strike damage (Post August 2016)**

 

## II.      Technical analysis of physical evidence

5.      The damage to the factory was indicative of that caused by the detonation of a large quantity of high explosive. There was clear evidence of the destruction of structural components of the building that equate to the damage to be expected from the shockwave of an explosion. The entry points (holes) (figures A.60.5 and A.60.6) and the damage to the concrete floor at the impact point of the explosive ordnance were both caused by the kinetic energy from the EO, which have hardened weapons grade steel cases. The aircraft bombs easily penetrated the thin-skinned roofs before detonating on the concrete floor of the factories.

Figure A.60.5
**Damage at impact point of EO[6]**

Figure A.60.6
**Damage at impact point of EO**

 

6.      The only party to the conflict with the known capability to deliver precision-guided HE aircraft bombs is the Saudi Arabia-led coalition.

## III.      Response of the Saudi Arabia-led coalition

7.      On 8 December 2016, the JIAT denied the involvement of the Saudi Arabia-led coalition. It stated:

"The Embassy of the Kingdom of Sweden has claimed that the food factory of Swedish honorary consul Mr. Abdullah Ahmed al-Aqil in (Sana'a) city suffered aerial bombardment on 9 August 2016 resulting in the death of 16 workers. Having investigated the facts and circumstances of the claim, (JIAT) found that, the coalition forces have struck two targets that day; the first target is a telecommunication antenna used

---

[6] All imagery was obtained from individuals working in the factory.

for military purposes in (Ayban) mountain, western (Sana'a), 7 km away from the subject factory. The second target is a cave used for military purposes in eastern (al-Nahdyan) mountain, southern Sana'a, 10 kilometers away from the subject factory. Thus, the said two locations are considered legitimate military targets according to the rules of engagement and the rules of the international humanitarian law. In light of that, (JIAT) did not find evidence that the collation forces struck the said factory. Thus, the coalition forces are not responsible for the alleged attack on the factory". [7]

8.      The Panel has not yet received a response to a request for information made to the Saudi Arabia-led coalition.[8]

## IV.    Analysis of violations of IHL

9.      The Panel finds that the Saudi Arabia-led coalition was responsible for this air strike (paragraphs 5 and 6), and that the use of precision-guided weapons demonstrates that the factory complex was the intended target of these air strikes. In 2016, the Panel found that there was no evidence to support a finding that the complex had become a legitimate military objective.

10.     Thus, the Panel concludes that the factory complex was *prima facie* a civilian object, immune from direct attack and that individuals within the factory had not lost their civilian protection.[9] Therefore, unless the Saudi Arabia-led coalition provides information to the contrary, evidence strongly demonstrates that the Saudi Arabia-led coalition violated IHL principles, including those relating to distinction, proportionality,[10] and precautions in attack.[11]

11.     The Panel will continue to welcome a clarification from the Saudi Arabia-led coalition.

---

[7] Press statement with Panel. Minor spelling mistakes were corrected. See also Saudi Arabia coalition spokesperson's response here, "14 killed at food factory in first Saudi strikes on Yemen in three months" at http://www.middleeasteye.net/news/14-dead-saudi-led-strikes-yemen-factory-medics-1702399607.

[8] Letter dated 21 November 2016.

[9] IHL requires that the civilian population, as well as individual civilians, shall not be the object of attack. Article 13(2) of the Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), 8 June 1977 (AP II) and ICRC Customary International Humanitarian Law Study Rule (CIHLR) 1.

[10] An attack is disproportionate if it may be expected to cause incidental loss of civilian life, injury to civilians, damage to civilian objects, or a combination thereof, which would be excessive in relation to the concrete and direct military advantage anticipated.

[11] IHL requires that all feasible precautions must be taken to avoid, and in any event to minimize, incidental loss of civilian life, injury to civilians and damage to civilian objects. Article 13(1) of AP II. CIHLR 15. This obligation is particularly incumbent on those who plan and decide on the air strikes. See William Boothby, "The Law of Targeting", OUP (2012), p. 72.

**Appendix B to Annex 60: Alsonidar Factory complex, Ban al-Hareth District, Sana (13 September 2016)**

1.      In November 2017, the JIAT provided the following justification in November 2017 for the two air strikes. It found that:

> "… during 4 – 23 September 2016, six ballistic missiles were launched towards Saudi Arabia from northern Sana'a. The coalition forces carried out Aerial Surveillance and Reconnaissance Missions on these areas. A convoy consist(ing) of three trucks accompanied by an armed military vehicle were spotted and tracked until they entered Al Senidar (sic) factory complex located north of Sana'a city.  Coalition forces targeted the warehouses inside the complex on 12 September 2016 and were targeted again on 22 September 2016 because of continued use of the complex in supporting the war effort, which is considered a legitimate military target."[12]

2.      The Panel reexamined and solicited further evidence[13] and continues to solicit further information from the Saudi Arabia-led coalition that supports JIAT's conclusions. The JIAT statement is disjointed in that it makes three separate points without direct attribution:

> (a)      From 4 – 23 September 2017 six ballistic missiles were fired launched from northern Sana'a to Saudi Arabia. Note that the only link in this respect made to the factory is that the factory in located in northern Sana'a;

> (b)      The JIAT finds that the coalition forces carried out surveillance in these areas (northern Sana'a) and tracked a convoy of three trucks accompanied by an armed military vehicle until they entered the factory complex. In the statement, there is no information on what was suspected to be in the trucks.  It is not clear if the possibility was considered that the trucks were carrying production material for the functioning factory within the complex.[14] It is also not clear as to whether the armed vehicle that is said to have been accompanying the vehicle also entered the factory, a fact that the factory owners contest, or indeed if the armed vehicle is another vehicle that was taking the same path – given that the capital Sana'a is full of these types of armed vehicles. In any event, at the time of the air strikes there were no evidence of the presence of any trucks or military vehicles in the compound; and

> (c)      The JIAT's third point is that the factories were targeted because of "the continued use of the complex in the war effort", without any articulation of what that might be.

3.      Previously, the Saudi Arabia-led coalition justified the strikes on the basis that the complex "is now becoming a military manufacturing unit specialized in producing pipes Houthis use to assemble local-made missiles". In January 2017, the Panel provided evidence to the Committee as to the reasons that it believed that the factory was incapable of specializing in producing pipes to assemble missiles. The Panel continues to welcome verifiable information that demonstrates the military advantage sought to be achieved in these strikes.

4.      The Panel declassifies and updates its findings in 2016 to enable an independent assessment to be made in view of the JIAT's findings.

---

[12] Press statement by the JIAT on Coalition forces targeted Alsonidar complex in Sana'a. Document with Panel.

[13] The Panel requested, and received, 18 videos, some taken in the immediate aftermath of the two incidents.

[14] The factory employees informed the Panel that regular deliveries of raw materials are made to the factory. The provided the Panel with information, including invoices, supplier information, and shipping details of raw and auxiliary material transportation that was ordered and that entered the factory in September 2016.

# I.   Background

5.      On 13 September 2016, at around 12:45 hours, military aircraft dropped four items of explosive ordnance on the Alsonidar factory complex in the Ban al-Hareth District of Sana'a.[15] This complex contains the Caprari Water Pump factory, the Alsonidar Steel Pipe factory, and the Alsonidar Red Brick factory. The explosive ordnance impacted on all three factories.[16] There were no civilian casualties. The water pump factory was salvageable after the first strike, but the other two factories were destroyed.

6.      At the time of the attack, only the water pump factory was functional. Those producing bricks and steel pipes were not operational.[17] The Panel found no evidence to suggest that there were military personnel or equipment in, or in the vicinity of the strike, immediately before, or during the strike. There was a second strike on 22 September 2016, which is examined in more detail in the case study at appendix C to annex 60.

Figure B.60.1
**Alsonidar complex (15 May 2015) prior to attack[18]**



Figure B.60.2
**Alsonidar complex (3 October 2016) post attack**



Figure B.60.3
**Steel and Water Pump factories (3 October 2016) post attack**



Figure B.60.4
**Red Brick factory (3 October 2016) post attack**



---

[15] 15°27'05.09"N 44°13'36.9"E.

[16] Sources informed that a fourth factory, the Alsonidar Galvanizing Plant, which was being installed inside the pipe factory, was also affected.

[17] The Brick Factory has been non-operational for approximately the last 20 years and the Steel Factory, since 2014.

[18] Source: Google Earth, as are all other aerial images in this appendix.

## II.    Technical analysis of physical evidence

7.    Panel finds that:

(a)    Technical analysis of imagery of fragmentation recovered from the explosion indicates that one explosive device was fitted with a Paveway IV laser guidance unit for a high Mark 82 explosive (HE) aircraft bomb (figures B.60.5 and B.60.6).

Figure B.60.5
**Component from a Paveway laser guidance system fin[19]**

Figure B.60.6
**Paveway IV laser guidance fin[20]**




(b)    At least one of the bombs used to destroy part of the Alsonidar factory complex was a Mark 82 HE aircraft bomb fitted with a Paveway IV GPS/INS and laser guidance unit;

(c)    The crater at figure 2.X.7 is highly indicative of that cause by the detonation of a significant quantity of high explosives on impacting with a concrete floor; and

(d)    The only party to the conflict with the known capability to deliver the Mark 82 HE aircraft bomb with the Paveway IV GPS/INS is the Saudi Arabia led coalition.

Figure 2.X.7
**Crater from explosion of A/C bomb**



---

[19] Images in this annex were provided by those working in the factory.
[20] The Commercial and Government Equipment (CAGE) Code displayed on the part means that it was manufactured by EDO MBM Technology Limited, UK. The parent company is the Harris Corporation, https://www.harris.com.

## III.   Response of the Saudi Arabia led coalition

8.    The Saudi Arabia led coalition stated in the media that it targeted the Alsonidar factory complex because it:

> "is now becoming a military manufacturing unit specialized in producing pipes Houthis use to assemble local-made missiles…This strike was necessary to protect Saudi border cities and eliminate the use of such missiles in Houthis attacks against the Yemeni national army and Yemeni citizens…The coalition takes its responsibilities under international humanitarian law seriously, and is committed to the protection of civilians in Yemen". [21]

9.    The Panel has not yet received a response to a request for information made to the Saudi Arabia-led coalition. [22]

10.    In January 2017, the Panel provided evidence to the Committee as to the reasons that it believed that the factory was incapable of specializing in producing pipes to assemble missiles.

## IV.   Panel findings on Saudi Arabia-led coalition's justification relating to the air strikes

### A.   Technical observations

11.    The Saudi Arabia-led coalition argues that it targeted the Alsonidar complex because it "is now becoming… specialized in producing pipes Houthis use to assemble local-made missiles". [23] The Panel, based on available information, [24] finds this rationale unconvincing as:

> (a)    The Caprari Water Pump factory had machine tools installed to make relatively short lengths of 3" and 4" flanged pipes. Such pipes would require considerable reverse engineering to remove the flanges to make plain hollow pipes suitable for main missile bodies. The Panel finds that they would be unsuitable for use as main missile bodies due to the piping being too short and the degree of reverse engineering required to remove the flanges;

> (b)    The Alsonidar Steel Pipe factory was still in the development and commissioning phase and had only produced test samples of 50mm and 75mm diameter steel pipes with a wall thickness of 2.9mm.  The Italian contractors left before the factory could become operational, and thus mass production would not be possible.  The factory has been effectively closed since late 2014;

> (c)    The type of steel pipes the factory was designed to produce would not be ideal for use as the main missile bodies [25] of a free flight rocket (FFR), although it would be theoretically possible. The wall thickness would make them heavy for a missile main body (at 1.74 and 2.45 kg/m$^2$), requiring a significant amount of propellant to just launch the missiles, let alone give them any credible range;

> (d)    The factory does not have the machine tools necessary to manufacture the fins that FFR require for stability in flight, although these could be manufactured in a light engineering facility elsewhere and then taken to an assembly and filling facility;

---

[21] http://www.reuters.com/article/us-yemen-security-idUSKCN11J27V.
[22] Letter dated 21 November 2016.
[23] http://www.reuters.com/article/us-yemen-security-idUSKCN11J27V.
[24] The Panel had access to video and imagery of the steel pipe factory taken prior to and after the airstrikes, installation manuals, investigators who visited the site after the incident, and other documentation, including letters from the Caprari Company dated 7 October 2016, Addar Fer, Italy dated 7 October 2016 and the Yemen Chamber of Commerce dated 14 September 2016.
[25] A main missile body being effectively a long, very thin pipe made of an appropriate material such as steel or composite materials.

(e)     The factory does not have the machine tools necessary to manufacture the specialist nozzles that FFR rockets require to direct the propellant gases to produce thrust, although these could be manufactured in a light engineering facility elsewhere and then taken to an assembly and filling facility;

(f)     The Panel has seen no evidence of any explosive manufacturing capability in Yemen to manufacture the double-based tubular propellant normally used in FFR.  A single based propellant, such as black powder, could be used to produce a very crude FFR system similar to a large firework;

(g)     Improvised FFR would still require fuzes to initiate them on impact.  Use of fuzes from the artillery or mortar ammunition currently known to be available to Houthi or Saleh forces would not work as: 1) the calibres of the ammunition are different from the pipes produced in the factory; 2) the forces induced by the firing of artillery or mortar ammunition are different to those induced by a FFR, meaning that many fuze types would not arm; and 3) there would be a degradation in operational capability in taking fuzes from more effective purpose designed ammunition to use on much less effective improvised weapons;

(h)     The only evidence seen by the Panel of the use of improvised FFR by the Houthi showed missile main bodies of different diameters to the piping manufactured in these factories;

(i)     Saudi Arabia led coalition has not produced any evidence of the use of improvised FFR to the Panel;

(j)     The Houthi or Saleh forces probably still have access to sufficient quantities of 107mm Type 63 and 122mm BM-21 GRAD FFR from the old Yemen Army stockpiles for their current operational needs; and

(k)     If the Houthi or Saleh forces were producing improvised FFR they would need an assembly and filling facility. Such a facility would be the more natural target as it would contain all of the equipment and materials[26] necessary for the manufacture of improvised FFR.

12.     The Panel finds that, even if the factory had been at the production stage, whilst the pipes manufactured at the Alsonidar Steel Pipe factory could theoretically be used as a crude main missile body for an improvised FFR, consideration of all the other factors make such a use extremely unlikely.

## B.     Legal observations

13.     There is insufficient evidence to support the Saudi Arabia-led coalition's justification that the factory complex was a military objective because it "is now becoming a military manufacturing unit":

(a)     A military objective is limited to those objects which by *their nature, location, purpose or use* make an effective contribution to military action and whose partial or total destruction, capture or neutralization, in the circumstances ruling at the time, offers a definite military advantage.[27] The "purpose" in these criteria relates to a future use, while "use", to its current functions.[28] The Saudi Arabia-led coalition's justification appears to be purpose-based;

(b)     The common view is that in using the purpose-based criteria there must be a certain

---

[26] Such materials being: 1) main missile bodies; 2) nozzles; 3) fins; 4) propellant; 5) high explosive for the warhead; and 6) fuzes.
[27] CIHLR 8.
[28] Commentary to Article 52 of Protocol Additional to the Geneva Conventions of 12 August 1949 and relating to the Protection of Victims of International Armed Conflicts (Protocol 1) of 08 June 1977  at https://ihl-databases.icrc.org/applic/ihl/ihl.nsf/1a13044f3bbb5b8ec12563fb0066f226/5f27276ce1bbb79dc12563cd00434969 .

reasonable probability the object may be used for a military purpose[29] and an attack should not be based on mere speculation.[30] It is not possible to base an attack of an otherwise entirely civilian object merely "on the intention to deny its potential use to an adversely."[31] Yet, as demonstrated in the technical analysis above, it is extremely unlikely that the factory, which was not functional, could have been converted into a "military unit" producing the type of weapons that the Saudi Arabia-led coalition alleges; and

(c)      The Panel finds it difficult to accept the Saudi Arabia-led coalition's justification on the basis on which this factory complex became a military objective.[32]

## V.    Panel conclusions in 2016 on violations of IHL

14.      The Panel finds that the use of precision guided weapons and repeated strikes, both on 13 and 22 September 2016, suggests that the factory complex was the intended target of these air strikes. This is further supported by the statement of the Saudi Arabia-led coalition.

15.      There is insufficient evidence to demonstrate that the factory complex was a legitimate military objective, as elaborated above.

16.      Thus, the Panel is unconvinced that the Saudi Arabia-led coalition complied with IHL principles relating to distinction.[33] It is also not convinced that it respected principles relating to distinction when it targeted the factory complex as a single military unit - there is no demonstrable evidence to suggest the Water Pump and Red Brick factories could manufacture the pipes specified.[34]

17.      The Panel further finds that any reasonable intelligence review undertaken by the Saudi Arabia led coalition, prior to the air strike, should have taken into consideration that: 1) two of the three factories were not functional at the time of the air strike; 2) that two of these factories lacked the technical capacity to manufacture the specific pipes; 3) that the only factory with the technical capacity, the Alsonidar steel factory, was not functional since 2014; and 4) even if it were to become functional, it would have been highly unlikely to produce the type of pipes specified (see technical analysis).[35]

18.      Even if the steel factory had become a legitimate military objective for reasons unknown to, or shared with, the Panel, the Panel is unconvinced that the Saudi Arabia-led coalition complied with the relevant IHL principles relating to proportionality. Two of the factories that were also subjected to air strikes had no technical capacity to produce or contribute to the production of the types of weapons specified.

19.      The Panel finds that the Saudi Arabia-led coalition took some measures to minimize civilian casualties by undertaking the air strike in early morning hours when the water pumps factory was not operational. There were no reported civilian casualties.

---

[29] Report on the Expert Meeting "Targeting Military Objectives", University Centre for International Humanitarian Law, Geneva (2005) p. 7 - 8.
[30] Yoram Dinstein, "The Conduct of Hostilities under the Law of International Armed Conflict" (2010), Cambridge University Press, p. 100.
[31]  William Boothby' "Law of Targeting", (2012), Oxford University Press,  pp. 103-105.
[32] The Panel reiterates that in situations where more than one inference may be drawn from military intelligence, purpose should be "predicated on intentions known to guide the adversary, and not those figured hypothetically in contingency plans based on a worst case scenario." Yoram Dinstein, "The Conduct of Hostilities under the Law of International Armed Conflict", p. 100.
[33] CIHLR 7. The Panel reiterates that while the pipes that the Alsonidar Steel Pipe factory is designed to produce, could theoretically be used as main missile bodies, this is highly unlikely considering the technical and tactical factors set out above. The Alsonidar Steel Pipe factory has not been operational since 2014.
[34] The red brick factory was not operational since 1995.
[35] IHL requires that in case of doubt whether a civilian object is a military objective, a careful assessment has to be made as to whether there are sufficient indications to warrant an air strike. CIHLR 10.

Appendix C to Annex 60: Alsonidar Factory complex, Ban al-Hareth District, Sana (22 September 2016)

# I.    Background

1.      On 22 September 2016, at around 01:00 hours, a military aircraft dropped explosive ordnance on the Alsonidar factory complex in Ban al-Hareth District, Sana.[36] The air strikes completely destroyed the Caprari Water Pump factory, the Alsonidar Steel Pipe factory, and the Alsonidar Red Brick factory.[37] There were no civilian injuries or deaths. Air strikes first targeted the complex on 13 September 2016.

2.      At the time of the attack, none of the factories were functional partly due to the first air strike.

Figure C.60.1
**Alsonidar complex (15 May 2015) prior to attack[38]**



Figure C.60.2
**Alsonidar complex (3 October 2016) post attack**



Figure C.60.3
**Steel and Water Pumps Factories (3 October 2016) post attack**



Figure C.60.4
**Red Brick factory (3 October 2016) post attack**



---

[36] 15°27'05.09"N 44°13'36.9"E.

[37] Sources informed the Panel that a fourth factory - Alsonidar Galvanizing Plant, which was being installed inside the pipe factory, was also affected.

[38] Source: Google Earth, as are all other aerial images in this appendix.

## II.   Technical analysis of physical evidence

4.      The Panel finds that:

(a)     Technical analysis of imagery of fragmentation recovered from the explosion indicates that one explosive device was certainly fitted with a Paveway IV laser guidance unit for a high Mark 82 explosive (HE) aircraft bomb (figures C.60.5 and C.60.6);

Figure C.60.5
**Component from a Paveway laser guidance system wing**

Figure C.60.6
**Paveway IV laser guidance fin[39]**





(b)     At least one of the bombs used to destroy the Alsonidar factory complex was a Mark 82 HE aircraft bomb fitted with a Paveway IV GPS/INS and laser guidance unit;

(c)     The entry points (holes) into the factories[40] were initially caused by the kinetic energy from aircraft bombs, which have hardened weapons grade steel cases. The aircraft bombs easily penetrated the thin-skinned roofs before detonating on the concrete floor of the factories; and

(d)     The only party to the conflict with the known capability to deliver the Mark 82 HE aircraft bomb with the Paveway IV GPS/INS is the Saudi Arabia-led coalition.

## III.   Response of the Saudi Arabia-led coalition

5.      The Saudi Arabia-led coalition made no public statements on the second set of airstrikes. It made a statement on 19 September 2016 after the first air strikes on the factory claiming responsibility for the strikes (see Annex 1). The JIAT also referred to this air strike in its statement above mentioned.

6.      The Panel has not yet received a response to a request for information made to the Saudi Arabia-led coalition.[41]

## IV.   Analysis of violations of IHL

7.      The Panel finds that the use of precision guided weapons and repeated strikes, both on 13 and 22 September 2016, suggests that the factory complex was the intended target of these air strikes. This is further supported by the statement of the Saudi Arabia-led coalition on 19 September 2016 (see appendix B to annex 60).

---

[39] The Commercial and Government Equipment (CAGE) Code displayed on the part means that it was manufactured by EDO MBM Technology Ltd, UK. The parent company is the Harris Corporation, https://www.harris.com.
[40] See imagery at Appendix B.
[41] Letter dated 21 November 2016.

8.      There is insufficient evidence to demonstrate that the factory complex had become a legitimate military objective or that the Saudi Arabia-led coalition complied with IHL principles relating to distinction for the reasons specified in appendix B to annex 60.

10.     The Panel further finds that any intelligence review undertaken by the Saudi Arabia-led coalition, prior to the air strike, should have taken into consideration that: 1) the facts mentioned in appendix B to annex 50; and 2) that the only factory that was not destroyed beyond immediate repair by the airstrikes was the water pump factory, which did not have the technical capacity to produce the types of pipes specified. It is reasonable to expect that intelligence gathered prior to the strike would have covered these aspects.[42]

11.     Even if the steel factory had become a legitimate military objective for reasons unknown to the Panel, the Panel is unconvinced that the Saudi Arabia-led coalition complied with the relevant IHL principles relating to proportionality. It was the water pump factory that was destroyed beyond immediate repair during this second strike.

15.     The Panel finds that the Saudi Arabia-led coalition took some measures to minimize civilian casualties by undertaking the air strike in early morning hours when the water pumps factory was not operational. There were no reported civilian casualties.

---

[42] IHL requires that in case of doubt whether a civilian object is a military objective, a careful assessment has to be made as to whether there are sufficient indications to warrant an air strike. CIHLR 10.

S/2018/68

**Appendix D to Annex 60: Residential complex, Mafraq Jiblah, Ibb (24 September 2016)**

1.      The JIAT concluded that the Saudi Arabia-led coalition did not target the residential complex on 24 September 2016.[43]

2.      The Panel finds that technical analysis of evidence demonstrates beyond a reasonable doubt that the residential complex was targeted using a Mark 82 high explosive aircraft bomb fitted with a Paveway laser guidance system. The only party to the conflict with the known capability to deliver precision guided HE aircraft bombs is the Saudi Arabia-led coalition.

## I.      Background

3.      At approximately 22:00 hours on 24 September 2016, explosive ordnance dropped from a military aircraft detonated on the top floor of a three-story residential apartment complex in the Mafrak Giblah area, Ibb.[44] The residents of the complex consisted of nine families.[45] The explosion killed nine occupants, which included seven women and children, and injured, at least, seven others, mostly women and children.[46] The complex was located within a heavily congested residential area.[47] Thus, the air strike partially destroyed this complex and seriously damaged several adjacent residential buildings.[48] It also destroyed several civilian vehicles.[49]

4.      At the time of the air strikes, there was an armed "locality defence team" composed of civilians in the area.[50] This team usually assembles following air strikes to prevent opportunistic looting and vandalism.[51] Some witnesses stated that the intended target of the air strikes may have been a civilian technical training centre located 46m from the residential complex.[52]

---

[43] Press release with Panel.

[44] 13°56'42.47"N, 44°10'34.59"E

[45] The heads of households of the nine families consisted of 1 teacher, 1 veterinarian, 1 doctor, 1 medical assistant, 1 manager of the building, 1 widow, 1 administrative officer, 1 nurse and 1 woman whose husband was abroad.

[46] The Panel found it difficult to verify the number of injured persons as: 1) families in the building had scattered following the air strikes; and 2) it was not possible to obtain comprehensive numbers of those injured in other buildings. Death certificates with Panel.

[47] Imagery available with Panel.

[48] Ibid.

[49] Ibid.

[50] Civilians are protected from direct attack unless and for such time as they take a direct part in hostilities. Article 13 of AP I.

[51] There were reports of some air strikes in the area preceding the attack on the Ibb house.

[52] Some stated that they felt that the training centre was a target because they knew that the Saudi Arabia led coalition targeted these institutions. Others stated that they felt it would be targeted because it was guarded by armed men. A majority denied that the institute was used in any way to contribute to military action. The website of the technical institute is http://t.oasyemen.net/portal/index.php.

Figure D.60.1
**Relative locations of apartment complex and training centre** [53]



## II. Technical analysis of physical evidence

5.      Technical analysis of imagery of fragmentation recovered from the explosion at the civilian house finds that:

>       (a)      The explosive device was almost certainly fitted with a Paveway laser guidance unit. Such units are usually designed to be paired with Mark 82 high explosive aircraft bombs (figures D.60.2 and D.60.3);

---
[53] Google Earth. (12 July 2016).

S/2018/68

Figure D.60.2
**Post-explosion guidance wing from a Paveway laser guidance system**



Figure D.60.3
**Post-explosion adapter flange from a Paveway laser guidance system**



(b)     The damage to civilian apartment complex was highly indicative of that caused by the detonation of a large quantity of high explosive. There was clear evidence of the destruction of structural components of the building that equate to the damage to be expected from the shock and blast waves of an explosion (figures D.60.4 and D.60.5);

Figure D.60.4
**Civilian apartment complex post blast**



Figure D.60.5
**Civilian apartment complex post blast**



(c)     The civilian apartment complex was almost certainly destroyed by a Mark 82 high explosive aircraft bomb fitted with a Paveway laser guidance system; and

(d)     The only military entity operating the type of aircraft in the area that has the capability to deliver high explosive ordnance of this type is the Saudi Arabia-led coalition.

18-00267

## III.    Response of the Saudi Arabia led coalition and findings of the JIAT

6.      The Panel has not yet received a response to a request for information made to the Saudi Arabia led coalition.[54]

7.      The JIAT stated in November 2017 that the Saudi Arabia-led coalition did not target this residential complex. It stated:

> "on 24 September 2016 Coalition forces targeted a building at bin Laden resort in Ibb governorate which was used as a military headquarters by the Armed Houthi Militia, which represents a legitimate military target, the target is located at a distance of 1070 meters from the claimed residential building. *JIAT concludes that the Coalition did not target the residential building*" (emphasis added).[55]

## IV.    Analysis of violations of IHL[56]

8.      The Panel finds that the Saudi Arabia-led coalition was responsible for this air strike (paragraph 4) and that the use of precision-guided weapons demonstrates that the residential complex was the intended target of these air strikes. In 2016, the Panel found that there was no evidence to support a finding that the complex had become a legitimate military objective.

9.      The Panel concluded that the residential complex was a *prima facie* civilian object, immune from direct attack and that the occupants had not lost their civilian protection.[57] Therefore, unless the Saudi Arabia-led coalition provides information to the contrary, evidence strongly demonstrates that the Saudi Arabia-led coalition violated principles of IHL, including those relating to distinction, proportionality and precautions in attack.

10.     The Panel will continue to welcome a clarification from the Saudi Arabia-led coalition.


**Appendix E to Annex 60:  Civilian house, T'baisha', Jebel Habshi, Ta'izz (25 March 2016)**

## I.    Background to events

1.      At approximately 07:00 hours on 25 March 2016, explosive ordnance dropped from a military aircraft detonated on a civilian two story house in the village of T'baisha', Ta'izz.[58] The blast and fragmentation from the explosion killed all ten occupants of the house, which included three women and five children from the same family. The closest military location was a Houthi base located on a mountain, which was a significant distance from the village. There was no reported presence of armed fighters near the house.

---

[54] Letter dated 21 November 2016.

[55] Press statement by the JIAT, Coalition forces claim to bomb residential building in Ibb governorate (document with Panel).

[56] In the absence of a response from the Saudi Arabia led coalition, the Panel analyzed the applicable IHL law in relation to this incident on the basis of its own independent investigations including: 1) witness testimonies; 2) technical analysis of weapon fragments; 3) satellite imagery; 4) examination of investigation reports of international and non-international organizations; 5) examination of medical reports; and 6) open source imagery and documentation. For open sources see "Raids kill nine in central Yemen - medical official, residents" http://www.reuters.com/article/us-yemen-security-idUSKCN11V04U, "Arab coalition airstrikes kill 10 civilians in Yemen's Ibb city" http://news.xinhuanet.com/english/2016-09/25/c_135712446.htm, "Gulf of Aden Security Review - September 26, 2016" http://www.criticalthreats.org/gulf-aden-security-review/gulf-aden-security-review-september-26-2016, "Yemen – Conflict (Health Cluster, media) (ECHO Daily Flash of 26 September 2016)", http://reliefweb.int/report/yemen/yemen-conflict-health-cluster-media-echo-daily-flash-26-september-2016.

[57] IHL requires that the civilian population, as well as individual civilians, shall not be the object of attack. Article 13(2) of AP II. and CIHLR 1.

[58] 13°33'56.2"N, 43°54'03.4"E.

Figure E.60.1
**Remote location of house** [59]

Figure E.60.2
**Post blast damage**



## II.  Technical analysis of physical evidence

4.      The Panel finds that post blast analysis of imagery of the explosion is highly indicative of damage consistent with the detonation of a high explosive aircraft bomb (figure E.60.2). This is collaborated by eye-witness statements that report the presence of a military aircraft preceding the explosion and a document issued by the ministry of justice stating the same;[60]

5.      The steel strengthening bars within the concrete have been sheared, due to the power of the shock wave close to an explosion, whereas further away from the point of explosion the steel strengthening bars have been deformed due to the power of the blast wave. Such damage mechanisms are highly indicative of that typically caused by the detonation of high explosives; a gas explosion, for example, would not have the power top shear steel strengthening bars; and

6.      The only military entity operating the type of aircraft in the area that has the capability to deliver high explosive ordnance of this type is the Saudi-led coalition.

7.      The house was highly likely to be the intended target of the air strike.  The Panel is not convinced that the Saudi Arabia led coalition directed its air strike against a legitimate military target. Yet, even if it had, the Panel is not convinced that the forces respected IHL principles relating to proportionality and precautions in attack.

---

[59] Google Earth.
[60] Document with Panel.

**Appendix F to Annex 60:  Radfan Mineral Water-Bottling Factory, al-Mahala, Lahj (25 May 2016)**

## I.    Background to events

1.      At around 04:00 hours, on 25 May 2016 military aircraft dropped multiple items of explosive ordnance on a water bottling plant in al-Mahala, Lahj.[61] There were no civilian fatalities reported.[62] The factory employed over 300 people at the time of the air strikes.[63]

2.      The Panel found no evidence to suggest that there were fighters or their equipment in or in the vicinity of the factory preceding or at the time of the air strikes. The closest military installation is a base under the control of the Hadi-led government of Yemen, which is located 15.3 km northwest of the factory. In the two weeks preceding the air strike, soldiers from this base had twice entered the water bottling plant.[64]

Figure F.60.1
**Radfan Factory (27 October 2013) prior to attack**[65]

Figure 6.X.2
**Radfan Factory (8 June 2016) post attack**[66]




---

[61] 13°05'09.07"N, 44°51'54.83"E.

[62] At the time of the attacks, there were approximately ten civilians guarding the factory.

[63] Owner of the factory. See also http://reliefweb.int/report/yemen/bombing-businesses-saudi-coalition-airstrikes-yemen-s-civilian-economic-structures-enar.

[64] The Yemen armed forces conducted search operations and forcefully removed and relocated several factory on the basis that they were "Northerners". See S/2017/81 para 153 for reference to this forced removal.

[65] Source: Google Earth.

[66] Ibid.

Figure F.60.3
**Al Anad Air Force Base**[67]



Figure 6.X.4
**Air Force Base relational to Factory**



## II.    Technical analysis of physical evidence

3.    Technical analysis of imagery of fragmentation recovered from the explosions at the factory (figures F.60.5 and F.60.6) demonstrates that the explosive device was almost certainly fitted with a Paveway[68] laser guidance unit.[69]  Such units are designed to be paired with Mark 82 high explosive (HE) aircraft bombs;

Figure F.60.5
**Guidance fin and component from a Paveway laser guidance system**



Figure F.60.6
**Paveway laser guidance fin**



4.    The water bottling plant was almost certainly destroyed by a Mark 82 HE aircraft bomb fitted with a Paveway laser guidance system, resulting in extensive damage; and

5.    The only party to the conflict with the known capability to deliver the Mark 82 HE aircraft bomb with the GBU-12 PAVEWAY II guidance unit is the Saudi Arabia-led coalition.

---

[67] 13°10'53.13" N 44°45'46.42" E.
[68] It was not possible to determine from just the fin whether it was a GBU-12 Paveway II (US manufactured) or Paveway IV (UK manufactured) laser guidance unit.
[69] The Enhanced GBU-12 (EGBU-12) has a dual mode laser guided and GPS inertial navigation system.  The Panel cannot determine if this was fitted to this bomb from the available evidence.

6.      The Panel finds that the factory that was the intended target of the air strikes. The Panel is not convinced that IHL principles relating to distinction and proportionality were met. The Yemen Armed Forces had entered and searched the factory on two occasions within the two weeks that preceded the air strikes, and had not, according to witnesses, made any claim or confiscated any material or arrested any person that could have demonstrated that the factory or its workers were making an effective contribution to military action.[70]

7.      The Panel finds that the Saudi Arabia-led coalition took certain precautions measures to successfully avoid civilian fatalities, in that it conducted its air strikes at night when the factory was not operational. It is also relevant that the first air strikes did not impact on the sleeping quarters of the workers, thus enabling them to seek protection from the effects of the strikes.

---

[70] Panel interviews with four persons who interacted with the Yemen Armed Forces.

**CONFIDENTIAL ANNEX NOT FOR PUBLIC DISSEMINATION**

**Annex 61:    Case studies and other information on UAE detentions**

## Annex 62:   IHL and HR violations relating to detentions by UAE military forces

### I.    Terminology

1.       In this annex, the terms "arrest", "detention", and "detainee" are used to describe the act of depriving an individual of his liberty, the consequential deprivation of liberty, and those subjected to the deprivation of liberty, respectively, without prejudice to the lawfulness of those acts and irrespective of whether detainees are subjected to internment[1] or criminal detention.[2] The Panel received information from former and current detainees, but because of veritable threats against detainees and their families, the Panel will refrain from providing more information on their current situation. The Panel defines the terms arbitrary arrest and detention,[3] torture,[4] enforced disappearance,[5] and sexual violence[6] in accordance with international law and jurisprudence.

2.       In this annex, unless otherwise stated, the term Yemeni forces refers only to the Security Belt in Aden, Hadrami Elite Force, and the Shabwani Elite Force.

### II.    Legal justification for UAE involvement

3.       The primary legal justification for the UAE's involvement in the armed conflict in Yemen is based on the invitation issued by the legitimate Government of Yemen.[7] The UAE's obligations are analyzed herein under both IHL and IHRL regimes, as both are binding on the UAE in respect of its obligations in Yemen.[8] Under IHL and/or IHRL norms, the following are prohibited at all times: arbitrary arrest and deprivation of liberty of individuals, non-adherence to certain due process rights, violence to life and person, torture and ill treatment, sexual violence, outrages upon personal dignity, and threats to commit the above acts, and enforced disappearances.[9] The following paragraphs outline the Panel's main findings and conclusions, based on its independent investigations.

---

[1] The term 'internment' refers to detention for security reasons in situations of armed conflict, i.e. the non-criminal detention of a person based on the serious threat that his or her activity poses to the security of the detaining authority in relation to an armed conflict. See Commentary on Common Article 3.

[2] Detention related to a criminal process. The Panel is only investigating those detentions linked to the conflict in Yemen and where IHL and/or IHRL violations can be established.

[3] The Panel considers an arrest, and consequent detention to be arbitrary when, inter alia; 1) it is clearly impossible to invoke any legal basis justifying the deprivation of liberty; and 2) when the total or partial non-observance of the international norms relating to the right to a fair trial is of such gravity as to give the deprivation of liberty an arbitrary character. See Working Group on Arbitrary Detention, Report, A/HRC/16/47 of 19 January 2011, paragraph 8.

[4] Article 1 of the Convention against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment (CAT).

[5] The Panel considers that enforced disappearances occur when; 1) persons are arrested, detained or abducted against their will or otherwise deprived of their liberty; 2) followed by a refusal to disclose the fate or whereabouts of the persons concerned; or 3) a refusal to acknowledge the deprivation of their liberty; and 4) which places such persons outside the protection of the law. See the Declaration on the Protection of All Persons from Enforced Disappearance (A/Res/47/133).

[6] Sexual violence includes any act of a sexual nature, which is committed on a person under circumstances which are coercive. See International Criminal Tribunal for Rwanda, *Prosecutor v. Jean-Paul Akayesu*, Case No. ICTR-96-4, Judgment (Trial Chamber), 2 September 1998, para. 688, (3).

[7] S/2015/217.

[8] The UAE is a party to the Geneva Conventions of 1949 (10 May 1972) and the Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), 8 June 1977 (Additional Protocol II) (09 March 1983). The UAE has not ratified the International Covenant on Civil and Political Rights (ICCPR), but is a party to, inter alia, CAT (19 July 2012) and the Convention on the Rights of the Child (CRC) (03 January 1997). The UAE is bound by provisions of the ICCPR, in so far as it reflects existing customary international law, and the Universal Declaration of Human Rights. The UAE military forces are bound by the State's human rights obligations in times of armed conflict and "in respect of acts done by a State in the exercise of its jurisdiction outside its own territory". See *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory, Advisory Opinion*, I.C.J. Reports 2004, pp. 178-181, paras. 106 – 113 and *Case Concerning Armed Activities on the Territory of the Congo (Democratic Republic of Congo v. Uganda)*, Judgment of 19 December 2005, para. 216.

[9] The relevant provisions can be found, inter alia, in Geneva Conventions Common Article 3 and Additional Protocol II articles 4 and 5 and the CAT. See also ICRC Customary IHL rules, inter alia, rules 90, 93, 98, 99, 100, 105, 117, 118, 123, 125 and 126 for an elaboration of relevant IHL principles. See also Chatham House and ICRC, Expert meeting on procedural safeguards for security detention in non-international armed conflict, December 2009.

## III.   UAE detention sites in Yemen

4.      The UAE denies maintaining detention facilities in Yemen. [10] It informed the Panel that all detainees are kept in "facilities and prisons under the authority of the legitimate Government".[11] In 2016 and 2017, the Panel investigated violations relating to eighteen detainees held in detention facilities administered and supervised exclusively by the UAE (see table 62.1).

Table 62.1
**Summary of UAE detentions investigated (2016 - 2017)**

| Serial | Date | Bureiqa UAE base | al-Rayyan UAE base | Shabwah Belhaf port |
|--------|------|------------------|--------------------|--------------------|
| 1 | Number of detentions investigated 2016[12] | 0 | 6 | 0 |
| 2 | Number of detentions investigated 2017 | 7 | 3 | 1 |

5.      The persons documented in the above sites fell within the exclusive jurisdiction of the UAE military forces, while at the detention site. [13] Yemeni official sources informed the Panel that the Government of Yemen does not have any authority over them once they are under UAE custody.[14]

6.      The Panel identified the location of the detention facility inside the Bureiqa UAE base, based on drawings and descriptions provided by six detainees (annex 61). Satellite imagery shows, what is now being identified as, solitary cells being built in 12 April 2016. The Bureiqa base was under the exclusive control of UAE forces in April 2016 and thus, they alone were responsible for the construction of this site.

---

[10] Previously UAE held that "… the UAE, as a part of the Arab Coalition (sic), does not administer or supervise any prisons in Yemen… This is within the jurisdiction of the Yemeni legitimate authorities. The Coalition forces provide training to Yemeni cadres in accordance with the best legal practices…". https://www.thenational.ae/world/foreign-ministry-denies-existence-of-uae-run-secret-prisons-in-yemen-1.92640, 23 June 2017.

[11] UAE letter to Panel 2017/578 of 8 November 2017.

[12] Paras. 133 and 134, S/2016/81.

[13] Three detainees witnessed/ or was informed by UAE officials of a "western presence" in Bureiqa. United States troops are reported to be present in al-Rayyan detention site. See https://www.apnews.com/4925f7f0fa654853bd6f2f57174179fe. The Panel requested confirmation from the United States on presence of its forces in al-Rayyan; their involvement in UAE-related detentions; and knowledge of detention-related abuses. The United States informed the Panel that it was "unable to share additional information with the Panel at this time." Email dated 13 December 2017.

[14] In addition to confidential Panel sources, the following documents also refer to UAE detentions; 1) letter dated 31/07/2017 sent to HRW by the 2nd Military Regional Command, which states that "Some of the assertions (on abuses associated with detentions) are biased, intended to slander Coalition forces and especially the United Arab Emirates. Everyone knows the honorable role played by this country… as well *as the ethical treatment of prisoners where much is done to facilitate communication with their families*", (emphasis added); 2) a previous iteration of the above letter, signed by Brigadier General Farag Salemeen al-Bahsani, Commander of the 2nd Military Regional Command. This letter states that allegations on abuses in detention were made to tarnish the reputation of the UAE, but that al-Bahsani "confirm(s) that they (UAE) have dealt with detainees in a civil and humane manner" including by facilitating communications between the detainees and their families and by allowing one detainee to visit his mother's funeral; and 3) Report of group of human rights activists in Hadramawt who visited "secret detention facilities" in July 2017 concluded that "They (sic) are around 175 detained at al-Rayyan that are being held for terrorism charges. The area that they are being held in (al-Rayyan) it is an old location that is not in the possession of the government (unofficial Panel translation)." Open sources include https://www.hrw.org/news/2017/06/22/yemen-uae-backs-abusive-local-forces (HRW), https://www.apnews.com/4925f7f0fa654853bd6f2f57174179fe (AP), and http://www.echr.org.uk/news/details-secret-prisons-yemen-under-supervision-uae (SAM Organization for Rights and Liberties).

18-00267

Imagery on 7 November 2017 shows a further expansion of the base (annex 61). The location of the UAE detention facility in al-Rayyan was identified by AP.[15]

## IV.    Joint arrest activities between UAE and Yemeni forces

7.      The UAE informed the Panel that all arrests are undertaken exclusively by Yemen security forces, and that the UAE does not arrest any civilians.[16] The Panel has documented three incidents where UAE and Yemeni forces conducted joint arrest operations. In two operations in Shabwah and Mukalla, UAE air assets were deployed during the arrest operation and in the other, in Mukalla, UAE forces acted as observers. These detainees were then directly transferred to UAE custody.

8.      The Panel finds that while the UAE has engaged in joint arrest operations with Yemeni forces that resulted in the UAE taking individuals into its custody, in most cases investigated by the Panel, the UAE military forces received detainees whom the Yemeni Forces had arrested.

## V.    Transfer of detainees between UAE and Yemeni forces

9.      In the incidents investigated, the Hadrami Elite Forces, the Director of General Security of Aden, the Security Belt in Aden, and Shabwani Elite Forces transferred detainees, whom they had arrested, to UAE custody (for individuals responsible for these forces see annex 65. Eye-witnesses informed the Panel that UAE forces also removed detainees out of Yemeni custody from Bir Ahmed I. Other transfers documented include three detainees transferred from the UAE site in Bureiqa to Bir Ahmed I. An identified UAE official also transferred detainees from Bir Ahmed I to Bir Ahmed II on 12 November 2017 (figure 62.2).

---

[15] https://www.apnews.com/4925f7f0fa654853bd6f2f57174179fe. At 14°40'9.92"N 49°22'28.49"E. The UAE informed the Panel that "*Riyan (sic) Airport is used (by the UAE) in providing the local authorities in Hadramaut (sic) with the necessary support to control the security situation …in coordination with …the governor*". UAE letter to Panel 2017/578 of 8 November 2017.

[16] UAE letter to Panel 2017/578 of 8 November 2017.

Figure 62.1
**Relative locations of Bir Ahmed site I and II and the UAE Bureiqa site[17]**



10.     The lack of transparency for these transfers, combined with official denials of the presence of individual detainees and/or detention sites at certain locations, create an environment conducive for enforced disappearances. For example, families said that they were aware of detainees being present in some sites, for example, al-Rayyan UAE base or Bureiqa UAE base, based on information received from former detainees or Yemeni officials who were involved in the transfers, but the UAE had not, to date, provided identification information on detainees held in these detention sites to families.[18] The Panel also met with fourteen families who were informed that their disappeared relatives were in UAE administered or controlled prisons.[19]

11.     The Panel finds that is no evidence that the UAE and/or Yemeni forces are taking the appropriate precautions required under international law, when engaging in the transfer of control of detainees into each other's

---

[17] Image: Panel of Experts. Bir Ahmed I was described by detainees, while Bir Ahmed II was located using satellite imagery, based on descriptions provided by detainees and open source images.

[18] Interviews with multiple family members who directly engaged with the Saudi Arabia-led coalition forces in Aden and Mukalla on seeking information on the fate of their loved ones. Initially, these forces were cooperative with families (for example, in Mukalla, in December 2016, coalition forces requested families to provide detainee lists), but later, they refused to engage, according to these families.

[19] Information provided to the families by other former detainees or security personnel. One detainee was witnessed by a relative entering the Bureiqa UAE base, his whereabouts are since unknown.

18-00267

authority and custody to prevent detention related abuses, including enforced disappearances.[20] For example, the Panel has identified torture and ill treatment of the same detainees by both the UAE and Yemen forces (see annex 61).

## VI.   UAE military forces' control and influence over Yemeni forces

12.     The Governments of Yemen and the UAE state that the Security Belt, Aden, and the Elite Forces are under the exclusive authority of the Government of Yemen.[21]

13.     This is denied by official Yemeni sources, who informed the Panel that the Government of Yemen does not have complete operational control over these forces and their leadership. These forces carry out operations independently of the Government, and are, sometimes, tasked by the UAE forces themselves.[22] The Panel was also informed by official Yemeni sources that:

(a)    Salaries of the Security Belt, for example, are paid directly by the UAE to the Security Belt forces, and the salary paid exceeds significantly from what is paid to regular forces operating under the Government of Yemen (see annex 65);

(b)    Government of Yemen does not have information on all names and other details of detainees arrested by the above Yemeni forces, and handed to UAE custody; and[23]

(c)    There have been clashes between some of these Yemeni forces, and those under the control of the legitimate government demonstrating the Government of Yemen's inability to exert full operational control over them.[24]

14.     The Panel has identified the Elite Forces and Security Belt as proxy forces of the Saudi Arabia-led coalition.

15.     Despite the level of control exercised by the UAE over the Security Belt and Elite Forces, there is no demonstrable evidence that the UAE has acted to prevent violations by the Yemeni forces. For example, the Panel investigated a case where a detainee was physically abused by the Security Belt, immediately prior to the transfer of that detainee to the UAE, and finds it is unlikely that the UAE military forces assuming custody would have failed to notice the abuse. Given, however, that the UAE military forces then physically abused the same detainee, the Panel can only conclude that there is collusion between the forces on measures adopted to collect information from detainees. This pattern of detainee abuse by multiple authorities was also observed with other detainees transferred to the UAE from the custody of the Director of General Security, Aden (see annex 61).

16.     The fact that the UAE military forces themselves engage in violations with impunity (see paragraph 19) creates an environment conducive to violations. It then enables the Yemeni forces operating with the UAE, also to engage in the same violations with enhanced impunity. See appendix A for levels of influence exerted by the Saudi Arabia-led coalition on Yemeni forces.

---

[20] See paras. 708 and 714 of the Commentary to Common Article 3 on obligations relating to *non-refoulement* when detainees are transferred to the custody of one State by another State. There is clearly an information exchange between the Yemeni forces and the UAE officials interrogating the detainees as demonstrated by the questions asked by detainees by both entities.

[21] Panel meeting with Ministry of Interior, Aden, 2 October 2017. UAE letter to Panel 2017/578 of 8 November 2017. S/2017/81, para 134. Both the UAE and the Government of Yemen's official positions are that the UAE provides, inter alia, training and other logistical support to these forces. http://arabfhr.org/2017/06/27/yemeni-human-rights-minister-denies-secret-prisons-in-aden-southern-yemen/?lang=en.

[22] Yemeni official sources, including those dealing with security.

[23] Ibid. Thus far, the Government of Yemen has not responded to any Panel requests for information on UAE detentions.

[24] See UAE-backed fighters take Aden airport from Hadi forces, *Middle East Eye*, May 31, 2017 at http://www.middleeasteye.net/news/uae-backed-fighters-yemen-take-over-aden-airport-ally-hadi-report-1568338746

## VII.   Legal authority for the UAE detentions in Yemen

17.     The Panel has asked, but not yet received, from Saudi Arabia, the UAE or Yemen, relevant information on the relevant legal authority under which the UAE engage in arrests and deprivation of liberty in Yemen. The invitation to GCC countries intervening in the Yemeni conflict, presented by the Government of Yemen is broad,[25] but, in the absence of a response from the Government of Yemen for a clarification, it is not for the Panel to conclude that this invitation provides the relevant legal authority for UAE to detain individuals, especially given that the Government consistently fails to acknowledge UAE detentions or detention sites maintained by the UAE.[26]

18.     Similarly, in the absence of a response by the Government of Yemen on the relevant position in its domestic law or on the existence of a bilateral/multilateral agreement on the same, the Panel is not able to conclude that the relevant legal basis can be found in those instruments.[27] The UN Security Council resolutions on Yemen do not provide the requisite legal authority. There are no standard operating procedures regulating the arrest and transfer of detainees and their conditions of detention in respect to UAE detentions.

19.     Thus, the Panel finds that the legal authority under which the UAE engages in arrests and detentions in Yemen is unclear, as neither country would provide the relevant clarification. The Panel finds that this is presumably because neither UAE nor Yemen acknowledges UAE detentions in Yemen, and to provide a clarification on UAE authority would invariably necessitate an acknowledgement of UAE detentions.

## VIII.   UAE violations of IHL and HR of detainees

20.     Detainees informed the Panel of the following violations at the Bureiqa detention site:[28]

(a)     Torture, including beatings, electrocution, constrained suspension, imprisonment in a metal cell ('the cage') in the sun and sexual violence (annex 61).[29] UAE soldiers and officials inflicted these abuses to obtain information or to punish individuals;

(b)     Denial of appropriate medical treatment, including for torture and prevailing medical conditions;[30]

(c)     Enforced disappearance. The detainees investigated by the Panel were at the Bureiqa detention site from a few days to over six months. With a few exceptions, families were unaware of their whereabouts. A significant majority of detainees were not allowed to communicate with their families;

---

[25] S/2015/217.

[26] One may argue that the transfer of detainees, arrested by individuals and entities said to be under the "de jure control" of the Government of Yemen, to UAE custody, may constitutes an implicit authorization on the part of the Government of Yemen for UAE to detain these individuals. It is not for the Panel to infer implicit authority especially given the low-level of control the Government of Yemen exercises over these Forces.

[27] It is unclear if Common Article 3 to the Geneva Conventions or AP II alone provides a basis for detention. See ICRC, "Internment in Armed Conflict: Basic Rules and Challenges, Opinion Paper", November 2014, p.8. It is recognized that in a non-international armed conflict additional authority maybe required as a legal basis for foreign forces to detain individuals. This may include authorizations under a Chapter VII Security Council resolution, domestic legislation, or an international agreement between the detaining State and host State. See also ICRC, "Strengthening international humanitarian law: protecting persons deprived of their liberty: Concluding report", 32IC/15/19.1, October 2015.

[28] In accordance with Panel methodology, all the information in this section (and this annex) was provided by, at minimum, two sources. For this section, the sources were either eye-witnesses or victims.

[29] Five detainees witnessed torture and sexual violence being committed against other detainees and, at least, four, interviewed by the Panel, stated that they were tortured. Medical records verified the occurrence of torture in two cases, but circumstances of other detainees did not allow for medical verification.

[30] Two detainees. Yet, another detainee was provided medical treatment, for torture that occurred immediately before he entered the Bureiqa base, as the UAE concluded that his arrest and detention was ill conceived and there was no reason for him to be detained. Yet, the detainee was not released.

(d)     The families of detainees, their legal representatives, or the representatives of international organizations, including the ICRC, have not had access to detainees;[31] and

(e)     While there were regular interrogations of detainees, including the allocation of case officers for each detainee, detainees had no access an impartial body to challenge their detention.

21.     The Panel finds that the UAE military forces have engaged in violations of IHL and IHRL when it engaged in arbitrary arrest and detention,[32] torture, ill treatment, enforced disappearances and threats to commit the above acts, and other violations of fundamental guarantees of detainees.[33]

## IX.   Acts of intimidation and threats by UAE forces and other groups

22.     There is widespread intimidation practiced by the UAE and their local collaborators to maintain secrecy of these detentions and associated abuses. The Panel considers that the following documented acts of intimidation are extremely grave in that they deprive families the right to know the fate of their relatives, prevent any accountability for the violations, and facilitate denials of continued violations:

(a)     A detainee was threatened with sexual abuse if he informed anyone of the detention and consequent abuses suffered at the hands of the UAE;

(b)     Another former detainee was warned not to discuss his detention with the UAE, but when he did, he was immediately rearrested and remains in UAE custody;[34]

(c)     The Panel observed widespread fear during its discussions with former detainees, families of detainees, and activists that there will be repercussions on those who speak of the UAE detentions, in Mukalla and Aden. In both Mukalla and Aden, protestors who demonstrated against these detentions were, on two occasions, subjected to verbal harassment and physical abuse.[35] They were sufficiently intimidated to discontinue their protests at the same locations; and

(d)     In one case, a letter sent to HRW by the UAE Ministry of Defence, following its findings on detentions in Mukalla, threatened the "prosecution" of those involved in reporting detention-related violations.[36]

23.     The Panel finds that UAE forces, the Yemeni Ministry of Defence, and other unidentified groups have engaged in intimidation and threats against detainees and those representing them.

---

[31] Source: families and detainees.

[32] For example, in one case, an individual was arrested, taken to al-Rayyan and was shown a list and asked to identify a specific unknown individual in that list as responsible for a recent security incident, and when he refused to do so, he was detained for several months. In another unrelated case, an individual, whose relative had recently been imprisoned in al-Rayyan, was requested to come to the base, asked to identify an individual on the list as AQAP, and he identified the individual despite knowing full well that he was not linked to AQAP. The Panel was informed he identified the individual to prevent being detained himself.

[33] See Article 4 and 5 of AP II and CA 3. ICRC, "Strengthening international humanitarian law: protecting persons deprived of their liberty: Concluding report", 32IC/15/19.1, October 2015. Jelena Pejic, Internment in armed conflict and other situations of violence, 87 (835) IRRC, June 2005.

[34] Specific details are omitted to protect detainee.

[35] Panel meetings with the protestors.

[36] Documents with Panel. See footnote 14. Following the release of HRW report on UAE detentions, the lead researcher's passport was circulated in the media stating that she was a Qatari affiliate. http://m.sahafah.net/show2924701.html. Even if this is not attributed to the UAE by the Panel, this demonstrates undue interference and lack of protection afforded to those reporting on violations.

S/2018/68

# X.   Government of Yemen's complicity in abuses

24.   The Government of Yemen is instrumental in, and is facilitating, continued violations by UAE military forces, in Yemen, by:

(a)   The continued failure to acknowledge UAE detentions in Yemen,[37] even though forces under its supposed de jure control continues to engage in and facilitate such detentions and/or conduct joint arrest operations with the UAE;

(b)   The failure to clarify the legal authority under which the UAE military forces, as an international force, continue to arrest and detain individuals in Yemen;

(c)   The failure to assert jurisdiction and to control abuses in detention sites maintained by the UAE;

(d)   The non-payment of salaries to its forces, which is essential in establishing its de facto authority over those forces, and by allowing the Saudi Arabia led-coalition to directly pay salaries or incentives to some of these forces operating with the UAE; and

(e)   The failure to conduct a credible inquiry into its own forces alleged to have committed violations;[38] failure to conduct an inquiry into the UAE's conduct and curtail its conduct in so far as it relates to abusive practices; and failure to ensure safeguards when engaging in detainee transfers between the UAE and forces under its supposed de jure control.

25.   The Government of Yemen has, during several meetings with the Panel, sought to distance itself from the legal responsibility accruing on the Government of Yemen for acts and omissions committed by the Saudi Arabia-led coalition in Yemen.[39] Yet, the Panel finds that:

(a)   The Government of Yemen continues to be responsible for any internationally wrongful acts committed by the Saudi Arabia-led coalition and individual members of the Saudi Arabia-led coalition in Yemen;

(b)   Saudi Arabia-led coalition member States are present and operating in Yemen, at the invitation of, and with the consent of, the Government of Yemen.  The Government has full discretion to revoke or limit this consent, or to clarify the boundaries of its consent, to further the compliance of these forces with IHL and IHRL;[40] and

(c)   The Government of Yemen is responsible for the consequent treatment and wellbeing of all detainees, especially those who have been transferred to UAE by forces under its de jure control.[41]

---

[37] The Minister of Human Rights stated that "reports…about secret prisons in the south are baseless". http://arabfhr.org/2017/06/27/yemeni-human-rights-minister-denies-secret-prisons-in-aden-southern-yemen/?lang=en. The spokesman of the Aden police "acknowledged that the UAE played a positive and supportive role for many prisoners who were released by the security services in Aden and Hadramawt, pointing out that the role of the UAE "was limited to providing support to the Department of Aden security…" http://arabfhr.org/2017/06/27/yemeni-human-rights-minister-denies-secret-prisons-in-aden-southern-yemen/?lang=en.

[38] According to the media, the Government of Yemen established a Commission, in June 2017, to "consider the allegations of violations of human rights in liberated areas and propose possible responses to those allegations and establish a mechanism to address and resolve any future problems in this regard." This Commission's findings are not yet public. http://arabfhr.org/2017/06/27/yemeni-human-rights-minister-denies-secret-prisons-in-aden-southern-yemen/?lang=en.

[39] Meetings with Yemeni officials.

[40] See Common Article 1 of the Geneva Conventions on the Government of Yemen's obligations. For consent related matters see *Democratic Republic of Congo v Uganda*.

[41] The Government of Yemen can absolve itself of its responsibility of internationally wrongful acts, if UAE forces in Yemen are classified as an occupying force (See Democratic *Republic of Congo v Uganda*. Although the President of Yemen did allege that the UAE is acting as an occupying force in Yemen, this was not repeated. http://www.middleeasteye.net/news/exclusive-yemeni-president-says-emiratis-acting-occupiers-1965874493.

## XI.    Involvement of other States

26.      As far as the Panel is aware, the UAE, in carrying out these operations, is working as a part of the Saudi Arabia-led coalition.[42] Thus, the following member States, especially, have responsibilities under Common Article 1 of the Geneva Conventions, that requires all parties to "ensure respect" for IHL: Bahrain, Djibouti, Jordan, Kuwait, Malaysia, Morocco, Saudi Arabia, Senegal and Sudan.[43]

27.      To the extent, that the UAE detentions are being undertaken to gather information on AQAP or ISIS or other terrorist groups, partners of the UAE should take proactive steps to inquire and ensure that the information that it receives on the basis of partnership agreements or otherwise, is not obtained by torture, not only because such information is unreliable, but also because it violates these member States international obligations.[44] These member States also have a special responsibility under Common Article 1 of the Geneva Conventions to ensure respect for IHL. The United States and Europol[45] work with the UAE on countering terrorism, with the United States actively engaged with the UAE in Yemen.[46]

## XII.    Conclusions

28.      The Panel finds that:

(a)      It is unlikely that UAE military forces in Yemen are conducting arrest and detention operations without the knowledge of the Governments of the UAE and Yemen;

(b)      The lack of public acknowledgement of the UAE's engagement in detention, by both governments, contribute to violations occurring with impunity by both UAE forces and its Yemeni collaborators. For the Yemeni forces, this denial guarantees the ability to operate without any foreseeable consequences for illegal conduct;

(c)      That this and other information available in the public domain on UAE detentions should be sufficient for the Governments of Yemen and UAE to reconsider their respective public positions that the UAE does not maintain any detention facilities in Yemen; to comply with their obligations under international law to call for an immediate investigation on the involvement of their armed forces and state organs in these violations; and to take appropriate action as required under domestic and international law to prevent further abuses;[47] and

(d)      Those who are in command and control of the UAE forces that engage in detention-related abuses in Yemen certainly fall within the designation criteria under paragraphs 17 and 18 of resolution 2140 (2014).

---

[42] The UAE justified its presence in Yemen to the invitation made by President Hadi. UAE letter to Panel of 8 November 2017. The Panel notes that the United States provides that "the UAE deployed forces in Yemen to counter the spread of AQAP and ISIS in Yemen at the same time as it partnered with the Saudi-led Islamic Military Alliance to Fight Terrorism… UAE forces remained in Yemen to support local forces in counterterrorism operations." See https://www.state.gov/j/ct/rls/crt/2016/272232.htm. The Panel continues to welcome any clarifications provided by the UAE on the legal basis under which it maintains detention sites, in Yemen.

[43] For the list of States identified as partners in the Saudi Arabia-led coalition, see http://www.spa.gov.sa/1682071.

[44] For example, obligations under CAT.

[45] https://www.state.gov/j/ct/rls/crt/2016/272232.htm. The UAE has a strategic cooperation agreement on countering serious crime and terrorism for exchange of information and expertise between UAE and Europol.

[46] https://www.uae-embassy.org/about-uae/foreign-policy/uae-counterterrorism, http://www.hedayahcenter.org/media-details/49/news/51/latest-news/829/uae-maintains-robust-counter-terrorism-stance--us-state-department-country-reports-on-terrorism-for-2016.

[47] The Panel notes that in this respect, that the JIAT informed the Panel that it did not have the necessary mandate to investigate UAE detention related violations. Meeting in June 2017 in Saudi Arabia.

S/2018/68

**Appendix A to Annex 62: Summary information on individuals and entities that engaged with the UAE on detentions**

| Ser | Entity | Name of Leader | Area of Responsibility | Image[48] | Relationship with the UAE |
|---|---|---|---|---|---|
| 1 | Security Belt, Aden | Brigadier General Wadha Omar Abdulaziz<br><br>Commander of Security Belt | Aden |  | • The transfer of detainees.<br>• UAE pays salaries to Security Belt forces.<br>• UAE supports training, intelligence and logistics.<br>**Analysis:**<br>• Collaborative relationship that goes beyond training, intelligence sharing and logistical support. |
| 2 | Aden Police Force | Major General Shallal Ali Shaye, Director of General Security Aden | Aden |  | • The transfer of detainees.<br>• UAE provides logistical support and provision of other resources to Aden Police.<br>**Analysis:**<br>• Collaborative relationship.<br>• Unknown if his work with the UAE on detainee transfers is undertaken in his personal capacity or on behalf of the Government of Yemen. |
| 3 | Shabwani Elite Forces | Lieutenant Colonel Mohammed al-Buhar al-Qumayshi<br>Commander Shabwani Elite Forces | Shabwah |  | • Engaged in joint UAE arrest operations.<br>• The transfer of detainees.<br>**Analysis:**<br>• There is a collaborative relationship between the UAE and the Shabwani Elite Forces on arrest and detentions. |
| 4 | Hadrami Elite Forces | | Hadramawt | | • Joint UAE arrest operations<br>• Transfer of detainees.<br>• UAE provides training, intelligence and other logistical support.<br>**Analysis:**<br>• Collaborative relationship that goes beyond training, intelligence sharing and logistical support. |
| 5 | 20th Military Camp | Imam al-Nubi,<br>Former commander 20th Military Camp | Aden |  | • UAE facilitated the release of detainee from al-Nubi.<br>**Analysis:**<br>• There is no collaborative relationship between UAE and al-Nubi on detentions.<br>• Operated with relative independence from UAE. |

---

[48] Images from @demolinari at https://twitter.com/search?q=demolinari%20andsrc=typd.

18-00267

S/2018/68

CONFIDENTIAL ANNEX NOT FOR PUBLIC DISSEMINATION

**Annex 63:    Detentions by 'PSO', 'NSB', and other Houthi officials**

## Annex 64:    Case studies on the indiscriminate use of explosive ordnance against civilian populated areas in Yemen and Saudi Arabia (2017)

## I.    Violations by Houthi-Saleh Forces

1.     In 2017, the Panel received information on 163 reported[1] cases of the indiscriminate use of explosive ordnance (EO) against civilian populated areas in Ta'izz and Ma'rib, Yemen, and one case in Riyadh, Saudi Arabia, that are attributable to Houthi-Saleh forces. The Panel investigated ten potential indiscriminate attacks.[2] Full case studies for three incidents are included as shown in table 64.1, and case study summaries for six incidents are included in table 64.2. These incidents demonstrate that parties to the conflict continue to engage in the apparent indiscriminate use of EO in proximity to the civilian population.

2.     The Panel arrived at its conclusions and findings, in respect of its findings, based on its own independent investigations and information available in the public domain. If the Houthi-Saleh political or military leadership can provide verifiable information on the military objectives sought to be achieved that may counter the Panel's conclusions and findings, then the Panel stands ready to review them.

3.     The Houthi-Saleh political and military leadership has not responded to Panel requests for information.

Table 64.1
**Full case studies of the indiscriminate use of EO against civilian populated areas**

| Appx | Date | Location | Incident and target | Type of explosive ordnance | Civilian casualties |
|---|---|---|---|---|---|
| A | 29 May 2017 | Al-Nour, Ta'izz | Civilian neighbourhood | ▪120mm high explosive (HE) mortar bomb | 1 dead 7 injured |
| B | 6 Sept 2017 | Al-Rawda, Ma'rib | Civilian neighbourhood | ▪120mm HE mortar bomb | 3 injured |
| C | 11 Nov 2017 | Riyadh, Saudi Arabia | Civilian airport | ▪Short-range ballistic missile | 0 |
| D | 2 Nov 2017 | Onsowa, Ta'izz | Civilian neighbourhood | ▪120mm HE mortar bomb | 5 dead 2 injured |

4.     In the ten incidents investigated by the Panel it finds that:

(a)     The damage observed in the available imagery is consistent with the type of damage caused by land service ammunition (for example, motor bombs and artillery shells);

(b)     In some cases, although the Panel was unable to exactly identify the type of explosive ordnance based on the available information, the Panel is almost certain that the explosions were not due to gas explosions, the initiation of improvised explosive devices (IED), the initiation of unexploded ordnance (UXO) or the initiation of abandoned explosive ordnance (AXO). The locations of the explosions were in areas of conflict and within the range of weapons from known enemy positions of the military forces participating in the conflict;

---

[1] These cases were documented and verified by Panel sources. The Panel can share further information with the Committee, with the consent of its sources.

[2] The Panel selected these 18 cases based on the availability of technical evidence, imagery, witnesses, medical records, GPS coordinates, and the ability of Panel investigators to reach the area. Yet, in only 10 did technical evidence confirm the use of explosive ordnance.

(c)     In all the cases investigated, there was no demonstrable evidence that the civilians in, or near these objects, who are prima facie immune from attack, had lost their civilian protection;

(d)     Even if in some of the cases that follow, the Houthi-Saleh fighters, or the Abu al-Abbas group (for incident in appendix D), have targeted legitimate military objectives, the Panel finds that it is highly unlikely that IHL principles of proportionality, and precautions in attack were respected in these incidents; and

(e)     The cumulative effect on civilians and the civilian object demonstrates that even if precautionary measures were taken, they were largely inadequate and ineffective.

5.     The Panel also concludes that:

(a)     In the absence of any verifiable information from Houthi-Saleh forces, the evidence gathered strongly demonstrates that Houthi-Saleh forces engaged in the indiscriminate use of EO in densely populated civilian areas, in violation of the principles of IHL; [3]

(b)     In their use of SRBM, Houthi-Saleh forces failed to take account of the inherently indiscriminate nature of the weapon in that:

(i)     SRBM are specifically designed to be area weapons, as precision accuracy cannot be guaranteed;

(ii)     Since the blast and fragmentation danger areas are primarily based on the size and design of the explosive warhead, this missile's likely impact on civilians was foreseeable, especially when directed at civilian populated areas; and

(iii)     As such weapons have a known Circular Error Probability (CEP) [4] of up to 1,000m, they should not be used against targets within 1,000m of the civilian population.

6.     The Panel stands ready to provide the Committee with further information if requested, but in the interest of brevity, provides only summaries of the cases in table 64.2 below.

Table 64.2
**Summary case studies of the indiscriminate use of EO against civilian targets**

| Ser | Date | Location | Incident and target | Type of explosive ordnance | Civilian casualties |
|-----|------|----------|---------------------|----------------------------|---------------------|
| E | 18 Jan 2017 | Al-Nour, Ta'izz | Residential area | 120mm HE mortar bomb | 9 dead 8 injured |
| F | 21 May 2017 | Al-Jahmila, Ta'izz | Residential area | HE EO TBC | 2 dead |
| G | 21 May 2017 | Tha'baat, Ta'izz | Residential area | HE EO TBC | 3 dead 3 injured |
| H | 21 May 2017 | Al-Hamaira, Ta'izz | Commercial area | HE EO TBC | 2 dead 5 injured |

---

[3] Customary international law, which binds Houthi-Saleh forces, requires parties to conflicts to distinguish between civilians and combatants. The International Court of Justice (ICJ) has held that "indiscriminate shelling is in itself a grave violation of humanitarian law" Case Concerning Armed Activities on the Territory of the Congo (Democratic Republic of Congo v. Uganda), Judgment of 19 December 2005, para. 208.

[4] The CEP is a measure of a weapon system's precision. It is defined as the radius of a circle, centered on the mean, whose boundary is expected to include the landing points of 50% of the missiles fired.

S/2018/68

| Ser | Date | Location | Incident and target | Type of explosive ordnance | Civilian casualties |
|-----|------|----------|---------------------|----------------------------|---------------------|
| I | 30 Jun 2017 | Al-Jumhuri, Ta'izz | Residential area | 106mm RCL[5] | 1 dead 9 injured |
| J | 21 Sep 2017 | Senei, Ta'izz | Residential area | RPG-7 variant | 0 |

7.      IHL requires military commanders and those responsible for planning and executing decisions regarding attacks to take all feasible precautions to avoid, and in any event to minimize, incidental loss of civilian life, injury to civilians and damage to civilian objects.[6] Unless Houthi-Saleh military or political forces provide evidence to the contrary, the Panel finds that there is compelling evidence that the commanders of the forces involved failed to take all feasible precautions to avoid or to minimize, incidental loss of civilian life, injury to civilians and damage to civilian objects.

8.      The Panel also documented the use of indiscriminate use of EO against civilian houses. The Panel received 161 reported cases where Houthi-Saleh forces have allegedly used explosive ordnance to intentionally damage or destroy houses (figures 64.1 and 64.2).

Figure 64.1
**Example of damage to house in Ta'izz caused by indiscriminate use of EO**

Figure 64.1
**Example of damage to house in Ta'izz caused by indiscriminate use of EO**





9.      The indiscriminate use of explosive ordnance against civilian locations in Yemen and Saudi Arabia committed by the Houthi-Saleh forces, falls within paragraph 17 and/or paragraph 18 of resolution 2140 (2014). Member States should consider the continued occurrences of widespread civilian casualties, including children, because of the indiscriminate use of EO is a veritable threat to peace, security, and stability in Yemen.

10.      Given that this regular and routine occurrence of use of EO cannot occur without at least the continued acquiesce of its leadership, the Security Council should consider expanding the narrative summary of the reasons for the listing of Abdulmalik al-Houthi (YEi.004) to reflect the threats to peace, security, and stability associated with this indiscriminate use of EO. In this context, the Council should also consider:

         (a)      The threats issued by the leadership of the Houthi-Saleh forces, including the chairman of the supreme revolutionary committee, Mohammad Ali al Houthi, who threatened further attacks on oil installations in Saudi Arabia, and commercial ships carrying oil, as reprisals, which are

---

[5] Recoilless Rifle.
[6] See Article 13(1) of Additional Protocol II to the Geneva Conventions and CIHLR 15 - 22.

18-00267

prima facie civilian objects immune from attack.[7] Saleh al Samad, head of the supreme political council, also referred to targeting of "capitals" of countries as reprisals;[8] and

(b)      The political office also reportedly issued a statement that "*All airports, ports, border crossings and areas of any importance to Saudi Arabia and the UAE will be a direct target of our weapons, which is a legitimate right*".[9] These statements do not distinguish between civilian objects and military objectives. Intentionally launching attacks against civilians and civilian objects violates IHL.[10] As far as the Panel is aware, these statements were not denounced by Abdulmalik al-Houthi (YEi.004).[11]

11.    The Panel finds:

(a)      That after such a prolonged period of conflict, Abdulmalik al-Houthi (YEi.004) would be aware of the ballistic performance of the weapons systems used by their forces and their target effects. Yet, as the Panel reported in S/2017/81, and has identified in this report, multiple incidents of the indiscriminate use of EO against the civilian population of Ta'izz and Ma'rib have continued during 2017. These incidents attributable to the Houthi-Saleh forces, are violations of IHL and constitute a threat to peace, security and stability of Yemen;

(b)      That in respect of the missiles fired at Saudi Arabia, even if one allows for the possibility that Abdulmalik al-Houthi (YEi.004) did not consent to each individual missile strike against Saudi Arabia, he is responsible for a policy adopted by the Houthi-Saleh leadership that allows for the continued use of these missiles against Saudi Arabia; and

(c)      Given the foreseeable political and military repercussions, it is inconceivable that the missile launched on 4 November 2017 at King Khalid International Airport, could have taken place without the knowledge and prior consent of Abdulmalik al-Houthi (YEi.004). The Panel finds that this missile strike violated IHL and constituted a threat to peace, security and stability of Yemen.

## II.    Violations by anti-Houthi forces (including the Abu al-Abbas group)

12.    Anti-Houthi forces also violate IHL when it establishes military installations in densely populated civilian areas as they are exposing civilians to the dangers arising out of conflict.[12] If done intentionally and systematically, then it is likely that civilians and civilian objects are being used as shields to avoid attack, which is in violation of IHL.[13] In four incidents in which EO detonated within the civilian population, anti-Houthi forces had established their checkpoints in densely residential areas within 700m of the impact points. The Panel has also investigated one case of use of explosive ordnance where, based on technical evidence, it appears that the a 120mm high explosive mortar bomb was fired from an area under the control of anti-Houthi forces, probably areas under the control of Abu al-Abbas.[14] On 2 November 2017, this mortar bomb detonated in al-Onsowa neighbourhood, Ta'izz, killing five children and injuring two others, highly likely by Abu al-Abbas group (appendix D).

---

[7] https://www.facebook.com/permalink.php?story_fbid=163853657542656andid=149354595659229.
[8] http://www.ansarollah.com/archives/124112.
[9] https://www.alaraby.co.uk/english/news/2017/11/8/houthis-threaten-to-attack-uae-and-saudi-airports.
[10] Common Article 3 to the Geneva Convention, CIHLR 1- 10.
[11] In at least one televised speech al-Houthi is reported to have stated that "*his ballistic missiles were capable of reaching the United Arab Emirates' capital of Abu Dhabi and anywhere inside Saudi Arabia... If the Saudi regime and with a green light from the US attack Hodeidah then we have to take steps that we haven't taken before*". See http://www.arabnews.com/node/1161156/middle-east.
[12] See for example, CIHLR Rules 22 and 23.
[13] See for example, CIHLR 97.
[14] al-Onsowa, 2 November 2017.

**Appendix A to Annex 64: Mortar bomb strike on civilian area, al-Nour, Ta'izz, (29 May 2017)**

1.　　At approximately 23:00 hours on 29 May 2017, one 120mm HE mortar bomb detonated in al-Nour, Ta'izz, killing one civilian and injuring seven others, including four children.

2.　　Analysis of imagery of fragmentation (figures A.64.1 and A.64.2) recovered from the explosion indicates that the explosive ordnance used was a 120mm HE mortar bomb. All parties to the conflict have access to this type of weapon and ammunition.[15]

3.　　Given that the nearest anti-Houthi forces checkpoint was approximately 500m from the house and anti-Houthi forces control the area, it is highly likely that the perpetrators were Houthi-Saleh forces.

Figure A.64.1
**Post explosion – Tail fragment**



Figure A.64.2
**Post explosion – Tail fragment**



4.　　This civilian, neighbourhood has now been hit over three times since the beginning of the conflict.

---

[15] Similar in design to the round shown here: http://www.armaco.bg/en/product/mortar-bombs-c19/120mm-mortar-rounds-p474. The Panel does not, however, suspect this company of any involvement in the conflict. It is for illustrative purposes only.

18-00267

**Appendix B to Annex 64:  Mortar strike on a residential building, al-Rawda, Mar'ib, (6 September 2017)**

(c)

1.      At approximately 12:00 hours on 6 September 2017, one 120mm HE mortar bomb detonated in a residential building in al-Rawda, Ma'rib, injuring three children.

2.      Analysis of imagery of fragmentation (figures B.64.1 and B.64.2) recovered from the explosion indicates that the explosive ordnance used was a 120mm HE mortar bomb. All parties to the conflict have access to this type of weapon and ammunition.

Figure B.64.1                                   Figure 2.B.64
**120mm HE mortar bomb fragment**         **Impact point**

 

3.      The building is in a neighbourhood controlled by the Government of Yemen. The closest government establishment is a police station located approximately 700m from the impact point. The Panel finds, based  it is highly likely that the perpetrators were Houthi-Saleh forces.

**Appendix C to Annex 64: SRBM missile on King Khalid International Airport, Riyadh, Saudi Arabia (4 November 2017)**

1.      At 20:07 hours (local time) on 4 November 2017 a short-range ballistic missile (SRBM) was launched against King Khaled International Airport (KKIA) in Riyadh.[16]

2.      The Panel finds it almost certain that Houthi-Saleh forces were responsible for launching the attack based on:

(a)      Media reports quoting Houthi-Saleh officials, who stated that their target was KKIA;[17]

(b)      No denial in the public domain by the Houthi-Saleh forces;

(c)      Technical analysis of the SRBM (see annex 36); and

(d)      The flight path of the SRBM.[18]

3.      The Panel finds it almost certain that Houthi-Saleh forces targeted the KKIA, which is a civilian airport, with some military equipment and installations. While the Houthi-Saleh forces insisted after the missile launch that the target was the military installations within the airport, the Panel notes that the Houthi-Saleh commanders should have reasonable grounds to know the weapons unpredictable effects when directed at a civilian establishment.

4.      The Panel finds that SRBM is not capable of precision targeting at the 1,065km range this missile travelled as it has a Circular Error Probability of 750m to 1,000m. SRBM are specifically designed to be area weapons, as precision accuracy cannot be guaranteed. Since the blast and fragmentation danger areas are primarily based on the size and design of the explosive warhead, this missile's likely impact on civilians was foreseeable, especially when directed at civilian populated areas.[19]

5.      Consequently, the commanders who authorized the launch of the missile were reckless and failed to take into consideration, or wilfully disregarded, the fact that a disproportionately number of civilians and civilian objects could be affected by targeting KKIA.

---

[16] 24°57'29.5272"N, 46°42'2.8044"E.

[17] https://www.sabanews.net/ar/news478520.htm.

[18] "The General Authority of Civil Aviation said some remnants of the missile landed inside the airport perimeter". http://www.arabnews.com/node/1188336/saudi-arabia. Another remnant landed in a civilian house in a populated area in Riyadh.

[19] Over 40 airlines operate from KKIA and according to the latest statistics (2015) over 20 million passengers used the airport in 2015. The airport is 35km from the densely-populated city of Riyadh. https://www.riyadh-airport.com.

18-00267

**Appendix D to Annex 64: Mortar strike on al-Onsowa, Ta'izz (2 November 2017)**

1.      On 2 November 2017, a 120mm high explosive mortar bomb detonated in al-Onsowa neighbourhood, Ta'izz, killing five children and injuring two others.

2.      Analysis of imagery of fragmentation (figures D.64.1 and D.64.2) recovered from the explosion indicates that the explosive ordnance used was a 120mm high explosive mortar bomb. All parties to the conflict have access to this type of weapon and ammunition.

Figure D.64.1
**120mm HE mortar bomb tail unit**



Figure D.64.1
**120mm HE mortar bomb tail unit**



3.      The distinctive fragmentation pattern (figure D.64.3) provides evidence as to the direction the mortar bomb was fired from.  The Panel finds that the firing point was to the South East of the impact point (overview at figure D.64.4).

Figure D.64.3
**82mm HE mortar bomb tail unit[20]**



Figure D.65.4
**Target area overview[21]**



4.      Abu al-Abbas forces are the only armed group operating in the area where the mortar firing point was located (see figure D.65.5).

_____

[20] The top of the image is North.
[21] Ibid.

Figure D.65.5
**Mortar base plate location[22]**



---

[22] The Mortar Base Plate is the term used to describe the geo-position of the mortar from where the rounds originated.

18-00267

**Appendix E to Annex 64: Imagery supporting findings for case studies E to J – 9**

Table E.64.1

**Imagery supporting findings for case studies E to J[23]**

| Case | Date | Location | Image | Type of explosive ordnance | Civilian casualties |
|------|------|----------|-------|----------------------------|---------------------|
| E | 18 Jan 2017 | al-Nour, Ta'izz |  | ▪ 120mm HE mortar bomb | 9 dead 8 injured |
| F | 21 May 2017 | Jamila |  | ▪ HE based on crater and fragmentation splatter | 2 dead |
| G | 21 May 2017 | Thabaat, Ta'izz |  | ▪ HE based on crater and fragmentation splatter | 3 dead 3 injured |
| H | 21 May 2017 | al-Himaira, Ta'izz |  | ▪ HE based on crater and fragmentation splatter | 2 dead 5 injures |
| I | 30 Jun 2017 | al-Jumhuri, Ta'izz |  | ▪ RCL tail unit | 1 dead 9 injured |
| J | 21 Sep 2017 | Senei, Ta'izz |  | ▪ RPG tail unit | - |

---

[23] Imagery for this annex was provided by residents, human rights investigators and other confidential sources who were in the area or who visited the area in its immediate aftermath. This imagery can be made available to the Committee for further examination.

S/2018/68

## Annex 65:   IHL and HR violations relating to detentions by Yemeni military and security forces in Yemen

### I.    Terminology

1.      In this annex, the terms "arrest", "detention", and "detainee" are used to describe the act of depriving an individual of his liberty, the consequential deprivation of liberty and those subjected to the deprivation of liberty, respectively, without prejudice to the lawfulness of those acts and irrespective of whether detainees are subjected to internment[1] or criminal detention.[2] The Panel received information from both former and current detainees, but because of veritable threats against detainees and their families, the Panel will refrain from providing more information on their current situation. The Panel defines the terms arbitrary arrest and detention, torture, enforced disappearance, and secret detentions, in accordance with international law and jurisprudence and, where such is unavailable, in line with standards adopted by UN treaty bodies. See annex 62 for an elaboration of these terms.

### II.    Yemeni military and security forces associated with violations

2.      This annex contains information with respect to individuals and leaders who have committed or who hold command responsibility over individuals and entities that have committed violations of IHL and IHRL. These violations include arbitrary arrest and detention, failure to respect due process, torture, ill treatment, enforced disappearance, and arbitrary deprivation of life (table 65.1). The Government of Yemen identifies these individuals and entities as organs of the State (table 65.2 and 65.3).[3]

Table 65.1
**Violations summary**[4]

| Serial | Organization / individual | No of individuals investigated[5] | Arbitrary arrest / detention | Enforced disappearance | Deaths | Torture | Ill treatment | Denial of medical assistance | Detainee transfers with UAE |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Shallal Ali Shaye | 5 | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ |
| 2 | Abdul Ghani Shaalan | 7 | | ✓ | ✓ | | ✓ | ✓ | |
| 3 | Ali Abdullah Taher | 2 | | ✓ | | | | | |
| 4 | Ghassan al-Aqrabi | 100+ | | ✓ | | | ✓ | ✓ | ✓ |
| 5 | Imam al-Nubi | 5 | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| 6 | Security Belt in Aden | 6 | ✓ | ✓ | | ✓ | ✓ | | ✓ |
| 7 | Security Belt in Lahij | 7 | ✓ | ✓ | ✓ | | | | |
| 8 | Shabwani Elite Forces | 2 | ✓ | ✓ | | | | | ✓ |
| 9 | Hadrami Elite Forces | 3 | ✓ | ✓ | | | | | ✓ |

---

[1] The term 'internment' refers to detention for security reasons in situations of armed conflict, i.e. the non-criminal detention of a person based on the serious threat that his or her activity poses to the security of the detaining authority in relation to an armed conflict. See Commentary to Common Article 3.

[2] This means detention related to a criminal process. The Panel is only concerned those detentions linked to the conflict in Yemen and where IHL and HR violations can be established.

[3] Meeting with Ministry of Interior, 2 October 2017. The conduct of any State organ is considered an act of that State under international law. See Article 4 of Articles on State Responsibility.

[4] 1, 4, 6, 8 and 9, in their joint operations with the UAE, highly likely operated outside the Government of Yemen's command and control.

[5] Some of the same individuals are affected by more than one listed perpetrator.

Table 65.2
**Summary of entities investigated (2017)**

| Location | Entity | Leader | De jure responsibility | De facto responsibility |
|---|---|---|---|---|
| Aden | Security Belt | Brigadier General Wadha Omar Abdulaziz | Government of Yemen | UAE |
| Lahij | Security Belt | Colonel Hader al-Shukatry | Government of Yemen | UAE |
| Hadramawt | Elite forces | TBC. | Government of Yemen | UAE |
| Shabwah | Elite forces | Lieutenant Colonel Mohammed Salem al-Buhar al-Qomaishi | Government of Yemen | UAE |

Table 65.3
**Summary of individuals investigated (2017)**

| Location | Individual | Role | De jure responsibility | De facto responsibility |
|---|---|---|---|---|
| Aden | Major General Shallal Ali Shaye | Director of General Security, Aden | Government of Yemen | Unknown if his work with UAE in detainee transfers are undertaken in his personal capacity or clandestinely on behalf of the Government of Yemen. |
| Aden | Ghassan al-Aqrabi | Supervisor of Bir Ahmed I and II | Unknown.[6] | UAE and Security Belt, Aden. |
| Aden | Ayman Tariq | Manager of Bir Ahmed I | Unknown.[7] | UAE and Security Belt, Aden. |
| Aden | Imam al-Nubi[8] | Former Commander of Camp 20 | Government of Yemen.[9] | NA |
| Marib | Brigadier General Ali Abdullah Taher | Former Director of Security, Marib | Government of Yemen | Investigations continue. |
| Marib | Colonel Abdul Ghani Shaalan | Special Forces Commander, Marib | Government of Yemen | Investigations continue. |

**A.    Major General Shallal Ali Shaye**

3.      The Government of Yemen continues to consider Major General Shallal Ali Shaye, the Director of General Security in Aden, as an official of the Government of Yemen. He falls under the responsibility of the Ministry of Interior. He continues to receive orders directly from President Hadi. Shallal Ali Shaye supervises:

---

[6] It is possible that no entity would claim de jure responsibility as Bir Ahmed I was a secret detention site in that authorities, until late October 2017, denied its existence to families, and those in that facility were forcefully disappeared until their relocation to Bir Ahmed II.

[7] Ibid.

[8] Imam Ahmed Muhammed Abdu al-Salwy.

[9] Camp 20 was under the oversight of the Security Belt and the Director of General Security, Aden.

(a)     Aden Police[10] and

(b)     Security Belt of Aden.[11]

4.      While Major General Shallal Ali Shaye maybe under de jure command and control of the Government of Yemen, he also continues to work simultaneously with the UAE on detentions. For example,

(a)     At least four individuals detained at a house under his control in at-Tawahi were subsequently transferred to the UAE, where they were subjected to enforced disappearance for a prolonged period;[12] and

(b)     **Major General** Shallal Ali Shaye facilitated the release of other detainees from the custody of the UAE.[13]

5.      Arbitrary arrests and deprivations of liberty, torture, enforced disappearance and other due process violations also occur in a house under the control of Major General Shallal Ali Shaye in At-Tawahi.[14] Those detained in this house were kept between 12 to 72 hours and were then transferred elsewhere, including to Bir Ahmed I and the UAE detention site in Bureiqa.

6.      The Panel finds that the deprivations of liberty in the house under his control occur outside the legal framework of arrests and detentions established by the Yemeni legal system.

7.      The Panel continues to investigate the role and influence of the UAE on the Aden Police outside its interaction with Major General Shallal Ali Shaye.[15]

## B.    Security Belt of Aden

8.      The Security Belt in Aden was established by President Hadi. The Government of Yemen considers the Security Belt as an organ of the State under the responsibility of the Ministry of Interior.[16] The Security Belt of Aden work closely with the UAE in respect of deprivations of liberty. For example:

(a)     There were multiple detainees transferred between UAE and the Security Belt custody;[17]

(b)     The Security Belt facilitated the arrest and release of detainees in UAE custody;[18]

---

[10] The Aden Police receive their salaries from the Government of Yemen, although as at October 2017, they had not received them for 8 months. Panel meeting with the Deputy Police Chief of Aden on 2 October 2017.

[11] Confidential official sources. The Security Belt forces receive salaries from the UAE. Panel meeting with Brigadier General Wadha Omar Abdulaziz on 2 October 2017.

[12] Sources: detainees and family members. Three of the detainees were interrogated on the basis they were supportive/members of AQAP.

[13] Sources: detainee and family members.

[14] Detainees and their families. One detainee informed the Panel that UAE soldiers also participated in interrogations at this house. The Panel continues to investigate. Media reports on detention-related abuses undertaken by Shallal Ali Shaye include http://hournews.net/news.php?id=79051, https://www.hunaaden.com/news41410.html, https://theyemen.net/عبدعيقش‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌لش‌‌ييلفيس‌سنجنفيقلعم-ةافو/.

[15] Aden police state that the UAE had played a positive and supportive role for many prisoners who were released by the security services in Aden and Hadramawt. The UAE provided the "Department of Aden security, cars and vehicles, and the rehabilitation and furnishing of police stations." See also http://www.emirates247.com/news/emirates/uae-offers-further-support-to-aden-police-2017-08-09-1.657318.

[16] Meeting with Ministry of Interior and the Panel on 2 October 2017.

[17] In all cases documented by the Panel in Aden, the Security Belt was identified as the entity that arrested individuals, whether those individuals were then transferred to Major General Shallal Ali Shaye's custody, to the UAE, or the Mansoora Central Prison.

[18] In Aden, the Panel did not document any joint arrest operations with UAE. It has, to date, not found any individuals released by the UAE directly, without the Security Belt's participation.

(c)     In Bir Ahmed I, while it is said to be under the control of the Security Belt, UAE officers exerted significant amount of control, for example by removing detainees from the site (figure X.1);

(d)     In one incident investigated the same detainee was tortured by the Security Belt, then handed over to the UAE, where the UAE continued to torture him, demanding the same information.

9.      Yemeni official sources (military and civilian) informed the Panel that the Security Belt in Aden is not under the de facto control of the Government of Yemen, but the UAE. The salaries of the Security Belt are paid by the UAE. One military source informed the Panel that while an officer of General Staff rank level receives around YER 30,000 (US$120) every 2 – 3 months as salary from the Government, the basic salary for a soldier in the Security Belt is SAR 3,500 (US$934) per month from the UAE. Thus, official confidential sources state that the Government is therefore unable to exercise operational control over these forces.

## C.     Ghassan al-Aqrabi and Ayman Tariq

10.     The Panel finds that Ghassan Abdul Aziz al-Aqrabi and Ayman Tariq[19] were responsible for the continued arbitrary deprivation of liberty of over 100 detainees who were in Bir Ahmed I, which was established around August 2016 (figure 65.1 and 65.2).

11.     These persons were detained without access to their families or legal representation. They had no access to any entity, judicial or administrative, to challenge their detention. They were not provided reasons for their continued detention, and all individuals investigated by the Panel had previously been subjected to detention-related abuses and torture by identified authorities (annex 61).[20]

Figure 65.1
**Bir Ahmed detention location (21 July 2016)**[21]



Figure 65.2
**Bir Ahmed detention location (07 November 2017)**[22]



12.     In October 2017, the detainees commenced a hunger strike calling for their release or referral to a judicial process. On 12 November 2017, they were transferred to Bir Ahmed II, a detention site funded by UAE, located close to Bir Ahmed I (figure 65.1), also said to be administered and supervised by Ghassan al-Aqrabi. On 13 November 2017, their case files were handed to the Attorney General of Yemen, Ahmed al-Awash. In December 2017, some detainees had access to their families and some others were released around the last week of December 2017.

---

[19] The rationale for their selection as detention facility administrators seems to be that the detention facility is established within an area under the control of the al-Aqrabi family. The Panel continues to investigate the activities of this family.
[20] Information withheld to protect detainees.
[21] Source: Imagery obtained by the Panel. Detainees and families of detainees assisted the Panel to identify the location.
[22] Source: Imagery obtained by the Panel. Those visiting the detention center assisted the Panel to identify the location. It is also based on information provided by the detainees of a new detention site being built next to Bir Ahmed I and confirmed by satellite imagery.

Figure 65.3
**Visit of Attorney General and Major General Shallal Ali Shaye to Bir Ahmed II**[23]



13.     The Panel cannot confirm that all detainees in Bir Ahmed I were transferred to Bir Ahmed II given that the identities of the detainees in Bir Ahmed I were not made available by the detaining authorities and the Government of Yemen.

---

[23] https://twitter.com/demolinari/status/930092238117380096. The Attorney General is third from right. Brigadier General Wadha Omar is behind the Attorney General to the left. Major General Shallal Ali Shaye is second from right.

18-00267

Figure 65.4
**Bir Ahmed I and Bir Ahmed II**[24]



Location source: Panel of Experts for Yemen, United Nations Security Council Sanction Committee
Prepared by Geospatial Information Section, ICTD, DFS, United Nations. December 2017.
Imagery source: WV1 acquisition date 2017-11-07 (C) DigitalGlobe

### D.    Security Belt of Lahij

14.    The Government of Yemen considers the Security Belt as an instrument of the State under the responsibility of the Ministry of Interior.[25] In detention related investigations, the Panel has not yet identified any detainee transfers between the UAE and the Security Belt in Lahij.

15.    The Panel finds that in 2017, the Security Belt in Lahij was responsible for the death of a 16-year-old, enforced disappearance of another individual, and four extra-judicial executions. The Security Belt in Lahij was also involved in the death of a 14-year-old child whose younger brother was alleged to be an AQAP affiliate. For Colonel Hader al-Shukhaty is the Commander of the Security Belt in Lahij (see annex 6)

---

[24] Source: Imagery obtained by the Panel. 7 November 2017.
[25] Meeting with Ministry of Interior and the Panel on 2 October 2017. The Security Belt in Lahij is under the supervision of Saleh al-Subaihi, Director of General Security, Lahij. Official confidential UAE sources.

Figure 65.5
**Colonel Hader al-Shukhaty**[26]



**E.      Colonel Abu Mohammad Abdul Ghani Shaalan**[27]

15.      The Special Forces Commander is a formal position of the Government of Yemen, established prior to the conflict and is under the operational command and control of the Government of Yemen.

16.      The Panel investigated the involvement of Colonel Abu Mohammad Abdul Ghani Shaalan, the Special Forces Commander of Ma'rib and his forces, in an incident relating to the death of a 15-year old child and injuries to an 11-year old child.[28] These incidents occurred when the Special Forces attempted to disperse a demonstration in Ma'rib, in October 2017, for which prior security approval was obtained.[29] A clash broke out between the protesters and the Special Forces following the death of the 15-year-old.[30] The Special Forces refused access of the families to the injured child in the hospital for a week, refused to release the body of the dead child for a prolonged period, and forcefully disappeared five individuals for prolonged periods, four of whom were subsequently released. The release of the other is pending tribal negotiations.[31]

---

[27] Originally from Hajjah Governorate. https://web.facebook.com/ة-صفل-نم ات-اوقةيشع نطقنو ة-لدعي-ديل-يجم 1836740393277690-برأم/?_rdc=1and_rdr.
[28] Eye-witnesses identified Shaalan at the site of the incident.
[29] Document with Panel.
[30] The events surrounding the death of the child is unclear. It is possible that the child resisted arrest. It is also clear that there was an armed exchange as one officer died and another was seriously injured (medical sources).
[31] Information as at 10 December 2017. The Panel was informed of other serious detention related abuses undertaken by the Special Forces in Ma'rib, which are not documented here to protect individuals.

Figure 65.6
**Colonel Abu Mohammad Abdul Ghani Shaalan**[32]



### F.   Brigadier General Ali Abdullah Taher

17.      Ali Abdullah Taher was the Director for General Security in Ma'rib. This is an official post under the control of the Government of Yemen. During his tenure, he was directly involved in one incident where he demanded a "suitable exchange" for the release of a detainee in his custody, Mustafa Hussain al-Mutawakel.[33] No other reasons were provided for the refusal to release al-Mutawakel.

18.      Mostafa Huseain al-Mutawakel was at the time of his arrest the President for the General Authority for Investment of Yemen and a Professor at the University of Sana'a. He was arrested on 27 April 2017 at Bab-al-Falej checkpoint in Ma'rib.[34] The checkpoint is under the control of security forces loyal to the Government of Yemen. Al-Mutawakel was travelling from Sayun to Sana'a on board a civilian bus. His family is unaware of his whereabouts since his arrest.[35] There is no evidence that al-Mutawakel had lost his civilian status or protection at the time of arrest (see annex 66).  IHL allows civilians to be detained if they pose an imminent security threat and then, only for as long as that threat is existent. Any attempt to detain a civilian until a suitable prisoner exchange can take place may also amount to hostage taking.

18.      The Panel documented another arrest and detention at Bab-al-Falej checkpoint, where the detainee was also forcefully disappeared after the detention, but was subsequently released following tribal negotiations. There were no reasons provided for his arrest other than that he was related to a prominent family aligned with the Houthis.

---

[32] Image: https://web.facebook.com/-أرب-ة-م-خص-ال-من  ا-توات-قد-نق  عش-ين-غ-دل-ع-هد-غ-ل-ي-مج
1836740393277690/?_rdc=1and_rdr.
[33] The name is divulged with the consent of the family.
[34] At approximately 15⁰21'25.48"N, 45⁰19'45.12E.
[35] In the latter half of 2017, the Panel was informed by official sources that Mustafa Hussain al-Mutawakel had been transferred to an as to yet unidentified detention facility in Saudi Arabia. The Panel continues to investigate.

S/2018/68

Figure 65.7
**Ali Abdullah Taher**[36]



S/2018/68

**CONFIDENTIAL ANNEX NOT FOR PUBLIC DISSEMINATION**

**Annex 66:    Case study on relating to detentions by the Government of Yemen**

**CONFIDENTIAL ANNEX NOT FOR PUBLIC DISSEMINATION**

**Annex 67:    Assassination of a patient and attacks against medical personnel at Revolution Hospital, Ta'izz (24 March - 5 April 2017)**

## Annex 68:   Houthi-Saleh recruitment of children

1.        The Panel conducted investigations aiming to identify individuals and networks operating in Yemen that engage in child recruitment.[1] In Houthi-Saleh controlled areas, there are local networks of former and current fighters and Houthi-Saleh loyalists that continue to recruit children. The Panel has identified two individuals who recruited a total of five children; four subsequently returned to their families and one returned to fighting. Details are contained in confidential annex 69. Of the two recruiters, one was a fighter forced to retire due to injury, the other is a current fighter. The Panel finds that there is a systematic network of recruitment within the Houthi-Saleh forces. Recruiters are deployed to their own residential areas, as they are known to the local population, which enhances the recruitment process.

2.        These five cases represent only a fraction of children who have been recruited into Houthi-Saleh forces, sent to the front lines, and then being injured, maimed, or killed in the conflict.[2] The Panel finds that there is prevailing impunity associated with child recruitment. For example, in one incident documented by the Panel, the officers of the '14th October' Police Station in Sana'a initially refused to record a complaint of the abduction of children removed from the parents' custody without their consent, because the children had been recruited (i.e. they were not missing).

3.        On 19 October 2017, Hassan Mohamed Zaid, the Sana'a based minister for youth and sports, and the head of the al-Haq party, called for the closure of schools with students being sent to battle-fronts. He stated on social media:

> "*What if school study stops one year and all the youths and their teachers go for military service?*
>
> *Is not this going to feed the fronts with hundreds of thousands for decisive battle?*
>
> *High school students used to be forced to stop study for one year waiting for documents.*
>
> *What is the difference then*?"

5.        He added: "*Wouldn't we be able to reinforce the ranks with hundreds of thousands (of fighters) and win the battle*?", and then criticized those who complained about his proposal stating that: "*People close the schools under the pretext of a strike and when we think about how to take advantage of this situation, they take offence*".[3] The Panel notes that on 21 October 2017, after widespread public criticism, he changed his statement to say that he originally referred to university students.

6.        On 6 November 2017, the Saudi Arabia-led coalition issued a statement listing Hassan Mohamed Zaid as one of the forty men "*responsible for planning, executing and supporting various terrorist activities by the Houthi terrorist group*".[4] It is not clear what 'terrorist activities' were undertaken by the said individual. The Panel continues to investigate.

---

[1] In this annex, individuals are considered to be children when they were under 18 years of age at the time of their recruitment. The "Optional Protocol to the Convention on the Rights of the Child on the involvement of children in armed conflict", to which Yemen is a party (2 March 2007), states that armed groups that are distinct from the armed forces of a State should not, under any circumstances, recruit persons under the age of 18 years. See Article 4(1).

[2] See S/2017/821. The United Nations verified 517 cases of the recruitment in Aden, Abyan, Amran, Sana'a and Ta'izz. 359 verified cases of recruitment and use were attributed to the Houthis and affiliated forces. Other perpetrators included the anti-Houthi forces, Ansar al-Sharia, AQAP and the Yemeni Armed Forces.

[3] https://www.theguardian.com/world/2017/oct/20/yemen-minister-send-our-children-to-war. All relevant tweets are with the Panel.

[4] https://english.alarabiya.net/en/News/gulf/2017/11/06/Saudi-Arabia-announces-millions-of-dollars-in-bounty-for-40-wanted-in-Yemen-.html.

Figure X.1
**Original tweet by the minister for youth and sports, 19 October 2017**



7.     The fact that a minister in the Houthi-Saleh forces openly advocated for the closure of schools and recruitment of children/students is particularly problematic in a context where students, parents, and teachers alike, are feeling the effects of the economic crisis, are struggling to continue education of children, and are resisting proactive child recruitment networks in their villages. This type of statement, from a person in authority, may be construed as implicit authority and encouragement for the continuing Houthi-Saleh recruitment and use of children in conflict. The Panel finds that this type of incitement is a threat to the peace, security, and stability in Yemen.

8.     The Panel finds that the following also contributes to increased recruitment of children:

(a)     The non-payment of salaries results in children being compelled to search for economic alternatives on behalf of their families. The only well-paid employment opportunities for children are with the Houthi-Saleh forces (the children are paid approximately 15,000 – 20,000 Yemeni Riyal (60 – 80 US$);

(b)     The disruption to education means that children often have little to do, this making them vulnerable to street level recruitment;

(c)     Parents cannot offer financial or lifestyle alternatives to induce the children to return to families after they have been recruited;

(d)     As families continue to live in areas controlled by the Houthi-Saleh forces, they are afraid to speak out against the recruitment, thus allowing recruitment to continue unchallenged; and

(e)     For parents with financial means, the airport closure and visa restrictions means that these parents cannot send or take the children out of the country for their own protection.

9.     There are also parents whom willingly, or are forced to, allow their children to be recruited because of financial considerations or loyalty to the cause.[5]

_____
[5] Multiple human rights activists.

10.     The Panel finds that Houthi-Saleh leadership also incurs command responsibility for these continuing violations,[6] and underscores that in current prevailing circumstances of regular and widespread recruitment and use, such recruitment and use of children in conflict is, at minimum, a war crime.[7]

---

[6] Under customary IHL, commanders and other superiors are criminally responsible for war crimes committed by their subordinates if they knew, or had reason to know, that the subordinates were about to commit or were committing such crimes and did not take all necessary and reasonable measures in their power to prevent their commission, or if such crimes had been committed, to punish the persons responsible. See, for example, ICRC Customary IHL Rule 153. The Panel highlights that not only military personnel but also civilians can be liable for war crimes based on command responsibility.

[7] See Statute of the International Criminal Court Article 8 (e) (vii). See also ICRC Customary IHL Rules 136 and 137.

S/2018/68

**<span style="color:red">CONFIDENTIAL ANNEX NOT FOR PUBLIC DISSEMINATION</span>**

**Annex 69:    Confidential case studies of Houthi-Saleh recruitment of children**

## Annex 70:   IHL violations relating to Sana'a airport closure

## I.    Introduction

1.     The Saudi Arabia-led coalition closed Sana'a airport to all commercial traffic on 9 August 2016. On 6 November 2017, the Saudi Arabia-led coalition announced that it would temporarily close "all Yemeni ground, air, and sea ports… while taking into consideration the continuation of the entry and exit of humanitarian supplies and crews"[1] On 23 November 2017 the Saudi Arabia-led coalition announced the opening of the airport to UN flights and by 29 November 2017, ICRC, MSF and UN flights had resumed operations into the airport.

2.     Yet, the airport has continued to be inaccessible to commercial flights since August 2016. This has created significant humanitarian issues for those who are chronically ill, who cannot leave the country to seek medical treatment by alternative routes, and whose access to medical care has been affected by the conflict;[2] and for those with protection concerns or who are fleeing persecution and cannot travel via other means.

## II.    IHL and HR violations relating to patients seeking medical care abroad

3.     According to the Sana'a based ministry of health, as at August 2017 approximately 10,000 Yemenis are estimated to have died from health conditions for which they were seeking medical treatment abroad.[3] The Panel was provided details on two cases where patients have died, where the closure of the airport potentially contributed to their inability to obtain timely medical treatment.[4]

4.     Because of the conflict, many patients in need of immediate medical treatment do not have access to the requisite medical assistance within Yemen, which may necessitate seeking treatment abroad. For example, the conflict has resulted in:

(a)     Limited medical resources due to the non-payment of salaries and lack of hospital operational funds;

(b)     Closure or destruction of hospitals;

(c)     Attacks against hospitals and health care workers;

(d)     Prioritized treatment for fighters and war wounded in some hospitals; and

(e)     Lack of medical supplies, equipment, and specialists.

5.     On one occasion, a team of doctors was cleared by the Saudi Arabia-led coalition to arrive at Sana'a International Airport to treat the former President of Yemen,[5] but this option is not available for others seeking medical treatment unavailable in Yemen. Thus, the options for civilians seeking treatment aboard are currently as follows:

---

[1] http://www.spa.gov.sa/viewfullstory.php?lang=enandnewsid=1684682#1684682.

[2] A person's medical condition or access to treatment may be said to be affected by the conflict when, for example, a medical facility on which their treatment depends has been destroyed, when they do not have access to medical personnel or facilities on which they depend owing to the conflict, or where they do not have access to medicines vital for their ongoing treatment for reasons related to the conflict. See Commentary to the Common Article 3 of the Geneva Conventions.

[3] See https://www.nrc.no/news/2017/august/yemen-airport-closure-killed-more-people-than-airstrikes/.

[4] Confidential sources.

[5] https://uk.reuters.com/article/uk-yemen-security-saleh/yemens-ex-president-saleh-stable-after-russian-medics-operate-idUKKBN1CJ0FS.

(a)     Leave through Sayun, which takes 24 hours by public transport from Sana'a, or by private transport at a cost of approximately US$ 200;[6]

(b)     Leave through Aden, which takes 12 hours by public transport from Sana'a, or by private transport at a cost of USD approximately US$ 280 – 350;[7] or

(c)     Leave by boat, often using human smuggling and trafficking routes.

6.     The fact that many countries have recently imposed stringent visa restrictions on Yemenis also compounds the difficulties for patients seeking medical treatment abroad.

7.     Common Article 3 of the Geneva Convention - which is binding on Saudi Arabia and the other Saudi-Arabia-led coalition member States authorizing and enforcing the air blockade over Sana'a - provides that civilians and other persons who do not take part in hostilities, who are sick or wounded shall, in all circumstances be protected and cared for. This protection given to the wounded and the sick is meaningless without access to requisite medical assistance, including medical supplies and medical personnel. Article 7 of Additional Protocol II further strengthens that right of the wounded and sick.

8.     Under IHRL the obligation to ensure the right to health of individuals is also binding on Saudi Arabia-led coalition member States.[8] States are legally bound under IHRL to ensure that their policies create an enabling environment for available and accessible health care for all in the shortest possible time,[9] including allowing patients have access healthcare in other countries.[10]

9.     The Saudi Arabia-led coalition has not exercised its discretion to impose restrictions and conditions on travel through the Sana'a International Airport, as may be required by military necessity,[11] while also allowing those requiring immediate treatment abroad the opportunity to do so. Instead it has exercised a blanket ban since August 2016 on travel to obtain medical services, except for the temporary lifting of the ban on selected medical flights immediately following the Sana'a Funeral Hall air strike and, more recently, for the flight carrying medical personnel that treated former president Ali Abdullah Saleh (YEi.003).

10.     In this context, the Panel concludes that the complete and unconditional closure of Sana'a International Airport to those genuinely seeking immediate medical treatment abroad, particularly those

---

[6] Sources organizing "medical tourist" visits.

[7] Ibid.

[8] See for example, the Universal Declaration of Human Rights, Article 25; International Covenant on Civil and Political Rights (ICCPR), Articles 6 and 12; and International Covenant on Economic, Social and Cultural Rights (ICESCR), Article 12.

[9] World Health Organization (WHO), Right to Health: Crossing barriers to access health in the occupied Palestinian territory, 2014 - 2015. See also Additional Protocol II, Article 7(2), and ICRC Study on Customary International Humanitarian Law (2005), Rule 110.

[10] Committee on Economic, Cultural, and Social Rights, General Comment No. 14, The right to the highest attainable standard of health (article 12 of the International Covenant on Economic, Social and Cultural Rights), 11 August 2000, UN Doc. E/C.12/2000/4. "To comply with their international obligations in relation to article 12, States parties have to respect the enjoyment of the right to health in other countries, and to prevent third parties from violating the right in other countries…".

[11] The Saudi Arabia-led coalition spokesperson stated that "closing Sana'a airport and limiting it to relief efforts came as a precaution to ensure the safety of all inbound commercial and cargo flights, due to the Huthi (sic) armed militia's attempts to smuggle arms into the country. As a result, we have assigned airports in liberated, and safe cities as alternatives at the request of the Yemeni government. Thus, these precautionary measured should not be stigmatized as cause of suffering for Yemeni people". He added, "should airport management and security be conducted properly, insuring the safety of all inbound flights and stopping arms smuggling, Joint Forces Command is prepared to restore normal flight activity".
http://www.spa.gov.sa/viewfullstory.php?lang=enandnewsid=1655689#1655689.

who do not have any other meaningful alternatives, is an infringement of Common Article 3. The WHO has held that denying access to medical care in some circumstances could constitute a war crime.[12]

11.     Although the Saudi Arabia-led coalition appears to justify the measures taken in respect of the Sana'a International Airport by referring to resolution 2216 (2015),[13] there is no provision in that resolution that supports a complete blockade on commercial flights into Sana'a International Airport. Additionally, the Saudi Arabia-led coalition is not currently complying with paragraph 17 of resolution 2216 (2015) on its reporting requirements. Since the resolution came into effect, the Saudi Arabia-led coalition has only issued one report to the Committee, which related to ten inspections.[14]

## III.   Conclusion

12.     The Panel does not dispute that the Saudi Arabia-led coalition may take such legitimate measures it deems appropriate, as required under military necessity, to control air traffic into geographical areas controlled by the Houthi forces. Yet, the Panel finds that:

(a)   The Saudi Arabia-led coalition has not demonstrated the military necessity for the closure of the airport to persons genuinely seeking immediate medical treatment abroad, particularly when there are no real alternative travel routes; and

(b)   That it is the responsibility of the member States of the Saudi Arabia-led coalition, and not the United Nations, to ensure that the Saudi Arabia-led coalition member States comply with their obligations under IHL and IHRL.

13.     The Panel notes that the Saudi Arabia-led coalition has offered to open the airport under the supervision of the United Nations;[15] an offer not taken up by the United Nations.[16]

## III.   IHL violations relating to persons seeking protection abroad

14.     The Panel investigated five situations relating to six individuals who wished to leave Yemen, on the basis that there were immediate threats against their life and liberty in Houthi-Saleh controlled areas. These individuals had all been subjected to arrest, detention, abuse, and/or persecution and other human rights violations by Houthi-Saleh forces/officials, but feared for their physical safety in Government controlled territory.

---

[12] World Health Organization (WHO), Right to health: Crossing barriers to access health in the occupied Palestinian territory, 2014-2015. United Nations Office of the High Commissioner of Human Rights (OHCHR), Freedom of Movement: Human rights situation in the Occupied Palestinian Territory, including East Jerusalem, Report of the Secretary-General to the United Nations Human Rights Council, February 2016. OHCHR and WHO examined the issue on the right of patients to receive treatment abroad when it considered the right of Palestinians to cross the Rafah border crossing between the Gaza Strip and Egypt to seek medical treatment. The OHCHR has held that "Any exception (to freedom of movement) must comply with international law, which means that restrictions are justified only for imperative reasons of security and only in response to a specific security threat".

[13] http://www.spa.gov.sa/viewfullstory.php?lang=enandnewsid=1655689#1655689. The Saudi Arabia-led coalition spokesperson stated in August 2017 that "the coalition command had and is still working to its best efforts to ensure the safe arrival of all commercial, cargo and relief flights to all Yemeni airports in Sana'a, Aden, Al Hudaydah, Seiyun, Mukalla and Socotra through issuing proper flight permits for all incoming requests, and assigning Bisha National Airport for air traffic management in accordance with UNSCR 2216".

[14] A/AC.56/2015/COMM.28 (KSA ref no UN/SC/378) dated 12 June 2015.

[15] https://www.nytimes.com/2017/08/10/world/middleeast/saudi-arabia-yemen-houthi-rebels-sana-airport.html and http://www.spa.gov.sa/viewfullstory.php?lang=enandnewsid=1655689#1655689.

[16] The UN stated that "the parties to the conflict have the responsibility to ensure the protection of civilians and their access to humanitarian relief, including through the use of airspace and airport". See https://www.reuters.com/article/us-yemen-security-airport/u-n-signals-not-responsible-for-controlling-yemens-main-airport-idUSKBN1AR22Y.

S/2018/68

14.     UNHAS flights do not transport civilians fleeing persecution,[17] compelling individuals fleeing Houthi-Saleh controlled territory to travel through the South of the country.  The risk of arrest and subsequent disappearance in the south and in Ma'rib, which are increasingly being reported in the south, compounds fear that individuals traveling between the north and the south can be targeted in those areas because of their family names, family history, or tribal affiliations.

---

[17] UN sources.

18-00267

CONFIDENTIAL ANNEX NOT FOR PUBLIC DISSEMINATION

**Annex 71:**   **Obstructions to the delivery of humanitarian aid**

CONFIDENTIAL ANNEX NOT FOR PUBLIC DISSEMINATION

**Annex 72:    Obstructions to humanitarian access and the distribution of humanitarian assistance (2017)**

## Annex 73:    Full list of abbreviations[1]

| | |
|---|---|
| a/c | Aircraft |
| AED | Arab Emirati Dinar |
| AES | Arms and Ammunition Search |
| a.k.a | Also Known As |
| AGM | Air-to-Ground Missile |
| AIO | Iran Aircraft Industries Organization |
| AIS | Automatic Identification System (maritime) |
| AK | *Avtomatik Kalishnikov* (assault rifle) |
| AP | Amended Protocol |
| APKWS | Advanced Precision Kill Weapon System |
| AQ | Al-Qaida |
| AQAP | Al-Qaida in the Arabian Peninsula |
| ASL | Above Sea Level |
| ATGM | Anti-Tank Guided Missile |
| ATGW | Anti-Tank Guided Weapon |
| ATO | Air Tasking Order |
| AUAV | Armed Unmanned Aerial Vehicle |
| AXO | Abandoned Explosive Ordnance |
| BAT | British American Tobacco |
| BCP | Border Crossing/Control Point |
| BMP | Best Maritime Practices |
| CA | Common Article (to Geneva Conventions of 1949) |
| CAGE | Commercial and Government Entity (Code) |
| CBD | Commercial Bank of Dubai |
| CBY | Central Bank of Yemen |
| CEP | Circular Error Probability |
| CFD | Computational Fluid Dynamics |
| CHA | Coalition Holding Area |
| CIFOR | Civil Forum for Asset Recovery |
| CIHL | Customary International Humanitarian Law |
| CIHLR | Customary IHL Study Rules (ICRC) |
| CMF | Combined Maritime Force |
| CN | Peoples' Republic of China |
| CP | Checkpoint |
| CRC | Convention on the Rights of Children |
| DADP | Di-Acetone Di-Peroxide |
| DC | Direct Current |
| DIO | Defence Industries Organization (Iran) |
| DoB | Date of Birth |
| DPRK | Democratic People's Republic of North Korea |
| DRC | Danish Refugee Council |
| DWT | Dead Weight Tonnage (Tonnes) |
| E | East |
| EGBU | Enhanced Guidance Bomb Unit |

---

[1] Including footnotes and annexes.

| | |
|---|---|
| EO | Explosive Ordnance |
| ER | Extended Range |
| ER-SRBM | Extended Range Short Range Ballistic Missile |
| ESH | Explosive Storehouses |
| EUC | End Use Certificates |
| F | Foreign Investor Stake / Fuel |
| FAE | Fuel Air Explosion |
| FFR | Free Flight Rocket |
| FFV | Fuel Filling Valve (SCUD) |
| FFDV | Fuel Filling and Drainage Valve |
| FOB | Free On Board |
| F of I | Figure of Insensitiveness |
| FR | France |
| FS | French Ship |
| FV | Fishing Vessel |
| FZC | Free Zone Company |
| g | Gravity (9.81m/s) |
| GBP | Great Britain Pounds (sterling) |
| GBU | Guidance Bomb Unit |
| GC | Geneva Conventions |
| GCC | Gulf Cooperation Council |
| GDP | Gross Domestic Product |
| GE | Germany |
| GGE | Group of Governmental Experts (GGE) |
| GIS | Geographical Information System |
| GLC | Global Logistics Cluster |
| GPC | General People's Congress |
| GPS | Global Positioning System |
| GT | Gross Tonnage |
| GWT | Gross Weight Tonnage |
| H | Height |
| HE | High Explosive |
| HEAT | High Explosive Anti-Tank |
| HESA | Iran Aircraft Manufacturing Industries |
| HMTD | Hexa-Methylene Triperoxide Diamine |
| HRW | Human Rights Watch |
| HSV | High Speed Vessel |
| IAIO | Iranian Aircraft Industries Organization (HESA) |
| ICC | International Criminal Court |
| ICJ | International Court of Justice |
| ICRC | International Committee of the Red Cross |
| ICU | Intensive Care Unit |
| IDP | Internally Displaced Person(s) |
| IED | Improvised Explosive Device |
| IHL | International Humanitarian Law |
| IHRL | International Human Rights Law |
| IMC | International Medical Corps |
| IMO | International Maritime Organization |
| IMS | Inertial Measurement System |

| | |
|---|---|
| INS | Inertial Navigation System |
| IPO | Initial Public Offering |
| IR | Iran |
| IRFNA | Inhibited Red Fuming Nitric Acid |
| IRGC | Iranian Revolutionary Guards Corps |
| ISIL | Islamic State in Iraq and the Levant (*Daesh*) |
| ISTAR | Intelligence, Surveillance, Targeting and Reconnaissance |
| IT | Italy |
| JIAT | Joint Investigation and Assessment Team (Saudi Arabia-led coalition) |
| KE | Kinetic Energy |
| KIIC | Kamaran Industry and Investment Company |
| KKIA | King Khaled International Airport |
| km | Kilometre(s) |
| KR | Republic of Korea |
| L | Litres Length |
| LAWS | Lethal Autonomous Weapons System |
| LC | Letters of Credit |
| Li-Ion | Lithium Ion |
| LLC | Limited Liability Company |
| LLI | Lloyds List Intelligence |
| LNG | Liquefied Nitrogen Gas |
| LTTE | Liberation Tigers of Tamil Eelam |
| m | Metres |
| m³ | Cubic Metres |
| MARAD | Maritime Administration (US Department of Transport) |
| MCCB | Moulded Case Circuit Breaker |
| MEKP | Methyl Ethyl Ketone Peroxide |
| MG | Machine Gun |
| mm | Millimetre(s) |
| 'MoPIC' | ministry of planning and international cooperation |
| MOU | Memorandum of Understanding |
| MRBM | Medium Range Ballistic Missile |
| MSA | Mine Safety Appliances Limited (USA) |
| MSN | Manufacturer's Serial Number |
| MSR | Main Supply Route |
| MT | Mega-Tonne(s) / Merchant Tanker |
| MV | Merchant Vessel |
| MWMS | Moveable Weapon Mount System |
| N | North / Newton(s) |
| NATO | North Atlantic Treaty Organization |
| NBD | National Bank of Dubai |
| NEQ(C) | Net Explosive Quantity (Content) |
| NFP | National Focal Point |
| NGO | Non-Governmental organization |
| NK | Not Known |
| NL | Netherlands |
| nm | Nautical Mile |
| NO | Norway |
| NRC | Norwegian Refugee Council |

S/2018/68

| | |
|---|---|
| NSB | National Security Bureau |
| 'NSB' | Sana'a based national security bureau |
| NSN | NATO Stock Number |
| O | Oxidiser |
| OCHA | Office for Coordination of Humanitarian Affairs (UN) |
| OFAC | Office of Foreign Assets Control (US Treasury) |
| OFV | Oxidiser Filling Valve (SCUD) |
| OFDV | Oxidiser Filling and Drainage Valve |
| P | Private Investor Stake |
| PDRY | People's Democratic Republic of Yemen |
| PBIED | Person-Borne IED ('suicide bomber') |
| PCB | Printed Circuit Board |
| PIL | Pacific International Lines Limited |
| POE | Panel of Experts |
| PRV | Pressure Relief Valve |
| PSO | Political Security Organization |
| 'PSO' | Sana'a based political security organization |
| PWA | Port Waiting Anchorage |
| QAR | Qatari Riyal |
| QNB | Qatar National Bank |
| RCIED | Radio Controlled Improvised Explosive Device |
| RCL | Recoilless Rifle |
| RDX | Hexogen or Cyclotrimethylenetrinitramine |
| RPG | Rocket Propelled Grenade |
| RSADF | Royal Saudi Air Defence Forces |
| RSAF | Royal Saudi Air Force |
| RSN | Royal Saudi Navy |
| SAA | Small Arms Ammunition |
| SAM | Surface-to-Air Missile |
| SAR | Saudi Riyal |
| SEMG | Somalia and Eritrea Monitoring Group |
| SBI | Shahid Bagheri (Bakeri) Industries (Iran) |
| SBIG | Shahid Bagheri (Bakeri) Industrial Group (Iran) |
| SGBV | Sexual and Gender-Based Violence |
| SHIG | Shahid Hemat Industrial Group (Iran) |
| SLOC | Sea Lines of Communication |
| SMC | Security and military committee (Houthi-Saleh) |
| SOLAS | International Convention for the Safety of Life at Sea |
| SPC | supreme political council |
| SPM | Ships Protection Measures |
| SRBM | Short Range Ballistic Missile |
| SRC | supreme revolutionary council |
| STC | Southern Transitional Council |
| STCO | Shaher Trading Company Limited |
| SVIED | Suicide Vehicle IED |
| TAN | Tangent |
| TATP | Tri-Acetone Tri-Peroxide |
| TBC | To Be Confirmed |
| TCBM | Transparency and Confidence Building Measures |

18-00267

| | |
|---|---|
| TCC | Trilateral Coordination Committee |
| TFTC | Terrorist Financing Target Centre |
| TNT | Tri-Nitro Toluene |
| TR | Turkey |
| UAE | United Arab Emirates |
| UAV | Unmanned Aerial Vehicle |
| UK | United Kingdom |
| UN | United Nations |
| UNCT | UN Country Team |
| UNESCO | UN Educational, Scientific and Cultural Organization |
| UNHAS | UN Humanitarian Air Service |
| UNHCR | UN High Commission for Refugees |
| UNICEF | United Nations Children's Fund |
| UNVIM | UN Verification and Inspection Mechanism |
| USA | United States of America |
| USAF | United States Air Force |
| USDA | United States Department of Agriculture |
| USN | United States Navy |
| USS | United States Ship |
| US$ | United States Dollar(s) |
| VHF | Very High Frequency |
| VLCC | Very Large Crude Carrier |
| UXO | Unexploded Ordnance |
| W | Width |
| WBIED | Water-Borne Improvised Explosive Device |
| WFP | World Food Programme |
| WSS | Weapon Storage Sites |
| YAF | Yemen Armed Forces |
| 'YCA' | Sana'a based Yemen customs authority |
| YEITI | Yemen Extractive Industries Transparency Initiatives |
| YER | Yemeni Riyal |
| YPC | Yemen Petroleum Company |

———————————

# U.S. DEPARTMENT OF THE TREASURY

## Press Center

## Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism

10/25/2007

*To view or print the PDF content on this page, download the free Adobe® Acrobat® Reader®.*

hp-644

The U.S. Government is taking several major actions today to counter Iran's bid for nuclear capabilities and support for terrorism by exposing Iranian banks, companies and individuals that have been involved in these dangerous activities and by cutting them off from the U.S. financial system.

Today, the Department of State designated under Executive Order 13382 two key Iranian entities of proliferation concern: the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps) and the Ministry of Defense and Armed Forces Logistics (MODAFL). Additionally, the Department of the Treasury designated for proliferation activities under E.O. 13382 nine IRGC-affiliated entities and five IRGC-affiliated individuals as derivatives of the IRGC, Iran's state-owned Banks Melli and Mellat, and three individuals affiliated with Iran's Aerospace Industries Organization (AIO).

The Treasury Department also designated the IRGC-Qods Force (IRGC-QF) under E.O. 13224 for providing material support to the Taliban and other terrorist organizations, and Iran's state-owned Bank Saderat as a terrorist financier.

Elements of the IRGC and MODAFL were listed in the Annexes to UN Security Council Resolutions 1737 and 1747. All UN Member States are required to freeze the assets of entities and individuals listed in the Annexes of those resolutions, as well as assets of entities owned or controlled by them, and to prevent funds or economic resources from being made available to them.

The Financial Action Task Force, the world's premier standard-setting body for countering terrorist financing and money laundering, recently highlighted the threat posed by Iran to the international financial system. FATF called on its members to advise institutions dealing with Iran to seriously weigh the risks resulting from Iran's failure to comply with international standards. Last week, the Treasury Department issued a warning to U.S. banks setting forth the risks posed by Iran. (For the text of the Treasury Department statement see: http://www.fincen.gov/guidance_fi_increasing_mlt_iranian.pdf.) Today's actions are consistent with this warning, and provide additional information to help financial institutions protect themselves from deceptive financial practices by Iranian entities and individuals engaged in or supporting proliferation and terrorism.

### Effect of Today's Actions

As a result of our actions today, all transactions involving any of the designees and any U.S. person will be prohibited and any assets the designees may have under U.S. jurisdiction will be frozen. Noting the UN Security Council's grave concern over Iran's nuclear and ballistic missile program activities, the United States also encourages all jurisdictions to take similar actions to ensure full and effective implementation of UN Security Council Resolutions 1737 and 1747.

Today's designations also notify the international private sector of the dangers of doing business with three of Iran's largest banks, as well as the many IRGC- affiliated companies that pervade several basic Iranian industries.

### Proliferation Finance – Executive Order 13382 Designations

E.O. 13382, signed by the President on June 29, 2005, is an authority aimed at freezing the assets of proliferators of weapons of mass destruction and their supporters, and at isolating them from the U.S. financial and commercial systems. Designations under the Order prohibit all transactions between the designees and any U.S. person, and freeze any assets the designees may have under U.S. jurisdiction.

The Islamic Revolutionary Guard Corps (IRGC): Considered the military vanguard of Iran, the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps) is composed of five branches (Ground Forces, Air Force, Navy, Basij militia, and Qods Force special operations) in addition to a counterintelligence directorate and representatives of the Supreme Leader. It runs prisons, and has

numerous economic interests involving defense production, construction, and the oil industry. Several of the IRGC's leaders have been sanctioned under UN Security Council Resolution 1747.

The IRGC has been outspoken about its willingness to proliferate ballistic missiles capable of carrying WMD. The IRGC's ballistic missile inventory includes missiles, which could be modified to deliver WMD. The IRGC is one of the primary regime organizations tied to developing and testing the Shahab-3. The IRGC attempted, as recently as 2006, to procure sophisticated and costly equipment that could be used to support Iran's ballistic missile and nuclear programs.

Ministry of Defense and Armed Forces Logistics (MODAFL): The Ministry of Defense and Armed Forces Logistics (MODAFL) controls the Defense Industries Organization, an Iranian entity identified in the Annex to UN Security Council Resolution 1737 and designated by the United States under E.O. 13382 on March 30, 2007. MODAFL also was sanctioned, pursuant to the Arms Export Control Act and the Export Administration Act, in November 2000 for its involvement in missile technology proliferation activities.

MODAFL has ultimate authority over Iran's Aerospace Industries Organization (AIO), which was designated under E.O. 13382 on June 28, 2005. The AIO is the Iranian organization responsible for ballistic missile research, development and production activities and organizations, including the Shahid Hemmat Industries Group (SHIG) and the Shahid Bakeri Industries Group (SBIG), which were both listed under UN Security Council Resolution 1737 and designated under E.O. 13382. The head of MODAFL has publicly indicated Iran's willingness to continue to work on ballistic missiles. Defense Minister Brigadier General Mostafa Mohammad Najjar said that one of MODAFL's major projects is the manufacturing of Shahab-3 missiles and that it will not be halted. MODAFL representatives have acted as facilitators for Iranian assistance to an E.O. 13382- designated entity and, over the past two years, have brokered a number of transactions involving materials and technologies with ballistic missile applications.

Bank Melli, its branches, and subsidiaries: Bank Melli is Iran's largest bank. Bank Melli provides banking services to entities involved in Iran's nuclear and ballistic missile programs, including entities listed by the U.N. for their involvement in those programs. This includes handling transactions in recent months for Bank Sepah, Defense Industries Organization, and Shahid Hemmat Industrial Group. Following the designation of Bank Sepah under UNSCR 1747, Bank Melli took precautions not to identify Sepah in transactions. Through its role as a financial conduit, Bank Melli has facilitated numerous purchases of sensitive materials for Iran's nuclear and missile programs. In doing so, Bank Melli has provided a range of financial services on behalf of Iran's nuclear and missile industries, including opening letters of credit and maintaining accounts.

Bank Melli also provides banking services to the IRGC and the Qods Force. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

Bank Mellat, its branches, and subsidiaries: Bank Mellat provides banking services in support of Iran's nuclear entities, namely the Atomic Energy Organization of Iran (AEOI) and Novin Energy Company. Both AEOI and Novin Energy have been designated by the United States under E.O. 13382 and by the UN Security Council under UNSCRs 1737 and 1747. Bank Mellat services and maintains AEOI accounts, mainly through AEOI's financial conduit, Novin Energy. Bank Mellat has facilitated the movement of millions of dollars for Iran's nuclear program since at least 2003. Transfers from Bank Mellat to Iranian nuclear-related companies have occurred as recently as this year.

IRGC-owned or -controlled companies: Treasury is designating the companies listed below under E.O. 13382 on the basis of their relationship to the IRGC. These entities are owned or controlled by the IRGC and its leaders. The IRGC has significant political and economic power in Iran, with ties to companies controlling billions of dollars in business and construction and a growing presence in Iran's financial and commercial sectors. Through its companies, the IRGC is involved in a diverse array of activities, including petroleum production and major construction projects across the country. In 2006, Khatam al-Anbiya secured deals worth at least $7 billion in the oil, gas, and transportation sectors, among others.

- Khatam al-Anbya Construction Headquarters
- Oriental Oil Kish
- Ghorb Nooh
- Sahel Consultant Engineering
- Ghorb-e Karbala
- Sepasad Engineering Co
- Omran Sahel
- Hara Company
- Gharargahe Sazandegi Ghaem

IRGC Individuals: Treasury is designating the individuals below under E.O 13382 on the basis of their relationship to the IRGC. One of the five is listed on the Annex of UNSCR 1737 and the other four are listed on the Annex of UNSCR 1747 as key IRGC individuals.

- General Hosein Salimi, Commander of the Air Force, IRGC
- Brigadier General Morteza Rezaie, Deputy Commander of the IRGC
- Vice Admiral Ali Akhbar Ahmadian, Most recently former Chief of the IRGC Joint Staff
- Brigadier Gen. Mohammad Hejazi, Most recently former Commander of Bassij resistance force
- Brigadier General Qasem Soleimani, Commander of the Qods Force

Case 1:19-cv-03363-RDM Document 20-6 Filed 01/15/21 Page 431 of 674

Other Individuals involved in Iran's ballistic missile programs: E.O. 13382 derivative proliferation designation by Treasury of each of the individuals listed below for their relationship to the Aerospace Industries Organization, an entity previously designated under E.O. 13382. Each individual is listed on the Annex of UNSCR 1737 for being involved in Iran's ballistic missile program.

- Ahmad Vahid Dastjerdi, Head of the Aerospace Industry Organization (AIO)
- Reza-Gholi Esmaeli, Head of Trade & International Affairs Dept., AIO
- Bahmanyar Morteza Bahmanyar, Head of Finance & Budget Department, AIO

## Support for Terrorism -- Executive Order 13224 Designations

E.O. 13224 is an authority aimed at freezing the assets of terrorists and their supporters, and at isolating them from the U.S. financial and commercial systems. Designations under the E.O. prohibit all transactions between the designees and any U.S. person, and freeze any assets the designees may have under U.S. jurisdiction.

IRGC-Qods Force (IRGC-QF): The Qods Force, a branch of the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps), provides material support to the Taliban, Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC).

The Qods Force is the Iranian regime's primary instrument for providing lethal support to the Taliban. The Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. Since at least 2006, Iran has arranged frequent shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and probably man-portable defense systems to the Taliban. This support contravenes Chapter VII UN Security Council obligations. UN Security Council resolution 1267 established sanctions against the Taliban and UN Security Council resolutions 1333 and 1735 imposed arms embargoes against the Taliban. Through Qods Force material support to the Taliban, we believe Iran is seeking to inflict casualties on U.S. and NATO forces.

The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.

In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.

Bank Saderat, its branches, and subsidiaries: Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hizballah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence. Hizballah has used Bank Saderat to send money to other terrorist organizations, including millions of dollars on occasion, to support the activities of Hamas. As of early 2005, Hamas had substantial assets deposited in Bank Saderat, and, in the past year, Bank Saderat has transferred several million dollars to Hamas.

## REPORTS

- Treasury and State Department Iran Designations Identifier

# U.S. DEPARTMENT OF THE TREASURY

## Press Center

## Treasury Sanctions Hizballah Leadership

8/22/2013

*Action Targets Hizballah's Leadership Responsible for Operations Outside of Lebanon*

**WASHINGTON –** The U.S. Department of the Treasury today designated four members of Hizballah's leadership responsible for operations throughout the Middle East, further exposing Hizballah's pernicious activities that reach beyond the borders of Lebanon. These designations include senior members of Hizballah responsible for activities ranging from assisting fighters from Iraq to support the Assad regime in Syria, to making payments to various factions within **Yemen**, and to military leaders responsible for terrorist operations in Egypt, Jordan, Turkey, Cyprus, Israel, the Palestinian territories, and Iraq.

Belying Hizballah's claim to be a domestic Lebanese "resistance" organization, its expansive global network seeks to extend its malign influence, and the influence of Hizballah's patron Iran, throughout the Middle East and beyond. The Treasury Department will continue to combat Hizballah's terrorist activity inside and outside Lebanon with all available tools and will continue to work with partners around the world to make it clear that Hizballah's militant and extremist activities should not be tolerated by any nation.

"Whether ferrying foreign fighters to the front lines of the Syrian civil war or inserting clandestine operatives in Europe, the Middle East, and elsewhere, Hizballah remains a significant global terrorist threat," said Under Secretary for Terrorism and Financial Intelligence David S. Cohen. "So long as Hizballah spreads instability, conducts terrorist attacks and engages in criminal and illicit activities around the world, we will continue to sanction Hizballah's operatives, leaders and businesses, wherever they may be found."

The individuals sanctioned today were designated pursuant to Executive Order 13224, which targets terrorists and their supporters for acting for, or on behalf of Hizballah. U.S. persons are generally prohibited from engaging in any transactions with the individuals designated today, and any assets of those designees subject to U.S. jurisdiction are frozen.

Khalil Harb

In the years prior to Israel's withdrawal from southern Lebanon in 2000, Khalil Harb served as the deputy commander for Hizballah's central military unit's southern Lebanon region from 1988 to 1992, and as the commander for this region from 1992 to 1994. From 1994 to 1997, Harb served as the commander of Hizballah's central military operations. By 2000, Harb supervised Hizballah military operations inside Israel, Jordan, Cyprus, and Turkey.

In late November 2000, Harb was given responsibility for overseeing work of the Islamic Resistance, including assisting with the smuggling of Hamas and Palestinian Islamic Jihad operatives from Syria into the West Bank via Jordan. By late 2003, Harb was head of the Syrian/Jordan/Israel/Egypt operations unit, which was subordinate to Hizballah's Islamic Jihad council.

In March 2006, Harb served as Hizballah's chief of military liaison with the Palestinian factions and Iran, dealing almost exclusively with Palestinians and Iranians inside and outside the territories. Prior to this posting, Harb had served as Hizballah's chief of military special operations. During the summer of 2006, Harb was given command of a Hizballah special operations unit in southern Lebanon, which engaged the Israeli Defense Forces (IDF) in July 2006, at the Lebanese-Israeli border where IDF Special Forces entered Lebanon. In early 2007, Khalil Harb was chief of Hizballah's Unit 1800, also known as Hizballah's Nun Unit, the Hizballah entity responsible for supporting Palestinian militants and conducting Hizballah operations in the countries surrounding Israel, and he travelled to Iran for meetings regarding coordination between Hizballah, Iran, and the Palestinians.

In February 2010, Harb, serving as the leader of the Palestinian activities for Hizballah, planned unspecified attacks against Israeli officials in Israel, in retaliation for the assassination of former Hizballah External Security Organization (ESO) chief Imad Mughniyah. By mid-May 2010, Hizballah created a new position for Harb as "advisor to the Secretary General," which provided Harb oversight of Hizballah Unit 1800, which he previously commanded.

As of 2012, Harb was responsible for Hizballah's **Yemen** activities and was involved in the political side of Hizballah's **Yemen** portfolio. Harb also served as commander of a Lebanon-based Hizballah special unit that focused on Israel. Since the summer of 2012, Harb has been involved in the movement of large amounts of currency to **Yemen**, through Saudi Arabia and the U.A.E., and in late 2012, Harb advised the leader of a **Yemen**i political party that the party's monthly Hizballah funding of $50,000 was ready for pick up.

Muhammad Kawtharani

As the individual in charge of Hizballah's Iraq activities, Kawtharani has worked on behalf of Hizballah's leadership to promote the group's interests in Iraq, including Hizballah efforts to provide training, funding, political, and logistical support to Iraqi Shi'a insurgent groups. A member of Hizballah's Political Council, Kawtharani also helped secure the release from Iraqi custody of Hizballah operative Ali Musa Daqduq, a senior Hizballah commander designated by the Treasury Department in November 2012 who was responsible for numerous attacks against Coalition Force in Iraq, including planning a January 20, 2007 attack on the Karbala Joint Provincial Coordination Center that resulted in the deaths of five U.S. soldiers.

Over the last year, Kawtharani has assisted in getting fighters to Syria to support the Assad regime.

Muhammad Yusuf Ahmad Mansur

Muhammad Yusuf Ahmad Mansur (Mansur), a member of Hizballah since at least 1986, once served in a Hizballah military unit operating in south Lebanon. Around 2004, Mansur was transferred to Hizballah's Unit 1800. Mansur was subsequently dispatched to Egypt to work with Unit 1800 under Muhammad Qabalan, and in 2008, the cell escalated its operations to target tourist destinations in Egypt. Mansur served as the Egypt-based cell leader. By early 2009, Egyptian authorities had disrupted the Hizballah cell and arrested and detained Mansur and dozens of other individuals for planning to carry out terrorist operations against Israeli and other tourists in Egypt. Hizballah Secretary-General Hassan Nasrallah in November 2009 publicly acknowledged that Mansur was a Hizballah member involved in transporting arms and equipment to Palestinian militants. In April 2010, an Egyptian court sentenced Mansur to 15 years for his involvement in the cell, which was subordinate to Hizballah's Unit 1800. However, in late January 2011, the imprisoned members of the Hizballah cell escaped and Mansur returned to Lebanon. In February 2011, Mansur appeared on Lebanese television with Hizballah officials at a Hizballah rally in Beirut.

Muhammad Qabalan

Hizballah terrorist cell leader Muhammad Qabalan (Qabalan) once served as the head of a Hizballah infantry platoon. In 2008, Qabalan, as a leader in Hizballah's Unit 1800, was serving as the Lebanon-based head of the Hizballah Egypt-based terrorist cell targeting tourist destinations in Egypt and was coordinating the cell's activities from Lebanon. In April 2010, an Egyptian court sentenced Qabalan in absentia to life imprisonment for his involvement in the cell, which was subordinate to Hizballah's Unit 1800. As of late 2011, Qabalan worked in a separate Hizballah covert unit operating in the Middle East.

Identifying Information

Name: Khalil Yusif Harb
AKA: Khalil Yusuf Harb
AKA: Hajj Ya'taqad Khalil Harb
AKA: Mustafa Khalil Harb
AKA: Sayyid Ahmad
AKA: Abu Mustafa
DOB: 9 October 1958

Name: Muhammad Kawtharani
AKA: Muhammad Al-Kawtharani
AKA: Mohammad Kawtharani
AKA: Muhammad Kawtarani
AKA: Jafar al-Kawtharani
Nationality #1: Lebanon
Nationality #2: Iraq
DOB #1: 1945
DOB #2: 1959
DOB #3: 1961
POB: Najaf, Iraq

Name: Muhammad Qabalan
AKA: Hassan al-Ghul
AKA: Muhammad Qablan
DOB: 1969
Citizenship: Lebanese
Location: Southern Suburbs, Beirut, Lebanon

Name: Muhammad Yusuf Ahmad Mansur
AKA: Sami Hani Shihab
AKA: Salem Bassem Sami
AKA: Jamal Hani Hillawi
AKA: Muhammad Yusuf Mansur Sami Shihab
AKA: Mohammad Yousef Mansour
AKA: Mohammad Youssef Mansour
AKA: Muhammad Yusuf Mansur
AKA: Mohammad Yusuf Ahmad Mansur
AKA: Muhammad Yusif Ahmad Mansur
AKA: Sami Shehab
AKA: Sami Shihab
AKA: Hani Halawi
DOB No. 1: September 14, 1970
DOB No. 2: January 1, 1974
DOB No. 3: 1980
POB: Bint Jubayl, Lebanon
Location: Beirut, Lebanon

###

You are viewing:

# **ARCHIVED** CONTENT

Information released online from January 20, 2009 to January 20, 2017.

**NOTE:** Content in this archive site is **NOT UPDATED**, and links may not function. External links to other Internet sites should not be construed as an endorsement of the views contained therein.

<u>Go to the current State.gov website for up-to-date information. (http://www.state.gov/)</u>

---

# U.S. Department of State
## Diplomacy in Action

# Interview With Judy Woodruff of PBS NewsHour

Interview

John Kerry

Secretary of State

Washington, DC

April 8, 2015

---

**QUESTION:** Secretary Kerry, welcome. Thank you for talking with us.

**SECRETARY KERRY:** Thank you. It's my pleasure.

**QUESTION:** So you've put a lot of effort into negotiating this framework agreement, spent months if not years on this. People look at this and they see all that effort and I think one question is: Is it going to take even more work to get the remaining unresolved issues figured out, or is the hardest part behind you?

**SECRETARY KERRY:** It's going to take more work. But it may also be that the hardest part is behind us, because we – the framework has really crossed the barrier, if you will. But the details are going to be tough and coming down to the last comma, the last crossed "T", I'm confident it will be probably as difficult as the last couple days were in the framework.

**QUESTION:** Well, before we talk about the details, I want to ask you something, I think, to sort of clarify for the American people what this is. Is it correct to say that this is really about – not about denying Iran a nuclear weapon, but delaying the day when they can have one, and delaying it really by only a matter of months?

**SECRETARY KERRY:** Absolutely not. Not in the least. No, it is not just about that. It's about denying them a nuclear weapon. And the reason I can say that with confidence is that we will have a sufficient level of transparency, of inspections, of accountability, of tracing of uranium, of following the production of their centrifuges, of knowing what is happening in their program, that if they began to increase their enrichment in order to be able to move to create a nuclear weapon, we would know immediately and be able to take actions.

So I don't agree with that assessment. This is a guarantee that for the next 15 to 20 years they won't possibly be able to advance that program. And then when they become a more legitimate member of the nonproliferation community and subject to lifetime inspections and investigation, we will have accountability.

**QUESTION:** But it is said that right now they have a breakout capacity of three to four months, and at the end of this agreement it would be a year. Meanwhile, they have enrichment capacity, they have the ability to do research and development on these so-called advanced centrifuges enriching uranium where they could even potentially – and the President himself has acknowledged this – create a weapon within – almost instantly.

**SECRETARY KERRY:** Well, let me describe where we are today, Judy, because it's important for people to think about where's the starting point here. When I became Secretary of State they had 20,000 centrifuges, a very large stockpile of enriched uranium at 20 percent, and they were moving in the direction of really threatening to perhaps go down and get a bomb.

Now they no longer have that 20 percent enriched uranium. It's been reduced to zero. It's gone. They no longer enrich above a small percentage – 3.5 percent. They no longer have the ability to break out in the same period of time as when we started this. When President Obama became president they already had enrichment. They already had mastered the fuel cycle. So in the years preceding that they were edging up and up and up constantly. Now we're going the other way. We're rolling the program back and putting in place a very strict set of transparency and accountability measures that will allow us to know what is happening.

And it is not accurate to say it's only 10 years. Some measures that are in this deal go for 15 years; some go for 20 years; some go for 25 years, like the tracking of uranium. That's a 25-year tracking of uranium – from mining, to milling, to the yellowcake, to the gas, to the centrifuge, to waste. We'll follow every part of that. And there are lifetime provisions here – forever provisions that they have to adhere to.

**QUESTION:** Well, let me ask about some of the details which you mentioned, inspections. The President has said these will be the most intrusive inspections, robust inspections ever. Others have said it will be anywhere, anytime. The Iranians are saying no, it won't be on military bases and there are going to limits. Which is it?

**SECRETARY KERRY:** We're going to have a very robust inspection system. We have a means of dispute resolution that will permit us to be able to resolve questions if there are any unresolved issues of access. They have agreed to abide by what is called the Additional Protocol of the Nonproliferation treaty. That protocol requires participating states to adhere to a higher standard. And if they don't, Judy, then the sanctions can and will come back. For a certain number of years that will happen automatically; but I can assure you that Iran if were to then suddenly move to try to advance its program beyond what would be normal for a peaceful nuclear power, the whole world will respond just as we have now and sanctions would be re-imposed.

**QUESTION:** But aren't there real questions about that? The Administration's calling them snapback sanctions, but in effect, you'd have to go --

**SECRETARY KERRY:** Well, that's for a period of time. No, we don't have to go back. There's no veto power capable. It's an automatic process under a specific procedure which will be spelled out in the course of the final deal. I'm not going to go into it all now except to say to you that we're not going to sit there and carve out a pretense here. We have told people – and we're serious about it – that there will be an ability to have accountability in this inspection regimen, and there will be.

**QUESTION:** So another issue: The International Atomic Energy Agency has said for a long time that it wants Iran to disclose past military-related nuclear activities.

**SECRETARY KERRY:** Right.

**QUESTION:** Iran is increasingly looking like it's not going to do this.

**SECRETARY KERRY:** No, I disagree.

**QUESTION:** Is the U.S. prepared to accept that?

**SECRETARY KERRY:** No. They have to do it. It will be done. If there's going to be a deal, it will be done.

**QUESTION:** Because it's not there now.

**SECRETARY KERRY:** It will be done.

**QUESTION:** So that information will be released before June 30th, will be available?

**SECRETARY KERRY:** It will be part of a final agreement. It has to be.

**QUESTION:** Congress. President Obama is now saying that there may be a role for Congress in signing off on the deal, as long as Congress doesn't materially change anything. My question to you is: If you were Senator Kerry, you were chairing the Senate Foreign Relations Committee and it were a different president, wouldn't you be insisting that Congress have an up-or-down say on this?

**SECRETARY KERRY:** (Laughter.) Judy, one of the things I learned a long time ago and I particularly know now is don't answer hypothetical questions. So I'm not going where I don't have to be. And I left the Senate; I'm not there now. I'm Secretary of State. And the President is absolutely correct in making sure that what Congress does does not assault presidential authority and the Constitution and doesn't destroy his ability to be able to negotiate this final deal. That's critical. And the President has said if the bill is what it is today, written the same way it is today, then he'd veto it. But if it's changed and adjusted and reflects the respect for the Constitution and the President's prerogatives, while at the same time embracing congressional oversight and review, fine.

One other thing I'd say to you is Congress is going to vote. Congress can vote any day it wants to. The majority leader has the right to bring something to the floor and have a vote. So this is really, I think, a little bit excessive. I mean, the truth is also Congress will have to vote to lift ultimately some of the sanctions which are congressionally mandated. So we all understand the process here, and I think we just need to be serious in a way that does not interfere with the President's ability to pursue the foreign policy interests of our nation.

**QUESTION:** Some of the other concerns that are now being raised – I mean, assuming this deal is finalized at the end of June and the U.S. embarks on this new way forward, doesn't this raise expectations – and there's already a lot of talk about this – that the U.S. is going to have to increasingly shore up its support for those in the region who fear Iran, not just Israel but the Arab nations, Saudi Arabia, the UAE, the others, Egypt? In other words, that the U.S. is increasingly obligated to have the back of more nations than it already is supporting and backing militarily in that region?

**SECRETARY KERRY:** Judy, let me make it clear: It doesn't take this negotiation to prompt this Administration to be there for our friends and our allies. We are there. We have been there. No administration – this is not an exaggeration – no administration has ever done as much as President Obama has done in order to help provide equipment and munitions and defensive mechanisms, other things to Israel. The President has said that's a lead pipe total guarantee.

At the same time, all of our other Gulf state allies and friends in the region – we have already, long before the discussions with Iran, been talking with them about pushing back against Iran's behavior in Yemen, in Iraq, in Syria, in Lebanon and other places. And that will continue, absolutely.

**QUESTION:** Quick questions off today's news: Yemen. Iran has announced it's sending two warships to the Gulf of Aden just off the coast of Yemen. Iran says it is not providing military assistance to the Houthi rebels who helped depose the president. Is that something the Administration accepts?

**SECRETARY KERRY:** No.

**QUESTION:** And what – and how concerned is the Administration about what's going on there?

**SECRETARY KERRY:** Well, we're very concerned about what's going on there. And it's just not a fact. They have been – there are obviously supplies that have been coming from Iran. There are a number of flights every single week that have been flying in, and we trace those flights and we know this. We're well aware of the support that Iran has been giving to Yemen, and Iran needs to recognize that the United States is not going to stand by while the region is destabilized or while people engage in overt warfare across lines, international boundaries, in other countries.

So we're very concerned about it. And we will – what we've made clear to our friends and allies is we can do two things at the same time. We have an ability to understand that an Iran with a nuclear weapon is a greater threat than an Iran without one; and at the same time, we have an ability to be able to stand up to interference that is inappropriate or against international law, or contrary to the region's stability and interests and those of our friends. And we're not looking for confrontation, obviously, but we're not going to step away from our alliances and our friendships and the need to stand with those who feel threatened as a consequence of the choices that Iran might be making.

**QUESTION:** Secretary John Kerry, we thank you very much for talking with us.

**SECRETARY KERRY:** Thank you.

---

---

The Office of Website Management, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department.

External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.

Note: documents in Portable Document Format (PDF) require Adobe Acrobat Reader 5.0 or higher to view, download Adobe Acrobat Reader (http://get.adobe.com/reader/).

United Nations

**S**/RES/2231 (2015)



# Security Council

Distr.: General
20 July 2015

## Resolution 2231 (2015)

### Adopted by the Security Council at its 7488th meeting, on 20 July 2015

*The Security Council*,

*Recalling* the Statement of its President, S/PRST/2006/15, and its resolutions 1696 (2006), 1737 (2006), 1747 (2007), 1803 (2008), 1835 (2008), and 1929 (2010),

*Reaffirming* its commitment to the Treaty on the Non-Proliferation of Nuclear Weapons, the need for all States Party to that Treaty to comply fully with their obligations, and *recalling* the right of States Party, in conformity with Articles I and II of that Treaty, to develop research, production and use of nuclear energy for peaceful purposes without discrimination,

*Emphasizing* the importance of political and diplomatic efforts to find a negotiated solution guaranteeing that Iran's nuclear programme is exclusively for peaceful purposes, and *noting* that such a solution would benefit nuclear non-proliferation,

*Welcoming* diplomatic efforts by China, France, Germany, the Russian Federation, the United Kingdom, the United States, the High Representative of the European Union for Foreign Affairs and Security Policy, and Iran to reach a comprehensive, long-term and proper solution to the Iranian nuclear issue, culminating in the Joint Comprehensive Plan of Action (JCPOA) concluded on 14 July 2015, (S/2015/544, as attached as Annex A to this resolution) and the establishment of the Joint Commission,

*Welcoming* Iran's reaffirmation in the JCPOA that it will under no circumstances ever seek, develop or acquire any nuclear weapons,

*Noting* the statement of 14 July 2015, from China, France, Germany, the Russian Federation, the United Kingdom, the United States, and the European Union aimed at promoting transparency and creating an atmosphere conducive to the full implementation of the JCPOA (S/2015/545, as attached as Annex B to this resolution),

*Affirming* that conclusion of the JCPOA marks a fundamental shift in its consideration of this issue, and *expressing* its desire to build a new relationship with



**Please recycle** 

Iran strengthened by the implementation of the JCPOA and to bring to a satisfactory conclusion its consideration of this matter,

*Affirming* that full implementation of the JCPOA will contribute to building confidence in the exclusively peaceful nature of Iran's nuclear programme,

*Strongly supporting* the essential and independent role of the International Atomic Energy Agency (IAEA) in verifying compliance with safeguards agreements, including the non-diversion of declared nuclear material to undeclared purposes and the absence of undeclared nuclear material and undeclared nuclear activities, and, in this context, in ensuring the exclusively peaceful nature of Iran's nuclear programme, including through the implementation of the "Framework for Cooperation" agreed between Iran and the IAEA on 11 November 2013 and the "Roadmap for Clarification of Past and Present Outstanding Issues", and *recognizing* the IAEA's important role in supporting full implementation of the JCPOA,

*Affirming* that IAEA safeguards are a fundamental component of nuclear non-proliferation, promote greater confidence among States, inter alia, by providing assurance that States are complying with their obligations under relevant safeguards agreements, contribute to strengthening their collective security and help to create an environment conducive to nuclear cooperation, and further *recognizing* that effective and efficient safeguards implementation requires a cooperative effort between the IAEA and States, that the IAEA Secretariat will continue to engage in open dialogue on safeguards matters with States to increase transparency and build confidence and to interact with them on the implementation of safeguards, and in this case, avoid hampering the economic and technological development of Iran or international cooperation in the field of peaceful nuclear activities; respect health, safety, physical protection and other security provisions in force and the rights of individuals; and take every precaution to protect commercial, technological and industrial secrets as well as other confidential information coming to its knowledge,

*Encouraging* Member States to cooperate, including through IAEA involvement, with Iran in the framework of the JCPOA in the field of peaceful uses of nuclear energy and to engage in mutually determined civil nuclear cooperation projects, in accordance with Annex III of the JCPOA,

*Noting* the termination of provisions of previous resolutions and other measures foreseen in this resolution, and *inviting* Member States to give due regard to these changes,

*Emphasizing* that the JCPOA is conducive to promoting and facilitating the development of normal economic and trade contacts and cooperation with Iran, and *having* regard to States' rights and obligations relating to international trade,

*Underscoring* that Member States are obligated under Article 25 of the Charter of the United Nations to accept and carry out the Security Council's decisions,

1.    *Endorses* the JCPOA, and *urges* its full implementation on the timetable established in the JCPOA;

2.    *Calls upon* all Members States, regional organizations and international organizations to take such actions as may be appropriate to support the implementation of the JCPOA, including by taking actions commensurate with the

implementation plan set out in the JCPOA and this resolution and by refraining from actions that undermine implementation of commitments under the JCPOA;

3.    *Requests* the Director General of the IAEA to undertake the necessary verification and monitoring of Iran's nuclear-related commitments for the full duration of those commitments under the JCPOA, and *reaffirms* that Iran shall cooperate fully as the IAEA requests to be able to resolve all outstanding issues, as identified in IAEA reports;

4.    *Requests* the Director General of the IAEA to provide regular updates to the IAEA Board of Governors and, as appropriate, in parallel to the Security Council on Iran's implementation of its commitments under the JCPOA and also to report to the IAEA Board of Governors and in parallel to the Security Council at any time if the Director General has reasonable grounds to believe there is an issue of concern directly affecting fulfilment of JCPOA commitments;

**Terminations**

5.    *Requests* that, as soon as the IAEA has verified that Iran has taken the actions specified in paragraphs 15.1-15.11 of Annex V of the JCPOA, the Director General of the IAEA submit a report confirming this fact to the IAEA Board of Governors and in parallel to the Security Council;

6.    *Requests* further that, as soon as the IAEA has reached the Broader Conclusion that all nuclear material in Iran remains in peaceful activities, the Director General of the IAEA submit a report confirming this conclusion to the IAEA Board of Governors and in parallel to the Security Council;

7.    *Decides*, acting under Article 41 of the Charter of the United Nations, that, upon receipt by the Security Council of the report from the IAEA described in paragraph 5:

(a)    The provisions of resolutions 1696 (2006), 1737 (2006), 1747 (2007), 1803 (2008), 1835 (2008), 1929 (2010) and 2224 (2015) shall be terminated;

(b)    All States shall comply with paragraphs 1, 2, 4, and 5 and the provisions in subparagraphs (a)-(f) of paragraph 6 of Annex B for the duration specified in each paragraph or subparagraph, and are called upon to comply with paragraphs 3 and 7 of Annex B;

8.    *Decides*, acting under Article 41 of the Charter of the United Nations, that on the date ten years after the JCPOA Adoption Day, as defined in the JCPOA, all the provisions of this resolution shall be terminated, and none of the previous resolutions described in paragraph 7 (a) shall be applied, the Security Council will have concluded its consideration of the Iranian nuclear issue, and the item "Non-proliferation" will be removed from the list of matters of which the Council is seized;

9.    *Decides*, acting under Article 41 of the Charter of the United Nations, that the terminations described in Annex B and paragraph 8 of this resolution shall not occur if the provisions of previous resolutions have been applied pursuant to paragraph 12;

**Application of Provisions of Previous Resolutions**

10.    *Encourages* China, France, Germany, the Russian Federation, the United Kingdom, the United States, the European Union (EU), and Iran (the "JCPOA participants") to resolve any issues arising with respect to implementation of JCPOA commitments through the procedures specified in the JCPOA, and *expresses* its intention to address possible complaints by JCPOA participants about significant non-performance by another JCPOA participant;

11.    *Decides*, acting under Article 41 of the Charter of the United Nations, that, within 30 days of receiving a notification by a JCPOA participant State of an issue that the JCPOA participant State believes constitutes significant non-performance of commitments under the JCPOA, it shall vote on a draft resolution to continue in effect the terminations in paragraph 7 (a) of this resolution, *decides* further that if, within 10 days of the notification referred to above, no Member of the Security Council has submitted such a draft resolution for a vote, then the President of the Security Council shall submit such a draft resolution and put it to a vote within 30 days of the notification referred to above, and *expresses* its intention to take into account the views of the States involved in the issue and any opinion on the issue by the Advisory Board established in the JCPOA;

12.    *Decides*, acting under Article 41 of the Charter of the United Nations, that, if the Security Council does not adopt a resolution under paragraph 11 to continue in effect the terminations in paragraph 7 (a), then effective midnight Greenwich Mean Time after the thirtieth day after the notification to the Security Council described in paragraph 11, all of the provisions of resolutions 1696 (2006), 1737 (2006), 1747 (2007), 1803 (2008), 1835 (2008), and 1929 (2010) that have been terminated pursuant to paragraph 7 (a) shall apply in the same manner as they applied before the adoption of this resolution, and the measures contained in paragraphs 7, 8 and 16 to 20 of this resolution shall be terminated, unless the Security Council decides otherwise;

13.    *Underscores* that, in the event of a notification to the Security Council described in paragraph 11, Iran and the other JCPOA participants should strive to resolve the issue giving rise to the notification, *expresses* its intention to prevent the reapplication of the provisions if the issue giving rise to the notification is resolved, *decides*, acting under Article 41 of the Charter of the United Nations, that if the notifying JCPOA participant State informs the Security Council that such an issue has been resolved before the end of the 30-day period specified in paragraph 12 above, then the provisions of this resolution, including the terminations in paragraph 7 (a), shall remain in effect notwithstanding paragraph 12 above, and *notes* Iran's statement that if the provisions of previous resolutions are applied pursuant to paragraph 12 in whole or in part, Iran will treat this as grounds to cease performing its commitments under the JCPOA;

14.    *Affirms* that the application of the provisions of previous resolutions pursuant to paragraph 12 do not apply with retroactive effect to contracts signed between any party and Iran or Iranian individuals and entities prior to the date of application, provided that the activities contemplated under and execution of such contracts are consistent with the JCPOA, this resolution and the previous resolutions;

15.  *Affirms* that any application of the provisions of previous resolutions pursuant to paragraph 12 is not intended to harm individuals and entities that, prior to that application of those provisions, engaged in business with Iran or Iranian individuals and entities that is consistent with the JCPOA and this resolution, *encourages* Member States to consult with each other with regard to such harm, and to take action to mitigate such unintended harm for these individuals and entities, and  *decides*  if the provisions of previous resolutions are applied pursuant to paragraph 12 not to impose measures with retroactive effect on individuals and entities for business activities with Iran that were consistent with the JCPOA, this resolution and the previous resolutions prior to the application of these provisions;

**JCPOA Implementation**

16.  *Decides*, acting under Article 41 of the Charter of the United Nations, to review recommendations of the Joint Commission regarding proposals by States to participate in or permit nuclear-related activities set forth in paragraph 2 of Annex B, and that such recommendations shall be deemed to be approved unless the Security Council adopts a resolution to reject a Joint Commission recommendation within five working days of receiving it;

17.  *Requests* Member States seeking to participate in or permit activities set forth in paragraph 2 of Annex B to submit proposals to the Security Council, *expresses* its intention to share such proposals with the Joint Commission established in the JCPOA for its review, *invites* any Member of the Security Council to provide relevant information and opinions about these proposals, *encourages* the Joint Commission to give due consideration to any such information and opinions, and *requests* the Joint Commission to provide its recommendations on these proposals to the Security Council within twenty working days (or, if extended, within thirty working days);

18.  *Requests* the Secretary-General, in order to support JCPOA implementation, to take the necessary administrative measures to facilitate communications with Member States and between the Security Council and the Joint Commission through agreed practical arrangements;

19.  *Requests* the IAEA and the Joint Commission to consult and exchange information, where appropriate, as specified in the JCPOA, and *requests* further that the exporting states cooperate with the Joint Commission in accordance with Annex IV of the JCPOA;

20.  *Requests* the Joint Commission to review proposals for transfers and activities described in paragraph 2 of Annex B with a view to recommending approval where consistent with this resolution and the provisions and objectives of the JCPOA so as to provide for the transfer of items, materials, equipment, goods and technology required for Iran's nuclear activities under the JCPOA, and *encourages* the Joint Commission to establish procedures to ensure detailed and thorough review of all such proposals;

**Exemptions**

21.  *Decides*, acting under Article 41 of the Charter of the United Nations, that the measures imposed in resolutions 1696 (2006), 1737 (2006), 1747 (2007), 1803 (2008), 1835 (2008), and 1929 (2010) shall not apply to the supply, sale, or

transfer of items, materials, equipment, goods and technology, and the provision of any related technical assistance, training, financial assistance, investment, brokering or other services, by JCPOA participant States or Member States acting in coordination with them, that is directly related to: (a) the modification of two cascades at the Fordow facility for stable isotope production; (b) the export of Iran's enriched uranium in excess of 300 kilograms in return for natural uranium; and (c) the modernization of the Arak reactor based on the agreed conceptual design and, subsequently, on the agreed final design of such reactor;

22. *Decides*, acting under Article 41 of the Charter of the United Nations, that Member States engaging in the activities permitted in paragraph 21 shall ensure that: (a) all such activities are undertaken strictly in accordance with the JCPOA; (b) they notify the Committee established pursuant to resolution 1737 (2006) and, when constituted, the Joint Commission ten days in advance of such activities; (c) the requirements, as appropriate, of the Guidelines as set out in the relevant INFCIRC referenced in resolution 1737 (2006), as updated, have been met; (d) they have obtained and are in a position to exercise effectively a right to verify the end-use and end-use location of any supplied item; and (e) in case of supplied items, materials, equipment, goods and technology listed in the INFCIRCs referenced in resolution 1737 (2006), as updated, they also notify the IAEA within ten days of the supply, sale or transfers;

23. *Decides*, acting under Article 41 of the Charter of the United Nations, also that the measures imposed in resolutions 1696 (2006), 1737 (2006), 1747 (2007), 1803 (2008), 1835 (2008), and 1929 (2010) shall not apply to the extent necessary to carry out transfers and activities, as approved on a case-by-case basis in advance by the Committee established pursuant to resolution 1737 (2006), that are:

(a)    directly related to implementation of the nuclear-related actions specified in paragraphs 15.1-15.11 of Annex V of the JCPOA;

(b)    required for preparation for the implementation of the JCPOA; or,

(c)    determined by the Committee to be consistent with the objectives of this resolution;

24. *Notes* that the provisions of paragraphs 21, 22, 23 and 27 continue in effect if the provisions of previous resolutions are applied pursuant to paragraph 12;

## Other Matters

25. *Decides* to make the necessary practical arrangements to undertake directly tasks related to the implementation of this resolution, including those tasks specified in Annex B and the release of guidance;

26. *Urges* all States, relevant United Nations bodies and other interested parties, to cooperate fully with the Security Council in its exercise of the tasks related to this resolution, in particular by supplying any information at their disposal on the implementation of the measures in this resolution;

27. *Decides* that all provisions contained in the JCPOA are only for the purposes of its implementation between the E3/EU+3 and Iran and should not be considered as setting precedents for any other State or for principles of international law and the rights and obligations under the Treaty on the Non-Proliferation of

Nuclear Weapons and other relevant instruments, as well as for internationally recognized principles and practices;

28.   *Recalls* that the measures imposed by paragraph 12 of resolution 1737 (2006) shall not prevent a designated person or entity from making payment due under a contract entered into prior to the listing of such a person or entity, provided that the conditions specified in paragraph 15 of that resolution are met, and *underscores*, that if the provisions of previous resolutions are reapplied pursuant to paragraph 12 of this resolution, then this provision will apply;

29.   *Emphasizes* the importance of all States taking the necessary measures to ensure that no claim shall lie at the instance of the Government of Iran, or any person or entity in Iran, or of persons or entities designated pursuant to resolution 1737 (2006) and related resolutions, or any person claiming through or for the benefit of any such person or entity, in connection with any contract or other transaction where its performance was prevented by reason of the application of the provisions of resolutions 1737 (2006), 1747 (2007), 1803 (2008), 1929 (2010) and this resolution;

30.   *Decides* to remain seized of the matter until the termination of the provisions of this resolution in accordance with paragraph 8.

### Annex A: Joint Comprehensive Plan of Action (JCPOA), Vienna, 14 July 2015

*PREFACE*

The E3/EU+3 (China, France, Germany, the Russian Federation, the United Kingdom and the United States, with the High Representative of the European Union for Foreign Affairs and Security Policy) and the Islamic Republic of Iran welcome this historic Joint Comprehensive Plan of Action (JCPOA), which will ensure that Iran's nuclear programme will be exclusively peaceful, and mark a fundamental shift in their approach to this issue. They anticipate that full implementation of this JCPOA will positively contribute to regional and international peace and security. Iran reaffirms that under no circumstances will Iran ever seek, develop or acquire any nuclear weapons.

Iran envisions that this JCPOA will allow it to move forward with an exclusively peaceful, indigenous nuclear programme, in line with scientific and economic considerations, in accordance with the JCPOA, and with a view to building confidence and encouraging international cooperation. In this context, the initial mutually determined limitations described in this JCPOA will be followed by a gradual evolution, at a reasonable pace, of Iran's peaceful nuclear programme, including its enrichment activities, to a commercial programme for exclusively peaceful purposes, consistent with international non-proliferation norms.

The E3/EU+3 envision that the implementation of this JCPOA will progressively allow them to gain confidence in the exclusively peaceful nature of Iran's programme. The JCPOA reflects mutually determined parameters, consistent with practical needs, with agreed limits on the scope of Iran's nuclear programme, including enrichment activities and R&D. The JCPOA addresses the E3/EU+3's concerns, including through comprehensive measures providing for transparency and verification.

The JCPOA will produce the comprehensive lifting of all UN Security Council sanctions as well as multilateral and national sanctions related to Iran's nuclear programme, including steps on access in areas of trade, technology, finance, and energy.

*PREAMBLE AND GENERAL PROVISIONS*

i.  The Islamic Republic of Iran and the E3/EU+3 (China, France, Germany, the Russian Federation, the United Kingdom and the United States, with the High Representative of the European Union for Foreign Affairs and Security Policy) have decided upon this long-term Joint Comprehensive Plan of Action (JCPOA). This JCPOA, reflecting a step-by-step approach, includes the reciprocal commitments as laid down in this document and the annexes hereto and is to be endorsed by the United Nations (UN) Security Council.

ii.  The full implementation of this JCPOA will ensure the exclusively peaceful nature of Iran's nuclear programme.

iii.  Iran reaffirms that under no circumstances will Iran ever seek, develop or acquire any nuclear weapons.

iv.  Successful implementation of this JCPOA will enable Iran to fully enjoy its right to nuclear energy for peaceful purposes under the relevant articles of the nuclear Non-Proliferation Treaty (NPT) in line with its obligations therein, and the Iranian nuclear programme will be treated in the same manner as that of any other non-nuclear-weapon state party to the NPT.

v.  This JCPOA will produce the comprehensive lifting of all UN Security Council sanctions as well as multilateral and national sanctions related to Iran's nuclear programme, including steps on access in areas of trade, technology, finance and energy.

vi.  The E3/EU+3 and Iran reaffirm their commitment to the purposes and principles of the United Nations as set out in the UN Charter.

vii.  The E3/EU+3 and Iran acknowledge that the NPT remains the cornerstone of the nuclear non-proliferation regime and the essential foundation for the pursuit of nuclear disarmament and for the peaceful uses of nuclear energy.

viii.  The E3/EU+3 and Iran commit to implement this JCPOA in good faith and in a constructive atmosphere, based on mutual respect, and to refrain from any action inconsistent with the letter, spirit and intent of this JCPOA that would undermine its successful implementation. The E3/EU+3 will refrain from imposing discriminatory regulatory and procedural requirements in lieu of the sanctions and restrictive measures covered by this JCPOA. This JCPOA builds on the implementation of the Joint Plan of Action (JPOA) agreed in Geneva on 24 November 2013.

ix.  A Joint Commission consisting of the E3/EU+3 and Iran will be established to monitor the implementation of this JCPOA and will carry out the functions provided for in this JCPOA. This Joint Commission will address issues arising from the implementation of this JCPOA and will operate in accordance with the provisions as detailed in the relevant annex.

x.  The International Atomic Energy Agency (IAEA) will be requested to monitor and verify the voluntary nuclear-related measures as detailed in this JCPOA. The IAEA will be requested to provide regular updates to the Board of Governors, and as provided for in this JCPOA, to the UN Security Council. All relevant rules and regulations of the IAEA with regard to the protection of information will be fully observed by all parties involved.

xi. All provisions and measures contained in this JCPOA are only for the purpose of its implementation between E3/EU+3 and Iran and should not be considered as setting precedents for any other state or for fundamental principles of international law and the rights and obligations under the NPT and other relevant instruments, as well as for internationally recognised principles and practices.

xii. Technical details of the implementation of this JCPOA are dealt with in the annexes to this document.

xiii. The EU and E3+3 countries and Iran, in the framework of the JCPOA, will cooperate, as appropriate, in the field of peaceful uses of nuclear energy and engage in mutually determined civil nuclear cooperation projects as detailed in Annex III, including through IAEA involvement.

xiv. The E3+3 will submit a draft resolution to the UN Security Council endorsing this JCPOA affirming that conclusion of this JCPOA marks a fundamental shift in its consideration of this issue and expressing its desire to build a new relationship with Iran. This UN Security Council resolution will also provide for the termination on Implementation Day of provisions imposed under previous resolutions; establishment of specific restrictions; and conclusion of consideration of the Iran nuclear issue by the UN Security Council 10 years after the Adoption Day.

xv. The provisions stipulated in this JCPOA will be implemented for their respective durations as set forth below and detailed in the annexes.

xvi. The E3/EU+3 and Iran will meet at the ministerial level every 2 years, or earlier if needed, in order to review and assess progress and to adopt appropriate decisions by consensus.

*Iran and E3/EU+3 will take the following voluntary measures within the timeframe as detailed in this JCPOA and its Annexes*

*NUCLEAR*

**A.   ENRICHMENT, ENRICHMENT R&D, STOCKPILES**

1.   Iran's long term plan includes certain agreed limitations on all uranium enrichment and uranium enrichment-related activities including certain limitations on specific research and development (R&D) activities for the first 8 years, to be followed by gradual evolution, at a reasonable pace, to the next stage of its enrichment activities for exclusively peaceful purposes, as described in Annex I. Iran will abide by its voluntary commitments, as expressed in its own long-term enrichment and enrichment R&D plan to be submitted as part of the initial declaration for the Additional Protocol to Iran's Safeguards Agreement.

2.   Iran will begin phasing out its IR-1 centrifuges in 10 years. During this period, Iran will keep its enrichment capacity at Natanz at up to a total installed uranium enrichment capacity of 5060 IR-1 centrifuges. Excess centrifuges and enrichment-related infrastructure at Natanz will be stored under IAEA continuous monitoring, as specified in Annex I.

3.   Iran will continue to conduct enrichment R&D in a manner that does not accumulate enriched uranium. Iran's enrichment R&D with uranium for 10 years will only include IR-4, IR-5, IR-6 and IR-8 centrifuges as laid out in Annex I, and Iran will not engage in other isotope separation technologies for enrichment of uranium as specified in Annex I. Iran will continue testing IR-6 and IR-8 centrifuges, and will commence testing of up to 30 IR-6 and IR-8 centrifuges after eight and a half years, as detailed in Annex I.

4.   As Iran will be phasing out its IR-1 centrifuges, it will not manufacture or assemble other centrifuges, except as provided for in Annex I, and will replace failed centrifuges with centrifuges of the same type. Iran will manufacture advanced centrifuge machines only for the purposes specified in this JCPOA. From the end of the eighth year, and as described in Annex I, Iran will start to manufacture agreed numbers of IR-6 and IR-8 centrifuge machines without rotors and will store all of the manufactured machines at Natanz, under IAEA continuous monitoring until they are needed under Iran's long-term enrichment and enrichment R&D plan.

5.   Based on its own long-term plan, for 15 years, Iran will carry out its uranium enrichment-related activities, including safeguarded R&D exclusively in the Natanz Enrichment facility, keep its level of uranium enrichment at up to 3.67%, and, at Fordow, refrain from any uranium enrichment and uranium enrichment R&D and from keeping any nuclear material.

6.   Iran will convert the Fordow facility into a nuclear, physics and technology centre. International collaboration including in the form of scientific joint partnerships will be established in agreed areas of research. 1044 IR-1 centrifuges in six cascades will remain in one wing at Fordow. Two of these cascades will spin without uranium and will be transitioned, including through appropriate infrastructure modification, for stable isotope production. The

other four cascades with all associated infrastructure will remain idle. All other centrifuges and enrichment-related infrastructure will be removed and stored under IAEA continuous monitoring as specified in Annex I.

7.    During the 15 year period, and as Iran gradually moves to meet international qualification standards for nuclear fuel produced in Iran, it will keep its uranium stockpile under 300 kg of up to 3.67% enriched uranium hexafluoride (UF6) or the equivalent in other chemical forms. The excess quantities are to be sold based on international prices and delivered to the international buyer in return for natural uranium delivered to Iran, or are to be down-blended to natural uranium level. Enriched uranium in fabricated fuel assemblies from Russia or other sources for use in Iran's nuclear reactors will not be counted against the above stated 300 kg UF6 stockpile, if the criteria set out in Annex I are met with regard to other sources. The Joint Commission will support assistance to Iran, including through IAEA technical cooperation as appropriate, in meeting international qualification standards for nuclear fuel produced in Iran. All remaining uranium oxide enriched to between 5% and 20% will be fabricated into fuel for the Tehran Research Reactor (TRR). Any additional fuel needed for the TRR will be made available to Iran at international market prices.

## B.   ARAK, HEAVY WATER, REPROCESSING

8.    Iran will redesign and rebuild a modernised heavy water research reactor in Arak, based on an agreed conceptual design, using fuel enriched up to 3.67 %, in a form of an international partnership which will certify the final design. The reactor will support peaceful nuclear research and radioisotope production for medical and industrial purposes. The redesigned and rebuilt Arak reactor will not produce weapons grade plutonium. Except for the first core load, all of the activities for redesigning and manufacturing of the fuel assemblies for the redesigned reactor will be carried out in Iran. All spent fuel from Arak will be shipped out of Iran for the lifetime of the reactor. This international partnership will include participating E3/EU+3 parties, Iran and such other countries as may be mutually determined. Iran will take the leadership role as the owner and as the project manager and the E3/EU+3 and Iran will, before Implementation Day, conclude an official document which would define the responsibilities assumed by the E3/EU+3 participants.

9.    Iran plans to keep pace with the trend of international technological advancement in relying on light water for its future power and research reactors with enhanced international cooperation, including assurance of supply of necessary fuel.

10.   There will be no additional heavy water reactors or accumulation of heavy water in Iran for 15 years. All excess heavy water will be made available for export to the international market.

11.   Iran intends to ship out all spent fuel for all future and present power and research nuclear reactors, for further treatment or disposition as provided for in relevant contracts to be duly concluded with the recipient party.

12.   For 15 years Iran will not, and does not intend to thereafter, engage in any spent fuel reprocessing or construction of a facility capable of spent fuel

reprocessing, or reprocessing R&D activities leading to a spent fuel reprocessing capability, with the sole exception of separation activities aimed exclusively at the production of medical and industrial radio-isotopes from irradiated enriched uranium targets.

## C.   TRANSPARENCY AND CONFIDENCE BUILDING MEASURES

13. Consistent with the respective roles of the President and Majlis (Parliament), Iran will provisionally apply the Additional Protocol to its Comprehensive Safeguards Agreement in accordance with Article 17(b) of the Additional Protocol, proceed with its ratification within the timeframe as detailed in Annex V and fully implement the modified Code 3.1 of the Subsidiary Arrangements to its Safeguards Agreement.

14. Iran will fully implement the "Roadmap for Clarification of Past and Present Outstanding Issues" agreed with the IAEA, containing arrangements to address past and present issues of concern relating to its nuclear programme as raised in the annex to the IAEA report of 8 November 2011 (GOV/2011/65). Full implementation of activities undertaken under the Roadmap by Iran will be completed by 15 October 2015, and subsequently the Director General will provide by 15 December 2015 the final assessment on the resolution of all past and present outstanding issues to the Board of Governors, and the E3+3, in their capacity as members of the Board of Governors, will submit a resolution to the Board of Governors for taking necessary action, with a view to closing the issue, without prejudice to the competence of the Board of Governors.

15. Iran will allow the IAEA to monitor the implementation of the voluntary measures for their respective durations, as well as to implement transparency measures, as set out in this JCPOA and its Annexes. These measures include: a long-term IAEA presence in Iran; IAEA monitoring of uranium ore concentrate produced by Iran from all uranium ore concentrate plants for 25 years; containment and surveillance of centrifuge rotors and bellows for 20 years; use of IAEA approved and certified modern technologies including on-line enrichment measurement and electronic seals; and a reliable mechanism to ensure speedy resolution of IAEA access concerns for 15 years, as defined in Annex I.

16. Iran will not engage in activities, including at the R&D level, that could contribute to the development of a nuclear explosive device, including uranium or plutonium metallurgy activities, as specified in Annex I.

17. Iran will cooperate and act in accordance with the procurement channel in this JCPOA, as detailed in Annex IV, endorsed by the UN Security Council resolution.

*SANCTIONS*

18. The UN Security Council resolution endorsing this JCPOA will terminate all provisions of previous UN Security Council resolutions on the Iranian nuclear issue - 1696 (2006), 1737 (2006), 1747 (2007), 1803 (2008), 1835 (2008), 1929 (2010) and 2224 (2015) – simultaneously with the IAEA-verified implementation of agreed nuclear-related measures by Iran and will establish specific restrictions, as specified in Annex V.[1]

19. The EU will terminate all provisions of the EU Regulation, as subsequently amended, implementing all nuclear-related economic and financial sanctions, including related designations, simultaneously with the IAEA-verified implementation of agreed nuclear-related measures by Iran as specified in Annex V, which cover all sanctions and restrictive measures in the following areas, as described in Annex II:

    i.    Transfers of funds between EU persons and entities, including financial institutions, and Iranian persons and entities, including financial institutions;

    ii.    Banking activities, including the establishment of new correspondent banking relationships and the opening of new branches and subsidiaries of Iranian banks in the territories of EU Member States;

    iii.    Provision of insurance and reinsurance;

    iv.    Supply of specialised financial messaging services, including SWIFT, for persons and entities set out in Attachment 1 to Annex II, including the Central Bank of Iran and Iranian financial institutions;

    v.    Financial support for trade with Iran (export credit, guarantees or insurance);

    vi.    Commitments for grants, financial assistance and concessional loans to the Government of Iran;

    vii.    Transactions in public or public-guaranteed bonds;

    viii.    Import and transport of Iranian oil, petroleum products, gas and petrochemical products;

    ix.    Export of key equipment or technology for the oil, gas and petrochemical sectors;

    x.    Investment in the oil, gas and petrochemical sectors;

    xi.    Export of key naval equipment and technology;

    xii.    Design and construction of cargo vessels and oil tankers;

    xiii.    Provision of flagging and classification services;

    xiv.    Access to EU airports of Iranian cargo flights;

    xv.    Export of gold, precious metals and diamonds;

    xvi.    Delivery of Iranian banknotes and coinage;

---

[1] The provisions of this Resolution do not constitute provisions of this JCPOA.

xvii. Export of graphite, raw or semi-finished metals such as aluminum and steel, and export or software for integrating industrial processes;

xviii. Designation of persons, entities and bodies (asset freeze and visa ban) set out in Attachment 1 to Annex II; and

xix. Associated services for each of the categories above.

20. The EU will terminate all provisions of the EU Regulation implementing all EU proliferation-related sanctions, including related designations, 8 years after Adoption Day or when the IAEA has reached the Broader Conclusion that all nuclear material in Iran remains in peaceful activities, whichever is earlier.

21. The United States will cease the application, and will continue to do so, in accordance with this JCPOA of the sanctions specified in Annex II to take effect simultaneously with the IAEA-verified implementation of the agreed nuclear-related measures by Iran as specified in Annex V. Such sanctions cover the following areas as described in Annex II:

i. Financial and banking transactions with Iranian banks and financial institutions as specified in Annex II, including the Central Bank of Iran and specified individuals and entities identified as Government of Iran by the Office of Foreign Assets Control on the Specially Designated Nationals and Blocked Persons List (SDN List), as set out in Attachment 3 to Annex II (including the opening and maintenance of correspondent and payable through-accounts at non-U.S. financial institutions, investments, foreign exchange transactions and letters of credit);

ii. Transactions in Iranian Rial;

iii. Provision of U.S. banknotes to the Government of Iran;

iv. Bilateral trade limitations on Iranian revenues abroad, including limitations on their transfer;

v. Purchase, subscription to, or facilitation of the issuance of Iranian sovereign debt, including governmental bonds;

vi. Financial messaging services to the Central Bank of Iran and Iranian financial institutions set out in Attachment 3 to Annex II;

vii. Underwriting services, insurance, or reinsurance;

viii. Efforts to reduce Iran's crude oil sales;

ix. Investment, including participation in joint ventures, goods, services, information, technology and technical expertise and support for Iran's oil, gas and petrochemical sectors;

x. Purchase, acquisition, sale, transportation or marketing of petroleum, petrochemical products and natural gas from Iran;

xi. Export, sale or provision of refined petroleum products and petrochemical products to Iran;

xii. Transactions with Iran's energy sector;

xiii. Transactions with Iran's shipping and shipbuilding sectors and port operators;

xiv.   Trade in gold and other precious metals;

xv.   Trade with Iran in graphite, raw or semi-finished metals such as aluminum and steel, coal, and software for integrating industrial processes;

xvi.   Sale, supply or transfer of goods and services used in connection with Iran's automotive sector;

xvii.   Sanctions on associated services for each of the categories above;

xviii. Remove individuals and entities set out in Attachment 3 to Annex II from the SDN List, the Foreign Sanctions Evaders List, and/or the Non-SDN Iran Sanctions Act List; and

xix.   Terminate Executive Orders 13574, 13590, 13622, and 13645, and Sections 5 – 7 and 15 of Executive Order 13628.

22.   The United States will, as specified in Annex II and in accordance with Annex V, allow for the sale of commercial passenger aircraft and related parts and services to Iran; license non-U.S. persons that are owned or controlled by a U.S. person to engage in activities with Iran consistent with this JCPOA; and license the importation into the United States of Iranian-origin carpets and foodstuffs.

23.   Eight years after Adoption Day or when the IAEA has reached the Broader Conclusion that all nuclear material in Iran remains in peaceful activities, whichever is earlier, the United States will seek such legislative action as may be appropriate to terminate, or modify to effectuate the termination of, the sanctions specified in Annex II on the acquisition of nuclear-related commodities and services for nuclear activities contemplated in this JCPOA, to be consistent with the U.S. approach to other non-nuclear-weapon states under the NPT.

24.   The E3/EU and the United States specify in Annex II a full and complete list of all nuclear-related sanctions or restrictive measures and will lift them in accordance with Annex V. Annex II also specifies the effects of the lifting of sanctions beginning on "Implementation Day". If at any time following the Implementation Day, Iran believes that any other nuclear-related sanction or restrictive measure of the E3/EU+3 is preventing the full implementation of the sanctions lifting as specified in this JCPOA, the JCPOA participant in question will consult with Iran with a view to resolving the issue and, if they concur that lifting of this sanction or restrictive measure is appropriate, the JCPOA participant in question will take appropriate action. If they are not able to resolve the issue, Iran or any member of the E3/EU+3 may refer the issue to the Joint Commission.

25.   If a law at the state or local level in the United States is preventing the implementation of the sanctions lifting as specified in this JCPOA, the United States will take appropriate steps, taking into account all available authorities, with a view to achieving such implementation. The United States will actively encourage officials at the state or local level to take into account the changes in the U.S. policy reflected in the lifting of sanctions under this JCPOA and to refrain from actions inconsistent with this change in policy.

26. The EU will refrain from re-introducing or re-imposing the sanctions that it has terminated implementing under this JCPOA, without prejudice to the dispute resolution process provided for under this JCPOA. There will be no new nuclear-related UN Security Council sanctions and no new EU nuclear-related sanctions or restrictive measures. The United States will make best efforts in good faith to sustain this JCPOA and to prevent interference with the realisation of the full benefit by Iran of the sanctions lifting specified in Annex II. The U.S. Administration, acting consistent with the respective roles of the President and the Congress, will refrain from re-introducing or re-imposing the sanctions specified in Annex II that it has ceased applying under this JCPOA, without prejudice to the dispute resolution process provided for under this JCPOA. The U.S. Administration, acting consistent with the respective roles of the President and the Congress, will refrain from imposing new nuclear-related sanctions. Iran has stated that it will treat such a re-introduction or re-imposition of the sanctions specified in Annex II, or such an imposition of new nuclear-related sanctions, as grounds to cease performing its commitments under this JCPOA in whole or in part.

27. The E3/EU+3 will take adequate administrative and regulatory measures to ensure clarity and effectiveness with respect to the lifting of sanctions under this JCPOA. The EU and its Member States as well as the United States will issue relevant guidelines and make publicly accessible statements on the details of sanctions or restrictive measures which have been lifted under this JCPOA. The EU and its Member States and the United States commit to consult with Iran regarding the content of such guidelines and statements, on a regular basis and whenever appropriate.

28. The E3/EU+3 and Iran commit to implement this JCPOA in good faith and in a constructive atmosphere, based on mutual respect, and to refrain from any action inconsistent with the letter, spirit and intent of this JCPOA that would undermine its successful implementation. Senior Government officials of the E3/EU+3 and Iran will make every effort to support the successful implementation of this JCPOA including in their public statements.[2] The E3/EU+3 will take all measures required to lift sanctions and will refrain from imposing exceptional or discriminatory regulatory and procedural requirements in lieu of the sanctions and restrictive measures covered by the JCPOA.

29. The EU and its Member States and the United States, consistent with their respective laws, will refrain from any policy specifically intended to directly and adversely affect the normalisation of trade and economic relations with Iran inconsistent with their commitments not to undermine the successful implementation of this JCPOA.

30. The E3/EU+3 will not apply sanctions or restrictive measures to persons or entities for engaging in activities covered by the lifting of sanctions provided for in this JCPOA, provided that such activities are otherwise consistent with E3/EU+3 laws and regulations in effect. Following the lifting of sanctions under this JCPOA as specified in Annex II, ongoing investigations on possible

---

[2] 'Government officials' for the U.S. means senior officials of the U.S. Administration.

infringements of such sanctions may be reviewed in accordance with applicable national laws.

31.  Consistent with the timing specified in Annex V, the EU and its Member States will terminate the implementation of the measures applicable to designated entities and individuals, including the Central Bank of Iran and other Iranian banks and financial institutions, as detailed in Annex II and the attachments thereto. Consistent with the timing specified in Annex V, the United States will remove designation of certain entities and individuals on the Specially Designated Nationals and Blocked Persons List, and entities and individuals listed on the Foreign Sanctions Evaders List, as detailed in Annex II and the attachments thereto.

32.  EU and E3+3 countries and international participants will engage in joint projects with Iran, including through IAEA technical cooperation projects, in the field of peaceful nuclear technology, including nuclear power plants, research reactors, fuel fabrication, agreed joint advanced R&D such as fusion, establishment of a state-of-the-art regional nuclear medical centre, personnel training, nuclear safety and security, and environmental protection, as detailed in Annex III. They will take necessary measures, as appropriate, for the implementation of these projects.

33.  The E3/EU+3 and Iran will agree on steps to ensure Iran's access in areas of trade, technology, finance and energy. The EU will further explore possible areas for cooperation between the EU, its Member States and Iran, and in this context consider the use of available instruments such as export credits to facilitate trade, project financing and investment in Iran.

*IMPLEMENTATION PLAN*

34.  Iran and the E3/EU+3 will implement their JCPOA commitments according to the sequence specified in Annex V. The milestones for implementation are as follows:

   i.  Finalisation Day is the date on which negotiations of this JCPOA are concluded among the E3/EU+3 and Iran, to be followed promptly by submission of the resolution endorsing this JCPOA to the UN Security Council for adoption without delay.

   ii.  Adoption Day is the date 90 days after the endorsement of this JCPOA by the UN Security Council, or such earlier date as may be determined by mutual consent of the JCPOA participants, at which time this JCPOA and the commitments in this JCPOA come into effect. Beginning on that date, JCPOA participants will make necessary arrangements and preparations for the implementation of their JCPOA commitments.

   iii.  Implementation Day is the date on which, simultaneously with the IAEA report verifying implementation by Iran of the nuclear-related measures described in Sections 15.1. to 15.11 of Annex V, the EU and the United States take the actions described in Sections 16 and 17 of Annex V respectively and in accordance with the UN Security Council resolution, the actions described in Section 18 of Annex V occur at the UN level.

   iv.  Transition Day is the date 8 years after Adoption Day or the date on which the Director General of the IAEA submits a report stating that the IAEA has reached the Broader Conclusion that all nuclear material in Iran remains in peaceful activities, whichever is earlier. On that date, the EU and the United States will take the actions described in Sections 20 and 21 of Annex V respectively and Iran will seek, consistent with the Constitutional roles of the President and Parliament, ratification of the Additional Protocol.

   v.  UN Security Council resolution Termination Day is the date on which the UN Security Council resolution endorsing this JCPOA terminates according to its terms, which is to be 10 years from Adoption Day, provided that the provisions of previous resolutions have not been reinstated. On that date, the EU will take the actions described in Section 25 of Annex V.

35.  The sequence and milestones set forth above and in Annex V are without prejudice to the duration of JCPOA commitments stated in this JCPOA.

*DISPUTE RESOLUTION MECHANISM*

36.  If Iran believed that any or all of the E3/EU+3 were not meeting their commitments under this JCPOA, Iran could refer the issue to the Joint Commission for resolution; similarly, if any of the E3/EU+3 believed that Iran was not meeting its commitments under this JCPOA, any of the E3/EU+3 could do the same. The Joint Commission would have 15 days to resolve the issue, unless the time period was extended by consensus. After Joint Commission consideration, any participant could refer the issue to Ministers of Foreign Affairs, if it believed the compliance issue had not been resolved.

Ministers would have 15 days to resolve the issue, unless the time period was extended by consensus. After Joint Commission consideration – in parallel with (or in lieu of) review at the Ministerial level - either the complaining participant or the participant whose performance is in question could request that the issue be considered by an Advisory Board, which would consist of three members (one each appointed by the participants in the dispute and a third independent member). The Advisory Board should provide a non-binding opinion on the compliance issue within 15 days. If, after this 30-day process the issue is not resolved, the Joint Commission would consider the opinion of the Advisory Board for no more than 5 days in order to resolve the issue. If the issue still has not been resolved to the satisfaction of the complaining participant, and if the complaining participant deems the issue to constitute significant non-performance, then that participant could treat the unresolved issue as grounds to cease performing its commitments under this JCPOA in whole or in part and/or notify the UN Security Council that it believes the issue constitutes significant non-performance.

37. Upon receipt of the notification from the complaining participant, as described above, including a description of the good-faith efforts the participant made to exhaust the dispute resolution process specified in this JCPOA, the UN Security Council, in accordance with its procedures, shall vote on a resolution to continue the sanctions lifting. If the resolution described above has not been adopted within 30 days of the notification, then the provisions of the old UN Security Council resolutions would be re-imposed, unless the UN Security Council decides otherwise. In such event, these provisions would not apply with retroactive effect to contracts signed between any party and Iran or Iranian individuals and entities prior to the date of application, provided that the activities contemplated under and execution of such contracts are consistent with this JCPOA and the previous and current UN Security Council resolutions. The UN Security Council, expressing its intention to prevent the reapplication of the provisions if the issue giving rise to the notification is resolved within this period, intends to take into account the views of the States involved in the issue and any opinion on the issue of the Advisory Board. Iran has stated that if sanctions are reinstated in whole or in part, Iran will treat that as grounds to cease performing its commitments under this JCPOA in whole or in part.

## JCPOA Annex I – Nuclear-related measures

A.   **GENERAL**

1.   The sequence of implementation of the commitments detailed in this Annex is specified in Annex V to the Joint Comprehensive Plan of Action (JCPOA). Unless otherwise specified, the durations of the commitments in this Annex are from Implementation Day.

B.   **ARAK HEAVY WATER RESEARCH REACTOR**

2.   Iran will modernise the Arak heavy water research reactor to support peaceful nuclear research and radioisotopes production for medical and industrial purposes. Iran will redesign and rebuild the reactor, based on the agreed conceptual design (as attached to this Annex) to support its peaceful nuclear research and production needs and purposes, including testing of fuel pins and assembly prototypes and structural materials. The design will be such as to minimise the production of plutonium and not to produce weapon-grade plutonium in normal operation. The power of the redesigned reactor will not exceed 20 MWth. The E3/EU+3 and Iran share the understanding that the parameters in the conceptual design are subject to possible and necessary adjustments in developing the final design while fully preserving the above-mentioned purposes and principles of modernisation.

3.   Iran will not pursue construction at the existing unfinished reactor based on its original design and will remove the existing calandria and retain it in Iran. The calandria will be made inoperable by filling any openings in the calandria with concrete such that the IAEA can verify that it will not be usable for a future nuclear application. In redesigning and reconstructing of the modernized Arak heavy water research reactor, Iran will maximise the use of existing infrastructure already installed at the current Arak research reactor.

4.   Iran will take the leadership role as the owner and as the project manager, and have responsibility for overall implementation of the Arak modernisation project, with E3/EU+3 participants assuming responsibilities regarding the modernisation of the Arak reactor as described in this Annex. A Working Group composed of E3/EU+3 participants will be established to facilitate the redesigning and rebuilding of the reactor. An international partnership composed of Iran and the Working Group would implement the Arak modernisation project. The Working Group could be enlarged to include other countries by consensus of the participants of the Working Group and Iran. E3/EU+3 participants and Iran will conclude an official document expressing their strong commitments to the Arak modernisation project in advance of Implementation Day which would provide an assured path forward to modernise the reactor and would define the responsibilities assumed by the E3/EU+3 participants, and subsequently contracts would be concluded. The participants of the Working Group will provide assistance needed by Iran for redesigning and rebuilding the reactor, consistent with their respective national laws, in such a manner as to enable the safe and timely construction and commissioning of the modernised reactor.

5.   Iran and the Working Group will cooperate to develop the final design of the modernised reactor and the design of the subsidiary laboratories to be carried

S/RES/2231 (2015)

out by Iran, and review conformity with international safety standards, such that the reactor can be licensed by the relevant Iranian regulatory authority for commissioning and operation. The final design of the modernised reactor and the design of the subsidiary laboratories will be submitted to the Joint Commission. The Joint Commission will aim to complete its review and endorsement within three months after the submission of the final design. If the Joint Commission does not complete its review and endorsement within three months, Iran could raise the issue through the dispute resolution mechanism envisaged by this JCPOA.

6. The IAEA will monitor the construction and report to the Working Group for confirmation that the construction of the modernised reactor is consistent with the approved final design.

7. As the project manager, Iran will take responsibility for the construction efforts. E3/EU+3 parties will, consistent with their national laws, take appropriate administrative, legal, technical, and regulatory measures to support co-operation.

E3/EU+3 parties will support the purchase by Iran, the transfer and supply of necessary materials, equipment, instrumentation and control systems and technologies required for the construction of the redesigned reactor, through the mechanism established by this JCPOA, as well as through exploration of relevant funding contributions.

8. E3/EU+3 parties will also support and facilitate the timely and safe construction of the modernized Arak reactor and its subsidiary laboratories, upon request by Iran, through IAEA technical cooperation if appropriate, including but not limited to technical and financial assistance, supply of required materials and equipment, state-of-the-art instrumentation and control systems and equipment and support for licensing and authorization.

9. The redesigned reactor will use up to 3.67 percent enriched uranium in the form of UO2 with a mass of approximately 350 kg of UO2 in a full core load, with a fuel design to be reviewed and approved by the Joint Commission. The international partnership with the participation of Iran will fabricate the initial fuel core load for the reactor outside Iran. The international partnership will cooperate with Iran, including through technical assistance, to fabricate, test and license fuel fabrication capabilities in Iran for subsequent fuel core reloads for future use with this reactor. Destructive and non-destructive testing of this fuel including Post-Irradiation-Examination (PIE) will take place in one of the participating countries outside of Iran and that country will work with Iran to license the subsequent fuel fabricated in Iran for the use in the redesigned reactor under IAEA monitoring.

10. Iran will not produce or test natural uranium pellets, fuel pins or fuel assemblies, which are specifically designed for the support of the originally designed Arak reactor, designated by the IAEA as IR-40. Iran will store under IAEA continuous monitoring all existing natural uranium pellets and IR-40 fuel assemblies until the modernised Arak reactor becomes operational, at which point these natural uranium pellets and IR-40 fuel assemblies will be converted to UNH, or exchanged with an equivalent quantity of natural uranium. Iran will make the necessary technical modifications to the natural

uranium fuel production process line that was intended to supply fuel for the IR-40 reactor design, such that it can be used for the fabrication of the fuel reloads for the modernised Arak reactor.

11. All spent fuel from the redesigned Arak reactor, regardless of its origin, for the lifetime of the reactor, will be shipped out of Iran to a mutually determined location in E3/EU+3 countries or third countries, for further treatment or disposition as provided for in relevant contracts to be concluded, consistent with national laws, with the recipient party, within one year from the unloading from the reactor or whenever deemed to be safe for transfer by the recipient country.

12. Iran will submit the DIQ of the redesigned reactor to the IAEA which will include information on the planned radio-isotope production and reactor operation programme. The reactor will be operated under IAEA monitoring.

13. Iran will operate the Fuel Manufacturing Plant only to produce fuel assemblies for light water reactors and reloads for the modernized Arak reactor.

## C.  HEAVY WATER PRODUCTION PLANT

14. All excess heavy water which is beyond Iran's needs for the modernised Arak research reactor, the Zero power heavy water reactor, quantities needed for medical research and production of deuterate solutions and chemical compounds including, where appropriate, contingency stocks, will be made available for export to the international market based on international prices and delivered to the international buyer for 15 years. Iran's needs, consistent with the parameters above, are estimated to be 130 metric tonnes of nuclear grade heavy water or its equivalent in different enrichments prior to commissioning of the modernised Arak research reactor, and 90 metric tonnes after the commissioning, including the amount contained in the reactor.

15. Iran will inform the IAEA about the inventory and the production of the HWPP and will allow the IAEA to monitor the quantities of the heavy water stocks and the amount of heavy water produced, including through IAEA visits, as requested, to the HWPP.

## D.  OTHER REACTORS

16. Consistent with its plan, Iran will keep pace with the trend of international technological advancement in relying only on light water for its future nuclear power and research reactors with enhanced international cooperation including assurances of supply of necessary fuel.

17. Iran intends to ship out all spent fuel for all future and present nuclear power and research reactors, for further treatment or disposition as provided for in relevant contracts to be concluded consistent with national laws with the recipient party.

## E.  SPENT FUEL REPROCESSING ACTIVITIES

18. For 15 years Iran will not, and does not intend to thereafter, engage in any spent fuel reprocessing or spent fuel reprocessing R&D activities. For the purpose of this annex, spent fuel includes all types of irradiated fuel.

19.  For 15 years Iran will not, and does not intend to thereafter, reprocess spent fuel except for irradiated enriched uranium targets for production of radio-isotopes for medical and peaceful industrial purposes.

20.  For 15 years Iran will not, and does not intend to thereafter, develop, acquire or build facilities capable of separation of plutonium, uranium or neptunium from spent fuel or from fertile targets, other than for production of radio-isotopes for medical and peaceful industrial purposes.

21.  For 15 years, Iran will only develop, acquire, build, or operate hot cells (containing a cell or interconnected cells), shielded cells or shielded glove boxes with dimensions less than 6 cubic meters in volume compatible with the specifications set out in Annex I of the Additional Protocol. These will be co-located with the modernised Arak research reactor, the Tehran Research Reactor, and radio-medicine production complexes, and only capable of the separation and processing of industrial or medical isotopes and non-destructive PIE. The needed equipment will be acquired through the procurement mechanism established by this JCPOA. For 15 years, Iran will develop, acquire, build, or operate hot cells (containing a cell or interconnected cells), shielded cells or shielded glove boxes with dimensions beyond 6 cubic meters in volume and specifications set out in Annex I of the Additional Protocol, only after approval by the Joint Commission.

22.  The E3/EU+3 are ready to facilitate all of the destructive and non-destructive examinations on fuel elements and/or fuel assembly prototypes including PIE for all fuel fabricated in or outside Iran and irradiated in Iran, using their existing facilities outside Iran. Except for the Arak research reactor complex, Iran will not develop, build, acquire or operate hot cells capable of performing PIE or seek to acquire equipment to build/develop such a capability, for 15 years.

23.  For 15 years, in addition to continuing current fuel testing activities at the TRR, Iran will undertake non-destructive post irradiation examination (PIE) of fuel pins, fuel assembly prototypes and structural materials. These examinations will be exclusively at the Arak research reactor complex. However, the E3/EU+3 will make available their facilities to conduct destructive testing with Iranian specialists, as agreed. The hot cells at the Arak research reactor in which non-destructive PIE are performed will not be physically interconnected to cells that process or handle materials for the production of medical or industrial radioisotopes.

24.  For 15 years, Iran will not engage in producing or acquiring plutonium or uranium metals or their alloys, or conducting R&D on plutonium or uranium (or their alloys) metallurgy, or casting, forming, or machining plutonium or uranium metal.

25.  Iran will not produce, seek, or acquire separated plutonium, highly enriched uranium (defined as 20% or greater uranium-235), or uranium-233, or neptunium-237 (except for use as laboratory standards or in instruments using neptunium-237) for 15 years.

26.  If Iran seeks to initiate R&D on uranium metal based TRR fuel in small agreed quantities after 10 years and before 15 years, Iran will present its plan to, and seek approval by, the Joint Commission.

F.   **ENRICHMENT CAPACITY**

27.   Iran will keep its enrichment capacity at no more than 5060 IR-1 centrifuge machines in no more than 30 cascades in their current configurations in currently operating units at the Natanz Fuel Enrichment Plant (FEP) for 10 years.

28.   Iran will keep its level of uranium enrichment at up to 3.67 percent for 15 years.

29.   Iran will remove the following excess centrifuges and infrastructure not associated with 5060 IR-1 centrifuges in FEP, which will be stored at Natanz in Hall B of FEP under IAEA continuous monitoring:

29.1.  All excess centrifuge machines, including IR-2m centrifuges. Excess IR-1 centrifuges will be used for the replacement of failed or damaged centrifuges of the same type on a one-for-one basis.

29.2.  UF6 pipework including sub headers, valves and pressure transducers at cascade level, and frequency inverters, and UF6 withdrawal equipment from one of the withdrawal stations, which is currently not in service, including its vacuum pumps and chemical traps.

30.   For the purpose of this Annex, the IAEA will confirm through the established practice the failed or damaged status of centrifuge machines before removal.

31.   For 15 years, Iran will install gas centrifuge machines, or enrichment-related infrastructure, whether suitable for uranium enrichment, research and development, or stable isotope enrichment, exclusively at the locations and for the activities specified under this JCPOA.

G.   **CENTRIFUGES RESEARCH AND DEVELOPMENT**

32.   Iran will continue to conduct enrichment R&D in a manner that does not accumulate enriched uranium. For 10 years and consistent with its enrichment R&D plan, Iran's enrichment R&D with uranium will only include IR-4, IR-5, IR-6 and IR-8 centrifuges. Mechanical testing on up to two single centrifuges for each type will be carried out only on the IR-2m, IR-4, IR-5, IR-6, IR-6s, IR-7 and IR-8. Iran will build or test, with or without uranium, only those gas centrifuges specified in this JCPOA.

33.   Consistent with its plan, Iran will continue working with the 164-machine IR-2m cascade at PFEP in order to complete the necessary tests until 30 November 2015 or the day of implementation of this JCPOA, whichever comes later, and after that it will take these machines out of the PFEP and store them under IAEA continuous monitoring at Natanz in Hall B of FEP.

34.   Consistent with its plan, Iran will continue working with the 164-machine IR-4 cascade at PFEP in order to complete the necessary tests until 30 November 2015 or the day of implementation of this JCPOA, whichever comes later, and after that it will take these machines out of the PFEP and store them under IAEA continuous monitoring at Natanz in Hall B of FEP.

35.   Iran will continue the testing of a single IR-4 centrifuge machine and IR-4 centrifuge cascade of up to 10 centrifuge machines for 10 years.

36.   Iran will test a single IR-5 centrifuge machine for 10 years.

37.   Iran will continue testing of the IR-6 on single centrifuge machines and its intermediate cascades and will commence testing of up to 30 centrifuge machines from one and a half years before the end of year 10. Iran will proceed from single centrifuge machines and small cascades to intermediate cascades in a logical sequence.

38.   Iran will commence, upon start of implementation of the JCPOA, testing of the IR-8 on single centrifuge machines and its intermediate cascades and will commence the testing of up to 30 centrifuges machines from one and a half years before the end of year 10. Iran will proceed from single centrifuges to small cascades to intermediate cascades in a logical sequence.

39.   For 10 years, Iran, consistent with the established practice, will recombine the enriched and depleted streams from the IR-6 and IR-8 cascades through the use of welded pipework on withdrawal main headers in a manner that precludes the withdrawal of enriched and depleted uranium materials and verified by the IAEA.

40.   For 15 years, Iran will conduct all testing of centrifuges with uranium only at the PFEP. Iran will conduct all mechanical testing of centrifuges only at the PFEP and the Tehran Research Centre.

41.   For the purpose of adapting PFEP to the R&D activities in the enrichment and enrichment R&D plan, Iran will remove all centrifuges except those needed for testing as described in the relevant paragraphs above, except for the IR-1 cascade (No. 1) as described below. For the full IR-1 cascade (No. 6), Iran will modify associated infrastructure by removing UF6 pipework, including sub-headers, valves and pressure transducers at cascade level, and frequency inverters. The IR-1 cascade (No. 1) centrifuges will be kept but made inoperable, as verified by the IAEA, through the removal of centrifuge rotors and the injection of epoxy resin into the sub headers, feeding, product, and tails pipework, and the removal of controls and electrical systems for vacuum, power and cooling. Excess centrifuges and infrastructure will be stored at Natanz in Hall B of FEP under IAEA continuous monitoring. The R&D space in line No. 6 will be left empty until Iran needs to use it for its R&D programme.

42.   Consistent with the activities in the enrichment and enrichment R&D plan, Iran will maintain the cascade infrastructure for testing of single centrifuges and small and intermediate cascades in two R&D lines (No. 2 and No. 3) and will adapt two other lines (No. 4 and No. 5) with infrastructure similar to that for lines No. 2 and No. 3 in order to enable future R&D activities as specified in this JCPoA. Adaptation will include modification of all UF6 pipework (including removal of all sub headers except as agreed as needed for the R&D programme) and associated instrumentation to be compatible with single centrifuges and small and intermediate cascade testing instead of full scale testing.

43.   Consistent with its plan and internationally established practices, Iran intends to continue R&D on new types of centrifuges through computer modelling and simulations, including at universities. For any such project to proceed to a

prototype stage for mechanical testing within 10 years, a full presentation to, and approval by, the Joint Commission is needed.

## H.   FORDOW FUEL ENRICHMENT PLANT

44.   The Fordow Fuel Enrichment Plant (FFEP) will be converted into a nuclear, physics, and technology centre and international collaboration will be encouraged in agreed areas of research. The Joint Commission will be informed in advance of the specific projects that will be undertaken at Fordow.

45.   Iran will not conduct any uranium enrichment or any uranium enrichment related R&D and will have no nuclear material at the Fordow Fuel Enrichment Plant (FFEP) for 15 years.

46.   For 15 years, Iran will maintain no more than 1044 IR-1 centrifuge machines at one wing of the FFEP of which:

46.1. Two cascades that have not experienced UF6 before will be modified for the production of stable isotopes. The transition to stable isotope production of these cascades at FFEP will be conducted in joint partnership between the Russian Federation and Iran on the basis of arrangements to be mutually agreed upon. To prepare these two cascades for installation of a new cascade architecture appropriate for stable isotope production by the joint partnership, Iran will remove the connection to the UF6 feed main header, and move cascade UF6 pipework (except for the dump line in order to maintain vacuum) to storage in Fordow under IAEA continuous monitoring. The Joint Commission will be informed about the conceptual framework of stable isotope production at FFEP.

46.2. For four cascades with all associated infrastructure remaining except for pipework that enables crossover tandem connections, two will be placed in an idle state, not spinning. The other two cascades will continue to spin until the transition to stable isotope production described in the previous subparagraph has been completed. Upon completion of the transition to stable isotope production described in the previous subparagraph, these two spinning cascades will be placed in an idle state, not spinning.

47.   Iran will:

47.1. remove the other 2 cascades of IR-1 centrifuges from this wing, by removing all centrifuges and cascade UF6 pipework, including sub-headers, valves and pressure transducers at cascade level, and frequency inverters.

47.2. also subsequently remove cascade electrical cabling, individual cascade control cabinets and vacuum pumps. All these excess centrifuges and infrastructure will be stored at Natanz in Hall B of FEP under IAEA continuous monitoring.

48.   Iran will:

48.1. remove all excess centrifuges and uranium enrichment related infrastructure from the other wing of the FFEP. This will include removal

of all centrifuges and UF6 pipework, including sub headers, valves and pressure gauges and transducers, and frequency inverters and converters, and UF6 feed and withdrawal stations.

48.2. also subsequently remove cascade electrical cabling, individual cascade control cabinets, vacuum pumps and centrifuge mounting blocks. All these excess centrifuges and infrastructure will be stored at Natanz in Hall B of FEP under IAEA continuous monitoring.

49. Centrifuges from the four idle cascades may be used for the replacement of failed or damaged centrifuges in stable isotope production at Fordow.

50. Iran will limit its stable isotope production activities with gas centrifuges to the FFEP for 15 years and will use no more than 348 IR-1 centrifuges for these activities at the FFEP. The associated R&D activities in Iran will occur at the FFEP and at Iran's declared and monitored centrifuge manufacturing facilities for testing, modification and balancing these IR-1 centrifuges.

51. The IAEA will establish a baseline for the amount of uranium legacy from past enrichment operations that will remain in Fordow. Iran will permit the IAEA regular access, including daily as requested by the IAEA, access to the FFEP in order to monitor Iran's production of stable isotopes and the absence of undeclared nuclear material and activities at the FFEP for 15 years.

## I.  OTHER ASPECTS OF ENRICHMENT

52. Iran will abide by its voluntary commitments as expressed in its own long term enrichment and enrichment R&D plan to be submitted as part of the initial declaration described in Article 2 of the Additional Protocol.[1] The IAEA will confirm on an annual basis, for the duration of the plan that the nature and scope and scale of Iran's enrichment and enrichment R&D activities are in line with this plan.

53. Iran will start to install necessary infrastructure for the IR-8 at Natanz in Hall B of FEP after year 10.

54. An agreed template for describing different centrifuge types (IR-1, IR-2m, IR-4, IR-5, IR-6, IR-6s, IR-7, IR-8) and the associated definitions need to be accomplished by implementation day.

55. An agreed procedure for measuring IR-1, IR-2m and IR-4 centrifuge performance data needs to be accomplished by implementation day.

## J.  URANIUM STOCKS AND FUELS

56. Iran will maintain a total enriched uranium stockpile of no more than 300 kg of up to 3.67% enriched uranium hexafluoride (or the equivalent in different chemical forms) for 15 years.

57. All enriched uranium hexafluoride in excess of 300 kg of up to 3.67% enriched UF6 (or the equivalent in different chemical forms) will be down blended to natural uranium level or be sold on the international market and delivered to the international buyer in return for natural uranium delivered to

---

[1] Iran will permit the IAEA to share the content of the enrichment and enrichment R&D plan, as submitted as part of the initial declaration, with the Joint Commission participants.

Iran. Iran will enter into a commercial contract with an entity outside Iran for the purchase and transfer of its enriched uranium stockpile in excess of 300 kg UF6 in return for natural uranium delivered to Iran. The E3/EU+3 will facilitate, where applicable, the conclusion and implementation of this contract. Iran may choose to seek to sell excess enriched uranium to the IAEA fuel bank in Kazakhstan when the fuel bank becomes operational.

58.　All uranium oxide enriched to between 5% and 20% will be fabricated into fuel plates for the Tehran Research Reactor or transferred, based on a commercial transaction, outside of Iran or diluted to an enrichment level of 3.67% or less. Scrap oxide and other forms not in plates that cannot be fabricated into TRR fuel plates will be transferred, based on a commercial transaction, outside of Iran or diluted to an enrichment level of 3.67% or less. In case of future supply of 19.75% enriched uranium oxide (U3O8) for TRR fuel plates fabrication, all scrap oxide and other forms not in plates that cannot be fabricated into TRR fuel plates, containing uranium enriched to between 5% and 20%, will be transferred, based on a commercial transaction, outside of Iran or diluted to an enrichment level of 3.67% or less within 6 months of its production. Scrap plates will be transferred, based on a commercial transaction, outside Iran. The commercial transactions should be structured to return an equivalent amount of natural uranium to Iran. For 15 years, Iran will not build or operate facilities for converting fuel plates or scrap back to UF6.

59.　Russian designed, fabricated and licensed fuel assemblies for use in Russian-supplied reactors in Iran do not count against the 300 kg UF6 stockpile limit. Enriched uranium in fabricated fuel assemblies from other sources outside of Iran for use in Iran's nuclear research and power reactors, including those which will be fabricated outside of Iran for the initial fuel load of the modernised Arak research reactor, which are certified by the fuel supplier and the appropriate Iranian authority to meet international standards, will not count against the 300 kg UF6 stockpile limit. The Joint Commission will establish a Technical Working Group with the goal of enabling fuel to be fabricated in Iran while adhering to the agreed stockpile parameters (300 kg of up to 3.67 % enriched UF6 or the equivalent in different chemical forms). This Technical Working Group will also, within one year, work to develop objective technical criteria for assessing whether fabricated fuel and its intermediate products can be readily converted to UF6. Enriched uranium in fabricated fuel assemblies and its intermediate products manufactured in Iran and certified to meet international standards, including those for the modernised Arak research reactor, will not count against the 300 kg UF6 stockpile limit provided the Technical Working Group of the Joint Commission approves that such fuel assemblies and their intermediate products cannot be readily reconverted into UF6. This could for instance be achieved through impurities (e.g. burnable poisons or otherwise) contained in fuels or through the fuel being in a chemical form such that direct conversion back to UF6 would be technically difficult without dissolution and purification. The objective technical criteria will guide the approval process of the Technical Working Group. The IAEA will monitor the fuel fabrication process for any fuel produced in Iran to verify that the fuel and intermediate products comport with the fuel fabrication process that was approved by the Technical Working Group. The Joint Commission will also support assistance to Iran including through IAEA

technical cooperation as appropriate, in meeting international qualification standards for nuclear fuel produced by Iran.

60. Iran will seek to enter into a commercial contract with entities outside Iran for the purchase of fuel for the TRR and enriched uranium targets. The E3/EU+3 will facilitate, as needed, the conclusion and implementation of this contract. In the case of lack of conclusion of a contract with a fuel supplier, E3/EU+3 will supply a quantity of 19.75% enriched uranium oxide (U3O8) and deliver to Iran, exclusively for the purpose of fabrication in Iran of fuel for the TRR and enriched uranium targets for the lifetime of the reactor. This 19.75% enriched uranium oxide (U3O8) will be supplied in increments no greater than approximately 5 kg and each new increment will be provided only when the previous increment of this material has been verified by the IAEA to have been mixed with aluminum to make fuel for the TRR or fabricated into enriched uranium targets. Iran will notify the E3/EU+3 within 2 year before the contingency of TRR fuel will be exhausted in order to have the uranium oxide available 6 months before the end of the 2 year period.

## K.  CENTRIFUGE MANUFACTURING

61. Consistent with its enrichment and enrichment R&D plan, Iran will only engage in production of centrifuges, including centrifuge rotors suitable for isotope separation or any other centrifuge components, to meet the enrichment and enrichment R&D requirements of this Annex.

62. Consistent with its plan, Iran will use the stock of IR-1 centrifuge machines in storage, which are in excess of the remaining 5060 IR-1 centrifuges in Natanz and the IR-1 centrifuges installed at Fordow, for the replacement of failed or damaged machines. Whenever during the 10 year period from the start of the implementation of the JCPOA, the level of stock of IR-1 machines falls to 500 or below, Iran may maintain this level of stock by resuming production of IR-1 machines at a rate up to the average monthly crash rate without exceeding the stock of 500.

63. Consistent with its plan, at the end of year 8, Iran will commence manufacturing of IR-6 and IR-8 centrifuges without rotors through year 10 at a rate of up to 200 centrifuges per year for each type. After year 10, Iran will produce complete centrifuges with the same rate to meet its enrichment and enrichment R&D needs. Iran will store them at Natanz in an above ground location, under IAEA continuous monitoring, until they are needed for final assembly according to the enrichment and enrichment R&D plan.

## L.  ADDITIONAL PROTOCOL AND MODIFIED CODE 3.1

64. Iran will notify the IAEA of provisional application of the Additional Protocol to its Safeguards Agreement in accordance with Article 17(b) of the Additional Protocol pending its entry into force, and subsequently seek ratification and entry into force, consistent with the respective roles of the President and the Majlis (Parliament).

65. Iran will notify the IAEA that it will fully implement the Modified Code 3.1 of the Subsidiary Arrangement to Iran's Safeguards Agreement as long as the Safeguards Agreement remains in force.

**M.   PAST AND PRESENT ISSUES OF CONCERN**

66.   Iran will complete all activities as set out in paragraphs 2, 4, 5, and 6 of the "Roadmap for Clarification of Past and Present Outstanding Issues", as verified by the IAEA in its regular updates by the Director General of the IAEA on the implementation of this Roadmap.

**N.   MODERN TECHNOLOGIES AND LONG TERM PRESENCE OF IAEA**

67.   For the purpose of increasing the efficiency of monitoring for this JCPOA, for 15 years or longer, for the specified verification measures:

67.1.   Iran will permit the IAEA the use of on-line enrichment measurement and electronic seals which communicate their status within nuclear sites to IAEA inspectors, as well as other IAEA approved and certified modern technologies in line with internationally accepted IAEA practice. Iran will facilitate automated collection of IAEA measurement recordings registered by installed measurement devices and sending to IAEA working space in individual nuclear sites.

67.2.   Iran will make the necessary arrangements to allow for a long-term IAEA presence, including issuing long-term visas, as well as providing proper working space at nuclear sites and, with best efforts, at locations near nuclear sites in Iran for the designated IAEA inspectors for working and keeping necessary equipment.

67.3.   Iran will increase the number of designated IAEA inspectors to the range of 130-150 within 9 months from the date of the implementation of the JCPOA, and will generally allow the designation of inspectors from nations that have diplomatic relations with Iran, consistent with its laws and regulations.

**O.   TRANSPARENCY RELATED TO URANIUM ORE CONCENTRATE (UOC)**

68.   Iran will permit the IAEA to monitor, through agreed measures that will include containment and surveillance measures, for 25 years, that all uranium ore concentrate produced in Iran or obtained from any other source, is transferred to the uranium conversion facility (UCF) in Esfahan or to any other future uranium conversion facility which Iran might decide to build in Iran within this period.

69.   Iran will provide the IAEA with all necessary information such that the IAEA will be able to verify the production of the uranium ore concentrate and the inventory of uranium ore concentrate produced in Iran or obtained from any other source for 25 years.

**P.   TRANSPARENCY RELATED TO ENRICHMENT**

70.   For 15 years, Iran will permit the IAEA to implement continuous monitoring, including through containment and surveillance measures, as necessary, to verify that stored centrifuges and infrastructure remain in storage, and are only used to replace failed or damaged centrifuges, as specified in this Annex.

71. Iran will permit the IAEA regular access, including daily access as requested by the IAEA, to relevant buildings at Natanz, including all parts of the FEP and PFEP, for 15 years.

72. For 15 years, the Natanz enrichment site will be the sole location for all of Iran's uranium enrichment related activities including safeguarded R&D.

73. Iran intends to apply nuclear export policies and practices in line with the internationally established standards for the export of nuclear material, equipment and technology. For 15 years, Iran will only engage, including through export of any enrichment or enrichment related equipment and technology, with any other country, or with any foreign entity in enrichment or enrichment related activities, including related research and development activities, following approval by the Joint Commission.

## Q.   ACCESS

74. Requests for access pursuant to provisions of this JCPOA will be made in good faith, with due observance of the sovereign rights of Iran, and kept to the minimum necessary to effectively implement the verification responsibilities under this JCPOA. In line with normal international safeguards practice, such requests will not be aimed at interfering with Iranian military or other national security activities, but will be exclusively for resolving concerns regarding fulfilment of the JCPOA commitments and Iran's other non-proliferation and safeguards obligations. The following procedures are for the purpose of JCPOA implementation between the E3/EU+3 and Iran and are without prejudice to the safeguards agreement and the Additional Protocol thereto. In implementing this procedure as well as other transparency measures, the IAEA will be requested to take every precaution to protect commercial, technological and industrial secrets as well as other confidential information coming to its knowledge.

75. In furtherance of implementation of the JCPOA, if the IAEA has concerns regarding undeclared nuclear materials or activities, or activities inconsistent with the JCPOA, at locations that have not been declared under the comprehensive safeguards agreement or Additional Protocol, the IAEA will provide Iran the basis for such concerns and request clarification.

76. If Iran's explanations do not resolve the IAEA's concerns, the Agency may request access to such locations for the sole reason to verify the absence of undeclared nuclear materials and activities or activities inconsistent with the JCPOA at such locations. The IAEA will provide Iran the reasons for access in writing and will make available relevant information.

77. Iran may propose to the IAEA alternative means of resolving the IAEA's concerns that enable the IAEA to verify the absence of undeclared nuclear materials and activities or activities inconsistent with the JCPOA at the location in question, which should be given due and prompt consideration.

78. If the absence of undeclared nuclear materials and activities or activities inconsistent with the JCPOA cannot be verified after the implementation of the alternative arrangements agreed by Iran and the IAEA, or if the two sides are unable to reach satisfactory arrangements to verify the absence of undeclared nuclear materials and activities or activities inconsistent with the JCPOA at the

specified locations within 14 days of the IAEA's original request for access, Iran, in consultation with the members of the Joint Commission, would resolve the IAEA's concerns through necessary means agreed between Iran and the IAEA. In the absence of an agreement, the members of the Joint Commission, by consensus or by a vote of 5 or more of its 8 members, would advise on the necessary means to resolve the IAEA's concerns. The process of consultation with, and any action by, the members of the Joint Commission would not exceed 7 days, and Iran would implement the necessary means within 3 additional days.

## R.   CENTRIFUGE COMPONENT MANUFACTURING TRANSPARENCY

79.   Iran and the IAEA will take the necessary steps for containment and surveillance on centrifuge rotor tubes and bellows for 20 years.

80.   In this context:

80.1. Iran will provide the IAEA with an initial inventory of all existing centrifuge rotor tubes and bellows and subsequent reports on changes in such inventory and will permit the IAEA to verify the inventory by item counting and numbering, and through containment and surveillance, of all rotor tubes and bellows, including in all existing and newly produced centrifuges.

80.2. Iran will declare all locations and equipment, namely flow-forming machines, filament-winding machines and mandrels that are used for production of centrifuge rotor tubes or bellows, and will permit the IAEA to implement continuous monitoring, including through containment and surveillance on this equipment, to verify that this equipment is being used to manufacture centrifuges only for the activities specified in this JCPOA.

## S.   OTHER URANIUM ISOTOPE SEPARATION ACTIVITIES

81.   For 10 years, Iran's uranium isotope separation-related research and development or production activities will be exclusively based on gaseous centrifuge technology.[2] Iran will permit IAEA access to verify that uranium isotope separation production and R&D activities are consistent with this Annex.

## T.   ACTIVITIES WHICH COULD CONTRIBUTE TO THE DESIGN AND DEVELOPMENT OF A NUCLEAR EXPLOSIVE DEVICE

82.   Iran will not engage in the following activities which could contribute to the development of a nuclear explosive device:

82.1. Designing, developing, acquiring, or using computer models to simulate nuclear explosive devices.

---

[2] For the purpose of this Annex, non-gaseous centrifuge uranium isotope separation-related research and development or production will include laser isotope separation systems, electromagnetic isotope separation systems, chemical exchange systems, gaseous diffusion systems, vortex and aerodynamic systems, and other such processes that separate uranium isotopes.

82.2. Designing, developing, fabricating, acquiring, or using multi-point explosive detonation systems suitable for a nuclear explosive device, unless approved by the Joint Commission for non-nuclear purposes and subject to monitoring.

82.3. Designing, developing, fabricating, acquiring, or using explosive diagnostic systems (streak cameras, framing cameras and flash x-ray cameras) suitable for the development of a nuclear explosive device, unless approved by the Joint Commission for non-nuclear purposes and subject to monitoring.

82.4. Designing, developing, fabricating, acquiring, or using explosively driven neutron sources or specialized materials for explosively driven neutron sources.

## Attachment: Arak conceptual design

**Fundamental Principles:**

- Maximize use of the current infrastructure of original design of Arak research reactor, designated by the IAEA as IR-40, according to their respective ratings.

- Modernizing of the original design in order to be a multi-purpose research reactor comprising radio-isotope production, structural materials and fuel (pins and assembly prototypes) testing and able to conduct other neutronic experiments which demand high neutron fluxes (more than $10^{14}$).

- Using heavy water as coolant, moderator and reflector. Light water would be utilized as an annular ring around the compact new core for safety reasons if necessary.

- Around 78 fuel assemblies in a tight hexagonal grid spacing with the following preliminary characteristics will be loaded.

- Up to 3.67 percent enriched $UO_2$, in the improved assembly design, will be used as fuel.

- Power will not exceed to 20 MWth.

- Adding different types of beam tubes to the existing beam tubes which being extended to the edge of the new compact core.

- Having one central channel in the center of the new core with passive cooling system for the purpose of structural materials and fuel pins and assembly prototypes testing with neutron flux beyond $2 \cdot 10^{14}$, twelve in-core irradiation channels (IIC) inside the core and twelve lateral irradiation channels (LIC) just next to the outer ring of fuel assemblies.

- The location of the in-core and lateral irradiation channels should be designed and fixed to meet the best anticipated performances.

- Consistent with relevant section of Annex 1, subsidiary laboratories are part of the modernization project of the Arak Research Reactor. In Addition, Annex III reinforce design and construction of subsidiary laboratories.

- The highest tolerable pressure for the first and second loop is 0.33 Mpa (at the interance of the reactor pit).

- The highest possible flow rate for coolant is 610 kg/s at the pressure of 0.33 MPa in the main piping system and 42 Kg/sec for Moderator with the same conditions.

S/RES/2231 (2015)

**Preliminary Characteristics:**

| Core Parameters | Values |
| --- | --- |
| Power (MW) | 20 |
| Number of fuel assemblies | ~ 78 |
| Active length (cm) | ~ 110 |
| Lattice configuration | Hexagonal |
| Fuel pellets Material | $UO_2$ |
| Fuel enrichment level | Up to 3.67 % |
| Clad material | Zr Alloys |
| Burnable poison | Yes, if necessary |
| Lattice pitch (cm) | ~ 11 |
| Coolant medium | $D_2O$ |
| Moderator medium | $D_2O$ |
| Reflector medium | $D_2O$ |
| Reflector thickness (cm) | ~ 50 |
| Purity of D2O | ~ 99.8% |
| Mass of D2O (mtons) | ~ 60-70 |
| Yearly makeup | Yes |
| $K_{eff}$ | < 1.25 |
| Core Excess reactivity (pcm) | < 20000 |
| Cycle length (days) approximatly | ~ 250 |
| $^{239}$Pu at EoC (g) | ~ 850 |
| $^{239}$Pu purity at EoC | ~ 78% |
| $^{235}$U consumption | ~ 60% |
| Maximum Thermal Flux, E<0.625ev | ~ $3 \cdot 10^{14}$ |
| Maximum Fast Flux, E>0.625ev | ~ $1 \cdot 10^{14}$ |
| Minimum Thermal Flux, E<0.625ev | ~ $1 \cdot 10^{14}$ |
| Minimum Fast Flux, E>0.625ev | ~ $1 \cdot 10^{14}$ |
| Fluid velocity in channels (m/s) | ~ 3.8 |
| Channel mass flow rate (kg/s) | ~ 2.4 |
| Working pressure (MPa) | 0.33 |
| Fluid inlet temperature ($^o$C) | ~ 47 |
| Fluid outlet temperature ($^o$C) | ~ 78 |
| Core material | Mainly S.S. 304 |
| Core wall Thichness (mm) | ~ 30 |
| Fuel Pellet Diameter (cm) | ~ 0.65 |
| Inner Clad Diameter (cm) | ~ 0.67 |
| Outer Clad Diameter (cm) | ~ 0.8 |
| Number of pins per assembly | 12 |
| Mass of UO2 in full core load (Kg) | ~ 350 |
| Core diameter (cm) | ~ 240 |

## JCPOA Annex II – Sanctions-related commitments

The sequence of implementation of the commitments detailed in this Annex is specified in Annex V (Implementation Plan) to this Joint Comprehensive Plan of Action (JCPOA).

**A.   <u>European Union</u>**[1]

**1.**   The EU and EU Member States commit to terminate all provisions of Council Regulation (EU) No 267/2012 (as subsequently amended) implementing all nuclear-related sanctions or restrictive measures as specified in Sections 1.1-1.10 below, to terminate all provisions of Council Decision 2010/413/CFSP (as subsequently amended), as specified in Sections 1.1-1.10 below, and to terminate or amend national implementing legislation as required, in accordance with Annex V:

**1.1.**   **Financial, banking and insurance measures**[2]

1.1.1   Prohibition and authorisation regimes on financial transfers to and from Iran (Article 10 of Council Decision 2010/413/CFSP; Articles 30, 30a, 30b and 31 of Council Regulation (EU) No 267/2012);

1.1.2.   Sanctions on banking activities (Article 11 of Council Decision 2010/413/CFSP; Article 33 of Council Regulation (EU) No 267/2012);

1.1.3.   Sanctions on insurance (Article 12 of Council Decision 2010/413/CFSP; Article 35 of Council Regulation (EU) No 267/2012);

1.1.4.   Sanctions on financial messaging services (Article 20(12) of Council Decision 2010/413/CFSP; Article 23(4) of Council Regulation (EU) No 267/2012);

1.1.5.   Sanctions on financial support for trade with Iran (Article 8 of Council Decision 2010/413/CFSP);

1.1.6.   Sanctions on grants, financial assistance and concessional loans (Article 9 of Council Decision 2010/413/CFSP);

1.1.7.   Sanctions on Government of Iran public-guaranteed bonds (Article 13 of Council Decision 2010/413/CFSP; Article 34 of Council Regulation (EU) No 267/2012); and

1.1.8.   Sanctions on associated services[3] for each of the categories above (see the references above).

---

[1] For the purposes of EU legislation, "Iranian person, entity or body" means:
  (i)   the State of Iran or any public authority thereof;
  (ii)   any natural person in, or resident in, Iran;
  (iii)   any legal person, entity or body having its registered office in Iran;
  (iv)   any legal person, entity or body, inside or outside Iran, owned or controlled directly or indirectly by one or more of the above mentioned persons or bodies.

[2] The headings and subheadings in this Annex are for descriptive purposes only.

[3] For the purposes of this Annex, the term "associated services" means any service – including technical assistance, training, insurance, re-insurance, brokering, transportation or financial service – necessary and ordinarily incident to the underlying activity for which sanctions have been lifted pursuant to this JCPOA.

**1.2.**   **Oil, gas and petrochemical sectors**

1.2.1.   Sanctions on the import of oil and gas from Iran (Articles 3a, 3c and 3e of Council Decision 2010/413/CFSP; Articles 11, 12 and 14a, and Annexes IV and IVA of Council Regulation (EU) No 267/2012);

1.2.2.   Sanctions on the import of Iranian petrochemical products (Articles 3b and 3d of Council Decision 2010/413/CFSP; Articles 13 and 14, and Annex V of Council Regulation (EU) No 267/2012);

1.2.3.   Sanctions on the export of key equipment for the oil, gas and petrochemical sectors (Articles 4, 4a and 4b of Council Decision 2010/413/CFSP; Articles 8, 9 and 10, and Annexes VI and VIA of Council Regulation (EU) No 267/2012);

1.2.4.   Sanctions on investment in the oil, gas and petrochemical sectors (Articles 6, 6a and 7 of Council Decision 2010/413/CFSP; Articles 17(1), 17(2)(b) and (c), 17(3), 17(4), 17(5), 20 and 21 of Council Regulation (EU) No 267/2012); and

1.2.5.   Sanctions on associated services for each of the categories above (see the references above).

**1.3.**   **Shipping, shipbuilding and transport sectors**

1.3.1.   Sanctions related to shipping and shipbuilding (Articles 4g, 4h, 8a, 18a and 18b of Council Decision 2010/413/CFSP; Articles 10a, 10b, 10c, 37a, and 37b, and Annex VIB of Council Regulation (EU) No 267/2012);

1.3.2.   Sanctions related to the transport sector (Articles 15, 16, 17 and 18 of Council Decision 2010/413/CFSP; Articles 36 and 37 of Council Regulation (EU) No 267/2012); and

1.3.3.   Sanctions on associated services for each of the categories above (see the references above).

**1.4.**   **Gold, other precious metals, banknotes and coinage**

1.4.1.   Sanctions on gold, precious metals and diamonds, banknotes and coinage (Articles 4c and 4d of Council Decision 2010/413/CFSP; Articles 15 and 16, and Annex VII of Council Regulation (EU) No 267/2012); and

1.4.2.   Sanctions on associated services for each of the categories above (see the references above).

**1.5.**   **Nuclear proliferation-related measures**

1.5.1.   Sanctions related to proliferation-sensitive nuclear activities (goods and technology, investment and specialised training) (Articles 1(1) (a), (b), (d), (e), (2), (3) and (4), 2, 3, 5, 14 and 21 of Council Decision 2010/413/CFSP; Articles 2, 3, 4, 5, 6,7, 17(1) and (2)(a), 18, 19 and 22, and Annexes I, II and III of Council Regulation (EU) No 267/2012); and

1.5.2.   Sanctions on associated services for the category above (see the references above).

### 1.6. Metals

1.6.1. Sanctions on metals (Articles 4e and 4f of Council Decision 2010/413/CFSP; Articles 15a, 15b and 15c, and Annex VIIB of Council Regulation (EU) No 267/2012); and

1.6.2. Sanctions on associated services for the category above (see the references above).

### 1.7. Software

1.7.1. Sanctions on software (Articles 4i and 4j of Council Decision 2010/413/CFSP; Articles 10d, 10e and 10f, and Annex VIIA of Council Regulation (EU) No 267/2012); and

1.7.2. Sanctions on associated services for the category above (see the references above).

### 1.8. Arms

1.8.1. Sanctions on arms (Articles 1(1)(c), (3) and (4), and 3 of Council Decision 2010/413/CFSP; Articles 5(1)(a) and (c), 17(1) and (2)(a), and 19 of Council Regulation (EU) No 267/2012); and

1.8.2. Sanctions on associated services for the category above (see the references above).

### 1.9. Listing of persons, entities and bodies (asset freeze and visa ban)

1.9.1. Asset freeze and visa ban measures applicable to:

    1.9.1.1. listed Iranian banks and financial institutions, including the Central Bank of Iran;

    1.9.1.2. listed persons, entities and bodies related to the oil, gas and petrochemical sectors;

    1.9.1.3. listed persons, entities and bodies related to shipping, shipbuilding and transport;

    1.9.1.4. other listed persons, entities and bodies not related to proliferation-sensitive nuclear-, arms- and ballistic missile-related activities;

    1.9.1.5. listed persons, entities and bodies related to proliferation-sensitive nuclear-, arms- and ballistic missile-related activities; and

    1.9.1.6. entities and individuals listed by the UN Security Council, as set out in Attachment 1, part I to this Annex for categories 1.9.1.1-1.9.1.4, Attachment 2, part I to this Annex for category 1.9.1.5, and Parts II of Attachments 1 and 2 to this Annex for category 1.9.1.6 (Articles 19 and 20, and Annexes I and II to Council Decision 2010/413/CFSP; Articles 23, 24, 25, 26, 27, 28, 28a, 28b and 29, and Annexes VIII and IX to Council Regulation (EU) No 267/2012).

**1.10.** **Other provisions**

1.10.1. The commitment in Section 1 covers all remaining provisions of Council Decision 2010/413/CFSP and Council Regulation (EU) No 267/2012 not specified above.

1.10.1.1. Definitions (Article 1 of Council Regulation (EU) No 267/2012); and

1.10.1.2. General and final provisions (Articles 22, 23, 24, 25, 26, 26a, 27 and 28 of Council Decision 2010/413/CFSP; Articles 38, 39, 40, 41, 42, 43, 43a, 44, 45, 46, 47, 48, 49, 50 and 51, and Annex X of Council Regulation (EU) No 267/2012).

**2.** The EU represents that the provisions listed in Section 1 above constitute the full and complete list of all EU nuclear-related sanctions or restrictive measures. These sanctions or restrictive measures will be lifted in accordance with Annex V.

**3.** **Effects of the lifting of EU economic and financial sanctions**

3.1. As a result of the lifting of sanctions specified in Section 1 above, the following activities, including associated services, will be allowed, beginning on implementation day, in accordance with this JCPOA and provided that such activities are otherwise consistent with EU and EU Member States' laws and regulations in effect:[4]

**3.2.** **Financial, banking and insurance measures (See Sections 1.1.1 to 1.1.8)**

3.2.1. Transfers of funds between EU persons, entities or bodies, including EU financial and credit institutions, and Iranian persons, entities or bodies, including Iranian financial and credit institutions, without the requirement for authorisation or notification;

3.2.2. Opening of new branches, subsidiaries or representative offices of Iranian banks in the territories of EU Member States; and the establishment of new joint ventures, or the taking of an ownership interest or the establishment of new correspondent banking relationships by Iranian banks with EU banks; and opening by EU persons, including EU financial and credit institutions, of representative offices, subsidiaries, joint ventures or bank accounts in Iran;

3.2.3. Provision of insurance or reinsurance to Iran or the Government of Iran, an Iranian legal person, entity or body, or a natural person or a legal person, entity or body acting on their behalf or at their direction;

3.2.4. Supply of specialised financial messaging services to any Iranian natural or legal persons, entities or bodies, including those listed in Attachment 1 to this Annex;

3.2.5. Entering into commitments by EU Member States to provide financial support for trade with Iran, including the granting of export credits,

---

[4] Unless specifically provided otherwise, the sanctions lifting described in this Section does not apply to transactions that involve persons still subject to restrictive measures and is without prejudice to sanctions that may apply under legal provisions other than those referred to in Section 1. Nothing in this JCPOA reflects a change in Iran's position on EU sanctions.

guarantees or insurance; and into commitments for grants, financial assistance and concessional loans to the Government of Iran; and

3.2.6.  Sale or purchase of public or public-guaranteed bonds to and from Iran, the Government of Iran, the Central Bank of Iran, or Iranian banks and financial institutions or persons acting on their behalf.

**3.3.    Oil, gas and petrochemical sectors (See Sections 1.2.1 to 1.2.5)**

3.3.1.  Import, purchase, swap or transport of Iranian crude oil and petroleum products, natural gas or petrochemical products and related financing;

3.3.2.  Sale, supply, transfer or export of equipment or technology, technical assistance, including training, used in the sectors of the oil, gas and petrochemical industries in Iran covering exploration, production and refining of oil and natural gas, including liquefaction of natural gas, to any Iranian person, in or outside Iran, or for use in Iran; and

3.3.3.  Granting of any financial loan or credit to, the acquisition or extension of a participation in, and the creation of any joint venture with, any Iranian person that is engaged in the oil, gas and petrochemical sectors in Iran or outside Iran.

**3.4.    Shipping, shipbuilding and transport sectors (See Sections 1.3.1 to 1.3.3)**

3.4.1.  Sale, supply, transfer or export of naval equipment and technology for ship building, maintenance or refit, to Iran or to any Iranian persons engaged in this sector; the design, construction or the participation in the design or construction of cargo vessels and oil tankers for Iran or for Iranian persons; the provision of vessels designed or used for the transport or storage of oil and petrochemical products to Iranian persons, entities or bodies; and the provision of flagging and classification services, including those pertaining to technical specification, registration and identification numbers of any kind, to Iranian oil tankers and cargo vessels;

3.4.2.  Access to the airports under the jurisdiction of EU Member States of all cargo flights operated by Iranian carriers or originating from Iran;

3.4.3.  Cessation of inspection, seizure and disposal by EU Member States of cargoes to and from Iran in their territories with regard to items which are no longer prohibited; and

3.4.4.  Provision of bunkering or ship supply services, or any other servicing of vessels, to Iranian-owned or Iranian-contracted vessels not carrying prohibited items; and the provision of fuel, engineering and maintenance services to Iranian cargo aircraft not carrying prohibited items.

**3.5.    Gold, other precious metals, banknotes and coinage (See Sections 1.4.1 to 1.4.2)**

3.5.1.  Sale, supply, purchase, export, transfer or transport of gold and precious metals as well as diamonds, and provision of related brokering, financing and security services, to, from or for the Government of Iran, its public bodies, corporations and agencies, or the Central Bank of Iran; and

3.5.2.  Delivery of newly printed or minted or unissued Iranian denominated banknotes and coinage to, or for the benefit of the Central Bank of Iran.

**3.6.      Metals (See Sections 1.6.1 to 1.6.2)**

3.6.1.   Sale, supply, transfer or export of graphite and raw or semi-finished metals, such as aluminum and steel to any Iranian person, entity or body or for use in Iran, in connection with activities consistent with this JCPOA.

**3.7.      Software (See Sections 1.7.1 to 1.7.2)**

3.7.1.   Sale, supply, transfer or export of software for integrating industrial processes, including updates, to any Iranian person, entity or body, or for use in Iran, in connection with activities consistent with this JCPOA,

**3.8.      Listing of persons, entities and bodies (asset freeze and visa ban) (See Section 1.9.1)**

3.8.1.   As a result of delisting as specified in this Annex, releasing of all funds and economic resources which belong to, and making available funds or economic resources to, the persons, entities and bodies, including Iranian banks and financial institutions, the Central Bank of Iran, listed in Attachment 1 to this Annex; and

3.8.2.   As a result of delisting as specified in this Annex, entry into, or transit through the territories of EU Member States of individuals listed in Attachment 1 to this Annex.

**B.    United States**[5]

**4.**    The United States commits to cease the application of, and to seek such legislative action as may be appropriate to terminate, or modify to effectuate the termination of, all nuclear-related sanctions[6] as specified in Sections 4.1-4.9 below, and to terminate Executive Orders 13574, 13590, 13622 and 13645, and Sections 5-7 and 15 of Executive Order 13628, in accordance with Annex V.[7]

**4.1.    Financial and banking measures**

4.1.1.    Sanctions on transactions with individuals and entities set out in Attachment 3 to this Annex, including: the Central Bank of Iran (CBI) and other specified Iranian financial institutions; the National Iranian Oil Company (NIOC),[8] Naftiran Intertrade Company (NICO), National Iranian Tanker Company (NITC) and other specified individuals and entities identified as Government of Iran by the Office of Foreign Assets Control; and certain designated individuals and entities on the Specially Designated Nationals and Blocked Persons List (SDN List) (Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (CISADA) Section 104(c)(2)(E)(ii)(I); National Defense Authorization Act for Fiscal Year 2012 (NDAA) Sections 1245(d)(1) and (3); Iran Freedom and Counter-Proliferation Act of 2012 (IFCA) Sections 1244(c)(1) and (d), 1245(a)(1)(A), (a)(1)(C)(i)(II) and (c), 1246(a) and 1247(a); Sections 1(a)(i) and 5(a) of Executive Order (E.O.) 13622 and Sections 2(a)(i) and 3(a)(i) of E.O. 13645);

---

[5] For the purposes of U.S. legislation, "Iranian person" means (A) an individual who is a citizen or national of Iran; and (B) an entity organised under the laws of Iran or otherwise subject to the jurisdiction of the Government of Iran.

[6] The sanctions that the United States will cease to apply, and subsequently terminate, or modify to effectuate the termination of, pursuant to its commitment under Section 4 are those directed towards non-U.S. persons. For the purposes of Sections 4 and 6-7 of this JCPOA, the term "non-U.S. person" means any individual or entity, excluding (i) any United States citizen, permanent resident alien, entity organised under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States, and (ii) any entity owned or controlled by a U.S. person. For the purposes of (ii) of the preceding sentence, an entity is "owned or controlled" by a U.S. person if the U.S. person: (i) holds a 50 percent or greater equity interest by vote or value in the entity; (ii) holds a majority of seats on the board of directors of the entity; or (iii) otherwise controls the actions, policies, or personnel decisions of the entity. U.S. persons and U.S.-owned or -controlled foreign entities will continue to be generally prohibited from conducting transactions of the type permitted pursuant to this JCPOA, unless authorised to do so by the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC).

[7] All citations to statutes and Executive orders included in this JCPOA refer to the statute or Executive order as amended as of the conclusion date of this JCPOA, including: the Iran Sanctions Act of 1996 (ISA), as amended by Section 102 of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (CISADA) and Sections 201-207 and 311 of the Iran Threat Reduction and Syria Human Rights Act of 2012 (TRA); CISADA, as amended by Sections 214-216, 222, 224, 311-312, 402-403 and 605 of TRA and Section 1249 of the Iran Freedom and Counter-Proliferation Act of 2012 (IFCA); the National Defense Authorization Act for Fiscal Year 2012 (NDAA), as amended by Sections 503-504 of TRA and Section 1250 of IFCA; Executive Order (E.O.) 13622, as amended by Section 15 of E.O. 13628 and Section 16 of E.O. 13645. The citations listed in Section 4 include authorities under which secondary sanctions will no longer apply as a result of actions described in Section 4.8.1.

[8] Removal of NIOC from the SDN List, as provided for in Section 4.8.1, will include resolution of related designations and determinations.

4.1.2.  Sanctions on the Iranian Rial (NDAA Sections 1245(d)(1) and (3); IFCA Sections 1244(c)(1), 1246(a) and 1247(a); Section 5(a) of E.O. 13622 and Sections 1(a), 2(a)(i) and 3(a)(i) of E.O. 13645);

4.1.3.  Sanctions on the provision of U.S. banknotes to the Government of Iran (NDAA Sections 1245(d)(1) and (3); IFCA Sections 1244(c)(1) and (d), 1246(a) and 1247(a); Section 5(a) of E.O. 13622 and Sections 2(a)(i) and 3(a)(i) of E.O. 13645);

4.1.4.  Bilateral trade limitations on Iranian revenues held abroad, including limitations on their transfer (NDAA Sections 1245(d)(1) and (3); IFCA Sections 1244(c)(1), (d) and (h)(2), 1246(a) and 1247(a); Sections 1(a)(i)-(ii), 2(a)(i) and 5(a) of E.O. 13622 and Sections 2(a)(i) and 3(a)(i) of E.O. 13645);

4.1.5.  Sanctions on the purchase, subscription to, or facilitation of the issuance of Iranian sovereign debt, including governmental bonds (NDAA Sections 1245(d)(1) and (3); Iran Threat Reduction and Syria Human Rights Act of 2012 (TRA) Section 213(a); IFCA Sections 1244(c)(1) and (d), 1246(a) and 1247(a); Sections 1(a)(i) and 5(a) of E.O. 13622 and Sections 2(a)(i) and 3(a)(i) of E.O. 13645);

4.1.6.  Sanctions on financial messaging services to the CBI and Iranian financial institutions set out in Attachment 3 to this Annex (NDAA Sections 1245(d)(1) and (3); TRA Section 220; IFCA Sections 1244(c)(1) and (d), 1246(a) and 1247(a); Section 5(a) of E.O. 13622 and Sections 2(a)(i) and 3(a)(i) of E.O. 13645); and

4.1.7.  Sanctions on associated services[9] for each of the categories above (see individual citation references above).

### 4.2. Insurance measures

4.2.1.  Sanctions on the provision of underwriting services, insurance, or re-insurance in connection with activities consistent with this JCPOA, including activities with individuals and entities set forth in Attachment 3 to this Annex (Iran Sanctions Act of 1996 (ISA) Section 5(a)(7); NDAA Sections 1245(d)(1) and (3); TRA Sections 211(a) and 212(a); IFCA Sections 1244(c)(1) and (d), 1246(a) and 1247(a); Section 5(a) of E.O. 13622 and Sections 2(a)(i) and 3(a)(i) of E.O. 13645).

### 4.3. Energy and petrochemical sectors

4.3.1.  Efforts to reduce Iran's crude oil sales, including limitations on the quantities of Iranian crude oil sold and the nations that can purchase Iranian crude oil (ISA Section 5(a)(7); NDAA Sections 1245(d)(1) and (3); TRA Section 212(a); IFCA Sections 1244(c)(1) and (d), 1246(a) and 1247(a); Section 1 of E.O. 13574, Sections 1(a)(i)-(ii), 2(a)(i) and 5(a) of E.O. 13622, Section 5 of E.O. 13628, and Sections 2(a)(i) and 3(a)(i) of E.O. 13645);

4.3.2.  Sanctions on investment, including participation in joint ventures, goods, services, information, technology and technical expertise and support for Iran's oil, gas, and petrochemical sectors (ISA Sections 5(a)(1)-(2) and

---

[9] See footnote 3 for the meaning of "associated services".

(4)-(8); TRA Section 212(a); IFCA Sections 1244(c)(1), (d) and (h)(2), 1245(a)(1)(B), (a)(1)(C)(i)(I)-(II), (a)(1)(C)(ii)(I)-(II) and (c), 1246(a) and 1247(a); Section 1 of E.O. 13574, Section 1 of E.O. 13590, Sections 1(a)(i)-(ii), 2(a)(i)-(iii) and 5(a) of E.O. 13622, and Sections 2(a)(i) and 3(a)(i) of E.O. 13645);

4.3.3.   Sanctions on the purchase, acquisition, sale, transportation, or marketing of petroleum, petrochemical products and natural gas from Iran (NDAA Sections 1245(d)(1) and (3); TRA Section 212(a); IFCA Sections 1244(c)(1), (d) and (h)(2), 1246(a) and 1247(a); Sections 1(a)(i)-(iii), 2(a)(i)-(ii) and 5(a) of E.O. 13622, and Sections 2(a)(i) and 3(a)(i) of E.O. 13645);

4.3.4.   Sanctions on the export, sale or provision of refined petroleum products and petrochemical products to Iran (ISA Section 5(a)(3); NDAA Sections 1245(d)(1) and (3); TRA Section 212(a); IFCA Sections 1244(c)(1) and (d), 1246(a) and 1247(a); Section 1 of E.O. 13574, Sections 1(a)(i) and 5(a) of E.O. 13622, Section 5 of E.O. 13628, and Sections 2(a)(i) and 3(a)(i) of E.O. 13645);

4.3.5.   Sanctions on transactions with Iran's energy sector including with NIOC, NICO and NITC (NDAA Sections 1245(d)(1) and (3); IFCA Sections 1244(c)(1), (d) and (h)(2), 1246(a) and 1247(a); TRA Section 212(a); Sections 1(a)(i)-(iii), 2(a)(i)-(ii) and 5(a) of E.O. 13622, and Sections 2(a)(i) and 3(a)(i) of E.O. 13645); and

4.3.6.   Sanctions on associated services for each of the categories above (see individual citation references above).

### 4.4.   Shipping, shipbuilding and port sectors

4.4.1.   Sanctions on transactions with Iran's shipping and shipbuilding sectors and port operators including IRISL, South Shipping Line, and NITC, and the port operator(s) of Bandar Abbas[10] (TRA Sections 211(a) and 212(a); IFCA Sections 1244(c)(1) and (d); 1245(a)(1)(B), (a)(1)(C)(i)(I)-(II), (a)(1)(C)(ii)(I)-(II) and (c), 1246(a) and 1247(a); Section 5(a) of E.O. 13622 and Sections 2(a)(i) and 3(a)(i) of E.O. 13645); and

4.4.2.   Sanctions on associated services for each of the categories above (see individual citation references above).

### 4.5.   Gold and other precious metals

4.5.1.   Sanctions on Iran's trade in gold and other precious metals (NDAA Sections 1245(d)(1) and (3); IFCA Sections 1244(c)(1), 1245(a)(1)(A) and (c), 1246(a) and 1247(a); Section 5(a) of E.O. 13622 and Sections 2(a)(i) and 3(a)(i) of E.O. 13645); and

4.5.2.   Sanctions on associated services for each of the categories above (see individual citation references above).

### 4.6.   Software and metals

4.6.1.   Sanctions on trade with Iran in graphite, raw or semi-finished metals such as aluminum and steel, coal, and software for integrating industrial processes,

---

[10] This commitment in Section 4.4.1 is based on the port operator(s) of Bandar Abbas no longer being controlled by a person on the SDN List.

in connection with activities consistent with this JCPOA, including trade with individuals and entities set forth in Attachments 3 and 4 to this Annex (NDAA Sections 1245(d)(1) and (3); IFCA Sections 1244(c)(1), 1245(a)(1)(B)-(C) and (c), 1246(a) and 1247(a); Section 5(a) of E.O. 13622 and Sections 2(a)(i) and 3(a)(i) of E.O. 13645); and

4.6.2. Sanctions on associated services for each of the categories above (see individual citation references above).

**4.7.    Automotive sector**

4.7.1. Sanctions on the sale, supply or transfer of goods and services used in connection with Iran's automotive sector (NDAA Sections 1245(d)(1) and (3); IFCA Sections 1244(c)(1), 1245(a)(1)(B), (a)(1)(C)(i)(II), (a)(1)(C)(ii)(II) and (c), 1246(a) and 1247(a); Section 5(a) of E.O. 13622 and Sections 2(a)(i), 3(a)(i)-(ii), 5 and 6 of E.O. 13645); and

4.7.2. Sanctions on associated services for each of the categories above (see individual citation references above).

**4.8.    Designations and other sanctions listings**

4.8.1. Removal of individuals and entities set out in Attachments 3 and 4 to this Annex from the Specially Designated Nationals and Blocked Persons List (SDN List), the Foreign Sanctions Evaders List, and/or the Non-SDN Iran Sanctions Act List (Removal of designations and/or sanctions imposed under ISA Section 5(a), IFCA Section 1244(d)(1) and TRA Section 212; and removals pursuant to the International Emergency Economic Powers Act of certain persons listed pursuant to E.O. 13382, E.O. 13608, E.O. 13622, and E.O. 13645).

**4.9.    Nuclear proliferation-related measures**

4.9.1. Sanctions under the Iran, North Korea and Syria Nonproliferation Act on the acquisition of nuclear-related commodities and services for nuclear activities contemplated in the JCPOA, to be consistent with the U.S. approach to other non-nuclear-weapon states under the NPT;

4.9.2. Sanctions on joint ventures relating to the mining, production, or transportation of uranium (ISA Section 5(b)(2)); and

4.9.3. Exclusion of Iranian citizens from higher education coursework related to careers in nuclear science, nuclear engineering or the energy sector (TRA Section 501).

**5.    Other trade measures**

**5.1.** The United States commits to:[11]

5.1.1. Allow for the sale of commercial passenger aircraft and related parts and services to Iran by licensing the (i) export, re-export, sale, lease or transfer to Iran of commercial passenger aircraft for exclusively civil aviation end-use,

---

[11] To give effect to the measures described in this Section 5.1, the United States will license activities that do not involve any person on the SDN List and are otherwise consistent with applicable U.S. laws and regulations, including but not limited to the Export Administration Act, the Federal Food, Drug and Cosmetic Act and the Iran-Iraq Arms Nonproliferation Act.

(ii) export, re-export, sale, lease or transfer to Iran of spare parts and components for commercial passenger aircraft, and (iii) provision of associated serviced, including warranty, maintenance, and repair services and safety-related inspections, for all the foregoing, provided that licensed items and services are used exclusively for commercial passenger aviation; [12]

5.1.2.   License non-U.S. entities that are owned or controlled by a U.S. person [13] to engage in activities with Iran that are consistent with this JCPOA; and

5.1.3.   License the importation into the United States of Iranian-origin carpets and foodstuffs, including pistachios and caviar.

**6.**   The United States represents that the provisions listed in Section 4 above constitute the full and complete list of all U.S. nuclear-related sanctions. These sanctions will be lifted in accordance with Annex V.

**7.**   **Effects of the lifting of U.S. economic and financial sanctions:**

**7.1.**   As a result of the lifting of sanctions specified in Section 4 above, beginning on implementation day such sanctions, including associated services, would not apply to non-U.S. persons who carry out the following or that: [14]

**7.2.**   **Financial and banking measures [15] (See Sections 4.1.1 to 4.1.7)**

Engage in activities, including financial and banking transactions, with the Government of Iran, the Central Bank of Iran, Iranian financial institutions and other Iranian persons specified in Attachment 3 to this Annex, including the provision of loans, transfers, accounts (including the opening and maintenance of correspondent and payable through accounts at non-U.S. financial institutions), investments, securities, guarantees, foreign exchange (including Rial related transactions), letters of credit and commodity futures or options, the provision of specialised financial messaging services and facilitation of direct or indirect access thereto, the purchase or acquisition by

---

[12] Licenses issued in furtherance of Section 5.1.1 will include appropriate conditions to ensure that licensed activities do not involve, and no licensed aircraft, goods, or services are re-sold or re-transferred to, any person on the SDN list. Should the United States determine that licensed aircraft, goods, or services have been used for purposes other than exclusively civil aviation end-use, or have been re-sold or re-transferred to persons on the SDN List, the United States would view this as grounds to cease performing its commitments under Section 5.1.1 in whole or in part.

[13] For the purposes of Section 5.1.2 of this JCPOA, a non-U.S. entity is owned or controlled by a U.S. person if the U.S. person: (i) holds a 50 per cent or greater equity interest by vote or value in the entity; (ii) holds a majority of seats on the board of directors of the entity; or (iii) otherwise controls the actions, policies, or personnel decisions of the entity.

[14] Unless specifically provided otherwise, the sanctions lifting described in this Section does not apply to transactions that involve persons on the SDN List and is without prejudice to sanctions that may apply under legal provisions other than those cited in Section 4. Nothing in this JCPOA reflects a change in Iran's position on U.S. sanctions.

[15] For the purposes of the cessation of application of the provisions set out in Sections 4.1.1-4.1.7, the effects described for non-U.S. financial institutions extend to the activities outside of U.S. jurisdiction of international financial institutions.

the Government of Iran of U.S. bank notes, and the purchase, subscription to, or facilitation of the issuance of Iranian sovereign debt.[16]

**7.3.    Insurance measures (See Section 4.2.1)**

Provide underwriting services, insurance, or re-insurance in connection with activities consistent with this JCPOA, including activities with individuals and entities set forth in Attachment 3 to this Annex, including underwriting services, insurance, or re-insurance in connection with activities in the energy, shipping, and shipbuilding sectors of Iran, for the National Iranian Oil Company (NIOC) or the National Iranian Tanker Company (NITC), or for vessels that transport crude oil, natural gas, liquefied natural gas, petroleum and petrochemical products to or from Iran.

**7.4.    Energy and petrochemical sectors (See Sections 4.3.1 to 4.3.6)**

Are part of the energy sector of Iran; purchase, acquire, sell, transport or market petroleum, petroleum products (including refined petroleum products), petrochemical products or natural gas (including liquefied natural gas) to or from Iran; provide to Iran support, investment (including through joint ventures), goods, services (including financial services) and technology that can be used in connection with Iran's energy sector, the development of its petroleum resources, its domestic production of refined petroleum products and petrochemical products; or engage in activities with Iran's energy sector, including NIOC, NITC, and NICO).

**7.5.    Shipping, shipbuilding and port sectors (See Sections 4.4.1 to 4.4.2)**

Are part of the shipping or shipbuilding sectors of Iran; own, operate, control or insure a vessel used to transport crude oil, petroleum products (including refined petroleum products), petrochemical products or natural gas (including liquefied natural gas) to or from Iran; operate a port in Iran, engage in activities with, or provide financial services and other goods and services used in connection with, the shipping and shipbuilding sectors of Iran or a port operator in Iran (including the port operator(s) of Bandar Abbas[17]), including port services, such as bunkering and inspection, classification, and financing, and the sale, leasing, and provision of vessels to Iran, including to the Islamic Republic of Iran Shipping Lines (IRISL), NITC, and South Shipping Line Iran or their affiliates.

**7.6.    Gold and other precious metals (See Sections 4.5.1 to 4.5.2)**

Sell, supply, export or transfer, directly or indirectly, to or from Iran, gold and other precious metals, or conduct or facilitate a financial transaction or

---

[16] Non-U.S., non-Iranian financial institutions engaging in transactions with Iranian financial institutions (including the Central Bank of Iran) not appearing on the SDN List will not be exposed to sanctions as a result of those Iranian financial institutions engaging in transactions or banking relationships involving Iranian individuals and entities, including financial institutions, on the SDN List, provided that the non-U.S., non-Iranian financial institution does not conduct or facilitate, and is not otherwise involved in, those specific transactions or banking relationships with the Iranian individuals and entities, including financial institutions, on the SDN List.

[17] The effects described in Section 7.5 with respect to the port operator(s) of Bandar Abbas are based on the port operator(s) of Bandar Abbas no longer being controlled by a person on the SDN List.

provide services for the foregoing including security, insurance and transportation.

**7.7.    Software and metals (See Sections 4.6.1 to 4.6.2)**

Sell, supply, or transfer, directly or indirectly, graphite, raw or semi-finished metals such as aluminum and steel, coal, and software for integrating industrial processes, to or from Iran in connection with activities consistent with this JCPOA, including trade with individuals and entities set forth in Attachment 3 to this Annex, and the sale, supply, or transfer of such materials to the energy, petrochemical, shipping and shipbuilding sectors of Iran, and Iranian ports, or conduct or facilitate a financial transaction or provide services for the foregoing, including insurance and transportation.

**7.8.    Automotive sector (See Sections 4.7.1 to 4.7.2)**

Conduct or facilitate financial or other transactions for the sale, supply or transfer to Iran of goods and services used in connection with the automotive sector of Iran.

**7.9.    Designations and other sanctions listings (See Section 4.8.1)**

The removal of designations and/or sanctions as described in Section 4.8.1, ceasing the application of secondary sanctions for transactions with individuals and entities set out in Attachment 3 to this Annex; and unblocking of property and interests in property within U.S. jurisdiction for individuals and entities set out in Attachment 3 to this Annex.

## <u>ATTACHMENT 1 - PART I</u>

LIST OF PERSONS, ENTITIES AND BODIES SET OUT IN ANNEX II TO COUNCIL DECISION 2010/413/CFSP AND ANNEX IX TO COUNCIL REGULATION (EU) NO 267/2012

ACENA SHIPPING COMPANY LIMITED
ADVANCE NOVEL
AGHAJARI OIL & GAS PRODUCTION COMPANY
AGHAZADEH, Reza
AHMADIAN, Mohammad
AKHAVAN-FARD, Massoud
ALPHA EFFORT LTD
ALPHA KARA NAVIGATION LIMITED
ALPHA NARI NAVIGATION LIMITED
ARIAN BANK
ARVANDAN OIL & GAS COMPANY
ASHTEAD SHIPPING COMPANY LTD
ASPASIS MARINE CORPORATION
ASSA CORPORATION
ASSA CORPORATION LTD
ATLANTIC INTERMODAL
AVRASYA CONTAINER SHIPPING LINES
AZARAB INDUSTRIES
AZORES SHIPPING COMPANY ALIAS AZORES SHIPPING FZE LLC
BANCO INTERNACIONAL DE DESARROLLO CA
BANK KARGOSHAE
BANK MELLAT
BANK MELLI IRAN INVESTMENT COMPANY
BANK MELLI IRAN ZAO
BANK MELLI PRINTING AND PUBLISHING COMPANY
BANK MELLI,
BANK OF INDUSTRY AND MINE
BANK REFAH KARGARAN
BANK TEJARAT
BATENI, Naser
BEST PRECISE LTD
BETA KARA NAVIGATION LTD
BIIS MARITIME LIMITED
BIS MARITIME LIMITED
BONAB RESEARCH CENTER
BRAIT HOLDING SA
BRIGHT JYOTI SHIPPING
BRIGHT SHIP FZC
BUSHEHR SHIPPING COMPANY LIMITED
BYFLEET SHIPPING COMPANY LTD
CEMENT INVESTMENT AND DEVELOPMENT COMPANY
CENTRAL BANK OF IRAN
CHAPLET SHIPPING LIMITED
COBHAM SHIPPING COMPANY LTD

S/RES/2231 (2015)

CONCEPT GIANT LTD
COOPERATIVE DEVELOPMENT BANK
CRYSTAL SHIPPING FZE
DAJMAR, Mohammad Hossein
DAMALIS MARINE CORPORATION
DARYA CAPITAL ADMINISTRATION GMBH
DARYA DELALAN SEFID KHAZAR SHIPPING COMPANY
DELTA KARA NAVIGATION LTD
DELTA NARI NAVIGATION LTD
DIAMOND SHIPPING SERVICES
DORKING SHIPPING COMPANY LTD
EAST OIL & GAS PRODUCTION COMPANY
EDBI EXCHANGE COMPANY
EDBI STOCK BROKERAGE COMPANY
EFFINGHAM SHIPPING COMPANY LTD
EIGHTH OCEAN ADMINISTRATION GMBH
EIGHTH OCEAN GMBH & CO. KG
ELBRUS LTD
ELCHO HOLDING LTD
ELEGANT TARGET DEVELOPMENT LIMITED
ELEVENTH OCEAN ADMINISTRATION GMBH
ELEVENTH OCEAN GMBH & CO. KG
EMKA COMPANY
EPSILON NARI NAVIGATION LTD
E-SAIL A.K.A.E-SAIL SHIPPING COMPANY
ETA NARI NAVIGATION LTD
ETERNAL EXPERT LTD.
EUROPÄISCH-IRANISCHE HANDELSBANK
EXPORT DEVELOPMENT BANK OF IRAN
FAIRWAY SHIPPING
FAQIHIAN, Dr Hoseyn
FARNHAM SHIPPING COMPANY LTD
FASIRUS MARINE CORPORATION
FATSA
FIFTEENTH OCEAN ADMINISTRATION GMBH
FIFTEENTH OCEAN GMBH & CO. KG
FIFTH OCEAN ADMINISTRATION GMBH
FIFTH OCEAN GMBH & CO. KG
FIRST ISLAMIC INVESTMENT BANK
FIRST OCEAN ADMINISTRATION GMBH
FIRST OCEAN GMBH & CO. KG
FIRST PERSIAN EQUITY FUND
FOURTEENTH OCEAN ADMINISTRATION GMBH
FOURTEENTH OCEAN GMBH & CO. KG
FOURTH OCEAN ADMINISTRATION GMBH
FOURTH OCEAN GMBH & CO. KG
FUTURE BANK BSC
GACHSARAN OIL & GAS COMPANY
GALLIOT MARITIME INCORPORATION
GAMMA KARA NAVIGATION LTD

GIANT KING LIMITED
GOLDEN CHARTER DEVELOPMENT LTD.
GOLDEN SUMMIT INVESTMENTS LTD.
GOLDEN WAGON DEVELOPMENT LTD.
GOLPARVAR, Gholam Hossein
GOMSHALL SHIPPING COMPANY LTD
GOOD LUCK SHIPPING COMPANY LLC
GRAND TRINITY LTD.
GREAT EQUITY INVESTMENTS LTD.
GREAT METHOD LTD
GREAT PROSPECT INTERNATIONAL LTD.
HAFIZ DARYA SHIPPING LINES
HANSEATIC TRADE TRUST & SHIPPING GMBH
HARVEST SUPREME LTD.
HARZARU SHIPPING
HELIOTROPE SHIPPING LIMITED
HELIX SHIPPING LIMITED
HK INTERTRADE COMPANY LTD
HONG TU LOGISTICS PRIVATE LIMITED
HORSHAM SHIPPING COMPANY LTD
IFOLD SHIPPING COMPANY LIMITED
INDUS MARITIME INCORPORATION
INDUSTRIAL DEVELOPMENT & RENOVATION ORGANIZATION
INSIGHT WORLD LTD
INTERNATIONAL SAFE OIL
IOTA NARI NAVIGATION LIMITED
IRAN ALUMINIUM COMPANY
IRAN FUEL CONSERVATION ORGANIZATION
IRAN INSURANCE COMPANY
IRAN LIQUEFIED NATURAL GAS CO.
IRANIAN OFFSHORE ENGINEERING & CONSTRUCTION CO
IRANIAN OIL COMPANY LIMITED
IRANIAN OIL PIPELINES AND TELECOMMUNICATIONS COMPANY
(IOPTC)
IRANIAN OIL TERMINALS COMPANY
IRANO MISR SHIPPING COMPANY
IRINVESTSHIP LTD
IRISL (MALTA) LTD
IRISL EUROPE GMBH
IRISL MARINE SERVICES AND ENGINEERING COMPANY
IRISL MARITIME TRAINING INSTITUTE
IRITAL SHIPPING SRL
ISI MARITIME LIMITED
ISIM AMIN LIMITED
ISIM ATR LIMITED
ISIM OLIVE LIMITED
ISIM SAT LIMITED
ISIM SEA CHARIOT LTD
ISIM SEA CRESCENT LTD
ISIM SININ LIMITED

ISIM TAJ MAHAL LTD
ISIM TOUR COMPANY LIMITED
ISLAMIC REPUBLIC OF IRAN SHIPPING LINES
JACKMAN SHIPPING COMPANY
KALA NAFT
KALAN KISH SHIPPING COMPANY LTD
KAPPA NARI NAVIGATION LTD
KARA SHIPPING AND CHARTERING GMBH
KAROON OIL & GAS PRODUCTION COMPANY
KAVERI MARITIME INCORPORATION
KAVERI SHIPPING LLC
KEY CHARTER DEVELOPMENT LTD.
KHALILIPOUR, Said Esmail
KHANCHI, Ali Reza
KHAZAR EXPL & PROD CO
KHAZAR SHIPPING LINES
KHEIBAR COMPANY
KING PROSPER INVESTMENTS LTD.
KINGDOM NEW LTD
KINGSWOOD SHIPPING COMPANY LIMITED
KISH SHIPPING LINE MANNING COMPANY
LAMBDA NARI NAVIGATION LIMITED
LANCING SHIPPING COMPANY LIMITED
LOGISTIC SMART LTD
LOWESWATER LTD
MACHINE SAZI ARAK
MAGNA CARTA LIMITED
MALSHIP SHIPPING AGENCY
MARBLE SHIPPING LIMITED
MAROUN OIL & GAS COMPANY
MASJED-SOLEYMAN OIL & GAS COMPANY
MASTER SUPREME INTERNATIONAL LTD.
MAZANDARAN CEMENT COMPANY
MEHR CAYMAN LTD.
MELLAT BANK SB CJSC
MELLI AGROCHEMICAL COMPANY PJS
MELLI BANK PLC
MELLI INVESTMENT HOLDING INTERNATIONAL
MELODIOUS MARITIME INCORPORATION
METRO SUPREME INTERNATIONAL LTD.
MIDHURST SHIPPING COMPANY LIMITED (MALTA)
MILL DENE LTD
MINISTRY OF ENERGY
MINISTRY OF PETROLEUM
MODALITY LTD
MODERN ELEGANT DEVELOPMENT LTD.
MOUNT EVEREST MARITIME INCORPORATION
NAFTIRAN INTERTRADE COMPANY
NAFTIRAN INTERTRADE COMPANY SRL
NAMJOO, Majid

NARI SHIPPING AND CHARTERING GMBH & CO. KG
NARMADA SHIPPING
NATIONAL IRANIAN DRILLING COMPANY
NATIONAL IRANIAN GAS COMPANY
NATIONAL IRANIAN OIL COMPANY
NATIONAL IRANIAN OIL COMPANY NEDERLAND (A.K.A.: NIOC
NETHERLANDS REPRESENTATION OFFICE)
NATIONAL IRANIAN OIL COMPANY PTE LTD
NATIONAL IRANIAN OIL COMPANY, INTERNATIONAL AFFAIRS LIMITED
NATIONAL IRANIAN OIL ENGINEERING AND CONSTRUCTION COMPANY
(NIOEC)
NATIONAL IRANIAN OIL PRODUCTS DISTRIBUTION COMPANY (NIOPDC)
NATIONAL IRANIAN OIL REFINING AND DISTRIBUTION COMPANY
NATIONAL IRANIAN TANKER COMPANY
NEUMAN LTD
NEW DESIRE LTD
NEW SYNERGY
NEWHAVEN SHIPPING COMPANY LIMITED
NINTH OCEAN ADMINISTRATION GMBH
NINTH OCEAN GMBH & CO. KG
NOOR AFZA GOSTAR
NORTH DRILLING COMPANY
NUCLEAR FUEL PRODUCTION AND PROCUREMENT COMPANY
OCEAN CAPITAL ADMINISTRATION GMBH
OCEAN EXPRESS AGENCIES PRIVATE LIMITED
ONERBANK ZAO
OXTED SHIPPING COMPANY LIMITED
PACIFIC SHIPPING
PARS SPECIAL ECONOMIC ENERGY ZONE
PARTNER CENTURY LTD
PEARL ENERGY COMPANY LTD
PEARL ENERGY SERVICES, SA
PERSIA INTERNATIONAL BANK PLC
PETRO SUISSE
PETROIRAN DEVELOPMENT COMPANY LTD
PETROLEUM ENGINEERING & DEVELOPMENT COMPANY
PETROPARS INTERNATIONAL FZE
PETROPARS IRAN COMPANY
PETROPARS LTD.
PETROPARS OILFIELD SERVICES COMPANY
PETROPARS OPERATION & MANAGEMENT COMPANY
PETROPARS RESOURCES ENGINEERING LTD
PETROPARS UK LIMITED
PETWORTH SHIPPING COMPANY LIMITED
POST BANK OF IRAN
POWER PLANTS' EQUIPMENT MANUFACTURING COMPANY (SAAKHTE
TAJHIZATE NIROOGAHI)
PROSPER METRO INVESTMENTS LTD.
RASTKHAH, Engineer Naser
REIGATE SHIPPING COMPANY LIMITED

RESEARCH INSTITUTE OF NUCLEAR SCIENCE & TECHNOLOGY
REZVANIANZADEH, Mohammad Reza
RISHI MARITIME INCORPORATION
SACKVILLE HOLDINGS LTD
SAFIRAN PAYAM DARYA SHIPPING COMPANY
SALEHI, Ali Akbar
SANFORD GROUP
SANTEXLINES
SECOND OCEAN ADMINISTRATION GMBH
SECOND OCEAN GMBH & CO. KG
SEIBOW LOGISTICS LIMITED
SEVENTH OCEAN ADMINISTRATION GMBH
SEVENTH OCEAN GMBH & CO. KG
SHALLON LTD
SHEMAL CEMENT COMPANY
SHINE STAR LIMITED
SHIPPING COMPUTER SERVICES COMPANY
SILVER UNIVERSE INTERNATIONAL LTD.
SINA BANK
SINO ACCESS HOLDINGS
SINOSE MARITIME
SISCO SHIPPING COMPANY LTD
SIXTEENTH OCEAN ADMINISTRATION GMBH
SIXTEENTH OCEAN GMBH & CO. KG
SIXTH OCEAN ADMINISTRATION GMBH
SIXTH OCEAN GMBH & CO. KG
SMART DAY HOLDINGS LTD
SOLTANI, Behzad
SORINET COMMERCIAL TRUST (SCT)
SOROUSH SARAMIN ASATIR
SOUTH WAY SHIPPING AGENCY CO. LTD
SOUTH ZAGROS OIL & GAS PRODUCTION COMPANY
SPARKLE BRILLIANT DEVELOPMENT LIMITED
SPRINGTHORPE LIMITED
STATIRA MARITIME INCORPORATION
SUREH (NUCLEAR REACTORS FUEL COMPANY)
SYSTEM WISE LTD
TAMALARIS CONSOLIDATED LTD
TENTH OCEAN ADMINISTRATION GMBH
TENTH OCEAN GMBH & CO. KG
TEU FEEDER LIMITED
THETA NARI NAVIGATION
THIRD OCEAN ADMINISTRATION GMBH
THIRD OCEAN GMBH & CO. KG
THIRTEENTH OCEAN ADMINISTRATION GMBH
THIRTEENTH OCEAN GMBH & CO. KG
TOP GLACIER COMPANY LIMITED
TOP PRESTIGE TRADING LIMITED
TRADE CAPITAL BANK
TRADE TREASURE

TRUE HONOUR HOLDINGS LTD
TULIP SHIPPING INC
TWELFTH OCEAN ADMINISTRATION GMBH
TWELFTH OCEAN GMBH & CO. KG
UNIVERSAL TRANSPORTATION LIMITATION UTL
VALFAJR 8TH SHIPPING LINE
WEST OIL & GAS PRODUCTION COMPANY
WESTERN SURGE SHIPPING COMPANY LIMITED
WISE LING SHIPPING COMPANY LIMITED
ZANJANI, Babak
ZETA NERI NAVIGATION

## ATTACHMENT 1 - PART II

LIST OF PERSONS, ENTITIES AND BODIES SET OUT IN ANNEX I TO COUNCIL DECISION 2010/413/CFSP AND ANNEX VIII TO COUNCIL REGULATION (EU) NO 267/2012


AGHA-JANI, Dawood
ALAI, Amir Moayyed
ASGARPOUR, Behman
ASHIANI, Mohammad Fedai
ASHTIANI, Abbas Rezaee
ATOMIC ENERGY ORGANISATION OF IRAN (AEOI)
BAKHTIAR, Haleh
BEHZAD, Morteza
ESFAHAN NUCLEAR FUEL RESEARCH AND PRODUCTION CENTRE (NFRPC) AND ESFAHAN NUCLEAR TECHNOLOGY CENTRE (ENTC)
FIRST EAST EXPORT BANK, P.L.C.:
HOSSEINI, Seyyed Hussein
IRANO HIND SHIPPING COMPANY
IRISL BENELUX NV
JABBER IBN HAYAN
KARAJ NUCLEAR RESEARCH CENTRE
KAVOSHYAR COMPANY
LEILABADI, Ali Hajinia
MESBAH ENERGY COMPANY
MODERN INDUSTRIES TECHNIQUE COMPANY
MOHAJERANI, Hamid-Reza
MOHAMMADI, Jafar
MONAJEMI, Ehsan
NOBARI, Houshang
NOVIN ENERGY COMPANY
NUCLEAR RESEARCH CENTER FOR AGRICULTURE AND MEDICINE
PARS TRASH COMPANY
PISHGAM (PIONEER) ENERGY INDUSTRIES
QANNADI, Mohammad
RAHIMI, Amir
RAHIQI, Javad
RASHIDI, Abbas
SABET, M. Javad Karimi
SAFDARI, Seyed Jaber
SOLEYMANI, Ghasem
SOUTH SHIPPING LINE IRAN (SSL)
TAMAS COMPANY

# ATTACHMENT 2 - PART I

LIST OF PERSONS, ENTITIES AND BODIES SET OUT IN ANNEX II TO COUNCIL DECISION 2010/413/CFSP AND ANNEX IX TO COUNCIL REGULATION (EU) NO 267/2012

AEROSPACE INDUSTRIES ORGANISATION, AIO
AL YASIN, Javad
ALUMINAT
ANSAR BANK
ARAN MODERN DEVICES
ARAS FARAYANDE
ARFA PAINT COMPANY
ARFEH COMPANY
ARIA NIKAN,
ARMED FORCES GEOGRAPHICAL ORGANISATION
ASHTIAN TABLO
BABAEI, Davoud
BALS ALMAN
BANK SADERAT IRAN
BANK SADERAT PLC
BARGH AZARAKSH
BEHNAM SAHRIYARI TRADING COMPANY
BONYAD TAAVON SEPAH
BORBORUDI, Sayed Shamsuddin
DANESHJOO, Kamran
DARVISH-VAND, IRGC Brigadier-General Javad
ELECTRONIC COMPONENTS INDUSTRIES
ESNICO (EQUIPMENT SUPPLIER FOR NUCLEAR INDUSTRIES CORPORATION)
ETEMAD AMIN INVEST CO MOBIN
EYVAZ TECHNIC
FADAVI, Rear Admiral Ali
FAJR AVIATION COMPOSITE INDUSTRIES
FARAHI, IRGC Brigadier-General Seyyed Mahdi
FARASEPEHR ENGINEERING COMPANY
FATAH, Parviz
GHANI SAZI URANIUM COMPANY
HAERI, Engineer Mojtaba
HIRBOD CO
HOSEYNITASH, IRGC Brigadier-General Ali
HOSSEINI NEJAD TRADING CO.
INSTITUTE OF APPLIED PHYSICS
IRAN AIRCRAFT INDUSTRIES
IRAN AIRCRAFT MANUFACTURING COMPANY
IRAN CENTRIFUGE TECHNOLOGY COMPANY
IRAN COMMUNICATIONS INDUSTRIES
IRAN COMPOSITES INSTITUTE
IRAN ELECTRONICS INDUSTRIES
IRAN MARINE INDUSTRIAL COMPANY

IRAN POOYA
IRAN SAFFRON COMPANY OR IRANSAFFRON CO.
IRANIAN AVIATION INDUSTRIES ORGANIZATION
IRGC AIR FORCE
IRGC QODS FORCE
IRGC-AIR FORCE AL-GHADIR MISSILE COMMAND
ISFAHAN OPTICS
ISLAMIC REVOLUTIONARY GUARD CORPS
JAFARI, Milad
JAVEDAN MEHR TOOS
JELVESAZAN COMPANY
KARANIR
KARIMIAN, Ali
KHALA AFARIN PARS
KHANSARI, Majid
MAAA SYNERGY
MACPAR MAKINA SAN VE TIC
MAHMUDZADEH, Ebrahim
MARINE INDUSTRIES
MAROU SANAT
MATSA (MOHANDESI TOSEH SOKHT ATOMI COMPANY)
MECHANIC INDUSTRIES GROUP
MEHR BANK
MINISTRY OF DEFENSE AND SUPPORT FOR ARMED FORCES LOGISTICS
MOBIN SANJESH
MODERN TECHNOLOGIES FZC
MOHAMMADI, Mohammad
MOHAMMADLU, Brigadier-General Beik
MOVASAGHNIA, Mohammad Reza
MULTIMAT LC VE DIS TICARET PAZARLAMA LIMITED SIRKETI
NACCACHE, Anis
NADERI, Brigadier-General Mohammad
NAJJAR, IRGC Brigadier-General Mostafa Mohammad
NAQDI, BrigGen Mohammad Reza
NASERI, Mohammad Sadegh
NASERIN VAHID
NEDA INDUSTRIAL GROUP
NEKA NOVIN
NOAVARAN POOYAMOJ
NOURI, Ali Ashraf
OIL INDUSTRY PENSION FUND INVESTMENT COMPANY
ORGANISATION OF DEFENSIVE INNOVATION AND RESEARCH
PAKPUR, BrigGen Mohammad
PARCHIN CHEMICAL INDUSTRIES
PARTO SANAT CO
PASSIVE DEFENSE ORGANIZATION
PAYA PARTO
QASEMI, Rostam (a.k.a. Rostam GHASEMI)
RAAD IRAN
RAKA

RESEARCH CENTRE FOR EXPLOSION AND IMPACT
ROSMACHIN
SAIDI, Hojatoleslam Ali
SALAMI, BrigGen Hossein
SAMAN NASB ZAYENDEH ROOD; SAMAN NASBZAINDE ROOD
SAMAN TOSE'E ASIA
SAMEN INDUSTRIES
SCHILLER NOVIN
SEPANIR OIL AND GAS ENERGY ENGINEERING COMPANY
SHAFI'I RUDSARI, Rear Admiral Mohammad
SHAHID AHMAD KAZEMI INDUSTRIAL GROUP
SHAHID BEHESHTI UNIVERSITY
SHAKHESE BEHBUD SANAT
SHAMS, Abolghassem Mozaffari
SHAMSHIRI, IRGC Brigadier-General Ali
SHARIF UNIVERSITY OF TECHNOLOGY
SHETAB G.
SHETAB GAMAN
SHETAB TRADING
SHIRAZ ELECTRONICS INDUSTRIES
SIMATEC DEVELOPMENT COMPANY
SOLAT SANA, Abdollah
SOLTANI, Hamid
STATE PURCHASING ORGANISATION
STEP STANDART TEKNIK PARCA SAN VE TIC A.S.
SUN MIDDLE EAST FZ COMPANY
SURENA (A.K.A. SAKHD VA RAH-AN- DA-ZI)
TABA (IRAN CUTTING TOOLS MANUFACTURING COMPANY - TABA
TOWLID ABZAR BORESHI IRAN)
TAGHTIRAN
TAJHIZ SANAT SHAYAN
TECHNOLOGY COOPERATION OFFICE OF THE IRANIAN PRESIDENT'S
OFFICE
TEST TAFSIR
TIDEWATER
TOSSE SILOOHA
TURBINE ENGINEERING MANUFACTURING
VAHIDI, IRGC Brigadier-General Ahmad
WEST SUN TRADE GMBH
Y.A.S. CO. LTD
YARSANAT
YASA PART
ZADEH, Amir Ali Haji

## ATTACHMENT 2 - PART II

LIST OF PERSONS, ENTITIES AND BODIES SET OUT IN ANNEX I TO COUNCIL DECISION 2010/413/CFSP AND ANNEXES VIII TO COUNCIL REGULATION (EU) NO 267/2012

7TH OF TIR.
ABBASI-DAVANI, Fereidoun
ABZAR BORESH KAVEH CO.
AGHAJANI, Azim
AHMADIAN, Ali Akbar
AMIN INDUSTRIAL COMPLEX
AMMUNITION AND METALLURGY INDUSTRIES GROUP
ARMAMENT INDUSTRIES GROUP
BAHMANYAR, Bahmanyar Morteza
BANK SEPAH
BANK SEPAH INTERNATIONAL
BARZAGANI TEJARAT TAVANMAD SACCAL COMPANIES
BEHINEH TRADING CO.
CRUISE MISSILE INDUSTRY GROUP
DASTJERDI, Ahmad Vahid
DEFENCE INDUSTRIES ORGANISATION (DIO)
DEFENSE TECHNOLOGY AND SCIENCE RESEARCH CENTER
DERAKHSHANDEH, Ahmad
DOOSTAN INTERNATIONAL COMPANY
ELECTRO SANAM COMPANY
ESLAMI, Mohammad
ESMAELI, Reza-Gholi
ETTEHAD TECHNICAL GROUP
FAJR INDUSTRIAL GROUP
FAKHRIZADEH-MAHABADI, Mohsen
FARASAKHT INDUSTRIES
FARAYAND TECHNIQUE
FATER (OR FAATER) INSTITUTE
GHARAGAHE SAZANDEGI GHAEM
GHORB KARBALA
GHORB NOOH
HARA COMPANY
HEJAZI, Mohammad
HOJATI, Mohsen
IMENSAZAN CONSULTANT ENGINEERS INSTITUTE
INDUSTRIAL FACTORIES OF PRECISION (IFP) MACHINERY
JOZA INDUSTRIAL CO.
KALA-ELECTRIC
KAVEH CUTTING TOOLS COMPANY
KETABACHI, Mehrdada Akhlaghi
KHATAM AL-ANBIYA CONSTRUCTION HEADQUARTERS
KHORASAN METALLURGY INDUSTRIES
M. BABAIE INDUSTRIES
MAKIN

MALEK ASHTAR UNIVERSITY
MALEKI, Naser
MINISTRY OF DEFENSE LOGISTICS EXPORT
MIZAN MACHINERY MANUFACTURING A.K.A.: 3MG
NAQDI, Mohammad Reza
NEJAD NOURI, Mohammad Mehdi
NIRU BATTERY MANUFACTURING COMPANY
OMRAN SAHEL
ORIENTAL OIL KISH
PARCHIN CHEMICAL INDUSTRIES
PARS AVIATION SERVICES COMPANY
PEJMAN INDUSTRIAL SERVICES CORPORATION
QODS AERONAUTICS INDUSTRIES
RAH SAHEL
RAHAB ENGINEERING INSTITUTE
REZAIE, Morteza
SABALAN COMPANY
SAD IMPORT EXPORT COMPANY
SAFARI, Morteza
SAFAVI, Yahya Rahim
SAFETY EQUIPMENT PROCUREMENT (SEP)
SAHAND ALUMINUM PARTS INDUSTRIAL COMPANY
SAHEL CONSULTANT ENGINEERS
SALIMI, Hosein
SANAM INDUSTRIAL GROUP
SEPANIR
SEPASAD ENGINEERING COMPANY
SHAHID BAGHERI INDUSTRIAL GROUP (SBIG)
SHAHID HEMMAT INDUSTRIAL GROUP (SHIG)
SHAHID KARRAZI INDUSTRIES
SHAHID SATARRI INDUSTRIES
SHAHID SAYYADE SHIRAZI INDUSTRIES
SHO'A' AVIATION.
SOLEIMANI, Qasem
SPECIAL INDUSTRIES GROUP
TABATABAEI, Ali Akbar
TIZ PARS
YA MAHDI INDUSTRIES GROUP
YAS AIR
YAZD METALLURGY INDUSTRIES
ZAHEDI, Mohammad Reza
ZOLQADR, General

## ATTACHMENT 3

IRANIAN FINANCIAL INSTITUTIONS AND INDIVIDUAL AND ENTITIES IDENTIFIED AS GOVERNMENT OF IRAN (GOI) ON THE SDN LIST; DESIGNATED ENTITIES AND INDIVIDUALS ON THE SDN LIST AND ENTITIES AND INDIVIDUALS LISTED ON THE FSE LIST; INDIVIDUALS AND ENTITIES SANCTIONED UNDER ISA; BLOCKED PROPERTY OF THE FOREGOING

AA ENERGY FZCO*
ABAN AIR
ADVANCE NOVEL LIMITED
AFZALI, Ali
AGHA-JANI, Dawood
AL AQILI GROUP LLC
AL AQILI, Mohamed Saeed
AL FIDA INTERNATIONAL GENERAL TRADING
AL HILAL EXCHANGE
ALPHA EFFORT LIMITED
AMERI, Teymour
AMIN INVESTMENT BANK*
ANTARES SHIPPING COMPANY NV
ARASH SHIPPING ENTERPRISES LIMITED*
ARIAN BANK
ARTA SHIPPING ENTERPRISES LIMITED*
ASAN SHIPPING ENTERPRISE LIMITED*
ASCOTEC HOLDING GMBH*
ASCOTEC JAPAN K.K.*
ASCOTEC MINERAL & MACHINERY GMBH*
ASCOTEC SCIENCE & TECHNOLOGY GMBH*
ASCOTEC STEEL TRADING GMBH*
ASHTEAD SHIPPING COMPANY LIMITED
ASIA BANK
ASIA ENERGY GENERAL TRADING (LLC)*
ASIA MARINE NETWORK PTE. LTD.
ASSA CO. LTD.
ASSA CORP.
ATLANTIC INTERMODAL
ATOMIC ENERGY ORGANIZATION OF IRAN
AZORES SHIPPING COMPANY LL FZE
BAHADORI, Masoud*
BANCO INTERNACIONAL DE DESARROLLO, C.A.
BANDAR IMAM PETROCHEMICAL COMPANY*
BANK KARGOSHAEE
BANK KESHAVARZI IRAN*

---

\* Denotes Iranian financial institutions and individuals and entities identified as GOI by the Office of Foreign Assets Control (OFAC). U.S. persons and foreign entities owned or controlled by a U.S. person will continue to be prohibited from transactions with these individuals and entities, pursuant to the Iranian Transactions and Sanctions Regulations.

BANK MARKAZI JOMHOURI ISLAMI IRAN*
BANK MASKAN*
BANK MELLAT*
BANK MELLI IRAN INVESTMENT COMPANY
BANK MELLI IRAN*
BANK MELLI PRINTING AND PUBLISHING CO.
BANK OF INDUSTRY AND MINE (OF IRAN)*
BANK REFAH KARGARAN*
BANK SEPAH INTERNATIONAL PLC
BANK SEPAH*
BANK TEJARAT*
BANK TORGOVOY KAPITAL ZAO*
BANK-E SHAHR*
BATENI, Naser
BAZARGAN, Farzad*
BEHSAZ KASHANE TEHRAN CONSTRUCTION CO.*
BEHZAD, Morteza Ahmadali
BELFAST GENERAL TRADING LLC
BEST PRECISE LIMITED
BIIS MARITIME LIMITED
BIMEH IRAN INSURANCE COMPANY (U.K.) LIMITED*
BLUE TANKER SHIPPING SA*
BMIIC INTERNATIONAL GENERAL TRADING LTD
BOU ALI SINA PETROCHEMICAL COMPANY*
BREYELLER STAHL TECHNOLOGY GMBH & CO. KG*
BUSHEHR SHIPPING COMPANY LIMITED
BYFLEET SHIPPING COMPANY LIMITED
CAMBIS, Dimitris*
CASPIAN MARITIME LIMITED*
CAUCASUS ENERGY
CEMENT INVESTMENT AND DEVELOPMENT COMPANY
CENTRAL INSURANCE OF IRAN
CISCO SHIPPING COMPANY CO. LTD.
COBHAM SHIPPING COMPANY LIMITED
COMMERCIAL PARS OIL CO.*
CONCEPT GIANT LIMITED
CREDIT INSTITUTION FOR DEVELOPMENT*
CRYSTAL SHIPPING FZE
CYLINDER SYSTEM L.T.D.*
DAJMAR, Mohhammad Hossein
DANESH SHIPPING COMPANY LIMITED*
DARYA CAPITAL ADMINISTRATION GMBH
DAVAR SHIPPING CO LTD*
DENA TANKERS FZE*
DERAKHSHANDEH, AHMAD
DETTIN SPA
DEY BANK*
DFS WORLDWIDE
DIVANDARI, Ali
DORKING SHIPPING COMPANY LIMITED

EDBI EXCHANGE COMPANY
EDBI STOCK BROKERAGE COMPANY
EFFINGHAM SHIPPING COMPANY LIMITED
EGHTESAD NOVIN BANK*
EIGHTH OCEAN ADMINISTRATION GMBH
EIGHTH OCEAN GMBH & CO. KG
ELEVENTH OCEAN ADMINISTRATION GMBH
ELEVENTH OCEAN GMBH & CO. KG
ESFAHAN NUCLEAR FUEL RESEARCH AND PRODUCTION CENTER
ESLAMI, Mansour
EUROPAISCH-IRANISCHE HANDELSBANK AG*
EUROPEAN OIL TRADERS
EVEREX
EXECUTION OF IMAM KHOMEINI'S ORDER*
EXPORT DEVELOPMENT BANK OF IRAN*
EZATI, Ali
FAIRWAY SHIPPING LTD
FAL OIL COMPANY LIMITED
FARNHAM SHIPPING COMPANY LIMITED
FARSOUDEH, Houshang
FAYLACA PETROLEUM
FERLAND COMPANY LIMITED
FIFTEENTH OCEAN GMBH & CO. KG
FIFTH OCEAN ADMINISTRATION GMBH
FIFTH OCEAN GMBH & CO. KG
FIRST EAST EXPORT BANK, P.L.C.
FIRST ISLAMIC INVESTMENT BANK LTD.
FIRST OCEAN ADMINISTRATION GMBH
FIRST OCEAN GMBH & CO. KG
FIRST PERSIA EQUITY FUND
FOURTEENTH OCEAN GMBH & CO. KG
FOURTH OCEAN ADMINISTRATION GMBH
FOURTH OCEAN GMBH & CO. KG
FUTURE BANK B.S.C.*
GALLIOT MARITIME INC
GARBIN NAVIGATION LTD*
GEORGIAN BUSINESS DEVELOPMENT
GHADIR INVESTMENT COMPANY*
GHAED BASSIR PETROCHEMICAL PRODUCTS COMPANY*
GHALEBANI, Ahmad*
GHARZOLHASANEH RESALAT BANK*
GHAVAMIN BANK*
GHEZEL AYAGH, Alireza
GOLDEN RESOURCES TRADING COMPANY L.L.C.*
GOLDENTEX FZE
GOLPARVAR, Gholamhossein
GOMSHALL SHIPPING COMPANY LIMITED
GOOD LUCK SHIPPING L.L.C.
GRACE BAY SHIPPING INC*
GREAT BUSINESS DEALS

GREAT METHOD LIMITED
HADI SHIPPING COMPANY LIMITED*
HAFIZ DARYA SHIPPING CO
HARAZ SHIPPING COMPANY LIMITED*
HATEF SHIPPING COMPANY LIMITED*
HEKMAT IRANIAN BANK*
HERCULES INTERNATIONAL SHIP*
HERMIS SHIPPING SA*
HIRMAND SHIPPING COMPANY LIMITED*
HODA SHIPPING COMPANY LIMITED*
HOMA SHIPPING COMPANY LIMITED*
HONAR SHIPPING COMPANY LIMITED*
HONG KONG INTERTRADE COMPANY*
HORMOZ OIL REFINING COMPANY*
HORSHAM SHIPPING COMPANY LIMITED
HOSSEINPOUR, Houshang
HTTS HANSEATIC TRADE TRUST AND SHIPPING, GMBH
IDEAL SUCCESS INVESTMENTS LIMITED
IFIC HOLDING AG*
IHAG TRADING GMBH*
IMPIRE SHIPPING COMPANY*
INDUS MARITIME INC
INDUSTRIAL DEVELOPMENT AND RENOVATION ORGANIZATION OF
IRAN*
INTERNATIONAL SAFE OIL
INTRA CHEM TRADING GMBH*
IRAN & SHARGH COMPANY*
IRAN & SHARGH LEASING COMPANY*
IRAN AIR
IRAN FOREIGN INVESTMENT COMPANY*
IRAN INSURANCE COMPANY*
IRAN O HIND SHIPPING COMPANY
IRAN O MISR SHIPPING COMPANY
IRAN PETROCHEMICAL COMMERCIAL COMPANY*
IRAN ZAMIN BANK*
IRANAIR TOURS
IRANIAN MINES AND MINING INDUSTRIES DEVELOPMENT AND
RENOVATION ORGANIZATION*
IRANIAN OIL COMPANY (U.K.) LIMITED*
IRANIAN-VENEZUELAN BI-NATIONAL BANK / JOINT IRAN-VENEZUELA
BANK*
IRASCO S.R.L.*
IRINVESTSHIP LTD.
IRISL (MALTA) LIMITED
IRISL (UK) LTD.
IRISL CHINA SHIPPING CO., LTD.
IRISL EUROPE GMBH
IRISL MARINE SERVICES & ENGINEERING COMPANY
IRISL MULTIMODAL TRANSPORT CO.
IRITAL SHIPPING SRL COMPANY

ISI MARITIME LIMITED
ISIM AMIN LIMITED
ISIM ATR LIMITED
ISIM OLIVE LIMITED
ISIM SAT LIMITED
ISIM SEA CHARIOT LIMITED
ISIM SEA CRESCENT LIMITED
ISIM SININ LIMITED
ISIM TAJ MAHAL LIMITED
ISIM TOUR LIMITED
ISLAMIC REGIONAL COOPERATION BANK*
ISLAMIC REPUBLIC OF IRAN SHIPPING LINES
JABBER IBN HAYAN
JAM PETROCHEMICAL COMPANY
JASHNSAZ, Seifollah*
JUPITER SEAWAYS SHIPPING*
KADDOURI, Abdelhak
KAFOLATBANK*
KALA LIMITED*
KALA PENSION TRUST LIMITED*
KARAFARIN BANK*
KASB INTERNATIONAL LLC*
KAVERI MARITIME INC
KAVOSHYAR COMPANY
KERMAN SHIPPING CO LTD
KHALILI, Jamshid
KHAVARMIANEH BANK*
KHAZAR SEA SHIPPING LINES
KISH INTERNATIONAL BANK*
KISH PROTECTION & INDEMNITY
KONING MARINE CORP*
KONT INVESTMENT BANK
KONT KOSMETIK
KSN FOUNDATION
KUO OIL PTE. LTD
LANCELIN SHIPPING COMPANY LIMITED
LEADING MARITIME PTE. LTD.
LEILABADI, Ali Hajinia
LISSOME MARINE SERVICES LLC
LOGISTIC SMART LIMITED
LOWESWATER LIMITED
MACHINE SAZI ARAK CO. LTD.*
MAHAB GHODSS CONSULTING ENGINEERING COMPANY*
MAHDAVI, Ali
MALSHIP SHIPPING AGENCY LTD.
MARANER HOLDINGS LIMITED
MARBLE SHIPPING LIMITED
MARJAN PETROCHEMICAL COMPANY*
MAZANDARAN CEMENT COMPANY
MAZANDARAN TEXTILE COMPANY

MCS ENGINEERING*
MCS INTERNATIONAL GMBH*
MEHR CAYMAN LTD.
MEHR IRAN CREDIT UNION BANK*
MEHRAN SHIPPING COMPANY LIMITED*
MELLAT BANK SB CJSC
MELLAT INSURANCE COMPANY*
MELLI AGROCHEMICAL COMPANY, P.J.S.
MELLI BANK PLC
MELLI INVESTMENT HOLDING INTERNATIONAL
MELODIOUS MARITIME INC
MERSAD SHIPPING COMPANY LIMITED*
MESBAH ENERGY COMPANY
METAL & MINERAL TRADE S.A.R.L.*
MID OIL ASIA PTE LTD
MILL DENE LIMITED
MINAB SHIPPING COMPANY LIMITED*
MINES AND METALS ENGINEERING GMBH*
MIR BUSINESS BANK ZAO
MOALLEM INSURANCE COMPANY
MOBIN PETROCHEMICAL COMPANY*
MODABER*
MODALITY LIMITED
MOGHADDAMI FARD, Mohammad
MOHADDES, Seyed Mahmoud*
MOINIE, Mohammad*
MONSOON SHIPPING LTD*
MOUNT EVEREST MARITIME INC
MSP KALA NAFT CO. TEHRAN*
N.I.T.C. REPRESENTATIVE OFFICE*
NABIPOUR, Ghasem
NAFTIRAN INTERTRADE CO. (NICO) LIMITED*
NAFTIRAN INTERTRADE CO. (NICO) SARL*
NAFTIRAN TRADING SERVICES CO. (NTS) LIMITED*
NARI SHIPPING AND CHARTERING GMBH & CO. KG
NASIRBEIK, Anahita
NATIONAL IRANIAN OIL COMPANY PTE LTD*
NATIONAL IRANIAN OIL COMPANY*
NATIONAL IRANIAN TANKER COMPANY LLC*
NATIONAL IRANIAN TANKER COMPANY*
NATIONAL PETROCHEMICAL COMPANY*
NAYEBI, Pourya
NEFERTITI SHIPPING COMPANY
NEUMAN LIMITED
NEW DESIRE LIMITED
NEW YORK GENERAL TRADING
NEW YORK MONEY EXCHANGE
NICO ENGINEERING LIMITED*
NIKOUSOKHAN, Mahmoud*
NIKSIMA FOOD AND BEVERAGE JLT

NINTH OCEAN ADMINISTRATION GMBH
NINTH OCEAN GMBH & CO. KG
NIOC INTERNATIONAL AFFAIRS (LONDON) LIMITED*
NIZAMI, Anwar Kamal
NOOR AFZAR GOSTAR COMPANY
NOOR ENERGY (MALAYSIA) LTD.*
NOURI PETROCHEMICAL COMPANY*
NOVIN ENERGY COMPANY
NPC INTERNATIONAL LIMITED*
NUCLEAR RESEARCH CENTER FOR AGRICULTURE AND MEDICINE
NUCLEAR SCIENCE AND TECHNOLOGY RESEARCH INSTITUTE
OCEAN CAPITAL ADMINISTRATION GMBH
OIL INDUSTRY INVESTMENT COMPANY*
OMID REY CIVIL & CONSTRUCTION COMPANY*
ONE CLASS PROPERTIES (PTY) LTD.*
ONE VISION INVESTMENTS 5 (PTY) LTD.*
ONERBANK ZAO*
ORCHIDEA GULF TRADING
P.C.C. (SINGAPORE) PRIVATE LIMITED*
PACIFIC SHIPPING DMCEST
PAJAND, Mohammad Hadi
PARDIS INVESTMENT COMPANY*
PARS MCS*
PARS OIL AND GAS COMPANY*
PARS OIL CO.*
PARS PETROCHEMICAL COMPANY*
PARS PETROCHEMICAL SHIPPING COMPANY*
PARS TRASH COMPANY
PARSAEI, Reza*
PARSIAN BANK*
PARTNER CENTURY LIMITED
PARVARESH, Farhad Ali
PASARGAD BANK*
PEARL ENERGY COMPANY LTD.
PEARL ENERGY SERVICES, SA
PERSIA INTERNATIONAL BANK PLC
PERSIA OIL & GAS INDUSTRY DEVELOPMENT CO.*
PETRO ENERGY INTERTRADE COMPANY*
PETRO ROYAL FZE*
PETRO SUISSE INTERTRADE COMPANY SA*
PETROCHEMICAL COMMERCIAL COMPANY (U.K.) LIMITED*
PETROCHEMICAL COMMERCIAL COMPANY FZE*
PETROCHEMICAL COMMERCIAL COMPANY INTERNATIONAL*
PETROIRAN DEVELOPMENT COMPANY (PEDCO) LIMITED*
PETROLEOS DE VENEZUELA S.A. (PDVSA)
PETROPARS INTERNATIONAL FZE*
PETROPARS LTD.*
PETROPARS UK LIMITED*
PIONEER ENERGY INDUSTRIES COMPANY
POLAT, Muzaffer

POLINEX GENERAL TRADING LLC*
POLYNAR COMPANY*
POST BANK OF IRAN*
POURANSARI, Hashem*
PROTON PETROCHEMICALS SHIPPING LIMITED*
PRYVATNE AKTSIONERNE TOVARYSTVO AVIAKOMPANIYA BUKOVYNA
QANNADI, Mohammad
QULANDARY, Azizullah Asadullah
RAHIQI, Javad
RASOOL, Seyed Alaeddin Sadat
REY INVESTMENT COMPANY*
REY NIRU ENGINEERING COMPANY*
REYCO GMBH.*
REZVANIANZADEH, Mohammed Reza
RISHI MARITIME INC
RISHMAK PRODUCTIVE & EXPORTS COMPANY*
ROYAL ARYA CO.*
ROYAL OYSTER GROUP
ROYAL-MED SHIPPING AGENCY LTD
SABET, Javad Karimi
SACKVILLE HOLDINGS LIMITED
SADAF PETROCHEMICAL ASSALUYEH COMPANY*
SAFDARI, Seyed Jaber
SAFIRAN PAYAM DARYA SHIPPING COMPANY
SAMAN BANK*
SAMAN SHIPPING COMPANY LIMITED*
SAMBOUK SHIPPING FZC*
SANDFORD GROUP LIMITED
SANTEX LINES LIMITED
SARKANDI, Ahmad
SARMAYEH BANK*
SARV SHIPPING COMPANY LIMITED*
SECOND OCEAN ADMINISTRATION GMBH
SECOND OCEAN GMBH & CO. KG
SEIBOW LIMITED
SEIBOW LOGISTICS LIMITED
SEIFI, Asadollah
SEPID SHIPPING COMPANY LIMITED*
SEVENTH OCEAN ADMINISTRATION GMBH
SEVENTH OCEAN GMBH & CO. KG
SEYYEDI, Seyed Nasser Mohammad*
SEYYEDI, Seyedeh Hanieh Seyed Nasser Mohammad
SHAHID TONDGOOYAN PETROCHEMICAL COMPANY*
SHALLON LIMITED
SHAZAND PETROCHEMICAL COMPANY*
SHERE SHIPPING COMPANY LIMITED
SHIPPING COMPUTER SERVICES COMPANY
SHOMAL CEMENT COMPANY
SIMA GENERAL TRADING CO FZE*
SIMA SHIPPING COMPANY LIMITED*

SINA BANK*
SINA SHIPPING COMPANY LIMITED*
SINGA TANKERS PTE. LTD.
SINO ACCESS HOLDINGS LIMITED
SINOSE MARITIME PTE. LTD.
SIQIRIYA MARITIME CORP.
SIXTH OCEAN ADMINISTRATION GMBH
SIXTH OCEAN GMBH & CO. KG
SMART DAY HOLDINGS GROUP LIMITED
SOKOLENKO, Vitaly
SORINET COMMERCIAL TRUST (SCT) BANKERS
SOROUSH SARZAMIN ASATIR SHIP MANAGEMENT COMPANY
SOUTH SHIPPING LINE IRAN
SPEEDY SHIP FZC
SPRINGTHORPE LIMITED
STARRY SHINE INTERNATIONAL LIMITED
SWISS MANAGEMENT SERVICES SARL*
SYNERGY GENERAL TRADING FZE*
SYSTEM WISE LIMITED
TABATABAEI, Seyyed Mohammad Ali Khatibi*
TABRIZ PETROCHEMICAL COMPANY*
TADBIR BROKERAGE COMPANY*
TADBIR CONSTRUCTION DEVELOPMENT COMPANY*
TADBIR ECONOMIC DEVELOPMENT GROUP*
TADBIR ENERGY DEVELOPMENT GROUP CO.*
TADBIR INVESTMENT COMPANY*
TAFAZOLI, Ahmad
TALAI, Mohamad
TAMAS COMPANY
TAT BANK*
TC SHIPPING COMPANY LIMITED*
TENTH OCEAN GMBH & CO. KG
THE EXPLORATION AND NUCLEAR RAW MATERIALS PRODUCTION
COMPANY
THE NUCLEAR REACTORS FUEL COMPANY
THIRD OCEAN ADMINISTRATION GMBH
THIRD OCEAN GMBH & CO. KG
THIRTEENTH OCEAN GMBH & CO. KG
TONGHAM SHIPPING CO LTD
TOP GLACIER COMPANY LIMITED
TOP PRESTIGE TRADING LIMITED
TOSEE EQTESAD AYANDEHSAZAN COMPANY*
TOSEE TAAVON BANK*
TOURISM BANK*
TRADE TREASURE LIMITED
TRUE HONOUR HOLDINGS LIMITED
TWELFTH OCEAN ADMINISTRATION GMBH
TWELFTH OCEAN GMBH & CO. KG
UPPERCOURT SHIPPING COMPANY LIMITED
VALFAJR 8TH SHIPPING LINE CO SSK

**S/RES/2231 (2015)**

VOBSTER SHIPPING COMPANY LTD
WEST SUN TRADE GMBH*
WIPPERMANN, Ulrich
WOKING SHIPPING INVESTMENTS LIMITED
YASINI, Seyed Kamal
YAZDI, Bahareh Mirza Hossein
ZADEH, Hassan Jalil
ZANJANI, Babak Morteza
ZARIN RAFSANJAN CEMENT COMPANY*
ZEIDI, Hossein
ZHUHAI ZHENRONG COMPANY
ZIRACCHIAN ZADEH, Mahmoud*

| BLOCKED PROPERTY | PROPERTY OF | TYPE | IMO NUMBER |
|---|---|---|---|
| EP-CFD | IRAN AIR | Aircraft | |
| EP-CFE | IRAN AIR | Aircraft | |
| EP-CFH | IRAN AIR | Aircraft | |
| EP-CFI | IRAN AIR | Aircraft | |
| EP-CFJ | IRAN AIR | Aircraft | |
| EP-CFK | IRAN AIR | Aircraft | |
| EP-CFL | IRAN AIR | Aircraft | |
| EP-CFM | IRAN AIR | Aircraft | |
| EP-CFO | IRAN AIR | Aircraft | |
| EP-CFP | IRAN AIR | Aircraft | |
| EP-CFQ | IRAN AIR | Aircraft | |
| EP-CFR | IRAN AIR | Aircraft | |
| EP-IAA | IRAN AIR | Aircraft | |
| EP-IAB | IRAN AIR | Aircraft | |
| EP-IAC | IRAN AIR | Aircraft | |
| EP-IAD | IRAN AIR | Aircraft | |
| EP-IAG | IRAN AIR | Aircraft | |
| EP-IAH | IRAN AIR | Aircraft | |
| EP-IAI | IRAN AIR | Aircraft | |
| EP-IAM | IRAN AIR | Aircraft | |
| EP-IBA | IRAN AIR | Aircraft | |
| EP-IBB | IRAN AIR | Aircraft | |
| EP-IBC | IRAN AIR | Aircraft | |
| EP-IBD | IRAN AIR | Aircraft | |
| EP-IBG | IRAN AIR | Aircraft | |
| EP-IBH | IRAN AIR | Aircraft | |
| EP-IBI | IRAN AIR | Aircraft | |
| EP-IBJ | IRAN AIR | Aircraft | |
| EP-IBK | IRAN AIR | Aircraft | |
| EP-IBL | IRAN AIR | Aircraft | |
| EP-IBM | IRAN AIR | Aircraft | |
| EP-IBN | IRAN AIR | Aircraft | |
| EP-IBP | IRAN AIR | Aircraft | |
| EP-IBQ | IRAN AIR | Aircraft | |
| EP-IBS | IRAN AIR | Aircraft | |
| EP-IBT | IRAN AIR | Aircraft | |
| EP-IBV | IRAN AIR | Aircraft | |
| EP-IBZ | IRAN AIR | Aircraft | |
| EP-ICD | IRAN AIR | Aircraft | |
| EP-ICE | IRAN AIR | Aircraft | |
| EP-ICF | IRAN AIR | Aircraft | |
| EP-IDA | IRAN AIR | Aircraft | |

---

× Denotes blocked property of individual and entities identified as GOI by the Office of Foreign Assets Control. U.S. persons and foreign entities owned or controlled by a U.S. person will continue to be prohibited from transactions with these individuals and entities, pursuant to the Iranian Transactions and Sanctions Regulations.

| EP-IDD | IRAN AIR | Aircraft | |
|---|---|---|---|
| EP-IDF | IRAN AIR | Aircraft | |
| EP-IDG | IRAN AIR | Aircraft | |
| EP-IEB | IRAN AIR | Aircraft | |
| EP-IEC | IRAN AIR | Aircraft | |
| EP-IED | IRAN AIR | Aircraft | |
| EP-IEE | IRAN AIR | Aircraft | |
| EP-IEF | IRAN AIR | Aircraft | |
| EP-IEG | IRAN AIR | Aircraft | |
| EP-IRK | IRAN AIR | Aircraft | |
| EP-IRL | IRAN AIR | Aircraft | |
| EP-IRM | IRAN AIR | Aircraft | |
| EP-IRN | IRAN AIR | Aircraft | |
| EP-IRR | IRAN AIR | Aircraft | |
| EP-IRS | IRAN AIR | Aircraft | |
| EP-IRT | IRAN AIR | Aircraft | |
| EP-MDD | IRAN AIR | Aircraft | |
| EP-MDE | IRAN AIR | Aircraft | |
| UR-BXI | IRAN AIR | Aircraft | |
| UR-BXL | IRAN AIR | Aircraft | |
| UR-BXM | IRAN AIR | Aircraft | |
| UR-CGS | IRAN AIR | Aircraft | |
| UR-CGT | IRAN AIR | Aircraft | |
| UR-CHW | IRAN AIR | Aircraft | |
| UR-CHX | IRAN AIR | Aircraft | |
| UR-CHY | IRAN AIR | Aircraft | |
| UR-CHZ | IRAN AIR | Aircraft | |
| UR-CJQ | IRAN AIR | Aircraft | |
| UR-BHJ | PRYVATNE AKTSIONERNE TOVARYSTVO AVIAKOMPANIYA | Aircraft | |
| UR-BXN | PRYVATNE AKTSIONERNE TOVARYSTVO AVIAKOMPANIYA | Aircraft | |
| UR-CIX | PRYVATNE AKTSIONERNE TOVARYSTVO AVIAKOMPANIYA | Aircraft | |
| UR-CIY | PRYVATNE AKTSIONERNE TOVARYSTVO AVIAKOMPANIYA | Aircraft | |
| UR-CJA | PRYVATNE AKTSIONERNE TOVARYSTVO AVIAKOMPANIYA | Aircraft | |
| UR-CJK | PRYVATNE AKTSIONERNE TOVARYSTVO AVIAKOMPANIYA | Aircraft | |
| RIONA | HAFIZ DARYA SHIPPING CO | Vessel | 9349588 |
| MIRZA KOCHEK KHAN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 7027899 |
| ASSA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 7632814 |
| AMITEES | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 7632826 |
| HORMUZ 2 | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 7904580 |
| PARMIDA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8105284 |
| BARSAM | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8107581 |
| PANTEA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8108559 |

| IRAN AKHAVAN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8113009 |
|---|---|---|---|
| SARINA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8203608 |
| SABRINA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8215742 |
| ATTRIBUTE | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8309593 |
| ALIAS | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8309608 |
| AQUARIAN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8309610 |
| ADVENTIST | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8309622 |
| AGEAN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8309634 |
| ANGEL | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8309646 |
| AGILE | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8309658 |
| AJAX | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8309672 |
| ACROBAT | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8309684 |
| SHADFAR | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8309696 |
| AMPLIFY | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8309701 |
| IRAN HORMUZ 21 | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8314263 |
| IRAN HORMUZ 22 | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8314275 |
| IRAN HORMUZ 23 | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8319782 |
| IRAN SHALAK | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8319940 |
| IRAN YOUSHAT | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8319952 |
| AEROLITE | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8320121 |
| ADRIAN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8320133 |
| NAGHMEH | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8320145 |
| RONAK | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8320157 |
| ACCURATE | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8320169 |
| TABANDEH | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8320171 |
| GULAFSHAN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8320183 |
| ALAMEDA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8320195 |
| IRAN PARAK | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8322064 |
| IRAN CHARAK | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8322076 |
| IRAN HORMUZ 25 | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8422072 |
| IRAN HORMUZ 26 | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8422084 |
| DORITA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8605234 |
| IRAN SHALAMCHEH | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8820925 |
| AAJ | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 8984484 |
| IRAN HORMUZ 12 | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9005596 |
| IRAN KONG | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9007582 |
| VISTA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9010711 |
| VIANA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9010723 |
| IRAN HORMUZ 14 | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9020778 |
| HAMD | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9036052 |
| SOBHAN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9036935 |
| SATTAR | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9040479 |
| ABBA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9051624 |
| BEHDAD | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9051636 |
| PARSHAN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9051648 |
| VALERIAN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9051650 |
| NEGEEN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9071519 |
| ATTAR | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9074092 |

S/RES/2231 (2015)

| PARIN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9076478 |
|---|---|---|---|
| TEEN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9101649 |
| GOWHAR | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9103087 |
| IRAN DALEER | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9118551 |
| PATRIS | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9137210 |
| NARDIS | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9137246 |
| KADOS | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9137258 |
| ZOMOROUD | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9138044 |
| BRELYAN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9138056 |
| NILDA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9165786 |
| JOVITA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9165798 |
| MANOLA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9165803 |
| GLADIOLUS | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9165815 |
| ELYANA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9165827 |
| NEGAR | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9165839 |
| SAVIZ | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9167253 |
| GLOXINIA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9167265 |
| NESHAT | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9167277 |
| BEHSHAD | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9167289 |
| JAIRAN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9167291 |
| IRAN SHAHED | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9184691 |
| GOLSAR | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9193185 |
| ZARSAN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9193197 |
| ARVIN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9193202 |
| ARTAVAND | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9193214 |
| TERESA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9209324 |
| GABRIELA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9209336 |
| SARITA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9209348 |
| SILVER CRAFT | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9209350 |
| MAHNAM | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9213387 |
| TERMEH | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9213399 |
| MAHSAN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9226944 |
| HAMADAN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9226956 |
| TARADIS | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9245304 |
| PARMIS | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9245316 |
| ZAR | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9260160 |
| ZIVAR | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9260172 |
| VALILI | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9270646 |
| SHAMIM | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9270658 |
| IRAN SHAHR-E-KORD | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9270684 |
| IRAN KASHAN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9270696 |
| SININ | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9274941 |
| PARMIS | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9283007 |
| AZARGOUN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9283019 |
| SALIS | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9283021 |
| GOLBON | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9283033 |
| PARDIS | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9284142 |
| TANDIS | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9284154 |

| SHERE | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9305192 |
|---|---|---|---|
| UPPERCOURT | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9305207 |
| TONGHAM | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9305219 |
| VOBSTER | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9305221 |
| GOLAFRUZ | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9323833 |
| ADALIA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9328900 |
| SHABGOUN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9346524 |
| AGATA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9346536 |
| BENITA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9346548 |
| MARISOL | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9349576 |
| ORIANA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9349590 |
| MERCEDES | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9349667 |
| RAMONA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9349679 |
| GILDA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9367982 |
| SANIA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9367994 |
| SARIR | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9368003 |
| SOMIA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9368015 |
| GLORY | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9369710 |
| ARIES | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9369722 |
| ABTIN 1 | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9379636 |
| ARSHAM | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9386500 |
| PARSHAD | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9387786 |
| HAADI | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9387798 |
| RAAZI | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9387803 |
| SAEI | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9387815 |
| ARTMAN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9405930 |
| BASKAR | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9405942 |
| BAHJAT | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9405954 |
| HAAMI | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9405966 |
| SHAADI | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9405978 |
| SHAYAN 1 | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9420356 |
| TABAN 1 | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9420368 |
| YARAN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9420370 |
| AMIN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9422366 |
| AVANG | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9465746 |
| KIAZAND | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9465758 |
| BATIS | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9465760 |
| WARTA | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9465849 |
| SALIM | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9465851 |
| ARDAVAN | ISLAMIC REPUBLIC OF IRAN SHIPPING LINES | Vessel | 9465863 |
| NAMI | LISSOME MARINE SERVICES LLC | Vessel | 8419178 |
| GAS CAMELLIA | LISSOME MARINE SERVICES LLC | Vessel | 8803381 |
| TESS | LISSOME MARINE SERVICES LLC | Vessel | 8913564 |
| KATERINA 1 | LISSOME MARINE SERVICES LLC | Vessel | 9031959 |
| MARIA | LISSOME MARINE SERVICES LLC | Vessel | 9110626 |
| SUN OCEAN | LISSOME MARINE SERVICES LLC | Vessel | 9408358 |
| YOUNES [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 8212465 |
| YOUSEF [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 8316106 |

| YAGHOUB [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 8316168 |
|---|---|---|---|
| TOLOU [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 8318178 |
| VALFAJR2 [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 8400103 |
| BADR [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 8407345 |
| BANEH [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 8508462 |
| SARDASHT [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 8517231 |
| MARIVAN [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 8517243 |
| BRIGHT [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9005235 |
| CARIBO [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9011246 |
| AURA [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9013749 |
| BICAS [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9077850 |
| MAHARLIKA [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9079066 |
| NAPOLI [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9079078 |
| NYOS [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9079080 |
| NAINITAL [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9079092 |
| NATIVE LAND [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9079107 |
| ATLANTIC [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9107655 |
| SPARROW [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9171450 |
| SWALLOW [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9171462 |
| SUPERIOR [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9172038 |
| SPOTLESS [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9172040 |
| SABRINA [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9172052 |
| DESTINY [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9177155 |
| HUMANITY [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9180281 |
| ORIENTAL [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9183934 |
| SHONA [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9187629 |
| ABELIA [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9187631 |
| ALERT [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9187643 |
| SUNDIAL [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9187655 |
| SILVER CLOUD [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9187667 |
| HUWAYZEH [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9212888 |
| HORIZON [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9212890 |
| HAPPINESS [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9212905 |
| MARINA [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9212917 |
| HALISTIC [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9212929 |
| DELVAR [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9218454 |
| DAYLAM [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9218466 |
| DAMAVAND [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9218478 |
| DENA [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9218480 |
| DARAB [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9218492 |
| IRAN FAZEL [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9283746 |
| FIANGA [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9283760 |
| IRAN FAHIM [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9286140 |
| IRAN FALAGH [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9286152 |
| DECESIVE [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9356593 |
| SANCHI [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9356608 |
| MAJESTIC [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9357183 |
| SUCCESS [x] | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9357353 |

| SUNEAST ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9357365 |
|---|---|---|---|
| SPLENDOUR ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9357377 |
| COURAGE ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9357389 |
| HONESTY ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9357391 |
| AMBER ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9357406 |
| DAL LAKE ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9357717 |
| JUSTICE ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9357729 |
| HYDRA ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9362059 |
| DOVE ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9362061 |
| ZEUS ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9362073 |
| IMICO NEKA 455 ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9404546 |
| IMICO NEKA 456 ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9404558 |
| IMICO NEKA 457 ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9404560 |
| SUNSHINE ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9569205 |
| DOJRAN ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9569619 |
| ATLANTIS ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9569621 |
| FORTUN ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9569633 |
| SALALEH ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9569645 |
| SMOOTH ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9569657 |
| SKYLINE ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9569669 |
| INFINITY ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9569671 |
| DEMOS ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9569683 |
| YANGZHOU DAYANG DY905 ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9575424 |
| SUNRISE ˣ | NATIONAL IRANIAN TANKER COMPANY | Vessel | 9615092 |
| ANTHEM | SIQIRIYA MARITIME CORP | Vessel | 8310669 |
| JAFFNA | SIQIRIYA MARITIME CORP | Vessel | 8609515 |
| OLYSA | SIQIRIYA MARITIME CORP | Vessel | 9001605 |

# ATTACHMENT 4

ABBASI-DAVANI, Fereidoun
ADVANCE ELECTRICAL AND INDUSTRIAL TECHNOLOGIES SL
ALUMINAT
ANDISHEH ZOLAL
ARIA NIKAN MARINE INDUSTRY
BUJAR, Farhad
DAYENI, Mahmoud Mohammadi
EYVAZ TECHNIC MANUFACTURING COMPANY
FAKHRIZADEH-MAHABADI, Mohsen
FARATECH
FARAYAND TECHNIQUE
FULMEN GROUP
IMANIRAD, Arman
IMANIRAD, Mohammad Javad
IRAN CENTRIFUGE TECHNOLOGY COMPANY
IRAN POOYA
JAHAN TECH ROOYAN PARS
JAVEDAN MEHR TOOS
KAHVARIN, Iradj Mohammadi
KALAYE ELECTRIC COMPANY
KHAKI, Parviz
MANDEGAR BASPAR KIMIYA COMPANY
MARO SANAT COMPANY
MODERN INDUSTRIES TECHNIQUE COMPANY
NEDA INDUSTRIAL GROUP
NEKA NOVIN
PARTO SANAT CO.
PAYA PARTOV CO.
PENTANE CHEMISTRY INDUSTRIES
PETRO GREEN
PISHRO SYSTEMS RESEARCH COMPANY
POUYA CONTROL
PUNTI, Pere
RAHIMYAR, Amir Hossein
SIMATIC DEVELOPMENT CO.
TAGHTIRAN KASHAN COMPANY
TANIDEH, Hossein
TARH O PALAYESH
THE ORGANIZATION OF DEFENSIVE INNOVATION AND RESEARCH
TOWLID ABZAR BORESHI IRAN
WISSER, Gerhard
YASA PART
ZOLAL IRAN COMPANY

## JCPOA Annex III - Civil Nuclear Cooperation

A.   **General**

1.   Iran and E3/EU+3 decided to co-operate, among others, including through IAEA technical cooperation, where appropriate, and without prejudice to the existing bilateral agreements, in different areas of civil nuclear co-operation to be developed within the framework of this JCPOA, as detailed in this Annex. In this context, the Joint Commission will also support assistance to Iran, including through IAEA technical cooperation projects, as appropriate.

2.   All civil nuclear cooperation projects under this JCPOA will be mutually determined by the participating states and will be consistent with the JCPOA and the national laws and regulations of the participating parties.

3.   The civil nuclear and scientific cooperation projects envisioned between Iran and the E3/EU+3 as part of this JCPOA may be undertaken in a variety of formats, with a variety of potential participants. A given project undertaken by the E3/EU+3 will not necessarily include participation by all E3/EU+3 parties:

3.1.   bilateral or multilateral cooperation arrangements with Iran. Such arrangements would be mutually determined by the participating states.

3.2.   projects under the auspices of the IAEA, either through IAEA technical co-operation projects including through Project and Supply Agreements.

3.3.   through International Science and Technology Centres.

Specifically, E3/EU+3 parties will undertake, to develop nuclear co-operation with Iran, in particular within the following areas:

B.   **Reactors, Fuels and Associated Technologies, Facilities and Processes**

4.   **Modern light water power and research reactors and associated equipment, technologies and facilities**

E3/EU+3 parties, as appropriate, will facilitate Iran's acquisition of light-water research and power reactors, for research, development and testing, and for the supply of electricity and desalination, with arrangements for the assured supply of nuclear fuel and the removal of spent fuel as provided for in relevant contracts, for each reactor provided. This may include the following areas for co-operation:

4.1.   Construction as well as effective and safe operation of new light water power reactors and associated equipment, according to Generation III+ requirements, including small and medium sized nuclear reactors, including joint design and manufacturing, as appropriate.

4.2.   Construction of state of the art light water moderated multipurpose research reactors capable of testing fuel pins, assembly prototypes and structural materials with associated related facilities, including joint design and manufacturing, as appropriate.

4.3.   Supply of state-of-the-art instrumentation and control systems for the above research and power reactors, including joint design and manufacturing, as appropriate;

4.4.  Supply of nuclear simulation and calculation codes and software solutions with regard to the above areas, including joint development, as appropriate;

4.5.  Supply of first and second loop main equipment as well as core of the above research and power reactors, including joint design and manufacturing, as appropriate;

4.6.  On-the-job training on fuel management scenarios and reshuffling for the above research and power nuclear reactors;

4.7.  Joint technical review of Iran's current nuclear reactors, upon the request by Iran, in order to upgrade current equipment and systems, including concerning nuclear safety;

5.  **Arak Modernisation Project**

5.1.  As described in Section B of Annex I, an international partnership composed of E3/EU+3 parties and Iran, which may subsequently be enlarged to include mutually determined third countries will be established, to support and facilitate the redesign and rebuilding of the IR-40 reactor at Arak into a modernised, not exceeding 20MWth, heavy-water moderated and cooled research reactor, based on the agreed conceptual design (as attached to Annex I).

5.2.  Iran will take the leadership role as the owner and as the project manager, and have responsibility for overall implementation of the Arak modernisation project. A Working Group composed of E3/EU+3 participants will be established to support and facilitate the redesigning and rebuilding of the reactor. An international partnership composed of Iran and the Working Group would implement the Arak modernisation project, with E3/EU+3 participants assuming responsibilities as described in Annex I. The Working Group could be enlarged to include other countries by consensus of the participants of the Working Group and Iran. E3/EU+3 participants and Iran will conclude an official document expressing their strong commitments to the Arak modernisation project in advance of Implementation Day which would provide an assured path forward to modernise the reactor and would define the responsibilities assumed by the E3/EU+3 participants, especially in the key areas such as redesign, design review and certification, reactor core manufacturing, fuel design, fabrication and supply, safety and security, spent fuel treatment or disposition, as well as concerning the supply of materials, equipment, instrumentation and control systems, and subsequently contracts would be concluded. The participants of the Working Group will provide assistance needed by Iran for redesigning and rebuilding the reactor, consistent with their respective national laws, in such a manner as to enable the safe and timely construction and commissioning of the modernised reactor.

5.3.  Iran and the Working Group will cooperate to develop the final design of the modernised reactor and the design of the subsidiary laboratories to be carried out by Iran, and review conformity with international safety standards, such that the reactor can be licensed by the relevant Iranian regulatory authority for commissioning and operation.

5.4.  Iran will continue to assume the primary responsibility for financing the modernisation project. Additional funding arrangements for the project, including for IAEA projects supporting the Arak modernisation project, will be

determined based on the official document and contracts to be subsequently concluded.

**6.  Nuclear Fuel**

6.1.  E3/EU+3 parties, as appropriate, will support assistance to Iran, including through the IAEA, as appropriate, in meeting international qualification standards for nuclear fuel fabricated by Iran.

6.2.  E3/EU+3 parties will seek to cooperate regarding the supply of modern fuels, including, as appropriate, joint design and fabrication, the relevant licenses and fabrication technologies and equipment and related infrastructure, for current and future nuclear research and power reactors, including technical assistance on purification processes, forming and metallurgical activities for different types of nuclear fuel clads and cladding for the modernised Arak heavy water research reactor.

**C.  Research and Development (R&D) Practices**

7.  To implement other aspects of this JCPOA and in support of a broader opening of scientific engagements between the E3/EU+3 and Iran, the E3/EU+3 and Iran will seek cooperation and scientific exchange in the field of nuclear science and technology:

7.1.  Accelerator-based nuclear physics and nuclear astrophysics research, and stable isotope production in international collaboration at the nuclear, physics, and technology centre at the Fordow facility. Iran will request from the E3/EU+3 and other interested parties specific proposals for cooperative international nuclear, physics, and technology projects and will host an international workshop to review these proposals. The goal is to realise international collaborative projects within a few years. The transitioning to stable isotope production of two cascades will be conducted in a joint partnership between the Russian Federation and Iran on the basis of arrangements to be mutually agreed upon.

7.2.  Plasma physics and nuclear fusion;

7.3.  Research reactor applications at the TRR, modernized Arak reactor, or at other future research reactors in Iran, such as:

7.3.1.  Training

7.3.2.  Radio-isotope production and utilization

7.3.3.  Nuclear desalination

7.3.4.  Neutron transmutation doping

7.3.5.  Neutron activation analysis

7.3.6.  Neutron capture therapy

7.3.7.  Neutron imaging and materials characterization studies using neutron beams

7.4.  E3/EU+3 parties and Iran could also explore co-operation in the following additional areas:

7.4.1. Design, manufacture and/or assembly of in-core measuring instrumentation and technologies;

7.4.2. Nuclear instrumentation and control, systems and electronics design, manufacture and/or assembly;

7.4.3. Fusion technology and plasma physics and related infrastructure and facilitating contribution of Iran to the International Thermonuclear Experimental Reactor (ITER) Project and/or similar projects, including relevant IAEA technical cooperation projects;

7.4.4. Neutrino astronomy;

7.4.5. Design and manufacturing, and supply, of different types of accelerators and supply of related equipment including through relevant IAEA technical cooperation projects;

7.4.6. Data acquisition and processing software and interface equipment;

**D. Nuclear Safety, Safeguards and Security**

**8. Nuclear safety**

E3/EU+3 parties, and possibly other states, as appropriate, are prepared to cooperate with Iran to establish a Nuclear Safety Centre in Iran, engage in workshops and training events in Iran to support interactions between Iranian nuclear regulatory authorities and those from the E3/EU+3 and elsewhere to, among other things, share lessons learned on establishing and maintaining regulatory independence and effectiveness, and training on implementing nuclear safety culture and best practices; facilitate exchanges and visits to nuclear regulatory authorities and nuclear power plants outside of Iran focusing on best practices for safe operation; and enhance and strengthen domestic emergency preparedness and severe accident management capability.

Provide support and assistance to enable Iran to join relevant conventions on nuclear safety and security, e.g. through workshops or seminars furthering accession to such commitments. Such workshops or seminars could also take place under the auspices of the IAEA.

E3/EU+3 parties, and possibly other states, as appropriate, will co-operate with Iran in the following areas of nuclear safety, as well as in other areas to be mutually agreed:

8.1. Conclusion of bilateral/multilateral agreements with related organisations and research centres;

8.2. Supply of valid codes, instruments and equipment related to nuclear safety;

8.3. Facilitate exchange of knowledge and experience in the area of nuclear safety;

8.4. Enhance and strengthen domestic emergency preparedness and severe accident management capability;

8.5. Arrange on-the-job training and apprenticeship courses for reactor and facility operators, regulatory authority personnel and related supportive organizations in the area of nuclear safety inside and outside of Iran;

8.6.  Establish a Nuclear Safety Centre in Iran, which shall be equipped with necessary tools, techniques and equipment, in order to support and facilitate technical and professional training and exchange of lessons-learned for reactor and facility operators, regulatory authority personnel and related supportive organizations;

## 9.  Nuclear Safeguards

E3/EU+3 parties, and possibly other states, as appropriate, are prepared to cooperate with Iran on the effective and efficient implementation of IAEA safeguards and transparency measures in Iran. Co-operation in the following areas can be envisaged:

9.1.  Cooperation in the form of on-the-job trainings and workshops to strengthen nuclear material accounting and control process, human resource development, and quality assurance/quality control processes;

9.2.  E3/EU+3 parties, and other states, as appropriate, are prepared to cooperate with Iran for the effective and efficient implementation of IAEA safeguards and transparency measures in Iran.

9.3.  This cooperation could take the form of training and workshops to strengthen Iran's safeguards regulatory authority, nuclear material accounting and control processes, human resource development, and quality assurance/quality control processes.

## 10.  Nuclear Security

E3/EU+3 parties, and possibly other states, as appropriate, are prepared to cooperate with Iran on the implementation of nuclear security guidelines and best practices. Co-operation in the following areas can be envisaged:

10.1. Co-operation in the form of training courses and workshops to strengthen Iran's ability to prevent, protect and respond to nuclear security threats to nuclear facilities and systems as well as to enable effective and sustainable nuclear security and physical protection systems;

10.2. Co-operation through training and workshops to strengthen Iran's ability to protect against, and respond to nuclear security threats, including sabotage, as well as to enable effective and sustainable nuclear security and physical protection systems.

## E.  Nuclear Medicine and Radioisotopes, Associated Technologies, Facilities and Processes

11.  E3/EU+3 parties, as appropriate, are prepared to cooperate with Iran to improve the utilization of nuclear medicine in Iran in order to enhance Iran's expertise in diagnostic imaging and radiotherapy, increase the availability of medical radioisotopes for diagnosis and treatment of Iranian citizens, and facilitate Iran's participation in the broader international scientific and nuclear medicine community. Such cooperation may include:

11.1. Upgrades to the infrastructure associated with existing cyclotron facilities, including for medical radioisotopes production.

11.2. Facilitating Iranian acquisition of a new cyclotron, and associated radio-pharmacy equipment, for medical radioisotopes production.

11.3. Acquisition of state-of-the-art diagnostic imaging and radiotherapy equipment for existing or new nuclear medicine centers, including co-operation between hospitals for the treatment of individual patients.

11.4. Cooperation on occupational and patient dosimetry procedures.

11.5. Improved target utilization to increase radioisotope production.

11.6. Acquisition of radioisotope sources for bracho therapy, and radiotherapy instrument calibration, and other medical and industrial applications.

11.7. Supply of state-of-the art radio-medicine center and necessary laboratories.

**F.   Waste Management and Facility Decommissioning**

12.    E3/EU+3 parties, as appropriate, are prepared to cooperate with Iran in the safe, effective, and efficient management and disposition of nuclear and radiological wastes derived from Iran's nuclear fuel cycle activities and nuclear medicine, radioisotope production and/or consumption activities.

13.    E3/EU+3 parties, as appropriate, are prepared to cooperate with Iran in areas of safe, effective, and environmentally friendly best practices for facility decontamination and decommissioning, including co-operation on long term storage facilities for the repository of low and medium level waste.

14.    E3/EU+3 parties, as appropriate, are prepared to facilitate exchanges and visits to relevant sites and locations outside of Iran related to effective waste management and best practices.

15.    E3/EU+3 parties, as appropriate, will facilitate the supply of appropriate equipment and systems for waste management and depository facilities in Iran.

**G.   Other projects**

16.    Other projects may be implemented between the relevant E3/EU+3 parties and Iran, as mutually determined by the participants in the JCPOA, including in the following areas:

16.1.   Construction of nuclear desalination and associated infrastructure in Iran;

16.2.   Development of laser technology for medical applications (e.g. for eye surgery);

## JCPOA Annex IV – Joint Commission

**1.   Establishment, Composition, and Coordinator**

1.1.   The Joint Commission is established to carry out the functions assigned to it in the JCPOA, including its Annexes.

1.2.   The Joint Commission is comprised of representatives of Iran and the E3/EU+3 (China, France, Germany, the Russian Federation, the United Kingdom, and the United States, with the High Representative of the Union for Foreign Affairs and Security Policy), together, the JCPOA participants.

1.3.   The Joint Commission may establish Working Groups in particular areas, as appropriate.

1.4.   The High Representative of the Union for Foreign Affairs and Security Policy ('High Representative'), or his/her designated representative will serve as the Coordinator of the Joint Commission.

**2.   Functions**

2.1.   The Joint Commission will perform the following functions:

2.1.1.   Review and approve the final design for the modernized heavy water research reactor and the design of the subsidiary laboratories prior to the commencement of construction, and review and approve the fuel design for the modernized heavy water research reactor as provided for in Section B of Annex I;

2.1.2.   Review and approve, upon request by Iran, development, acquisition, construction or operation of hot cells (containing a cell or interconnected cells), shielded cells or shielded glove boxes with dimensions beyond 6 cubic meters in volume and specifications set out in Annex I of the Additional Protocol, as provided for in paragraph 21 of Annex I;

2.1.3.   Review and approve plans submitted by Iran to initiate R&D on uranium metal based TRR fuel, as provided for in paragraph 26 of Annex I;

2.1.4.   Review and approve, upon request by Iran, projects on new types of centrifuges to proceed to a prototype stage for mechanical testing, as provided for in paragraph 43 of Annex I;

2.1.5.   Receive information in advance about the specific projects that will be undertaken at Fordow, as provided for in paragraph 44 of Annex I;

2.1.6.   Receive information about the conceptual framework of stable isotope production at Fordow, as provided for in paragraph 46.1 of Annex I;

2.1.7.   Assess and then approve, upon request by Iran, that fuel assemblies manufactured in Iran and their intermediate products cannot be readily reconverted into UF6, based on the objective technical criteria, with the goal of enabling fuel to be fabricated in Iran, as provided in paragraph 59 of Annex I;

2.1.8.    Support assistance to Iran, including through IAEA technical cooperation as appropriate, in meeting international qualification standards for nuclear fuel produced by Iran, as provided for in paragraph 59 of Annex I;

2.1.9.    Review and approve in advance, upon request by Iran, engagement by Iran, including through export of any enrichment or enrichment related equipment and technology, with any other country, or with any foreign entity in enrichment and enrichment related activities, including related research and development, as provided for in paragraph 73 in Annex I;

2.1.10.  Provide consultation, and advise on the necessary means in the context of access as specified in paragraph 78 of Annex I;

2.1.11.  Review and approve in advance, upon request by Iran, the design, development, fabrication, acquisition, or use for non-nuclear purposes of multi-point explosive detonation systems suitable for a nuclear explosive device and explosive diagnostic systems (streak cameras, framing cameras and flash x-ray cameras) suitable for the development of a nuclear explosive device, as provided for in paragraphs 82.2 and 82.3 of Annex I;

2.1.12.  Review and consult to address issues arising from the implementation of sanctions lifting as specified in this JCPOA and its Annex II;

2.1.13.  Review and decide on proposals for nuclear-related transfers to or activities with, Iran, in accordance with Section 6 of this Annex and the United Nations Security Council resolution endorsing this JCPOA;

2.1.14.  Review, with a view to resolving, any issue that a JCPOA participant believes constitutes nonperformance by another JCPOA participant of its commitments under the JCPOA, according to the process outlined in the JCPOA;

2.1.15.  Adopt or modify, as necessary, procedures to govern its activities;

2.1.16.  Consult and provide guidance on other implementation matters that may arise under the JCPOA.

## 3.    Procedures

3.1.    The Joint Commission will meet on a quarterly basis and at any time upon request of a JCPOA participant to the Coordinator. The Coordinator will convene a meeting of the Joint Commission to be held no later than one week following receipt of such a request, except for consultations in accordance with Section Q of Annex I and any other matter that the Coordinator and/or a JCPOA participant deem urgent, in which case the meeting will be convened as soon as possible and not later than three calendar days from receipt of the request.

3.2.    Meetings of the Joint Commission will be held in New York, Vienna, or Geneva as appropriate. The host country should facilitate entry formalities for those attending such meetings.

3.3.    The Joint Commission may decide by consensus to invite observers to attend its meetings.

3.4.    Except as provided in Section 6 of this Annex which will be subject to the confidentiality procedure of the UN, the work of the Joint Commission is

confidential and may be shared only among JCPOA participants and observers as appropriate, unless the Joint Commission decides otherwise.

**4.       Decisions**

4.1.     Except as stated otherwise in this Annex, decisions by the Joint Commission are to be made by consensus.

4.2.     Each JCPOA participant will have one vote. Decisions of the Joint Commission are to be taken by the Representative or the Deputy Representative or other such alternate as the JCPOA participant may designate.

4.3.     The vote of each JCPOA participant will be made known to all other JCPOA participants if any JCPOA participant requests a recorded vote.

4.4.     Matters before the Joint Commission pursuant to Section Q of Annex I are to be decided by consensus or by affirmative vote of five JCPOA participants. There is no quorum requirement.

4.5.     The Coordinator will not take part in decision-making on nuclear-related transfers and activities as set out in Section 6 of this Annex.

**5.       Other**

5.1.     Each JCPOA participant will be responsible for its own costs of participating in the Joint Commission, unless the Joint Commission decides otherwise.

5.2.     JCPOA participants may request that the Coordinator circulates a notification to the other JCPOA participants at any time. Upon such a request, the Coordinator will circulate such notification without delay to all JCPOA participants.

**6.       Procurement Working Group**

6.1.     With the purpose of establishing a procurement channel, the Joint Commission will, except as otherwise provided by the United Nations Security Council resolution endorsing this JCPOA, review and decide on proposals by states seeking to engage in:

6.1.1.   the supply, sale or transfer directly or indirectly from their territories, or by their nationals or using their flag vessels or aircraft to, or for the use in or benefit of, Iran, and whether or not originating in their territories, of all items, materials, equipment, goods and technology set out in INFCIRC/254/Rev.12/Part 1, and, if the end-use will be for Iran's nuclear programme set out in this JCPOA or other non-nuclear civilian end-use, all items, materials, equipment, goods and technology set out in INFCIRC/254/Rev.9/Part 2 (or the most recent version of these documents as updated by the Security Council), as well as any further items if the relevant State determines that they could contribute to activities inconsistent with the JCPOA; and,

6.1.2.   the provision to Iran of any technical assistance or training, financial assistance, investment, brokering or other services related to the supply, sale, transfer, manufacture, or use of the items, materials, equipment, goods and technology described in subparagraph (a) above;

6.1.3.   acquisition by Iran of an interest in a commercial activity in another State involving uranium mining, production or use of nuclear materials and technologies as listed in INFCIRC/254/Rev.12/Part 1, and such investments in territories under their jurisdiction by Iran, its nationals, and entities incorporated in Iran or subject to its jurisdiction, or by individuals or entities acting on their behalf or direction, or by entities owned or controlled by them.

6.2.   The Joint Commission will discharge its responsibility for reviewing and making recommendations on proposals for nuclear-related transfers to or activities with Iran through a Procurement Working Group.

6.3.   Each E3+3 State and Iran will participate in the Procurement Working Group. The High Representative will serve as the Coordinator of the Procurement Working Group.

6.4.   Except as otherwise provided by the Joint Commission or the United Nations Security Council resolution endorsing this JCPOA, the Procurement Working Group will consider proposals according to the following process:

6.4.1.   Upon receipt of a proposal, including all necessary supporting information, by a State seeking to engage in transfers and activities referenced in Section 6.1, the Coordinator will forward the proposal, through appropriate means, without delay to the Procurement Working Group and, when the proposal relates to items, material, equipment, goods and technology intended to be used in nuclear activities authorized by the JCPOA, to the IAEA. The Procurement Working Group will have up to 30 working days to consider and decide on the proposal.

6.4.2.   "Necessary supporting information" for purposes of Section 6.4.1 means: (a) a description of the item; (b) the name, address, telephone number, and email address of the exporting entity; (c) the name, address, telephone number, and email address of the importing entity; (d) a statement of the proposed end-use and end use location, along with an end-use certification signed by the AEOI or the appropriate authority of Iran attesting the stated end-use; (e) export license number if available; (f) contract date, if available; and (g) details on transportation, if available; provided that if any of the export license number, contract date, or details on transportation are not available as of the time of submittal of the proposal, such information will be provided as soon as possible and in any event as condition of approval prior to shipment of the item.

6.4.3.   Each participant in the Procurement Working Group will have to communicate to the Coordinator, within 20 working days, whether it approves or rejects the proposal. The timeline for consideration may be extended for an additional period of 10 working days at the request of a participant of the Procurement Working Group.

6.4.4.   The proposal will be recommended for approval as soon as the Coordinator receives formal approvals from all the Procurement Working Group Participants or if, at the end of the 30 working day period, the Coordinator has received no disapprovals from any of the Procurement Working Group Participants. If at the end of the 30 working day period, the proposal has

not been recommended for approval, the proposal may, at the request of at least two Working Group Participants within 5 working days, be referred to the Joint Commission, which would decide on approval of the proposal by consensus within 10 working days. Otherwise the proposal will be recommended for disapproval. The disapproving JCPOA participant(s) should provide relevant information regarding the disapproval to the Joint Commission as appropriate, taking into account the need to protect confidential information.

6.4.5.   The Coordinator will communicate the recommendation of the Joint Commission to the United Nations Security Council no later than 35 working days, or in case of referral to the Joint Commission no later than 45 working days from the date the Coordinator transmitted the proposal and all necessary supporting information to the Procurement Working Group.

6.4.6.   Except as decided otherwise by consensus, the Procurement Working Group will meet every three weeks for reviewing the proposals. When some of the proposals to be reviewed relate to items, material, equipment, goods and technology intended to be used in nuclear activities authorized by the JCPOA, the IAEA may be invited to attend the meeting as an observer.

6.5.   All JCPOA participants will act in accordance with the procurement channel and will only engage in transfers and activities referenced in Section 6.1 following approval by the Joint Commission and the United Nations Security Council. Iran will not use, acquire, or seek to procure the items, materials, equipment, goods, and technology referred to in Section 6.1 of this Annex for nuclear activities which are inconsistent with this JCPOA.

6.6.   Any JCPOA participant may refer a procurement-related activity to the Joint Commission under the dispute settlement mechanism if it is concerned that such activity is inconsistent with this JCPOA.

6.7.   Iran will provide to the IAEA access to the locations of intended use of all items, materials, equipment, goods and technology set out in INFCIRC/254/Rev.12/Part 1 (or the most recent version of these documents as updated by the Security Council) imported following the procedure under Section 6 of this Annex.

6.8.   Iran will permit the exporting state to verify the end-use of all items, materials, equipment, goods and technology set out in INFCIRC/254/Rev.9/Part 2 (or the most recent version of these documents as updated by the Security Council) imported following the procedure under Section 6 of this Annex. Upon request of the exporting state, or if the Joint Commission deems necessary when approving a proposal for transfer, the Joint Commission will provide expertise to the exporting state, including experts, as needed, to participate in the end-use verification.

6.9.   The Procurement Working Group will respond to requests for guidance on procurement activities from third parties, as communicated by the Coordinator. The Procurement Working Group will endeavor to respond to

such requests for guidance within 9 working days from the date the Coordinator submits it to the Procurement Working Group.

6.10.    The Joint Commission will report to the United Nations Security Council at least every 6 months on the status of the Procurement Working Group's decisions and on any implementation issues.

**7.       Working Group on Implementation of Sanctions Lifting**

7.1.     The Joint Commission will discharge its responsibilities for reviewing and consulting on issues related to the implementation of sanctions lifting as specified in this JCPOA assisted by a working group on the implementation of sanctions lifting.

7.2.     The Joint Commission participants will participate in this working group. The High Representative will serve as coordinator of this working group.

7.3.     If at any time following the implementation day Iran believes that any other nuclear-related sanction or restrictive measure including related designations of the E3/EU+3 is preventing the full implementation of the sanctions lifting as specified in this JCPOA, the JCPOA participant in question will consult with Iran with a view to resolving the issue. If they are not able to resolve the issue, Iran or any member of the E3/EU+3 may refer the issue to the working group.

7.4.     The participants of the working group will review and consult, with a view to resolving the issue within 30 working days.

7.5.     If after involvement of the working group, the issue remains unresolved, any participant of the JCPOA may refer it to the Joint Commission.

## JCPOA Annex V - Implementation Plan[1]

1.   This Annex describes the sequence of the actions specified in Annexes I and II to this JCPOA.

**A.   <u>Finalisation Day</u>**

2.   Upon conclusion of the negotiations of this JCPOA, the E3/EU+3 (China, France, Germany, the Russian Federation, the United Kingdom and the United States, with the High Representative of the European Union for Foreign Affairs and Security Policy) and Iran will endorse this JCPOA.

3.   Promptly after the conclusion of the negotiations of this JCPOA, the proposed UN Security Council resolution referred to in Section 18 of this Annex will be submitted to the UN Security Council for adoption without delay.

4.   The EU will promptly endorse the UN Security Council resolution referred to above through Council Conclusions.

5.   Iran and the IAEA will start developing necessary arrangements to implement all transparency measures provided for in this JCPOA so that such arrangements are completed, in place, and ready for implementation on Implementation Day.

**B.   <u>Adoption Day</u>**

6.   Adoption Day will occur 90 days after the endorsement of this JCPOA by the UN Security Council through the resolution referred to above, or at an earlier date by mutual consent of all JCPOA participants, at which point this JCPOA comes into effect.

7.   Beginning on Adoption Day, JCPOA participants will make necessary arrangements and preparations, including legal and administrative preparations, for the implementation of their JCPOA commitments.

8.   Iran will officially inform the IAEA that, effective on Implementation Day, Iran will provisionally apply the Additional Protocol, pending its ratification by the Majlis (Parliament), and will fully implement the modified code 3.1.

9.   Iran will implement paragraph 66 from Section M on "Past and Present Issues of Concern" of Annex I.

10.   The EU and its Member States will adopt an EU Regulation, taking effect as of Implementation Day, terminating all provisions of the EU Regulation implementing all nuclear-related economic and financial EU sanctions as specified in Section 16.1 of this Annex, simultaneously with the IAEA-verified implementation by Iran of agreed nuclear-related measures.

11.   The United States, acting pursuant to Presidential authorities, will issue waivers, to take effect upon Implementation Day, ceasing the application of the statutory nuclear-related sanctions as specified in Sections 17.1 to 17.2 of this Annex. The President will also take action to direct that all appropriate

---

[1] This Annex is only for the purpose of determining the sequence of implementation of the commitments described in this JCPOA and annexes thereto and does not restrict or expand the scope of these commitments.

additional measures be taken to implement the cessation of application of sanctions as specified in Sections 17.1 to 17.4 of this Annex, including the termination of Executive orders as specified in Section 17.4, and the licensing of activities as specified in Section 17.5.

12.  E3/EU+3 participants and Iran will begin discussions on an official document to be concluded in advance of Implementation Day which will express strong commitments of the E3/EU+3 participants to the Arak Heavy Water Reactor modernisation project and define the responsibilities assumed by the E3/EU+3 participants.

13.  The EU, its Member States and the United States will begin consultation as appropriate with Iran regarding relevant guidelines and publicly accessible statements on the details of sanctions or restrictive measures to be lifted under this JCPOA.

**C.   <u>Implementation Day</u>**

14.  Implementation Day will occur upon the IAEA-verified implementation by Iran of the nuclear-related measures described in paragraph 15 below, and, simultaneously, the E3/EU+3 taking the actions described in paragraphs 16 and 17 below, and with the actions described in paragraph 18 below taking place at the UN level in accordance with the UN Security Council resolution.

**15.   Iran will implement the nuclear-related measures as specified in Annex I:**

15.1.  Paragraphs 3 and 10 from Section B on "Arak Heavy Water Research Reactor";

15.2.  Paragraphs 14 and 15 from Section C on "Heavy Water Production Plant";

15.3.  Paragraphs 27, 28, 29, 29.1 and 29.2 from Section F on "Enrichment Capacity";

15.4.  Paragraphs 32, 33, 34, 35, 36, 37, 38, 39, 40, 41 and 42 from Section G on "Centrifuges Research and Development";

15.5.  Paragraphs 45, 46, 46.1, 46.2, 47.1, 48.1 from Section H on "Fordow Fuel Enrichment Plant";

15.6.  Paragraphs 52, 54 and 55 from Section I on "Other Aspects of Enrichment";

15.7.  Paragraphs 57 and 58 from Section J on "Uranium Stocks and Fuels";

15.8.  Paragraph 62 from Section K on "Centrifuge Manufacturing";

15.9.  Complete the modalities and facilities-specific arrangements to allow the IAEA to implement all transparency measures provided for in Annex I;

15.10. Paragraphs 64 and 65 from Section L on "Additional Protocol and Modified Code 3.1";

15.11. Paragraphs 80.1 and 80.2 from Section R on "Centrifuge Component Manufacturing Transparency"; and

15.12. Within one year from Implementation Day, Iran will have completed the measures specified in paragraphs 47.2 and 48.2 of Section H on "Fordow Fuel Enrichment Plant".

16.    **The European Union will:**

16.1.   Terminate the provisions of Council Regulation (EU) No 267/2012 and suspend the corresponding provisions of Council Decision 2010/413/CFSP specified in Sections 1.1.1-1.1.3; 1.1.5-1.1.8; 1.2.1-1.2.5; 1.3.1, 1.3.2 (in so far as it concerns Articles 16 and 17 of Council Decision 2010/413/CFSP) and 1.3.3; 1.4.1 and 1.4.2; 1.10.1.2 (in so far as it concerns Articles 39, 43, 43a of Council Regulation (EU) No 267/2012) of Annex II. EU Member States will terminate or amend national implementing legislation as required.

16.2.   Amend the provisions of Council Regulation (EU) No 267/2012 and the corresponding provisions of Council Decision 2010/413/CFSP specified in Sections 1.6.1-1.7.2 of Annex II, in connection with activities consistent with this JCPOA.

16.3.   Remove individuals and entities set forth in Attachment 1 to Annex II of this JCPOA from Annexes VIII and IX to Council Regulation (EU) 267/2012. Suspend the provisions of Council Decision 2010/413/CFSP specified in Section 1.9.1 of Annex II in relation to individuals and entities set forth in Attachment 1 to Annex II.

16.4.   Amend the provisions of Council Regulation (EU) No 267/2012 and Council Decision 2010/413/CFSP specified in Sections 1.5.1 and 1.5.2 of Annex II to implement the relevant provisions of the UN Security Council resolution referred to above.

17.    **The United States will:**[2]

17.1.   Cease the application of the sanctions set forth in Sections 4.1-4.5 and 4.7 of Annex II, with the exception of Section 211(a) of the Iran Threat Reduction and Syria Human Rights Act of 2012 (TRA);

17.2.   Cease the application of the sanctions set forth in Section 4.6 of Annex II, in connection with activities consistent with this JCPOA, including trade with individuals and entities set forth in Attachment 3 to Annex II;

17.3.   Remove individuals and entities set forth in Attachment 3 to Annex II from the Specially Designated Nationals and Blocked Persons List (SDN List), the Foreign Sanctions Evaders List (FSE List), and/or the Non-SDN Iran Sanctions Act List as set forth in Section 4.8.1 of Annex II;

17.4.   Terminate Executive Orders 13574, 13590, 13622, 13645 and Sections 5-7 and 15 of Executive Order 13628 as set forth in Section 4 of Annex II; and

17.5.   License activities as set forth in Section 5 of Annex II.

18.    **UN Security Council**

18.1.   In accordance with the UN Security Council resolution endorsing this JCPOA, the provisions imposed in UN Security Council resolutions 1696 (2006), 1737 (2006), 1747 (2007), 1803 (2008), 1835 (2008), 1929 (2010) and 2224 (2015) will be terminated subject to re-imposition in the event of significant non-performance by Iran of JCPOA commitments, and specific

---

[2] The sanctions that the United States will cease to apply are those directed towards non-U.S. persons, as described in Section 4 of Annex II.

restrictions, including restrictions regarding the transfer of proliferation sensitive goods will apply.[3]

18.2.  The E3/EU+3 will take appropriate measures to implement the new UNSC resolution.

**D.      Transition Day**

19.     Transition Day will occur 8 years from Adoption Day or upon a report from the Director General of the IAEA to the IAEA Board of Governors and in parallel to the UN Security Council stating that the IAEA has reached the Broader Conclusion that all nuclear material in Iran remains in peaceful activities, whichever is earlier.

20.     **The European Union will:**

20.1.   Terminate the provisions of Council Regulation (EU) No 267/2012 and suspend the corresponding provisions of Council Decision 2010/413/CFSP specified in Sections 1.1.4, 1.3.2 (in so far as it concerns Articles 15 and 18 of Council Decision and Articles 36 and 37 of Council Regulation); 1.5.1 and 1.5.2 (in so far as it concerns Ballistic Missiles restrictions); 1.6.1-1.9.1 of Annex II.

20.2.   Remove individuals and entities set forth in Attachment 2 to Annex II from Annexes VIII and IX to Council Regulation (EU) 267/2012.

20.3.   Remove individuals and entities set forth in Attachment 1 to Annex II from Annexes I and II to Council Decision 2010/413/CFSP.

20.4.   Terminate all provisions in Council Decision 2010/413/CFSP suspended on Implementation Day.

21.     **The United States will:**

21.1.   Seek such legislative action as may be appropriate to terminate, or modify to effectuate the termination of, the statutory sanctions set forth in Sections 4.1-4.5, 4.7 and 4.9 of Annex II;

21.2.   Seek such legislative action as may be appropriate to terminate, or modify to effectuate the termination of, the statutory sanctions described in Section 4.6 of Annex II, in connection with activities consistent with this JCPOA, including trade with individuals and entities set forth in Attachments 3 and 4 to Annex II; and

21.3.   Remove individuals and entities set out in Attachment 4 to Annex II from the SDN List and/or the FSE List as set forth in Section 4.8.1 of Annex II.

22.     **Iran will:**

22.1.   Seek, consistent with the Constitutional roles of the President and Parliament, ratification of the Additional Protocol.

**E.      UNSCR Termination Day**

23.     UNSCR (UN Security Council resolution) Termination Day will occur in accordance with the terms of the UN Security Council resolution endorsing

---

[3] The provisions of this Resolution do not constitute provisions of this JCPOA.

the JCPOA, which is 10 years from Adoption Day, provided that the provisions of previous resolutions have not been reinstated.

24. On UNSCR Termination Day, the provisions and measures imposed in that resolution would terminate and the UN Security Council would no longer be seized of the Iran nuclear issue.

25. **The European Union will:**

25.1. Terminate all remaining provisions of Council Regulation (EU) No 267/2012 and Council Decision 2010/413/CFSP.

**F.** **Other**

26. The terminations described in this Annex V are without prejudice to other JCPOA commitments that would continue beyond such termination dates.

### Annex B: Statement

**Statement**

China, France, Germany, the Russian Federation, the United Kingdom, the United States, and the European Union have concluded with Iran a Joint Comprehensive Plan of Action (JCPOA) to reach a comprehensive, long-term and proper solution to the Iranian nuclear issue. To improve transparency and create an atmosphere conducive to the full implementation of the JCPOA, China, France, Germany, the Russian Federation, the United Kingdom, the United States, and the European Union have set forth below certain provisions. Their participation in the JCPOA is contingent upon the United Nations Security Council adopting a new resolution that would, acting under Article 41 of the UN Charter: terminate resolutions 1696 (2006), 1737 (2006), 1747 (2007), 1803 (2008), 1835 (2008), 1929 (2010), and 2224 (2015); require States to comply with the provisions in this statement for their respective durations; and facilitate, in cooperation with the Joint Commission established in the JCPOA, implementation of the JCPOA as provided in paragraphs 2 and 6(a) below.

As provided by a resolution so deciding, the following provisions would apply on the date on which the IAEA Director General submits a report verifying that Iran has taken the actions specified in paragraph 15.1-15.11 of Annex V of the JCPOA:

1.  The term "all States" as used in this document, and as incorporated in the resolution, means "all States without exception."

2.  All States may participate in and permit the following activities provided that approval is provided in advance, on a case-by-case basis, by the Security Council:

    (a)   the supply, sale or transfer directly or indirectly from their territories, or by their nationals or using their flag vessels or aircraft to, or for the use in or benefit of, Iran, and whether or not originating in their territories, of all items, materials, equipment, goods and technology set out in INFCIRC/254/Rev.12/Part 1 and INFCIRC/254/Rev.9/Part 2 (or the most recent versions of these documents, as updated by the Security Council), as well as any further items if the State determines that they could contribute to reprocessing or enrichment-related or heavy water-related activities inconsistent with the JCPOA;

    (b)   the provision to Iran of any technical assistance or training, financial assistance, investment, brokering or other services, and the transfer of financial resources or services, related to the supply, sale, transfer, manufacture or use of the items, materials, equipment, goods and technology described in subparagraph (a) above; and

    (c)   acquisition by Iran of an interest in a commercial activity in another State involving uranium mining or production or use of nuclear materials and technology as listed in INFCIRC/254/Rev.12/Part 1, and such investment in territories under their jurisdiction by Iran, its nationals, and entities incorporated in Iran or subject to its jurisdiction, or by individuals or entities acting on their behalf or at their direction, or by entities owned or controlled by them,

*except that* approval in advance by the Security Council shall not be required for the supply, sale, or transfer to Iran of equipment covered by B.1 of INFCIRC/254/Rev.12/Part 1 when such equipment is for light water reactors, low-enriched uranium covered by A.1.2 of INFCIRC/254/Rev.12/Part 1 when it is incorporated in assembled nuclear fuel elements for such reactors, as well as items, materials, equipment, goods and technology set out in INFCIRC/254/Rev. 9/Part 2 only when for exclusive use in light water reactors.

For any items, materials, equipment, goods and technology that are approved by the Security Council pursuant to subparagraph (a) above, or are supplied, sold, or transferred subject to the exception stated above, States are to ensure that: (a) the requirements, as appropriate, of the Guidelines as set out in the referenced INFCIRC have been met; (b) they have obtained and are in a position to exercise effectively a right to verify the end-use and end-use location of any supplied item; (c) they notify the Security Council within ten days of the supply, sale or transfer; and d) in the case of supplied items, materials, equipment, goods and technology listed in the referenced INFCIRCs, they also notify the IAEA within ten days of the supply, sale or transfer.

*And except also* that approval in advance by the Security Council is not required for the supply, sale, or transfer of items, materials, equipment, goods and technology, and the provision of any related technical assistance, training, financial assistance, investment, brokering or other services, that is directly related to the necessary modification of two cascades at the Fordow facility for stable isotope production, the export of Iran's enriched uranium in excess of 300 kilograms in return for natural uranium, and the modernization of the Arak reactor based on the agreed conceptual design and, subsequently, on the agreed final design of such reactor, provided that Member States ensure that: (a) all such activities are undertaken strictly in accordance with the JCPOA; (b) they notify the Security Council and Joint Commission ten days in advance of such activities; (c) the requirements, as appropriate, of the Guidelines as set out in the referenced INFCIRC have been met; (d) they have obtained and are in a position to exercise effectively a right to verify the end-use and end-use location of any supplied item; and (e) in case of supplied items, materials, equipment, goods and technology listed in the referenced INFCIRCs, they also notify the IAEA within ten days of the supply, sale or transfers.

This paragraph shall apply until the date ten years after JCPOA Adoption Day, as defined in the JCPOA, except if the IAEA submits a report confirming the Broader Conclusion before that date, then the requirement to obtain approval in advance by the Security Council shall be suspended immediately and, beginning on the date of this suspension, the exceptions provided for in this paragraph shall continue to apply and all States may participate in and permit the activities set forth in this paragraph if they notify the Security Council and the Joint Commission at least ten working days in advance of each such activity on a case-by-case basis.

3.   Iran is called upon not to undertake any activity related to ballistic missiles designed to be capable of delivering nuclear weapons, including launches using such ballistic missile technology, until the date eight years after the JCPOA Adoption Day or until the date on which the IAEA submits a report confirming the Broader Conclusion, whichever is earlier.

4. All States may participate in and permit the activities described below *provided* that the Security Council decides in advance on a case-by-case basis to permit such activity:

   (a) the supply, sale or transfer directly or indirectly from their territories, or by their nationals or using their flag vessels or aircraft to or from Iran, or for the use in or benefit of Iran, and whether or not originating in their territories, of all items, materials, equipment, goods and technology set out in S/2015/546 and of any items, materials, equipment, goods and technology that the State determines could contribute to the development of nuclear weapon delivery systems; and

   (b) the provision to Iran of any technology or technical assistance or training, financial assistance, investment, brokering or other services, and the transfer of financial resources or services, or Iran's acquisition of an interest in any commercial activity in another State, related to the supply, sale, transfer, manufacture or use of the items, materials, equipment, goods and technology described in subparagraph a of this paragraph or related to the activities described in paragraph 3.

*provided* that in the event of an approval by the Security Council: (a) the contract for delivery of such items or assistance include appropriate end-user guarantees; and (b) Iran commit not to use such items for development of nuclear weapon delivery systems.

This paragraph shall apply until the date eight years after the JCPOA Adoption Day or until the date on which the IAEA submits a report confirming the Broader Conclusion, whichever is earlier.

5. All States may participate in and permit, *provided* that the Security Council decides in advance on a case-by-case basis to approve: the supply, sale or transfer directly or indirectly from or through their territories, or by their nationals or individuals subject to their jurisdiction, or using their flag vessels or aircraft, and whether or not originating in their territories, to Iran, or for the use in or benefit of Iran, of any battle tanks, armoured combat vehicles, large caliber artillery systems, combat aircraft, attack helicopters, warships, missiles or missile systems, as defined for the purpose of the United Nations Register of Conventional Arms, or related materiel, including spare parts, and the provision to Iran by their nationals or from or through their territories of technical training, financial resources or services, advice, other services or assistance related to the supply, sale, transfer, manufacture, maintenance, or use of arms and related materiel described in this subparagraph.

This paragraph shall apply until the date five years after the JCPOA Adoption Day or until the date on which the IAEA submits a report confirming the Broader Conclusion, whichever is earlier.

6. All States are to:

   (a) Take the necessary measures to ensure that any activities described in paragraphs 2, 4, and 5 occur on their territories, or involving their nationals or individuals subject to their jurisdiction, or involving their flag vessels or aircraft, only pursuant to the relevant terms of those paragraphs, and also to prevent and prohibit any activities inconsistent

with these provisions, until the date ten years after the JCPOA Adoption Day or until the date on which the IAEA submits a report confirming the Broader Conclusion, whichever is earlier;

(b)   Take the necessary measures to prevent, except as decided otherwise by the UN Security Council in advance on a case-by-case basis, the supply, sale, or transfer of arms or related materiel from Iran by their nationals or using their flag vessels or aircraft, and whether or not originating in the territory of Iran, until the date five years after the JCPOA Adoption Day or until the date on which the IAEA submits a report confirming the Broader Conclusion, whichever is earlier;

(c)   For eight years after the JCPOA Adoption Day or until the date on which the IAEA submits a report confirming the Broader Conclusion, whichever is earlier, continue to freeze the funds, other financial assets and economic resources which are on their territories at the date of adoption of the JCPOA, and freeze the funds, other financial assets and economic resources which are on their territories at any time thereafter, that are owned or controlled by the individuals and entities that were specified on the list established and maintained by the Committee pursuant to resolution 1737 (2006) as of the date of adoption of the new resolution, with the exception of those individuals and entities specified in Attachment hereto, or that may be de-listed by the Security Council, and freeze those of additional individuals and entities that may be designated by the Security Council as: having engaged in, directly associated with or provided support for Iran's proliferation-sensitive nuclear activities undertaken contrary to Iran's commitments in the JCPOA or the development of nuclear weapon delivery systems, including through the involvement in procurement of prohibited items, goods, equipment, materials and technology specified in this statement; having assisted designated individuals or entities in evading or acting inconsistently with the JCPOA or the new resolution; having acted on behalf or at the direction of designated individuals or entities; or having been owned or controlled by designated individuals or entities, including through illicit means.

(d)   For eight years from the JCPOA Adoption Day or until the date on which the IAEA submits a report confirming the Broader Conclusion, whichever is earlier, ensure that any funds, financial assets or economic resources are prevented from being made available by their nationals or by any individuals or entities within their territories, to or for the benefit of designated individuals or entities. These requirements shall not apply to funds, other financial assets or economic resources that have been determined by relevant States:

    i.   To be necessary for basic expenses, including payment for foodstuffs, rent or mortgage, medicines and medical treatment, taxes, insurance premiums, and public utility charges or exclusively for payment of reasonable professional fees and reimbursement of incurred expenses associated with the provision of legal services, or fees or service charges, in accordance with national laws, for routine holding or maintenance of frozen funds,

other financial assets and economic resources, after notification by the relevant States to the Security Council of the intention to authorize, where appropriate, access to such funds, other financial assets or economic resources and in the absence of a negative decision by the Security Council within five working days of such notification;

ii. To be necessary for extraordinary expenses, provided that such determination has been notified by the relevant States to the Security Council and has been approved by the Security Council;

iii. To be necessary for the civil nuclear cooperation projects described in Annex III of the JCPOA, provided that such determination has been notified by the relevant States to the Security Council and has been approved by the Security Council;

iv. To be the subject of a judicial, administrative or arbitral lien or judgment, in which case the funds, other financial assets and economic resources may be used to satisfy that lien or judgment provided that the lien or judgment was entered into prior to the date of Security Council resolution 1737 (2006), is not for the benefit of a person or entity subject to the measures in this paragraph, and has been notified by the relevant States to the Security Council; or

v. To be necessary for activities directly related to the items specified in paragraph 2, or to any other activity required for the implementation of the JCPOA, provided that such determination has been notified by the relevant States to the Security Council and has been approved by the Security Council.

In addition, this provision shall not prevent a designated individual or entity from making payment due under a contract entered into prior to the listing of such individual or entity, provided that the relevant States have determined that the contract is not related to any of the prohibited items, materials, equipment, goods, technologies, assistance, training, financial assistance, investment, brokering or services referred to in this statement; the payment is not directly or indirectly received by an individual or entity subject to the measures in this paragraph; and after notification by the relevant States to the Security Council of the intention to make or receive such payments or to authorize, where appropriate, the unfreezing of funds, other financial assets or economic resources for this purpose, ten working days prior to such authorization.

In addition, States may permit the addition to the accounts frozen pursuant to this paragraph of interest or other earnings due on those accounts or payments due under contracts, agreements or obligations that arose prior to the date on which those accounts were frozen, provided that such interest, other earnings and payments continue to be subject to these measures and are frozen;

    (e)    For five years from the JCPOA Adoption Day or until the date on which the IAEA submits a report confirming the Broader Conclusion, whichever is earlier, take the necessary measures to prevent the entry into or transit through their territories of individuals described in paragraphs 6(c) above, although underlining that nothing in this paragraph shall oblige a State to refuse its own nationals entry into its territory. The measures imposed in this paragraph shall not apply when the Security Council determines on a case-by-case basis that such travel is justified on the grounds of humanitarian need, including religious obligations, or where the Security Council concludes that an exemption would otherwise further the objectives of the new resolution, including where Article XV of the IAEA statute is engaged;

    (f)    Take the required actions, in accordance with the resolution and guidance provided by the Security Council, with respect to items the supply, sale, transfer, or export of which is being undertaken contrary to the provisions contained in the JCPOA or this statement, and cooperate in such efforts.

7.    All States are called upon to facilitate full implementation of the JCPOA by inspecting, in accordance with their national authorities and legislation and consistent with international law, in particular the law of the sea and relevant international civil aviation agreements, all cargo to and from Iran, in their territory, including seaports and airports, if the State concerned has information that provides reasonable grounds to believe that the cargo contains items the supply, sale, transfer, or export of which is being undertaken contrary to the provisions contained in the JCPOA or this statement; and are called upon also to cooperate in inspections on the high seas with the consent of the flag State, if there is information that provides reasonable grounds to believe the vessel is carrying items the supply, sale, transfer or export of which is being undertaken contrary to the provisions contained in the JCPOA or this statement.

China, France, Germany, the Russian Federation, the United Kingdom, the United States and the European Union note their understanding that, upon adoption of a resolution endorsing the JCPOA, the Security Council would make the practical arrangements to undertake directly the tasks specified in this statement, including to monitor and take action to support the implementation by Member States of these provisions, review proposals described in paragraph 2 of this statement, answer inquiries from Member States, provide guidance, and examine information regarding alleged actions inconsistent with the resolution. Furthermore, these states propose that the Security Council ask the Secretary-General to report to the Security Council on the implementation of these provisions every six months.

The duration of the provisions in this statement may be reviewed by the Joint Commission at the request of any participant at its biannual ministerial-level meetings, at which time the Joint Commission could make recommendations by consensus to the Security Council.

## ATTACHMENT

1. AGHA-JANI, Dawood
2. ALAI, Amir Moayyed
3. ASGARPOUR, Behman
4. ASHIANI, Mohammad Fedai
5. ASHTIANI, Abbas Rezaee
6. ATOMIC ENERGY ORGANISATION OF IRAN (AEOI)
7. BAKHTIAR, Haleh
8. BEHZAD, Morteza
9. ESFAHAN NUCLEAR FUEL RESEARCH AND PRODUCTION CENTRE (NFRPC) AND ESFAHAN NUCLEAR TECHNOLOGY CENTRE (ENTC)
10. FIRST EAST EXPORT BANK, P.L.C.:
11. HOSSEINI, Seyyed Hussein
12. IRANO HIND SHIPPING COMPANY
13. IRISL BENELUX NV
14. JABBER IBN HAYAN
15. KARAJ NUCLEAR RESEARCH CENTRE
16. KAVOSHYAR COMPANY
17. LEILABADI, Ali Hajinia
18. MESBAH ENERGY COMPANY
19. MODERN INDUSTRIES TECHNIQUE COMPANY
20. MOHAJERANI, Hamid-Reza
21. MOHAMMADI, Jafar
22. MONAJEMI, Ehsan
23. NOBARI, Houshang
24. NOVIN ENERGY COMPANY
25. NUCLEAR RESEARCH CENTER FOR AGRICULTURE AND MEDICINE
26. PARS TRASH COMPANY
27. PISHGAM (PIONEER) ENERGY INDUSTRIES
28. QANNADI, Mohammad
29. RAHIMI, Amir
30. RAHIQI, Javad
31. RASHIDI, Abbas
32. SABET, M. Javad Karimi
33. SAFDARI, Seyed Jaber
34. SOLEYMANI, Ghasem
35. SOUTH SHIPPING LINE IRAN (SSL)
36. TAMAS COMPANY

---

United Nations



**Security Council**

S/2016/589*

Distr.: General
12 July 2016

Original: English

---

**Report of the Secretary-General on the implementation of Security Council resolution 2231 (2015)**

## I.  Introduction

1.   On 14 July 2015, diplomatic efforts by China, France, Germany, the Russian Federation, the United Kingdom of Great Britain and Northern Ireland, the United States of America and the European Union with the Islamic Republic of Iran culminated in agreement on the Joint Comprehensive Plan of Action. On 20 July, the Security Council adopted resolution 2231 (2015), in which the Council endorsed the Plan and called upon all Member States, regional organizations and international organizations to support its implementation. On 18 October 2015, the date of adoption of the agreement (Adoption Day), the Plan came into effect and its participants began to take steps to implement their commitments.

2.   On 16 January 2016, upon the submission by the Director General of the International Atomic Energy Agency (IAEA) to the IAEA Board of Governors, and, in parallel, to the Security Council, of a report confirming that the Islamic Republic of Iran had taken the actions specified in paragraphs 15.1 to 15.11 of annex V to the Joint Comprehensive Plan of Action (S/2016/57, annex), I welcomed the achievement of reaching the day of implementation of the Plan (Implementation Day), a key milestone that reflected the good-faith efforts of all parties to the agreement.

3.   On the same day, in line with paragraph 7 of resolution 2231 (2015), with the submission of this IAEA report, all provisions of resolutions 1696 (2006), 1737 (2006), 1747 (2007), 1803 (2008), 1835 (2008), 1929 (2010) and 2224 (2015) were terminated[1] and all the provisions of annex B to resolution 2231 (2015) entered into force. All States are now to comply with paragraphs 1, 2, 4 and 5 and the provisions in paragraphs 6 (a) to (f) of annex B to the resolution for the duration specified therein and are called upon to comply with paragraphs 3 and 7 of annex B to the

---

\* Reissued for technical reasons on 2 August 2016.

[1] These included the proliferation-sensitive nuclear and ballistic missile programmes-related embargo, the arms embargo, the travel ban and asset freeze, the various financial measures and business restrictions and the ban on the provision of bunkering services. The provisions relating to the mandates of the Committee established pursuant to resolution 1737 (2006) and its Panel of Experts were also terminated on Implementation Day.


**Please recycle** 

resolution.[2] The Security Council requested me to report on the implementation of those provisions every six months.

4.     The present report is submitted in fulfilment of that request and the request of the President of the Security Council that I submit a report on the implementation of resolution 2231 (2015), with findings and recommendations (S/2016/44, para. 7).

## II.   Key findings and recommendations

5.     Six months since Implementation Day, I am encouraged by the implementation by the Islamic Republic of Iran of its nuclear-related commitments under the Joint Comprehensive Plan of Action. The Islamic Republic of Iran continues to provisionally apply the Additional Protocol to its Safeguards Agreement, pending its entry into force, and the transparency measures contained in the Plan. The Agency reported that it was continuing to verify the non-diversion of declared nuclear material, and that its evaluations regarding the absence of undeclared material or activities were ongoing. Since Implementation Day, the Agency has been verifying and monitoring the implementation by the Islamic Republic of Iran of its nuclear-related commitments under the Plan. I call upon Member States to continue to provide support to IAEA so that it may fulfil its mandate under the Plan. In addition, there have been no reports of the supply, sale, transfer or export to the Islamic Republic of Iran of nuclear-related items undertaken contrary to the provisions of the Plan and resolution 2231 (2015).

6.     The key practical arrangements for supporting the work of the Security Council and its facilitator for the implementation of resolution 2231 (2015) are in place. In particular, the necessary operational linkages between the Council and the Procurement Working Group of the Joint Commission for the processing of nuclear-related proposals submitted by Member States under the procurement channel have been established, with due regard given to information security and confidentiality. Optional forms in all six official languages of the United Nations are also available for use by Member States.

7.     These positive developments notwithstanding, the Islamic Republic of Iran brought to the attention of the Secretariat its view that it has yet to fully benefit from the lifting of multilateral and national sanctions. The concerns raised by the country include issues such as the United States Visa Waiver Program Improvement and Terrorist Travel Prevention Act of 2015 and the confiscation of Central Bank assets following a United States court order. Annex I to the present report reflects the information obtained by the Secretariat in the course of its contacts with Iranian

---

[2] These include provisions on nuclear-related transfers, which will apply for up to 10 years, provisions on missile-related transfers and financial measures, including an asset freeze, which will apply for up to 8 years, and provisions on arms-related transfers and a travel ban, which will apply for up to 5 years. In October 2025, provided that the provisions of previous Security Council resolutions have not been reinstated in the event of significant non-compliance with the Joint Comprehensive Plan of Action, all the provisions of resolution 2231 (2015) will be terminated and the Council will have concluded its consideration of the Iranian nuclear issue.

representatives.[3] Implementation challenges exist for any agreement, in particular one as comprehensive and complex as the Joint Comprehensive Plan of Action. I call upon all participants to remain steadfast in their commitment to the full implementation of the agreement and work through challenges in a spirit of cooperation and compromise, good faith and reciprocity. In that regard, I am encouraged by the strong commitments of the European Union and the United States to ensuring that the Plan works for all its participants, including by delivering benefits to the Iranian people.[4]

8.      With regard to the implementation of the provisions of annex B to resolution 2231 (2015), I am concerned by the ballistic missile launches conducted by the Islamic Republic of Iran in March 2016. I call upon the Islamic Republic of Iran to refrain from conducting such launches, given that they have the potential to increase tensions in the region. Whereas it is for the Security Council to interpret its own resolutions, I am concerned that those launches are not consistent with the constructive spirit demonstrated by the signing of the Joint Comprehensive Plan of Action.

9.      I am also concerned by the reported seizure of an arms shipment by the United States Navy in the Gulf of Oman in March 2016 (see annex II). The United States concluded that the arms had originated in the Islamic Republic of Iran and were likely bound for Yemen. The Islamic Republic of Iran has informed the Secretariat that it never engaged in such delivery (see annex I). I would like to remind all Member States of their obligation to fully implement paragraph 6 (b) of annex B to resolution 2231 (2015), and I call upon them to provide reports on any arms seizures to the Council and to my Office.

10.     I wish to draw the attention of the Security Council to the participation of Iranian entities in the Fifth Iraq Defence Exhibition, held in Baghdad in March. No prior approval was requested from the Council for the transfer of arms from the Islamic Republic of Iran to Iraq. The Secretariat has sought clarification from both countries on the issue. The Islamic Republic of Iran has indicated to the Secretariat that, in its view, such an activity did not require prior approval of the Council, given that it retained ownership of the items displayed (see annex I). I recommend that the Council clarify whether paragraph 6 (b) applies to all supply, sale or transfer regardless of change of ownership.

11.     An entity on the list established under resolution 2231 (2015)[5] and maintained by the Security Council, the Defence Industries Organisation, also appears to have participated in the exhibition and should have been subject to action under the asset-freeze provisions of the resolution. Likewise, I am informing the Security Council

---

[3]  See also paragraph 6 of the annex to the letter dated 20 July 2015 from the Permanent Representative of the Islamic Republic of Iran to the United Nations addressed to the President of the Security Council, entitled "Statement of the Islamic Republic of Iran following the adoption of United Nations Security Council resolution 2231 (2015) endorsing the Joint Comprehensive Plan of Action" (S/2015/550).

[4]  See the "Statement by France, Germany, United Kingdom, United States and the High Representative of the European Union for Foreign Affairs and Security Policy on post-JCPOA business with Iran", issued on 19 May 2016. Available from http://eeas.europa.eu/statements-eeas/2016/160519_05_en.htm.

[5]  See www.un.org/en/sc/2231/list.shtml. Individuals on the list established under resolution 2231 (2015) are subject to the asset freeze and travel ban restrictions. Listed entities are subject to the asset freeze. There are currently 23 individuals and 61 entities listed.

that open-source information indicates that a listed individual, Major General Qasem Soleimani, recently travelled to Iraq. The Secretariat has also sought clarification from the Islamic Republic of Iran and Iraq on those issues, and I intend to report back to the Council accordingly.

12.   In its response to queries on the Fifth Iraq Defence Exhibition and the travel by Major General Qasem Soleimani, Iraq informed the Secretariat that it was "fully aware of its obligations according to its understanding regarding resolution 2231 (2015) specifically, operative paragraph 7 (a) and paragraph 18 in annex A, which clearly terminated all previous resolutions and sanctions regime set out in resolutions adopted from 2006-2015". Furthermore, Iraq stated that resolution 2231 (2015) was "lengthy, technical and confusing". This demonstrates the importance of further awareness-raising and outreach activities on the provisions of resolution 2231 (2015) and the obligations of Member States.

## III.   Implementation of nuclear-related provisions

13.   In March and June 2016, IAEA issued quarterly reports on its verification and monitoring activities in the Islamic Republic of Iran in the light of resolution 2231 (2015) (S/2016/250 and S/2016/535). The Agency reported that it was continuing to verify the non-diversion of declared nuclear material and that its evaluations regarding the absence of undeclared nuclear material and activities for the Islamic Republic of Iran were ongoing. The Agency also reported verifying and monitoring the implementation by the Islamic Republic of Iran of its nuclear-related commitments under the Joint Comprehensive Plan of Action. In addition, since 16 January 2016, I have not received any report, nor am I aware of any open-source information, regarding the supply, sale, transfer or export to the Islamic Republic of Iran of nuclear-related items undertaken contrary to the provisions of the Plan and resolution 2231 (2015).

14.   In resolution 2231 (2015), the Security Council endorsed the establishment under the Joint Comprehensive Plan of Action of a dedicated procurement channel for the transfer of items, materials, equipment, goods and technology required for the nuclear activities of the Islamic Republic of Iran under the Plan. Through this channel, the Council will review and decide on recommendations from the Joint Commission established under the Plan regarding proposals by States to participate in or permit nuclear-related activities set out in paragraph 2 of annex B to resolution 2231 (2015).

15.   Provided that they have obtained prior approval from the Security Council, on a case-by-case basis, all States may now participate in and permit the supply, sale or transfer of dual-use and nuclear items, materials, equipment, goods and technology,[6]

---

[6] The items, materials, equipment, goods and technology concerned are those set out in International Atomic Energy Agency (IAEA) documents INFCIRC/254/Rev.12/Part 1 and INFCIRC/254/Rev.9/Part 2, as well as any other items that the State determines could contribute to reprocessing or enrichment-related or heavy water-related activities inconsistent with the Joint Comprehensive Plan of Action.

and the provision of various related services or assistance.[7] States may also permit the acquisition by the Islamic Republic of Iran of an interest in certain commercial nuclear-related activities in another State provided that they have obtained prior approval from the Council.[8] When submitting a proposal to the Council, States are encouraged to use the optional application form and model end-use certification developed by the Procurement Working Group of the Joint Commission available on the Council webpage dedicated to resolution 2231 (2015)[9] and to submit those forms in a machine-readable format. States are also encouraged to send proposals to the Council facilitator for the implementation of resolution 2231 (2015) through their permanent missions to the United Nations.

16.   As at the date of submission of the present report, one proposal had been submitted to the Security Council. The proposal, for a temporary export of dual-use items to the Islamic Republic of Iran for the purpose of an exhibit, was subsequently withdrawn.

17.   Certain nuclear-related activities do not require prior approval but do require a notification to the Security Council and the Joint Commission. Those activities are, inter alia, those directly related to the necessary modification of two cascades at the Fordow facility for stable isotope production, the export from the Islamic Republic of Iran of enriched uranium in excess of 300 kg in return for natural uranium and the modernization of the Arak reactor. Six exemption notifications were received between July 2015 and January 2016, all in relation to the export of enriched uranium in return for natural uranium. No notifications have been received by the Council since Implementation Day.

18.   The restrictions established under paragraph 2 of annex B to resolution 2231 (2015) will apply until October 2025 or until the date on which IAEA submits its report indicating the broader conclusion that all nuclear material in the Islamic Republic of Iran remains in peaceful activities (the "broader conclusion" report),[10] whichever is earlier. Should IAEA submit such a report before October 2025, the requirement to obtain prior approval from the Security Council for nuclear-related activities set out in paragraph 2 of annex B to resolution 2231 (2015) will be replaced by the requirement to notify the Council and the Joint Commission at least 10 working days in advance of such activities.

---

[7] The provision to the Islamic Republic of Iran of any technical assistance or training, financial assistance, investment, brokering or other services, and the transfer of financial resources or services, related to the supply, sale, transfer, manufacture or use of the items, materials, equipment, goods and technology described in paragraph 2 (a) of annex B to resolution 2231 (2015).

[8] Activity in another State involving uranium mining or production or use of nuclear materials and technology as listed in IAEA document INFCIRC/254/Rev.12/Part 1, and such investment in territories under their jurisdiction by the Islamic Republic of Iran, its nationals and entities incorporated in the Islamic Republic of Iran or subject to its jurisdiction, or by individuals or entities acting on their behalf or at their direction, or by entities owned or controlled by them.

[9] See www.un.org/en/sc/2231/restrictions-nuclear.shtml.

[10] In paragraph 6 of resolution 2231 (2015), the Security Council requested that as soon as IAEA has reached the broader conclusion that all nuclear material in the Islamic Republic of Iran remains in peaceful activities, the Director General of IAEA will submit a report confirming that conclusion to the IAEA Board of Governors and, in parallel, to the Security Council.

## IV.   Implementation of ballistic missile-related provisions

### A.   Restrictions on Iranian ballistic missile-related activities

19.   In paragraph 3 of annex B to resolution 2231 (2015), the Security Council called upon the Islamic Republic of Iran not to undertake any activity related to ballistic missiles designed to be capable of delivering nuclear weapons, including launches using such ballistic missile technology. That restriction will apply until October 2023 or until the date on which IAEA submits its "broader conclusion" report, whichever is earlier.

20.   Early in March, during military exercises, the Islamic Republic of Iran launched a series of ballistic missiles (see fig. I). According to official Iranian news agencies and a report provided to me by France, Germany, the United Kingdom and the United States, the missiles launched included the Qiam-1 short-range ballistic missile and the Shahab-3 medium-range ballistic missile. Images and video footage released by the Islamic Revolutionary Guard Corps suggest that at least one of the missiles bore an inscription calling for the destruction of Israel. Both missiles are based on Scud liquid-propellant technology and are both capable of delivering a payload of approximately 700 kg, to a range of 700 km for the Qiam-1 and to a range of 1,300 to 2,000 km for the Shahab-3.

Figure I
**Various Iranian ballistic missile launches from undisclosed locations released by the Islamic Revolutionary Guard Corps on 9 March 2016**

 

*Source*: Sepah News (official Islamic Revolutionary Guard Corps online news site).

21.   In identical letters dated 23 March (S/2016/279), the Islamic Republic of Iran stressed that those launches were not inconsistent with resolution 2231 (2015), given that it had not undertaken "any activity related to ballistic missiles designed to be capable of delivering nuclear weapons". The country underlined that it had never sought to acquire nuclear weapons and never would, as it fully honoured its commitment under the Treaty on the Non-Proliferation of Nuclear Weapons and the Joint Comprehensive Plan of Action. It noted that the resolution did not prohibit legitimate and conventional military activities and that the language of paragraph 3 of annex B to the resolution was clearly not mandatory.

22.   On 28 March, I received a letter from France, Germany, the United Kingdom and the United States in which it was stressed that those launches were destabilizing, provocative and that they had been conducted in defiance of resolution 2231 (2015). Those States underscored that the phrase "ballistic missiles designed to be capable of delivering nuclear weapons" in resolution 2231 (2015) included all Missile Technology Control Regime Category I systems, defined as those capable of delivering at least a 500 kg payload to a range of at least 300 km, which are inherently capable of delivering nuclear weapons and other weapons of mass destruction. Given that the Qiam-1 and Shahab-3 are Category I missiles, those States concluded that the launches of those missiles constituted an "activity related to ballistic missiles designed to be capable of delivering nuclear weapons" and "launches using such ballistic missile technology", which the Islamic Republic of Iran has been called upon not to undertake pursuant to paragraph 3 of annex B to resolution 2231 (2015).

23.   I am aware that the Security Council discussed those launches on 14 March and 1 April. I also recognize that there was no consensus reached among Council members as to whether those launches were covered under resolution 2231 (2015). Whereas it is for the Council to interpret its own resolutions, we must maintain the momentum created by the signing of the Joint Comprehensive Plan of Action, consistent with its constructive spirit. In that regard, I call upon the Islamic Republic of Iran to avoid such ballistic missile launches that have the potential to increase tensions in the region.

## B.   Restrictions on ballistic missile-related transfers or activities with the Islamic Republic of Iran

24.   Since 16 January, pursuant to paragraph 4 of annex B to resolution 2231 (2015), provided that they have obtained prior approval from the Security Council, on a case-by-case basis, all States may participate in and permit the supply, sale or transfer to the Islamic Republic of Iran of certain ballistic missile-related items, materials, equipment, goods and technology[11] and the provision of various services or assistance.[12] Prior approval from the Council is also required for the acquisition by the Islamic Republic of Iran of an interest in certain commercial ballistic missile-related activities.[13]

25.   This provision will apply until October 2023 or until the date on which IAEA submits its "broader conclusion" report, whichever is earlier. As at the date of

---

[11] The items, materials, equipment, goods and technology concerned are those set out in the Missile Technology Control Regime list (S/2015/546, annex) and any items, materials, equipment, goods and technology that the State determines could contribute to the development of nuclear weapon delivery systems.

[12] The provision to the Islamic Republic of Iran of any technical assistance or training, financial assistance, investment, brokering or other services, and the transfer of financial resources or services, related to the supply, sale, transfer, manufacture or use of the items, materials, equipment, goods and technology described in paragraph 4 (a) or related to the activities described in paragraph 3 of annex B to resolution 2231 (2015).

[13] The acquisition by the Islamic Republic of Iran of an interest in any commercial activity in another State related to the supply, sale, transfer, manufacture or use of the items, materials, equipment, goods and technology described in paragraph 4 (a) or related to the activities described in paragraph 3 of annex B to resolution 2231 (2015).

submission of the present report, no proposal had been submitted by Member States to the Security Council pursuant to paragraph 4 of annex B to resolution 2231 (2015). In addition, since 16 January, no information regarding the supply, sale, transfer or export to the Islamic Republic of Iran of ballistic missile-related items undertaken contrary to the provisions of the Joint Comprehensive Plan of Action and resolution 2231 (2015) has been brought to the attention of either the Security Council or myself.

## V.  Implementation of arms-related provisions

26.   As stipulated in paragraph 5 of annex B to resolution 2231 (2015), provided that they have obtained prior approval from the Security Council, on a case-by-case basis, all States may now participate in and permit the supply, sale or transfer to the Islamic Republic of Iran of any battle tanks, armoured combat vehicles, large-calibre artillery systems, combat aircraft, attack helicopters, warships, missiles or missile systems, as defined for the purpose of the United Nations Register of Conventional Arms, or related materiel. Prior approval from the Council is also required for the provision to the Islamic Republic of Iran of various services or assistance relating to the supply, sale, transfer, manufacture, maintenance, or use of those arms and related materiel.[14]

27.   The Security Council also decided, in paragraph 6 (b) of annex B to resolution 2231 (2015), that all States were to take the measures necessary to prevent, except as decided otherwise by the Council in advance, on a case-by-case basis, the supply, sale or transfer of arms or related materiel from the Islamic Republic of Iran.

28.   Both provisions will apply until October 2020, or until the date on which IAEA submits its "broader conclusion" report, whichever is earlier. As at the date of submission of the present report, no proposals had been submitted by Member States to the Security Council pursuant to paragraphs 5 and 6 (b) of annex B to resolution 2231 (2015).

29.   On 7 June, I received a report from the United States providing information on an arms seizure that, in its assessment, had originated in the Islamic Republic of Iran. That information was also communicated to the Security Council and to the Security Council Committee established pursuant to resolution 2140 (2014). Furthermore, open-source information indicated that Iranian entities had participated in and had displayed arms during a foreign defence exhibition. I am also aware of certain media reports that suggest that the Islamic Republic of Iran has been providing arms to Hizbullah.[15] During the reporting period I have received no reports from Member States on such transfers, nor do I have independent information to corroborate the media reports.

---

[14]  The provision to the Islamic Republic of Iran of technical training, financial resources or services, advice, other services or assistance related to the supply, sale, transfer, manufacture, maintenance, or use of arms and related materiel described in paragraph 5 of annex B to resolution 2231 (2015).

[15]  See, for example, "Israel's main concern in Syria: Iran, not ISIS", Wall Street Journal, 17 March 2016; and "Lebanese army slowly crushing extremists near Syria border", Associated Press, 22 June 2016.

**Arms seizure:** *Adris*

30.   In its report, the United States indicated that it had seized an arms shipment from the Islamic Republic of Iran, which was likely bound for Yemen (see annex II). According to the report, on 28 March, a United States Navy ship boarded a dhow, the *Adris*, which was transiting international waters in the vicinity of the Gulf of Oman. That action, which the United States took in accordance with customary international law, as stated in its report, resulted in the discovery of a large weapons cache aboard the vessel, which included 1,500 Kalashnikov variant rifles, 200 RPG-7 and RPG-7V rocket-propelled grenade launchers and 21 DshK 12.7-mm machine guns (see fig. II). On the basis of an analysis of available information, including interviews with the crew and a review of the arms, the United States concluded that the arms had originated in the Islamic Republic of Iran and that their transfer was being undertaken contrary to paragraph 6 (b) of annex B to resolution 2231 (2015). After the weapons were seized, the dhow and its crew were allowed to depart.

31.   The representatives of the Secretariat met with members of the Permanent Mission of the Islamic Republic of Iran to the United Nations, in New York on 8 June, to inform them of this report and, subsequently, wrote to the Permanent Representative of the Islamic Republic of Iran to the United Nations to seek clarification on the shipment. The Islamic Republic of Iran categorically rejected this allegation (see annex I). The Secretariat is still reviewing the information provided by the United States and the Islamic Republic of Iran, and I intend to provide an update on this arms seizure to the Security Council in due course.

Figure II
**Kalashnikov variant rifles, rocket-propelled grenade launchers and machine guns seized on-board the *Adris* on 28 March 2016**

  

*Source*: United States.

**Arms transfer: Fifth Iraq Defence Exhibition**

32.   According to open-source information, several Iranian entities participated in the Fifth Iraq Defence Exhibition, held from 5 to 8 March at the Baghdad International Fairground. According to images published by the Islamic Republic News Agency[16] and the Islamic Republic of Iran Broadcasting news agency, items

---

[16]   "Baghdad exhibit featuring the Islamic Republic of Iran defence, military capabilities", Islamic Republic News Agency, 5 March 2016.

S/2016/589

displayed by those entities appeared to include small arms, artillery ammunition and rockets (see fig. III). It is my understanding that such an arms transfer from the Islamic Republic of Iran to Iraq should have required prior approval from the Security Council, pursuant to paragraph 6 (b) of annex B to resolution 2231 (2015). The Secretariat has raised its concerns with the Permanent Missions of the Islamic Republic of Iran and Iraq to the United Nations, in New York, and has invited both Member States to provide further information. Iranian representatives considered that no prior approval was required from the Council for this activity because the Islamic Republic of Iran retained ownership of the items exhibited (see annex I).

Figure III
**Items displayed by Iranian entities during the Fifth Iraq Defence Exhibition**

 

*Source*: Islamic Republic of Iran Broadcasting news agency (left) and Islamic Republic News Agency (right).

## VI.   Asset freeze

33.   The Security Council decided, in paragraphs 6 (c) and (d) of annex B to resolution 2231 (2015), that all States were to freeze the funds, other financial assets and economic resources of the individuals and entities on the list established under resolution 2231 (2015) and ensure that no funds, financial assets or economic resources were made available to those individuals and entities. That provision will apply until October 2023 or until the date on which IAEA submits its "broader conclusion" report, whichever is earlier.

34.   The list established under resolution 2231 (2015) includes the individuals and entities specified on the list established under resolution 1737 (2006) and maintained by the Security Council Committee established pursuant to resolution 1737 (2006), as at the date of adoption of resolution 2231 (2015), with the exception of 36 individuals and entities specified in the attachment to annex B to resolution 2231 (2015) who were delisted on Implementation Day. As specified in that paragraph, the Council can delist individuals or entities, and list additional individuals and entities, found to meet certain designation criteria defined in the

S/2016/589

resolution.[17] On 17 January, the Council decided to delist one entity, Bank Sepah and Bank Sepah International.[18]

35.   During the reporting period, it appears that an entity currently on the list established under resolution 2231 (2015), the Defence Industries Organisation, may have participated in the Fifth Iraq Defence Exhibition, which was held in March (see para. 32 and fig. IV). I wish to stress that, pursuant to paragraph 6 (c) of annex B to resolution 2231 (2015), the Iraqi authorities should have frozen all of the entity's funds, other financial assets and economic resources on Iraqi territory at the date of adoption of the Joint Comprehensive Plan of Action or at any time thereafter. This concern was also raised with members of the Permanent Missions of the Islamic Republic of Iran and Iraq to the United Nations by the Secretariat, and both Member States were invited to provide further information. I intend to report back to the Security Council in due course.

Figure IV
**Iranian booth at the Fifth Iraq Defence Exhibition and logo of the Defence Industries Organisation**

 

*Source*: Still frame of video released by the Islamic Republic of Iran Broadcasting news agency (left) and the website of the Defence Industries Organisation (www.diomil.ir/en/home.aspx) accessed through the Wayback Machine Internet archive (http://archive.org/web/web.php) (right).

---

[17] Pursuant to paragraph 6 (c) of annex B to resolution 2231 (2015), the Council may designate additional individuals and entities for having engaged in, directly associated with or provided support for the proliferation-sensitive nuclear activities of the Islamic Republic of Iran undertaken contrary to its commitments under the Joint Comprehensive Plan of Action or the development of nuclear weapons delivery systems, including through the involvement in procurement of prohibited items, goods, equipment, materials and technology specified in the resolution; having assisted designated individuals or entities in evading or acting inconsistently with the Plan or the resolution; having acted on behalf or at the direction of designated individuals or entities; or having been owned or controlled by designated individuals or entities, including through illicit means.

[18] Security Council, press release of 17 January 2016, entitled "Security Council removes Bank Sepah and Bank Sepah International from 2231 list".

## VII.   Travel ban

36.    Pursuant to paragraph 6  (e) of annex B to resolution 2231 (2015), all States are to take the measures necessary to prevent the entry into, or transit through, their territories of the individuals on the list established under resolution 2231 (2015) (see para. 34 above).[19] That provision will apply until October 2020 or until the date on which IAEA submits its "broader conclusion" report, whichever is earlier.

37.    During the reporting period, it was brought to my attention that at least one listed individual might have engaged in foreign travel. On 25 May, an Iranian news agency reproduced photographs showing the Commander of the Quds Force of the Islamic Revolutionary Guard Corps, Major General Qasem Soleimani, in what was referred to as the "Fallujah operations room" in Iraq (see fig. V).[20] On 27 May, the Ministry of Foreign Affairs of the Islamic Republic of Iran stated that "Iranian military advisers are in Iraq under Major General Qasem Soleimani on the request of the legal government of Iraq".[21] On 29 May, the Deputy Head of the Iraqi volunteer forces, Abu Mahdi al-Muhandis, who appeared in the same photograph, reportedly stated that General Soleimani's presence in Iraq was at the request of the Government of Iraq.[22] On 6 June, during a press conference, the Minister for Foreign Affairs of Iraq, while not denying that Major General Soleimani had visited Iraq, emphasized that he had done so as a military adviser.[23] The Secretariat has also raised the matter with members of the Permanent Missions of the Islamic Republic of Iran and Iraq to the United Nations, in New York, and has invited both Member States to provide clarification on the issue. Similarly, I intend to report back to the Security Council in due course.

---

[19] This provision does not oblige a State to refuse its own nationals entry into its territory. Furthermore, the travel ban restriction does not apply when the Security Council determines, on a case-by-case basis, that such travel is justified on the grounds of humanitarian need, including religious obligations, or where the Council concludes that an exemption would otherwise further the objectives of resolution 2231 (2015).

[20] Fars News Agency, "Iran's Gen. Soleimani in Fallujah operations room", 25 May 2016. Available from http://en.farsnews.com/imgrep.aspx?nn=13950304001274.

[21] Ministry of Foreign Affairs of the Islamic Republic of Iran, "Spokesman slams Saudi FM for anti-Iran statements", 27 May 2016. Available from www7.irna.ir/en/News/82090143.

[22] For example, see Tasnim News Agency, "General Soleimani in Iraq at Baghdad's request: Voluntary Force official", 29 May 2016. Available from www.tasnimnews.com/en/news/2016/05/29/1087056/general-soleimani-in-iraq-at-baghdad-s-request-voluntary-force-official.

[23] Ministry of Foreign Affairs of Iraq, Press conference of the Minister for Foreign Affairs of Iraq and the Head of the Sunni Endowment Dewan, held in Amman on 6 June 2016. Available from www.mofa.gov.iq/ab/news.php?articleid=856 (in Arabic).

Figure V
**General Soleimani in the "Fallujah operations room"**



*Source*: Fars News Agency, published on 25 May 2016 with the following caption: "Iraqi Harakat
Hezbollah al-Nujaba media group published photos of popular forces operations room showing
Iran's Quds Force Commander Major General Qassem Soleimani discussing Fallujah battle
strategies with Badr commander Hadi Al-'Amiri, Nujaba's Akram Al-Ka'abi and another popular
fighters' commander, Abu Mahdi Al-Muhandis" (General Soleimani is featured on the
extreme left).

## VIII. Secretariat support provided to the Security Council and its facilitator for the implementation of resolution 2231 (2015)

38.   Since the adoption of resolution 2231 (2015), the Security Council Affairs
Division of the Department of Political Affairs has devoted considerable effort to
putting into place the practical arrangements to support the work of the Council and
its facilitator for the implementation of resolution 2231 (2015). The Division has
also liaised with the Procurement Working Group of the Joint Commission for the
establishment of the procurement channel.

39.   Since 16 January, the Division has provided support to the organization and
staffing of two informal meetings of the Security Council at the expert level and to
an open briefing to inform Member States about the implementation of resolution
2231 (2015). The Division also processed all incoming and outgoing communications
relating to implementation of the resolution. To actively promote available
information on the restrictions imposed by the Council, including the procurement
channel, on the day of the implementation, the Division launched a webpage
dedicated to resolution 2231 (2015) on the Council website.[24] In February 2016,
documents provided by the Procurement Working Group of the Joint Commission
offering practical information to States on the procurement channel were added to
the website. Revised versions of those documents were provided by the Working
Group in May. In April, the presentations delivered by the Security Council

---

[24] See www.un.org/en/sc/2231.

facilitator for the implementation of resolution 2231 (2015) and representatives of the Working Group during an open briefing were also added.

40. In close cooperation with the Security Council facilitator for the implementation of resolution 2231 (2015) and the Procurement Working Group of the Joint Commission, the Division established the required processes to facilitate the timely translation of proposals and secured electronic transmission and tracking of all proposals submitted by States and all subsequent related communications between Member States, the Security Council and the Joint Commission. The working language of the Joint Commission is English, but Member States may submit proposals to the Security Council in any of the six official languages of the United Nations.

41. The Division has responded to several queries from Member States about the procurement channel, including the procedures for submission of proposals and the review process, exemptions to the channel and confidentiality issues.

## Annex I

## Information obtained by the Secretariat in the course of its contacts with Iranian representatives*

### A.   Allegations

1.    Iran's views on resolution 2231 have been elaborated extensively in its Statement issued following its adoption (document S/2015/550), which remains valid in full. Accordingly, Iran continues to insist that all sanctions and restrictive measures introduced against Iran including those applied under the pretext of its nuclear programme, have been baseless, unjust and unlawful, hence nothing in the JCPOA shall be construed to imply, directly or indirectly, an admission of or acquiescence by Iran in the legitimacy, validity or enforceability of the sanctions and restrictive measures adopted against Iran by the Security Council, the European Union or its member States, the United States or any other State, nor shall it be construed as a waiver or a limitation on the exercise of any related right the Islamic Republic of Iran is entitled to under relevant national legislation, international instruments or legal principles.

2.    At the same time, taking into account the fact that, by acting under Article 41 of the UN Charter, the Council decided to terminate the provisions of all resolutions issued in regard to the Iran's nuclear program, all sanctions and restrictive measures imposed by such resolutions have been removed completely. Measures contained in Annex B of resolution 2231 do not amount to prohibitions or sanctions and solely entail procedures for certain issues for a limited time-frame.

3.    In view of the above, attention is drawn to the following:

3.1   In regard to allegation of arms delivery to Yemen, Iran categorically rejects the allegation as it has never engaged in such delivery.

3.2   In relations to the Iraq Defense Exhibition, no supply, sale, or transfer of arms or related materiel which may entail prior approval of the Council has taken place, the items are only exhibited and no change of title or ownership takes place.

### B.   EU/US' defective implementation of resolution 2231

Despite U.S. and EU's clear commitments with regard to lifting of sanctions, Iran has not been able to fully benefit from lifting of Sanctions due to a series of deficiencies and/or non-performance on the part of either U.S. or the EU. The following are some examples of the actions taken by them in spite of the resolution and its Annexes:

1.    The US Visa Waiver Program Improvement and Terrorist Travel Prevention Act of 2015: Under this Act, nationals of Visa Waiver Program (VWP) countries who have travelled to or been present in Iran from 1 March 2011 or those who are also nationals of Iran are no longer eligible to travel or be admitted to the United States under the VWP. It was announced later that a case by case waiver might be issued for individuals who travelled to Iran for legitimate business-related

---

* The information contained herein is reproduced as received.

purposes following the conclusion of the JCPOA (July 14, 2015). There are no waivers for tourist trips to Iran. The new Act was adopted against several provisions of the JCPOA, including paragraphs 26, 28 and 29. In accordance with paragraph 26 of the JCPOA, the United States is committed to prevent interference with the realization of the full benefit by Iran of the sanctions lifting specified in Annex II. Under Paragraph 28 of the JCPOA, the US is committed to refrain from any action that would undermine its successful implementation. General Provisions of the JCPOA, Paragraph viii, The same has been stipulated in the, which goes as far as stating that the E3/EU+ 3 will refrain from 'imposing discriminatory regulatory and procedural requirements in lieu of the sanctions and restrictive measures covered by this JCPOA. Also, paragraph 29 of the JCPOA has committed the United States to refrain from any policy specifically intended to directly and adversely affect the normalization of trade and economic relations with Iran.

2.   Confiscation of the Central Bank assets following a U.S. court order: Less than 4 months after the JCPOA's Implementation Day, around US$ 1.8 billion of Iran Central Bank's assets were seized following a U.S. court order. The Central Bank does not also have access to another approximately 1.7 billion US$ of its assets held in Clear stream, Luxemburg, under similar grounds. This unlawful and illegitimate act is inconsistent with the spirit of the JCPOA.

3.   Continuing U.S.' State and local sanctions: In addition to many sanction legislations existed prior to JCPOA, some States and local governments have enacted new divestment legislations and persist in their enforcement of sanctions, even by sending threatening correspondence to foreign banks and companies querying them about their investment in Iranian energy sectors in the post JCPOA era. In accordance with Para 25 of the JCPOA the US shall "actively encourage officials at the state or local level to take into account the changes in the U.S. policy reflected in the lifting of sanctions under this JCPOA and to refrain from actions inconsistent with this change". Formalistic writing of letters cannot be considered active encouragement.

4.   The US Presidential Executive Order 13645 is re-introduced inconsistent with the JCPOA: Executive Order 13645 was supposed to be terminated as of "Implementation Day" consistent with Paragraph 21(xix) of the JCPOA, Paragraph 4 of its Annex II, and Paragraph 17.4 of its Annex V. Although Section l(d) of Executive Order No. 13716 revoked that Executive Order, several parts of the revoked Order including its section 9 to 19 are reintroduced in the Executive Order No.13716. This is not consistent with United States commitment for termination of the Executive Order as well as paragraph 26 of the JCPOA regarding refraining from re-introduction or re-imposition of lifted sanctions.

5.   The Inability of the Iranian Central Bank to have free access to its assets held abroad due to the US lack of cooperation in converting those assets into non-US currencies as well as for their transfer, despite the U.S. commitments in this regard under paragraph 21(iv) and paragraphs and 7.2 of Annex IV of JCPOA.

6.   Continuing reluctance on the part of non-American banks to do business with Iran due to OFAC's dissuading behavior, including through settlement agreements that officially bar those banks from re-engaging with Iran.

7.   Introducing discriminatory restriction for the sale of dual use items (other than those items in NSG list) to Iran by the EU: A list of items that before the

JCPOA were exported to Iran without an End User Certificate signed by an Iranian Authority, have been added to Annex II of EU Regulation 1861 which necessitates such procedures. This makes the export of these items more difficult than even before the JCPOA.

8.    Introduction of authorization regimes for metal and software by the EU: Annexes VIIA and VIIB of Council regulation 1861/2015 lists metal and software that are subject to a new authorization regime which is new restriction, especially when it utilizes negative textual structures such as "the competent authorities shall not grant any authorization..." and broad and obscure restrictive terms and conditions like "... indirect benefit of IRGC" which is very restrictive.

9.    Moreover, Iranian civilian aircraft passengers are not still given fuel in some EU destinations. And still we have to wait for cumbersome US sanctions-induced problems in order to execute our agreements and contracts with Airbus and others to buy passenger aircrafts.

Please note that the above problems, deficiencies and defective performances are happening despite the fact that Iran has honored its obligations in full.

## Annex II

### Report dated 7 June 2016 from the United States of America regarding the implementation of Security Council resolutions 2231 (2015) and 2216 (2015)*

The United States would like to share information with the Security Council and the Committee established pursuant to resolution 2140 (2014) ("Yemen Sanctions Committee") regarding a shipment of arms and related material from Iran, which were likely bound for Yemen. This information may be useful to the Facilitator for implementation of Security Council resolution 2231 (2015) ("Facilitator"), the Yemen Sanctions Committee, the Yemen Panel of Experts, and the Secretary General in carrying out their mandates with respect to reported violations of UN Security Council resolutions 2231 (2015) and 2216 (2015).

On March 28, 2016, at 1930Z, the U.S. Navy Coastal Patrol ship USS Sirocco, operating as part of U.S. Naval Forces Central Command, encountered and boarded a dhow transiting international waters in the vicinity of the Gulf of Oman. This action was taken in accordance with customary international law. Following discovery of a large weapons cache found aboard the vessel, the USS Gravely was directed to the scene by U.S. authorities to relieve the USS Sirocco. The USS Gravely took control of the arms cargo.

Paragraph 6(b) of Annex B of resolution 2231 (2015) requires Iran not to supply, sell or transfer directly or indirectly from its territory or by its nationals any arms or related material until the date five years after the JCPOA Adoption Day or until the date on which the IAEA submits a report confirming the Broader Conclusion, whichever is earlier, absent approval in advance on a case-by-case basis by the Security Council. Based on an analysis of available information, including crew interviews and review of the arms aboard the vessel, the United States concluded that the arms originated in Iran and that their transfer from Iran violated paragraph 6(b) of Annex B of resolution 2231. Interviews with the crew revealed strong indications that the arms were being smuggled from Iran. The United States intends to share additional information obtained as a result of the boarding with the Security Council Affairs Division for use in relation to the report by the Secretary-General on the implementation of resolution 2231.

The transfer of these arms to forces acting on the behalf of or at the direction of individuals on the UN Yemen sanctions list would be a violation of paragraph 14 of resolution 2216 (2015).

The cargo seized on board the dhow included 1,500x Kalashnikov variant rifles, 200x RPG-7 and RPG-7V Rocket Propelled Grenade launchers (RPGs), and 21x DshK 12.7mm machine guns. The dhow and its crew were allowed to depart once the weapons were seized.

The United States is concerned that Iran's exports of weapons continue in violation of Iran's obligations under Security Council resolution 2231 (2015). Transfers to Yemen in violation of the arms embargo imposed in resolution 2216 (2015) also undermine opportunities to achieve peace in the region and reduce the suffering of the people of Yemen.

_____

* The information contained herein is reproduced as received.

We trust this information will assist the Security Council in promoting implementation of resolution 2231 (2015). In light of the requests made of the Secretary-General in resolution 2231 and S/2016/44, we therefore respectfully request that the Secretary-General report fully and thoroughly Iran's exports of arms in violation of resolution 2231. The United States also encourages the Security Council and the Yemen Sanctions Committee to raise this incident with Iran directly and to review additional ways to improve enforcement of these measures. The United States offers its assistance with any investigation undertaken.

United Nations

$S$/2016/1136



**Security Council**

Distr.: General
30 December 2016

Original: English

## Second report of the Secretary-General on the implementation of Security Council resolution 2231 (2015)

## I. Introduction

1.    On 20 July 2015, the Security Council, in its resolution 2231 (2015), endorsed the Joint Comprehensive Plan of Action concluded by China, France, Germany, the Russian Federation, the United Kingdom of Great Britain and Northern Ireland, the United States of America and the European Union, with the Islamic Republic of Iran.

2.    In the same resolution, the Security Council requested that I submit a report on the provisions contained in annex B to resolution 2231 (2015) every six months. The present report is the second submitted in fulfilment of that request and the request of the President of the Security Council that I submit a report on the implementation of resolution 2231 (2015), with findings and recommendations (S/2016/44, para. 7).[1]

3.    The provisions of annex B to resolution 2231 (2015) entered into force on 16 January 2016, upon submission by the Director General of the International Atomic Energy Agency (IAEA) of a report confirming that the Islamic Republic of Iran had taken a series of initial nuclear-related actions as called for in the Joint Comprehensive Plan of Action and in resolution 2231 (2015) (S/2016/57, annex).

4.    Annex B includes provisions applicable to nuclear-related transfers, ballistic missile-related transfers, and arms-related transfers to or from the Islamic Republic of Iran, as well as the asset freeze and travel ban provisions. All those provisions will apply for set periods of time or until the date on which IAEA submits its report indicating the broader conclusion that all nuclear material in the Islamic Republic of Iran remains in peaceful activities (the "broader conclusion" report),[2] whichever is earlier.

---

[1]  The first report of the Secretary-General was issued on 12 July 2016 (S/2016/589).
[2]  In paragraph 6 of resolution 2231 (2015), the Security Council requested that as soon as IAEA has reached the broader conclusion that all nuclear material in Islamic Republic of Iran remains in peaceful activities, the Director General of IAEA will submit a report confirming that conclusion to the IAEA Board of Governors and, in parallel, to the Security Council.



Please recycle ♻ 

## II.   Key findings and recommendations

5.    Since 16 January 2016, I have not received any report on the supply, sale, transfer or export to the Islamic Republic of Iran of nuclear-related items undertaken contrary to the provisions of annex B to resolution 2231 (2015). Since my first report (S/2016/589), five additional nuclear-related proposals were submitted through the procurement channel, three of which have already been approved by the Security Council. All the necessary operational linkages between the Council and the Joint Commission established in the Joint Comprehensive Plan of Action are in place and functioning fully for the processing of such proposals, with due regard given to information security and confidentiality.

6.    Since 12 July 2016, no information regarding Iranian ballistic missile activity or ballistic missile-related transfers undertaken contrary to the provisions of annex B to resolution 2231 (2015) were brought to my attention or that of the Security Council.

7.    I received one new report on an arms transfer alleged to have originated in the Islamic Republic of Iran and to have been undertaken contrary to the provisions of annex B to resolution 2231 (2015). On 5 July 2016, France informed the Security Council and me that, in March 2016, it had seized an arms shipment in the northern Indian Ocean. France concluded that the arms shipment originated in the Islamic Republic of Iran and was likely bound for Somalia or Yemen. In addition, the Secretariat was recently provided with information (by the Combined Maritime Forces and Australia) on an arms seizure in February 2016 by the Royal Australian Navy, off the coast of Oman, which the United States of America assessed as having originated in the Islamic Republic of Iran. I look forward to the opportunity for the Secretariat to examine those weapons and previously seized weapons, in order to corroborate the information provided and independently ascertain the origin of the shipments.

8.    On 24 June 2016, the Secretary-General of Hizbullah, Hassan Nasrallah, stated in a televised speech that it receives all its weapons and missiles from the Islamic Republic of Iran. Any Iranian arms transfer to Hizbullah would have been undertaken contrary to the provisions of annex B to resolution 2231 (2015) should they have taken place after 16 January 2016.[3]

9.    On 21 November 2016, Israel drew my attention to information it possessed regarding the alleged use of commercial flights by the Islamic Revolutionary Guard Corps to transfer arms and related materiel to Hizbullah. The information was also provided to the Security Council in identical letters from the Permanent Representative of Israel, dated 21 November (S/2016/987). The Islamic Republic of Iran, in identical letters dated 22 November 2016 (S/2016/992), asserted that the claims were baseless and unsubstantiated accusations. I wish to remind all Member States of their obligations under resolution 2231 (2015) to prevent, except as decided otherwise by the Council in advance on a case-by-case basis, the supply, sale or transfer of arms or related materiel from the Islamic Republic of Iran.

---

[3] Any Iranian arms transfer to Hizbullah between the adoption of resolution 1747 (24 March 2007) and 16 January 2016 would have constituted a violation of paragraph 5 of that resolution. The provisions of resolution 1747 (2007) and those of other previous Security Council resolutions on the Iranian nuclear issue were terminated on 16 January 2016.

10.   On the basis of information provided by both the Permanent Missions of the Islamic Republic of Iran and of Iraq, I have concluded my review of the participation of Iranian entities in the Fifth Iraq Defence Exhibition. While no further action will be taken by the Secretariat in relation to this matter, I wish to reiterate my recommendation that the Council clarify whether the provisions of annex B to resolution 2231 (2015) on arms-related transfers to or from the Islamic Republic of Iran apply to all supply, sale or transfer of arms or related materiel, including temporary transfers, regardless of change of ownership (see S/2016/589, para. 10).

11.   Since my previous report, Iranian and other media outlets reported that Major General Qasem Soleimani and Brigadier General Mohammad Reza Naqdi have engaged in foreign travel. I call upon all Member States to take the necessary measures to prevent the entry or transit through their territories of individuals presently on the list maintained pursuant to resolution 2231 (2015).

12.   In the course of the Secretariat's contact with the Permanent Mission of the Islamic Republic of Iran to seek clarification on the statement by the Secretary-General of Hizbullah and the foreign travels of Major General Soleimani and Brigadier General Naqdi, the Islamic Republic of Iran underlined "that measures undertaken by the Islamic Republic of Iran in combating terrorism and violent extremism in the region have been consistent with its national security interests and international commitments".

## III.   Implementation of nuclear-related provisions

13.   In preparing the present report on the provisions of annex B to resolution 2231 (2015), I note that in September and November 2016, IAEA issued quarterly reports on its verification and monitoring in the Islamic Republic of Iran in the light of resolution 2231 (2015), (S/2016/808 and S/2016/983). In addition, on 6 December 2016, IAEA provided an update on developments in relation to the Iranian stockpile of heavy water since its last quarterly report. The Agency reported that it was continuing to verify the non-diversion of declared nuclear material and that its evaluations regarding the absence of undeclared nuclear material and activities for the Islamic Republic of Iran were ongoing. The Agency also reported on its verifying and monitoring of the implementation by the Islamic Republic of Iran of its nuclear-related commitments under the Joint Comprehensive Plan of Action and that the Islamic Republic of Iran continues to provisionally apply the Additional Protocol to its Safeguards Agreement, pending its entry into force, and the transparency measures contained in the Plan.

14.   Since 16 January 2016, I have not received any information regarding the supply, sale, transfer or export to the Islamic Republic of Iran of nuclear-related items undertaken contrary to paragraph 2 of annex B to resolution 2231 (2015).

15.   As of 30 December 2016, five additional proposals to participate in or permit the activities set forth in paragraph 2 of annex B to resolution 2231 (2015) were submitted to the Security Council for approval through the procurement channel process. Two proposals submitted on 6 October 2016, for the supply of items, material, equipment, goods and technology set out in INFCIRC/254/Rev.9/Part 2,

were approved by the Council on 17 November 2016. A proposal received by the Council on 16 November 2016, for the supply of items, material, equipment, goods and technology set out in INFCIRC/254/Rev.12/Part 1, was approved on 28 December 2016. Two proposals submitted to the Council on 6 December 2016, for the supply of items, material, equipment, goods and technology set out in INFCIRC/254/Rev.9/Part 2, are currently under review by the Joint Commission.

16.   One notification was submitted to the Council on 17 November 2016 in relation to the transfer to the Islamic Republic of Iran of technology covered by B.1 of INFCIRC/254/Rev.12/Part 1, intended for light-water reactors. Two further notifications were submitted to the Council, the first on 23 December and the second on 28 December 2016, in relation to the transfer to the Islamic Republic of Iran of low-enriched uranium covered by A.1.2 of INFCIRC/254/REV.12/Part 1, incorporated in assembled nuclear fuel elements intended for light-water reactors, as well as of equipment covered by B.1 of INFCIRC/254/Rev.12/Part.1, intended for light-water reactors. Such activities and certain other nuclear-related activities do not require approval but do require a notification to the Security Council or to both the Security Council and the Joint Commission (see resolution 2231 (2015), annex B, para. 2).

17.   In September 2016, the Joint Commission provided guidance on temporary nuclear-related transfers. It indicated that all nuclear-related transfers in cases where the goods in question are intended to remain in the Islamic Republic of Iran only for a certain period of time and subsequently leave the Islamic Republic of Iran would follow the established procedure within the procurement channel, including an end-use certification signed by the designated Iranian national authority. The Joint Commission also indicated that it would endeavour to expedite its review of temporary exports for demonstration or display in exhibitions. The guidance was reflected in amended versions of the documents offering practical information on the procurement channel, which are available on the Security Council website dedicated to the implementation of resolution 2231 (2015)[4] and were brought to the attention of all Member States through a note verbale issued by the Security Council facilitator on 18 October 2016.

## IV.   Implementation of ballistic missile-related provisions

18.   In paragraph 3 of annex B to resolution 2231 (2015), the Security Council called upon the Islamic Republic of Iran not to undertake any activity related to ballistic missiles designed to be capable of delivering nuclear weapons, including launches using such technology.

19.   In addition, pursuant to paragraph 4 of annex B to resolution 2231 (2015), provided that they have obtained prior approval from the Security Council, on a case-by-case basis, all States may now participate in and permit the supply, sale or transfer to the Islamic Republic of Iran of certain ballistic missile-related items, materials, equipment, goods and technology, the provision of various services or assistance, as well as the acquisition by the Islamic Republic of Iran of an interest in certain commercial ballistic missile activities.

---

[4] www.un.org/en/sc/2231/restrictions-nuclear.shtml.

20.   Since my first report to the Security Council, neither I nor the Security Council have received any information regarding activity undertaken contrary to paragraphs 3 and 4 of annex B to resolution 2231 (2015).

## V.   Implementation of arms-related provisions

21.   As stipulated in paragraph 5 of annex B to resolution 2231 (2015), all States, provided that they have obtained prior approval from the Security Council on a case-by-case basis, may now participate in and permit the supply, sale or transfer to the Islamic Republic of Iran of the seven categories of arms as defined for the purpose of the United Nations Register of Conventional Arms and of related materiel. Prior approval from the Council is also required for the provision to the Islamic Republic of Iran of various related services or assistance.

22.   As of 30 December 2016, one proposal to participate in and permit the activities set forth in paragraph 5 of annex B to resolution 2231 (2015) was submitted to the Security Council. The proposal is still under consideration by the Security Council.

23.   The Security Council decided, in paragraph 6 (b) of annex B to resolution 2231 (2015), that all States were to take the necessary measures to prevent, except as decided otherwise by the Council in advance on a case-by-case basis, the supply, sale or transfer of arms or related materiel from the Islamic Republic of Iran. At the time of drafting of the present report, no proposal has been submitted to the Council pursuant to that paragraph.

24.   In July, I brought to the attention of the Security Council open-source information about the participation of several Iranian entities in the Fifth Iraq Defence Exhibition, held from 5 to 8 March 2016 at the Baghdad International Fairground (see S/2016/589, para. 32). According to images published by the Islamic Republic News Agency and the Islamic Republic of Iran Broadcasting news agency, items displayed by those entities appeared to include small arms, artillery ammunition and rockets. The Secretariat raised this issue with the Permanent Missions of the Islamic Republic of Iran and Iraq to the United Nations and invited both Member States to provide further information.

25.   As I reported in July, Iranian representatives considered that no prior approval was required from the Security Council for this activity because the Islamic Republic of Iran retained ownership of the items exhibited. In addition, in October 2016, Iraqi authorities informed the Secretariat that all items exhibited by Iranian entities during the exhibition were subsequently returned to the Islamic Republic of Iran "in compliance with requirements stipulated in the applicable resolutions issued by the [Security Council], ensuring legality of the process in its entirety".

26.   In view of the above, no further action will be taken by the Secretariat in relation to this matter. Nevertheless, I wish to reiterate my recommendation that the Security Council clarify whether paragraph 6 (b) applies to all supply, sale or transfer of arms or related materiel, including temporary transfers, regardless of change of ownership (see para. 10 of S/2016/589).

27.   On 5 July 2016, France brought to my attention information on the seizure of an arms shipment that, in its assessment, had originated in the Islamic Republic of Iran and was likely bound for Somalia or Yemen.[5] According to information provided, the French frigate *Provence*, operating as part of the Combined Task Force 150, boarded a stateless dhow on 20 March 2016 in the northern Indian Ocean. That action resulted in the discovery of weapons aboard the vessel that included 2,000 AK-47 assault rifles, 64 Hoshdar-M sniper rifles, 6 type-73 machine guns and 9 Kornet anti-tank missiles. On the basis of an analysis of available information, including interviews with the crew and an inspection of the weapons, France concluded that the weapons had originated in the Islamic Republic of Iran and that their transfer was being undertaken contrary to paragraph 6 (b) of annex B to resolution 2231 (2015).

28.   That report was brought to the attention of the Permanent Mission of the Islamic Republic of Iran to the United Nations by the Security Council facilitator for the implementation of resolution 2231 (2015), in July 2016. In addition, the Secretariat has requested the opportunity to examine the arms seized and obtain additional information.

29.   In March 2016, the Combined Maritime Forces announced the seizure of a weapons cache aboard a small fishing vessel off the coast of Oman by HMAS *Darwin* of the Royal Australian Navy, also operating as part of the Combined Task Force 150.[6] Upon the request of the Secretariat, Australia and the Combined Maritime Forces recently provided information on that arms seizure. According to information provided, on 28 February 2016, HMAS *Darwin* discovered aboard a stateless dhow, the *Samer*, a total of 1,989 AK-47 assault rifles, 100 RPG-7 rocket-propelled grenade launchers, 49 PKM general purpose machine guns, 39 PKM spare barrels and twenty 60 mm mortar tubes.

30.   According to the United States, that arms shipment originated in the Islamic Republic of Iran.[7] The Secretariat is still reviewing the information recently provided by Australia and the Combined Maritime Forces, and I intend to provide an update on the arms seizure in due course.

31.   In a televised speech broadcast by Al-Manar television on 24 June 2016, the Secretary-General of Hizbullah stated that the budget of Hizbullah, its salaries, expenses, weapons and missiles all came from the Islamic Republic of Iran. I am very concerned by that statement, which suggests that transfers of arms and related materiel from the Islamic Republic of Iran to Hizbullah may have been undertaken contrary to the provisions of annex B to resolution 2231 (2015).[3] The Secretariat raised the matter with representatives of the Permanent Mission of the Islamic Republic of Iran to the United Nations in November 2016. In the course of the Secretariat's contact with the Permanent Mission to seek clarification on this issue, the Islamic Republic of Iran underlined "that measures undertaken by the Islamic

---

[5] That information was also communicated to the Security Council, the Committee pursuant to resolutions 751 (1992) and 1907 (2009) concerning Somalia and Eritrea and the Committee established pursuant to resolution 2140 (2014).

[6] "HMAS Darwin seizes large weapons cache", Combined Maritime Force press release dated 6 March 2016.

[7] See "Third Illicit Arms Shipment in Recent Weeks Seized in Arabian Sea", United States Navy, story number NNS160404-01, dated 4 April 2016.

Republic of Iran in combating terrorism and violent extremism in the region have been consistent with its national security interests and international commitments".

32.   In addition, in identical letters dated 21 November 2016 (S/2016/987), the Permanent Representative of Israel stated that the Islamic Republic of Iran continues to transfer arms and related materiel to Hizbullah in order to supply Hizbullah with the capacity to enhance its missile arsenal. According to Israel, those arms and related materiel are shipped by the Islamic Revolutionary Guard Corps, using commercial flights from the Islamic Republic of Iran either directly to Beirut or to Damascus (the arms and related materiel being subsequently shipped to Lebanon by land). In identical letters dated 22 November 2016, the Permanent Representative of the Islamic Republic of Iran stated that the information was baseless and "without a shred of evidence" (S/2016/992).

## VI.   Implementation of the assets freeze provisions

33.   Pursuant to paragraphs 6 (c) and (d) of annex B to resolution 2231 (2015), all States shall freeze the funds, other financial assets and economic resources of the individuals and entities on the list maintained pursuant to resolution 2231 (2015) and ensure that no funds, financial assets or economic resources are made available to those individuals and entities.

34.   In July 2016, I brought to the attention of the Council that an entity presently on the list maintained pursuant to resolution 2231 (2015),[8] the Defence Industries Organisation, appeared to have participated in the Fifth Iraq Defence Exhibition in March 2016 (see para. 35 of S/2016/589). Based on the information provided by Iraqi authorities in October 2016 (see para. 25 above), no further action will be taken by the Secretariat in relation to this matter.

35.   Since my previous report, I have not received any other information, nor am I aware of any open-source information, related to the implementation of the paragraphs 6 (c) and (d) of annex B to resolution 2231 (2015).

## VII.   Implementation of the travel ban provision

36.   Pursuant to paragraph 6 (e) of annex B to resolution 2231 (2015), all States are to take the measures necessary to prevent the entry into or transit through their territories of the individuals on the list maintained pursuant to resolution 2231 (2015). At the time of the drafting of the present report, no travel exemption requests were received or granted by the Security Council in relation to individuals presently on the list.

---

[8]  The list maintained pursuant to resolution 2231 (2015) includes the individuals and entities specified on the list established under resolution 1737 (2006) and maintained by the Security Council Committee established pursuant to resolution 1737 (2006), as at the date of adoption of resolution 2231 (2015), with the exception of 36 individuals and entities specified in the attachment to annex B to resolution 2231 (2015), who were delisted on Implementation Day. The Council can delist individuals or entities, and list additional individuals and entities found to meet certain designation criteria defined by resolution 2231 (2015). There are currently 23 individuals and 61 entities on the list maintained pursuant to resolution 2231 (2015).

37.   In my first report, I brought to the attention of the Security Council that Major General Qasem Soleimani, Commander of the Quds Force of the Islamic Revolutionary Guard Corps, may have engaged in foreign travel (see S/2016/589, para. 37). In recent months, additional information from open sources suggests that Major General Soleimani continues to engage in foreign travel. In late June 2016, several Iranian media outlets (Fars News Agency, Tasnim News Agency) reproduced pictures of Major General Soleimani visiting the former Prime Minister of Iraq, Nouri al-Maliki. In October 2016, another Iranian media outlet (Mehr News Agency) reproduced a picture of the General in the Iraqi Kurdistan region, visiting the family of a Kurdish Peshmerga officer killed fighting ISIL militants in 2015. In November 2016, the leader of the Harakat Hezbollah al-Nujaba militia declared that he was in Mosul along with other Iranian military advisers (Fars News Agency). In September 2016, the media group of the same militia, which had released the pictures of Major General Soleimani in the "Fallujah operations room" in May 2016 (see S/2016/589, fig. V) released pictures showing him reportedly in southern Aleppo. The following day a picture showing Major General Soleimani reportedly with officers of the Syrian Arab Army was reproduced by various media outlets (Fars News Agency, Al-Masdar News). In mid-December 2016, pictures showing the General at the citadel of Aleppo were widely circulated by Iranian and other media outlets (Fars News Agency).

38.   In addition, in late July 2016, Iranian media outlets (Basij Press, Fars News Agency) reported that another listed individual, Brigadier General Mohammad Reza Naqdi, former Deputy Chief of Armed Forces General Staff for Logistics and Industrial Research, travelled to the Syrian Arab Republic in March and July 2016. In the following days, the same media outlets reproduced pictures of him reportedly in the Golan region, near Qunaytirah, as well as in the Sayyidah Zainab mosque in Damascus.

39.   The Secretariat raised the travel of Major General Soleimani to Iraq with the Permanent Missions of the Islamic Republic of Iran and Iraq to the United Nations in June 2016. In October 2016, the Permanent Representative of Iraq informed the Secretariat that "there [was] no means of confirmation regarding Soleimani's entry into Iraqi territory; Iraq has not invited Mr. Soleimani to visit Iraq and no entry visa [was] requested by him or granted by the Foreign Ministry of Iraq".

40.   The Secretariat also raised the travels of both Major General Soleimani and Brigadier General Naqdi to the Syrian Arab Republic with the Permanent Missions of the Islamic Republic of Iran and the Syrian Arab Republic to the United Nations in November 2016. The Syrian Government affirmed that "no visas were issued to the above-mentioned individuals". During the Secretariat's contact with the Permanent Mission of the Islamic Republic of Iran to seek clarification on this issue, the Islamic Republic of Iran underlined "that measures undertaken by the Islamic Republic of Iran in combating terrorism and violent extremism in the region have been consistent with its national security interests and international commitments".

## VIII. Secretariat support provided to the Security Council and its facilitator for implementation of resolution 2231 (2015)

41.    The Security Council Affairs Division of the Department of Political Affairs has continued to support the work of the Security Council, in close cooperation with the facilitator for the implementation of resolution 2231 (2015). The Division has also continued to liaise with the Procurement Working Group of the Joint Commission on all matters related to the procurement channel. In addition, the Division provided induction briefings for the incoming facilitator and members of the Security Council to assist them in their work on the implementation of resolution 2231 (2015).

42.    The Division continued to promote publicly available information on the restrictions imposed by resolution 2231 (2015), including through the Council's website[9] and outreach activities. Relevant documents were regularly added to the website in all official languages. In particular, revised versions of the documents provided by the Procurement Group of the Joint Commission offering practical information to States on the procurement channel were uploaded in October.

43.    During the reporting period, the Division responded to queries from Member States regarding the termination of previous Security Council resolutions on the Iranian nuclear issue and the provisions of resolution 2231 (2015), in particular on the procedures for the submission of nuclear-related proposals and the review process.

------------

[9]  www.un.org/en/sc/2231/.

United Nations

S/2017/515



**Security Council**

Distr.: General
20 June 2017

Original: English

---

**Third report of the Secretary-General on the implementation
of Security Council resolution 2231 (2015)**

## I. Introduction

1.    On 20 July 2015, the Security Council, in its resolution 2231 (2015), endorsed the Joint Comprehensive Plan of Action concluded by China, France, Germany, the Russian Federation, the United Kingdom of Great Britain and Northern Ireland, the United States of America, the European Union and the Islamic Republic of Iran.

2.    At the start of my tenure as Secretary-General, I am encouraged by the continued implementation of the Joint Comprehensive Plan of Action. I hope that ongoing commitments to the Plan can provide an example of the benefits of diplomacy, which leads to the reduction of tensions among States. I encourage all States to act in accordance with and support this historic agreement, and avoid provocative actions and speech.

3.    The International Atomic Energy Agency (IAEA) continues to verify and monitor the implementation by the Islamic Republic of Iran of its nuclear-related commitments under the Joint Comprehensive Plan of Action. On 15 January 2017, IAEA announced that it had verified that the Islamic Republic of Iran had removed, within one year from Implementation Day, as required by the Plan, all excess centrifuges and infrastructure from the Fordow Fuel Enrichment Plant and transferred them to storage at the Natanz Fuel Enrichment Plant under IAEA continuous monitoring.

4.    In March and June 2017, the Agency issued quarterly reports on its verification and monitoring in the Islamic Republic of Iran in the light of resolution 2231 (2015) (S/2017/234 and S/2017/502). The Agency reported that it has been verifying and monitoring the implementation by the Islamic Republic of Iran of its nuclear-related commitments since Implementation Day and that the Islamic Republic of Iran continues to provisionally apply the Additional Protocol to its Safeguards Agreement, pending its entry into force, and the transparency measures contained in the Joint Comprehensive Plan of Action. The Agency also reported that it continues to verify the non-diversion of declared nuclear material and that its evaluation regarding the absence of undeclared nuclear material and activities for the Islamic Republic of Iran remained ongoing.

5.    I welcome the recent recommitment by the participants in the Joint Comprehensive Plan of Action, in Vienna on 25 April 2017, to the full and effective implementation of the Plan. I call upon them to continue to work together in good faith and reciprocity to ensure that all participants benefit from the Plan. In



Please recycle 

resolution 2231 (2015), the Security Council called upon all Member States, regional organizations and international organizations to take such actions as may be appropriate to support the implementation of the Plan. It is in the interest of the international community, writ large, that this achievement of multilateral diplomacy endures transitions and implementation challenges, cementing our collective commitment to diplomacy and dialogue.

6.     The present report, the third on the implementation of resolution 2231 (2015), provides an assessment of the implementation of the resolution, including findings and recommendations, since the second report of the Secretary-General, issued on 30 December 2016 (S/2016/1136). Consistent with the first and second reports, the focus of the present report is on the provisions set forth in annex B to resolution 2231 (2015), which include restrictions applicable to nuclear-related transfers, ballistic missile-related transfers and arms-related transfers to or from the Islamic Republic of Iran, as well as asset freeze and travel ban provisions.

## II.   Key findings and recommendations

7.     Since 16 January 2016, my predecessor and I have not received any report on the supply, sale, transfer or export to the Islamic Republic of Iran of nuclear or dual-use items, materials, equipment, goods or technology undertaken contrary to paragraph 2 of annex B to resolution 2231 (2015).

8.     Since 30 December 2016, 10 additional proposals to participate in or permit activities with the Islamic Republic of Iran for nuclear or non-nuclear civilian end uses were submitted to the Security Council for approval through the procurement channel. Five of the proposals have been approved by the Council.

9.     On 29 January 2017, the Islamic Republic of Iran launched a Khorramshahr medium-range ballistic missile. As in the case of the ballistic missile launches by the Islamic Republic of Iran in March 2016 (see S/2016/649, paras. 17-22), there was no consensus in the Security Council on how this particular launch related to resolution 2231 (2015). I call upon the Islamic Republic of Iran to avoid such ballistic missile launches, which have the potential to increase tensions. I appeal to all Member States to redouble their efforts to promote peace and stability in the region.

10.    The Secretariat has examined the weapons and analysed the information related to the arms shipment seized by the French frigate *Provence* in the northern Indian Ocean in March 2016 (see S/2016/1136, para. 27). On the basis of the information analysed, the Secretariat is confident that the weapons seized are of Iranian origin and were shipped from the Islamic Republic of Iran.

11.    Iranian entities, including the Defence Industries Organisation, which is on the list maintained pursuant to resolution 2231 (2015), once again participated in the International Defence Exhibition in Iraq. The present report also provides information on additional travel by Major General Qasem Soleimani. I reiterate my call upon all Member States to fully implement their obligations in relation to resolution 2231 (2015), including those regarding the travel ban and asset freeze of individuals and entities on the list maintained pursuant to resolution 2231 (2015).

## III.   Implementation of nuclear-related provisions

12.    In resolution 2231 (2015), the Security Council endorsed the establishment of a dedicated procurement channel, under the Joint Comprehensive Plan of Action, to review proposals by States seeking to engage in certain transfers of nuclear or dual-

use goods, technology and/or related services to the Islamic Republic of Iran. Through this channel, the Council reviews and decides on recommendations from the Joint Commission established under the Plan regarding proposals by States to participate in or permit activities set out in paragraph 2 of annex B to resolution 2231 (2015).

13.   Since 30 December 2016, 10 new proposals to participate in or permit the activities set forth in paragraph 2 of annex B to resolution 2231 (2015) were submitted to the Security Council, bringing to 16 the total number of proposals submitted since Implementation Day for approval through the procurement channel. At the time of reporting, 10 proposals were approved by the Council, two were withdrawn by the proposing States and four are currently under review by the Joint Commission.

14.   In addition, the Security Council received six new notifications pursuant to paragraph 2 of annex B to resolution 2231 (2015) for certain nuclear-related activities that do not require approval but do require a notification to the Security Council or to both the Security Council and the Joint Commission.

## IV.   Implementation of ballistic missile-related provisions

### A.   Restrictions on ballistic missile-related activities by the Islamic Republic of Iran

15.   In paragraph 3 of annex B to resolution 2231 (2015), the Security Council called upon the Islamic Republic of Iran not to undertake any activity related to ballistic missiles designed to be capable of delivering nuclear weapons, including launches using such ballistic missile technology.

16.   On 1 February 2017, the Minister of Defence of the Islamic Republic of Iran confirmed that the Islamic Republic of Iran had flight-tested a ballistic missile, while stressing that the launch did not contradict the Joint Comprehensive Plan of Action or resolution 2231 (2015).[1] In the same period, the Minister for Foreign Affairs of the Islamic Republic of Iran reiterated that the Islamic Republic of Iran's ballistic missiles "have not been designed to be capable of carrying a nuclear weapons" and therefore were not in violation of resolution 2231 (2015).[2]

17.   On 7 February 2017, I received a joint letter from France, Germany, the United Kingdom and the United States on the launch by the Islamic Republic of Iran of a Khorramshahr medium-range ballistic missile on 29 January 2017. Those States underscored that the phrase "ballistic missiles designed to be capable of delivering nuclear weapons" in paragraph 3 of annex B to resolution 2231 (2015) included all Missile Technology Control Regime Category I systems, defined as those capable of delivering at least a 500 kg payload to a range of at least 300 km, which are inherently capable of delivering nuclear weapons and other weapons of mass destruction. Those States considered that since the Khorramshahr is designed to be capable of delivering a 500 kg payload to a range of at least 300 km, the launch of the missile constituted an "activity related to ballistic missiles designed to be capable of delivering nuclear weapons" and "[a] launch using such ballistic missile technology", which the Islamic Republic of Iran has been called upon not to undertake pursuant to paragraph 3 of annex B to resolution 2231 (2015). In the letter it was also stated that the launch was destabilizing and provocative and that it had been conducted in defiance of resolution 2231 (2015).

---

[1] Fars News Agency, "Iran Confirms Missile Test", 1 February 2017.
[2] Mehr News Agency, "Iran not to hesitate in reinforcing defense capabilities", 31 January 2017.

18.   In identical letters dated 10 February 2017 addressed to me and the President of the Security Council (S/2017/123), the Permanent Representative of Israel to the United Nations expressed Israel's strong condemnation of the ballistic missile test conducted by the Islamic Republic of Iran on 29 January 2017. He indicated that the Khorramshahr medium-range missile had travelled a distance of 1,000 km. He also stated that the Khorramshahr is a Missile Technology Control Regime Category I missile "capable of delivering a nuclear payload of 500 kilograms for a range of over 300 kilometres". He concluded that the test constituted "yet another flagrant violation" of resolution 2231 (2015) and that "the development of surface-to-surface missiles with nuclear warhead capability reveals the true intentions of Iran not to comply with resolution 2231 (2015)".

19.   In a letter dated 9 March 2017 addressed to the President of the Security Council (S/2017/205), the Permanent Representative of the Islamic Republic of Iran to the United Nations stated that the above-mentioned letter from the Permanent Representative of Israel was "replete with baseless speculations about the name, range, performance and technical characteristics of a missile". He also stated that "Iran's indigenous missiles are an indivisible part of its conventional deterrence and defensive capabilities" and underlined that "no universal norm, treaty or agreement bans or limits the development and testing of missiles equipped with conventional capabilities for self-defence requirements". He further stated that "nothing in Security Council resolution 2231 (2015) prohibits Iran's conventional missile activities" and concluded that "in this context, any demand for the cessation of Iran's legitimate and conventional defence activities is groundless and unwarranted".

20.   The Security Council discussed the Iranian ballistic missile launch on 31 January and 2 March 2017. There was no consensus among Council members on how that particular launch related to resolution 2231 (2015). The third six-month report of the Facilitator on the implementation of Security Council resolution 2231 (2015) provides the details of Council deliberations on this issue.[3]

## B.   Restrictions on ballistic missile-related transfers or activities with the Islamic Republic of Iran

21.   Pursuant to paragraph 4 of annex B to resolution 2231 (2015), provided that they have obtained prior approval from the Security Council, on a case-by-case basis, all States may participate in and permit the supply, sale or transfer to or from the Islamic Republic of Iran of certain ballistic missile-related items, materials, equipment, goods and technology,[4] the provision of various services or assistance, and the acquisition by the Islamic Republic of Iran of an interest in certain commercial ballistic missile-related activities. At the time of reporting, no proposal had been submitted to the Council pursuant to that paragraph.

22.   In his identical letters dated 10 February 2017, the Permanent Representative of Israel stated that the Khorramshahr missile originated from the Democratic People's Republic of Korea, which had also conducted several tests of the same kind of missile in 2016. He added that "this serves as additional proof of the cooperation between Iran and DPRK on the development and transfer of surface-to-surface missile technologies". In his letter dated 9 March 2017, the Permanent

---

[3]  Document symbol not yet assigned.
[4]  The items, materials, equipment, goods and technology concerned are those set out in the Missile Technology Control Regime list (S/2015/546, annex) and any items, materials, equipment, goods and technology that the State determines could contribute to the development of nuclear weapon delivery systems.

Representative of the Islamic Republic of Iran stated that the aforementioned letter from the Permanent Representative of Israel contained "misleading information, lies and allegations".

23.   In a letter dated 7 June 2017, the United States brought to the attention of the Secretariat information on a shipment of ballistic missile-related items that, in its assessment, was undertaken contrary to resolution 2231 (2015). The letter stated that "in October 2016, an Iranian firm that supports the ballistic missile program received a consignment of controlled carbon fiber". The letter concluded that "because this shipment did not receive advance, case-by-case approval as specified in Annex B of UN Security Council resolution 2231 (2015), this export to Iran's ballistic missile program was a violation of that resolution".

24.   The Secretariat has not been able to independently corroborate these reports. I will provide a further update on these issues should additional information become available to the Secretariat.

## V.   Implementation of arms-related provisions

## A.   Restrictions on arms-related transfers to the Islamic Republic of Iran

25.   As stipulated in paragraph 5 of annex B to resolution 2231 (2015), all States, provided that they have obtained prior approval from the Security Council on a case-by-case basis, may participate in and permit the supply, sale or transfer to the Islamic Republic of Iran of any battle tanks, armoured combat vehicles, large-calibre artillery systems, combat aircraft, attack helicopters, warships, missiles or missile systems, as defined for the purpose of the United Nations Register of Conventional Arms, or related materiel, including spare parts. Prior approval from the Council is also required for the provision to the Islamic Republic of Iran of technical training, financial resources or services, advice, other services or assistance related to the supply, sale, transfer, manufacture, maintenance or use of those arms and related materiel.

26.   On 20 January 2017, the State Border Guard Service of Ukraine announced the discovery of 17 boxes containing missile system components and aircraft parts without accompanying documents in a cargo plane in Kyiv bound for the Islamic Republic of Iran. In its interactions with the Secretariat, the Permanent Mission of Ukraine to the United Nations confirmed that competent Ukrainian authorities had prevented an unauthorized shipment of suspected military items on 19 January 2017, including possible component parts of the "Fagot" anti-tank missile system, had initiated criminal proceedings on 30 January 2017 and were in the process of determining whether the confiscated items were covered by paragraph 5 of annex B to resolution 2231 (2015). On 13 June 2017, during consultations in Kyiv, Ukrainian authorities shared additional information on the unauthorized shipment with the Secretariat, including on the status of the judicial proceedings and classification process of the confiscated items. I intend to report to the Security Council in due course as additional information becomes available.

27.   In a letter dated 1 June 2017, the Permanent Representative of Turkey to the United Nations confirmed to the Secretariat that on 27 April 2017, in the port of Zonguldak, Turkish authorities confiscated component parts of 9K111 Fagot and 9K113 Konkurs anti-tank guided missiles concealed in a truck that was transiting from Ukraine to the Islamic Republic of Iran on board a vessel named *CENK Y*. According to Turkish authorities, the Iranian truck driver stated that he had obtained the items from another Iranian citizen in Kyiv, to be transported to the Islamic

Republic of Iran. A criminal investigation has been launched by the Office of the Prosecutor of Zonguldak Province. On 9 June 2017, during consultations in Ankara, Turkish authorities confirmed to the Secretariat that judicial proceedings were ongoing. I will report to the Security Council accordingly as additional information becomes available, including on whether the confiscated items are covered by paragraph 5 of annex B to resolution 2231 (2015).

28.  With regard to the provision of services or assistance related to the maintenance of arms and related materiel specified in paragraph 5 of annex B to resolution 2231 (2015), open-source information indicated that services had been provided to a warship[5] of the Navy of the Islamic Republic of Iran in the port of Durban, South Africa, in late 2016.[6] In a letter dated 16 May 2017, the Permanent Representative of South Africa to the United Nations confirmed to the Secretariat that "following a distress call from the Iranian vessel *Bushehr*, the vessel was allowed to enter Durban port on 15 November 2016" and "departed on 22 January 2017 following emergency repairs on its hull". He also indicated that "its accompanying vessel, the *Alvand*, requested access to the Durban Port on 19 November 2016 to support the *Bushehr* and departed on 10 January 2017". The Permanent Representative stressed that "the assistance provided to the *Bushehr* related to emergency repairs undertaken in accordance with South Africa's international obligations to assist a vessel in distress and was not related to 'the supply, sale, transfer, manufacture, maintenance, or use of arms and related materiel' as provided for in paragraph 5 of Annex B of UN Security Council resolution 2231 (2015)".

## B.   Restrictions on arms-related transfers from the Islamic Republic of Iran

29.   In paragraph 6 (b) of annex B to resolution 2231 (2015), the Security Council decided that all States were to take the necessary measures to prevent, except as decided otherwise by the Council in advance on a case-by-case basis, the supply, sale or transfer of arms or related materiel from the Islamic Republic of Iran. At the time of reporting, no proposal had been submitted to the Council pursuant to that paragraph.

30.   In July 2016, France brought to the attention of my predecessor information on the seizure of an arms shipment on board a stateless dhow on 20 March 2016 in the northern Indian Ocean. In its assessment, the arms shipment had originated in the Islamic Republic of Iran and was likely bound for Somalia or Yemen. In January 2017, France provided to the Secretariat additional information regarding the dhow, including its course prior to its interception, documents found on board and the identity of some of the crew members. The Secretariat notes that the dhow was stopped by the frigate *Provence* at a point on the most direct and economical route between its home port, Konarak, Islamic Republic of Iran, and its destination off the coast of Somalia, as declared by the crew master, an Iranian individual.

---

[5] Warships are defined in the Register of Conventional Arms as "vessels or submarines armed and equipped for military use with a standard displacement of 500 metric tons or above, and those with a standard displacement of less than 500 metric tons, equipped for launching missiles with a range of at least 25 kilometres or torpedoes with similar range". It is the understanding of the Secretariat that the Iranian vessel involved had a displacement of more than 500 metric tons and was armed and equipped for military use.

[6] Jeremy Binnie, "Iranian navy flotilla stuck in South Africa", *Jane's Defence Weekly*, 19 January 2017.

31.   In March 2017, French authorities granted full access to the Secretariat to examine the assault rifles, sniper rifles, light machine guns and anti-tank missiles seized. The Secretariat was able to independently ascertain that the 2,000 assault rifles and 64 sniper rifles were in new condition. Although lacking country or factory marking, the weapons corresponded to known features of Iranian-manufactured weapons. The 2,000 assault rifles have characteristics identical to Iranian-produced KLS-7.62 mm,[7] an assault rifle type AK-47. The 64 sniper rifles have characteristics identical to those of the Iranian-produced SVD sniper rifle. Furthermore, the Secretariat confirmed with the foreign manufacturer of the optical sights fitting the sniper rifles that they were produced as recently as 2015 and were sold to an Iranian company.

32.   My predecessor and I received several letters regarding the arms shipments seized by Australia and the United States in early 2016, information that was already provided to the Security Council in the first and second reports on the implementation of resolution 2231 (2015). They include identical letters dated 15 May 2017 addressed to me and the President of the Security Council from the Permanent Representative of Saudi Arabia to the United Nations (S/2017/427), as well as a note verbale dated 27 October 2016 from the Permanent Mission of the United Arab Emirates to the United Nations (A/71/581). The latter brought to the attention of my predecessor a letter dated 18 October 2016 addressed to the President of the General Assembly from the Permanent Representatives of Bahrain, Egypt, Jordan, Kuwait, Morocco, Oman, Qatar, Saudi Arabia, the Sudan, the United Arab Emirates and Yemen (ibid., annex).

33.   In a letter dated 18 February 2017 addressed to me, the Permanent Representative of Yemen to the United Nations stated that "multiple reports of similar interceptions documented the seizure of considerable quantities of weapons and ammunition" that, in the assessment of Yemen, included "Iranian-made anti-tank missiles, assault rifles, Dragunov sniper rifles, AK-47s, spare barrels, mortar tubes, and hundreds of rocket-propelled grenades, and RBG launchers". He also stated that three disassembled spy drones found concealed in a truck at the Yemen-Oman border on 12 December 2016 by Yemeni armed forces and a spy drone belonging to the Houthis intercepted in-flight by coalition forces in the Al-Mokha area on 28 January 2017 were a "clear manifestation of the involvement of Iranians in providing the Houthis with weapons and expertise". The Government of Yemen was invited to provide detailed information, documents and images. I will report thereon to the Council accordingly as additional information becomes available.

34.   In a letter dated 18 May 2017, the Permanent Representative of the United Arab Emirates to the United Nations brought to the attention of the Secretariat information regarding arms and related materiel seized or recovered by the armed forces of the United Arab Emirates in Yemen since 16 January 2016 that, in the assessment of the United Arab Emirates, were Iranian-made or sourced. This included detailed information and images of anti-tank missiles and unmanned aerial vehicles reportedly seized or recovered by the Presidential Guard forces of the United Arab Emirates. The Secretariat is examining the information and will provide an update to the Council, as appropriate, in due course.

35.   In the second report of the Secretary-General, information was provided that arms and related materiel are shipped by the Islamic Revolutionary Guard Corps to Hizbullah using commercial flights from the Islamic Republic of Iran, either directly to Beirut or via Damascus (see S/2016/1136, para. 32). In a statement dated 24 November 2016, the Chair of Rafic Hariri International Airport strongly refuted

---

[7] The KLS is the fixed stock version of the Iranian-produced KL-7.62 mm assault rifle.

those allegations. In identical letters dated 25 January 2017 addressed to me and the President of the Security Council (A/71/770-S/2017/80), the Permanent Representative of Lebanon to the United Nations stated that the letter of the Permanent Representative of Israel dated 21 November 2016 (S/2016/987) contained fabrications and false claims and reiterated that his Government respects its obligations pursuant to international resolutions.

36.    Information released by the organizers of the sixth International Defence Exhibition in Iraq, held in Baghdad from 5 to 7 March 2017, indicates that several Iranian entities participated in the exhibition for the second year in a row. According to press coverage of the event, items displayed by those entities appear to have included small arms, artillery ammunition, rockets, anti-tank guided missiles and man-portable air defence systems. The Secretariat again raised the issue with the Permanent Mission of Iraq to the United Nations. The Permanent Mission of the Islamic Republic of Iran to the United Nations had previously stated that it believed that no prior approval was required from the Security Council for that activity since the Islamic Republic of Iran retained ownership of the items exhibited. I intend to report thereon to the Council in due course as additional information becomes available.

## VI.   Implementation of the asset freeze provisions

37.    Pursuant to paragraphs 6 (c) and (d) of annex B to resolution 2231 (2015), all States shall freeze the funds, other financial assets and economic resources of the individuals and entities on the list maintained pursuant to resolution 2231 (2015)[8] and ensure that no funds, financial assets or economic resources are made available to those individuals and entities.

38.    It appears that an entity presently on the list maintained pursuant to resolution 2231 (2015), the Defence Industries Organisation, may have participated again in the International Defence Exhibition in Iraq, which was held in March 2017 (see para. 36 above). Its name is on the exhibitors list released by the organizers of the exhibition and, according to images released by the Iraqi and Iranian media, its official company logo appears on several visual displays next to exhibited items. All of the entity's funds, other financial assets and economic resources on Iraqi territory on the date of adoption of the Joint Comprehensive Plan of Action or at any time thereafter should have been frozen by the Iraqi authorities. The issue was raised again with the Permanent Mission of Iraq to the United Nations. I intend to report thereon to the Council in due course.

## VII.   Implementation of the travel ban provision

39.    Pursuant to paragraph 6 (e) of annex B to resolution 2231 (2015), all States are to take the measures necessary to prevent the entry into or transit through their territories of the individuals on the list maintained pursuant to resolution 2231

---

[8]  Available from www.un.org/en/sc/2231/list.shtml. The list maintained pursuant to resolution 2231 (2015) includes the individuals and entities specified on the list established under Security Council resolution 1737 (2006) and maintained by the Security Council Committee established pursuant to resolution 1737 (2006), as at the date of adoption of resolution 2231 (2015), with the exception of 36 individuals and entities specified in the attachment to annex B to resolution 2231 (2015), who were delisted on Implementation Day. The Council can delist individuals or entities, and list additional individuals and entities found to meet certain designation criteria defined in resolution 2231 (2015). There are currently 23 individuals and 61 entities on the list maintained pursuant to resolution 2231 (2015).

17-09630

(2015). At the time of reporting, no travel exemption requests had been received or granted by the Security Council in relation to individuals presently on the list.

40.   Since the issuance of the second report of the Secretary-General, additional information has surfaced regarding travel by Major General Qasem Soleimani. New pictures and video showing the General in the vicinity of Aleppo, Syrian Arab Republic, in late December 2016 were reproduced in early January 2017. In February 2017, in an interview with an Iranian media outlet (Tasnim News Agency), the President of Iraq, in response to a question about the presence of the General in Iraq, reportedly stated that "the presence of General Qasem Soleimani is in the context of the presence of foreign military advisors in Iraq". He stressed that Iranian military advisers, including the General, had a right to be present in Iraq, as did advisers from other countries, to provide military advice in the fight against terrorism.

41.   Furthermore, in early April 2017, Iranian and Arab media outlets (Fars News Agency, Al-Masdar News) reproduced a picture allegedly showing Major General Soleimani in the central province of Hama in the Syrian Arab Republic for a meeting with officers of the Syrian Arab Army. A few days later, media from the Kurdish region of Iraq (Rudaw Media Network) reported that Major General Soleimani had visited Sulaymaniyah, in Iraqi Kurdistan. Several Iranian and Arab media outlets (Fars News Agency, Al-Masdar News) also reported that the General had been photographed with Iraqi popular mobilization forces in north-western Iraq on 29 May 2017. According to those reports, Major General Soleimani was present in the area as part of an Islamic Revolutionary Guard Corps advisory mission during an operation of the popular mobilization forces along the Iraq-Syrian Arab Republic border crossing.

## VIII.   Secretariat support provided to the Security Council and its facilitator for implementation of resolution 2231 (2015)

42.   The Security Council Affairs Division of the Department of Political Affairs has continued to support the work of the Security Council and of its facilitator for the implementation of resolution 2231 (2015). The Division has also continued to liaise with the Procurement Working Group of the Joint Commission on all matters related to the procurement channel.

43.   The Division continued to promote publicly available information on the restrictions imposed by resolution 2231 (2015) through the Security Council website.[9] Relevant documents were regularly added in all official languages to the website. The Division also continued to use outreach opportunities to promote information on the resolution, in particular the procurement channel, in line with paragraph 6 (e) of the note by the President of the Security Council dated 16 January 2016 (S/2016/44). On 18 January 2017, the Division participated in an export control seminar organized by the Awa Aussenwirtschafts-Akademie (Foreign Trade Academy) in Frankfurt, Germany. On 12 June 2017, the Division also participated in a public awareness-raising seminar related to the procurement channel organized by the Vienna Centre for Disarmament and Non-Proliferation, held in Vienna.

44.   During the reporting period, the Division continued to respond to queries from Member States and to provide relevant support to Member States regarding the provisions of resolution 2231 (2015), in particular on the procedures for the submission of nuclear-related proposals and the review process.

------------

[9] www.un.org/en/sc/2231/.

United Nations

S/2017/1030



**Security Council**

Distr.: General
8 December 2017

Original: English

---

## Fourth report of the Secretary-General on the implementation of Security Council resolution 2231 (2015)

## I. Introduction

1.    Almost two years after Implementation Day (16 January 2016), I continue to believe that the Joint Comprehensive Plan of Action is the best way to ensure the exclusively peaceful nature of the nuclear programme of the Islamic Republic of Iran and to realize the aspirations of the Iranian people. The Plan constitutes a major achievement in nuclear non-proliferation and diplomacy in addressing issues that could have an impact on regional and international peace and security, and it is my hope that it will be preserved.

2.    Since 16 January 2016, the International Atomic Energy Agency has reported nine times to the Security Council that the Islamic Republic of Iran is implementing its nuclear-related commitments under the Joint Comprehensive Plan of Action. In its most recent quarterly reports (S/2017/777 and S/2017/994), the Agency again reported that it continued to verify the non-diversion of declared nuclear material and that its evaluations regarding the absence of undeclared nuclear material and activities for the Islamic Republic of Iran remained ongoing. The Agency also reported that the Islamic Republic of Iran continued to provisionally apply the Additional Protocol to its Safeguards Agreement, pending its entry into force, and to apply the transparency measures contained in the Plan. In its latest report, the Agency further indicated that it had conducted complementary accesses under the Additional Protocol to all the sites and locations in the Islamic Republic of Iran that it needed to visit.

3.    Against this backdrop of diplomatic achievement, compliance and robust verification, the decision of 13 October by the President of the United States of America not to certify that the suspension of its national sanctions pursuant to the agreement is "appropriate and proportionate to the specific and verifiable measures taken by Iran with respect to terminating its illicit nuclear programme", and the potential legislative actions that the Congress of the United States may take to reimpose those national sanctions, have regrettably created considerable uncertainty regarding the future of the Joint Comprehensive Plan of Action. At present, these national executive actions do not affect the validity of the Plan or the respective commitments of the participants contained therein. I am reassured that the United States has expressed its commitment to stay in the Joint Comprehensive Plan of Action for now.

4.    I call upon all participants to remain steadfast in their commitment to the full implementation of the agreement and to work through differences and challenges in

---

Please recycle 

S/2017/1030

a spirit of cooperation and compromise, good faith and reciprocity. It is important that the Plan continue to work for all its participants, including by delivering benefits to the Iranian people.

5.     I encourage all Member States and regional and international organizations to act in accordance with and support the implementation of this historic agreement, which is in the interest of the international community at large. I welcome the commitment of the European Union to the continued full and effective implementation of all parts of the Joint Comprehensive Plan of Action. I also welcome the affirmative statements by China, the Russian Federation and numerous other Member States in support of the Plan. I encourage the United States to maintain its commitments to the Plan and to consider the broader implications for the region and beyond before taking any further steps. Similarly, I encourage the Islamic Republic of Iran to carefully consider the concerns raised by other participants in the Plan.

6.     The present report, the fourth on the implementation of resolution 2231 (2015), provides an assessment of the implementation of the resolution, including findings and recommendations, since the issuance of the third report of the Secretary-General (S/2017/515), on 20 June 2017. Consistent with previous reports, the focus of the present report is on the provisions set forth in annex B to resolution 2231 (2015), which include restrictions applicable to nuclear-related transfers, ballistic missile-related transfers and arms-related transfers to or from the Islamic Republic of Iran, as well as asset freeze and travel ban provisions.

## II.   Key findings and recommendations

7.     Since 16 January 2016, the Secretariat has not received any reports on the supply, sale, transfer or export to the Islamic Republic of Iran of nuclear or dual-use items, materials, equipment, goods or technology undertaken contrary to paragraph 2 of annex B to resolution 2231 (2015). In relation to alleged inconsistent Iranian procurement activities in Germany, the Government of Germany confirmed to the Secretariat in November 2017 that it had no indications of any activities inconsistent with paragraph 2 of annex B and had no evidence of any transfers or activities inconsistent with paragraph 4 of annex B.

8.     Since 20 June 2017, eight additional proposals to participate in or permit activities with the Islamic Republic of Iran for nuclear or non-nuclear civilian end uses have been submitted to the Security Council for approval through the Procurement Channel.[1]

9.     On the basis of interactions that took place during outreach activities carried out by the Secretariat, it appears that there remains a general lack of understanding of resolution 2231 (2015), especially in the private sector. This lack of understanding, coupled with a sense of political uncertainty, appears to have adversely affected the decisions of some Member States and private sector entities to engage in activities requiring prior approval from the Security Council. Member States should undertake greater efforts to promote awareness and understanding of the specific restrictions, in particular the Procurement Channel, the procedures for the submission of proposals and the process for review. The Secretariat stands ready to assist Member States in such efforts, in line with the arrangements and procedures outlined in the note by the President of the Council dated 16 January 2016 (S/2016/44).

10.    Regarding the emerging information on the possible transfer by the Islamic Republic of Iran of ballistic missiles, parts thereof or related technology to the

---

[1] All nuclear-related proposals and other documents related to the Procurement Channel are treated as confidential.

Houthis in Yemen that may have been used in the ballistic missile launches aimed at the territory of Saudi Arabia on 22 July and 4 November 2017, the Secretariat has examined the debris of the missiles launched at Yanbu' and Riyadh and is carefully reviewing all the information and material available. The Security Council should consider a joint meeting of the Security Council Committee established pursuant to resolution 2140 (2014) and the Council in the "2231 format", to be jointly briefed by the Panel of Experts on Yemen and the Secretariat on their respective findings at the appropriate time.

11.    The Secretariat was provided with an opportunity to examine the arms and related materiel seized by the United States aboard a dhow in the vicinity of the Gulf of Oman in March 2016 (see S/2016/589, paras. 29–31). The Secretariat is confident that close to 900 of the assault rifles seized by the United States are identical to those seized by France, also in March 2016, which the Secretariat had assessed to be of Iranian origin and to have been shipped from the Islamic Republic of Iran (see S/2017/515, para. 10).

12.    The Defence Industries Organisation, an entity on the list maintained pursuant to resolution 2231 (2015),[2] participated in a foreign exhibition, the International Aviation and Space Salon, held in Zhukovsky, Russian Federation, in July 2017. In November, the Permanent Mission of the Russian Federation to the United Nations informed the Secretariat that an investigation into the issue had found no action inconsistent with resolution 2231 (2015).

13.    Since the issuance of my previous report, Major General Qasem Soleimani has continued to travel to Iraq and the Syrian Arab Republic, despite the travel ban provision of resolution 2231 (2015) and previous reporting to the Security Council on this issue. The Council should call upon the Government of the relevant Member States in the region, including the Islamic Republic of Iran, to take the steps necessary to ensure proper implementation of the travel ban and other provisions of annex B to resolution 2231 (2015).

14.    The list maintained pursuant to resolution 2231 (2015) has not been reviewed or updated by the Security Council since 17 January 2016. To ensure proper implementation of the asset freeze and travel ban provisions, I recommend that the Council review and update the list as appropriate and consider appropriate options for delisting processes.

15.    In a letter dated 28 August 2017 addressed to me (S/2017/739), the Permanent Representative of the Islamic Republic of Iran to the United Nations stated that the Countering America's Adversaries through Sanctions Act, signed into law on 2 August 2017, violated the terms of paragraphs 3, 4 and 5 of annex B to resolution 2231 (2015). While the allegations raised in the letter have been duly considered, it is my assessment that this information does not fall within the scope of the present report, unless guidance to the contrary is provided by the Security Council.

---

[2] Available from www.un.org/en/sc/2231/list.shtml. The list maintained pursuant to resolution 2231 (2015) includes the individuals and entities specified on the list established under resolution 1737 (2006) and maintained by the Security Council Committee established pursuant to resolution 1737 (2006), as at the date of adoption of resolution 2231 (2015), with the exception of 36 individuals and entities specified in the attachment to annex B to resolution 2231 (2015), who were delisted on Implementation Day. The Council can delist individuals or entities and list additional individuals and entities found to meet certain designation criteria defined by resolution 2231 (2015). There are currently 23 individuals and 61 entities on the list maintained pursuant to resolution 2231 (2015).

S/2017/1030

## III.   Implementation of nuclear-related provisions

16.   In resolution 2231 (2015), the Security Council endorsed the establishment of a dedicated Procurement Channel, under the Joint Comprehensive Plan of Action, to review proposals by States seeking to engage in certain transfers of nuclear or dual-use goods, technology and/or related services to the Islamic Republic of Iran. Through this Channel, the Council reviews and decides on recommendations from the Joint Commission established under the Plan regarding proposals by States to participate in or permit activities set out in paragraph 2 of annex B to resolution 2231 (2015).

17.   Since 20 June 2017, 8 new proposals to participate in or permit the activities set forth in paragraph 2 of annex B to resolution 2231 (2015) have been submitted to the Security Council, bringing to 24 the total number of proposals submitted since Implementation Day for approval through the Procurement Channel. At the time of reporting, 16 proposals had been approved by the Council, 3 had not been approved, and 5 had been withdrawn by the proposing States.

18.   In addition, the Security Council received four new notifications pursuant to paragraph 2 of annex B to resolution 2231 (2015) for certain nuclear-related activities that do not require approval but require a notification to the Council or to both the Council and the Joint Commission.

19.   During the reporting period, following the publication of German domestic intelligence reports, various media outlets alleged that Iranian entities might have attempted to procure nuclear or dual-use items, materiel, goods and technology in Germany outside the Procurement Channel. In its interactions with the Secretariat, including during meetings in Berlin in early November 2017, the Government of Germany recalled the 2016 report of the Federal Office for the Protection of the Constitution according to which, as far as the Federal Office was able to verify such evidence, it did not reveal any violation of the Joint Comprehensive Plan of Action. On 27 November 2017, the Government of Germany informed the Secretariat that it had no indications of any activities inconsistent with paragraph 2 of annex B to resolution 2231 (2015) conducted in Germany by the Islamic Republic of Iran. It was also reiterated that German authorities would continue to rigorously explore and assess any possible activities inconsistent with paragraph 2 of annex B to resolution 2231 (2015).

## IV.   Implementation of ballistic missile-related provisions

### A.   Restrictions on ballistic missile-related activities by the Islamic Republic of Iran

20.   In paragraph 3 of annex B to resolution 2231 (2015), the Security Council called upon the Islamic Republic of Iran not to undertake any activity related to ballistic missiles designed to be capable of delivering nuclear weapons, including launches using such ballistic missile technology.

21.   On 2 August 2017, I received a joint letter from France, Germany, the United Kingdom of Great Britain and Northern Ireland and the United States on the launch by the Islamic Republic of Iran of a Simorgh space launch vehicle on 27 July 2017. Those States underscored that the phrase "ballistic missile designed to be capable of delivering nuclear weapons" in paragraph 3 of annex B to resolution 2231 (2015) included all Missile Technology Control Regime Category I systems — defined as those capable of delivering at least a 500 kg payload to a range of at least 300 km — that are inherently capable of delivering nuclear weapons and other weapons of mass

destruction. They noted that space launch vehicles such as the Simorgh were "inherently capable of delivering a 500 kg payload to a range of at least 300 km if configured as a ballistic missile" and "inherently capable of delivering nuclear weapons". Therefore, those States considered that the launch was inconsistent with paragraph 3 of annex B to resolution 2231 (2015).

22. Through a letter dated 16 August 2017 addressed to me (S/2017/720), the Permanent Representative of the Russian Federation to the United Nations transmitted a position paper in which it was underscored that there was "no legal prohibition on the development by the Islamic Republic of Iran of missile and space programmes", as resolution 2231 (2015) contained only a call, which was "by all means not a prohibition", to refrain from activities related to ballistic missiles that were designed to be capable of carrying nuclear weapons. It was also stated in the paper that there was no information that Iranian ballistic missiles were specifically designed to carry nuclear weapons and that, as verified by the International Atomic Energy Agency, "Tehran does not possess nuclear weapons, and it does not carry out work on the development thereof". The Russian Federation also noted that "no prohibition on cooperation with the Islamic Republic of Iran on missile-related items" was in existence, but that there was the requirement for Member States to seek prior approval of the Security Council for the activities set forth in paragraph 4 of annex B to resolution 2231 (2015).

23. In a letter dated 23 August 2017 addressed to me (S/2017/731), the Permanent Representative of the Islamic Republic of Iran underscored that the launch of a Simorgh space launch vehicle on 27 July 2017 was "part of a scientific and technological activity related to the use of space technology" and that the Islamic Republic of Iran was "determined to continue to exercise this right for its socioeconomic interests". He also stated that the definition of the Missile Technology Control Regime was not an internationally agreed definition and that the "technical characteristics and operational requirements of the satellite launch vehicles clearly make them distinct from ballistic missile systems". The Permanent Representative concluded that the test launch could not be regarded as inconsistent with the resolution.

24. The Security Council discussed the launch of the Simorgh space launch vehicle on 8 September 2017. There was no consensus among Council members on how that launch related to resolution 2231 (2015). The fourth six-month report of the facilitator for the implementation of Security Council resolution 2231 (2015) will provide the details of Council deliberations on this issue.

25. In addition to the above, several launches of ballistic missiles by the Islamic Republic of Iran were brought to my attention. In identical letters dated 28 June 2017 addressed to me and the President of the Security Council (S/2017/555), the Permanent Representative of Israel to the United Nations brought to my attention information that had reportedly come to light regarding the flight test of a Qiam ballistic missile on 15 November 2016 that used a Star of David as the intended target. In the same letter, the Permanent Representative referred to the ballistic missiles reportedly launched by the Islamic Republic of Iran at targets in the Syrian Arab Republic on 18 and 19 June 2017. He considered that the test-firing of those ballistic missiles, all of which were Missile Technology Control Regime Category I systems, was in violation of resolution 2231 (2015). A joint statement by France, Germany, the United Kingdom and the United States, issued on 28 July 2017, referred to the same launches at targets in the Syrian Arab Republic, as well as to an alleged flight test of a medium-range ballistic missile on 4 July 2017.

26. In identical letters dated 17 August 2017 addressed to me and the President of the Security Council (S/2017/719), the Permanent Representative of the Islamic Republic

of Iran stated that the claim made "regarding the test launch of a ballistic missile on 15 November 2016 and the use of a specific marking as target practice is a sheer falsehood". He also underscored that "Iranian military capabilities, including ballistic missiles, have not been designed to be capable of delivering nuclear weapons" and were thus "outside the purview of the Security Council resolution". In addition, he referred to the terrorist attacks by Islamic State in Iraq and the Levant (ISIL, also known as Da'esh) in Tehran on 7 June 2017 and to the determination of the Islamic Republic of Iran to fight terrorism and violent extremism.

## B.   Restrictions on ballistic missile related-transfers or activities with the Islamic Republic of Iran

27.   Pursuant to paragraph 4 of annex B to resolution 2231 (2015), all States, provided that they have obtained prior approval from the Security Council on a case-by-case basis, may participate in and permit the supply, sale or transfer to or from the Islamic Republic of Iran of certain ballistic missile-related items, materials, equipment, goods and technology,[3] the provision of various services or assistance, and the acquisition by the Islamic Republic of Iran of an interest in certain commercial ballistic missile activities. At the time of reporting, no proposal had been submitted to the Council pursuant to that paragraph.

28.   In identical letters dated 7 November 2017 addressed to me and the President of the Security Council (S/2017/937), the Permanent Representative of Saudi Arabia to the United Nations stated that the authorities of Saudi Arabia had confirmed, through the examination of the debris of the missiles launched from within Yemeni territory on 22 July and 4 November 2017 at Yanbu' and at Riyadh, respectively, "the role of the Iranian regime in manufacturing the missiles". He also stated that this was "a flagrant violation of Security Council resolutions 2216 (2015) and 2231 (2015)". In a letter also dated 7 November 2017 addressed to me and the President of the Security Council (S/2017/936), the Permanent Representative of the Islamic Republic of Iran stated that "the Islamic Republic of Iran categorically rejects such baseless and unfounded accusations".

29.   In October and November 2017, the authorities of Saudi Arabia invited the Secretariat to examine the debris of the ballistic missiles launched at its territory on 22 July and 4 November 2017. During those visits, the authorities of Saudi Arabia indicated that, according to their assessment, those missiles were Iranian Qiam-1 ballistic missiles (a variant of the Scud missile). The Secretariat observed that the diameter of both missiles was consistent with that of the Scud family and that the missiles had similar structural and manufacturing features, which suggested a common origin. The Secretariat noted that markings found on the missiles indicated that the oxidizer tank was situated above the fuel tank. The Secretariat also observed that, under the blue overpaint, the missile launched on 4 November had paint and markings resembling those of the one launched on 22 July. The Secretariat was informed that no tail fins had been recovered in either instance. The Secretariat observed remnants of mounting plates on the tail unit of the missile of 22 July, which suggest that the missile was finless. The Secretariat also observed three actuators that bore the castings of a logo similar to that of the Shahid Bagheri Industrial Group, an entity on the list maintained pursuant to resolution 2231 (2015) and a subordinate to the Aerospace Industries Organization of the Islamic Republic of Iran. According to

---

[3] The items, materials, equipment, goods and technology concerned are those set out in the Missile Technology Control Regime list (see S/2015/546, annex) and any items, materials, equipment, goods and technology that the State determines could contribute to the development of nuclear-weapon delivery systems.

Saudi authorities, the actuators belonged to the missile of 4 November. The Secretariat is still analysing the information collected and will report back to the Security Council, as appropriate, in due course.

30.   During the reporting period, following the publication of German domestic intelligence reports, various media outlets alleged that Iranian entities might also have attempted to procure ballistic missile-related items, materials, equipment, goods or technology in Germany. On 27 November 2017, the Government of Germany informed the Secretariat that it had no evidence of any transfers or activities inconsistent with paragraph 4 of annex B to resolution 2231 (2015) conducted by the Islamic Republic of Iran in Germany. It was also reiterated that German authorities would continue to rigorously explore and assess any possible transfers or activities inconsistent with paragraph 4 of annex B to resolution 2231 (2015).

## V.   Implementation of arms-related provisions

31.   As stipulated in paragraph 5 of annex B to resolution 2231 (2015), all States, provided that they have obtained prior approval from the Security Council on a case-by-case basis, may participate in and permit the supply, sale or transfer to the Islamic Republic of Iran of any battle tanks, armoured combat vehicles, large-calibre artillery systems, combat aircraft, attack helicopters, warships, missiles or missile systems, as defined for the purpose of the Register of Conventional Arms, or related materiel, including spare parts. Prior approval from the Council is also required for the provision to the Islamic Republic of Iran of technical training, financial resources or services, advice, other services or assistance related to the supply, sale, transfer, manufacture, maintenance or use of those arms and related materiel. At the time of reporting, no proposal had been approved by the Council pursuant to that paragraph.

32.   In paragraph 6 (b) of annex B to resolution 2231 (2015), the Security Council decided that all States were to take the necessary measures to prevent, except as decided otherwise by the Council in advance on a case-by-case basis, the supply, sale or transfer of arms or related materiel from the Islamic Republic of Iran. At the time of reporting, no proposal had been submitted to the Council pursuant to that paragraph.

33.   In June 2016, the United States brought to the attention of my predecessor information on the seizure, on 28 March 2016, of an arms shipment on board a dhow, the *Adris*, transiting international waters in the vicinity of the Gulf of Oman (see S/2016/589, paras. 29–31). According to the assessment of the United States, the arms shipment had originated in the Islamic Republic of Iran. In October 2017, United States authorities invited the Secretariat to examine the arms and related materiel seized, consisting of 1,500 AKM type assault rifles, 200 rocket propelled grenade launchers, 21 heavy machine guns and miscellaneous other items. The Secretariat could independently ascertain that close to 900 of the assault rifles and the 21 machine guns were in new condition. The 900 assault rifles were identical to those seized by France in March 2016, which had characteristics of the Iranian-produced KLS 7.62 x 39 mm (furnishing made of dark brown synthetic material, fire selector and rear sight markings, slanted screw-on compensator and dot-peen marking style), which the Secretariat has assessed were of Iranian origin and shipped from the Islamic Republic of Iran (see S/2017/515, paras. 10 and 31). In addition, the serial numbers of the assault rifles seized by France and the United States fall within the same production batch and include sequential numbers. More than 100 of the grenade launchers appeared to have characteristics similar to Iranian-produced launchers (for example, paint markings and heat shields). Among the miscellaneous items examined by the Secretariat, which included gun covers, tools and cleaning kits, were two foreign-made neodymium sirens that appeared to have been modified after sale by the addition

of a cable, bearing markings indicating Iranian manufacture, with a military-type electrical connector. An identical siren was also observed by the Secretariat in a separate incident (see para. 34 below), as well as a fuse plate and a detonation device booster identical to those seen in photographs taken on board the *Adris* and provided to the Secretariat by United States authorities. The Secretariat is still analysing the remaining information, and I will report back to the Council accordingly as additional information becomes available.

34.    During its visits to Saudi Arabia in October and November 2017, the Secretariat received information on unmanned surface vessels laden with explosives allegedly used against the Saudi-led coalition. Saudi authorities indicated that one such vessel had been recovered by the armed forces of the United Arab Emirates in Yemeni waters. Reportedly, the vessel itself and the explosives were from Yemen, but parts of the guidance and detonation systems had been supplied by the Islamic Republic of Iran. In November 2017, the Secretariat examined parts of the detonation and guidance systems. It observed that the computer terminal (part of the guidance system) had a dual English/Farsi keyboard and characteristics (design and construction features, graphical user interface and programme icon) similar to those of terminals produced by an Iranian company. The Secretariat also observed that some of the electrical cables bore markings indicating Iranian manufacture and that the detonation system included a neodymium siren, a fuse plate and a detonation device booster identical to those seized on board the dhow *Adris* (see para. 33 above). The Secretariat was also presented with a selection of photographs and geographical coordinates reportedly extracted from the guidance system computer. At the time of reporting, the Secretariat had not been able to independently confirm the authenticity of the photographs and geographical coordinates. The Secretariat is still analysing the available information and will provide an update to the Council in due course.

35.    Also during its visits to Saudi Arabia, the Secretariat was given the opportunity to examine two unmanned aerial vehicles reportedly recovered in Yemen after Implementation Day. Saudi authorities determined that one was an Iranian-made unmanned aerial vehicle of the Ababil-II family. The Secretariat observed that the vehicle appeared to have characteristics (for example, design and construction features, serial number prefixes and engine) identical to those of others reportedly seized or recovered in Yemen after Implementation Day that had been brought to its attention by the Permanent Representative of the United Arab Emirates to the United Nations in letters dated 18 May 2017 (see S/2017/515, para. 34) and 8 November 2017. The Secretariat is still analysing the information provided by the Government of Saudi Arabia and looks forward to the opportunity to examine the other unmanned aerial vehicles reportedly seized or recovered by the Presidential Guard forces of the United Arab Emirates, in order to independently ascertain their origin.

# VI.    Implementation of the asset freeze provisions

36.    Pursuant to paragraph 6 (c) and (d) of annex B to resolution 2231 (2015), all States shall freeze the funds, other financial assets and economic resources of the individuals and entities on the list maintained pursuant to resolution 2231 (2015) and ensure that no funds, financial assets or economic resources are made available to those individuals and entities.

37.    It appears that the Defence Industries Organisation, an entity presently on the list maintained pursuant to resolution 2231 (2015), once again participated in a foreign exhibition, the International Aviation and Space Salon held in Zhukovsky, Russian Federation, in July 2017. Its name is on the list of exhibitors released by the organizers and, according to images released by Iranian and Russian media outlets, its official company logo appears on several visual displays next to exhibited items.

38.   The Secretariat raised this issue with the Permanent Mission of the Russian Federation. In November, the Permanent Mission informed the Secretariat that an investigation into the issue had found no action inconsistent with resolution 2231 (2015). The Permanent Mission indicated that no financial transactions had been carried out with the Defence Industries Organisation because no fee had been charged to Iranian participants by the hosts. The Permanent Mission also indicated that all samples of Iranian-made military equipment exhibited were mock-ups that had been returned to the Islamic Republic of Iran after the exhibition.

## VII.   Implementation of the travel ban provision

39.   Pursuant to paragraph 6 (e) of annex B to resolution 2231 (2015), all States are to take the measures necessary to prevent the entry into or transit through their territories of the individuals on the list maintained pursuant to resolution 2231 (2015). At the time of reporting, no travel exemption requests had been received or granted by the Security Council in relation to individuals presently on the list.

40.   Since the issuance of my previous report, additional information has surfaced regarding travel by Major General Qasem Soleimani. In mid-June, pictures of the General on a pilgrimage to the holy shrine of Imam Husayn in the city of Karbala', Iraq, were published by Iraqi media outlets. In October, pictures of him visiting the tomb of the former President of Iraq, Jalal Talabani, in Sulaymaniyah, Iraq, were also published by Iraqi media outlets. In addition, according to media from the Kurdish region of Iraq, the General reportedly visited Iraqi Kurdistan several times in September and October.

41.   Furthermore, in mid-June, pictures showing Major General Soleimani in the Syrian Arab Republic, allegedly with members of the Afghan militia known as the Fatemiyoun Division along the border with Iraq, were published by Iranian media outlets. In early November, pictures of the General, allegedly with members of the Syrian militia known as the Baqir Brigade, in Dayr al-Zawr, Syrian Arab Republic, were reproduced by Arab media outlets. In mid-November, the Iraqi militia known as Harakat Hizbullah al-Nujaba published pictures of the General posing with militia members in the vicinity of Albu Kamal, Syrian Arab Republic. In late November, video footage of him in Albu Kamal after its liberation from ISIL (Da'esh) was reproduced by Arab media outlets.

42.   The Secretariat raised the topic of travel by Major General Soleimani with the Permanent Missions of Iraq and the Syrian Arab Republic to the United Nations. In November 2017, the Permanent Representative of the Syrian Arab Republic informed the Secretariat that his Government had not granted the General any visas to enter the territory of the Syrian Arab Republic.

## VIII.   List maintained pursuant to resolution 2231 (2015)

43.   During the reporting period, the Secretariat was provided with information on an individual who may be acting in support of a designated entity on the list maintained pursuant to resolution 2231 (2015). The Secretariat was also provided with information indicating that another designated entity on the list had used subsidiaries to circumvent the asset freeze provision of annex B to the resolution. The Secretariat is seeking further information and will report to the Security Council in due course. An updated list would facilitate the implementation of the restrictive measures.

S/2017/1030

## IX.  Secretariat support provided to the Security Council and its facilitator for implementation of resolution 2231 (2015)

44.   The Security Council Affairs Division of the Department of Political Affairs continued to support the work of the Security Council, in close cooperation with the facilitator for the implementation of resolution 2231 (2015). The Division also continued to liaise with the Procurement Working Group of the Joint Commission on all matters related to the Procurement Channel. In addition, the Division provided induction briefings for the incoming facilitator and members of the Security Council, to assist them in their work on the implementation of resolution 2231 (2015).

45.   The Division continued to promote publicly available information on the restrictions imposed by resolution 2231 (2015) through the Security Council website.[4] Relevant documents were regularly added to the website and updated in all official languages. The Division also continued to use outreach opportunities to promote information on the resolution, in particular the Procurement Channel, in line with paragraph 6 (e) of the note by the President of the Council dated 16 January 2016. In October 2017, the Division participated in two forums organized by the World Export Controls Review, held in London and Washington, D.C. Also in October 2017, the Secretariat participated in a public awareness-raising workshop on resolution 2231 (2015) and the Procurement Channel, held in Seoul and organized by the International Institute for Strategic Studies. The interactions of the Division with representatives of Member States and private sector entities at these events showed that there remains a general lack of understanding of resolution 2231 (2015), of the restrictive measures that came into force on 16 January 2016, in particular the Procurement Channel process, and of the respective roles of the Joint Commission, the Security Council and its facilitator and the Secretariat. This lack of understanding, as well as a sense of political uncertainty, appears to have adversely affected the decisions of some Member States and private entities to re-engage with the Islamic Republic of Iran in trade activities relating to items, materials, equipment, goods and technology requiring the prior approval of the Security Council.

46.   During the reporting period, the Division continued to respond to queries from Member States and to provide relevant support to Member States regarding the provisions of resolution 2231 (2015), in particular on the procedures for the submission of nuclear-related proposals and the review process.

---

[4]  See www.un.org/en/sc/2231.

United Nations



**Security Council**

S/2018/602

Distr.: General
12 June 2018

Original: English

---

## Implementation of Security Council resolution 2231 (2015)

### Fifth report of the Secretary-General

## I. Introduction

1.  Almost three years ago, China, France, Germany, the Russian Federation, the United Kingdom of Great Britain and Northern Ireland, the United States of America, the European Union and the Islamic Republic of Iran concluded the Joint Comprehensive Plan of Action, marking the culmination of 12 years of intense diplomatic efforts to reach a comprehensive, long-term and proper solution to the Iranian nuclear issue. The Plan, which was unanimously endorsed by the Security Council in its resolution 2231 (2015), laid out reciprocal commitments.

2.  Since 16 January 2016, the International Atomic Energy Agency has reported 11 times to the Security Council that the Islamic Republic of Iran has been implementing its nuclear-related commitments under the Joint Comprehensive Plan of Action. In its most recent quarterly reports (see S/2018/205 and S/2018/540), the Agency again reported that it continued to verify the non-diversion of declared nuclear material and that its evaluations regarding the absence of undeclared nuclear material and activities for the Islamic Republic of Iran remained ongoing. The Agency also reported that the Islamic Republic of Iran continued to provisionally apply the Additional Protocol to its Safeguards Agreement, pending its entry into force, and to apply the transparency measures set out in the Plan. In its latest report, the Agency further indicated that it had conducted complementary accesses under the Additional Protocol to all the sites and locations in the Islamic Republic of Iran that it needed to visit.

3.  Notwithstanding the continued adherence by the Islamic Republic of Iran to its nuclear-related commitments, the agreement is unfortunately at a crossroads. On 8 May 2018, the United States of America announced its withdrawal from the Joint Comprehensive Plan of Action and the re-imposition of all national sanctions that had been lifted or waived pursuant to the Plan. I deeply regret this setback to the Joint Comprehensive Plan of Action, a major achievement in nuclear non-proliferation that has contributed to regional and international peace and security. I believe that issues not directly related to the Plan should be addressed without prejudice to preserving the agreement and its accomplishments.

4.  I take note of the letter dated 11 May 2018 addressed to me by the Minister for Foreign Affairs of the Islamic Republic of Iran (see A/72/869-S/2018/453), in which he indicated that the Islamic Republic of Iran would continue to abide by the

Please recycle 



agreement as long as the full benefits that the Iranian people were entitled to were guaranteed. I welcome the reaffirmation by the remaining participants, on 25 May 2018 in Vienna, of their commitment to the continued, full and effective implementation of the Plan.

5.      It is important to recall that the Security Council, in its resolution 2231 (2015), urged the full implementation of the Joint Comprehensive Plan of Action on the timetable established in the Plan. The Council further called upon all Members States, regional organizations and international organizations to support its implementation and to refrain from actions that undermine the implementation of commitments under the Plan. In this regard, it is important that the withdrawal of one country not impede the ability of others to fully implement their commitments under the Plan or to engage in activities consistent with resolution 2231 (2015) and the provisions and objectives of the Plan.

6.      The Joint Comprehensive Plan of Action is only one part of resolution 2231 (2015). A number of Member States that support the Plan have expressed concerns about Iranian activities allegedly undertaken contrary to the restrictive measures set out in annex B to the resolution. Therefore, I again encourage the Islamic Republic of Iran to carefully consider those concerns.

7.      The present report, the fifth on the implementation of resolution 2231 (2015), provides an assessment of the implementation of the resolution, including findings and recommendations, since the issuance of the fourth report of the Secretary-General (S/2017/1030), on 8 December 2017. Consistent with previous reports, the focus of the present report is on the provisions set forth in annex B to resolution 2231 (2015), which include restrictions applicable to nuclear-related transfers, ballistic missile-related transfers and arms-related transfers to or from the Islamic Republic of Iran, as well as asset freeze and travel ban provisions.

## II.  Key findings and recommendations

8.      Since 8 December 2017, 13 additional proposals to participate in or permit activities with the Islamic Republic of Iran for nuclear or non-nuclear civilian end-uses have been submitted to the Security Council for approval through the procurement channel. Meanwhile, the Secretariat received information from two Member States on the supply, sale, transfer or export to the Islamic Republic of Iran of dual-use items, materials, equipment, goods and technology allegedly undertaken contrary to the provisions of paragraph 2 of annex B to resolution 2231 (2015). The Secretariat has sought clarification on that information from all relevant Member States, and I intend to report back to the Security Council accordingly.

9.      In relation to the above, and on the basis of feedback received by the Secretariat during its outreach activities, I call upon all Member States to continue their efforts to promote awareness and understanding of the procurement channel, the procedures for submission of proposals and the process for their review. The Secretariat stands ready to further assist Member States in such efforts, in line with the arrangements and procedures outlined in the note by the President of the Security Council dated 16 January 2016 (S/2016/44).

10.     The Secretariat has carefully reviewed all information and material available regarding the allegations of the transfer of ballistic missiles, parts thereof or related technology by the Islamic Republic of Iran to the Houthis in Yemen that may have been used in ballistic missile launches aimed at the territory of Saudi Arabia. On the basis of the information and material analysed, it is the assessment of the Secretariat that the debris of five missiles launched at Yanbu' and Riyadh since July 2017 share

key design features with a known type of missile manufactured by the Islamic Republic of Iran. It is also the assessment of the Secretariat that some component parts of the debris were manufactured in the Islamic Republic of Iran. However, the Secretariat has not yet been able to determine when such missiles, parts thereof or related technology may have been transferred from the Islamic Republic of Iran, and in particular whether the transfer(s) occurred after 16 January 2016, the day the restrictions set out in annex B to resolution 2231 (2015) came into force.[1]

11.   In February 2018, Israel brought to my attention information regarding the possible presence of an Iranian unmanned aerial vehicle (UAV) in the Syrian Arab Republic, which Israel stated had been intercepted and shot down after entering Israeli airspace. While the Secretariat has not yet had the opportunity to examine the debris, Iranian media outlets have reported that various Iranian UAVs have been deployed in the Syrian Arab Republic. The Secretariat has no information regarding the owner or operator of that UAV.

12.   The Secretariat was invited to examine arms and related materiel seized by Bahrain after 16 January 2016. The Secretariat also concluded its review of the unmanned surface vessel laden with explosives recovered by the armed forces of the United Arab Emirates. In both instances, the Secretariat is confident that some of the arms and related materiel it examined are of Iranian manufacture. However, it has found no indications of whether those items were transferred from the Islamic Republic of Iran after 16 January 2016.[2]

13.   On 21 May 2018, the political leader of Hamas in the Gaza Strip, Yahya Sinwar, stated in a televised interview that the Islamic Republic of Iran had provided the Izz al-Din al-Qassam Brigades and other armed groups in Gaza with "money, [military] equipment and expertise", including after the 2014 Israel-Gaza conflict. Any Iranian arms transfers after 16 January 2016 would have been undertaken contrary to the provisions of annex B to resolution 2231 (2015).

14.   Iranian entities continue to participate in foreign arms exhibitions, including the Defence Industries Organization, an entity on the list maintained pursuant to resolution 2231 (2015). Since the issuance of my previous report, Major General Qasem Soleimani appears to have continued to travel to Iraq despite the travel ban provisions of the resolution and previous reporting on this issue. I reiterate my call upon all Member States in the region to take the steps necessary to fully implement their obligations in relation to resolution 2231 (2015), including those regarding the travel ban and asset freeze with respect to individuals and entities on the list maintained pursuant to resolution 2231 (2015).

## III.   Implementation of nuclear-related provisions

15.   In its resolution 2231 (2015), the Security Council endorsed the establishment of a dedicated procurement channel, under the Joint Comprehensive Plan of Action, to review proposals by States seeking to engage in certain transfers of nuclear or dual-use goods, technology and/or related services to the Islamic Republic of Iran. Through that channel, the Council reviews and decides on recommendations from the Joint

---

[1]  Any such transfer from the Islamic Republic of Iran between the adoption of Security Council resolution 1737 (2006) and 16 January 2016 would have been subject to paragraph 7 of that resolution. The provisions of resolution 1737 (2006) and those of other previous Security Council resolutions on the Iranian nuclear issue were terminated on 16 January 2016.

[2]  Any such transfer from the Islamic Republic of Iran between the adoption of Security Council resolution 1747 (2007) and 16 January 2016 would have been subject to paragraph 5 of that resolution.

Commission established under the Plan, regarding proposals by States to participate in or permit activities set forth in paragraph 2 of annex B to resolution 2231 (2015).

16.    Since 8 December 2017, 13 new proposals to participate in or permit the activities set forth in paragraph 2 of annex B to resolution 2231 (2015) have been submitted to the Security Council, bringing to 37 the total number of proposals submitted since Implementation Day (16 January 2016) for approval through the procurement channel. At the time of reporting, 24 proposals had been approved by the Council, 3 had been disapproved, 7 had been withdrawn by the proposing States and 3 were currently under review.

17.    In addition, the Security Council received 13 new notifications pursuant to paragraph 2 of annex B to resolution 2231 (2015) for certain nuclear-related activities that do not require approval, but do require a notification to the Council or to both the Council and the Joint Commission.

18.    Since my previous report, the Secretariat received information on the supply, sale, transfer or export to the Islamic Republic of Iran of dual-use items, materials, equipment, goods and technology that may have been undertaken contrary to the provisions of paragraph 2 of annex B to resolution 2231 (2015). In a letter dated 19 April 2018, the Permanent Representative of the United Arab Emirates brought to the attention of the Secretariat information and documents related to four shipments of dual-use items. Those shipments were seized by the authorities of the United Arab Emirates while in transit to the Islamic Republic of Iran in May 2016 and in April, July and December 2017. The authorities of the United Arab Emirates assessed, on the basis of the declared technical specifications or specialized tests, that the items involved (40 cylindrical segments of tungsten, 1 inductively coupled plasma mass spectrometer, 10 capacitors, and 1 titanium rod) met the criteria set out in INFCIRC/254/Rev.10/Part 2 and that their transfer to the Islamic Republic of Iran would have required prior approval from the Security Council.

19.    In addition, on 27 April 2018, the authorities of the United States informed the Secretariat that, in their assessment, two commodities (carbon fibre and aluminium alloys) that had been transferred to the Islamic Republic of Iran over the past year without prior approval from the Security Council met the criteria set out in the above-mentioned information circular.

20.    In response to requests for clarification on the above-mentioned information, several Member States informed the Secretariat that they had initiated internal reviews and would provide additional information as soon as those reviews were concluded. In a letter dated 1 June 2018, the Permanent Representative of the Islamic Republic of Iran stated, inter alia, that it was "the responsibility of the exporting State to seek approval through the procurement channel" and encouraged the Secretariat to undertake more outreach activities to address the lack of awareness among some Member States. I intend to report thereon to the Council in due course as more information becomes available.

# IV.    Implementation of ballistic missile-related provisions

## A.    Restrictions on ballistic missile-related activities by the Islamic Republic of Iran

21.    In paragraph 3 of annex B to resolution 2231 (2015), the Security Council called upon the Islamic Republic of Iran not to undertake any activity related to ballistic missiles designed to be capable of delivering nuclear weapons, including launches using such ballistic missile technology.

22.   In identical letters dated 23 May 2018 addressed to me and the President of the Security Council (S/2018/495), the Permanent Representative of Israel brought to my attention information regarding two flight tests of ballistic missiles by the Islamic Republic of Iran. According to the information provided, a Shahab-3 variant and a Scud variant were flight tested on 2 and 5 January 2018, respectively. The Permanent Representative of Israel considered that those two ballistic missiles were both category I systems under the Missile Technology Control Regime "capable of delivering a nuclear payload of 500 kg with a range of over 300 km," and that their test-firing was in violation of resolution 2231 (2015). In a letter dated 29 May 2018 addressed to me and the President of the Security Council (S/2018/511), the Permanent Representative of the Islamic Republic of Iran stressed that there was no reference to the criteria of the Missile Technology Control Regime in paragraph 3 of annex B to resolution 2231 (2015) and underscored that "none of the ballistic missiles of the Islamic Republic of Iran have been designed to be capable of delivering nuclear weapons".

## B.   Restrictions on ballistic missile related-transfers or activities with the Islamic Republic of Iran

23.   Pursuant to paragraph 4 of annex B to resolution 2231 (2015), all States, provided that they have obtained prior approval from the Security Council, on a case-by-case basis, may participate in and permit the supply, sale or transfer to or from the Islamic Republic of Iran of all items, materials, equipment, goods and technology set out in S/2015/546,[3] the provision of various services or assistance, and the acquisition by the Islamic Republic of Iran of an interest in certain commercial ballistic missile activities. At the time of reporting, no proposal had been submitted to the Council pursuant to that paragraph.

24.   In my previous report, I informed the Council of the possible transfer of ballistic missiles, parts thereof or related technology by the Islamic Republic of Iran to the Houthis in Yemen that may have been used in the ballistic missile launches aimed at the territory of Saudi Arabia on 22 July and 4 November 2017 (see S/2017/1030, paras. 28 and 29). Since then, Saudi authorities have brought to the attention of the Secretariat nine additional launches of ballistic missiles by the Houthis, which, in their assessment, were Iranian Qiam-1 ballistic missiles (see S/2017/1133, S/2018/266, S/2018/337 and S/2018/448).[4]

25.   In letters addressed to me and the Security Council (see S/2018/123, S/2018/145, S/2018/278, S/2018/424 and S/2018/533), the Permanent Representative of the Islamic Republic of Iran stressed that, inter alia, the Islamic Republic of Iran "neither has a policy nor seeks to transfer arms or military equipment in Yemen or manufacture them therein". In addition, he noted that the Yemeni Government had "notable stockpiles of short-range ballistic missiles that could have been utilized by its local expertise as technical bases for further upgrades". In this regard, the Secretariat notes that, in an interview with France 24 on 31 March 2018, the head of the Houthi revolutionary committee, Mohammed Ali Al-Houthi, stated that the Houthis were developing and manufacturing their own missiles based on missiles provided by the former Soviet Union and the Democratic People's Republic of Korea prior to the outbreak of the current conflict.

_____

[3] The items, materials, equipment, goods and technology concerned are those set out in the Missile Technology Control Regime list (S/2015/546, annex) and any items, materials, equipment, goods and technology that the State determines could contribute to the development of nuclear weapon delivery systems.

[4] The nine additional launches reportedly occurred on 19 December 2017 (1), and on 5 January (1), 30 January (1), 25 March (3), 11 April (1) and 9 May 2018 (2).

S/2018/602

26.    During the reporting period, Saudi authorities invited the Secretariat to examine the debris which they stated were of three ballistic missiles launched at its territory on 19 December 2017 and on 5 and 30 January 2018. The Secretariat also had the opportunity to re-examine the debris of the two missiles launched at the territory of Saudi Arabia on 22 July and 4 November 2017. It is the assessment of the Secretariat that the debris of the five missiles share key design features with a known type of missile manufactured in the Islamic Republic of Iran. It is also the assessment of the Secretariat that some component parts in the debris had been manufactured in the Islamic Republic of Iran. However, the Secretariat has not yet been able to determine when such missiles, parts thereof or related technology may have been transferred from the Islamic Republic of Iran, in particular whether the transfer(s) occurred after 16 January 2016.

27.    The Secretariat conducted first-hand and in-depth examinations of debris recovered by Saudi authorities and collected all other information and material available, including photographs and videos of the debris in situ. The Secretariat visited several locations in and around Riyadh to confirm impact sites and that the debris seen in images and videos provided by the Saudi authorities or available on social media corresponded to the debris presented to the Secretariat. Whenever possible, the Secretariat carried out a visual comparison to determine whether the features of the debris of the missiles examined were consistent with those of the missiles seen in the videos of the launches released by the Houthis.

28.    The Secretariat observed that the debris of the missiles airframes were made of aluminium, painted a tan colour and bore similar markings in English script and in white lettering. Other than the debris of the missile launched on 22 July 2017, the Secretariat observed that the airframes had been painted over in blue. The Secretariat further observed that the debris of the five missiles examined had identical internal and external design characteristics, with the following features that are consistent with those of the Scud-B missile and all its variants:

(a)    They were all single stage and liquid-fuelled missiles;

(b)    They had a diameter of 880 mm;

(c)    They were powered by a single-chamber rocket engine fed by a turbopump;

(d)    The steering mechanism consisted of four graphite vanes in the motor exhaust section.

29.    The Secretariat also determined from its observations of the debris that the missiles had the following specific features:

(a)    The fuel and oxidizer tanks were longer than those of the Scud-B missile, while the guidance section was shorter;

(b)    The oxidizer tank was split in two sections and located above the fuel tank;

(c)    The fuel tanks had three external valves, while the oxidizer tanks had six (due to the split sections), bringing the total number of external valves per missile to nine (the positioning pattern was consistent across all five missiles);

(d)    They were finless and had no observable features suggesting that the fins had been removed post-factory production;[5]

_____

[5] On four of the missiles examined, small stabilizers had been affixed to the jet vane housings. Paint and markings observed underneath the stabilizers indicate that they had been added after the tan paint and white markings were applied.

(e)   Retrieved guidance components had been built with modern digital subcomponents;

(f)   They had a separable re-entry vehicle.[6]

30.   On the basis of all available information and material at its disposal, including information and photographs published by Iranian media outlets, it is the understanding of the Secretariat that the above-mentioned features are consistent with those of the Iranian Qiam-1 short-range ballistic missile. In addition, it is the understanding of the Secretariat that the Qiam-1 is the only known Scud variant with nine external valves and without fins.

31.   In addition, all examined jet vane actuators bore the casting of a logo and the abbreviation "S.B.I". The logo matches that of an Iranian entity, Shahid Bagheri Industries.[7] The abbreviation is consistent with the name of that entity. The Secretariat also observed partly burned yellow safety labels with the words "quality assurance" in Farsi and the number "6000" on some actuators parts. Burn marks consistent with the dimensions of those safety labels were observed on the other actuators parts. The Secretariat observed similar yellow safety labels with the number "6000" on other retrieved guidance components. The Secretariat further observed that one printed circuit board in another guidance component was marked "SHIG 6081". As indicated in the list maintained pursuant to resolution 2231 (2015), "SHIG" is a known abbreviation for the Shahid Hemmat Industrial Group, which is reportedly responsible for the liquid-fuelled ballistic missiles programme of the Islamic Republic of Iran.

32.   Moreover, according to the information provided to the Secretariat by foreign manufacturing companies, most of the retrieved guidance subcomponents had been produced between 2002 and 2010.[8] This production date range is incompatible with that of the Scud missiles provided by the former Soviet Union and the Democratic People's Republic of Korea to Yemen and that were known to be in Yemeni stockpiles prior to the outbreak of the current conflict in early 2015. The latest delivery of Scud missiles to Yemen by the Democratic People's Republic of Korea reportedly occurred in late 2002.[9]

33.   Pursuant to paragraph 4 of annex B to resolution 2231 (2015), since 16 January 2016, prior approval of the Security Council is also required for, inter alia, the supply, sale or transfer from the Islamic Republic of Iran of complete UAV systems (including target drones and reconnaissance drones) capable of a range equal to or greater than 300 km.[10] In identical letters dated 10 February 2018 addressed to me and the President of the Security Council (S/2018/111), the Permanent Representative of Israel stated that the UAV intercepted and downed that same day after entering Israeli airspace was an Iranian UAV launched from a site in eastern Homs, Syrian Arab Republic. In follow-up identical letters dated 13 April 2018 addressed to me and the President of the Security Council (S/2018/349), the Permanent Representative of Israel indicated that further analysis of its flight path and debris had led Israeli authorities to conclude that the UAV "was armed with explosives and was intended to attack Israeli territory". In letters dated 20 February and 9 May 2018 addressed to me and the President of the Security Council (S/2018/142 and S/2018/445), the

_____

[6] According to videos of the launches released by the Houthis, the separable re-entry vehicle had a triconic shape.

[7] As seen on the website www.shahidbagheri.ir/, accessed through the website of Wayback Machine (https://web.archive.org/).

[8] Some subcomponents had been produced in the 1990s. None appears to have been produced after July 2010.

[9] See "Yemeni rebels enhance ballistic missile campaign", Jane's Intelligence Review, 10 July 2017.

[10] See S/2015/546, item 19.A.2.

Permanent Representative of the Islamic Republic of Iran stated that the aforementioned letters from the Permanent Representative of Israel contained "misleading information and accusations". The Permanent Representative of the Islamic Republic of Iran further stated that "operational details that were provided to the Government of the Islamic Republic of Iran illustrate that the unmanned aerial vehicle was flying inside Syria near the border with Jordan and the occupied Palestinian territories for the purpose of monitoring and surveillance of ISIL and other terrorist groups there", and that it had been unarmed and not intended to engage in an attack anywhere.

34.　Images of the debris of the UAV downed on 10 February 2018 provided to the Secretariat by Israeli authorities showed that its wing configuration appeared to be consistent with that of the Iranian Saeʾqeh (Thunder) UAV, which, according to Iranian media outlets, had been unveiled in October 2016.[11] According to information provided by Israeli authorities, the UAV flew at a range that meets the specified criteria before its interception. No information is available to the Secretariat as to the owner or operator of that UAV. The Secretariat notes that, according to Iranian media outlets, other UAVs, including the Shahed-129, had been previously deployed by the Islamic Republic of Iran in the Syrian Arab Republic.[12] It is also the understanding of the Secretariat that the Shahed-129 meets the specified range criteria. One Shahed-129 was reportedly shot down in southern Syrian Arab Republic on 20 June 2017.[13]

# V.　Implementation of arms-related provisions

## A.　Restrictions on arms-related transfers to the Islamic Republic of Iran

35.　As stipulated in paragraph 5 of annex B to resolution 2231 (2015), all States, provided that they have obtained prior approval from the Security Council, on a case-by-case basis, may participate in and permit the supply, sale or transfer to the Islamic Republic of Iran of any battle tanks, armoured combat vehicles, large-calibre artillery systems, combat aircraft, attack helicopters, warships, missiles or missile systems, as defined for the purpose of the United Nations Register of Conventional Arms, or related materiel, including spare parts. Prior approval from the Council is also required for the provision to the Islamic Republic of Iran of technical training, financial resources or services, advice, other services or assistance related to the supply, sale, transfer, manufacture, maintenance or use of those arms and related materiel. At the time of reporting, no proposal had been approved by the Council pursuant to that paragraph.

36.　In a letter dated 15 May 2018, the Permanent Representative of Ukraine indicated to the Secretariat that the Security Service of Ukraine had prevented an attempt by two Iranian nationals to procure and transfer to the Islamic Republic of Iran component parts of the "Kh-31" (AS-17 "Krypton") air-to-surface missile and

---

[11] For example, see Mehr News Agency, "IRGC inaugurates its latest drone 'Thunder'", 1 October 2016. Available from https://en.mehrnews.com/news/120176/IRGC-inaugurates-its-latest-drone-Thunder.

[12] See Fars News Agency, "Iran's Shahed-129 drone in combat operations in Syria", 4 February 2016. Available at http://en.farsnews.com/newstext.aspx?nn=13941115000734; and Mehr News Agency, "Iran's Mohajer-6, Qaem bomb deadly weapons against terrorists", 10 February 2018. Available at https://en.mehrnews.com/news/132045/Iran-s-Mohajer-6-Qaem-bomb-deadly-weapons-against-terrorists.

[13] See U.S. Central Command, "Coalition shoots down armed UAV in Syria", 20 June 2017. Available at http://www.centcom.mil/MEDIA/PRESS-RELEASES/Press-Release-View/Article/1219863/coalition-shoots-down-armed-uav-in-syria/.

related technical documents. The Permanent Representative noted in his letter that no Ukrainian individual or entity had engaged in an illegal activity or action inconsistent with resolution 2231 (2015). The letter further noted that that missile type had not been in use in Ukraine since 1991 and that all remaining component parts were stored under the proper control of its armed forces.

## B.   Restrictions on arms-related transfers from the Islamic Republic of Iran

37.   In paragraph 6 (b) of annex B to resolution 2231 (2015), the Security Council decided that all States were to take the necessary measures to prevent, except as decided otherwise by the Council in advance on a case-by-case basis, the supply, sale or transfer of arms or related materiel from the Islamic Republic of Iran. At the time of reporting, no proposal had been submitted to the Council pursuant to that paragraph.

38.   In a letter dated 24 May 2017, the Permanent Representative of Bahrain brought to the attention of the Secretariat information regarding multiple seizures of arms and related materiel in Bahrain after 16 January 2016 that, in its assessment, had been produced by the Islamic Republic of Iran and transferred in a manner inconsistent with paragraph 6 (b) of annex B to resolution 2231 (2015). The authorities of Bahrain invited the Secretariat to examine those items in May 2018. The Secretariat observed that two assault rifles and ammunition rounds had characteristics of the Iranian-produced KL 7.62 x 39 mm assault rifles (featuring furnishing made of dark brown synthetic material, fire selector and rear sight markings, slanted screw-on compensator and dot-peen marking style) and 7.62 x 39 mm ammunition (featuring brass cartridge case and green primer annulus lacquer, and identifiable by the nature, position and format of the head stamp markings). The Secretariat also observed that three hand grenades, the packaging of C-4 explosive blocks, and electronic and electrical equipment that could be used to manufacture improvised explosive devices, were similar to those found in various arms shipments seized previously and assessed to have been shipped from the Islamic Republic of Iran. While the Secretariat is confident that some of the arms and related materiel it examined in May 2018 were manufactured in the Islamic Republic of Iran, it has found no indication of whether those items were transferred from the Islamic Republic of Iran after 16 January 2016. The Secretariat is still analysing other information collected and will report back to the Security Council, as appropriate, in due course.

39.   The Secretariat obtained additional information on the unmanned surface vessel laden with explosives recovered by the armed forces of the United Arab Emirates (see S/2017/1030, para. 34). In a letter dated 12 March 2018, the Permanent Representative of the United Arab Emirates confirmed to the Secretariat that the vessel had been recovered on 19 September 2016, six miles east of the port of Assab, Eritrea (and not in Yemeni waters as previously indicated to the Secretariat). The Secretariat was provided with the opportunity to examine the vessel and to re-examine the guidance and detonation systems. In both the computer and the dome camera (both integral parts of the guidance system), the logo and/or name of an Iranian entity that produces terminals with characteristics similar to those found in the vessel were observed. The Secretariat confirmed that some of the previously presented photographs and geographical coordinates, including for locations in Tehran and in Iranian territorial waters, had originated from the recovered hard drive of the computer found in the unmanned surface vessel. However, the Secretariat could not confirm the actual dates on which they had been captured. The Secretariat has also received documentary evidence indicating that identical fuse plates and detonation device boosters seized in a separate incident had been shipped from the Islamic Republic of Iran (see S/2017/1030, para. 33). The Secretariat is confident that at least

parts of the detonation and guidance systems of the unmanned surface vessel had been manufactured in the Islamic Republic of Iran. However, no indications have been found of whether those items were transferred from the Islamic Republic of Iran after 16 January 2016.

40.   In March 2018, the Secretariat was invited by the authorities of the United Arab Emirates to examine UAVs reportedly recovered in Yemen after 16 January 2016, which, in their assessment, were Iranian-made and had been transferred from the Islamic Republic of Iran in a manner inconsistent with resolution 2231 (2015). One was a composite assembly of parts from various seizures. The other one had reportedly crashed in Mukhaʻ, Yemen, in February 2018. The Secretariat observed that those were identical to the one examined during the previous reporting period (see S/2017/1030, para. 35) and had the same design features as the Iranian-made Ababil-2 UAV (featuring a pusher propeller, high-mounted canards at the front and larger wings at the rear, each fitted with a vertical stabilization fin with a rudder).[14] They had similar serial number prefixes and were built using identical material, component and subcomponent parts. The Secretariat is still analysing the information collected on all three vehicles and will report back to the Security Council, as appropriate, in due course.

41.   In identical letters dated 10 and 23 May 2018 addressed to me and the President of the Security Council (S/2018/443 and S/2018/495), the Permanent Representative of Israel stated that rockets launched from the Syrian Arab Republic towards Israel on 10 May 2018 had been launched "by the Quds Force of the Iranian Revolutionary Guard" and constituted an "Iranian breach" of resolution 2231 (2015). In a letter dated 14 May 2018 addressed to me and the President of the Security Council (S/2018/459), the Permanent Representative of the Islamic Republic of Iran recalled the identical letters dated 10 May by the Chargé d'affaires a.i. of the Permanent Mission of the Syrian Arab Republic (S/2018/447), in which it had been indicated that the Syrian Army had exercised its right to self-defence, and stated that the claim by Israeli authorities of "military action by Iran from the Syrian territory against their military positions in the occupied Golan Heights is false and unfounded".

42.   In identical letters dated 28 November 2017 addressed to me and the President of the Security Council (S/2017/1000), the Permanent Representative of Israel expressed concern at what he said was a statement by the Commander of the Iranian Islamic Revolutionary Guard Corps, Major General Mohamed Ali Jafari, which he said expressed "Iran's intentions and actions taken to continue arming Hizbullah" in violation of Security Council resolutions, including resolution 2231 (2015). In response, in a letter dated 5 December 2017 addressed to me (S/2017/1019), the Permanent Representative of the Islamic Republic of Iran accused Israel of making "false and baseless accusations".

43.   In a televised interview broadcasted on 21 May 2018, the political leader of Hamas in the Gaza Strip, Yahya Sinwar, stated that the Islamic Republic of Iran had provided the Izz al-Din al-Qassam Brigades and other armed groups in Gaza with "money, [military] equipment and expertise" before and after the 2014 Israel-Gaza conflict.[15] That statement suggests that transfers of arms and related materiel from the Islamic Republic of Iran may have been undertaken contrary to the provisions of annex B to resolution 2231 (2015).

44.   It appears that Iranian entities continue to exhibit what appears to be arms and related materiel in foreign exhibitions. Information released by the organizers of the seventh International Defence Exhibition in Iraq, held in Baghdad from 10 to

---

[14] Catalogue of the Export Centre of the Ministry of Defence of the Islamic Republic of Iran. Available at http://www.mindexcenter.ir/product/ababil-2-uav-system.

[15] Available at http://www.almayadeen.net/episodes/880421/حوار-خاص--يحيى-السنوار--حركة-سماح-في-غزة.

13 March 2018, indicates that several Iranian entities participated in the exhibition for the third year in a row. Items displayed by those entities during previous exhibitions appeared to include small arms, artillery ammunition, rockets, anti-tank guided missiles and man-portable air defence systems. Furthermore, information released by the organizers of the Eurasia Airshow 2018, held in Antalya, Turkey, from 25 to 29 April 2018, indicates that several Iranian entities participated in that exhibition. According to Iranian media outlets, the items exhibited included reconnaissance drones. [16] The Secretariat raised these issue with the Permanent Missions of Iraq and Turkey to the United Nations. The Permanent Mission of the Islamic Republic of Iran had previously stated that it had believed that no prior approval had been required from the Security Council for that activity since the Islamic Republic of Iran retained ownership of the items exhibited. I intend to report thereon to the Council in due course as additional information becomes available.

## VI.  Implementation of the assets freeze provisions

45.    Pursuant to paragraphs 6 (c) and (d) of annex B to resolution 2231 (2015), all States shall freeze the funds, other financial assets and economic resources of the individuals and entities on the list maintained pursuant to resolution 2231 (2015)[17] and ensure that no funds, financial assets or economic resources are made available to those individuals and entities.

46.    It appears that an entity presently on the list maintained pursuant to resolution 2231 (2015), the Defence Industries Organization, may have participated again in the International Defence Exhibition in Iraq, which was held in March 2018 (see para. 44 above). Its name is on the exhibitors list released by the organizers of the exhibition. Any of the entity's funds, other financial assets and economic resources on Iraqi territory, on or after the date of adoption of the Joint Comprehensive Plan of Action, should have been frozen by the Iraqi authorities. The issue has been raised again with the Permanent Mission of Iraq to the United Nations, and I will provide an update thereon to the Council in due course.

47.    It also appears that another entity on the list maintained pursuant to resolution 2231 (2015), Khatam al-Anbiya Construction Headquarters, signed a memorandum of understanding in 2017 with the Syrian Engineers Syndicate "for joint cooperation in building sector, services and developmental projects, training cadres, conducting researches and holding symposiums".[18] The Syrian authorities are to ensure that any funds, financial assets or economic resources are prevented from being made available by their nationals or by any individuals or entities within their territories, to or for the benefit of the entity. The Secretariat has sought clarification from the

---

[16] Fars News Agency, "Iran displays 2 reconnaissance drones in Eurasia 2018 Airshow in Turkey", 25 April 2018. Available at http://en.farsnews.com/newstext.aspx?nn=13970205001259.

[17] Available at www.un.org/en/sc/2231/list.shtml. The list maintained pursuant to resolution 2231 (2015) includes the individuals and entities specified on the list established under resolution 1737 (2006) and maintained by the Security Council Committee established pursuant to resolution 1737 (2006), as at the date of adoption of resolution 2231 (2015), with the exception of 36 individuals and entities specified in the attachment to annex B to resolution 2231 (2015), who had been delisted on Implementation Day. The Council can delist individuals or entities, and list additional individuals and entities found to meet certain designation criteria defined by resolution 2231 (2015). There are currently 23 individuals and 61 entities on the list maintained pursuant to resolution 2231 (2015).

[18] Syrian Arab News Agency, "Syria, Iran to enhance cooperation on urban development", 26 September 2017. Available at https://sana.sy/en/?p=114661; and Financial Tribune, "Iran seeking role in Syria's power grid reconstruction", 7 November 2017. Available at https://financialtribune.com/articles/energy/75756/iran-seeking-role-in-syrias-power-grid-reconstruction.

Permanent Mission of the Syrian Arab Republic. I intend to report thereon to the Council in due course.

## VII. Implementation of the travel ban provision

48.    Pursuant to paragraph 6 (e) of annex B to resolution 2231 (2015), all States are to take the measures necessary to prevent the entry into or transit through their territories of the individuals on the list maintained pursuant to resolution 2231 (2015). At the time of reporting, no travel exemption requests had been received or granted by the Security Council in relation to individuals presently on the list.

49.    Since the issuance of my previous report, additional information has surfaced regarding travel by Major General Soleimani. According to Iraqi media outlets, the General reportedly travelled to Baghdad in mid-May 2018. The Secretariat sought clarification from the Permanent Mission of Iraq.

## VIII. Secretariat support provided to the Security Council and its Facilitator for implementation of resolution 2231 (2015)

50.    The Security Council Affairs Division of the Department of Political Affairs has continued to support the work of the Security Council, in close cooperation with the Facilitator for the implementation of resolution 2231 (2015). The Division has also continued to liaise with the Procurement Working Group of the Joint Commission established in the Joint Comprehensive Plan of Action on all matters related to the procurement channel. In addition, the Division has provided induction briefings for the incoming Facilitator and members of the Security Council to assist them in their work on the implementation of resolution 2231 (2015).

51.    Through the Security Council website, the Division continued to promote the dissemination of publicly available information on the restrictions imposed by resolution 2231 (2015).[19] Relevant documents in all official languages were regularly added to and updated on the website. The Division also continued to use outreach opportunities to promote the dissemination of information on the resolution, in particular the procurement channel, in line with paragraph 6 (e) of the note by the President of the Council dated 16 January 2016 (S/2016/44). In February 2018, the Division participated in the Twenty-fifth Asian Export Control Seminar, held in Tokyo, and jointly organized by the Centre for Information on Security Trade Controls, the Ministry of Economy, Trade and Industry and the Ministry of Foreign Affairs. In April 2018, the Division also participated in an outreach event, organized by the Permanent Mission of the Netherlands to United Nations organizations in Vienna and hosted by the Vienna Centre for Disarmament and Non-Proliferation, on the margins of a meeting of the Nuclear Suppliers Group. The interactions of the Division with representatives of Member States and private sector entities during those events showed that outreach activities remained important to increasing awareness and allaying misunderstandings with respect to provisions set out in annex B to resolution 2231 (2015), including regarding the procurement channel, and the actors involved in the implementation of the resolution and their respective roles.

52.    During the reporting period, the Division continued to respond to queries from Member States and to provide relevant support to Member States regarding the provisions of resolution 2231 (2015), in particular on the procedures for the submission of nuclear-related proposals and the review process.

_____

[19] See http://www.un.org/en/sc/2231/.

# YEMEN 2015 HUMAN RIGHTS REPORT

*Note: This report was updated 4/25/16; see Appendix F: Errata for more information.*

## EXECUTIVE SUMMARY

Yemen is a republic with a constitution that provides for a president, a parliament, and an independent judiciary.  Former president Ali Abdullah Saleh stepped down in 2012 when voters elected Abd Rabbuh Mansur Hadi, the sole consensus candidate, as president in a vote generally considered free and fair.  The transitional government sought to expand political participation to formerly excluded groups, including women, youth, and minorities.  Progress ended when Ansar Allah forces, a movement of Houthi rebels backed by former president Saleh, staged an armed takeover against the government in 2014, precipitating its exile.  Houthi rebel actors exerted significant control and influence over government institutions, including the security forces; the government-in-exile exercised limited control over some security forces.

On January 22, Houthi-Saleh rebels seized the presidential palace and other government buildings in Sana'a.  The Houthis placed President Hadi under house arrest, and Prime Minister Khaled Bahah and his cabinet resigned.  On February 6, the movement illegally disbanded parliament and attempted to establish the appointive Supreme Revolutionary Committee as the highest governing authority. In March, President Hadi requested Arab League and Gulf Cooperation Council (GCC) military intervention, invoking Article 51 of the UN Charter, and fled the country the following day.  A Saudi-led coalition launched air and ground operations against the Houthi rebels.  Peace talks led by the UN special envoy for Yemen began in December.

The most significant human rights problems were arbitrary killings, disappearances, kidnappings, and other violence committed by various groups, as well as a corrupt judicial system that did not provide for the rule of law, further weakened after the Houthi-Saleh takeover.  The internationally recognized government-in-exile lacked the capacity to enforce laws protecting against human rights abuses, particularly after its exile in March.

Other human rights abuses included the use of excessive force and torture by security forces; cruel, inhuman, or degrading treatment or punishment; poor prison conditions; arbitrary arrest and detention; lengthy pretrial detentions; infringements

on citizens' privacy rights; limits on freedom of speech, press, assembly, association, religion, and movement; lack of transparency; corruption; violence and discrimination against women, children, persons with disabilities, and minorities; use of child soldiers; restrictions on worker rights; and trafficking in persons to include forced labor.  Government and Saudi-led coalition delays or denials of permits for commercial and humanitarian aid shipments bound for rebel-held ports exacerbated a deteriorating humanitarian situation, where a reported 82 percent of the population required aid.  Air strikes by the Saudi-led coalition resulted at times in civilian casualties and damage to infrastructure, including destruction of a medical facility operated by Doctors without Borders.  The unstable security situation significantly complicated efforts to assess human rights practices.

Impunity was persistent and pervasive.  Security forces remained essentially immune from civilian oversight.  Expanded Houthi-Saleh influence over government institutions severely reduced the government-in-exile's capacity to conduct investigations.

Nonstate actors committed significant abuses while engaged in internal armed conflict.  Groups included:  Houthi-Saleh rebels; tribal militias; resistance forces; militant secessionist elements; al-Qaeda in the Arabian Peninsula (AQAP); and a local branch of Da'esh, also known as the Islamic State in Iraq and the Levant.  Few actions led to prosecutions.

*Note:  This report draws heavily on non-U.S. Government sources.  The United States Embassy in Sana'a suspended operations and withdrew all U.S. Government personnel from Yemen on February 10.*

**Section 1. Respect for the Integrity of the Person, Including Freedom from:**

**a. Arbitrary or Unlawful Deprivation of Life**

The government-in-exile exercised limited control over military and security forces due to Houthi rebel influence.  Competing family, tribal, party, and sectarian influences also affected the government-in-exile's ability to control military and other security forces.  During the year military and other security forces loyal to the government-in-exile battled with Houthi-Saleh forces.  For additional information on deaths resulting from the ongoing conflict, see section 1.g.

There were numerous unconfirmed reports that current or former members of the security forces committed arbitrary or unlawful killings.  Security forces, some

affiliated with the former regime, and armed groups operated outside the law and committed human rights abuses.

Politically motivated killings by nonstate actors increased significantly during the year.  Such actors included Houthi-Saleh rebel forces and terrorist and insurgent groups claiming affiliation with AQAP or Da'esh.  Prior to the Houthi takeover in Sana'a in 2014, the number of killings involving gunmen on motorcycles increased to the extent that the government banned motorcycles in that city; rebels reportedly did not continue that ban in areas under their control during the year.

In August the Yemeni Coalition to Monitor Human Rights Violations (YCMHRV), a government-funded NGO created to document Houthi-Saleh violations, reported that Houthi and pro-Saleh forces killed 11 detainees, including Amin Nagi al-Ragawi of the Islah Party and two journalists whose views the rebels found objectionable, on Jabal Hirran in Dhamar Governorate between December 2014 and August.

In August, AQAP militants carried out public executions in Ta'iz, according to press reports.

In January an unknown perpetrator detonated a bomb outside a police academy in Sana'a, killing 37 persons and wounding 66.  The blast targeted a line of prospective cadet enrollees, according to Human Rights Watch and the Henry Jackson Society.

Da'esh, emerging in Yemen this year, claimed responsibility for a series of attacks on Houthi-affiliated Shia mosques.  See the *International Religious Freedom Report* at www.state.gov/religiousfreedomreport/.  On December 3, Da'esh-affiliated militants executed two members of the Awlaki tribe in Seiyun in Hadramawt Province after kidnapping them, according to a senior tribesman.

On August 30, unidentified gunmen on a motorcycle shot and killed the chief of security operations in Aden, Colonel Abd al-Hakim al-Sunaydi, in the city's al-Mansurah district, according to several media reports.

In September media reported the killing of al-Hudaydah University Secretary-General Hassan Said Abd al-Wadud by unknown assailants who threw a hand grenade into his passing car.  On September 4, unknown assailants shot and killed human rights activist Anwar al-Wazir in Ta'iz Governorate, according to media reports.

On the evening of September 6, unknown assailants shot and killed Popular Resistance leader Abdullah al-Zanqari in Aden, the fourth killing of a resistance leader in the city in a week, according to media reports.

Impunity for security officials remained a problem, in part because the government-in-exile exercised limited authority over officials implicated in committing abuses and using excessive force.

## b. Disappearance

During the year there were reports of politically motivated disappearances and kidnappings of individuals associated with political parties, NGOs, and media outlets critical of various security forces within the government, as well as others reportedly kidnapped for supporting the Houthis in the north or the Hirak separatist movement in the south (see section 1.g.). The incidence of kidnapping of citizens increased during the year because of deteriorating security in many areas. Houthi-Saleh rebels and their allies sometimes detained individuals' civilian family members. Nonstate actors targeted foreigners, including those believed to be working for foreign diplomatic missions.

Abductions were difficult for foreign entities to verify, unless they involved a foreigner or government official. Many unofficial groups abducted persons to achieve specific goals. During the period September 2014 to August 15, Houthi and pro-Saleh forces and their allies arbitrarily detained 5,894 persons in 17 governorates, 900 of them in Aden; by the end of that period, the captors had released 4,640 of the detainees and continued to hold 1,254, according to the YCMHRV (see section 1.g., Abductions).

On January 17, Houthi forces kidnapped then presidential advisor Ahmed bin Mubarak while he was delivering the draft constitution to a national review body in Sana'a, releasing him later that month. As of November no authority had investigated the case or arrested suspects, according to the government-in-exile.

In March, Houthi fighters detained three men at a military base in Lahij who were delivering medical supplies to a pharmacy connected to al-Jumhuri Hospital in Aden and accused them of delivering medicine to Da'esh-backed groups.

On April 18, Houthi-Saleh forces abducted Sana'a University professor of political science Abd al-Majid al-Mikhlafi and his son Fikri at Haradh on the border with

Saudi Arabia, according to the YCMHRV.  Al-Mikhlafi's captors freed him on August 17, according to media reports; no information was available about Fikri al-Mikhlafi.

In September the Houthi-controlled National Security Bureau (NSB) released three Saudi, two American, and one British hostage; the American hostages had been held 177 days, according to media reports.

In February tribal forces kidnapped French aid worker Isabelle Prime and her interpreter; they released them in August.

In August a UAE military operation freed British petroleum engineer Douglas Robert Semple, who AQAP had kidnapped in February 2014 in Hadramawt Governorate, according to press reports.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The constitution prohibits torture and other such abuses.  Although the law lacks a comprehensive definition of torture, there are provisions allowing jail terms of up to 10 years for acts of torture.

Prior to its exile, there were reports that the government's security officials committed abuses.  Human rights NGOs, former detainees, and prisoners alleged that torture and mistreatment occurred frequently during arrests or detentions.

There were also reports of abuses by elements of the Houthi-Saleh security forces and in institutions under their control.  Torture and other forms of mistreatment were common in Houthi-Saleh detention facilities, according to the YCMHRV, which documented 796 cases in 16 of the country's 21 governorates and the capital Sana'a from September 2014 to August 15.  On January 31, Houthi forces abducted activist Fuad Ahmed al-Hamdani while he participated in a peaceful protest and detained him for 143 days.  YCMHRV monitors claimed Houthi forces tortured him, based on the injuries they observed when they visited him in detention on February 15 and after his release.  According to al-Hamdani, his captors subjected him to extreme physical discomfort through contortion, beat him on the thighs and hips with an iron rod until he lost consciousness, and forced him to pledge not to organize demonstrations.

On February 11, Houthi militia detained three men in Sana'a after they attempted to join a peaceful protest marking the anniversary of the 2011 revolution, and tortured them, according to Human Rights Watch and the YCMHRV. One victim, Saleh Awad al-Bushri, died within hours of his release, according to YCMHRV monitors who observed injuries sustained during his detention (see section 1.a.).

In August unconfirmed social media reports described the mutilation of Houthi rebels by fighters loyal to the government-in-exile.

According to the government-in-exile, a group of AQAP fighters killed approximately 10 progovernment fighters before detaining a group of Houthi snipers, torturing them, and mutilating them.

**Prison and Detention Center Conditions**

Prison conditions were harsh and life threatening and did not meet international standards. Prisoners lacked many basic needs. The government-in-exile exercised no effective control over prison facilities during the year. In past years government officials and NGOs identified overcrowding, lack of professional training for corrections officials, poor sanitation, inadequate access to justice, intermingling of pretrial and convicted inmates, lack of effective case management, lack of funding, and deteriorating infrastructure as problems within the 18 central prisons and 25 reserve prisons (also known as pretrial detention centers). Authorities held prisoners with physical or mental disabilities with the general population with no special accommodations.

Houthi-Saleh rebels seized control of most prisons, according to the government-in-exile, and released many convicted criminals; they also engineered several jailbreaks from facilities they did not control. Under Houthi-Saleh management, prisons and other places of detention failed to meet minimum health or hygiene standards, according to YCMHRV monitors who visited Houthi-run facilities in Sana'a during the year.

Tribes in rural areas operated unauthorized "private" prisons and detention centers based on traditional tribal justice. Tribal leaders sometimes placed "problem" tribesmen in private jails, sometimes simply rooms in a sheikh's house, to punish them for noncriminal actions. Tribal authorities often detained persons for personal or tribal reasons without trial or judicial sentencing.

**YEMEN** 7

<u>Physical Conditions</u>:  Under the transitional government, the Ministry of Interior acknowledged prison conditions did not meet international standards but stated the government could not afford improvements.  After the Houthi rebel takeover, information on prison conditions and population was limited.

No information was available on prison populations post Houthi-Saleh takeover during the year.  In 2014 human rights NGOs reported that 70 percent of detainees either awaited trial or were remanded subject to investigation.  In some rural and women's prisons, as well as in some prisons in the capital, local NGOs reported that prison authorities held juveniles with adults.  Until the government's exile, the Ministry of Human Rights made efforts to separate juvenile detainees from adults, although overcrowding and financial constraints limited progress.  By custom young children and infants born in prison remained in custody with their mothers until age nine.  Prison authorities performed pregnancy tests on all female prisoners upon entry into a facility.  Prisons segregated male and female adult prisoners and subjected them to similar conditions.

Political prisoners reportedly faced torture, abuse, and other forms of mistreatment, while all prisoners experienced harsh physical conditions.  In 2014 the NGO National Organization for Defending Rights and Freedoms (HOOD) claimed bribery and corruption played major roles in prison mismanagement, and prisoners who paid bribes received better services and benefits.  Observers described most prisons, particularly in rural areas, as overcrowded, with poor sanitary conditions, inadequate food and access to potable water, and inadequate medical care.

Houthi rebels reportedly chained detainees to toilets for months, denied them water, and prevented them from performing their prayers, according to former detainees.

On October 19, riots reportedly broke out in al-Hudaydah's central prison to protest overcrowding and the mistreatment of a prisoner, according to media reports.  The riots continued until at least October 20, when security forces, assisted by Houthi militia, used bullets and tear gas to disperse a demonstration in the central courtyard.  Ten prison guards were injured.

No credible statistics were available on the number of inmate deaths during the year.

The continuing conflict negatively affected the condition of prisons.  On April 2, AQAP militants stormed a prison in al-Mukalla in Hadramawt Governorate and

freed at least 270 prisoners, according to media reports. Two guards and five inmates died during the incident. There were no reports of subsequent recapture of any of those freed.

On June 30, AQAP militants stormed the central prison in Ta'iz, freeing an estimated 1,200 prisoners, according to rebel-controlled media. There were no reports of subsequent recapture of any of those freed.

On October 24, tribesmen from al-Muflahi reportedly attacked Aden's central al-Mansurah prison, using a rocket-propelled grenade. One guard, a member of the resistance loyal to the government-in-exile, died in the attack, according to media sources. The breach reportedly led to the escape of Ghassan al-Muflahi, a prisoner accused of attempting to bomb the offices of former Aden Governor Nayif al-Bakri; unknown assailants had attempted to free al-Muflahi two months previously, according to the reports.

Administration:  No information was available on prison administration after the Houthi-Saleh takeover during the year. Poor recordkeeping and a lack of communication between prisons and the central government made it difficult for authorities to estimate accurately the size of the prison population. Prior to the government's exile, a restructuring of prison administration also impeded improvement in recordkeeping. Many prisoners faced prolonged stays in detention beyond their sentences if they or their families could not pay fines or provide expected bribes.

The transitional government recognized the need to find alternatives to incarceration for nonviolent offenders, but had taken no action by the time of the Houthi takeover. There was no ombudsman to serve on behalf of prisoners and detainees. Under past practice prisoners could submit complaints to judicial authorities, but according to NGO reports, authorities would largely ignore such complaints. Authorities generally allowed prisoners and detainees visitors when family members knew a detainee's location but granted limited access to family members of security-offense prisoners and detainees. They generally allowed prisoners and detainees religious observance.

Independent Monitoring:  The ongoing conflict prevented substantial prison monitoring by independent human rights observers such as the International Committee of the Red Cross (ICRC), although YCMHRV had limited access to some prisons.

## d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention, but both continued to occur.  The law prohibits arrests or serving subpoenas between sundown and dawn, but local NGOs reported that authorities took some persons suspected of crimes from their homes at night without warrants.  Security forces remained largely under the control of Houthi rebels as of year's end.

## Role of the Police and Security Apparatus

By law the primary state security and intelligence-gathering entities, the Political Security Organization (PSO) and the NSB, report first to the minister of interior and then the president.  The relationship and coordination efforts between the NSB and PSO are unclear.  There was no clear definition of many of the NSB's priorities.  The law charges the PSO with identifying and combating political crimes and acts of sabotage.  These institutions came under Houthi-Saleh control following the Houthi-Saleh rebel takeover of Sana'a in September 2014, although their structure appeared to remain the same.

The Criminal Investigation Division reports to the Ministry of Interior and conducted most criminal investigations and arrests.  The ministry's paramilitary Special Security Force (SSF), often responsible for crowd control, was under the direct authority of the interior minister, along with the counterterrorism unit.  The Ministry of Defense also employed units under its formal supervision to quell domestic unrest and to participate in internal armed conflicts.

The SSF, Yemen Special Operations Forces, Presidential Guard (formerly the Republican Guard), NSB, and other security organs ostensibly reported to civilian authorities in the Ministry of Interior, Ministry of Defense, and the Office of the President; however, security institutions in Sana'a and other rebel-occupied areas of the country operated with increased impunity during the year.  Civilian control of these agencies deteriorated as rebel actors undid restructuring efforts inspired by the GCC Initiative (GCC-I), a regional effort to promote national reconciliation.  Interest groups, including former president Saleh's family and other tribal and party entities, expanded their influence over these agencies, often through unofficial channels rather than through the formal command structure.  Such influence, coupled with a lack of effective mechanisms to investigate and prosecute abuse and corruption, exacerbated the problem of impunity.

## Arrest Procedures and Treatment of Detainees

The law provides that authorities cannot arrest an individual unless they apprehend him while he is committing a criminal act or have served him with a summons. Additionally, authorities must arraign a detainee must within 24 hours or release him.  The judge or prosecuting attorney, who decides whether detention is required, must inform the accused of the basis for the arrest.  The law stipulates authorities may not hold a detainee longer than seven days without a court order. The government-in-exile exercised no effective control over the responsible institutions within the country.

The law contains provisions for bail, but no information was available on their systemic application; in the past some authorities abided by these provisions only if they received a bribe.  The law prohibits incommunicado detention, provides detainees the right to inform their families of their arrest, and allows detainees to decline to answer questions without an attorney present, but no information was available on systemic practice; in the past authorities did not always respect these rights.  The law states the government must provide attorneys for indigent detainees, but no information was available on systemic practice; in the past the government often did not do so.  Tribal mediators commonly settled rural cases without reference to the formal court system.

Detainees often did not know which investigating agency arrested them, and the agencies frequently complicated matters by unofficially transferring custody of individuals among entities.  Prior to the rebel takeover, security forces routinely detained relatives of fugitives as hostages until the fugitive was located. Authorities stated that they detained relatives only when the relatives obstructed justice, but human rights organizations rejected this claim.

Arbitrary Arrest:  Prior to the outbreak of conflict, the government routinely practiced arbitrary arrest, and the rebels who seized power did the same.  The number of persons arrested arbitrarily was difficult to estimate.  Even prior to the outbreak of conflict, authorities did not record many detainees' names, did not transfer some detainees to official detention centers, and arrested and released many detainees multiple times during the year.  In many areas Houthi and pro-Saleh forces and their allies arbitrarily detained persons and kept them in temporary prisons, including at military sites.  Between September and August 2014, the largest number of arbitrary detentions occurred in Sana'a, followed by Aden, according to the YCMHRV.  Other nonstate actors also arbitrarily detained persons.

A Baha'i Yemeni whom authorities detained in 2013 appeared before a court on November 8.  In 2013 PSO officials took him from his home and held him in prison in Sana'a without charge and without access to a lawyer.  The individual reported authorities tortured him during the first 45 days of his detention.  During the court hearing, the judge threw out all evidence obtained during the period of alleged torture, emphasized that the detainee was not on trial for his beliefs, and said any charge against him must be for a crime not related to his faith.  According to an NGO, the judge also denied the defense lawyer's request for the detainee's conditional release on the grounds of poor health but directed that he receive medical attention.  The court scheduled another appearance for November 24, but the authorities admitted the individual to a hospital from prison on November 23.  The court rescheduled the appearance to December 6, but no additional information was available.

Pretrial Detention:  No information was available on pretrial detention practices during the year.  In the past international monitoring organizations estimated that half of all detainees held by the Ministry of Interior either awaited trial or held during a pending investigation.  Prolonged detentions without charge or, if charged, without a public preliminary judicial hearing within a reasonable time, were common practices, despite their prohibition by law.  Staff shortages, judicial inefficiency, and corruption caused trial delays.

**e. Denial of Fair Public Trial**

The constitution provides for an independent judiciary, but the judiciary was weak, not fully independent, and hampered by corruption, political interference, and lack of proper legal training.  Judges' social and political affiliations and occasional bribery influenced verdicts.  The government's lack of capacity and reluctance at times to enforce court orders, especially outside the cities, further undermined the credibility of the judiciary.  Criminals threatened and harassed members of the judiciary to influence cases.  Once exiled, the government lost control over the court or prison systems, and both systems deteriorated.

**Trial Procedures**

The law considers defendants innocent until proven guilty.  Trials are generally public, but all courts may conduct closed sessions "for reasons of public security or morals."  There are no jury trials.  Judges, who play an active role in questioning witnesses and the accused, adjudicate criminal cases.  Defendants have the right to be present and to consult with an attorney in a timely manner.  Defendants can

confront or question witnesses against them and present witnesses and evidence on their behalf.  The law provides for the government to furnish attorneys for indigent defendants in serious criminal cases, but no information was available on systemic practice; in the past the government did not always provide counsel in such cases.  In principle defendants and their attorneys had access to government-held evidence relevant to their cases, and authorities allowed defense attorneys to counsel their clients, address the court, and examine witnesses and any relevant evidence.  All defendants had the right to appeal, and the slow pace of court cases provided adequate time to prepare a defense.  Defendants could not be compelled to testify or confess guilt.  During the year there was little information available regarding respect for due process.

A court of limited jurisdiction considers security cases.  A specialized criminal court, the State Security Court, operates under different procedures in closed sessions.  This court does not provide defendants with the same rights provided in the regular courts.  Defense lawyers reportedly did not have full access to their clients' charges, relevant government-held evidence, or court files.

In addition to established courts, there is a tribal justice system for noncriminal issues.  Tribal judges, usually respected neutral sheikhs, often also adjudicated criminal cases under tribal law.  Authorities usually did not formally charge persons tried under the tribal system usually but rather publicly accused them.  Tribal mediation often emphasized social cohesion more than punishment.  The results carried the same weight as court judgments, if not more, because the public often respected the tribal process more than a formal court system seen by many as corrupt and lacking independence.

**Political Prisoners and Detainees**

There were numerous reports of political prisoners and detainees, although confirmation of the number and assessment of the status of political prisoners or detainees was difficult.  Activists accused the interim government of detaining Hirak activists, demonstration leaders, and journalists.  Following their takeover of state institutions, rebels detained activists, journalists, and demonstration leaders.  They did not charge detainees publicly, and they severely restricted or barred information to and access by local or international human rights organizations.  Absent public charges it was often difficult to determine whether authorities held detainees for criminal or political activity.

As of June, 13 journalists were in prison, according to the Yemen Journalists Syndicate.  On June 9, Houthi forces abducted 10 journalists from Sana'a, including Akram al-Waledi, according to the YCMHRV, citing a family member. Rebels first detained them at the Criminal Investigation Division and later at an undisclosed location (see section 2.a., Freedom of Speech and Expression).

**Civil Judicial Procedures and Remedies**

The law provides a limited ability to pursue civil remedies for human rights violations as tort claims against private persons.  There were no reports of such efforts during the year.  Citizens cannot sue the government directly but may petition the public prosecutor to initiate an investigation.

**f. Arbitrary Interference with Privacy, Family, Home, or Correspondence**

The law prohibits these actions, but authorities continued such interference.  Prior to the outbreak of conflict, government security forces sometimes detained relatives of fugitives as hostages until authorities located the suspect.  In other cases detention of family members continued while the families negotiated compensation for the alleged wrongdoing.  There were no reports that authorities injured or mistreated such family members.

Both before and after the armed takeover, security forces sometimes claimed justification for their actions on security grounds, and, at other times, the attorney general personally authorized telephone call monitoring and reading of personal mail and e-mail.  Once exiled the government lost control over security institutions.

In multiple instances Ansar Allah authorities went to the homes of activists, journalists, and political leaders opposed to the Houthis and used arrest and other means to intimidate perceived opponents and to silence dissent.  Authorities frequently compelled detainees to sign contracts promising not to affiliate themselves with groups their captors saw as opposed to Ansar Allah, according to Human Rights Watch.  According to human rights NGOs, rebel security actors searched homes and private offices, monitored telephone calls, read personal mail and e-mail, and otherwise intruded into personal matters without legally issued warrants or judicial supervision.

No citizen may marry a foreigner without permission from the Ministry of Interior, the NSB, and, in some instances, the PSO, under a regulation authorities enforced

arbitrarily.  In the past the government enacted regulations to reduce a form of sex tourism in which significant numbers of foreigners, particularly Saudis and Emiratis, entered into temporary marriages with young Yemeni women (as is possible under Islamic law).  They then left the bride, frequently pregnant, without means of support, to return to their countries of origin, where they would terminate the temporary marriage (see section 6, Women).  The ministry typically approved marriages to foreigners if the foreigner provided an embassy letter stating that the government of the non-Yemeni spouse had no objection to the marriage and presented a marriage contract signed by a judge.  Frequently, bribes facilitated approval; there was no available information on current practice.

## g. Use of Excessive Force and Other Abuses in Internal Conflicts

The country experienced significant internal conflict during the year.  On January 22, forces affiliated with the Houthi-led Ansar Allah, a movement backed by former president Ali Abdallah Saleh, seized the presidential palace and other government buildings in Sana'a, leading Prime Minister Khaled Bahah and his cabinet to resign, while the Houthis placed President Hadi under house arrest.  On February 6, the movement illegally disbanded parliament and attempted to establish the Supreme Revolutionary Committee as the highest governing authority.  On March 24, President Hadi requested Arab League/ GCC military intervention, invoking Article 51 of the UN Charter; the president fled the country the following day.  In response to this request, on March 26, Saudi officials announced the formation of a coalition to counter the Houthi rebellion, with membership including the United Arab Emirates, Bahrain, Egypt, Jordan, Kuwait, Morocco, Qatar, Somalia, Sudan, and Senegal.  The Saudi-led coalition conducted air and ground operations throughout the remainder of the year.

Clashes occurred as the parties expanded control over, lost, and regained territory.  The military's loyalties divided among numerous local actors.  Armed clashes continued and expanded to several areas of the country among Houthi-Saleh rebels, supporters of both the Islah Party (Sunni Islamist) and the Rashad Party (Salafi), armed separatists affiliated with the Southern Mobility Movement, tribal forces, and progovernment resistance forces, and some Saudi-led coalition ground forces, with participation by elements of the country's armed forces.  Terrorist groups, including AQAP and Da'esh, carried out attacks against government representatives and installations, Houthi combatants, members of Hirak, and other actors AQAP and Da'esh accused of behavior violating sharia law.  In October, Vice President Bahah (who was named to this position in April) and most ministers established themselves in Aden and attempted to restart government services,

despite an attack on their temporary headquarters on October 6, for which Da'esh claimed responsibility.  On December 15, UN Special Envoy for Yemen, Ismail Ould Cheikh Ahmed, convened the government-in-exile and Houthi-Saleh representatives to peace talks in Switzerland.  As of year's end, those talks continued, and the government had established a tentative hold in Aden.

Yemeni and international observers criticized all parties to the conflict for civilian casualties and damage to infrastructure resulting from shelling and airstrikes.

As a result of the fighting, the humanitarian situation in the country deteriorated significantly, with a reported 82 percent of the country's population requiring humanitarian assistance by the end of the year, according to the UN.

Killings:  NGOs, media, and humanitarian organizations reported on the use of what they considered disproportionate force by all parties to the ongoing conflict.

Available information on civilian casualties is incomplete, especially with the closure of many health facilities during the year due to insecurity and the lack of supplies.  Casualties reportedly resulted from airstrikes and shelling of civilian areas.  Numerous organizations tried to track fatalities in the fighting.  For instance, on September 1, the UN Office of the High Commissioner for Human Rights (OHCHR) stated that of the estimated 95 civilian deaths during the preceding two weeks in Ta'iz, the Saudi-led coalition's aerial bombardment caused 53, while the OHCHR attributed the remaining 42 to sniper fire and shelling by Houthi rebel forces.  According to the government-in-exile, shelling by Houthi-Saleh forces killed 7,235 civilians between March 21 and August 15.  The OHCHR estimated that between March 26 and December 31, the conflict produced 8,119 casualties, including 2,795 killed and 5,324 wounded.

In August the YCMHRV reported 3,074 fatalities and 7,347 injured persons during the period September 2014 to August 15 in 14 of Yemen's 21 governorates plus Sana'a.  As of August 19, the World Health Organization counted 4,513 persons killed since the start of the conflict, many of them reportedly civilian.

In September the UK-based NGO Action on Armed Violence reported 1,363 civilian fatalities between January 1 and July 15 due to explosive weapon use; of 124 recorded incidents, 60 percent took place in populated areas.  According to Human Rights Watch and other reporting, from March 20 to September 27, an estimated 1,866 civilian fatalities occurred from all causes, the majority from coalition airstrikes.

There were many reported instances of killing civilians.  For example, on August 29, Houthi-Saleh rebel forces shelled the al-Saeed mosque in Usayferah, north of Ta'iz, reportedly causing the deaths of 20 children ages two to 14.

Houthi rebels fired numerous rockets and three SCUD missiles across the border into Saudi Arabia, killing at least 47 Saudi civilian and military personnel from April to December, according to media reports.

Human Rights Watch and Amnesty International reported that the Saudi-led coalition launched rocket attacks into populated civilian areas near the Saudi Arabia-Yemen border in the northern Yemeni town of Sa'ada and Hajjah Province. Human Rights Watch reported that seven rocket attacks killed 13 persons, including three children, in seven rocket attacks from April to mid-July in Hajjah Province.

The Saudi-led coalition airstrikes resulted in civilian casualties and damage to infrastructure on multiple occasions.  Coalition sources sometimes reported that damage in a given explosive incident resulted not from airstrikes but from shelling by Houthi-Saleh rebel forces; there were often contrary claims by pro-Houthi media.  Due to ongoing fighting, there was limited opportunity for post-incident forensic investigations.

On September 28, a Saudi-led coalition airstrike hit a wedding party in a village near Mokha, Ta'iz Governorate, resulting in upwards of 130 civilian fatalities and as many injuries, according to media reports.

On August 30, a Saudi-led coalition airstrike targeted the al-Sham bottling plant in Hajjah Province, according to the coalition spokesman, resulting in more than 30 casualties, according to media reports.  The coalition spokesperson asserted that Houthi rebels had used the plant to make explosive devices and to train African migrants pressed into service as combatants.  Human rights organizations reported that there had been no militant activity in that area for several months.

Abductions:  Between September 2014 and August 15, Houthi-Saleh forces and their allies abducted and forcibly disappeared 982 persons in 17 governorates, extracting forced pledges and confessions and demanding ransom from family members, according to the YCMHRV.  Tribal groups were probably responsible for kidnappings for ransom, as were other nonstate actors such as AQAP, according to reports by the NGO HOOD in 2014 (see section 1.b.).

Physical Abuse, Punishment, and Torture:  Media and NGOs reported that the Houthis used land mines in civilian areas in the governorates of Abyan, Aden, Marib, Lahij, and Ta'iz.  According to Human Rights Watch, land mines killed at least 12 persons and wounded more than nine since September.  Al-Jazeera reported that the Houthis planted land mines on intercity roads and in residential areas in and around Aden in retaliation for their defeat and loss of the city in August.  Adel Saeed, an expert at the Yemen Executive Mine Action Center, said in a press interview that the Houthis left behind tens of thousands of mines, explosive devices, and explosive remnants of war.  The government-in-exile and the Saudi-led coalition brought in an antimine team from Saudi Arabia and the United Arab Emirates to clear the land mines.

Child Soldiers:  Although law and government policy expressly forbid the practice, children under age 18 directly participated in armed conflict for government, tribal, and militant forces, primarily as guards and couriers.  During the year the Houthis and other armed groups, including tribal and Islamist militias, including AQAP, increased their recruitment, training, and deployment of the children as participants in the conflict, according to Human Rights Watch.  In May, Human Rights Watch reported that children accounted for as many as a third of all fighters for these armed groups.  Fighting killed at least 279 children and wounded 402 others between March 26 and June 16, more than four times the 2014 child casualty rate, according to Human Rights Watch.

Tribes, including some armed and financed by the government to fight alongside the regular army, used underage recruits in combat zones, according to reports by international NGOs such as Save the Children.  Houthis routinely used children to operate checkpoints and search vehicles.  Combatants reportedly involved married boys ages 12 to 15 in armed conflicts in the northern tribal areas.  Tribal custom considers married boys as adults who owe allegiance to the tribe.  As a result, according to international and local human rights NGOs, half of tribal fighters were youths under 18.  Other observers noted tribes rarely placed boys in harm's way but used them as guards rather than fighters.

Extremist groups also used child soldiers.  AQAP recruited boys for combat operations against military and security forces.

Also see the Department of State's annual *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/.

<u>Other Conflict-Related Abuses</u>:  There were reports of restriction of the passage of relief supplies and of humanitarian organizations' access.  After progovernment forces established a tenuous hold by August, the government-in-exile and the Saudi-led coalition delayed or withheld clearance permits for commercial and humanitarian aid shipments bound for rebel-held Red Sea ports, directing shipments instead to Aden.  Also that month, media and NGOs reported that multiple attacks severely damaged infrastructure critical to offloading shipments at the Houthi-controlled Port of al-Hudaydah on August 18.  According to these reports, five cranes, several storehouses, and the container terminal sustained damage.  Supply interruptions made it difficult for aid agencies to support vulnerable populations.  Increasing food insecurity, fuel shortages, damage to local infrastructure, and lack of access for humanitarian organizations to vulnerable populations contributed to the deteriorating humanitarian situation.

In general, NGOs reported relative cooperation from Houthi leadership related to delivery of humanitarian aid to ports that they controlled; however, the Houthis did not permit the delivery of humanitarian aid to the besieged city of Ta'iz, exacerbating the humanitarian crisis there.

There were reports of attacks on health-care facilities.  On October 26, a Saudi-led coalition airstrike hit a medical facility operated by Doctors without Borders (MSF) in Haydan District, Sa'ada Governorate, resulting in one staff member's injury and the building's destruction, according to MSF.  According to another international NGO based in Sana'a, an initial strike landed to the side of the facility, while a subsequent one hit it directly.

In August, Houthi forces reportedly shelled al-Thawrah Hospital in Ta'iz and turned the Yemen International Hospital on the city outskirts into a military barracks, installing heavy artillery, according to reports by the government-in-exile, citing Yemeni NGOs.

There were reports of deliberate attacks on health-care workers.  On September 2, a gunman at a Houthi checkpoint killed two ICRC workers, both Yemeni nationals, in Amran Governorate.  On August 25, the ICRC evacuated its foreign staff in Aden after gunmen robbed its main office while holding staff at gunpoint.  On December 1, unknown parties kidnapped two ICRC workers; the kidnappers subsequently released one while the other, a Tunisian national, remained in captivity at year-end.

**YEMEN** 19

Eight Yemeni Red Crescent Society volunteers died in the line of duty since the start of the conflict. Two volunteers died in an airstrike in the al-Swaida area of Ta'iz. On April 4, two volunteer paramedics died when an unknown assailant's gunfire hit their ambulance in Aden. On March 30, an unknown assailant shot and killed a volunteer ambulance driver in al-Dhale in the south.

There were reports of use of civilians to shield combatants. Houthi-Saleh forces reportedly used captives as human shields at military encampments and ammunition depots under threat of Saudi-led coalition airstrikes, extracted forced pledges and confessions, and demanded ransoms ranging from 100,000 to 200,000 rials ($465 to $930) from family members, according to the YCMHRV. They seized most detainees in their homes or at their workplaces during raids, detaining the remainder at checkpoints, according to the YCMHRV, citing a Houthi militia document. Houthi-Saleh forces detained individuals without judicial orders and denied them family visits or legal representation, according to the YCMHRV.

On May 21, Houthi and pro-Saleh forces used detainees as human shields during Saudi-led coalition airstrikes against rebel positions on Jabal Hirran in Dhamar Governorate, according to the YCMHRV.

**Section 2. Respect for Civil Liberties, Including:**

**a. Freedom of Speech and Expression**

The constitution provides for freedom of speech and the press "within the limits of the law," but rebel actors did not respect these rights, and the government-in-exile was not in a position to enforce them. Following the outbreak of conflict in March, rebel actors actively suppressed news outlets, including formerly government-run media, as well as independent journalists. Rebels ransacked media outlets, according to Reporters without Borders. In the summer and fall, the government-in-exile reconstituted some media outlets outside the country. Since Ansar Allah disbanded parliament in February, the government-in-exile did not and was unable to take action to amend the Press and Publications Law, unchanged since 1990. Despite several initiatives by activists to amend it, the law calls for journalists to uphold national unity and prohibits criticism of the head of state.

<u>Freedom of Speech and Expression</u>: There were reports that Houthi-led Ansar Allah suppressed the freedom of speech.

<u>Press and Media Freedoms</u>:  Prior to the outbreak of conflict, the transitional government approved legislation to regulate broadcasting and television channels, and radio stations proliferated.  A number of domestic private stations operated under media production company permits, and several stations broadcast from abroad for domestic audiences.

The law stipulates that newspapers and magazines show a bank statement of 700,000 rials ($3,260) and have one million rials ($4,660) in operating capital to obtain a license to publish.  According to the law, newspapers and magazines must pay 10,000 rials ($47) annually to renew their licenses.  Similarly, correspondents of regional and international media outlets must pay 5,000 rials ($23) annually to renew their work licenses.

<u>Violence and Harassment</u>:  Rebel actors, including Houthi militias and forces loyal to former president Saleh were primarily responsible for a campaign of violence and harassment against journalists, according to a report from the Yemen Journalists Syndicate, an affiliate of the International Federation of Journalists. The government-in-exile was unable to take any substantive steps to protect journalists from violence and harassment (see section 2.a., Nongovernmental Impact).

<u>Censorship or Content Restrictions</u>:  The government-in-exile did not and could not counter the practice of censorship by rebel actors inside Yemen.  During the year Houthi-controlled Ministry of Telecommunications and Internet service providers reportedly systematically blocked websites and domains that it deemed critical of the Houthi agenda.

Prior to the government's exile, Customs Authority and Ministry of Culture officials occasionally confiscated foreign publications regarded as either pornographic or religiously objectionable, according to the Freedom Foundation. No information was available on practices following the government's departure.

Prior to the outbreak of conflict, the government required book authors to obtain certification from the Ministry of Culture for publication and to submit copies to the ministry.  Publishers sometimes refused to deal with an author who had not obtained certification.  Prior to the conflict, the ministry approved most books, but long delays were frequent.  Both the ministry and the PSO monitored and sometimes removed books from stores.  A ban continued on publishers distributing books deemed pornographic.

<u>Libel/Slander Laws</u>:  The law criminalizes criticism of the "person of the head of state," although not necessarily "constructive" criticism; the publication of "false information" that may spread "dissent and division among the people"; materials that may lead to "the spread of ideas contrary to the principles of the Yemeni revolution"; and "false stories intended to damage Arab and friendly countries or their relations" with the country.  Citing these restrictions, the Specialized Press and Publications Court intimidated journalists with excessive prosecutions for criminal defamation prior to the government's exile.  No information was available on the court's subsequent operations.

<u>Nongovernmental Impact</u>:  Houthi rebels and AQAP significantly inhibited freedom of expression and members of the press through violence and harassment.  As of December the Houthi rebels controlled several state ministries responsible for press and communications, including the Ministry of Telecommunications.  Ansar Allah selected items for formerly government-run broadcast and print media and did not allow reports critical of Houthi rebels.

From January through June, according to the Yemen Journalists Syndicate, Houthi-Saleh rebels, and presumably popular resistance forces and tribal militias, were responsible for a range of abuses of the media.  Fighting killed 10 journalists; authorities arrested, kidnapped or prosecuted 55 media workers; and dozens of journalists fled to their villages or left the country.  There were 48 cases of storming of newspapers and radio stations and 21 cases of journalists threatened, harassed, and/or victimized by smear campaigns in which authorities accused them of treason due to their work or for expressing their opinion.  Authorities forced eight journalists to stop working and threatened them with dismissal and salary cuts; and hundreds of state media workers, including those working for al-Thawrah, Saba, Yemen TV, and Radio Sana'a, were similarly affected.  There were 16 cases of newspapers and media outlets shut and their equipment confiscated; nine television stations shut; and 33 websites blocked.  Rebel actors were primarily responsible for these abuses, although some cases involved other security forces and the Saudi-led coalition, according to a Yemen Journalists Syndicate report.  As of the end of the year, 13 journalists were in prison, according to the syndicate.

In August the Studies and Economic Media Center (SEMC), a Yemeni NGO, reported a marked increase in media freedom violations, including "killings, injuries, arrests, intimidation, raids of homes and offices, website blackouts, and newspaper closures" by actors within the country, principally Houthi-Saleh rebels and presumably popular resistance forces and tribal militias.  An estimated half of

the 61 recorded incidents were abductions, 17 were instances of intimidation, five were raids, one was a killing, and another was a wounding.  In September, SEMC reported 42 similar violations.

Houthi rebels stormed Suhail TV twice since September 2014, according to the Freedom Foundation.  The station reportedly relocated outside Yemen.

On March 27, Houthi forces reportedly ransacked al-Jazeera's news bureau in Sana'a to protest Qatar's participation in the Saudi-led coalition's military campaign against Ansar Allah, according to the International Federation of Journalists.

On April 25, Houthi rebels ransacked the Sana'a headquarters of Belquees TV, according to Reporters without Borders.

In July, Houthi rebels stormed and took control of government-run Yemen TV's studios and offices in Sana'a, according to the Freedom Foundation.  Government-in-exile officials later established a parallel Yemen TV base in Riyadh.

In May pro-Houthi forces detained Abdullah Qabil and Yousef al-Ayzari, journalists who had criticized Ansar Allah.  Both journalists reportedly died when a Saudi-led coalition airstrike hit the building in which the Houthis held them in Dhamar Governorate, according to Human Rights Watch.

On June 9, Houthi forces abducted 10 journalists including Akram al-Waledi from Sana'a, according to the YCMHRV, citing a family member; the rebels first detained them at the Criminal Investigation Division and later at an unknown location.  No information on the journalists' status was available at year's end.

In December 2014, AQAP mortally wounded captive American journalist Luke Somers and South African teacher Pierre Korkie, both of whom it detained in Shabwah Governorate.

On October 12, AQAP kidnapped three journalists in the city of al-Mukalla, according to Reporters without Borders.

In January an explosion killed local journalist Khaled al-Washli while he covered attempts to defuse a bomb placed by AQAP, according to the Committee to Protect Journalists.

On March 18, an unknown assailant in Sana'a shot and killed leading Yemeni journalist and human rights defender, Abd al-Karim Mohammed al-Khalwani, according to Reporters without Borders.

**Internet Freedom**

The government-in-exile did not and could not uphold internet freedom. Censorship affected internet freedom, and there were notable cases of Ansar Allah intrusion into cyberspace. The Houthi-controlled Public Telecommunications Corporation systematically blocked user access to websites and internet domains it deemed dangerous to the rebel actors' political agenda.

According to an October 20 study by the University of Toronto's Citizen Lab, Ansar Allah used internet-filtering technology to censor sources critical of the group and "to manipulate the information environment."

Electricity and fuel shortages during the year, as well as the reduced availability of access points, poor quality of internet lines, and high costs, reversed what had been a positive growth in the use of the internet. According to the Ministry of Telecommunication and Communication Technology, the number of internet users had increased from 14.9 percent in 2012 to an estimated 17 percent in 2014.

On August 5, according to Human Rights Watch and the YCMHRV, Houthi rebels abducted prominent pediatrician and activist Dr. Abd al-Qader al-Juneyd at gunpoint from his home in the al-Humayra neighborhood of Ta'iz, accusing him of disseminating anti-Houthi writings in his Twitter feed. As of November 2, al-Juneyd remained in captivity, and no authority had investigated the case or arrested or tried suspects, according to the government-in-exile.

**Academic Freedom and Cultural Events**

Prior to the conflict, political parties frequently attempted to influence university academic appointments and faculty and student elections. They actively recruited new students into party branches specifically created as youth divisions (for example, the General People's Congress Youth Division and the Islah Youth Division), through which the parties could mobilize youth on campuses.

The NSB maintained permanent offices on campuses, reflecting continued government concern about security and, in some cases, controversial speech. Party-affiliated officials at the Ministry of Higher Education and academic

institutions reviewed prospective university professors and administrators for political acceptability before hiring them and commonly showed favoritism toward supporters of specific political parties. There were no reported instances of censored curriculums, sanctioned professors or students; however, after their takeover Houthi and other actors' incursions onto campuses and detentions of academics appeared designed to intimidate them as perceived opponents.

On August 23, Houthi forces kidnapped several professors from the University of Sana'a campus, according to media and NGO reports. Within a month the captors released the professors, according to the government-in-exile.

On October 17, a group of unidentified Islamists entered the Administrative Sciences College in Aden and informed the staff and students they could no longer teach male and female students in the same classes, according to an NGO.

## b. Freedom of Peaceful Assembly and Association

### Freedom of Assembly

The law provides for freedom of assembly. The government-in-exile was unable to prevent infringements on freedom of assembly by rebel forces and their proxies, who responded at times with excessive force to demonstrations and protests in various parts of the country.

Shortly after Houthi rebels seized government offices and disbanded parliament, the interim interior minister on February 8 ordered police in Sana'a to prevent all unauthorized demonstrations, citing "the exceptional circumstances" prevailing in the country, according to Human Rights Watch.

Between January 25 and February 11, Houthi-Saleh rebels beat peaceful protestors in Sana'a with sticks and rifle butts, according to Human Rights Watch. They detained at least 46 protestors between January 25 and February 11 but released most the same day. Militias detained another 10 persons near demonstration sites for up to 13 days.

On February 11, Ansar Allah militiamen detained three men attempting to join a protest and tortured them. One victim died. During the same protest, the militiamen stabbed two protestors in the neck, according to Human Rights Watch.

In March, Houthi forces used lethal force against demonstrators in Ta'iz Governorate, killing at least seven persons and wounding more than 83, according to Human Rights Watch.

**Freedom of Association**

While the law provides for freedom of association, the government-in-exile lacked the capacity to protect this right.  The law regulates associations and foundations and outlines the establishment and activities of NGOs.  Authorities require annual registration.  The law exempts registered NGOs from taxes and tariffs and requires the government to provide a reason for denying an NGO registration, such as deeming an NGO's activities "detrimental" to the state.  It forbids NGOs' involvement in political or religious activities.  It permits foreign funding of NGOs.  The law requires government observation of NGO internal elections. There were no known attempts by NGOs to register during the year.

According to the government-in-exile, Houthi-Saleh forces "stormed and looted" the premises of 115 civil society organizations between March 21 and August 15.

On April 18, Houthi rebels looted the office of the Yemen Parliamentarians against Corruption (YemenPAC), the local branch of the Global Organization of Parliamentarians against Corruption (GOPAC) and a registered NGO in Yemen. Rebels damaged equipment and documents, according to a July 8 GOPAC statement.  According to a June 11 statement on the YemenPAC Facebook page, the rebels were armed, and Houthi forces had previously subjected the group's offices to multiple "inspections" from September 2014 through April 4, and an additional raid on May 24.

**c. Freedom of Religion**

See the Department of State's *International Religious Freedom Report* at www.state.gov/religiousfreedomreport/.

**d. Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons**

The law provides for freedom of internal movement, foreign travel, emigration, and repatriation.  Prior to September 2014, the transitional government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to internally

## YEMEN                                                                   26

displaced persons (IDPs), refugees, returning refugees, asylum seekers, stateless persons, and other persons of concern.  The Houthi takeover and the ensuing conflict, however, made it difficult for humanitarian organizations to reach many areas of the country due to security concerns.  The government-in-exile did not and could not enforce the law.

According to UNHCR, the country's laws and policies were consistent with international standards, but the authorities' capacity to protect and assist persons in need was limited.  No authority was able to provide services in some parts of the country.

<u>In-country Movement</u>:  Rebel forces, resistance forces, elements of the army and security forces, and tribesmen maintained checkpoints on major roads.  In many regions, especially in areas outside effective central security control, armed tribesmen frequently restricted freedom of movement, operating their own checkpoints, sometimes with military or other security officials, and often subjecting travelers to physical harassment, extortion, theft, or short-term kidnappings for ransom.  The number of nongovernment checkpoints increased in many governorates as central government control in those areas weakened.  All sides of the conflict damaged transportation infrastructure, leading to widespread damage or destruction of key roads, bridges, and other key infrastructure.

Social discrimination severely restricted women's freedom of movement.  Women in general did not enjoy full freedom of movement, although restrictions varied by location.  Some observers reported increased restrictions on women in conservative locations, such as Sa'ada.  Authorities required travel permits for all non-Yemeni nationals leaving Sana'a.

<u>Foreign Travel</u>:  The law requires women to have the permission of a male guardian, such as a husband, before applying for a passport or leaving the country.  A husband or male relative may bar a woman from leaving the country by placing a woman's name on a "no-fly list" maintained at airports, and prior to the conflict, authorities strictly enforced this requirement when women traveled with children.

In September authorities twice prevented Dr. Shafiqa al-Wahsh, director of the Women's National Committee, from leaving the country to participate in meetings in preparation for peace talks.  The Houthis stated they rejected her request because of the security situation in the country.

## Internally Displaced Persons

According to the Task Force on Population Movements, co-led by UNHCR and the International Organization for Migration (IOM), there were more than 2.5 million IDPs as of November.  The government's IDP registration system has been on pause since the escalation of the conflict in March.

IDPs originated from all governorates and have dispersed throughout the country. Ta'iz Governorate hosted the highest number of IDPs (approximately 392,000 individuals), followed by Amran (an estimated 288,000 persons) and Hajjah (approximately 280,000 individuals).  The governorates of al-Dhale, Abyan, al-Bayda, al-Jawf, Dhamar, Ibb, Sa'ada, Sana'a, and Hadramawt each hosted more than 100,000 IDPs.  Approximately 50 percent of the total displaced population originated from the governorates of Sa'ada, Ta'iz, and Amanat al-Asimah.  IDPs with available resources and nearby family generally rented houses or stayed with relatives.  IDPs without means usually sought refuge at the first village, school, or public health facility that would accept them.

Humanitarian organizations' access to IDPs was generally poor due to the ongoing conflict; however, the ICRC and MSF maintained a presence in multiple locations throughout the country.  According to reporting shared by the United Nations, humanitarian organizations, local NGOs, and charities that still functioned in the capital supported IDPs in Sana'a with food, shelter, and non-food items.  IDPs from Sa'ada reported limited access to cash for purchasing basic household items. Most were farmers and had no other means to earn an income while in Sana'a.

The humanitarian situation in Ta'iz Governorate worsened as Houthi-affiliated forces continued to prevent food, medical supplies, and fuel from entering the city. Without fuel to run generators, the State Water Foundation could not function, putting hundreds of thousands of civilians at risk of illness due to disruption to water and sanitation facilities.  Militias held trucks containing food, medical supplies, and aid equipment at checkpoints and prevented them from entering major cities.

Armed robberies, theft of vehicles, and the looting of offices impeded humanitarian organizations' access to IDPs.

On March 30, a Saudi-led coalition airstrike at the al-Mazraq IDP camp in Hajjah Governorate killed approximately 40 persons, including three government soldiers who were guarding the facility, and injured an estimated 200, according to media

reports (see also section 1.g., Use of Excessive Force and Other Abuses in Internal Conflicts).

There was a marked increase in food insecurity throughout the country. On August 27, the Famine Early Warning Systems Network reported that at least 6.2 million people faced extreme food consumption gaps or were experiencing extreme loss of livelihood assets that would likely lead to food consumption gaps. An additional 6.7 million persons required livelihood support. Rates of acute malnutrition were high among displaced persons and other vulnerable groups. Government and/or Saudi-led coalition delays or denials of clearance permits for humanitarian and commercial aid shipments bound for rebel-held Red Sea ports, and Houthi checkpoints that disrupted overland distribution of food, significantly exacerbated food insecurity (see section 1.g., Other Conflict-Related Abuses).

In August, Saudi Arabia's King Salman Relief Center set up a temporary camp for displaced persons in al-Abr District, 60 miles south of al-Wadiah border crossing. The camp provided services for as many as 3,000 persons, including electricity, air conditioning, and drinking water.

**Protection of Refugees**

Yemen maintained open borders during the conflict and received refugees from a variety of countries. Many refugees became increasingly vulnerable due to the worsening security and economic situation in the country. Somali, Ethiopian, and Eritrean refugees, and others shared in the general poverty and insecurity of the country.

UNHCR estimated that since the start of the year, despite the conflict, more than 70,000 refugees, asylum-seekers, and migrants arrived in Yemen by sea, the majority from Ethiopia as well as Somalis and other nationalities. Many were attempting to reach or return to Saudi Arabia for work, deceived by smugglers who told them the conflict in Yemen was over, according to UNHCR. Additionally, UNHCR figures showed there were approximately 250,000 refugees, mainly Somali, in Yemen. Due to the fighting, many had displaced from Aden to the camp at Kharaz and towns in southern Yemen. The government-in-exile could not provide physical protection to refugees.

More than 121,000 persons fled Yemen since March, some seeking to cross the border into Saudi Arabia, and others to cross the Red Sea for Djibouti, Somalia, or other nearby countries, despite the difficulty and danger of the crossing. Almost

half of the persons who fled Yemen were Yemeni nationals; others included Somali refugees, Ethiopians, Djiboutians, Sudanese, and other third-country nationals who had worked in Yemen prior to the conflict. Between April and mid-November, IOM assisted 2,060 migrants to leave Yemen by air, and organized 12 boat rotations that evacuated 2,257 migrants by sea.

Access to Asylum: Yemen is a signatory to the 1951 Refugee Convention and its 1967 Protocol; however, no law addresses the granting of refugee status or asylum, and there was no system for providing protection to asylum seekers. In past years the government provided automatic refugee status to Somalis who entered the country. There is not information available on whether this practice continued during the conflict. Approximately 5 percent of refugees were from Ethiopia (the majority of new arrivals during the year), Eritrea, Iraq, Syria, and other countries recognized under UNHCR's mandate.

Refugee Abuse: In past years multiple NGOs reported criminal smuggling groups had built a large number of "camps" near the Yemeni-Saudi border city of Haradh, where authorities held migrants hoping to reach Saudi Arabia for extortion and ransom. There were reports of torture and kidnapping by smuggling gangs.

## Section 3. Freedom to Participate in the Political Process

The law provides citizens with the ability to change their government peacefully through free and fair periodic elections based on universal and equal suffrage, and citizens exercised that ability. The outbreak of conflict interrupted a government-initiated new voter registration program. There were no elections since the outbreak of conflict in 2014.

## Elections and Political Participation

Recent Elections: Observers generally considered the one-candidate election conducted in 2012 to be free and fair. Elections for the presidency remain pending under the GCC-I, which superseded elements of the constitution and permitted the extension of President Hadi's term through the end of the transition. In March 2014 political parties acting within the National Dialogue Conference (NDC) endorsed that extension, and President Hadi remained the legitimate holder of the office. In September 2014 13 parties signed the Peace and National Partnership Agreement, which temporarily ended the violence associated with the Houthi entrance into Sana'a and called for implementation of the NDC outcomes, including elections and a new constitution.

In January the Constitutional Drafting Committee prepared a new draft constitution for review by the national body designated for that purpose under the GCC-I.  On January 17, a government representative was in the process of delivering the draft constitution to that national body when Houthi forces kidnapped him (see section 1.d., Disappearances).

On February 6, Houthi rebels declared the constitution null and void, illegally disbanded parliament, and announced the formation of the appointive Supreme Revolutionary Committee as the highest governing body.  A government initiative to update voter rolls remained suspended.

Political Parties and Political Participation:  The law requires political parties to be national organizations that do not restrict their membership to residents of a particular region, or to members of a given tribe, religious sect, class, or profession.  The power-sharing agreement outlined in the 2011 GCC-I broke down as rebels drove the internationally recognized government from the country.

According to the government-in-exile, between March 21 and April 15, Houthi-Saleh forces "stormed and looted" 163 premises belonging to or associated with political parties (For example, see section 1.c. and section 4).

Since March, Houthi forces reportedly detained more than 100 members of the Islah Party after it expressed support for the Saudi-led coalition campaign against the rebels.  On April 4, Houthi militia members detained Islah Party leader Muhammad Qahtan after first placing him under house arrest on March 31, according to Human Rights Watch.  As of August 15, Qahtan's captors continued to hold him in an undisclosed location without access to his family, according to the YCMHRV.  In August, Houthi rebels entered the home of Islah Party Secretary-General, Mohammed al-Yadumi, kidnapping his brother and two of his sons, according to media reports.  As of November 2, no authority had investigated the case or arrested or tried suspects, according to the government-in-exile; and the al-Yadumi family members whereabouts remained unknown.

Participation of Women and Minorities:  Prior to the outbreak of conflict, the 2014 NDC outcomes included a 30-percent quota for women in all branches of government.  Thirty percent of delegates to the 2013-14 NDC were women, and women chaired many committees and working groups.

The NDC had one delegate representing the minority group commonly known as "Muhamasheen" or "Akhdam." According to some estimates, the Muhamasheen (an ethnic group largely descended from East Africans) comprised up to 10 percent of the population. Although only one of the 565 delegates was from the Muhamasheen, this representation was a first for the community.

## Section 4. Corruption and Lack of Transparency in Government

While the law provides for criminal penalties for official corruption, the government-in-exile was unable to implement the law effectively. There were reports of government corruption during the year. A burdensome process creates a separate legal system for the political elite. According to the constitution, approval of one-fifth of the members of parliament is necessary to conduct a criminal investigation on a deputy minister or higher-ranking official. The law then requires a two-thirds majority in parliament and presidential permission to bring criminal investigation results to the general prosecutor for indictment. The government did not use the procedure before Houthi rebels illegally disbanded parliament in February.

Corruption: The culture of corruption was pervasive, and observers reported petty corruption in nearly every government office. Job candidates often expected to purchase their positions. Observers believed tax inspectors undervalued assessments and pocketed the difference. Many government officials and civil service employees received salaries for jobs they did not perform or multiple salaries for the same job. Corruption also regularly affected government procurement.

Recent analyses by impartial international and local observers, including Transparency International, agreed that corruption was a serious problem in every branch and level of government, and especially in the security sector. International observers presumed government officials and parliamentarians benefited from insider arrangements, embezzlement, and bribes. Political leaders and most government agencies took negligible action to combat corruption.

The Central Organization for Control and Audit (COCA) is the national auditing agency for public expenditures and the investigative body for corruption. COCA presented no report to parliament before Houthi rebels illegally disbanded parliament in February. Prior to the outbreak of conflict, the president was responsible for appointing its top officials. In cases involving high-level officials, COCA submitted reports directly to the president, who had the power to refuse the

reports.  Since COCA's inception in 1999, authorities have prosecuted only low-ranking officials for corruption.  It has conducted no known investigations since February.

Some police stations reportedly maintained an internal affairs section to investigate security force abuses, and citizens had the right to file complaints with the Prosecutor's Office.  The Ministry of Interior had a fax line for citizens to file claims of abuse for investigation.  There was no available information on how many fax complaints the ministry received or investigated or whether the mechanism still existed.

In August 2014, to combat fraud and corruption in the government payroll system, the government implemented a plan to collect biometric information on all government employees, including soldiers and security forces, and to create a central registry designed to eliminate tens of thousands of fraudulent names and double dippers from the payroll.  By the end of 2014, this registry included nearly half a million civil servants.  It had reportedly identified 5,000 workers who illegally received more than one paycheck.  The government suspended implementation following the armed Houthi takeover in February.  The government also suspended implementation of a payment system for soldiers and security forces via bank or post office accounts.  Prior to the outbreak of conflict, that system bypassed paymasters who had previously paid soldiers in cash, to provide for only the intended individuals collecting salaries.

The independent Supreme National Authority for Combating Corruption (SNACC) received complaints and developed programs to raise awareness of corruption prior to the outbreak of conflict.  It included a council of government, civil society, and private sector representatives.  A lack of capacity, particularly in terms of financial analysis, hampered the SNACC.  According to the government-in-exile, the SNACC continued to operate "at minimal levels" during the year; however, no information was available on the number of complaints received or referrals for prosecution.

On June 10, GOPAC presented Yemeni parliamentarian Ali Ashal with its first-ever International Anticorruption Award "for his work fighting corruption and promoting oversight in Yemen and around the world."  GOPAC recognized him in part for introducing the Access to Information Right Law in parliament, which passed in 2012.

**YEMEN** 33

Financial Disclosure:  The law requires annual disclosure of financial assets by all ministers, deputy ministers, agency heads, members of parliament, and Shura Council members.  Filers are to provide disclosures to the SNACC for verification.  The information was not publicly available.  The SNACC may also request disclosures from any other government employee.  The law does not require disclosure of assets of children or spouses.  It provides for penalties for false filing of information.

Public Access to Information:  The country's "right of access to information" law requires establishment of an independent agency to respond to requests for information and resolve grievances when authorities deny requests; however, the government did not establish that agency prior to the outbreak of conflict.  Houthi rebels established extralegal "resolution committees" and "monitoring committees" within ministries as part of their continued efforts to establish parallel government institutions, while at the same time inserting themselves into the government.

The law normally requires the Ministry of Finance to publish the government budget online, in print, and in CD format; however, the government-in-exile continued to implement the 2014 budget on a month-by-month basis, as provided for under Article 88 of the constitution.  Information related to contract awards, including geographical area, company, and terms of the contract, was publicly available through the High Tender Board website and announcements in state media.  Government spending, however, particularly at the local level and with respect to military and security, and data relating to extractive industries were murky and difficult to trace.

The law provides for journalists to have some access to government reports and information, but the government did little to provide for accessibility or transparency.

## Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

Prior to the outbreak of conflict, domestic and international human rights groups generally operated without outright government restriction, but lower-level government officials, particularly those in security organizations, were occasionally uncooperative and unresponsive to human rights groups' views and requests for information.  Local and international organizations attempting to investigate human rights cases reported obstacles in accessing victims, prisoners, and prisons.  International, regional, and local media published their reports.

Rebel actors subjected domestic human rights NGOs to significant harassment during the year (see also section 1.b., Freedom of Association).

Government Human Rights Bodies:  In 2014 multistakeholder working groups within the NDC focused on a wide spectrum of problems pertaining to human rights, including freedom of press and expression, women's and minority rights, and religious diversity.  In September, Presidential Decree Number 13 established an independent National Human Rights Commission, which is responsible for investigating all human rights violations since 2011.  Its chairman is Qaher Mustafa Ali Ibrahim, and it consists of eight members with legal, judicial, or human rights backgrounds.

## Section 6. Discrimination, Societal Abuses, and Trafficking in Persons

The law provides for equal rights and equal opportunity regardless of race, gender, language, belief, or disability, in accordance with the UN Charter, the International Declaration of Human Rights, and the Charter of the Arab League, as affirmed by the 1994 constitution, but the government-in-exile could not enforce the law in country.  Discrimination based on race, gender, social status, sexual orientation and gender identity, and disability remained a serious problem.  Some groups, such as the marginalized Muhamasheen or Akhdam community and the Muwaladeen (Yemenis born to foreign parents), faced social and institutional discrimination based on social status.  Societal discrimination severely limited women's ability to exercise equal rights.

Article 75 of the draft constitution completed in January, under the authority of the provisional government and awaiting review (see section 3), affirmed "equal rights, freedoms, and public duties without discrimination due to sex, skin color, race, origin, religion, sect, belief, opinion, economic or social status, disability, political or geographic affiliation, occupation, birth, or any other considerations."

## Women

Rape and Domestic Violence:  The law criminalizes rape, but does not criminalize spousal rape because the law states that a woman may not refuse sexual relations with her husband.  The government-in-exile could not enforce the law against rape effectively in country.  The punishment for rape is imprisonment for up to 25 years.

There were no reliable rape statistics, principally because of social stigma, fear of familial and societal retaliation, and a legal system largely stacked against survivors, which limited willingness to report the crime.  Most rape victims did not report the crime due to fear of shaming the family, incurring violent retaliation by the perpetrator or a family member, or facing prosecution.  By law authorities can prosecute rape victims on charges of fornication if authorities do not charge a perpetrator.  There were no known cases during the year.  According to law without the perpetrator's confession, the rape survivor must provide four male witnesses to the crime.

The law states that authorities should execute a man if convicted of killing a woman.  The penal code, however, allows leniency for persons guilty of committing an "honor" killing or violently assaulting or killing a woman for perceived "immodest" or "defiant" behavior.

The law provides women with protection against domestic violence, except spousal rape, under the general rubric of protecting persons against violence, but authorities did not enforce this provision effectively.  Victims rarely reported domestic abuse to police.  Spousal abuse generally was undocumented, but women's groups asserted that physical, emotional, and sexual abuse within marriage was widespread.

The tribal arbitration process rather than criminal courts usually adjudicated cases of violence against women due to the widespread perception, shared by authorities, that violence against women was a private, family matter.  Some local female tribal experts argued that tribal arbitration is fairer for women, and victims often preferred it to the courts for that reason.  Due to social pressures, authorities expected an abused woman to take her complaint to a male relative, rather than to authorities, to intercede on her behalf or provide sanctuary.  For these social reasons, as well as the corruption and inefficiency of the justice system, criminal proceedings in cases of domestic abuse were rare.

As of September 2014, the Ministry of Public Health and the Ministry of Human Rights maintained hotlines for complainants, although they had little capacity to act on complaints.  The Ministry of Human Rights referred callers to various civil society organizations or foundations for assistance.  It also referred complainants to the nongovernmental National Women's Union for assistance.  The National Women's Union, which had chapters across the country, had at least one shelter. The general director of the Family Protection Unit reported that the unit rarely

received complaints of violence against women.  No information was available on the availability of hotlines during the year.

The ongoing conflict and humanitarian crisis hampered media coverage and advocacy of women's rights and investigations of violations of women's rights.

Female Genital Mutilation/Cutting (FGM/C):   The law does not prohibit female genital mutilation/cutting (FGM/C), although a 2001 ministerial directive banned the practice in government institutions and medical facilities, according to Human Rights Watch.  The 2013 Demographic and Health Survey (DHS), administered by the Ministry of Public Health and Population, found that 19 percent of all women aged 15-49 had undergone some form of FGM/C.  In some coastal areas influenced by cultural practices from the Horn of Africa, such as Mahara and al-Hudaydah, FGM/C practitioners had subjected up to 90 percent of women reportedly to FGM/C.  The UN Children's Fund (UNICEF) reported in 2012 that 97 percent of FGM/C procedures took place in the home and found Type 2--partial or total removal of the clitoris and the labia minora, with and without excision of the labia majora--in 83 percent of studied cases.  The Women's National Committee and the Ministry of Endowments and Religious Guidance provided a manual for religious leaders on women's health problems, including the negative health consequences of FGM/C.  A 2012 UNICEF report concluded that, despite an awareness campaign, the country still lagged in addressing the problem.

Other Harmful Traditional Practices:  Cases of "honor" killing--the murder of a daughter or sister who "shamed" the family--occurred, particularly in rural areas.  Most cases of honor killing went unreported, and authorities investigated very few instances.  There have been reports that family members murdered both male and female victims of rape or sexual abuse who reported the crime, to protect the family's honor.  While the law stipulates the death penalty for a man convicted of murdering a woman, the penal code allows leniency for persons guilty of committing an "honor" killing or violently assaulting or killing a woman for perceived "immodest" or "defiant" behavior.  The law also allows for a substantially reduced sentence when a husband kills his wife and a man he believes to be involved in an extramarital affair with her.  The law does not address other types of gender-based violence such as beatings, forced isolation, imprisonment, and early and forced marriage.

Sexual Harassment:  No laws specifically prohibit sexual harassment, although the penal code criminalizes "shameful" or "immoral" acts.  Authorities, however, rarely enforced the law.  Sexual harassment in the streets was a major problem for

women.  A 2010 report by the Athar Foundation for Development, the most recent data available to date, found that 98.8 percent of women faced sexual harassment in the streets.  The extent of sexual harassment was difficult to determine, although anecdotal reports, direct observation, and infrequent media reports suggested it also occurred in the workplace.  There were anecdotal reports of employers transferring men accused of sexual harassment to other offices to prevent further abuse, although no further information was available.

Reproductive Rights:  There were no reports of interference by the government-in-exile in the right of couples and individuals to decide freely and responsibly the number, spacing, and timing of children, to have the information and means to do so, and to attain the highest standard of reproductive health, free from discrimination, coercion, and violence.  NGOs reported, however, that nonstate actors forbade birth control devices and other forms of contraception in areas under their control.  Social pressure, women's lack of knowledge about reproduction, and the young age of marriage for many girls also meant many women had little or no real control over reproduction.  Access to contraceptives and procedures involving reproductive and fertility treatments required the consent of both husband and wife.  It was technically illegal for single women to buy and use contraception, but if a particular contraceptive (such as birth control pills) had another medical use, a woman could procure it.  The information and means to make decisions on reproduction were available in cities, although contraception, skilled pre- and post-natal assistance, and obstetric care were too costly for much of the population.  The 2013 DHS indicated that only 28 percent of ever-married women had used a "modern" family planning method.  Contraceptive use increased with educational attainment and had increased over the 16-year period for which survey data were available, according to Human Rights Watch.  During the year there was, however, a general lack of access to medications and pharmaceutical products due to the conflict.

Most women gave birth at home attended by traditional midwives and did not see a doctor during their pregnancies or after delivery.  According to UN sources, the estimated maternal mortality ratio was 385 deaths per 100,000 live births during the year; there were an estimated 3,300 maternal deaths during the year.  Major factors contributing to the high maternal mortality rate included lack of access to skilled health care (including emergency obstetric care), adolescent pregnancy, and lack of awareness and education on reproductive health.

<u>Discrimination</u>:  Women faced deeply entrenched discrimination in both law and practice in all aspects of their lives.  Mechanisms to enforce equal protection were weak, and the government-in-exile could not implement them effectively.

Women cannot marry without permission of their male guardians; do not have equal rights in inheritance, divorce, or child custody; and have little legal protection.  Women do not enjoy the same legal status as men in family law, property law, inheritance law, and the judicial system.  They experienced discrimination in areas such as employment, credit, pay, owning or managing businesses, education, and housing (see section 7.d.).  The estimated 55-percent female literacy rate, compared with 85.1 percent for men, accentuated this discrimination.  Women accounted for 30.5 percent of university students countrywide.  Prior to the conflict, the NDC had adopted a 30-percent quota for admission of women to institutions of higher education.

Under family law and inheritance law, courts awarded custody of children over a specified age (seven years for boys and nine years for girls) to the divorced husband or the deceased husband's family.  In numerous cases former husbands prevented divorced noncitizen women from visiting their children.  Under sharia inheritance laws, which assume that women receive support from their male relatives, daughters receive half the inheritance and accidental death or injury compensation awarded to their brothers.

Women also faced unequal treatment in courts, where the testimony of a woman equals half that of a man's.  Female parties in court proceedings such as divorce and other family law cases normally deputized male relatives to speak on their behalf, although they have the option to speak for themselves.

A husband may divorce a wife without justifying the action in court.  In the formal legal system, a woman must provide justification.  Under tribal customary law, however, a woman may divorce without justification.

Some local interpretations of sharia prohibit a Muslim woman from marrying a non-Muslim man, others permit marrying a Christian or Jewish man.  All interpretations allow a Muslim man to marry a Christian or Jewish woman.  The foreign wife of a male citizen must remain in the country for two years to obtain a residency permit.

Any citizen who wishes to marry a foreigner must obtain the permission of the Ministry of Interior (see section 1.f.).  A woman wishing to marry a foreigner must

present proof of her parents' approval.  A foreign woman who wishes to marry a male citizen must prove to the ministry that she is "of good conduct and behavior."

Yemeni women may confer citizenship on children born of a foreign-born father if the child is born in the country.  If the child is not born in the country, in rare cases the ministry may permit a woman to transmit citizenship to the child if the father died or abandoned the child (see section 6, Children).

Women experienced economic discrimination (see section 7.d.).  Within the country's limited professional sphere, women have low rates of representation in a range of fields, including the security sector.  In October, Ta'iz resistance forces announced the graduation of the first class of female police officers, according to official government media.

**Children**

Birth Registration:  Citizenship derives from a child's parents.  A child of a Yemeni father is a citizen.  Yemeni women may confer citizenship on children born of a foreign-born father if the child is born in the country.  If the child is not born in the country, in rare cases the Ministry of Interior may permit a woman to transmit citizenship to the child if the father died or abandoned the child.  The NDC recommended that a parent of either sex be able to convey citizenship.

There was no universal birth registration, and parents, especially in rural areas, never registered many children or registered them several years after birth.  The requirement that children have birth certificates to register for school was not universally enforced, and there were no reports of authorities denying educational or health care services and benefits to children based on lack of registration.  The lack of birth registration compounded difficulties in proving age, which led to authorities recruiting minors into the military and trying and sentencing juveniles as adults, including imposing the death penalty.

Education:  The law provides for universal, compulsory, and tuition-free education from ages six to 15.  Public schooling was free to children through the secondary school level, but many children, especially girls, did not have easy access.  In addition to the 1.1 million children not attending school before the crisis escalated in March, another 1.8 million children lost access to school due to the conflict.  In Sana'a city alone, half a million school-aged children ceased attending school between March and September 21, according to the UN Office for the Coordination of Humanitarian Affairs (OCHA).  According to a November

Humanitarian Situation Report from UNICEF, student registration and attendance ranged from 20 to 50 percent in most parts of the country.

Although attendance was nominally mandatory through the ninth grade prior to the outbreak of the conflict, only 79 percent of boys and 60 percent of girls attended primary school.  The gender gap was larger for secondary and postsecondary schooling, with 34 percent of girls attending secondary school and only 6 percent continuing to postsecondary education.  The lack of private toilet facilities for girls and reports of sexual harassment on the school commute contributed to the drop in female attendance after puberty.

As of September 17, 70 percent of schools had closed since March, and various armed groups occupied at least 68 school buildings, according to Save the Children.  In a September 21 bulletin, OCHA estimated that "shelling and airstrikes" had totally damaged 140 schools and partially damaged 390 across the country.  School damage and destruction was particularly severe in the governorates of Hajjah, Marib, Sa'ada, Sana'a, and Ta'iz, where the conflict was particularly intense.

Medical Care:  Due to social discrimination, male children received preferential medical treatment.

Child Abuse:  The law does not define or prohibit child abuse, and there was no reliable data on its extent.  Authorities considered violence against children a family affair, and tribal arbitration was more likely to handle it than reporting to police.

Early and Forced Marriage:  Early and forced marriage was a significant, widespread problem.  There was no minimum age for marriage, and girls married as young as eight years of age, which traditionalists claimed served to assure they were virgins at the time of marriage.  UNICEF's 2013 data estimated that 12 percent of females married by age 15 and 32 percent by age 18.  The conflict likely exacerbated the situation, but new information was not available.  The law forbids sex with underage brides until they are "suitable for sexual intercourse," an age that is undefined.  An assessment undertaken by Intersos in Ta'iz in July found that 27 IDP and 10 host community families openly practiced early marriage, caused mostly by security concerns and local traditions, according to an NGO.

Other Harmful Traditional Practices:  Cases of "honor" killing--the murder of a daughter or sister who "shamed" the family--occurred, particularly in rural areas.

**YEMEN**                                    41

Most cases of honor killing went unreported, and authorities investigated very few instances.  There have been reports that family members murdered both male and female victims of rape or sexual abuse who reported the crime, to protect the family's honor.

Sexual Exploitation of Children:  The law does not define statutory rape and does not impose an age limit for consensual sex.  The law prohibits pornography, including child pornography.  Article 161 of the Child Rights Law criminalizes the prostitution of children.

Prior to the outbreak of conflict, observers reported the practice of foreigners visiting the country to enter short-term marriages with underage girls.  No laws specifically address sex tourism from outside the country, but it was particularly a problem in Aden and Sana'a.  In 2014 the Ministry of Interior attempted to stop the use of "temporary marriage" provisions of Islamic law as a vehicle for sex tourism (see section 1.f.).  There were reports that elements within the government security forces exacted bribes and fees for facilitating temporary marriages.  No information was available about related practices during the year.

Child Soldiers:  See section 1.g., Child Soldiers.

International Child Abductions:  The country is not a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction.

**Anti-Semitism**

Fewer than 150 Jews remained in the country, residing in two communities in Sana'a and Amran Governorate.  Weak law enforcement put the Jewish community at risk, particularly following the Houthi takeover in Sana'a in September 2014, after which anti-Israeli rhetoric increased and blurred into anti-Semitic utterances.  Prior to the outbreak of conflict, the transitional government continued to protect the Sa'ada Jewish community in Sana'a and provided secure housing and a living stipend.  See the Department of State's *International Religious Freedom Report* at www.state.gov/religiousfreedomreport/.

Anti-Semitic material was rare.  Many Yemenis were proud to sustain a small Jewish community with some charities reportedly donating food and gifts during Jewish holidays, and media coverage of the country's Jews was generally positive. The most prominent exception was the slogan of the Houthi movement, "Death to Israel, a curse on the Jews."

Members of the Jewish community are not eligible to serve in the military or federal government.  Authorities forbid them from carrying the ceremonial Yemeni dagger.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/.

## Persons with Disabilities

Several laws mandate the rights and care of persons with disabilities, but the government-in-exile was unable to enforce them.  The law permits persons with disabilities to exercise the same rights as persons without disabilities, but this did not happen in practice.  Prior to the outbreak of conflict, social stigma and official indifference were obstacles to implementation.

The law reserves 5 percent of government jobs for persons with disabilities, and the law mandates the acceptance of persons with disabilities in universities, exempts them from paying tuition, and requires that schools be made more accessible to persons with disabilities.  The extent to which any authority implemented these laws was unclear.

Children with disabilities may attend public schools, although schools make no special accommodations for them.  There were some private educational institutions for persons with disabilities in large cities.  Many parents refused to send their children with disabilities to public schools, due to concern about potential harassment.

Although the law mandates new buildings have access for persons with disabilities, compliance was poor.  Most persons with disabilities relied on their extended family for support.

Information about patterns of abuse of persons with disabilities in educational and mental health institutions was not publicly available.

Prior to the outbreak of conflict, authorities imprisoned persons with mental disabilities with criminals without providing adequate medical care and in some instances without legal charge.  At that time the Ministry of Interior reported that

family members sometimes brought relatives with mental disabilities to ministry-run prisons, asking officers to imprison the individuals.  Ministry-run prisons in Sana'a, Aden, and Ta'iz operated semiautonomous units for prisoners with mental disabilities in cooperation with the Red Crescent Society.  Conditions in these units reportedly were deficient in cleanliness and professional care.  Prior to its exile, the government did not act on a 2005 Ministry of Interior initiative to establish centers for persons with mental disabilities and, once in exile, the government could not act on it.

The Ministry of Social and Labor Affairs is responsible for protecting the rights of persons with disabilities.  The government-in-exile could not continue collaboration with the World Bank to administer a Social Development Fund; nor was the ministry able to oversee the Fund for the Care and Rehabilitation of the Disabled, which provided limited basic services and supported more than 60 NGOs assisting persons with disabilities.

**National/Racial/Ethnic Minorities**

Although racial discrimination is illegal, racial and social discrimination against the Muhamasheen, who traditionally provided low-prestige services such as street sweeping, was a problem.  The Muhamasheen generally lived in poverty and endured persistent societal discrimination.  Muhamasheen women were particularly vulnerable to rape and other abuse because of the general impunity for attackers due to the women's low-caste status.  In 2013 the NDC's Rights and Freedoms Working group announced agreement on measures to protect the rights of the Muhamasheen and to ban discrimination against them.

**Acts of Violence, Discrimination, and Other Abuses Based on Sexual Orientation and Gender Identity**

Lesbian, gay, bisexual, transgender, and intersex (LGBTI) persons faced discrimination and could face the death penalty, although there have been no known executions of LGBTI persons in more than a decade.  The penal code criminalizes consensual same-sex sexual conduct, with the death penalty as a sanction, under the country's interpretation of Islamic law.

Due to the illegality of and possible severe punishment for consensual same-sex sexual conduct, there were no LGBTI organizations.  Because the law does not prohibit discrimination, the government did not consider LGBTI problems "relevant" for official reporting, and few LGBTI persons were open about their

sexual orientation or gender identity.  The government blocked access to LGBTI internet sites.  LGBTI persons in Aden reported threats from AQAP; non-Yemen-based LGBTI rights blogs reported on the killings of four gay men by AQAP in Aden.

## HIV and AIDS Social Stigma

While there were no reports of social violence against persons with HIV/AIDS, the topic was socially sensitive and infrequently discussed.  Senior imams participated in international meetings on community support for persons with HIV/AIDS, and the country's senior cleric advocated on television for family and community compassion.  Discrimination against persons with HIV/AIDS is a criminal offense, but incidents occurred during the year.  Human Rights Watch claimed that in August 2014, at a hospital in Sana'a, three professionals claimed that a doctor refused to treat a patient when she learned the patient was HIV positive.

## Other Social Violence or Discrimination

In July in Hadramawt Governorate, AQAP executed three individuals it accused of "witchcraft and sorcery."  It also distributed flyers in Hadramawt threatening to "sever the hands" of corrupt officials.

## Section 7. Worker Rights

Government enforcement of labor law was weak to nonexistent due to lack of capacity, corruption, and conflict.  Labor laws were still in effect, but Houthi rebels controlled the ministries responsible for their implementation, and the government-in-exile was unable to enforce them.  Little information on labor conditions during the year was unavailable.

## a. Freedom of Association and the Right to Collective Bargaining

The labor code provides for the right of salaried private-sector employees to organize and bargain collectively without government interference.  These protections do not apply to public servants, day laborers, domestic servants, foreign workers, and other groups who together make up the majority of the work force.  The civil service code covers public servants.  The law generally protects employees from antiunion discrimination and prohibits dismissal for union activities.  Due to the conflict, the government-in-exile lacked the capacity to enforce labor laws effectively.

While unions may negotiate wage settlements for their members and may conduct strikes or other actions to achieve their demands, workers have the right to strike only if prior attempts at negotiation and arbitration fail.  They must give advance notice to the employer and government and receive prior written approval from the executive office of the General Federation of Unions of the Republic.

The Ministry of Social and Labor Affairs has veto power over collective bargaining agreements.  Employees may appeal any dispute, including cases of antiunion discrimination, to the ministry.  Employees also may take a case to the Labor Arbitration Committee, which the ministry chairs, composed of an employer representative and a representative of the General Federation of the Yemeni Workers' Trade Unions (GFYWTU).  Parties generally preferred to resolve cases via the committee system, since court proceedings were costly and the judicial system was often corrupt.

According to the GFYWTU, the government allowed public sector employees, especially those employed in ministries, to unionize and strike if the unions had more than 200 members.  Otherwise, authorities prohibited public employees from unionizing, and they must take labor grievances to court.

Although not required by law, all unions were federated within the GFYWTU.  While not formally affiliated with the government, the GFYWTU was the only official federation and worked with the government to resolve labor disputes.

The law requires a minimum of 18 employees to establish a union in a workplace.  The majority of private-sector employers registered only five to 10 employees, allowing them to avoid many social security and labor union regulations.  Companies with more than 100 employees comprised fewer than 100,000 persons.  Union sources stated the private sector had begun to recognize the benefit of working with unions to meet employee demands.  Prior to the outbreak of conflict, penalties were generally sufficient to deter violations.

Prior to the outbreak of the conflict, the government at times sought to influence unions by inserting its own personnel into them.  In some instances political parties also attempted to control unions and professional associations by influencing internal elections or placing their own personnel in them, usually tied to the government.

In practical terms a union's ability to strike depended on its political strength. Under the transitional government, authorities often accused unions and associations of being tied to a political party.  The Development Working Group of the NDC called for the independence of all unions.

The government-in-exile was unable to enforce laws on freedom of association and the right to collective bargaining.

## b. Prohibition of Forced or Compulsory Labor

The penal code prescribes up to 10 years' imprisonment for any person who "buys, sells, gives [a human being] as a present, or deals in human beings; and anyone who brings into the country or exports from it a human being with the intent of taking advantage of him."  This statue's narrow focus on transactions and movement means the law does not criminalize many forms of forced labor.  Prior to the outbreak of conflict, the government did not effectively enforce the law due to lack of resources and financial interests of the elite, many of whom supported such forms of labor; once in exile authorities could not enforce the law.  There were numerous reports of such practices in both urban and rural areas.  In some instances employers forced children into domestic servitude and agricultural work (see section 7.c.) and women into domestic servitude or prostitution.  Migrant workers were vulnerable to forced labor conditions.

See also the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/.

## c. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits child labor, but the government-in-exile was unable to implement its regulations effectively.  Poverty, disruption of services due to conflict, and lack of resources posed a serious challenge to this law.  There is no monitoring mechanism to observe the implementation of the child labor law.

There were inconsistencies in the law with regard to the minimum age for work and hazardous work, and there were inconsistencies in the law with regard to the minimum age for work and hazardous work.  The Combating Child Labor Unit (CCLU) within the Ministry of Social and Labor Affairs was responsible for implementing and enforcing child labor laws and regulations.

**YEMEN** 47

Current regulations reportedly do not clearly specify a minimum work age, but common practice is 14 or 15 years.  The International Labor Organization (ILO) characterizes the country's minimum work age as "the minimum age for admission to employment which is free of any hazards may not be lower than the age of completion of compulsory education and may not be less than 14 years."

Children under 18 with formal contracts may work no longer than six hours a day, with a one-hour break after four consecutive hours, on weekdays between 7 a.m. and 7 p.m.  The law prohibits children under age 18 from engaging in hazardous work based on job, work conditions, and health circumstances, rather than by specific sectors or industries.

Child labor was common, including its worst forms.  According to a 2013 ILO study, more than 1.3 million children participated in the workforce, including 469,000 children between ages five and 11.  The results of the country's 2012 national child labor survey indicated that 17 percent of 7.7 million children in the five to 17 age group and 11 percent of those between ages five and 11 were involved in child labor.  In 2014 the director of the CCLU estimated informal minimum wages paid by private-sector businesses to children ranged between 430 and 650 rials ($2 to $3) per day.

By November school attendance ranged from 20 to 50 percent in most parts of the country, according to UNICEF (see section 6, Children).  Many children of school age worked instead of attending school, particularly in areas where schools were not easily accessible or closed due to conflict.  In rural areas family poverty and traditional practice led many children to work in subsistence farming.  In urban areas children worked in stores and workshops, sold goods, and begged on the streets.  Children also worked in some industries and construction.  According to the Ministry of Social and Labor Affairs, small factories and shops sometimes employed children outside the family, particularly in rural areas.  Continued weak economic conditions forced hundreds of children to seek work in the hazardous fishery sector.  Children also reportedly worked in dangerous conditions in construction, offshore fishing, mining, and waste dumps.  According to UNICEF up to a third of fighters in armed groups were children frequently used to man checkpoints and carry weapons (see section 1.g., Child Soldiers).

Although penalties existed to punish the worst forms of child labor, the penalties were not sufficient to prevent violations, and the government made minimal enforcement efforts.  No information was available on arrests, investigations, or prosecutions for child labor offenses.  The 160 child labor inspectors did not travel

to carry out their work during the year.  If inspectors found child labor violations, authorities resolved most cases between inspectors and employers with a verbal warning and by working with the employer to change the child's job to remove the child from danger.

See also the Department of Labor's *Findings on the Worst Forms of Child Labor* at www.dol.gov/ilab/reports/child-labor/findings/.

## d. Discrimination with Respect to Employment or Occupation

Labor laws and regulations prohibit discrimination with regard to race, sex, color, beliefs, language, or disability, and specifically state, "Women shall be equal with men in relation to conditions of employment and employment rights."  The law does not address sexual orientation, political opinion, national origin, social origin, gender identity, HIV status, or other communicable diseases.  Authorities did not consistently enforce the laws, and discrimination based on race, gender, and disability remained a serious problem in employment and occupation.

Women's rights activists and NGOs reported discrimination was a common practice in the public and private sectors.  Women experienced discrimination in areas such as employment, credit, pay, owning or managing businesses, education, and housing.  Despite the government's goal of increasing the role of women in the economic sector, women and girls ages 15 and older represented only 25 percent of the formal workforce, largely due to barriers to education and social traditions that precluded women from seeking and gaining employment.  Cultural barriers also restricted the exercise of women's property rights.  In most rural areas, social norms largely prevented women from owning land.

## e. Acceptable Conditions of Work

There was no established minimum wage in the private sector.  The minimum civil service wage was 21,000 rials ($98) per month; government agencies implemented it.  The labor law provides equal wages for public sector workers employed in joint ventures between the government and the private sector.

The law specifies a maximum 48-hour workweek with a maximum eight-hour workday, although many workshops and stores operated 10- to 12-hour shifts without penalty.  The 35-hour workweek for government employees was nominally seven hours per day from Sunday through Thursday.  The law requires

overtime pay, paid holidays, and leave, and prohibits excessive or compulsory overtime.

The law prescribes occupational, safety, and health standards. It states every employer must provide safe and healthy conditions for workers. The law recognizes the right of workers to remove themselves from dangerous work situations, and workers may challenge dismissals based on such actions in court. There were no reported instances of this during the year. The law provides for compensation in the event of work accidents or death. The safety law does not apply to domestic servants, casual workers, or agricultural workers.

The Ministry of Social Affairs and Welfare's vocational safety department relied on inspection committees to conduct primary and periodic safety and health investigations. A lack of funding and resources, such as vehicles to travel to inspection sites, constrained such committees. The Ministry of Social and Labor Affairs had 160 safety inspectors who also worked as child labor inspectors. Some foreign-owned companies and major manufacturers implemented higher health, safety, and environmental standards than the government requires. The Ministry of Oil has monitoring responsibility for oil-related businesses. There was no credible information available regarding work-related accidents or fatalities during the year. Government enforcement of labor law was weak to nonexistent. Working conditions generally were poor, and wage and overtime violations were common. Foreign migrant workers, youth, and female workers typically faced the most exploitative working conditions.



# Toophan ATGM





# Qiam SRBM





# SHARK 33





# Qasef-1 UAV



Case 1:19-cv-03363-RDM    Document 20-6    Filed 01/15/21    Page 654 of 674

# IRAN'S EXPANDING MILITARY INFLUENCE



## Qiam Missile Capabilities
### IRANIAN DEVELOPED BASED ON SCUD TECHNOLOGY, FIRST DEPLOYED IN 2014



▲ *Picture reportedly of 4 Nov Qiam Launch*

| RANGE | 900+ KM | 559+ MILES |
|---|---|---|
| PAYLOAD | 746 KG | 1,645 LBS |
| LENGTH | 11.5 M | 37.7 FT |
| DIAMETER | 0.88 M | 2.89 FT |
| PROPELLANT TYPE | LIQUID | |





▲ *Qiam Short Range Ballistic Missile*


Missile component recovered in Saudi Arabia reveals identity and logo of Iranian manufacturer.







# IRAN'S EXPANDING MILITARY INFLUENCE

## Iranian "Qiam" Ballistic Missile

TAIL SECTION COMPARISON



▲ *Iranian Qiam ballistic missile displayed on FARS News Agency*

- The Qiam is the world's only short-range ballistic missile without stabilizing tail fins.

- Missile debris recovered in Saudi Arabia confirms Iranian origin.



▲ *SCUD Ballistic Missile Tail Section*

 

◄ *Qiam Tail Section Debris*

# IRAN'S EXPANDING MILITARY INFLUENCE

## Iranian "Qiam" Ballistic Missile

UNIQUE MISSILE CONSTRUCTION AND MARKINGS PROVE IRANIAN ORIGIN







**Distinct markings from missile debris recovered in Saudi Arabia confirms Iranian origin.**

*Iranian Qiam Ballistic Missile Displayed on FARS News Agency* ▶



Case 1:19-cv-03363-RDM Document 20-6 Filed 01/15/21 Page 658 of 674



# IRAN'S EXPANDING MILITARY INFLUENCE

## Evidence of Field Disassembly for Illicit Transport

MISSILE CONSTRUCTION FACTORY MACHINED WELDS VS. FIELD WELDS



The size of this missile would make it difficult to transport as a complete unit without being detected. These welds likely represent an effort to disassemble for undetected delivery and then reassemble in the field for operations.



▲ *Typical factory machine weld*

▲ *Field weld. The quality of the welding makes it clear this was not welded in a production facility.*



# IRAN'S EXPANDING MILITARY INFLUENCE

## Iranian "Qiam" Ballistic Missile
LAUNCHED 4 NOVEMBER 2017 BY HUTHI FORCES INTO SAUDI ARABIA

*"2-H Burkan"*



**Huthi forces refer to the Qiam as the "Burkan 2-H"**



# IRAN'S EXPANDING MILITARY INFLUENCE

## Qiam Guidance Components



▲ Inertial Measurement Unit



◄ Junction Box



Qiam Debris



▲ SHIG Manufactured Computer Board



# IRAN'S EXPANDING MILITARY INFLUENCE

## Toophan Anti-tank Guided Missile

### IRANIAN COPY OF U.S. TOW CURRENTLY IN USE BY HUTHI FORCES



▲ *Missile debris collected by Saudi Arabia*



The Toophan is a line-of-sight missile that receives guidance commands by wire and has a range of about 4 km (2.5 miles). This missile is only produced by the U.S. and Iran.



▲ *Iranian Toophan launch motor nozzle is externally cylindrical*



▲ *U.S. TOW launch motor nozzle is externally conical*









◄ *White actuator bottle consistent with Iranian produced Toophan using Persian calendar date scheme*



# IRAN'S EXPANDING MILITARY INFLUENCE
## Qasef-1 Unmanned Aerial Vehicle Capabilities





- The Qasef-1 is based on the Iranian Ababil UAV family first developed in the 1990's

- The quality of components, design, and original mission are similar to those found on aerial target UAVs

- This design was repurposed to conduct land attack missions





# IRAN'S EXPANDING MILITARY INFLUENCE

## Qasef-1 Unmanned Aerial Vehicle

- Used as one-way attack or "lethal" UAV designed to dive on targets in a kamikaze-like fashion detonating its onboard warhead

- These UAVs are expendable, one-time use; similar to a cruise missile

- According to the UK-based NGO, Conflict Armament Research, the Qasef-1 was used to target Saudi-led Coalition missile defense systems

- Reconnaissance and surveillance versions also available





- Qasef-1, a smaller member of the Iranian designed and produced Ababil UAV family, has an endurance of 120 minutes, a range of 150 km (93 miles), and carries an explosive warhead of about 15-20 kg (33-44 lbs).

- Serial numbers are consistent with other Ababil 2 UAV variants observed in Iran

- Unique configuration to only the Iranian Ababil UAV family

# IRAN'S EXPANDING MILITARY INFLUENCE

## Iranian Technology Transfers to Yemen

### (UK-BASED NGO, CONFLICT ARMAMENT RESEARCH)

















# IRAN'S EXPANDING MILITARY INFLUENCE
## Interdiction of Iranian Flagged Dhow on 29 March 2016



▲ *Interdiction*



▲ *Dhow*



▲ *Fuze plate*



▲ *Seized RPGs*



▲ *AK-47s*



# IRAN'S EXPANDING MILITARY INFLUENCE

## HMS Al Madinah (F2000 Class Frigate)

### STRUCK BY HUTHI-OPERATED SMALL BOAT 30 JAN 2017

- HMS Al Madinah is a 133m, 2610 ton  frigate, built in France for the Saudi Navy in 1985

- Al Madinah was on patrol in the Red Sea when attacked by a single explosive boat

- Detonation produced a shock hole in the transom measuring approximately 1.5m wide x 2.0m high

- Steering gear compartment was completely destroyed in the initial blast; Aft crew quarters destroyed by subsequent fire

- Five casualties reported in crew berthing



◄ *Direction of Attack*



**Blast Damage to HMS Al Madinah**



*Approximate location of attack*



# IRAN'S EXPANDING MILITARY INFLUENCE
## Captured Explosive Boat
### SHARK-33 OVERVIEW



◄ *GPS Antenna and Heading Senor*

▲ *Pan/Tilt/Zoom Camera System*

*Throttle Controls* ►





▲ *Hydraulic Steering Pump*



▲ *STYX Warhead*



*Fuze Plate* ►

◄ *Guidance Computer*



# IRAN'S EXPANDING MILITARY INFLUENCE

## Huthi SHARK-33

### CAPTURED LATE 2016

- Fuze plate found on SHARK-33 identical to those found onboard Iranian-flagged dhow ADRIS boarded in March 2016

- Documentation found on ADRIS showed its likely origin as Shahid Jolaie Maritime Industries which is located in Tehran.





*Fuze plate on SHARK-33*





"Shahid Jolaie Maritime Industries" "Maritime Armament Factory"

*One of six fuze plates on ADRIS*

# IRAN'S EXPANDING MILITARY INFLUENCE

## Huthi SHARK-33

### CAPTURED LATE 2016





Same software logo as advertised FHM Electronics software

Very Similar parsing of table

Same speed layout

Software "Mode One"

*Software advertised by FHM*

*Software onboard SHARK-33*

The computer software advertised in the FHM Electronics catalog is similar to the software found on the SHARK-33, including the company logo.



# IRAN'S EXPANDING MILITARY INFLUENCE

## Huthi SHARK-33

### CAPTURED LATE 2016

- Circuit board in camera and multiple boards inside control system are marked "FHM Electronics"

- FHM Electronics is an Iranian private company located in Tehran



◄ *"FHM Electronics"*



▲ *FHM Logo*



# IRAN'S EXPANDING MILITARY INFLUENCE



## Huthi SHARK-33
### CAPTURED LATE 2016

- 90 sets of coordinates for locations in Iran, Yemen, and the Red Sea found on SHARK-33 computer

- One of two Tehran locations corresponds to the Self Sufficiency Jihad Organization (SSJO)



◀ *IRGCN SSJO location in Tehran*

▲ *GPS locations recovered from Shark-33 hard drive in the area of the Strait of Hormuz*

▲ *Locations in Tehran*



# IRAN'S EXPANDING MILITARY INFLUENCE

## Huthi SHARK-33

### CAPTURED LATE 2016

Images found on SHARK-33 computer show the likely production, assembly or testing of at least seven probable additional computers at an IRGC facility in eastern Tehran.





**IRGC Hat**





# IRAN'S EXPANDING MILITARY INFLUENCE
## Iranian Defense Industries

Not all MODAFL subordinates shown

Ministry of Defense and Armed Forces Logistics (MODAFL)

Aerospace Industries Organization (AIO)

Defense Industries Organization (DIO)

Marine Industries Organization (MIO)

Iran Aviation Industries Organization (IAIO)

Shahid Hemmat Industries Group (SHIG)

Ya Mahdi Industries Group (YMIG)

Shahid Bagheri Industries (SBI)

Shahid Jolaie Marine Industries (JMI)

Iran Aircraft Manufacturing Industries (HESA)

QIAM

TOOPHAN

QIAM

SHARK-33

QASEF



# IRAN'S EXPANDING MILITARY INFLUENCE

## Iranian Missile Distance Capabilities

INFO GRAPHIC SHOWING VARIOUS MISSILE DISTANCES ORIGINATING FROM IRAN



| SYSTEM | FATEH-110 | SHAHAB 1 | SHAHAB 2 | QIAM-1 | SHAHAB 3 | EMAD-1 | SEJIL |
|---|---|---|---|---|---|---|---|
| MAX RANGE (KM) | 300 | 300 | 500 | 900 | UP TO 2,000 | UP TO 2,000 | 2,000 |
| PROPELLANT TYPE | SOLID | LIQUID | LIQUID | LIQUID | LIQUID | LIQUID | SOLID |
| DEPLOYMENT MODE | ROAD-MOBILE | | | | | | |

System - Max Range (km)
- Fateh-110/Shahab 1 - 300
- Shahab 2 - 500
- Qiam - 900
- Shahab 3*/Emad-1*/Sejil - 2000
  * Max Range up to 2000 km