# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CASEY COOMBS, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 19-3363 (RDM) |
| ISLAMIC REPUBLIC OF IRAN, | |
| *Defendant.* | |

## MEMORANDUM OPINION AND ORDER

This case arises from the kidnapping and detention of four United States citizens by members of the Houthi militant group in Yemen between 2015 and 2016.  Plaintiffs Casey Coombs, Scott Darden, Haisam Farran, Wallead Luqman, and their family members bring this suit against the Islamic Republic of Iran, invoking the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(a).  Although Plaintiffs allege that they were kidnapped and detained by Houthi rebels in Yemen, they bring this action against Iran on the theory that Iran provided "material support" to the Houthis, who then used that support to take Plaintiffs hostage and torture them, Dkt. 1 at 6 (Compl. ¶ 35); *see* 28 U.S.C. § 1605A(c).

Because Iran has not answered or otherwise appeared in this litigation, the Clerk of Court entered a default at Plaintiffs' request on October 8, 2020.  Dkt. 18.  Plaintiffs now move the Court for an entry of default judgment against Iran.  Dkt. 19.  As explained below, Plaintiffs have established their right to relief under 28 U.S.C. § 1605A(c).  Accordingly, the Court will **GRANT** Plaintiffs' motion for the entry of a default judgment against the Islamic Republic of Iran and will **REFER** the matter to a special master to assist in evaluating Plaintiffs' damages.

# I.  INTRODUCTION

Plaintiffs Casey Coombs, Scott Darden, Haisam Farran, Wallead Luqman, and twenty-six of their U.S. citizen family members bring this action against Defendant the Islamic Republic of Iran seeking damages arising out of the alleged hostage taking and torture of Coombs, Darden, Farran, and Luqman in Yemen at the hands of the Houthi militant group.  Dkt. 1 (Compl.).  Plaintiffs have proceeded against Iran on the theory that Iran "knowingly and intentionally provid[ed] material support and resources to enable and assist the Houthis in carrying out acts of terrorism and torture on Americans" and thus is "liable for the damages [Plaintiffs] suffered . . . as a direct and proximate result of the hostage taking and torture" of Coombs, Darden, Farran, and Luqman.  *Id.* at 6 (Compl. ¶ 35).  Plaintiffs effected service on the Islamic Republic of Iran on July 14, 2020.  Dkt. 15 at 8.  Iran has not answered, filed a motion under Federal Rule of Civil Procedure 12, or otherwise appeared.

Plaintiffs now seek entry of a default judgment against the Islamic Republic of Iran pursuant to Federal Rule of Civil Procedure 55.  Dkt. 19 at 1.  Entry of a default judgment is not automatic, however, and requires the Court to exercise its sound discretion.  *See Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005); *Sanchez v. Devashish Hosp.*, 322 F.R.D. 32, 36 (D.D.C. 2017); *Boland v. Yoccabel Const. Co.*, 293 F.R.D. 13, 17 (D.D.C. 2013) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)).  Most notably, the Court must—in all cases—satisfy itself that it has subject-matter jurisdiction over the claims and personal jurisdiction over the defendant.  *See Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) ("A default judgment rendered in excess of a court's jurisdiction is void."); *Mwani*, 417 F.3d at 6 (explaining that a court must "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant").

In cases brought against a foreign state, however, the Court's discretion to enter a default judgment is more narrowly circumscribed.  By statute, no federal or state court may enter a default judgment against a foreign state or instrumentality "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  This is the same standard that applies to default judgments against the United States under Federal Rule of Civil Procedure 55(d).  *See Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1610 (2020); *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003).  In a case such as this, which alleges that a foreign state materially supported acts of terrorism, the district court must determine "how much and what kinds of evidence the plaintiff must provide."  *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014).  And the Court must do so in light of both Congress's purpose in enacting § 1605A—that is, to "compensate the victims of terrorism [so as to] punish foreign states who have committed or sponsored such acts and [to] deter them from doing so in the future," *id.* at 1048—and the difficulty in obtaining "firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign," *Owens*, 864 F.3d at 785.  As a result, Plaintiffs carry the burden of (1) producing evidence sufficient to show that their claims fall within the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), *see* 28 U.S.C. § 1605A(a); *Owens*, 864 F.3d at 784; (2) establishing that Iran was served in accordance with the FSIA, *see* 28 U.S.C. § 1608(a); and (3) demonstrating their right to relief under federal law, *see* 28 U.S.C. § 1605A(c), *Owens*, 864 F.3d at 808, by offering evidence "satisfactory to the court," 28 U.S.C. § 1608(e).

Plaintiffs have sought to meet this burden using three sets of evidence:  First, Plaintiffs have submitted sworn affidavits from Coombs, Luqman, Farran, and Darden, in which they

recount their abductions, detention, and treatment by the Houthis.  Dkt. 20-1 (Coombs Aff.); Dkt. 20-2 (Luqman Aff.); Dkt. 20-3 (Farran Aff.); Dkt. 20-4 (Darden Aff.); Dkt. 21-1 (Coombs Suppl. Aff.); Dkt. 21-2 (Farran Suppl. Aff.).  Second, Plaintiffs have asked the Court to take judicial notice of the testimony and evidence that was presented in *Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85 (D.D.C. 2019), a Foreign Sovereign Immunities Act case that also involved abductions of U.S. citizens by Houthi militants in Yemen.  Finally, Plaintiffs have submitted expert affidavits from Michael Pregent, Dkt. 20-5 (Pregent Aff.); Dkt. 21-3 (Pregent Suppl. Aff.), a former intelligence officer and Senior Fellow at Hudson Institute, whom this Court qualified in *Hamen* as an "expert on the [Islamic Revolutionary Guard Corps] Qods Force and Iranian efforts to influence political activity in Yemen, Iraq, Syria, and Lebanon," 401 F. Supp. at 91 n.1.  In addition to providing relevant updates and discoveries since July 2018, Pregent "confirm[ed] and reaffirm[ed] the truth and accuracy of each statement made during [his] testimony [in *Hamen*], without need for retraction or amendment, despite the benefit of hindsight and [his] observation of subsequent developments."  Dkt. 20-5 at 2 (Pregent Aff. ¶ 10).

On December 17, 2021, the Court held an oral argument on Plaintiffs' motion, during which it granted Plaintiffs leave to file a supplemental memorandum and exhibits to address certain questions raised by the Court.  *See* Min. Entry (Dec. 17, 2021).  Plaintiffs filed those materials on January 16, 2022.  Dkt. 21; Dkt. 21-1 (Coombs Suppl. Aff.); Dkt. 21-2 (Farran Suppl. Aff.); Dkt. 21-3 (Pregent Suppl. Aff.).

In the course of reviewing the evidence, the Court has applied the Federal Rules of Evidence, but has done so on the understanding, first, that it has "the authority—indeed, . . . the obligation—to 'adjust [evidentiary requirements] to . . . differing situations,'" *Han Kim*, 774 F.3d at 1048 (modifications in *Han Kim*) (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C.

Cir. 1981)), and, second, that the Court need not "step into the shoes of the defaulting party and pursue every possible evidentiary challenge," *Owens*, 864 F.3d at 785. Expert testimony, moreover, is not only entirely proper in FSIA cases, but often sufficient, *see id.* at 787–89, and even indispensable in "terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain." *Id.* at 787. Whether through expert testimony or other competent evidence, though, the Court must ultimately determine whether Plaintiffs have "substantiate[d] [the] essential element[s] of jurisdiction" with admissible evidence. *Id.* at 786.

Based on this record, the Court now makes the following findings of fact and conclusions of law.

## II.  FINDINGS OF FACT

In addition to submitting affidavits from Coombs, Darden, Farran, Luqman, and Pregent, Plaintiffs have also asked the Court to take notice of the evidence and testimony presented to this Court in *Hamen*. *See Salzman v. Islamic Republic of Iran*, No. 17-cv-2475, 2019 WL 4673761, at *3 (D.D.C. 2017). The evidentiary presentation in that case included testimony from eleven witnesses (including experts), and over a dozen exhibits (including government reports). *Hamen*, 401 F. Supp. 3d at 91. Among others, the Court in *Hamen* heard testimony from experts Michael Pregent and Dr. Daniel Green, a Defense Fellow at the Washington Institute for Near East Policy. *Id.*

Although prior decisions in this district "have . . . frequently taken judicial notice of earlier, related proceedings," *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010), that does not mean that the Court should simply accept the facts found in the earlier opinion, which would amount to a prohibited exercise of collateral estoppel, *see Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 20 (D.D.C. 2001) ("[F]indings of fact

5

made during the course of this type of one-sided [FSIA] hearing should not be given a preclusive effect."). The Court may, however, "review evidence considered in" a prior proceeding "without necessitating the re-presentment of such evidence." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010). With this in mind, the Court has reviewed the exhibits admitted into evidence and the testimony presented in the *Hamen* case and has considered that evidence for the purposes of this proceeding as well.

Based on that evidence and the affidavits that Plaintiffs have submitted in this case, the Court finds as follows: First, Iran provided the Houthis with significant support, either directly or indirectly through other proxies, in the form of training, weapons and funding, as part of its larger strategy to use proxy groups to destabilize the region. Second, the Houthis would not have been in a position to effectuate the abductions of Coombs, Darden, Farran, and Luqman without the assistance of Iran. Third, the Houthis would not have attempted the kidnapping and hostage taking of Coombs, Darden, Farran, and Luqman without the backing of Iran. The Court ultimately concludes that, through these actions, Iran supported the hostage taking of Coombs, Darden, Farran, and Luqman. The Court will discuss the factual foundation for each of these conclusions in turn.

**A.      Iran's Provision of Support to the Houthis**

1.      *Overview of Iran's Proxy Strategy*

Since the Iranian Revolution in 1979, Iran has sought to maintain influence over other countries in the region, such as Lebanon, Syria, and Yemen, by pursuing a strategy of "destabilizing" and "fractur[ing]" the governments in those countries. *Hamen*, No. 16-cv-1394,

Dkt. 48 at 173–74 (Pregent).[1]  One of the principal ways that Iran has sought to achieve this goal is by financing and supporting local groups known as "proxy organizations," which Iran, in turn, uses to "strategically carry out Iran's goals." *Id.* (Pregent).  By using these groups as surrogates, Iran is able to achieve its goals in the region, while simultaneously denying responsibility for the actions of its proxies.

The Iranian military body responsible for identifying and training proxy organizations is known as the Islamic Revolutionary Guard Corps Qods Force ("Qods Force").  *Id.* at 173–74 (Pregent).  The Qods Force is the "external operating body" of the Iranian government, *id.* at 174 (Pregent), and "focuses on conducting foreign operations which support insurgents and terrorists," *Hamen*, No. 16-cv-1394, Dkt. 32-4 at 8 (Green Aff. ¶ 33).  The commander of the Qods Force at the time, General Qasem Soleimani, reported directly to the Supreme Leader of Iran, Ali Khomeini.  *Hamen*, No. 16-cv-1394, Dkt. 48 at 174 (Pregent).

The Qods Force coordinates with proxy militant groups to conduct terrorist attacks by providing weapons, training, funding, and guidance.  *Id.* at 179–80 (Pregent); *Hamen*, No. 16-cv-1394, Ex. 10 at 3.[2]  Once the Qods Force develops a relationship with a group, it supplies

---

[1] Many of the Court's findings in this section are derived from the expert testimony of Michael Pregent and Dr. Daniel Green.  After considering the requirements of Federal Rule of Evidence 702, the Court in *Hamen* qualified Pregent as an expert on the Islamic Revolutionary Guard Corps Qods Force and Iranian efforts to influence political activity in Yemen, Iraq, Syria, and Lebanon, *Hamen*, No. 16-cv-1394, Dkt. 48 at 172, and qualified Dr. Green as an expert on terrorism, insurgency and counter-insurgency issues generally in the Middle East, and particularly as it relates to Iran and its activities in Yemen, *Hamen*, No. 16-cv-1394, Dkt. 49 at 41.  *See Hamen*, 401 F. Supp. 3d at 91–92 n.1.  The Court has re-reviewed the testimony of Pregent and Green and reaffirms their qualifications as experts.

[2] Exhibit 10 from the *Hamen* case is a press release, entitled "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," *Hamen*, No. 16-cv-1394, Ex. 10 at 1, that describes U.S. Government actions "to counter Iran's . . . support for terrorism," *id.* at 1.  In *Hamen*, the Court concluded that this exhibit was admissible under the public records exception to the hearsay rule, which provides that "a record or statement of a

weapons, which range from small arms such as AK-47s to sophisticated weaponry such as antitank weapons and explosively formed penetrators, depending on the group's training and capability. *Hamen*, No. 16-cv-1394, Dkt. 48 at 180–81 (Pregent); *Hamen*, No. 16-cv-1394, Dkt. 49 at 63–64 (Pregent). The Qods force also trains proxies to use those weapons, both in the home countries of the proxies and in other areas in the region. *Hamen*, No. 16-cv-1394, Dkt. 48 at 182–83 (Pregent).

In addition to military support and training, the Qods Force "exports" to its proxies a "collection of behaviors[,] tactics, and capabilities," *Hamen*, No. 16-cv-1394, Dkt. 49 at 111 (Green), which includes other terrorism techniques such as "bomb making" and "assassination and kidnapping," *Hamen*, No. 16-cv-1394, Dkt. 48 at 182 (Pregent). Of particular relevance here, Iran encourages its proxy groups to kidnap "high value targets" by providing "incentives" in the form of "a bounty or reward." *Id.* at 191–92 (Pregent). The "highest value target" to Iran is an American. *Id.* (Pregent). The Qods Force also typically exercises control over its proxies' efforts to kidnap Americans because such operations and subsequent negotiations are complex and can potentially implicate Iran if not strategically executed. *Id.* at 16–18 (Pregent).

According to the U.S. Department of the Treasury, the Qods Force has supported militant groups including the Taliban, Hamas, and—most relevant here—the Lebanese Hezbollah ("Hezbollah"). *Hamen*, No. 16-cv-1394, Ex. 10 at 3. As a result of these activities, the State Department has designated Iran as a state sponsor of terrorism, *see* U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm (last visited March 1, 2022),

---

public office" is admissible if it contains "factual findings . . . from a legally authorized investigation" and does not "indicate a lack of trustworthiness." Fed. R. Evid. 803(8); *see also Owens*, 864 F.3d at 792. The Court has re-reviewed the exhibit and reaffirms its admissibility finding in *Hamen*.

and the Treasury Department has designated the Qods Force as providing support for terrorism, *Hamen*, No. 16-cv-1394, Ex. 10 at 1, 3.

      2.    *Hezbollah*

      Hezbollah's role as an Iranian proxy force is relevant to this case in two respects.  First, it serves as an example of how Iran cultivates militant organizations in other countries and employs them as surrogates—a model that Iran applied to the Houthis in Yemen.  *Hamen*, No. 16-cv-1394, Dkt. 48 at 185–86 (Pregent).  Second, Hezbollah served as a liaison between Iran and the Houthis to provide training and regular financial support.

      The Qods Force has developed Hezbollah as a proxy for over 20 years.  *See id.* at 185 (Pregent).  As a result of that ongoing and established relationship, Hezbollah is today regarded as the "gold standard" for what Iran hopes to achieve with proxy militias in Afghanistan, Syria, Iraq, and Yemen.  *Id.* at 184–85 (Pregent).  In particular, Hezbollah is directed by the Qods Force to conduct external operations on Iran's behalf, and, in order to facilitate those efforts, Iran provides Hezbollah with a budget of roughly $200 million per year.[3]  *Id.* at 185–86 (Pregent).  Hezbollah's "3800 Unit" is responsible for Hezbollah's training activities that support the proxy militias—including the Houthis—and the 3800 Unit develops a closer relationship with the proxies through proximity and frequent interactions.  *Id.* at 190 (Pregent).  To further strengthen Hezbollah's relationship with other proxies, it often distributes funding to these groups at Iran's direction.  *Id.* at 191 (Pregent).  The Qods Force also maintains oversight over Hezbollah and its

---

[3] To the extent these dollar figures "recite potentially inadmissible facts," the Court concludes that they appropriately "disclose" a portion of the "factual basis for" the admissible expert testimony.  *Owens*, 864 F.3d at 790.  The same is true with respect to various other "potentially inadmissible facts" referenced in Plaintiffs' expert testimony and reports.  *Id.*

3800 Unit by sending advisers to oversee the Unit and to meet with proxy leadership. *Id.* at 192 (Pregent).

Also relevant here, the Unit's training of proxy groups typically includes not only weapons training, but also training in kidnapping and hostage-taking techniques, focusing on American targets. Dkt. 49 at 16 (Pregent). Notably, Hezbollah trains proxy groups to target lower profile Americans (*i.e.*, not high-ranking officials or diplomats) such as enlisted soldiers and contractors, to avoid triggering a military response. *Id.* at 16–17 (Pregent). Specific techniques include using American accents either to gain access to the target or to interrogate the detainee. *Id.* at 18 (Pregent).

Based on this evidence, and consistent with numerous other decisions from this Court, the Court finds that Hezbollah is an Iranian proxy. *See, e.g.*, *Hamen*, 401 F. Supp. 3d at 93; *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 48, 60 (D.D.C. 2018); *Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, 313 F. Supp 50, 54–55 (D.D.C. 2018).

       3.    *The Houthis*

       a.   <u>Origins</u>

The Houthis originate from the Saada Governorate region in the northwest of Yemen, near the border of Saudi Arabia. The group began as a localized insurgency, which protested the Yemeni government's economic discrimination and political marginalization of the region. *Hamen*, No. 16-cv-1394, Dkt. 49 at 43–44 (Green); *Hamen*, No. 16-cv-1394, Dkt. 32-4 (Green Aff. ¶ 20). The Houthis, like many northern Yemenis, subscribe to the Zaidi Shia religion, which differs from the Iranian Shia religion and from the religion of most Yemenis, which is Sunni. *Hamen*, No. 16-cv-1394, Dkt. 49 at 44 (Green). The Houthis are named for one of its leading families—the al-Houthis—and adopted that family name when the group's first leader, Hussain al-Houthi, was killed by government forces. Hussain al-Houthi "embrace[d] the radical

elements of Iranian foreign policy" since travelling there in 1986, including "a rabid opposition to the United States and Israel." *Hamen*, No. 16-cv-1394, Dkt. 32-4 at 6 (Green Aff. ¶ 24). Before his death, Hussain al-Houthi popularized the Houthi chant, known as the "sarkha," of "God is great!  Death to America!  Death to Israel!  A curse upon the Jews!  Victory for Islam!" *Hamen*, No. 16-cv-1394, Dkt. 51-1 at 1 (Green Suppl. Aff. ¶¶ 5–6).  These words also appear in Arabic on patches worn by Houthi soldiers.  Dkt. 48 at 52–53 (McAlister).

Until the early 2000s, the Houthis remained a localized insurgency.  *Hamen*, No. 16-cv-1394, Dkt. 49 at 43–44 (Green).  In 2004, however, the government of Yemen launched a military campaign against the Saada Governorate region, and the al-Houthi family in particular, which triggered a period of "six wars" between the Houthis and the Yemeni government.  *Id.* at 45–46 (Green).  Even at this early stage in the Houthis' history, Iran supported and exerted influence over the group, but, Iran's influence was limited at the time, and the Yemeni government remained strong.  *Id.* at 46–47, 96 (Green).  The six wars officially came to an end in 2010, when, after much death and destruction, both sides signed a peace accord.  *Id.* at 46 (Green).

In 2011, the Arab Spring movement took hold in Yemen, which led to broad-based demonstrations against the government.  *Hamen*, No. 16-cv-1394, Dkt. 32-4 at 7 (Green Aff. ¶ 30).  These protests, coupled with "poor governance, corruption, and incompetence[,] . . . contributed to a general collapse of government control throughout the country."  *Id.*; *accord* Dkt. 49 at 48 (Green).  In 2012, Ali Abdullah Saleh resigned as President of Yemen, and a provisional government, backed by the United Nations and the international community, took control until Saleh's former vice president, Abdrabbuh Mansur Hadi, was elected about a year later.  *Hamen*, No. 16-cv-1394, Dkt. 49 at 49–51 (Green).  Saleh retained power and influence,

however, particularly in his home province in the north of Yemen, and sections of the Yemeni military remained loyal to him. *Id.* at 50, 54 (Green).

During this political transition, Iran took steps to "deepen its relationship with the Houthis and to expand its assistance to the group." *Hamen*, No. 16-cv-1394, Dkt. 32-4 at 8 (Green Aff. ¶ 31); *see also Hamen*, No. 16-cv-1394, Dkt. 49 at 6 (Pregent) ("[T]he IRGC-Qods Force increase[d] the Houthis' capabilities during the 2010–2011 uprisings . . . ."). With Iran's backing, the Houthis took up arms against Yemen's government and began to infiltrate Yemen's capital city of Sana'a. *Hamen*, No. 16-cv-1394, Dkt. 49 at 54 (Green). During this time, the Houthis—enabled by Iran—also joined forces with former President Saleh, forming a coalition with the goal of isolating and marginalizing the Yemeni government under Hadi's authority. *Id.* at 54 (Green). In 2014, the Houthis attacked Sana'a, seizing the city and forcing President Hadi to flee to the south of Yemen. *Id.* at 53–54 (Green). The Houthis solidified their control of the city by seizing the homes of opponents who had fled, undertaking an assassination campaign against prominent leaders, and initiating a detention program against potential opponents. *Id.* at 55–56 (Green). When the Houthis took control of Sana'a, the United States withdrew its diplomatic personnel in February 2015. *Id.* at 54–55 (Green). The Houthis maintained political and military control over the city of Sana'a throughout the time of the abductions and detention of Coombs, Dardan, Farran, and Luqman.

          b.   Iran's Provision of Funding, Weapons, and Training

There is ample evidence that Iran has facilitated arms shipments to the Houthis since at least 2009. *Id.* at 58–64 (Green); *Hamen*, No. 16-cv-1394, Dkt. 32-4 at 13 (Green Aff. ¶¶ 49–50). The evidence submitted in the *Hamen* case, which the Court considers here as well, shows that numerous shipments originating in Iran and carrying Iranian-made weapons—ranging from small arms to advanced weaponry—have been recovered on their way to Houthi territory.

*Hamen*, No. 16-cv-1394, Dkt. 49 at 58–64 (Green). Arms shipments including ammunition, rocket-propelled grenade launchers, 122 millimeter rockets, C4 plastic explosive blocks, electrical equipment that can be used to manufacture improvised explosive devices, AK-47s, unmanned aerial vehicles, and explosively formed penetrators, have been intercepted on their way to Houthi territory. *Id.* at 58–59, 63 (Green). The weapons shipped, moreover, have become increasingly sophisticated over time. *Id.* at 63 (Green).

There is also evidence of the use of Iranian-made weapons: Iranian-made SCUD missiles were fired at Saudi Arabia from Houthi-controlled territory, *id.* at 65–66 (Green); *id.* at 7–12 (Pregent); the Houthis used an Iranian "Shark 33" attack boat to attack the Saudis, *id.* at 13–14 (Pregent); and the Houthis used Iranian-made sea mines in southern Yemen, *id.* at 66 (Green). Iran has continued to supply arms and arms-related material to the Houthis despite agreeing not to do so as part of the (now-defunct) 2015 Joint Comprehensive Plan of Action with the United States and United Nations. *Id.* at 70–85 (Green). There is also no indication that Iran provided support of this type to any group in Yemen other than the Houthis, *id.* at 14 (Pregent), confirming the conclusion that the arms shipments were intended for the Houthis. The repeated nature of the shipments and the variety and sophistication of armaments, moreover, reflect a significant, long-term commitment on behalf of Iran to militarily support the Houthis. *Hamen*, No. 16-cv-1394, Dkt. 32-4 at 14 (Green Aff. ¶ 51). Iran has also provided financial support to the Houthis. There is evidence, for example, that Iran directed Hezbollah's 3800 Unit to provide the Houthis $50,000 per month, or about $600,000 per year. *Hamen*, No. 16-cv-1394, Dkt. 48 at 187–91 (Pregent).

In addition to providing financial support and weapons, Iran has provided training to the Houthi militants, either directly or through Hezbollah. Since 2009, Houthi militants have

received training at Hezbollah training camps, *Hamen*, No. 16-cv-1394, Dkt. 49 at 15 (Pregent),

including in Lebanon, Syria, and Iraq, *id.* at 96 (Green).  Beginning in 2011, Iran assigned Qods

Force officer Abdul Reza Shahlai as the leader of its efforts to "advise, assist, resource, and train

the Houthis."  *Hamen*, No. 16-cv-1394, Dkt. 32-4 (Green Aff. ¶ 32); *Hamen*, No. 16-cv-1394,

Dkt. 49 at 53, 64, 96 (Green).  In 2013 and 2015, select Houthis participated in combat in Syria

after having undergone training in Hezbollah training camps. *Hamen*, No. 16-cv-1394, Dkt. 49 at

15–16 (Pregent).  In October 2014, several 3800 Unit members were captured in Yemen while

training the Houthis.  *Id.* at 18–19 (Pregent).  Hezbollah leaders have also confirmed training the

Houthis in Yemen, Lebanon, and Iran.  *Hamen*, No. 16-cv-1394, Dkt. 32-4 at 11 (Green Aff.

¶ 43).

There is also evidence that Iran trained the Houthis on hostage taking and kidnapping

techniques.  Although kidnapping was used as a political tool in Yemen prior to Iran's influence,

those tactics predominantly involved kidnapping other Yemenis.  *Hamen*, No. 16-cv-1394, Dkt.

49 at 68–69 (Green).  However, as further discussed below, the Houthis seized and held Coombs,

Darden, Farran, and Luqman in the Spring of 2015, *Hamen*, No. 16-cv-1394, Dkt. 51-1 at 1

(Green Suppl. Aff. ¶¶ 1–4); *Hamen*, No. 16-cv-1394, Dkt. 49 at 108 (Green), before taking two

other civilian Americans, Mark McAlister and John Hamen, hostage in October 2015, *see*

*Hamen*, 401 F. Supp. 3d at 89.  The experts who testified in the *Hamen* case both agreed that,

due to the risk and complexity of kidnapping Americans and holding them hostage, the Houthis

would not have taken Americans and other foreigners hostage without the backing of Iran.  *Id.* at

69 (Green); *id.* at 21–22 (Pregent).

Although Iran has denied assisting the Houthis, *id.* at 76 (Green), Iran's Supreme Leader

Ayatollah Ali Khamenei stated in May of 2015 that "Yemen, Bahrain and Palestine are

oppressed, and we protect oppressed people as much as we can." *Id.* at 87 (Green).  Similarly,

Iranian Brigadier General Masoud Jazayeri, the deputy chief of staff of the Iranian armed forces,

stated in March of 2016 that "[t]he Islamic Republic felt its duty to help . . . the people of Yemen

in any way it can and to a level necessary." *Id.* at 88 (Green).  In 2014, an unnamed senior

Iranian official stated that "[t]he Qods Force had a 'few hundred' military personnel in Yemen to

train Houthi fighters." *Id.* at 88 (Green).  In light of the evidence as whole, these statements

show that Houthi support was authorized by Iranian officials at the highest level.

   Without Iranian backing, the Houthis would not have been able to exert power or control

outside of their home province of Saada; would not have been able to seize the capital city of

Sana'a or to maintain control of the city; and would not have developed the tactic of taking

American nationals hostage.  *Id.* at 112–13 (Green); *id.* at 20–22 (Pregent).

**B.**  **Abduction and Detention of Casey Coombs**

   Casey Coombs worked in Yemen as a freelance journalist beginning in February 2012.

Dkt. 20-1 at 1 (Coombs Aff. ¶ 5).  In late 2014 and early 2015, Coombs reported on the civil war

between President Hadi and the Houthis and planned to stay in Yemen as a neutral observer of

the conflict.  *Id.* at 2 (Coombs Aff. ¶ 7).  Throughout his time in Yemen, Coombs rented a home

in the al-Buniya neighborhood of Sana'a.  *Id.* (Coombs Aff. ¶ 8).  After the Houthis seized

Sana'a, Coombs attempted to secure travel out of Yemen, but was unable to obtain safe

transport.  *Id.* (Coombs Aff. ¶¶ 8–9).

   On May 15, 2015, Coombs's landlord demanded that he pay her $100 immediately for

the remainder of the month's rent.  *Id.* (Coombs Aff. ¶ 10).  Coombs explained that he could not

pay.  *Id.*  In response, his landlord told him he would be evicted, and she then sent a guard to his

home.  *Id.*  When Coombs tried to block the guard from entering, the guard informed Coombs

that he was going to get the Houthis.  *Id.*

Later that day, while walking home from a nearby store, Coombs was surrounded by

armed Houthi gunmen who appeared to be in their teens.  *Id.* (Coombs Aff. ¶ 12).  The gunmen

took Coombs inside his home and remained with him for several minutes until the police arrived.

*Id.*  The police and Houthis searched Coombs's belongings and took him on foot to a nearby

Houthi military compound.  *Id.* at 3 (Coombs Aff. ¶¶ 12–13).  From there, they drove him to the

local police station, where Coombs was interrogated, *id.*, and then a police officer and a Houthi

soldier drove Coombs to the Criminal Investigations Department of the Ministry of the Interior,

while a truck full of Houthi soldiers followed.  *Id.* (Coombs Aff. ¶ 14).

The group parked outside the Department and waited.  *Id.*  Sometime later, a white van

with dark tinted windows pulled up, which Coombs recognized as "the same color, make[,] and

model of van with tinted windows parked at Houthi military compounds throughout the city

since the Houthis took control of Sana'a."  *Id.* (Coombs Aff. ¶ 15).  An "older man" then exited

the building and "ordered" the police and soldiers to bring Coombs to him, which they

immediately did.  *Id.*  According to Coombs, the older man "did not look Yemeni" and "spoke

very clear English with a subtle accent" that he "did not recognize."  *Id.* (Coombs Aff. ¶ 16).

The man ordered a soldier to handcuff Coombs, and then Coombs was placed into the backseat

of the white van and blindfolded.  *Id.*

Once inside the van, Coombs tried to ask the older man a question, but the man yelled

"Shut up! You've done something terrible," and shoved his head down between his legs.  *Id.*

(Coombs Aff. ¶ 17).  The driver then "floored the accelerator" and the van "began to zigzag

through Sana'a" at what felt to Coombs like "a dangerous pace." *Id.* Coombs recalls "hearing horns blare at every corner and intersection." *Id.*

After some time, they "began to gain altitude" then followed a winding road and stopped in front of a building with a gravel driveway. *Id.* (Coombs Aff. ¶ 18). The Houthis took Coombs inside and placed him in a windowless, 10-feet-by-15-feet cell with three Yemeni detainees. *Id.* at 3 (Coombs Aff. ¶¶ 18–19). The room had no toilet—just a hole in the ground. *Id.* (Coombs Aff. ¶ 19).

Coombs spent a few days in that cell, after which he was moved to a solitary cell without any windows. *Id.* (Coombs Aff. ¶¶ 18, 20). The cell had a bright light in the ceiling that "frequently" turned off and on "at random intervals." *Id.* Coombs lost "all sense of whether it was light or dark outside" and could "hear the screams of other detainees at all hours." *Id.*

At the time of his abduction, Coombs had been taking the same prescription medication for depression and anxiety for several years. *Id.* (Coombs Aff. ¶ 21). Even though he repeatedly asked the guards to retrieve his medication, they either ignored him or brought him Tylenol. *Id.* After a few days, Coombs began to experience serious withdrawal symptoms, including "extreme headaches, body pains, and nightmares." *Id.*

During the seventeen days of his captivity, *see id.* at 2, 6 (Coombs Aff. ¶¶ 10, 27), Coombs was frequently interrogated, *id.* at 4 (Coombs Aff. ¶ 21). Guards would enter his room at random times, blindfold and handcuff him, and then question him "for what felt like hours," accusing him "of being everything from a member of al-Qaeda to a CIA spy." *Id.* (Coombs Aff. ¶ 22). The guards did not appear to care when Coombs repeatedly provided his captors with the names of the Houthi political officials who could confirm his role as an independent journalist. *Id.*

One day, Coombs was eating with the three Yemeni prisoners from his original cell when he accidentally bumped into one of the other prisoners. *Id.* at 5 (Coombs Aff. ¶ 25). The prisoner pushed him back, at which point one of the Houthi guards incited the other prisoners to fight Coombs. *Id.* The guard slid two wooden sticks through a slot in the cell door and directed the prisoners to beat him with them. *Id.* After the prisoners gave Coombs "a significant beating" the guards carried Coombs back to his cell, where they forced him to do "repetitive hard exercises" until he passed out. *Id.* Coombs later awoke on the floor of the cell, unable to stand. *Id.* Extremely dehydrated, he dragged himself across the floor to his water bucket but in his weakness and confusion accidentally poured the bucket all over his body. *Id.* (Coombs Aff. ¶ 23). He then passed out in the corner of his cell, shivering and wet, and drifted in and out of consciousness. *Id.*

Coombs eventually regained consciousness while inside an MRI machine at a hospital in Sana'a. *Id.* (Coombs Aff. ¶ 26). The imaging showed that his T9, T10, T11, T12, and L1 vertebrae were fractured or crushed. *Id.* at 5–6 (Coombs Aff. ¶ 26). Coombs remained at the hospital guarded by multiple Houthi gunmen, and he heard the doctors plead with the guards to release him, fearing that Coombs would become paralyzed or die if he did not undergo surgery given the proximity of bone fragments to his spinal cord. *Id.* at 6 (Coombs Aff. ¶ 26). About a week later, on June 1, 2015—seventeen days after his abduction—the Houthis released Coombs to an Omani delegation at the Sana'a airport. *Id.* (Coombs Aff. ¶ 27). He spent a week in Oman and then was flown to Seattle, Washington, where he underwent spinal surgery. *Id.*

Coombs regained the ability to walk a month after his surgery; however, he experienced "extreme pain in certain points on [his] spine for about two more years" and his "entire right hip and parts of [his] right leg and abdomen are permanently numb." *Id.* (Coombs Aff. ¶ 28). For

18

years after his captivity, Coombs dealt with persistent anemia, which caused him extreme mental and physical fatigue. *Id.* (Coombs Aff. ¶ 30). He has also experienced difficulty sleeping and suffered from short-term memory loss and "anxiety, depression, nightmares, and suicidal thoughts" that have "placed extreme strain on [his] relationships." *Id.* (Coombs Aff. ¶ 31)

C.   **Abduction and Detention of Scott Dardan and Haisam Farran**

        a.   Abduction of Scott Darden and Haisam Farran

Beginning in November 2014, Scott Darden worked in Yemen as a contractor for a logistics company. Dkt. 20-4 at 1 (Darden Aff. ¶ 4). He left the country in January 2015 after the Houthis initially took control of Sana'a and the Yemeni government but returned on March 16, 2015. *Id.* (Darden Aff. ¶ 4). At that time, Haisam Farran worked in Sana'a as a security consultant assisting with the evacuation and personal security of American expatriates, including Darden. Dkt. 20-3 at 1 (Farran Aff. ¶ 4). When fighting broke out in Sana'a shortly after Darden's return, Farran arranged to move, along with Darden, to a villa in a safer part of Sana'a, which they did on March 17, 2015. *Id.* at 2 (Farran Aff. ¶ 6); Dkt. 20-4 at 2 (Darden Aff. ¶ 6).

Several days later (Darden says it was March 20, Farran says March 27), armed Houthi soldiers arrived at the villa. Dkt. 20-3 at 2 (Farran Aff. ¶ 7); Dkt. 20-4 at 2 (Darden Aff. ¶ 7). The Houthis searched Darden's and Farran's belongings and took anything they could find that was of value, including the men's money, phones, and laptops. Dkt. 20-3 at 2 (Farran Aff. ¶ 9); *see* Dkt. 20-4 at 2 (Darden Aff. ¶ 7). The soldiers then led Darden and Farran outside, where they blindfolded Darden and placed a sack over Farran's head. Dkt. 20-3 at 2–3 (Farran Aff. ¶ 10); Dkt. 20-4 at 2 (Darden Aff. ¶ 8). They then placed Darden and Farran into a waiting vehicle and drove them to a Houthi prison situated in a national security facility in northeastern Sana'a, commonly referred to as "The Grave." Dkt. 20-3 at 3 (Farran Aff. ¶¶ 10–11); Dkt. 20-4 at 2 (Darden Aff. ¶ 8); Dkt. 21-2 at 1 (Farran Suppl. Aff. ¶ 2). On the way, the Houthis stripped

both Farran and Darden down to their underwear.  Dkt. 20-3 at 3 (Farran Aff. ¶ 11); Dkt. 20-4 at 2 (Darden Aff. ¶ 8).

   b. <u>Detention of Scott Darden</u>

  When Darden arrived at the prison, he was placed in a cell with two al-Qaeda fighters. Dkt. 20-4 at 2 (Darden Aff. ¶ 9).  The cell measured 8 feet by 20 feet and had only a hole in the ground for a toilet.  *Id.*  In his first few days at the prison, Darden was repeatedly questioned by his captors, who routinely threatened his life and promised that he would never see his family again.  *Id.* (Darden Aff. ¶ 10).  One interrogator threatened to have people murder Darden's son, who lived in Dubai, if Darden did not comply.  *Id.*

  Darden was "often beaten severely" during these interrogations.  *Id.* (Darden Aff. ¶ 11). His captors would force him into "stress positions" and make him do squats while a man hit his knees with a bat.  *Id.*  Once, the beatings dislocated his left knee.  *Id.*  During a different interrogation, Darden's captors showed him a hand-written note from his wife and "intensely questioned" him about potential hidden meanings within the text.  *Id.* at 3 (Darden ¶ 15).  When Darden could not identify any, he was "beaten severely."  *Id.*

  Darden was eventually moved to a different cell with only one other prisoner, though his captors would occasionally remove the other prisoner, leaving Darden in solitary confinement. *Id.* at 2 (Darden Aff. ¶ 12).  At one point, Darden was left alone for five days, during which he struggled with suicidal thoughts.  *Id.* at 3 (Darden Aff. ¶ 12).

  Darden was also deprived of basic necessities.  After arriving in only his underwear, Darden was not given any clothing, except for a sarong wrapped around his waist.  *Id.*  (Darden Aff. ¶ 13).  For the first three months of his captivity, Darden was not permitted to go outside, and over the course of his entire captivity he was only allowed to go outside a total of three times, each time for only one hour in a small enclosed area.  *Id.* (Darden Aff. ¶ 14).

Darden was finally released on September 20, 2015, six months after his abduction.  *Id.* (Darden Aff. ¶ 16).  Houthi soldiers entered Darden's cell, helped him clean up his appearance, and then reunited him with Farran.  *Id.*  The soldiers then drove Darden and Farran to the Sana'a airport, where they were handed over to a delegation from Oman.  *Id.*

During his captivity, Darden suffered "severe weight and muscle loss."  *Id.* (Darden Aff. ¶ 17).  Darden's poor living conditions and the beatings he received caused him "severe orthopedic issues," including a shortened iliotibial band, bone spurs, and ankle and knee pain, which make it "painful to stand and walk."  *Id.* at 3–4 (Darden Aff. ¶ 18).  Darden has also "struggle[d] mentally and emotionally" with the effects of his captivity, and, as a result, his personal relationships have been "severely hampered."  *Id.* at 4 (Darden Aff. ¶ 19).

  c. <u>Detention of Haisam Farran</u>

When Farran arrived at the prison, the soldiers escorted him to a large room and left him to sit on the floor, shackled, blindfolded, and in his underwear.  Dkt. 20-3 at 3 (Farran Aff. ¶ 12).  Some men then entered the room and interrogated him.  *Id.* (Farran Aff. ¶ 13).  They told Farran he "was there for long haul" and could be there "for a day, a month, a year, ten years, or . . . could be killed at any time."  *Id.*  The men then accused Farran of "being a CIA agent" and beat him for four hours until he lost consciousness.  *Id.*

Farran spent most of his captivity in solitary confinement.  *See id.* at 3–4 (Farran Aff. ¶¶ 15, 17).  His cell measured 5 feet by 15 feet, with only a 6-inch hole in the ceiling for ventilation, a faucet for water, and a hole in the ground for a toilet.  *Id.* at 3 (Farran Aff. ¶ 15).  He was given a thin sponge mattress and a small blanket to sleep with.  *Id.* at 4 (Farran Aff. ¶ 18).

Farran's cell was "twenty to twenty-five feet away from Casey [Coomb's] when he was brought in for his initial interrogation."  Dkt. 21-2 at 2 (Farran Suppl. Aff. ¶ 6).  He recalls

hearing the guards say in Arabic that "they were holding [Coombs] with the rest of the Americans to be used as a bargaining tool," and they accused Coombs "of working with the CIA and of being a spy." *Id.* (Farran Suppl. Aff. ¶ 7).

For the first month, Farran was interrogated three times a week and each time was beaten until he was unconscious. Dkt. 20-3 at 4 (Farran Aff. ¶ 16). The interrogations and beatings continued in the following five months, but with less frequency. *Id.* During his entire captivity, Farran was only allowed outside twice for one hour. *Id.* (Farran Aff. ¶ 20). Farran's captors also denied him access to his heart medication. *Id.* (Farran Aff. ¶ 19). After 45 days in prison, he began to experience chest pains and suffered a heart attack that required hospitalization. *Id.* (Farran Aff. ¶ 19); Dkt. 21-2 at 2 (Farran Suppl. Aff. ¶ 8). For a check-up visit some days later, Farran was transported to the hospital with Coombs, who Farran recalls "was laid out on a wooden stretcher with shackles on both his hands and feet" and "was screaming in pain from what appeared to be back injuries." Dkt. 21-2 at 2 (Farran Suppl. Aff. ¶ 8).

Farran's captors made clear that American hostages had been placed in The Grave for a specific reason. *Id.* at 1 (Farran Suppl. Aff. ¶ 4). When Saudi-led coalition fighters bombarded Sana'a, the guards reassured the other inmates that they "were safe so long as they had American prisoners." *Id.* at 1–2 (Farran Suppl. Aff. ¶ 4). On one of these occasions, Farran overheard a guard say in Arabic, "Don't be afraid. The American dogs are with us as hostages, so they will not strike this place," and "these American dogs are with us as hostages for negotiation." *Id.* at 2 (Farran Suppl. Aff. ¶ 5).

Farran was released on September 20, 2015, six months after his abduction. Dkt. 20-3 at 4 (Farran Aff. ¶ 21). His captors forced him to sign a false confession admitting that he was a spy, which Farran did to avoid endangering his release. *Id.* (Farran Aff. ¶ 22). Shortly

thereafter, he was reunited with Darden, and the two were driven to the Sana'a airport and turned over to Omani officials. *Id.* (Farran Aff. ¶ 23).

Farran lost thirty-six pounds during his captivity. *Id.* at 5 (Farran Aff. ¶ 25). As a result of the beatings he sustained in captivity and his poor living conditions, he was unable to stand or walk normally for two years, and he continues to live with constant pain in both his shoulders and knees. *Id.* (Farran Aff. ¶¶ 25–26). He now needs surgery to repair part of his spine and at least one of his shoulders, *id.* (Farran Aff. ¶¶ 26–27), and had to have stents inserted into his heart due to the worsening of his heart condition in captivity, *id.* (Farran Aff. ¶ 28). To date, Farran suffers from mental and emotional trauma, problems sleeping, and flashbacks, which have caused problems with his career and tensions in his personal relationships. *Id.* (Farran Aff. ¶ 29).

## D.     Abduction and Detention of Wallead Luqman

In 2013, Wallead Luqman moved with his wife and children from the United States to Yemen. Dkt. 20-2 at 1 (Luqman Aff. ¶ 5). Luqman and his wife chose Yemen because his wife's extended family lived there and because they believed the trip would teach their children to "experienc[e] a simpler life, practice[e] [Islam] more closely, and . . . not . . . take their comfortable life in America for granted." *Id.* at 1–2 (Luqman Aff. ¶ 5). To support the family financially, Luqman took a job teaching English to Yemenis. *Id.*

As conditions throughout Yemen began to deteriorate in late 2014 and early 2015, the family decided to attempt to leave Sana'a and to return to the United States. *Id.* (Luqman Aff. ¶¶ 6–8). On April 4, 2015, they boarded a bus headed for Saudi Arabia, where they hoped to find a flight back to the United States. *Id.* (Luqman Aff. ¶ 9).

Midway through their ride, at approximately 2:00 a.m. on April 5, 2015, the bus stopped at a roadblock controlled by Houthi soldiers. *Id.* (Luqman Aff. ¶ 10). The soldiers, all armed, boarded the bus, took everyone's passports, and left. *Id.* at 2-3 (Luqman Aff. ¶¶ 10–11). After 15 minutes, they returned and demanded that five specific passengers, including Luqman, leave the bus with them. *Id.* at 3 (Luqman Aff. ¶ 11). Once off the bus, Luqman and the others were directed to hand over their cell phones and luggage. *Id.* They were then loaded into the back of a Land Rover and driven to a nearby police station. *Id.* (Luqman Aff. ¶ 12).

After several hours, the Houthi soldiers drove Luqman and the other detained passengers to a Houthi-controlled headquarters in the city of Harith in the Hajjah Governorate. *Id.* (Luqman Aff. ¶ 13). Luqman identified the facility as Houthi affiliated for several reasons: many of the soldiers wore patches indicating their allegiance to the Houthis, and the facility itself was covered in Houthi banners, paraphernalia, signs, logos and writings. *Id.* At this location, the Houthis interrogated Luqman for the first time. *Id*. (Luqman Aff. ¶ 14).

By the late afternoon, the Houthis released three of the five passengers, leaving only Luqman and another prisoner named Talal, who had been informally serving as Luqman's interpreter to the Houthis. *Id.* (Luqman Aff. ¶¶ 14–15). The local police chief visited later that evening. When Talal asked whether he could secure their release, the chief explained that he had no power to do so because the Houthis were in command. *Id.* (Luqman Aff. ¶ 15). At 2:00 a.m. the next morning, Houthi soldiers with large rifles and RPGs woke Talal and Luqman, loaded them into a Land Rover and drove them to a Houthi compound to the west of Sa'dah, where Luqman was interrogated a second time. *Id.* at 4 (Luqman Aff. ¶¶ 16–17).

The following day, the Houthis drove Luqman to a compound in the town of Sa'dah belonging to the Houthi-controlled Yemeni intelligence and internal security force, the Political

Security Organization ("PSO").  *Id.* (Luqman Aff. ¶ 17).  *See generally* Bureau of Democracy,

Hum. Rts. & Lab., U.S. Dep't of State, *Yemen 2019 Human Rights Report* 1 (2019),

https://www.state.gov/wp-content/uploads/2020/03/YEMEN-2019-HUMAN-RIGHTS-

REPORT.pdf ("The primary state security and intelligence-gathering entities [in Yemen], the

Political Security Organization (PSO) and the National Security Bureau (NSB), came under

Houthi control in 2014.").  Luqman was held at that compound from April 8, 2015, to April 20,

2015, during which time he was regularly interrogated by PSO officials, who demanded to know

about his family, why he was in Yemen, his political and religious affiliations, and his thoughts

on the Yemeni war, Saudi Arabia, and Iran.  *Id.* (Luqman Aff. ¶ 18).

On April 20, 2015, Luqman was transferred to a home that the Houthis had converted

into a prison compound.  *Id.* at 5 (Luqman Aff. ¶ 21).  At this facility, the Houthis forced

Luqman to sleep on a bare cement floor without padding, and he developed significant right knee

and right elbow pain and experienced extreme weight loss.  *Id.* (Luqman Aff. ¶ 23).  Luqman

was "interrogated formally once" and "informally interrogated numerous times."  *Id.*  The

Houthis also forced Luqman to drink water from fuel storage tanks, which caused him to contract

a severe urinary tract infection.  *Id.* (Luqman Aff. ¶ 22).  The Houthis eventually took Luqman to

a local hospital to receive treatment with IV antibiotics.  *Id.*

On June 21, 2015, Luqman was woken up in the middle of the night, blindfolded, and

driven a few miles to another Houthi prison, where he remained for about four months.  *Id.*

(Luqman Aff. ¶ 24).  Luqman experienced deplorable conditions at this facility.  His first few

nights, he was placed in a room that was so packed that everyone had to sleep in the fetal

position to fit.  *Id.*  The prison was infested with cockroaches, scorpions, and bed lice, and the

water was contaminated with fuel, rust, and microorganisms.  *Id.* at 6 (Luqman Aff. ¶ 27).  Once

every twenty days, the prisoners were permitted either to take a shower or to wash their clothing, but not both. *Id.* At one point, Luqman got into a fight, and he was forced to wear shackles around his ankles for months, causing him "severe pain, bruising, and skin infections." *Id.* (Luqman Aff. ¶ 28).

The Houthis permitted Luqman to make two phone calls at this prison, one to his mother, who did not pick up, and one to a colleague in Yemen, who Luqman asked to contact his wife. *Id.* (Luqman Aff. ¶¶ 25–26). When Luqman let it slip on the second call that he was being held in Sa'dah, however, the Houthis grabbed his phone and ended the call. *Id.* (Luqman Aff. ¶ 26).

On November 15, 2015, he was "intensely interrogated" for four hours while blindfolded and handcuffed. *Id.* (Luqman Aff. ¶ 29). Later that day, Luqman was loaded into a van and transferred to a new prison—a maximum-security facility called PSO Sana'a—where he spent the next year. *Id.* at 7 (Luqman Aff. ¶¶ 31, 33). Luqman was placed into a 7-feet-by-5-feet cell that he shared with another prisoner. *Id.* (Luqman Aff. ¶ 31).

At PSO Sana'a, Luqman was treated "much more harshly than before." *Id.* (Luqman Aff. ¶ 32). His Houthi captors interrogated him seventeen times. *Id.* For each session, he was blindfolded and handcuffed and routinely threatened with physical harm. *Id.* The guards would tighten Luqman's handcuffs to the maximum limit, cutting into the skin of his wrists. *Id.* They hit him on the back of the head and threatened him with a bent iron and shackles. *Id.*

During this time, Luqman conducted three hunger strikes. *Id.* (Luqman Aff. ¶ 33). The first lasted five days. The second lasted three days and ended when the guards promised Luqman that he could call his family. *Id.* When the warden reneged, however, Luqman began the third strike, which lasted seven days and caused him severe dehydration and malnourishment. *Id.* at 7–8 (Luqman Aff. ¶ 33). Finally, one of the guards "pleaded" with Luqman to end his

strike and to receive IV fluids at the infirmary, after which the guard promised he could contact his family.  *Id.* at 8 (Luqman Aff. ¶ 33).  Luqman did so and was allowed to call his wife.  *Id.*

On November 6, 2016, the Houthis removed Luqman from the prison and drove him to the Sana'a airport.  *Id.* (Luqman Aff. ¶ 37).  They interrogated Luqman one last time, demanding that he admit to being a member of the American military.  *Id.*  Eventually, Luqman's captors handed him over to an Omani delegation.  *Id.*

All told, Luqman spent 581 days in Houthi custody.  *Id.* (Luqman Aff. ¶ 38).  During that time, his weight dropped from 190 pounds to as low as 120 pounds.  *Id.*  To date, Luqman's physical strength has not returned to what it was before his detention.  *Id.*  The poor living conditions Luqman experienced during his captivity reaggravated a prior back injury and injured his right knee and right elbow, which now cause him pain on a daily basis, *id.* at 9 (Luqman Aff. ¶ 40), and he has developed chronic arthritic pain in his hands and feet that likely is permanent, *id.* (Luqman Aff. ¶ 39).

### III.  CONCLUSIONS OF LAW

Under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604, a foreign state, including its instrumentalities, is immune from suit in state or federal court unless the case falls within an express statutory exemption.  *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004).  For present purposes, the sole relevant exception is found in the "state-sponsored terrorism exception," 28 U.S.C. § 1605A, which both confers subject-matter jurisdiction to hear certain terrorism-related claims under state or federal law and recognizes a federal cause of action against those foreign states subject to the exception, *see Owens*, 864 F.3d at 764–65.  The FSIA also addresses personal jurisdiction and specifies

precise procedures that a plaintiff must follow—at times with the assistance of the Clerk of the Court and the U.S. Department of State—to effect service on a foreign state.  28 U.S.C. § 1608.

For different reasons, the Court must satisfy itself that an FSIA plaintiff has cleared each of these hurdles, even if the defendant fails to appear.  First, because the FSIA deprives courts of subject-matter jurisdiction in the absence of a relevant exception, a failure to appear does not waive the defense, and the courts are "obligated to consider *sua sponte*" whether they have jurisdiction to hear the case and to order any relief.  *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983) (even where a defendant foreign state does not appear, the Court "still must determine that immunity is unavailable").  Second, with respect to the substance of the plaintiff's state or federal law claims, the FSIA precludes courts from entering a default judgment against a foreign state unless satisfied that the plaintiff has established her right to relief.  28 U.S.C. § 1608(e); *see also Owens*, 864 F.3d at 784–86.  Third, because "the entry of default judgment is not automatic," courts must "satisfy [themselves] that [they have] personal jurisdiction before entering judgment against an absent defendant."  *Mwani*, 417 F.3d at 6.

Each of these inquiries implicates a slightly different standard of proof.  To establish subject-matter jurisdiction, an FSIA "plaintiff bears [the] initial burden of production to show an exception to immunity, such as § 1605A, applies," but, if the plaintiff does so, and the defendant does not appear, "jurisdiction attaches."  *Owens*, 864 F.3d at 784.  Having cleared this initial hurdle, however, "the plaintiff must still prove [her] case on the merits."  *Id.*  To do so, the plaintiff must "establish her right to relief, which does not "relieve[] the sovereign of the duty to defend" but, nonetheless, requires that the plaintiff offer admissible evidence sufficient to substantiate the essential elements of her claim.  *Id.* at 785–86 (quotation marks omitted).

Finally, to establish personal jurisdiction over a defaulting defendant, the plaintiff must make "a prima facie showing of [personal] jurisdiction." *Mwani*, 417 F.3d at 6–7.

## A.      Subject-Matter Jurisdiction and Liability for § 1605A(c) Claims

"[T]he [federal] district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" asserting any claim for relief in personam with respect which the foreign state is not entitled to immunity under" the FSIA.  28 U.S.C. § 1330(a).  The Court, accordingly, has subject-matter jurisdiction over the present "nonjury civil action" against Iran if, and only if, the conditions for the waiver of immunity found in 28 U.S.C. § 1605A are satisfied. As explained below, Plaintiffs have carried their burden of establishing the Court's subject-matter jurisdiction.

Under the state-sponsored terrorism exception, 28 U.S.C. § 1605A(a)(1), a foreign state is not immune from the jurisdiction of the federal and state courts in cases in which

> [1] money damages are sought against a foreign state [2] for personal injury or death [3] that was caused by [4] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is [5] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).  The exception, moreover, applies only to suits in which two requirements are met.  First, the claimant or victim must be a U.S. national, a member of the U.S. armed forces, or a U.S. government employee or contractor at the time the act of terrorism occurred.  *Id.* § 1605A(a)(2).  Second, the foreign state must be designated as a state sponsor of terrorism both at the time the act occurred (or was so designated as a result of the act) and at the

time the lawsuit was filed (or was so designated within the six-month period preceding the filing of the suit).[4]  *Id.*

Most of the conditions for subject-matter jurisdiction are easily addressed.  First, Plaintiffs seek only monetary relief.  *See* Dkt. 1 at 34–37 (Compl.).  Second, all of the claims seek to recover "for personal injury."  28 U.S.C. § 1605A(a)(1); Dkt. 1 at 34–37 (Compl.).  Third, Iran was designated as a state sponsor of terrorism in 1984, *see* 49 Fed. Reg. 2836-02 (Jan. 23, 1983) (statement of Secretary of State George P. Shultz), and has remained designated as a state sponsor of terrorism to this day, *see* U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm (last visited Mar. 1, 2022).  This longstanding designation of Iran as a state sponsor of terrorism is sufficient to satisfy the designation requirement.  *See* 28 U.S.C. § 1605A(a)(2)(A)(i)(I).  Fourth, at the time the relevant acts occurred, Coombs, Darden, Farran, and Luqman were all U.S. nationals.  Dkt. 20-1 at 1 (Coombs Aff. ¶ 2); Dkt. 20-2 at 1 (Luqman Aff. ¶ 2); Dkt. 20-3 at 1 (Farran Aff. ¶ 2); Dkt. 20-4 at 1 (Darden Aff. ¶ 2).

As a result, the only substantial jurisdictional question left for the Court is whether Plaintiffs' injuries were "caused by . . . act[s] of torture, . . . hostage taking, or the provision of material support or resources for such an act" by an "official, employee, or agent of" Iran.  28 U.S.C. § 1605A(a)(1).  For the reasons explained below, the Court concludes as follows: (1) the Houthis committed acts of "hostage taking" within the meaning of the International Convention Against the Taking of Hostages; (2) Iranian officials or their agents provided "material support

---

[4] Section 1605A(a)(2) also requires that the foreign state have received "a reasonable opportunity to arbitrate the claim," but only if the act of terrorism "occurred in the foreign state against which the claim has been brought."  28 U.S.C. § 1605A(a)(2)(A)(iii).  That requirement is inapplicable to the facts of this case because none of the alleged acts of terrorism occurred in Iran.

or resources" for these acts within the meaning of 18 U.S.C. § 2339A; and (3) Iran's provision of material support caused the injuries of Coombs, Darden, Farran, and Luqman, as well as the associated injuries suffered by their family members.  Plaintiffs, accordingly, have established that their claims fall within the state-sponsored terrorism exception of 28 U.S.C. § 1605A(a)(1).

       1.    *The Houthis' Acts of Hostage Taking*

The state-sponsored terrorism exception to the FSIA defines the terms "hostage taking," by reference to the Convention Against the Taking of Hostages, 1316 U.N.T.S. 205, and "torture" by reference to the Torture Victim Protection Act ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 (note)).  *See* 28 U.S.C. § 1605A(h)(2) & (7).  To support a finding of subject-matter jurisdiction, the Court need only find that one of the statutory acts was present as to each of the victims.  Dkt. 21 at 1; 28 U.S.C. § 1605A(a)(1); *see also* *Hamen*, 401 F. Supp. 3d 85, 101 (D.D.C. 2019).  As discussed below, the Court concludes that Coombs, Darden, Farran, and Luqman were all victims of hostage taking within the meaning of the Convention Against the Taking of Hostages.  As a result, the Court need not reach the question whether Plaintiffs were also victims of torture.

The FSIA's definition of "hostage taking" is borrowed from Article 1 of the International Convention Against the Taking of Hostages.  28 U.S.C. § 1605A(h).  Under that treaty, "hostage taking" means

> seiz[ing] or detain[ing] and threaten[ing] to kill, to injure or to continue to detain another person . . . in order to compel a third party, namely, a State, an international governmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage . . . .

International Convention Against the Taking of Hostages, art. 1, Dec. 17, 1979, 1316 U.N.T.S. 205 (emphases added).  Thus, to show that the hostage taker had the requisite purpose of detaining the individual, "the plaintiff must 'suggest[] [a] demand for *quid pro quo* terms

between . . . [the hostage-taker] and a third party whereby [the hostages] would have been released.'" *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 360 (D.C. Cir. 2006) (first and second alterations in original).

### a. The Hostage Taking of Casey Coombs

The Court finds that the Houthis committed an act of "hostage taking" when they seized and detained Casey Coombs.  Although Coombs came to the attention of the Houthis due to a rent dispute with his landlord, Plaintiffs have presented ample evidence that the Houthis intended to treat him as a bargaining chip and never mentioned the rent dispute again over the course of his abduction.  When Coombs first arrived at the prison known as The Grave, Haisam Farran— whose cell was 20 feet away—overheard the guards conversing in Arabic about Coombs. Farran recalls hearing the guards say that "they were holding [Coombs] with the rest of the Americans to be used as a bargaining tool," and they accused Coombs "of working with the CIA and of being a spy."  Dkt. 21-2 at 2 (Farran Suppl. Aff. ¶ 7).  Coombs himself remembers the Houthis interrogating him for hours and accusing him "of being everything from a member of al-Qaeda to a CIA spy," Dkt. 20-1 at 3 (Coombs Aff. ¶ 21), but "[t]he $100 in late rent claimed by [his] landlord never came up," Dkt. 21-1 at 3 (Coombs Suppl. Aff. ¶ 9).

The initial progression of Coombs's abduction also fits with the expert testimony in the *Hamen* case concerning Houthi hostage taking techniques.  Coombs was initially seized by armed Houthi teenagers who escorted him to the local police station.  Dkt. 20-1 at 3 (Coombs Aff. ¶ 12).  Shortly thereafter, the Houthis and police took Coombs to meet the English-speaking, older man who did not look Yemeni and who appeared to be in command of the situation.  *Id.* (Coombs Aff. ¶¶ 15–16).  Plaintiffs' expert opined that this man was likely an "embedded advisor[]" from Hezbollah or the Iranian Qods Force.  Dkt. 21-3 at 2 (Pregent Suppl. Aff. ¶ 6). This fits with the expert testimony presented in *Hamen*, which established (1) that Iran would

have been notified very shortly after an American victim was taken into Houthi custody; (2) that

the Houthis could not have "h[e]ld Americans without the IRGC-Qods Force allowing it;" and

(3) that the Qods Force "would have pressured the Houthis to release [the captured Americans]

that day" if they did not support a kidnapping.  *Hamen*, No. 16-cv-1394, Dkt. 49 at 20–22

(Pregent).

Aspects of Coombs's detention and release also share important similarities with the

kidnappings of the other victims in this case.  First, Coombs was repeatedly "asked to confess

that [he] was a foreign intelligence agent" even though the Houthi political arm had already

confirmed that he was a "harmless journalist."  Dkt. 21-1 at 2–3 (Coombs Suppl. Aff. ¶¶ 5, 9).

Plaintiffs submitted evidence that this kind of demand is "common hostage protocol" for the

Houthis because those admissions "increase the value of [hostages] either to procure a ransom or

to score a propaganda victory-and-ransom combination."  Dkt. 21-3 at (Pregent Suppl. Aff. ¶ 4).

Second, in keeping with Hezbollah's hostage-taking tactics, Coombs was a lower profile

American and not a high ranking official or diplomat whose abduction would trigger a military

response.  *See Hamen*, No. 16-cv-1394, Dkt. 49 at 16–17 (Pregent).  And, third, when Coombs

was eventually released, the Houthis drove him to the Sana'a airport and handed him over to a

delegation from Oman.  That release scenario fits a pattern applicable to all four victims.  *See*

Dkt. 21-2 at 2 (Farran Suppl. Aff. ¶ 9); Dkt. 20-1 at 6 (Coombs Aff. ¶ 27); Dkt. 20-2 at 8

(Luqman Aff. ¶ 37); Dkt. 20-3 at 4–5 (Farran Aff. ¶ 23); Dkt. 20-4 at 3 (Darden Aff. ¶ 16).

The possibility that Coombs's release might, ultimately, have been motivated by his

severe injuries, rather than a *quid pro quo* exchange, does not render his detention any less of a

hostage taking.  Under Article 1 of the International Convention Against the Taking of Hostages,

an "[a]ttempt[] to commit an act of hostage taking" qualifies as an offense for the purposes of the

Convention, just as much as a completed hostage taking.  1316 U.N.T.S. at 207.  And it is enough to establish a hostage taking if the "*intended purpose* of the detention [was] to accomplish the sort of third-party compulsion described in the [C]onvention." *Simpson*, 470 F.3d at 359; *see also Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 94 (D.C. Cir. 2002).  That is, a plaintiff need not show that such an exchange was, in fact, consummated. Under this standard, Coombs has done enough to meet his burden.

It bears note, moreover, that Coombs's beating occurred spontaneously, and thus, the Houthis officials may not have intended his injuries to be life-threatening.  If anything, the fact that they took Coombs to the hospital afterward demonstrates that Coombs had value to the Houthis alive.  Plaintiffs' evidence also suggests that the Houthis agreed to released Coombs only when it seemed that he would die if he did not receive immediate, specialized medical attention, and otherwise the Houthis would have continued to detain him.  *See* Dkt. 20-1 at 6 (Coombs Aff. ¶ 26).

Finally, Plaintiffs have pointed to evidence in the *Hamen* record that Houthi guards holding the plaintiffs in that case bragged that they were detaining two Americans and would get "something in exchange [for them], *as they had done before*."  *Hamen*, No. 16-cv-1394, Dkt. 46-1 at 41–42, 44 (Al-Juanid Dep.) (emphasis added).  It is likely that this was a reference to Coombs, Darden, and Farran, who had already been released by the time the Hamen plaintiffs were abducted; indeed, Plaintiffs assert that Coombs, Darden, and Farran "were the only three detained Americans known to have been released by the Houthis prior to that guard's statement." Dkt. 21 at 8.

Based on this evidence, the Court finds that the Houthis committed "hostage taking" within the meaning of the International Convention Against the Taking of Hostages with respect to Casey Coombs.

### b.   The Hostage Taking of Scott Darden and Haisam Farran

For many of the same reasons, the Court finds that the Houthis committed an act of "hostage taking" when they seized and detained Scott Darden and Haisam Farran.  Like Coombs, Darden and Farran were both imprisoned at The Grave, where Farran overheard the guards say that the "American prisoners" were being kept "as hostages for negotiation" and to deter Saudi-led coalition forces from bombarding the prison.  Dkt. 21-2 at 1–2 (Farran Suppl. Aff. ¶¶ 3–5).  Farran was also repeatedly interrogated by his Houthi captors, who accused him of being a spy and demanded that he confess to such.  Dkt. 20-3 at 4 (Farran Aff. ¶ 22).  Furthermore, as contractors, Darden and Farran fit the Hezbollah-backed tactic of abducting lower-profile Americans.  *See Hamen*, No. 16-cv-1394, Dkt. 49 at 16–17 (Pregent).  And, like Coombs and Luqman, when Darden and Farran were released, they were taken to the Sana'a airport and handed over to an Omani delegation.  *See* Dkt. 21-2 at 2 (Farran Suppl. Aff. ¶ 9); Dkt. 20-3 at 4–5 (Farran Aff. ¶ 23); Dkt. 20-4 at 3 (Darden Aff. ¶ 16); Dkt. 20-1 at 6 (Coombs Aff. ¶ 27); Dkt. 20-2 at 8 (Luqman Aff. ¶ 37).  In short, the abduction and detention of Darden and Farran fits the same pattern as what happened to Coombs, and it appears that they were held longer than he was simply because they did not have life-threatening injuries that undermined their value as hostages.

### c.   The Hostage Taking of Wallead Luqman

The Court further finds that the Houthis committed an act of "hostage taking" when they abducted and detained Wallead Luqman.  Plaintiffs' evidence shows that Luqman was specifically targeted because of his U.S. citizenship.  The Houthis directed Luqman to disembark

his bus after collecting and reviewing his passport and then, during his captivity, interrogated him about his reasons for living in Yemen and accused him of working for the American military.  Dkt. 20-2 at 2–3, 4, 8 (Luqman Aff. ¶¶ 10–11, 18, 37).  Luqman's detention and release, moreover, was similar to that of his co-plaintiffs in important respects:  As with Coombs and Farran, the Houthis demanded that Luqman confess to being an American official.  *Id.* at 8 (Luqman Aff. ¶ 37).  And, like all three of his co-plaintiffs, Luqman was a low-profile American and was eventually released to an Omani delegation at the Sana'a airport.  *Id.*  As with Coombs, moreover, the Houthis' administration of medical care to Luqman demonstrates that Luqman had value to them alive; they took him to a hospital, for example, when he contracted a urinary tract infection and pleaded with him to end his hunger strike and receive medical treatment.  *Id.* at 5, 8 (Luqman Aff. ¶¶ 22, 33).  Finally, the length of time that the Houthis held Luqman—581 days— strongly suggests that the Houthis were holding out in hopes of receiving some quid pro quo for his release.

        2.    *Iran's Provision of Material Support for the Houthis' Acts of Hostage Taking*

        The Court further concludes that Iran provided the Houthis with material support for the acts described above. The FSIA's definition of "material support or resources" is borrowed from 18 U.S.C. § 2339A, which defines "material support or resources" in relevant part as

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).  The evidence set forth above demonstrates that Iran provided "material support or resources" to the Houthi militants in the form of weapons, financial support, and training, both directly and indirectly through Hezbollah.  *See generally supra* Part II.A.3. The *Hamen* record contains a litany of evidence that Iran provided the Houthis with weaponry

since at least 2009.  Dkt. 20-5 at 4 (Pregent Aff. ¶ 15); *Hamen*, No. 16-cv-1394, Dkt. 49 at 63–66

(Green); *id* at 10–14 (Pregent).  That evidence also shows that Iran provided financial assistance

to the Houthis through Hezbollah.  Dkt. 20-5 at 4 (Pregent Aff. ¶ 15); *Hamen*, No. 16-cv-1394,

Dkt. 48 at 187–91 (Pregent); *Hamen*, No. 16-cv-1394, Ex. 11 at 1.  And, finally, Iran assigned a

Qods Force officer as the leader of its efforts to "advice, assist, resource, and train the Houthis,"

*Hamen*, No. 16-cv-1394, Dkt. 32-4 at 8 (Green Aff. ¶ 32); *Hamen*, No. 16-cv-1394, Dkt. 49 at

53, 64, 96 (Green); *see also* Dkt. 20-5 at 4 (Pregent Aff. ¶ 19), and facilitated the Houthis'

training with Hezbollah's Unit 3800 in Yemen, Lebanon, Syria, and Iraq, *Hamen*, No. 16-cv-

1394, Dkt. 49 at 96 (Green); *Hamen*, No. 16-cv-1394, Dkt. 48 at 191 (Pregent); *see also* Dkt. 20-

5 at 4 (Pregent Aff. ¶ 19).

Plaintiffs have also offered evidence that, without Iranian financial, military, and political

support, the Houthis would not have been able to exert power or control outside of their home

province of Saada; would not have been able to seize or maintain control of the capital city of

Sana'a; and, most importantly, would not have developed and implemented the tactic of taking

foreign nationals hostage.  Dkt. 20-5 at 4, 7–8 (Compl. ¶¶ 15, 19, 29, 30, 33); *Hamen*, No. 16-cv-

1394, Dkt. 49 at 112 (Green); *id.* at 20–22 (Pregent).  Even more to the point, Plaintiffs have

offered evidence that, without Iran's backing, the Houthis would not have attempted to kidnap an

American, nor would they have been able to do so without Iran's support.  *Hamen*, No. 16-cv-

1394, Dkt. 49 at 16–17 (Pregent); *id.* at 69 (Green).

     3.   *Causation*

The only remaining requirement for finding a waiver of sovereign immunity under

§ 1605A is a showing that the injuries were "caused by" Iran's provision of material support to

the Houthis.  28 U.S.C. § 1605A(a)(1).  The D.C. Circuit has held that this statutory language,

37

like the similar language that previously appeared in 28 U.S.C. § 1605(a)(7) (repealed), "requires a causal connection" as a jurisdictional prerequisite to suit. *Kilburn*, 276 F.3d at 1127. The court of appeals has rejected the contention that the plaintiff need establish "but for" causation, however, and has held that the statute "require[s] only a showing of 'proximate cause.'" *Id.* at 1128. An FSIA plaintiff, accordingly, need not show that the defendant state "specifically knew of or intended its support to cause" a *particular* terrorist act. *Owens*, 864 F.3d at 798.

Under long-established law, proximate cause requires "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Kilburn*, 376 F.3d at 1128 (quoting Prosser & Keeton on the Law of Torts 263 (5th ed. 1984)). The proximate cause inquiry "contains two similar but distinct elements." *Kilburn*, 376 F.3d at 1128. First, Plaintiffs must show that Iran's provision of support to the Houthis was "a 'substantial factor' in the sequence of events that led to the" hostage takings of Coombs, Darden, Farran, and Luqman. *Id.* (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)). Second, Plaintiffs must establish that the kidnappings were "'reasonably foreseeable or anticipated as a natural consequence' of [Iran's] conduct." *Id.* (quoting *Rothstein*, 708 F.3d at 91).

The Court finds that there is sufficient evidence in the record to satisfy this standard. The support Iran provided the Houthis was not only a "substantial factor" but a necessary precondition to the Houthis taking Coombs, Darden, Farran, and Luqman hostage. Without Iran's support, the Houthis would not have had control in early 2015 of Sana'a, Dkt. 20-5 at 7 (Pregent Aff. ¶¶ 30, 31); *Hamen*, No. 16-cv-1394, Dkt. 49 at 53–54, 112 (Green); *id.* at 20–22 (Pregent), where Coombs, Darden, and Farran were kidnapped and where all four plaintiffs were detained, Dkt. 21-2 at 1, 2 (Farran Suppl. Aff. ¶¶ 1–2, 6); Dkt. 20-1 at 2 (Coombs Aff. ¶ 12); Dkt. 20-2 at 7 (Luqman Aff. ¶ 31); Dkt. 20-3 at 2–3 (Farran Aff. ¶¶ 7–12); Dkt. 20-4 at 2

(Darden Aff. ¶¶ 7–9).  Prior to receiving Iran's support the Houthis were "localized" to their home province, *Hamen*, No. 16-cv-1394, Dkt. 49 at 44 (Green), and would not have had the resources to seize Sana'a or to control wide swaths of the country such that they would have been able to kidnap Luqman at a road block near the Saudi Arabian border, *id.* at 53–54 (Green); Dkt. 20-2 at 2–3 (Luqman Aff. ¶¶ 9–13).  In short, Iran's support put the Houthis in a position of power to commit acts of terrorism like the ones at issue in this case.

Beyond increasing the Houthis' influence in Yemen, Iran also provided the training and political backing necessary to enable and to embolden the Houthis to target and to kidnap Americans and to negotiate for their release.  The record indicates that the Qods Force, either directly or through Hezbollah, "exports" to its proxies a "collection of behaviors[,] tactics, and capabilities," *Hamen*, No. 16-cv-1394, Dkt. 49 at 111 (Green), which includes training in "targeted hostage taking[] and kidnapping[]," Dkt. 20-5 at 4 (Pregent Aff. ¶ 17); *see also Hamen*, No. 16-cv-1394, Dkt. 48 at 182–83 (Pregent), and, in particular, the "taking of international hostages," *Hamen*, No. 16-cv-1394, Dkt. 49 at 107 (Green); *see also* Dkt. 20-5 at 4 (Pregent Aff. ¶¶ 17, 18).  There is also evidence that the Houthis have adopted the full range of those tactics, *see Hamen*, No. 16-cv-1394, Dkt. 49 at 96–107 (Green), including abducting 982 people for ransom and engaging in 796 documented cases of torture between September 2014 and August 2015, *id.* at 101 (Green); *Hamen*, No. 16-cv-1394, Ex. 39 at 4–5, 16.  Plaintiff's expert has attested, moreover, that the "manner in which the victims in this case were detained, treated, and interrogated is consistent with the training and direction that the Houthis received from Hezbollah and the [Qods Force]."  Dkt. 20-5 at 7 (Pregent Aff. ¶ 32).

In addition to training, Iran has provided the political backing and tactical support necessary for the Houthis to execute a high-stakes abduction of Americans.  The experts in

*Hamen* testified that, due to the risk and complexity of kidnapping Americans and bargaining for their release, the Houthis would not have attempted to do so without the support of Iran, *Hamen*, No. 16-cv-1394, Dkt. 49 at 69 (Green); *id.* at 16–17, 21–22 (Pregent), and that Iran would have been made aware of any hostage-taking the Houthis carried out, *id.* at 21–22 (Pregent).  Even more to the point, the record indicates that the Qods Force encourages its proxies to kidnap Americans by providing "kidnapping incentives" in the form of a "bounty or reward for . . . high value targets."  *Hamen*, No. 16-cv-1394, Dkt. 48 at 191–92 (Pregent); *Hamen*, No. 16-cv-1394, Dkt. 49 at 22 (Pregent).  And, from Iran's perspective, the "highest value target [a proxy] can kidnap would be an American."  *Hamen*, No. 16-cv-1394, Dkt. 48 at 192 (Pregent).

Casey Coombs attests that, when he was initially abducted, his captors took him to an "older man" who "did not look Yemeni" and "spoke very clear English with a subtle accent." Dkt. 20-1 at 3 (Coombs Aff. ¶ 15–16).  According to Coombs, this man issued "order[s]" to the "police and soldiers" which they "obeyed immediately," *id.* (Coombs Aff. ¶ 15), and, at the man's direction, the soldiers placed Coombs in handcuffs and took him to a prison, *id.* (Coombs Aff. ¶ 15).  Based on this description, Plaintiffs' expert opined that "this man was most likely one of the embedded advisors providing advice and training to the Houthis by Hezbollah" or "the Quds Force."  Dkt. 21-3 at 2 (Pregent Suppl. Aff. ¶ 6).

The Court finds, accordingly, that Iran's support was a "substantial factor" in the hostage takings of Coombs, Darden, Farran, and Luqman.

For similar reasons, the hostage takings of Coombs, Darden, Farran, and Luqman were "'reasonably foreseeable or anticipated as a natural consequence' of [Iran's] material support." *Owens*, 864 F.3d at 798 (quoting *Rothstein*, 708 F.3d at 91).  In assessing reasonable foreseeability, the Court must consider "the broader context" of Iran's conduct.  *Id.*  In this

respect, it is clear that Iran's assistance made it possible for the Houthis—a militant group that chants "Death to America" and has a history of kidnapping local dissenters and holding them for ransom—to become a regional power and to assume a position of control where it could execute abductions of U.S. citizens.  In the years preceding the abductions of Coombs, Darden, Farran, and Luqman, moreover, Iran provided training (either directly or through Hezbollah), which included training in "targeted hostage taking[] and kidnapping[]," Dkt. 20-5 at 4 (Pregent Aff. ¶ 17); *see also Hamen*, No. 16-cv-1394, Dkt. 48 at 182–83 (Pregent), and, in particular, the "taking of international hostages," *Hamen*, No. 16-cv-1394, Dkt. 49 at 107 (Green); *see also* Dkt. 20-5 at 4 (Pregent Aff. ¶¶ 17, 18).  Iran also encourages their proxies to kidnap Americans. *Hamen*, No. 16-cv-1394, Dkt. 48 at 191–92 (Pregent); *Hamen*, No. 16-cv-1394, Dkt. 49 at 22 (Pregent).  That one of Iran's proxies acted to abduct and detain Americans is not only a reasonably foreseeable natural consequence, but a desired result of Iran's training and directives. Finally, although specific intent is not required to establish causation, *Owens*, 864 F.3d at 798, Plaintiffs have submitted evidence that, even if Iran had not been involved at "the hour of the kidnapping," it would have been notified once the victims were in the custody of the Houthis, and the Houthis could not have "h[e]ld Americans without the IRGC-Qods Force allowing it" to do so.  *Hamen*, No. 16-cv-1394, Dkt. 49 at 20–22 (Pregent); *see also id.* at 69 (Green).  Indeed, the expert testimony in *Hamen* indicated that, if the Qods Force did not support a kidnapping, "they would have pressured the Houthis to release [the captured Americans] that day."  *Hamen*, No. 16-cv-1394, Dkt. 49 at 20–22 (Pregent).  The Houthi soldiers' presentation of Coombs to the older, English-speaking man who "did not look Yemeni" and who issued orders to the Houthi soldiers, Dkt. 20-1 at 3 (Coombs Aff. ¶ 15–16), fits within this pattern and further evinces the likely involvement of Iran or Hezbollah, Dkt. 21-3 at 6 (Pregent Suppl. Aff. ¶ 6).

Having determined that Iran provided material support for the Houthis and that this support "caused" the hostage taking of Coombs, Darden, Farran, and Luqman, the Court finds that this case falls squarely within the state-sponsored terrorism exception to the FSIA.[5]  *See* 28 U.S.C. § 1605A(a)(1).  As a result, the Islamic Republic of Iran is not entitled to foreign sovereign immunity, and the Court possesses subject-matter jurisdiction over Plaintiffs' claims. *See* 28 U.S.C. §§ 1330(a), 1605A(a)(1).

4.    *Federal Cause of Action*

Having concluded that the Court possesses subject-matter jurisdiction, little else is required to show that Plaintiffs are entitled to relief under the federal cause of action the Congress enacted in 2008 as part of the National Defense Authorization Act, Pub. L. No. 110-181, § 1083, 122 Stat. 338–44 (2008) (codified at 28 U.S.C. § 1605A(c)).  There is almost total "overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017), and a plaintiff who offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law—with one minor exception.  For the "personal injury or death caused by" any of the acts described in the state-sponsor of terror waiver of foreign sovereign immunity and over "which the courts of the United States may maintain jurisdiction under [§ 1605A] for money damages," 28 U.S.C. § 1605A(c), a foreign state designated as a sponsor of terrorism is liable only to "a national of the United States," "a member of the armed forces," "an employee [or contractor] of the [U.S.]

---

[5] The fact that most of the Plaintiffs in this case are "third-party claimant[s]" rather than "the legal representative[s] of [the] victim[s] [who were] physically injured" does not divest this Court of subject-matter jurisdiction.  *Owens*, 864 F.3d at 807.  "Who in particular may bring a claim against a foreign sovereign is a question of substantive law, wholly separate from the question of [federal courts'] jurisdiction." *Id.*

Government . . . acting within the scope of the employee's employment," or "the legal representative of" any such person. *Id.* Because Plaintiffs are all U.S. nationals or representatives of U.S. nationals, Dkt. 20-1 (Coombs Aff. ¶¶ 2–3); Dkt. 20-2 (Luqman Aff. ¶¶ 2–3); Dkt. 20-3 (Farran Aff. ¶¶ 2–3); Dkt. 20-4 (Darden Aff. ¶¶ 2–3), Plaintiffs have, for the reasons described above, carried their burden of demonstrating that they are entitled to relief under § 1605A(c).

## B.    Personal Jurisdiction

The Court also finds that it has personal jurisdiction over the Islamic Republic of Iran. Under the FSIA, the Court has personal jurisdiction over a foreign state "as to every claim for relief over which the [Court] ha[s] jurisdiction . . . where service has been made under section 1608." 28 U.S.C. § 1330(b). Thus, "[i]n order to sue a foreign state or one of its political subdivisions, a plaintiff must effect service in compliance with" 28 U.S.C. § 1608(a). *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015).

Section 1608(a) sets forth four methods of service in descending order of preference:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned; or

(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of

the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).

The first two mechanisms of effecting service—by delivery of the summons and complaint either "in accordance with any special arrangement for service between the plaintiff and the foreign state" under § 1608(a)(1) or "in accordance with an applicable international convention on service of judicial documents" under § 1608(a)(2)—were unavailable to Plaintiffs in this case. No "special arrangement" governs service between Plaintiffs and Iran, and "Iran is not party to an 'international convention on service of judicial documents,'" *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008) (citations omitted).

As a result, Plaintiffs attempted service under the third alternative, which requires service by mail from the Clerk of the Court to the head of the ministry of foreign affairs of the foreign state. 28 U.S.C. § 1608(a)(3). On December 12, 2019, Plaintiffs initiated service to Iran under § 1608(a)(3). Dkt. 8. The Clerk of Court mailed the relevant documents to Iran on December 23, 2019. Dkt. 10. On January 24, 2020, Plaintiffs notified the Court that "thirty days ha[d] passed and the materials ha[d] not been delivered." Dkt. 11 at 2; *see* 28 U.S.C. § 1608(a)(4).

Finally, Plaintiffs served Defendants under § 1608(a)(4). Dkt. 13. That provision requires service by mail from the Clerk of Court to the Secretary of State, who must then transmit the required material through diplomatic channels to the foreign state. 28 U.S.C. § 1608(a)(4). The Department of State must then send "the Clerk of the Court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.* Plaintiffs provided the Clerk with the relevant documents and requested service pursuant to § 1608(a)(4) on January 24, 2020. Dkt. 11. The Clerk mailed these materials to the State Department on January 30, 2020.

Dkt. 13.  On October 7, 2020, the Department of State notified the Clerk that the documents had been served on Iran.  Dkt. 15; *see also* Dkt. 17 at 2.  Because the United States does not maintain diplomatic relations with the government of Iran, the documents were transmitted to the Embassy of Switzerland in Iran, which then transmitted the materials to the Iranian Ministry of Foreign Affairs on July 14, 2020.  Dkt. 15 at 1, 7–8.  The Swiss Embassy reported that the Iranian Ministry "refused" to accept the documents.  *Id.* at 8.  After the Islamic Republic of Iran failed to respond, the Clerk entered a default.  Dkt. 18.

Plaintiffs' efforts to serve Iran satisfied the requirements of § 1608(a)(4).  Because Plaintiffs accomplished service under 28 U.S.C. § 1608(a)(4) on the Islamic Republic of Iran, the Court possesses personal jurisdiction over Defendant.  *See* 28 U.S.C. § 1330(b).

Accordingly, Plaintiffs have established their right to relief under 28 U.S.C. § 1605A(c).

## CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** Plaintiffs' motion for default judgment, Dkt. 19.  The Court will also enter a separate order appointing a Special Master to consider Plaintiffs' damages claims and to report to the Court regarding the appropriate award.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 10, 2022